## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a Member
of the U.S. House of Representatives,
2400 Rayburn House Office Building
Washington, D.C. 20515,

ADRIANO ESPAILLAT, in his official capacity as
a Member of the U.S. House of Representatives,
2332 Rayburn House Office Building
Washington, D.C. 20515,

BENNIE G. THOMPSON, in his official capacity
as a Member of the U.S. House of Representatives,
2466 Rayburn House Office Building
Washington, D.C. 20515,

JAMIE RASKIN, in his official capacity as a
Member of the U.S. House of Representatives,
2242 Rayburn House Office Building
Washington, D.C. 20515,

ROBERT GARCIA, in his official capacity as a
Member of the U.S. House of Representatives,
109 Cannon House Office Building
Washington, D.C. 20515,

J. LUIS CORREA, in his official capacity as a
Member of the U.S. House of Representatives,
2082 Rayburn House Office Building
Washington, D.C. 20515,

JASON CROW, in his official capacity as a
Member of the U.S. House of Representatives,
1323 Longworth House Office Building
Washington, D.C. 20515,

VERONICA ESCOBAR, in her official capacity as
a Member of the U.S. House of Representatives,
2448 Rayburn House Office Building
Washington, D.C. 20515,

DANIEL S. GOLDMAN, in his official capacity as
a Member of the U.S. House of Representatives,
245 Cannon House Office Building
Washington, D.C. 20515,

Case No. 1:25-cv-2463

JIMMY GOMEZ, in his official capacity as a
Member of the U.S. House of Representatives,
506 Cannon House Office Building
Washington, D.C. 20515,

RAUL RUIZ, in his official capacity as a Member
of the U.S. House of Representatives,
2342 Rayburn House Office Building
Washington, D.C. 20515,

NORMA TORRES, in her official capacity as a
Member of the U.S. House of Representatives,
2227 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St. SW
Washington, D.C. 20536,

TODD M. LYONS, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
500 12th St. SW
Washington, D.C. 20536,

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

                    *Defendants*.

**COMPLAINT**

## INTRODUCTION

1.      As part of its campaign of mass deportation, the Trump-Vance administration has stretched the U.S. immigration detention system far beyond its capacity. More people are being held by the United States in immigration detention than ever before, with many facilities housing more individuals than they were built to contain. Reports of mistreatment have been widespread and have included disturbing details of overcrowding, food shortages, lack of adequate medical care, and unsanitary conditions. At least eleven people have died in immigration custody in just the first six months of this administration. And American citizens have been unlawfully detained by immigration enforcement, in some instances without access to counsel.

2.      Against this backdrop, individual members of the U.S. Congress have an essential role to play in oversight of the U.S. Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) detention facilities, in the course of the members' legislative work on behalf of the American people. This oversight informs potential legislation on the subject of immigration detention, ensures that administration officials are carrying out their responsibilities consistent with federal law, and ensures that funds appropriated to DHS and ICE are being used appropriately on the ground.

3.      Members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." *Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) (quoting *Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985)).

4.      The authority of members of Congress "to secure needed information . . . is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 591 U.S.

848, 862 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161, 174) (1927)). Indeed, "[i]t is the proper duty" of the people's representatives "to look diligently into every affair of government and to talk much about what [they] see[]," because "[u]nless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *United States v. Rumely*, 345 U.S. 41, 43 (1953) (quoting Woodrow Wilson, *Congressional Government* 303–04 (1885)).

5.      Since 2019, Congress and the President have agreed that individual members of Congress must have the right to visit any DHS facilities that detain or house individuals. They have determined that the need to conduct real-time oversight of the true conditions of these facilities means that members must not be required to provide advance notice of their visits. Congress has passed bills to ensure this critical access, and Presidents of both parties have signed those bills into law.

6.      Each year since 2019, Congress has adopted statutory provisions providing that no funds appropriated to DHS "may be used to prevent" "[a] Member of Congress" "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Further Consolidated Appropriations Act, 2024 ("FY2024 Appropriations Act"), div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024), as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Resolution"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11, 12 (Mar. 15, 2025); *see* Consolidated Appropriations Act, 2020, div. D, title V, § 532, Pub. L. No. 116-93, 133 Stat. 2317, 2530 (Dec. 20, 2019). Section 527 of the fiscal year 2024 DHS appropriations bill, as incorporated by the fiscal year 2025 Continuing Resolution, specifically provides that it may not "be construed to require a Member of Congress to provide prior notice of the intent to enter a

[DHS] facility" used to detain or otherwise house noncitizens "for the purpose of conducting oversight." FY2024 Appropriations Act, div. C, title V, § 527(b), 138 Stat. at 619.

7.    Nevertheless, since June 2025, each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding section 527.

8.    Defendants have adopted a new policy and practice (the "oversight visit policy"), without any congressional revision to the text of section 527, that purports to require notice "a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities," absent authorization by the secretary of DHS. Despite the clear statutory text requiring congressional access to *any* "facility used to detain or otherwise house aliens," Defendants' new oversight visit policy and practice also deems certain DHS facilities, including ICE field offices, off-limits for congressional oversight even when they are used for detention.

9.    Defendants' new oversight visit policy is unlawful.

10.    Plaintiffs, 12 members of the U.S. House of Representatives, bring this action against Defendants ICE and its acting director, Todd M. Lyons, and DHS and its secretary, Kristi Noem, to obtain relief from Defendants' unlawful obstruction of Plaintiffs' attempts to obtain information through visits to ICE facilities for congressional oversight purposes.

11.    By denying Plaintiffs' attempts to obtain information through in-person oversight visits to DHS facilities, Defendants have acted and are acting *ultra vires*, contrary to law, in excess of statutory authority, and in an arbitrary and capricious manner.

12.    These illegal actions have harmed each Plaintiff's right as an individual member of Congress to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention. These harms are significant, irreparable, and ongoing as long as Defendants continue to block such visits pursuant to their unlawful policy.

13.    Adherence to the rule of law requires that Plaintiffs be permitted to conduct their congressionally authorized oversight activities, notwithstanding DHS's unlawful efforts to thwart scrutiny of its facilities.

## JURISDICTION AND VENUE

14.    The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*

15.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

16.    Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because Defendants reside in this district.

## THE PARTIES

17.    Plaintiff Joe Neguse is a duly elected member of Congress representing the 2nd congressional district in Colorado. He sues in his official capacity as an individual member of Congress.

18.     Plaintiff Adriano Espaillat is a duly elected member of Congress representing the 13th congressional district in New York. He sues in his official capacity as an individual member of Congress.

19.     Plaintiff Bennie G. Thompson is a duly elected member of Congress representing the 2nd congressional district in Mississippi. He sues in his official capacity as an individual member of Congress.

20.     Plaintiff Jamie Raskin is a duly elected member of Congress representing the 8th congressional district in Maryland. He sues in his official capacity as an individual member of Congress.

21.     Plaintiff Robert Garcia is a duly elected member of Congress representing the 42nd congressional district in California. He sues in his official capacity as an individual member of Congress.

22.     Plaintiff J. Luis Correa is a duly elected member of Congress representing the 46th congressional district in California. He sues in his official capacity as an individual member of Congress.

23.     Plaintiff Jason Crow is a duly elected member of Congress representing the 6th congressional district in Colorado. He sues in his official capacity as an individual member of Congress.

24.     Plaintiff Veronica Escobar is a duly elected member of Congress representing the 16th congressional district in Texas. She sues in her official capacity as an individual member of Congress.

25.     Plaintiff Daniel S. Goldman is a duly elected member of Congress representing the 10th congressional district in New York. He sues in his official capacity as an individual member of Congress.

26.     Plaintiff Jimmy Gomez is a duly elected member of Congress representing the 34th congressional district in California. He sues in his official capacity as an individual member of Congress.

27.     Plaintiff Raul Ruiz is a duly elected member of Congress representing the 25th congressional district in California. He sues in his official capacity as an individual member of Congress.

28.     Plaintiff Norma Torres is a duly elected member of Congress representing the 35th congressional district in California. She sues in her official capacity as an individual member of Congress.

29.     Defendant ICE is a component of DHS, a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is headquartered in Washington, D.C.

30.     Defendant Todd M. Lyons is the acting director of ICE. He is sued in his official capacity.

31.     Defendant DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is headquartered in Washington, D.C.

32.     Defendant Kristi Noem is the secretary of DHS. She is sued in her official capacity.

## BACKGROUND

### I.    Congressional Oversight Power

33.     "From the earliest times in its history, the Congress has assiduously performed an informing function" that permits members of Congress "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (quotation marks omitted). The Supreme Court has long recognized that "the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is

intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. The power to "secure needed information" is thus firmly grounded in Congress's duty and authority to exercise "[a]ll legislative powers" under article I of the U.S. Constitution. *Id.* at 160–61.

34.     This power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). It "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars*, 591 U.S. at 862 (quoting *Watkins*, 354 U.S. at 187).

35.     Congress exercises its investigative duty and authority in various ways. Through its committees, for example, it regularly requests and, when necessary, compels documents and testimony, including from executive branch officials. Individual members of Congress play distinct oversight roles, and "each member needs accurate information from the executive branch in order to make informed decisions on all sorts of matters."[1] Those matters vary by member, according to the concerns of their constituents, their committee memberships, and their issue areas of focus. For example, pursuant to their individual oversight roles, members of Congress regularly write letters raising concerns to and requesting information from executive branch officials, and they seek information on the ground through in-person investigations.[2]

---

[1] *See, e.g.*, Press Release, Sen. Charles Grassley, Grassley on the Importance and Responsibility of Congressional Oversight (June 25, 2018), https://perma.cc/N687-4XQC.

[2] *See, e.g.*, Levin Center for Oversight and Democracy, *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, & Abuse in World War II*, https://perma.cc/4EJU-Z6Y4; Press Release, Sen. Charles Grassley, Grassley to Gates: Defense IG Audits Need Changes in order to Root Out Waste (Sept. 8, 2010), https://perma.cc/QH83-HUX2.

36.     Congressional oversight over DHS and ICE is particularly important because those agencies have received significant—and increasing—appropriated funds, which they use to apprehend, detain, and remove individuals from the United States.

## II. Each Member of Congress Has a Right to Conduct Oversight Visits at DHS Facilities

### A. Section 527 provides an individual right for members of Congress to conduct oversight visits

37.     Robust and effective congressional oversight of DHS and ICE is critical, particularly in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and even remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens.

38.     To that end, Republican and Democratic members alike have sought information about ICE facilities through requests for information, hearing testimony, and in-person member and staff oversight visits.[3] And they have used that information to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds, to draft and pass relevant legislation, to attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

39.     Members of Congress have also long engaged in on-the-ground, in-person oversight to obtain relevant information.

40.     This method of oversight became especially important for many members of Congress during the first Trump administration.[4] In 2018, a humanitarian crisis created by the

---

[3] *See, e.g.*, Brian Fitzpatrick, Press Release, Fitzpatrick Leads Bipartisan Inspection of Tornillo Detention Center (June 22, 2018), https://perma.cc/M299-W4AD; Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021), https://perma.cc/ALL9-KB83.

[4] *See, e.g.*, H.R. 6256, 115th Cong. (2d Sess. 2018) (proposed bipartisan bill to "require the Secretary of Homeland Security and the Secretary of Health and Human Services to allow Members of Congress to tour detention facilities that house foreign national minors"); *They Are Not Letting Us*

administration rapidly unfolded at the southern border, where "children and families [were] subjected to inhumane conditions, asylum seekers [were] denied access to our nation's legal ports of entry, and thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became particularly concerned about "DHS'[s] poor management of this humanitarian crisis." *Id.*

41.     Members of Congress who attempted to conduct oversight to assess the detention conditions of separated families in 2018 were routinely frustrated in their attempts to assess on-the-ground conditions of immigration detention facilities without delay and often denied entry to these facilities completely.[5] This included members of Congress who are now Plaintiffs in this lawsuit.

42.     Congress recognized that obtaining real-time information in person at those facilities, including speaking directly with both DHS employees and detained individuals, played an important role in effective oversight of the administration's use of appropriated funds and its treatment of noncitizens.

43.     To ensure its members' ability to assess true facility conditions without obstruction, Congress included a provision in the fiscal year 2019 appropriations bill that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532, 113 Stat. 13, 42 (Feb. 15, 2019).

44.     President Trump signed that provision into law. The provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility used to detain or otherwise house noncitizen minors. *Id.*

---

*In': Nelson, Wasserman Schultz Denied Entry to Kid Migrant Shelter*, CBSMiami (June 19, 2018), https://perma.cc/F6QD-FTY6.
    [5] *See, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

45.     Emphasizing the importance of obtaining accurate information about immigration detention, the provision further prohibited the use of appropriated funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress, compared to what would be observed in the absence of such modification." *Id.*

46.     In enacting this provision, Congress was thus focused on the ability of its members to assess the *actual* conditions in which minor migrants are detained by DHS, without alteration or manipulation by executive branch officials.

47.     This provision was a direct response to DHS's obstruction of congressional oversight of its facilities.

48.     Many members of Congress, including several Plaintiffs, exercised their right to conduct in-person oversight at DHS detention facilities in the weeks and months following the passage of the fiscal year 2019 oversight provision.

49.     It was soon clear, however, that the need for oversight by individual members of Congress was not limited to facilities housing noncitizen minors. Indeed, members of Congress were already actively engaged in this oversight with respect to all individuals detained or housed by DHS.

50.     For example, by July 2019, Plaintiff Representative Crow had instituted weekly visits by him or his staff to the ICE detention facility in his district. Representative Crow and his office began to build a productive relationship with ICE officials that has both informed his legislative activities and allowed him to better serve his constituents through close and constructive oversight of that facility.

51.     Members on committees with jurisdiction over DHS and ICE likewise actively exercised their oversight visit rights after the provision's passage. In the summer of 2019, under Plaintiff Representative (then-Chairman) Thompson's direction, the House Committee on Homeland Security staff conducted an investigation that involved oversight visits to eight ICE

facilities across five states, to assess the conditions of confinement and adequacy of the internal oversight tools.[6] And in August and September of 2019, the House Committee on Oversight and Reform and its Subcommittee on Civil Rights and Civil Liberties—of which Plaintiff Representative Raskin was then chair—sent bipartisan staff delegations to conduct oversight visits at 22 DHS detention facilities across six states, including 12 ICE detention facilities.[7]

52.     In addition, although members were provided a right of access to DHS facilities housing noncitizen minors for oversight purposes, staff did not have the same statutory protection in the fiscal year 2019 oversight provision. Congressional staff occasionally encountered difficulties accessing DHS detention facilities in the course of aiding members in their oversight duties.[8] Those difficulties underscored for Congress the importance of allowing members' staff to aid in their oversight work in DHS facilities where noncitizens of all ages are detained or otherwise housed.[9]

53.     As a result, the following year, in fiscal year 2020 appropriations, Congress expanded members' right of oversight access in multiple ways.

54.     First, Congress broadened the provision to apply to DHS facilities used to detain or otherwise house *any* noncitizens—not just minors. Consolidated Appropriations Act, 2020, div. D, title V, § 532(a), 133 Stat. at 2530.

55.     Second, Congress added that "[n]othing" in the provision "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a DHS facility used to detain or otherwise house noncitizens. *Id.* § 532(b).

---

[6] Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC ("*ICE Detention Facilities* Report").

[7] Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* 7 (2020), https://perma.cc/37NF-SFBS.

[8] *Id.*; *ICE Detention Facilities* Report, *supra* n.6, at 5–6.

[9] *See, e.g.*, Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K. McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4.

56.     Finally, it "broadened the applicability" of the provision "to designated congressional staff," providing that "while Members need not provide prior notice of their visit, DHS can require at least 24 hours' notice for designated staff to visit."[10] *See id.* § 532(a), (c).

57.     This expanded provision has been carried forward with identical language in DHS appropriations every year since, including in the most recent continuing resolution signed by President Trump. *See* FY2025 Continuing Resolution, §§ 1101(a)(6), 1105.[11]

58.     Thus, since 2019, the law has provided that no funds appropriated to DHS "may be used to prevent . . . [a] member of Congress" or their designated congressional employee "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens," nor may funds be used "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification." *Id.* § 527(a).

59.     The law further provides, in no uncertain terms, that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter [such] a facility . . . for the purpose of conducting oversight." *Id.* § 527(b). The provision allows a narrow exception, however, that DHS "may require that a request be made at least 24 hours in advance of an intent to enter a facility" by a designated congressional employee—but not for the members themselves. *Id.* § 527(c).

---

[10] CRS, R46113, *Department of Homeland Security Appropriations: FY2020* (Jan. 21, 2020), https://perma.cc/C344-CDBN.

[11] *See* FY2024 Appropriations Act, div. C, title V, § 527; Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022).

**B. Congressional oversight at DHS facilities is increasingly important**

60.    As section 527 reflects, the information gained from congressional visits to facilities where migrants are detained or otherwise housed—through both scheduled and unannounced visits—is critical to effective congressional oversight of DHS and ICE. This oversight is increasingly important today.

61.    In recent years, congressional reports have expressed particular concern regarding "conditions and care provided at ICE's civil detention facilities" and "conditions and lack of adequate infrastructure at ICE's . . . field offices and sub-offices that serve migrants."[12] Congressional visits to several ICE detention facilities in 2021 "found that ICE . . . le[ft] deficiencies unidentified and uncorrected, and that ICE facilities frequently failed to meet basic standards of care."[13] Reflecting these concerns, since fiscal year 2018, Congress has mandated that ICE publicly report all deaths that occur in immigration custody within 90 days.[14]

62.    Members of Congress and their staff have continually sought timely information on the ground regarding the conditions of DHS facilities used to detain or otherwise house noncitizens.

63.    For example, the 2020 Homeland Security Committee staff oversight report highlighted the failures of internal ICE oversight of immigration detention facilities.[15] The report emphasized that when congressional staff provided advance notice of oversight visits, "ICE facilities used the advanced warning to improve the conditions within the facility."[16] Staff detected evidence of those improvements, including the smell of fresh paint, evidence of a major clean-up, the

---

[12] H.R. Rep. No. 116-180, at 34–35 (2019).
[13] H.R. Rep. No. 116-720, at 106 (2021).
[14] *Detainee Death Reporting*, ICE, https://perma.cc/3TST-Q5EX.
[15] *ICE Detention Facilities* Report, *supra* n.6, at 1–2.
[16] *Id.* at 8.

relocation of individuals from solitary cells to the general population, and the installation of new guards.[17]

64.    Congressional findings regarding the failures of internal DHS oversight underscore the critical role of direct congressional oversight on the ground, and members' and staffs' experiences demonstrate the importance of conducting that oversight in real time, without prior notice.

65.    The number of individuals detained by ICE has exploded in the last several months. In February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals[18]—and that number has only continued to increase since then. In March 2025, ICE held 47,600 individuals in detention and announced that immigration detention facilities had been filled to capacity.[19] Notwithstanding this overflow, by late June 2025, that number had increased to nearly 58,000.[20]

66.    Unsurprisingly, amid this rapid increase in immigration arrests and detentions, there have been reports that the rights of noncitizens and citizens alike have been violated. Numerous U.S. citizens have reportedly been mistakenly detained, with no opportunity to prove their citizenship.[21] For example, a 25-year-old citizen and U.S. Army veteran was wrongfully detained by

---

[17] *Id.* at 5.

[18] Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

[19] *US immigration detention maxed out at 47,600 detainees, ICE official says*, Reuters (Mar. 12, 2025), https://perma.cc/6ZDL-F3JH.

[20] Austin Kocher, *US Immigrant Detention System Entering a Period of Unprecedented Growth – 58,000 People Now Held in Over 200 Facilities*, Substack (July 8, 2025), https://perma.cc/P9GS-B9UE.

[21] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily J. (June 19, 2025), https://perma.cc/CNQ6-2CC4; Dani Anguiano, *US citizen arrested during Ice raid in what family describes as 'kidnapping'*, Guardian (June 26, 2025), https://perma.cc/L98U-NMA9; Judd Legum, *US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False*, Mother Jones (Apr. 23, 2025), https://perma.cc/NP4S-926K.

ICE during a raid at the farm where he works as a security guard on July 10.[22] At another raid on June 15, multiple American citizens were detained by ICE with no due process, and a lawyer representing one of them was not permitted to speak with his client while the client was in a detention facility.[23] There are countless such examples from the last six months. And there is every indication that the number of ICE arrests and detentions will only continue to grow at an unmanageable rate, in service of the administration's stated goal of deporting more than one million people each year.[24]

67.    Concerns regarding poor conditions in ICE facilities predate the current administration,[25] but recent news reports suggest that detention conditions have drastically deteriorated as the number of individuals in ICE custody has risen.[26] In some cases, detainees are being denied medical care, forced to sleep on the floor in overcrowded cells, and severely underfed,

---

[22] Angelique Brenes, *Disabled veteran detained during immigration raid speaks out, alleges civil rights violations*, KTLA5 (July 15, 2025), https://perma.cc/SY64-2DX6.

[23] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://perma.cc/C5FN-KXUD.

[24] Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.

[25] *See, e.g.*, Tom Dreisbach, *Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention*, NPR (Aug. 16, 2023), https://perma.cc/2KMB-2MK9; Office of the Inspector Gen., DHS, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://perma.cc/6Y67-LR7H.

[26] Yale Law School, News, *Students Document Reports of Abuse at Immigration Detention Center* (Jan. 17, 2025), https://perma.cc/4MA4-VF6K; Jasmine Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers*, NPR (June 6, 2025), https://perma.cc/B9B6-KN2D; Tracee Wilkins & Rick Yarborough, *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Wash. (Mar. 12, 2025), https://perma.cc/MCM8-UMZP.

with potentially deadly consequences.[27] In one instance, noncitizen women were chained for hours

on a prison bus without access to food, water, or a toilet.[28]

68.    As the number of arrested and detained individuals grows beyond the capacity of

existing ICE detention facilities, DHS has resorted to using ICE field offices to detain or otherwise

house noncitizens. The conditions of confinement at field offices are of particular concern because

field offices are not designed nor set up to be—facilities in which individuals are detained or housed.

69.    For example, members of Congress have received reports that immigrants were

being detained and held in the basement of the ICE Los Angeles Field Office—some overnight—in

inhumane conditions.[29] Recent public reporting has similarly confirmed the unacceptable conditions

of detention at the ICE New York Field Office in Manhattan. Video footage captured by an

individual detained in the facility showed significant overcrowding and a lack of safe and sanitary

conditions.[30]

70.    ICE generally does not consider field offices subject to its detention standards, thus

exempting field offices from requirements to uphold certain standards for safety, security, and care

and from attendant internal oversight.

---

[27] Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers,*
https://perma.cc/B9B6-KN2D; Wilkins and Yarborough, *'Like living in a dark room',*
https://perma.cc/MCM8-UMZP; Allen Cone, *Acting head of ICE clashes with Democrats, says agency
funding assured through fiscal 2026,* UPI (May 14, 2025), https://perma.cc/K9XG-ZKRN; Lauren
Villagran, *Immigrant women describe 'hell on earth' in ICE detention,* USA Today (Mar. 24, 2025),
https://perma.cc/QW2W-M4XX.
[28] Villagran, *Immigrant women describe 'hell on earth' in ICE detention,* https://perma.cc/QW2W-
M4XX.
[29] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles,
some overnight,* CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-
ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.
[30] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan,* N.Y.
Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-
holding-cells-overcrowded-unsanitary.html.

71.    In the administration's rush to increase its immigration detention capacity, DHS has also begun reopening previously shuttered for-profit facilities—many of which had been closed due to poor conditions.[31] One such reopened facility, privately owned Delaney Hall in Newark, has already faced accusations of abusive conditions, including persistent food shortages and mistreatment of detainees.[32] Public reporting suggests that detainees there—many of whom have never been convicted of a crime—have been fed only two meals a day and have gone up to 20 hours without food; one woman did not receive her daily medication for three or four days; and dozens of family members were prevented from seeing their detained loved ones after traveling to visit.[33]

72.    Close congressional oversight of new and reopened facilities is critical to ensure that members of Congress are fully informed of such conditions and can address them as appropriate through legislation and appropriations.

73.    The importance of congressional oversight is compounded by the administration's gutting of three DHS oversight offices—the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO). Congress tasked these three independent offices with distinct roles in receiving and investigating complaints and performing other oversight functions within DHS, to ensure lawful treatment of individuals by DHS components and to provide for the investigation and resolution of DHS activities, including immigration detention.

---

[31] Amanda Hernández, *For-profit immigration detention expands as Trump accelerates his deportation plans*, Stateline (Apr. 11, 2025), https://perma.cc/TT7N-22BM; Allison McCann, Alexandra Berzon & Hamed Aleaziz, *Trump Administration Aims to Spend $45 Billion to Expand Immigrant Detention*, N.Y. Times (Apr. 7, 2025), https://perma.cc/6JNL-S6B8.

[32] Mark Crudele et al., *4 detainees remain unaccounted for following unrest at New Jersey ICE facility: Officials*, ABC News (June 13, 2025), https://perma.cc/2MAQ-CSW8.

[33] Ricardo Kaulessar, *Before recent Delaney Hall uprising, detainees frequently complained about conditions*, NorthJersey.com (June 18, 2025), https://perma.cc/N8AP-JFXH.

74.      For example, CRCL's responsibilities include reviewing and investigating complaints of civil rights and civil liberties abuses; overseeing DHS compliance with legal requirements related to the civil rights and civil liberties of people affected by DHS programs and activities; and helping DHS develop and implement policies and procedures for that compliance. 6 U.S.C. § 345(a). OIDO is tasked with deploying individuals in the field to work independently in DHS detention facilities and to conduct unannounced inspections at DHS detention facilities, to which they are statutorily required to have unfettered access, and providing direct assistance to detained individuals. 6 U.S.C. § 205(c), (d)(2). And all three offices must provide regular reports to Congress on their investigations, case work, and recommendations. 6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

75.      On March 21, 2025, DHS placed essentially all employees of OIDO, CRCL, and the CIS Ombudsman's Office on administrative leave. Those three critical internal oversight offices ceased performing nearly all oversight functions. DHS then separated nearly all employees of those offices through a "reduction in force" that went into effect on May 23.

76.      The absence of statutorily required administrative oversight personnel on the ground in DHS facilities deprives Congress of important information that it would ordinarily receive from those internal DHS oversight offices. Congress's direct oversight role is therefore even more critical than before.

77.      The recently passed budget bill allocates a staggering $45 billion for ICE detention, including family detention. Pub. L. No. 119-21. This number is more than 13 times ICE's current annual detention budget, which was already at a record high.[34]

---

[34] Hayes Brown, *How ICE's massive cash infusion is poised to transform America*, MSNBC (July 7, 2025), https://perma.cc/B7DS-G7NB.

78.      Members of Congress have both a statutory right and a duty to assess how this appropriation is being used at DHS facilities that detain or otherwise house noncitizens. Such a dramatic budgetary expansion will inevitably create more opportunities for abuse and misuse of power, making robust congressional oversight more critical than ever. This is especially true as Congress is working to determine fiscal year 2026 appropriations, including any restrictions it may place on the funding provided to DHS and ICE.

### III.  Defendants' Unlawful Obstruction of Plaintiffs' Oversight Activities

#### A.  Defendants adopted a policy and practice of obstructing congressional oversight

79.      On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Lyons testified that he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ; *see also id.* ("[W]e have proper access and oversight from the men and women of your committee and Congress to oversee what Immigration and Custom Enforcement are doing in our detention centers [because] we have nothing to hide.").

80.      In mid-June, however, ICE stated on its website, for the first time, that it would prohibit members of Congress from conducting oversight visits at ICE field offices.

81.      Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE issued a guidance document that contained the novel contention that field offices are not "used to detain or otherwise house aliens"

because the individuals housed there have not yet been processed for longer-term "custody

determinations."[35]

82.    Pursuant to this unfounded interpretation, Defendants have prevented Plaintiffs

from conducting oversight visits to DHS facilities, including ICE field offices, where individuals are

being detained or otherwise housed.

83.    The guidance document and ICE's website further provided that, although advance

notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be

submitted as early as possible and not less than 72 hours in advance."[36] It also reiterated, consistent

with the statute, that staff members must provide at least 24 hours' notice.

84.    By June 23, Defendants removed the guidance document and changed the language

on its website.

85.    Despite its recent acknowledgment that members of Congress "are not required to

provide advance notice for visits," Defendants now "require[] requests be made a minimum of

seven (7) calendar days in advance to schedule visits to DHS detention facilities. Any requests to

shorten that time must be approved by the DHS Secretary."[37]

86.    ICE did not post a new guidance document providing details or otherwise explaining

its oversight visit policy.

87.    Since June, DHS and ICE officials have denied Plaintiffs access to DHS facilities on

the stated grounds that Defendants require at least seven days' notice and that some facilities,

including ICE field offices, are entirely exempt from congressional oversight.

---

[35] DHS, U.S. Immigration and Customs Enforcement (ICE) Facility Visits for Members of
Congress and Staff (June 2025), *archived at* https://perma.cc/UL23-J4ZM.
[36] *Id.*
[37] Office of Congressional Relations, ICE, https://perma.cc/P6XD-4HNV.

88.     Thus, pursuant to DHS's new oversight visit policy and practice, Defendants have prevented Plaintiffs from conducting oversight visits to DHS facilities where individuals are being detained or otherwise housed.

**B.  Defendants have obstructed each Plaintiff's lawful oversight activities**

89.     Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. The information that can be obtained only through in-person visits is critical to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for the upcoming fiscal year 2026.

90.     Defendants have denied each Plaintiff crucial information needed to conduct oversight on at least one occasion—but in many instances on multiple occasions—by obstructing a requested or attempted oversight visit to a DHS facility where noncitizens are detained or otherwise housed.

91.     Defendants denied Plaintiffs' access to DHS facilities to conduct oversight visits on the basis of their oversight visit policy, requiring at least seven days' notice and prohibiting any oversight visits to certain facilities, including ICE field offices, notwithstanding the presence of detainees at those facilities.

92.     In doing so, Defendants used "funds appropriated or otherwise made available to" DHS "to prevent" each Plaintiff "Member of Congress" "from entering, for the purpose of conducting oversight, a[] facility operated by or for [DHS] used to detain or otherwise house aliens"—in direct contravention of section 527.

93.     Defendants' obstruction of Plaintiffs' efforts to conduct in-person, real-time oversight at DHS detention facilities significantly harms Plaintiffs' ability to satisfy their individual

duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody.

### 1. Representative Escobar

94. Representative Escobar represents Texas's 16th congressional district. She has been a member of Congress since 2019 and currently serves on the Appropriations Committee and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies.

95. As a member of Congress representing El Paso, Texas, a vibrant city on the United States–Mexico border with a large binational population, Representative Escobar has been actively engaged in oversight of the conditions of immigration detention in her district since becoming a member of Congress, including by conducting numerous in-person oversight visits to immigration detention facilities. That includes visits to DHS facilities operated for and by U.S. Customs and Border Protection (CBP), ICE, and the Department of Health and Human Services Office of Refugee Resettlement (ORR). Additionally, as a member of Congress who has served on House committees with jurisdiction over immigration and border matters, she has been actively engaged in oversight of DHS and ICE.

96. Representative Escobar's district currently contains two ICE facilities: an ICE detention facility known as the El Paso Service Processing Center (SPC) and the ICE El Paso Field Office. In addition, the ICE Enhanced Hardened Facility (EHF) is located just outside of her district. There is a new ICE facility under construction in her district, at the Fort Bliss military base, that is predicted to be the largest ICE facility in the country.

97.     Historically, Representative Escobar has maintained an effective and respectful working relationship with local DHS and ICE personnel who work on the ground in El Paso. This relationship is critical given the number of DHS facilities within her border district and the importance of immigration-related issues to her constituents. Over the years, in-person visits have been critical to building and maintaining these relationships, including with the field directors and other ICE personnel, with whom she can effectively communicate issues that arise during visits.

98.     Both announced and unannounced visits to DHS facilities are necessary to Representative Escobar's oversight work. Many of her visits have been scheduled at least one day in advance to allow one of her staff members to join, but some of her visits have been made without advance notice.

99.     Throughout Representative Escobar's tenure, as part of her oversight duties and as a member representing a border district in which the issue of immigration is omnipresent, she has led multiple congressional delegations to El Paso, including to the El Paso EHF in February 2024 and to the Border Patrol Central Processing Center in February 2023.

100.    In-person oversight visits allow Representative Escobar and her staff to discover issues that need to be addressed before they become larger problems. Additionally, because of their working relationship with DHS local leadership, when there have been surges in border crossings, her office has been able to closely coordinate with ICE and to connect DHS leadership with local nonprofits, border patrol, and city and county law enforcement, most recently in February 2025.

101.    Between 2021 and 2022, Representative Escobar conducted multiple oversight visits to the ORR Emergency Intake Site (EIS) at Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the Trump administration's family separation policy. To provide consistent oversight of this facility, she and her staff visited the EIS more than a dozen times. On oversight visits, she learned that minors were not

allowed to leave the tents in which they were kept and did not have access to social workers. She raised these and other issues with Border Patrol and CBP, as well as the Department and Health and Human Services. As a result of her oversight, she observed significant improvements in processes and facility conditions at the EIS because of concerns that she raised during her visits.

102.    To take another example, in 2019, Representative Escobar learned of disturbing reports that individuals being held in ICE custody in a facility in her district in El Paso were being force-fed, and it was imperative that she find out what was happening on the ground through an unannounced visit. Although she was initially denied entry to the facility, she was eventually able to meet with the individuals who were being force-fed. She learned of horrific situations in which these individuals were being tied down and, without their consent, had feeding tubes forced down their throats and into their stomachs. Representative Escobar learned that a single doctor had the ability to make the decision that an individual should be intubated and force-fed, with no formalized process for making that determination.

103.    As a result of the visit and subsequent investigation, Representative Escobar worked with ICE to institute a consultation process, in which multiple doctors would be required to be involved to make a decision. As a result of this oversight visit and subsequent work, conditions for detainees were improved. Visits like this one are also critical to her oversight work to ensure that ICE is treating people in U.S. custody in her district with humanity and following applicable federal laws.

104.    Oversight visits can also have practical and positive outcomes for DHS and the public fisc. In 2019, Representative Escobar learned during oversight visits that Border Patrol had expensive and inefficient processes at its facilities, employing highly trained and highly paid law enforcement officers to do data entry. She worked with Acting DHS Secretary Kevin McAleenan under the previous Trump administration to add a position for a special civilian employee to do data

entry at facilities. After making this change, nearly every Border Patrol sector chief she spoke with on subsequent visits praised the implementation of this position because it frees up their agents to focus on their jobs and is far less expensive.

105. Representative Escobar also informs other members of Congress, her constituents, and the public when information gained from visits is cause for concern—and therefore a potential basis for legislation or further oversight. She also informs them of positive and productive information obtained through oversight and when she observes that things are going well. For example, after a June 18, 2025, visit, Representative Escobar shared with the press positive comments from women detained at the El Paso EHF.

106. In-person visits to El Paso facilities also allow Representative Escobar to respond to and follow up on constituent casework. Immigration, including immigration detention, is a huge issue of concern within her border district. Her office receives a significant amount of constituent outreach about constituents or family members that are being held in ICE facilities, but about which they have no information. Representative Escobar uses oversight visits as an opportunity to investigate constituent complaints about access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes her office uncovers issues, and sometimes they determine that the situation is acceptable and are able to assuage her constituents' concerns. She receives necessary information through her observations, conversations with detainees, and conversations with ICE employees on the ground.

107. The oversight visits that Representative Escobar conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities.

108. After ICE denied Representative Escobar entry into an ICE facility in 2019 to visit with detainees being force-fed, she worked with the Appropriations Committee to include a

25

provision ensuring that members of Congress had the right to conduct oversight visits of DHS facilities without providing advance notice. That provision, now section 527, serves as the basis for this suit.

109. Defendants' unlawful oversight visit policy has abruptly halted Representative Escobar's consistent oversight of the ICE detention facilities in her district.

110. On July 9, 2025—for the first time since 2019—ICE denied Representative Escobar entry into an ICE facility.

111. On July 8, 2025, Representative Escobar's staff notified ICE via email that she would be conducting an oversight visit of the El Paso SPC the next day, July 9, accompanied by one staff member. That facility had recently been plagued by accusations of mistreatment and inhumane conditions, including a recent Amnesty International report detailing nearly thirty pages of alleged human rights violations at that facility. This included reports of physical abuse by guards, use of solitary confinement, unsanitary and overcrowded living spaces including dysfunctional toilets, inadequate medical care, expired or poor quality food, and lack of access to legal services. Family members and legal representatives of detainees at the El Paso SPC had also raised concerns with Representative Escobar's office about detainees' access to telephones. It was important that Representative Escobar visit the facility in person to see the conditions firsthand, to inquire about the concerns raised in the Amnesty Internal report and about detainees' access to their legal representatives and communication with family, and to speak to detainees directly about their experiences.

112. In response, ICE stated that it could not accommodate Representative Escobar's July 9 visit because ICE is "now requiring requests to be made seven (7) calendar days in advance."

113. On July 9, Representative Escobar and two staff members traveled to the El Paso SPC to conduct the oversight visit announced the previous day. Representative Escobar identified

herself and informed ICE personnel of her intention to conduct an oversight visit of the facility

under section 527. ICE denied her entry because of the oversight visit policy.

114.    Given the disturbing allegations in the Amnesty International report about the El

Paso SPC facility, it was imperative for Representative Escobar to be able to visit the facility in

person. On July 11, her staff requested a second visit on July 18, providing seven days' notice.

However, votes at the House went into the early morning of July 18, and Representative Escobar

was unable to travel from El Paso to Washington, D.C., in time to conduct the scheduled visit to the

facility on July 18 to personally assess conditions and speak with detainees herself.

115.    Defendants' oversight visit policy and practice have significantly hindered

Representative Escobar's ability to perform her duties as the member of Congress serving Texas's

16th congressional district by depriving her of information necessary for that role. Representative

Escobar still has been unable to visit the El Paso SPC facility in person.

116.    The oversight visit policy significantly diminishes Representative Escobar's ability to

understand how funds Congress appropriates are being used at facilities in her district. Without

immediate, accurate information, she is less able to ensure that detainees at the facility are being

treated consistent with federal law. She is less able to work effectively on the Appropriations

Committee and its Subcommittee on Homeland Security and Subcommittee on Military

Construction, Veterans Affairs, and Related Agencies. And she is less able to assess the health and

safety of her constituents and to address constituent inquiries and complaints. Without in-person

visits by Representative Escobar and her staff, her only recourse is to submit inquiries to and wait

for a response from administration officials, which is likely to be received too late—if ever.

117.    Defendants' oversight visit policy and practice have created severe friction between

Representative Escobar's office and local ICE officials and undermined a largely respectful and

effective working relationship that she established and had maintained during the first Trump administration, the Biden Administration, and the first part of second Trump administration.

118.    It is important that Representative Escobar be able to conduct timely oversight. The realities on the ground often do not allow for a seven-day delay to her oversight and investigation. Her constituents frequently contact her office with pressing immigration-related issues and concerns, many of which involve the El Paso facilities. When her office receives reports that, for example, detained individuals have not been fed sufficient meals, or that individuals have not been able to shower in several days, it is important that she is able to visit that facility in person, in a timely fashion, to investigate the circumstances. If individuals lack food, showers, and basic medical care, those are situations that need to be rectified immediately to ensure that individuals in custody in facilities in Representative Escobar's district are being treated humanely and consistent with federal law.

119.    Additionally, requiring seven days' notice can present a significant and sometimes insurmountable barrier to conducting an oversight visit. As Representative Escobar's attempts to visit the facility between July 9 and 18 demonstrate, her work as a member of Congress—including unpredictable votes, scheduling, and travel between Washington, D.C., and her district—may make it impossible to schedule and attend an oversight visit with more than a couple of days' notice, if that.

120.    In light of the importance of this on-the-ground, immediate oversight at the El Paso facilities, Representative Escobar intends to continue conducting oversight visits to DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit her to do so thwarts her ability to perform her duties.

## 2. Representative Crow

121.    Representative Crow represents Colorado's 6th congressional district, where the ICE Denver Contract Detention Facility in Aurora ("Aurora Facility"), and a field office, the Denver Field Office in Centennial, are located. The Aurora Facility is operated by a private contractor, the GEO Group, on behalf of ICE. Representative Crow has been deeply and consistently engaged in oversight of the conditions of immigration detention in his district since he became a member of Congress more than six years ago.

122.    In response to concerning reports regarding the Aurora Facility, including reports of disease outbreaks, Representative Crow attempted his first in-person visit to the facility, without prior notice, in February 2019. He was denied entry. That same day, he sent a letter to the secretary of DHS raising his concerns about conditions at the facility, particularly with respect to medical care and public health.

123.    Representative Crow requested to tour the Aurora Facility three more times before his request was granted, and he finally conducted an oversight visit on March 15, 2019.

124.    Nearly four months after sending a letter to ICE raising concerns regarding medical conditions at the Aurora Facility, in June 2019, Representative Crow received a response in which ICE denied responsibility for developing policies and protocols for managing infectious and communicable diseases at the facility.

125.    Representative Crow recognized the need for increased oversight over the Aurora Facility. He instituted regular visits to the facility, conducted by him or his staff, generally scheduled one to seven days in advance, and sometimes without prior notice. On January 6, 2020, for example, he conducted an oversight visit without prior notice and was able to tour the facility as usual.

126.    These regular visits have allowed Representative Crow and his staff to track conditions closely, including, for example, the number of detainees, their medical care, and their

access to counsel. To keep his constituents and the public informed, he regularly posts accountability reports to his website with the information gained through both in-person visits and regular communication with ICE officials.

127.    These visits have also demonstrated to ICE and GEO Group personnel that Representative Crow will hold the Aurora Facility accountable for maintaining adequate public health conditions within the facility whenever concerning circumstances arise, such as a potential tuberculosis exposure that occurred in April 2025 that led to detainees being quarantined as a precautionary measure. In this way, his oversight allows him to monitor the medical care of detainees, protect the broader community, and ensure that federal law is being followed.

128.    Representative Crow's and his staff's regular visits—sometimes with notice and sometimes without—have also shown him that advance notice can sometimes result in the member or staff getting a curated view of the facility. This hinders his ability to assess the true conditions of detention and thereby engage in real oversight with accurate information to inform his legislative functions.

129.    Representative Crow's on-the-ground oversight has also allowed him and his staff to build a productive relationship with the ICE and GEO Group personnel and to discover issues that need to be addressed before they become larger problems. For example, after raising specific concerns, Representative Crow has seen improvements to detainees' telephone access, to the number of medical staff at the facility, and to access to counsel for detainees in quarantine.

130.    In addition, Representative Crow and his staff are better able to respond to and follow up on constituent casework through on-the-ground oversight. Immigration, including immigration detention, is the most frequent topic of concern raised to his district office, and he uses the oversight visits as an opportunity to investigate constituent complaints. He can get the needed

information through observations, conversations with detainees, and conversations with ICE employees on the ground.

131.    The oversight visits that Representative Crow regularly conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities. For example, he introduced legislation in 2020 and 2021 that sought to protect his constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities and, by extension, in the surrounding communities.

132.    Defendants' unlawful oversight visit policy and practice have hindered Representative Crow's ability to conduct comprehensive oversight of the Aurora Facility.

133.    On July 20, 2025—for the first time since he began conducting oversight visits in February 2019—Representative Crow was denied in his attempt to visit the Aurora Facility. He traveled there in person and identified himself, his oversight purpose, and his right to conduct that oversight under section 527. After waiting some time, he was told that ICE had denied his request, and he was not permitted to enter.

134.    ICE OCR later confirmed by email to Representative Crow's staff that his request was denied because "DHS requires requests be made a minimum of seven calendar days in advance for scheduling."

135.    Defendants' oversight visit policy and practice that resulted in this obstruction of Representative Crow's lawful oversight significantly hinder his ability to perform his duties as the member of Congress serving Colorado's 6th congressional district. He is less able to understand how appropriated funds are being used at the facility. He is less able to ensure that detainees at the facility are being treated consistent with federal law. And he is less able to ensure the health and safety of his constituents and to address constituent complaints. Without in-person visits by him or

his staff, his only recourse is to submit inquiries to and wait on a response from administration officials, which is likely to be received too late—if ever.

136.     In light of the importance of this on-the-ground, immediate oversight at ICE facilities in his district, Representative Crow intends to continue conducting oversight visits of DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit him to do so thwarts his ability to perform his duties.

### 3.     Representative Goldman

137.     Representative Goldman represents New York's 10th congressional district. He currently serves as a member of both the Homeland Security Committee and the House Judiciary Committee. As a member of these committees, he has been actively engaged in oversight of DHS and ICE.

138.     The ICE New York Field Office, located at 26 Federal Plaza in Manhattan, is located in his district. The Metropolitan Detention Center (MDC) in Brooklyn, which has an agreement to house immigration detainees, is also located in his district. Both the New York Field Office and MDC are used to detain or otherwise house immigrants.

139.     Representative Goldman has engaged in oversight related to immigration detention at both facilities through in-person visits and letters to executive branch officials.

140.     Representative Goldman's previous oversight activities include regularly leading and signing oversight letters to DHS and ICE on a variety of immigration and border security issues. For example, on June 5, 2025, he led a letter joined by 85 House colleagues to DHS Secretary Kristi Noem seeking information regarding the rise of masked, plainclothes ICE officers involved in detaining individuals without criminal records in connection with their immigration court proceedings. Representative Goldman has also led letters to the chair and ranking member of the

Appropriations Committee regarding immigration and border security issues that have been informed by his oversight work.

141.    Representative Goldman has also introduced legislation to address issues that have arisen in the course of his oversight of DHS. For example, after observing ICE agents conducting operations at the immigration courts at 290 Broadway in May 2025 and experiencing obstruction during an attempted visit to ICE's New York Field Office at 26 Federal Plaza in June 2025, he introduced the No Secret Police Act, which would require DHS agents who are engaged in civil immigration enforcement to display certain identifying insignia and to provide proper identification, and would prohibit them from wearing masks or face coverings.

142.    On June 9, 2025, Representative Goldman's staff emailed ICE personnel on his behalf to request a scheduled tour of the 10th floor of the ICE New York Field Office (the "10th Floor Facility"), where individuals were reportedly being detained. On June 10, ICE personnel responded to the email indicating that the tour request was being reviewed.

143.    On June 16, Representative Goldman's staff again emailed ICE personnel to notify the agency of Representative Goldman's intended visit on June 18, pursuant to his statutory oversight authority under section 527.

144.    On June 17, ICE personnel responded by email to the June 16 email, claiming that Representative Goldman's statutory oversight authority did not apply to the 10th Floor Facility at the New York Field Office because it was not a "detention facility."

145.    On June 18 at 10:00 a.m., as noticed in the June 16 email, Representative Goldman, along with Representative Jerry Nadler, arrived at 26 Federal Plaza and attempted to gain entry to the 10th Floor Facility for the purpose of conducting oversight, consistent with their authority under section 527.

146.    Representative Goldman was not allowed to enter and observe the 10th Floor Facility, and was instead met in the lobby by the deputy director of the New York Field Office. The deputy director refused Representative Goldman entry into the 10th Floor Facility. The deputy director stated that the reason for the denial of the visit was because, according to directions the deputy director received from his supervisors, the 10th Floor Facility is not a "detention facility" under the statute and is instead a "holding and processing center."

147.    The deputy director told Representative Goldman that the 10th Floor Facility did not have beds or showers; that individuals were being held overnight, some for at least two nights; and that they were being fed. Representative Goldman asked the deputy director how a facility that was holding and housing individuals for two nights or more was not being "used to detain or otherwise house" those individuals. The deputy director responded that Representative Goldman should ask the DHS Office of Legislative Affairs.

148.    Representatives Goldman and Nadler were unable to conduct oversight of the ICE facility at 26 Federal Plaza, based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices.

149.    They were entitled to conduct such oversight under section 527.

150.    Both announced and unannounced oversight visits by Representative Goldman provide necessary information on how appropriated funds are being used in real time on the ground in immigration detention, in order to ensure the physical safety of his constituents and to ensure that DHS immigration detention activities are being conducted in accordance with the requirements of federal law. It is also vital to his work on legislation and his ability to actively and effectively participate on his assigned committees, both of which have jurisdiction over DHS.

151.     Without the ability to conduct oversight of ICE facilities—particularly those located in his district, where his constituents may be detained—he is unable to ensure his constituents are being treated humanely and have access to legal counsel.

152.     Representative Goldman's ability to conduct unannounced visits at ICE facilities where individuals are being detained or otherwise housed is imperative for him to assess the actual conditions of these facilities and to ensure that DHS and ICE do not have time to hide unacceptable conditions prior to his visit.

153.     Representative Goldman intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and serve his constituents.

154.     Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 4.     Representative Espaillat

155.     Representative Espaillat represents New York's 13th congressional district. From 2021 to the present, he has served on the Appropriations Committee. Since 2023, he has served as the ranking member of the Subcommittee on the Legislative Branch. He is also the chairman of the Congressional Hispanic Caucus (CHC), a group of more than 40 members of Congress of Hispanic and Latino descent. As part of his role as a member of Congress and his committee assignments, he has been actively engaged in oversight of DHS and ICE since he was elected to Congress.

156.     The 10th Floor Facility at the New York Field Office, 26 Federal Plaza, is located near his district. This facility is used to detain or otherwise house immigrants.

157.     Representative Espaillat's office does regular and significant case work for constituents involving ICE activities and detention, including for individuals detained at the New

York Field Office's 10th Floor Facility. In the course of conducting oversight of DHS and ICE, Representative Espaillat has performed multiple in-person visits to ICE facilities in New York, New Jersey, and Georgia.

158.     For example, in May 2025, Representative Espaillat visited the Elizabeth Contract Detention Facility in New Jersey, where he met with noncitizens who had been detained despite having attended all their required appointments.

159.     In September 2020, he visited the Irwin County Detention Center in Ocilla, Georgia, after a whistleblower complaint alleged that the medical staff there had performed invasive and unnecessary medical procedures, including hysterectomies, on detained women. Following that visit, he wrote a letter to the then-acting director of ICE detailing his concerns about those practices and requesting an investigation at other facilities.

160.     Those on-the-ground oversight visits are integral to other activities Representative Espaillat has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

161.     On June 8, 2025, Representative Espaillat and his colleague Representative Nydia Velázquez traveled to the 10th Floor Facility. Their purpose was to conduct an unannounced oversight visit.

162.     They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility had deteriorated due to surging arrests. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the 10th Floor Facility.

163.    Upon arrival, Representatives Espaillat and Velázquez were greeted outside of the building around 3:00 p.m. by a DHS officer. Representative Espaillat and his colleague said that they were members of Congress, and that they were interested in visiting the 10th floor at 26 Federal Plaza, pursuant to their authority under section 527, because they had heard from constituents that detainees were being held there overnight.

164.    At first, the DHS officer denied them entry to the building entirely, but after 15 minutes, they were allowed to enter alone, without their staff members. Once they were inside the lobby of 26 Federal Plaza, the DHS officer said that he was going to check with the acting deputy field office director (deputy FOD).

165.    Representative Espaillat spoke with the deputy FOD on the phone and told her that he had a right to gain access to the facility on the 10th floor. The deputy FOD told Representative Espaillat that he and his colleague could not enter the 10th Floor Facility, because it was a "sensitive facility."

166.    Representative Espaillat and his colleague left the building without being able to conduct oversight to which they are entitled under section 527.

167.    The following month, on July 14, 2025, Representative Espaillat returned with Representative Velázquez to the 10th Floor Facility to conduct an oversight visit. He did not provide advance notice of his visit. He conducted this visit because he had continued to hear reports from constituents and advocates of the inhumane conditions of the facility.

168.    Representatives Espaillat and Velázquez arrived at 26 Federal Plaza and told a DHS officer that they wanted to go to the 10th floor to conduct an oversight visit, consistent with their authority under section 527. They stated that they understood individuals were being held there overnight. They were instructed to wait but were not met by any DHS official.

169.    Representative Espaillat and Representative Velázquez proceeded on their own volition to the 10th floor to conduct the oversight visit. Once on the 10th floor, Representatives Espaillat and Velázquez were denied access to the area where DHS was detaining the individuals.

170.    Representatives Espaillat and Velázquez waited approximately 45 minutes. Multiple DHS staff informed them that someone would speak to them shortly. DHS staff also told the representatives that the deputy FOD was informed of their presence but that the deputy FOD would not speak with them herself. DHS staff informed them that they could not enter because the 10th Floor Facility was a "sensitive facility."

171.    One of the security officials told Representatives Espaillat and Velázquez to contact a public affairs representative. The same security official denied them access to the 10th Floor Facility to conduct oversight.

172.    Representative Espaillat's oversight visits to ICE facilities, including the 10th Floor Facility at 26 Federal Plaza in Manhattan, are critical to his legislative work, including his work on the Appropriations Committee. The information that can be obtained only through in-person oversight is also essential to his ability to serve his constituents, because many of them are detained in or impacted by these and other DHS and ICE facilities.

173.    Defendants' oversight visit policy and practice, which bar Representative Espaillat from conducting oversight visits at the 10th Floor Facility at the New York Field Office, hinder his ability to perform his duties as a member of Congress.

174.    Representative Espaillat intends to conduct both announced and unannounced visits to DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight and to address the concerns of his constituents.

175.    Without obtaining necessary information through this oversight, Representative Espaillat is less able to serve his constituents, to ensure that DHS and ICE are acting consistently

with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

**5.     Representative Correa**

176.     Representative Correa represents the California's 46th congressional district. He is a member of the Judiciary Committee and the Homeland Security Committee. In 2023, he was named ranking member of the Homeland Security Committee's Subcommittee on Border Security and Enforcement. As part of that role, he has been actively engaged in oversight of DHS and ICE.

177.     The ICE Santa Ana Field Office at 34 Civic Center Plaza in Santa Ana, California, is located in his district. This facility is used to detain or otherwise house immigrants.

178.     Representative Correa's previous oversight activities include numerous in-person oversight visits to DHS facilities where noncitizens were detained or otherwise housed over the last several years. These on-the-ground oversight visits are integral to other activities he has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. He has sent oversight letters to DHS, ICE, and the Government Accountability Office, calling for greater transparency regarding ICE arrests, the conditions of detention facilities and processing facilities at ports of entry, and the processing of asylum claims, and expressing concern regarding the denial of entry by members of Congress into detention facilities for oversight purposes.

179.     On June 7, 2025, Representative Correa, along with Representatives Gomez, Rivas, and Torres traveled to the ICE Enforcement and Removal Operations Field Office at the Roybal Federal Building ("LA Field Office") in downtown Los Angeles to conduct an oversight visit, consistent with their authority under section 527. The LA Field Office is used to detain or otherwise house immigrants.

180.     After they arrived, Representative Torres contacted an ICE liaison officer and informed the officer that members of Congress were requesting a briefing on the previous day's ICE

operations. After numerous attempts to communicate with ICE officials in the facility, the representatives were told they would not be granted access to the LA Field Office and would not receive the requested briefing.

181.    The representatives remained within the vicinity and were later told by ICE officials they needed to return during regular business hours and that they were being denied access because of "unsafe conditions" related to a protest that had started outside the facility. A short time later, while they were still in the vicinity, someone inside the building deployed a chemical agent that caused irritation to their throats and lungs, making them cough. They did not see who sprayed the chemical agent and remain uncertain as to what it was.

182.    Beginning on June 8, 2025, Representative Correa began visiting the Santa Ana Field Office in his district on a daily basis to ensure there was no overcrowding and to locate specific individuals based on requests from his constituents. Representative Correa often conducted these visits with one day's notice, and sometimes, with no notice at all. Over the course of his visits, he witnessed a surge in the number of detainees at the field office, from fewer than 10 to approximately 77 individuals, housed in about eight holding cells.

183.    After conducting these visits without issue for about 12 days, Representative Correa was denied entry to the Santa Ana Field Office on June 21, 2025. When he arrived that morning, ICE officials informed him of a new rule requiring his office to provide written notice at least seven days in advance in order to visit the facility. He was therefore unable to obtain immediate, reliable information regarding the conditions of confinement.

184.    Representative Correa left the Santa Ana Field Office without being able to conduct oversight of the facility. He was also told that he could no longer use his regular contacts to schedule visits to the Santa Ana Field Office but had to submit requests to a centralized email address.

185.    Representative Correa's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. It is also directly relevant to his role as ranking member of the Subcommittee on Border Security and Enforcement, which requires close oversight to inform him on the topic of immigration detention and to ensure that funds are being adequately appropriated to immigration agencies.

186.    Representative Correa therefore intends to continue conducting in-person oversight at DHS facilities that detain or otherwise house immigrants, including both planned and unannounced visits.

187.    Defendants' refusal to permit Representative Correa to conduct oversight visits at the Santa Ana Field Office without seven days' notice hinders his ability to perform his duties as a member of Congress.

188.    Without the information that can be obtained through timely, in-person oversight, Representative Correa is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations—including limits on such appropriations—going forward.

### 6.    Representative Gomez

189.    Representative Gomez represents California's 34th congressional district. He previously served as the vice chair of the House Committee on Oversight and Government Reform.

190.    The LA Field Office is located in Representative Gomez's district.

191.    Representative Gomez has conducted in-person oversight visits to the United States–Mexico border to monitor CBP interactions with asylum seekers in 2020 and twice to CBP facilities in 2018 and 2020. In June 2025, his staff, at his direction, aided his oversight duties by visiting the LA Field Office following reports that attorneys and family members were being denied

access to the individuals detained in the basement of the building. He has issued statements and written letters to DHS and ICE leadership raising a number of concerns, including claims of mistreatment by detainees in CBP custody and the illegal rejection of asylum seekers at official ports of entry.

192.    On June 7, 2025, Representative Gomez, along with Representatives Torres, Rivas, and Correa, traveled to the LA Field Office to conduct an oversight visit, consistent with their authority under section 527. As alleged above, they requested a briefing and access to the facility. Their requests were denied. *See supra* ¶¶ 179–81.

193.    Over the following several weeks, Representative Gomez and his staff attempted to conduct oversight visits at the LA Field Office and were repeatedly denied access.

194.    On June 9, Representative Gomez and his staff returned to the LA Field Office. They identified themselves and requested access for Representative Gomez for the purpose of conducting oversight consistent with section 527. He was again denied entry and given the same reason that it was "unsafe."

195.    On June 17, Representative Gomez and his staff returned to the LA Field Office. Representative Gomez presented himself to officials on site and requested access. While he was waiting, an ICE official contacted by phone told his staff that she did not have authority to speak to them. A second ICE official contacted by phone told them that they needed to provide 72 hours' notice to conduct a visit and that ICE had previously emailed this information to his team. Representative Gomez's staff informed the ICE official that the representative had the legal authority under section 527 to conduct a site visit for oversight purposes. The ICE official told Representative Gomez and his staff that the LA Field Office is not a "detention facility," but rather a field office, and that ICE does not detain immigrants in field offices. They denied him entry on that basis.

196.    On June 19, Representative Gomez's staff contacted an ICE official via email to follow up on a request to schedule an oversight visit to the LA Field Office. ICE denied this request and cited the new DHS oversight visit policy. ICE stated that the new policy requires seven days' notice for congressional oversight visits. ICE further stated that because the LA Field Office is not a "detention facility," there was no legal basis for Representative Gomez's oversight request. Representative Gomez's staff had observed vans transporting detainees earlier in the month, while they had been on site seeking access to the LA Field Office.

197.    On July 7, after receiving repeated reports of poor facility conditions, Representative Gomez's staff once again attempted to schedule a visit to the LA Field Office for the purposes of conducting oversight. ICE again responded that the field office was not a "detention facility" and denied their request on that basis.

198.    Oversight visits by Representative Gomez and his staff provide necessary information on how to serve his constituents impacted by ICE raids and detention. His district is especially diverse; he represents temporary protected status (TPS) recipients, asylum seekers, undocumented immigrants, and their families. The reported inhumane treatment and conditions of those detained in the LA Field Office directly affects the wellbeing of his constituents. The uptick in the number of those detained has already begun to take an emotional and economic toll on the communities he represents.

199.    Defendants' refusal to permit Representative Gomez to conduct immediate oversight visits at the LA Field Office therefore significantly harms his ability to perform his duties as a member of Congress.

200.    Representative Gomez intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and

accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

201.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation that would require ICE to be transparent and accountable for resolving poor facility conditions.

### 7.    Representative Garcia

202.    Representative Garcia represents California's 42nd congressional district. He has been a member of Congress since 2023, and as of June 2025 he is the ranking member of the Oversight and Government Reform Committee. Prior to serving in that role, he served on both the Oversight Committee and the Homeland Security Committee. As part of his roles, he has been actively engaged in oversight of DHS and ICE.

203.    The LA Field Office is located near Representative Garcia's district. This facility is being used to detain or otherwise house immigrants.

204.    In-person oversight visits to this and other facilities, both announced and unannounced, are essential to Representative Garcia's ability to conduct oversight of DHS and ICE. These visits permit him to directly observe conditions with his own eyes and speak directly with impacted individuals in these environments.

205.    On-the-ground oversight visits and activities are also interconnected with activities Representative Garcia has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent various oversight letters to DHS and ICE officials, as well as to private contractors, regarding issues related to immigration detention and enforcement operations, as well as recent obstruction of oversight by the Trump administration. He has also introduced legislation to address issues he has observed and identified through his oversight of DHS.

206.    On July 23, 2025, Representative Garcia's staff provided ICE with written notice of his intent to travel to the LA Field Office to conduct an oversight visit.

207.    He had received information that individuals were being detained in that facility and that the conditions in the facility were bleak, with many individuals crammed in a small concrete room without basic necessities. He had also seen reports that many individuals have been held overnight at the LA Field Office without beds or general medical care.

208.    An in-person oversight visit was necessary for Representative Garcia to obtain timely, reliable information regarding the conditions of confinement at the LA Field Office.

209.    The written notice specifically stated that Representative Garcia was "authorized by Sec. 527 of PL 118-47" to visit the facility and conduct oversight.

210.    The facility's assistant field office director (AFOD) responded to the written notice by email the same day, referencing Defendants' new oversight visit policy, stating "the Department requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. . . . Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate." The AFOD did not schedule or confirm a visit for Representative Garcia.

211.    On July 24, 2025, Representative Garcia traveled to the LA Field Office. His purpose in doing so was to conduct oversight. Upon arrival, Representative Garcia presented himself at the intercom controlling access to a locked door that visitors are known to use. After identifying himself as a member of Congress, he stated his intent to conduct an oversight walk-through, consistent with section 527. However, he was not permitted to enter. A voice on the intercom told Representative Garcia that they had asked their "management" and stated, "We're not considered a facility. You will have to go to the Adelanto Detention Facility," a facility located about 85 miles from downtown Los Angeles.

212.     Representative Garcia responded that he was taking that as a denial from ICE of his request to conduct oversight at a detention facility. Representative Garcia reiterated that members of Congress have the right to conduct such oversight and ended the conversation. Representative Garcia left the facility without being able to conduct the oversight he is entitled by statute to perform.

213.     Oversight visits by Representative Garcia and his staff provide necessary information on how to best craft legislation, understand how appropriated funds are being used for immigration detention, and ensure humane and legal treatment of detainees within the facilities. These visits also inform him on how to best serve his constituents when he hears about issues or concerns about immigration detention and enforcement actions. The information obtained through in-person oversight is also directly relevant to his work as ranking member of the Oversight and Government Reform Committee.

214.     Representative Garcia intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

215.     Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

**8.     Representative Ruiz**

216.     Representative Ruiz represents California's 25th congressional district. He has a medical degree from Harvard Medical School and a Master of Public Heath from the Harvard School of Public Health.

217.    Representative Ruiz's previous oversight activities include in-person oversight visits to an ICE field office in 2014 and to multiple border patrol facilities in 2018, 2019, and 2023. As a physician trained in humanitarian aid, he has focused his oversight on ensuring that those in ICE and CBP custody have access to adequate healthcare. He has issued statements and written letters to DHS and ICE leadership raising these concerns, among others.

218.    In-person oversight visits to DHS facilities are integral to Representative Ruiz's legislative work. He has used the information obtained from those visits in drafting legislation, including the Humanitarian Standards for Individuals in Customs and Border Protection Custody Act, which calls on CBP to conduct health assessments, provide emergency medical care and humane living conditions, and ensure access to adequate water and nutrition.

219.    On July 11, 2025, Representative Ruiz, along with Representative Torres, traveled to the ICE Adelanto Processing Center in Adelanto, California, to conduct an oversight visit. An in-person oversight visit was necessary to obtain immediate, reliable information regarding the conditions of confinement at the Adelanto Processing Center.

220.    Upon arrival, Representative Ruiz and Representative Torres identified themselves and were greeted by a guard at the fence surrounding the facility. While they explained that they were authorized to tour the facility under section 527, an individual whom they believe to be an employee of the GEO Group (the private prison company that contracts with ICE to manage the Adelanto facility) met them at the gate. He told them that it was his understanding that they had been given notice that they were not approved for a visit that day.

221.    Representative Torres explained that she had made prior arrangements and provided ICE with notice of the visit the previous week. The individual then handed the representatives a piece of paper with DHS contact information and suggested they contact DHS. Representative Ruiz reiterated that it was their legal right to conduct an unannounced oversight visit, and he asked to

speak to an ICE agent. The individual told them he would let the ICE officials in the facility know and then walked back to the building. No one from the facility came out to speak with the representatives.

222.    Because of Defendants' oversight visit policy and practice, Representatives Ruiz and Torres left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

223.    Representative Ruiz's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. Defendants' refusal to permit Representative Ruiz to conduct immediate oversight visits at the Adelanto Processing Center, and other ICE facilities, therefore significantly harms his ability to perform his duties as a member of Congress.

224.    He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both scheduled and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Ruiz is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation.

### 9.    Representative Torres

225.    Representative Torres represents California's 35th congressional district. She is a member of the Appropriations Committee and Administration Committee. She also previously served on the Homeland Security Committee.

226.    The LA Field Office is located near Representatives Torres's district, as is the Adelanto ICE Processing Center in Adelanto, California. The LA Field Office is being used to detain or otherwise house noncitizens.

227.    In the course of conducting oversight of DHS, Representative Torres has performed previous in-person visits to immigration detention facilities in California, New Mexico, and Texas. Representative Torres conducted oversight visits of these facilities to assess conditions of minors and families being held at CBP and ICE facilities based on reports of inhumane treatment of minors and families.

228.    For example, while at the ICE Otay Mesa Detention Center in San Diego, California, in June 2018, Representative Torres observed toddlers huddled under aluminum blankets in freezing cold cells as they waited to be processed. In June 2019, she conducted oversight visits, along with colleagues from the Congressional Hispanic Caucus, of El Paso Border Patrol Station 1 and Clint Border Patrol Station, both located in Texas and operated by CBP, to investigate reports of inhumane conditions faced by children and families. During this visit she observed appalling conditions in which children were being held in groups of 10 to 15 in cells with no furniture and without access to basic necessities. She has conducted numerous visits to ensure that DHS and ICE adhere to the law and provide a safe environment for detained individuals.

229.    For example, on February 19, 2025, Representative Torres visited the LA Field Office following reports that unidentified federal agents had removed her constituents from their homes and detained them in the facility. During her visit, Representative Torres was able to have a conversation with ICE officials about how to safely execute their duties without endangering local communities.

230.    Representative Torres's on-the-ground visits and activities are integral to her other legislative duties. For example, these visits have informed relevant legislation she has crafted, including the Fairness to Freedom Act, introduced in April 2025, which seeks to establish a universal right to legal representation for individuals facing deportation.

231.    On June 7, 2025, Representative Torres joined Representatives Gomez, Rivas, and Correa in an unannounced oversight visit at the LA Field Office. Representative Torres had seen reports of violent ICE operations taking place in the Los Angeles area, and information from constituents suggested that individuals detained in the operations were being held in the LA Field Office. She was also aware of credible reports that individuals were being detained in the LA Field Office under inhumane conditions. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the LA Field Office.

232.    As alleged above, the representatives were denied access to the LA Field Office. *See supra* ¶¶ 179–81. While the representatives stood in the vicinity of the field office, someone from inside the building deployed a chemical agent that caused irritation to the representatives' throats and lungs. Representative Torres's exposure to the chemical agent required her to visit the hospital emergency room for respiratory treatment.

233.    Representatives Torres, Gomez, Rivas, and Correa left the LA Field Office without being able to conduct the oversight which they are entitled to perform under section 527.

234.    On June 18, Representative Torres again attempted to conduct an oversight visit at the LA Field Office. She identified herself as member of Congress at an entrance to the building and requested access to tour the facility pursuant to her authority under section 527. Representative Torres was denied access to the LA Field Office. In later correspondence, an ICE representative asserted that she was denied entry because the LA Field Office did not "house aliens." This information was directly contrary to the reports she had received regarding the detention of individuals at that location.

235.    Representatives Torres again left the LA Field Office without being able to conduct the oversight which she is entitled by statute to perform.

236.    On July 11, Representative Torres traveled to the Adelanto Processing Center to conduct an oversight visit with Representative Ruiz, as described above. *See supra* ¶¶ 219–21.

237.    Representatives Torres and Ruiz were denied entry and left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

238.    On July 11, after Representative Torres was denied entry to the Adelanto Processing Center, her staff emailed ICE requesting an oversight visit on a future date.

239.    On July 16, Representative Torres received a communication from ICE informing her that she was "approved" for a 90-minute tour of the Adelanto Processing Center to take place on July 18 at 10:00 a.m. PT. Due to travel delays, Representative Torres was unable to arrive at the Adelanto Processing Center until approximately 11:00 a.m. PT, whereupon she was informed that the length of the tour could not be extended. She was given a tour of the Processing Center's health unit, kitchen, and processing area, but she was unable to see other parts of the facility, including where detained individuals are housed.

240.    Representative Torres's tour of the Adelanto Processing Center ended before she was able to see all parts of the facility necessary to conduct the oversight that she is entitled by statute to perform.

241.    Representative Torres's staff immediately placed another request for a full visit of the facility, which ICE scheduled for July 28, 2025—10 days after the request was made. The visit took place as scheduled at 10:00 a.m. PT on July 28. Representative Torres and her staff reviewed the East Wing and West Wing facilities, the latter of which holds female detainees. They also observed the female health clinic and an ongoing immigration court proceeding, which was taking place virtually. Representative Torres was told that she was not allowed to speak with detainees, and that neither she nor her staff could have access to detained constituents unless names were sent in

advance along with a privacy release form with the detainee's own signature. The staff located at the facility indicated that the number of detainees was well below capacity. Representative Torres observed low-risk and medium-risk detainees, but not high-risk detainees.

242.     Representative Torres's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents, who are directly affected by the presence of ICE facilities near her district. The information obtained through in-person oversight is also directly relevant to her work on the Appropriations Committee.

243.     Representative Torres intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Torres is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 10.     Representative Thompson

244.     Representative Thompson represents Mississippi's 2nd congressional district and is the ranking member of the Homeland Security Committee. From 2007 to 2011 and 2019 to 2023, he served as chair of the committee; during all other times since 2005, he has served as the ranking member. As part of that role, he has been actively engaged in oversight of DHS and ICE since Congress created those agencies.

245.     An ICE detention facility, the Adams County Correctional Center, is located in his district, and an ICE field office is located just outside of his district in Mississippi. His office does regular and significant case work for constituents involving ICE activities and detention, at the Adams County Correctional Center facility in particular.

246.    In the course of conducting oversight of DHS, Representative Thompson has performed many in-person visits to immigration detention facilities, including ICE facilities and many CBP facilities.

247.    For example, in April 2025, Representative Thompson visited the Central Louisiana ICE Processing Center and South Louisiana ICE Processing Center, where he received tours of the facilities and spoke with detained individuals about their medical care and other concerns. In addition, at his direction as then-chair of the Homeland Security Committee, committee staff visited eight ICE detention facilities in Louisiana, Mississippi, California, New Mexico, and Maryland, leading to the 2020 committee staff report on the conditions of confinement and the inadequacy of DHS's internal oversight tools.[38]

248.    Those on-the-ground oversight visits and activities are integral to other activities Representative Thompson has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

249.    On July 21, 2025, Representative Thompson, along with Representatives Raskin and Neguse, traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility were unknown. They were also aware of reports regarding poor conditions and overcrowding at ICE field offices across the country. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the Washington Field Office.

---

[38] *ICE Detention Facilities* Report, *supra* n.6.

250.    Upon arrival, Representative Thompson and the others identified themselves and were greeted at the door around 10:00 a.m. by a guard, who asked them to wait outside while he conferred with officials inside. An ICE official offered to show them only the public lobby. After the representatives explained that they intended to and were authorized under section 527 to tour entire facility, the ICE official returned inside to confer with management. Eventually, the deputy field office director and assistant field office director informed them that their latest guidance was that field offices are not subject to section 527. On that basis, ICE denied Representatives Thompson, Neguse, and Raskin entry to conduct an oversight visit.

251.    In answer to questions from the representatives, the ICE officials confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. The Washington Field Office is being used to detain or otherwise house noncitizens.

252.    Representatives Thompson, Neguse, and Raskin left the facility without being able to conduct the oversight which they are entitled by statute to perform.

253.    Representative Thompson's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Homeland Security Committee and to his ability to serve his constituents, who are directly affected by the presence of ICE facilities in and nearby his district. He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both planned and unannounced visits.

254.    Without the information that can be obtained only in those circumstances, Representative Thompson is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 11.    Representative Neguse

255.    Representative Neguse represents Colorado's 2nd Congressional district. He has served as the Assistant Democratic Leader in the House since 2024 and is a member of the Judiciary Committee. He also previously served on the Immigration Subcommittee of the Judiciary Committee. As a member of the Judiciary Committee, he has been actively engaged in oversight of DHS and ICE.

256.    Representative Neguse's previous oversight activities include in-person oversight visits to ICE facilities where noncitizens were detained or otherwise housed in 2019 and 2020, and his staff has, at his direction, aided his oversight duties by visiting ICE facilities in 2019, 2023, and 2024. As a member of the Colorado delegation, he has focused his concerns in particular on the use of private contractor facilities to detain noncitizens, including at the ICE detention facility in Aurora, Colorado. He has issued statements and written letters to DHS and ICE leadership raising those concerns.

257.    On July 21, 2025, Representative Neguse joined Representatives Thompson and Raskin in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Neguse based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices. *See supra* ¶¶ 249–52.

258.    Oversight visits by Representative Neguse and his staff provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

259.    Representative Neguse intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and

accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

260.     Without obtaining necessary information through this oversight, Representative Neguse is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 12.     Representative Raskin

261.     Representative Raskin represents Maryland's 8th congressional district. He currently serves as the ranking member of the Judiciary Committee. From 2023 to 2025 he served as ranking member of the House Oversight Committee. Before 2023, he was a member of both the Judiciary and Oversight Committees; he also served as chair of the Subcommittee on Civil Rights and Civil Liberties of the Oversight Committee.

262.     Oversight of immigration matters is particularly important to Representative Raskin's service on the Judiciary Committee. The Judiciary Committee has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. The committee has authorized tens of billions of dollars for ICE, including for detention facilities. Because Representative Raskin is the ranking member of the Judiciary Committee, it is very important for him to have an accurate and detailed understanding of ICE's detention operations, including the processes under which ICE detains individuals and the conditions in which they are detained. In-person oversight visits, both announced and unannounced, are critical to this understanding of ICE detention facilities.

263.     Immigration enforcement and detention are important issues to Representative Raskin's constituents, who often reach out to his office about these matters. Some of these constituents have family members in ICE detention, and they are desperate for information about

their relatives. Recently, his office was contacted by a Maryland resident whose mother is in immigration detention and is facing removal despite the fact that she fled her country of origin because of persecution on the basis of her religion and political opinions. Another of his constituents was unexpectedly detained by ICE in front of his home on his way to work, despite having no criminal record or any removal order; he was transferred to a facility in Texas for no apparent reason. Constituents have also told Representative Raskin's office that ICE refuses to provide their detained relatives with a privacy waiver form, which is necessary to allow family members to learn about their case.

264.    Representative Raskin also engaged in oversight of DHS and ICE in his prior capacity as member and subcommittee chair of the House Oversight Committee. In August and September 2019, the Oversight Committee sent bipartisan staff delegations across the country to conduct oversight inspections of DHS immigration detention facilities. Committee staff inspected 22 DHS facilities in six states, including 12 detention centers run by ICE and for-profit contractors, seven Border Patrol stations, and three ports of entry operated by CBP. DHS cancelled staff inspections of 11 CBP facilities a day before they were to occur.[39]

265.    A 2019 investigation by the Oversight Committee, in which Representative Raskin participated, led to issuance of a staff report in 2020 on the poor treatment of detainees in detention facilities operated by private contractors, focusing especially on deaths in custody and deficient medical care. That report followed staff visits to 12 detention facilities, 10 of which were operated by contractors and two by ICE. The report concluded that the detention system needs fundamental reform, including greater internal and external oversight, and that privately run facilities are particularly problematic. It also concluded that DHS and ICE had refused to release full investigative reports into detainee deaths, as required by law.

---

[39] *ICE Detention Facilities* Report, *supra* n.6.

266.    Representative Raskin's oversight visits have also led to oversight actions during his service in Congress. In July 2019, he chaired a hearing on inhumane treatment of children in detention facilities. In August 2020, he requested that the Government Accountability Office (GAO) prepare a report on the care of pregnant women in DHS facilities, which it did. In March 2020, Representative Raskin requested that ICE and CBP provide documents on procedures in detention facilities to protect detainees from the virus that causes COVID-19.

267.    In September 2020, the Oversight Committee, along with the Homeland Security Committee, opened an investigation into a medical whistleblower complaint from an ICE detainee and requested that ICE produce documents. In May 2024, Representative Raskin, along with other members of the Oversight Committee, requested that GAO conduct a review of medically necessary procedures for detainees in ICE and CBP facilities.

268.    More recently, during the current Trump administration, Representative Raskin has sent several letters to DHS and ICE leadership, raising issues such as the detention of U.S. citizens, DHS plans for detention of families, and the detention of individuals whose student visas have been revoked.

269.    On July 21, 2025, Representative Raskin joined Representatives Thompson and Neguse in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Raskin based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices. *See supra* ¶¶ 249–52.

270.    Representative Raskin's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Judiciary Committee and to his ability to serve his constituents. These visits provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the

appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

271.     Representative Raskin intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation, serve on relevant committees, and otherwise serve his constituents.

272.     Without obtaining necessary information through this oversight, Representative Raskin is less able to serve his constituents, ensure that DHS and ICE are acting consistently with the law, and craft relevant legislation and appropriations, including limits on such appropriations.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA—Contrary to Law and in Excess of Statutory Authority

273.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

274.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

275.     Defendants' oversight visit policy, which requires individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibits members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, is final agency action.

276.     Defendants' oversight visit policy is "not in accordance with law" under 5 U.S.C. § 706(2)(A) because it is contrary to the requirements of section 527.

277.     Defendants' oversight visit policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because no statute or other source of law provides Defendants with the authority to prohibit unannounced oversight visits by individual members of Congress to any DHS facilities that detain or otherwise house noncitizens.

## COUNT II

### Violation of the APA—Arbitrary, Capricious, and an Abuse of Agency Discretion

278.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

279.     The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

280.     Defendants' oversight visit policy, which requires individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibits members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, is final agency action.

281.     Defendants' oversight visit policy is arbitrary and capricious because it lacks a lawful basis and because Defendants have not articulated an adequate, reasoned, or lawful basis for requiring seven days' notice for individual members of Congress to inspect DHS facilities or for denying members of Congress access to ICE field offices, where noncitizens are detained or otherwise housed, for the purpose of conducting oversight.

## COUNT III

### Violation of the APA—Unlawfully Withheld or Unreasonably Delayed

282.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

283.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

284.    Section 527 imposes a mandatory duty on Defendants to admit individual members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

285.    Defendants have not complied with their nondiscretionary duties to admit individual members of Congress without advance notice to DHS facilities, including ICE field offices, used to detain or otherwise house noncitizens for the purpose of conducting oversight.

286.    This court should compel Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purposes of conducting oversight.

## COUNT IV

### *Ultra Vires* / Violation of Section 527

287.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

288.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted "beyond th[e] limitations" set by federal statute, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

289.    Plaintiffs have a nonstatutory right of action to ask a court to enjoin and declare unlawful official action that is *ultra vires*. Section 527 establishes a nondiscretionary duty on the part of Defendants to admit members of Congress to DHS facilities used to detain or house noncitizens.

290.    Each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise

house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding section 527.

291. Defendants' oversight visit policy, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, violates section 527.

292. Plaintiffs are entitled to equitable relief to remedy Defendants' ongoing violation of federal law.

## COUNT V

### Mandamus Act and All Writs Act

293. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

294. The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

295. The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

296. Section 527 imposes a mandatory duty on Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens.

297. Defendants' oversight visit policy, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house

noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS

facilities, including ICE field offices, is contrary to section 527.

298.    Defendants have not complied with their nondiscretionary duty under section 527 to

admit individual members of Congress to conduct oversight activities without advance notice at

DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

299.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant

to 28 U.S.C. §§ 1361 and 1651 to compel Defendants' nondiscretionary legal duty to admit members

of Congress, without advance notice, to DHS facilities used to detain or otherwise house

noncitizens.

## COUNT VI

### Declaratory Judgment Act

300.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1

through 272.

301.    Defendants' refusal to admit individual members of Congress to DHS facilities used

to detain or otherwise house noncitizens, including ICE field offices, to conduct oversight activities

without advance notice violates Plaintiffs' rights under section 527.

302.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes the Court to

"declare the rights . . . of any interested party seeking such a declaration," in addition to any

injunctive or other available relief.

303.    Plaintiffs are entitled to a declaratory judgment awarding them declaratory and

injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter the following relief:

A.     Declare unlawful, vacate, and set aside Defendants' oversight visit policy, requiring members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, as contrary to law, in excess of statutory authority, arbitrary and capricious, and *ultra vires*.

B.     Declare unlawful, vacate, and set aside Defendants' withholding and unreasonable delays of performing their mandatory duties to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

C.     Grant preliminary and permanent injunctive relief to enjoin Defendants from enforcing, implementing, maintaining, or giving effect to the oversight visit policy, including through denying individual members of Congress entry to conduct oversight visits, without prior notice, at any DHS facilities that detain or otherwise house noncitizens.

D.     Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate relief pending review, barring Defendants from enforcing or otherwise giving effect to the oversight visit policy.

E.     Enter an order in exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that individual members of Congress may conduct oversight visits, without advance notice, at all DHS facilities that detain or otherwise house noncitizens.

F.     Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate.

G.     Grant such other relief as the Court deems just, equitable, and proper.

July 30, 2025                              Respectfully submitted,

                                          */s/ Christine L. Coogle*
                                          Christine L. Coogle (D.C. Bar No. 1738913)
                                          Lisa Newman (TX Bar No. 24107878)
                                          Paul R.Q. Wolfson (D.C. Bar No. 414759)
                                          Brian D. Netter (D.C. Bar No. 979362)
                                          Josephine T. Morse (D.C. Bar No. 1531317)
                                          Skye L. Perryman (D.C. Bar No. 984573)

                                          DEMOCRACY FORWARD FOUNDATION
                                          P.O. Box 34553
                                          Washington, D.C. 20043
                                          (202) 448-9090
                                          ccoogle@democracyforward.org

                                          Daniel Martinez
                                          D.C. Bar No. 90025922
                                          Ronald A. Fein
                                          D.C. Bar No. 90026641
                                          Katherine M. Anthony
                                          D.C. Bar No. 1630524
                                          Jessica Jensen
                                          D.C. Bar No. 1048305

                                          AMERICAN OVERSIGHT
                                          1030 15th Street NW, B255
                                          Washington, DC 20005
                                          (202) 897-2465
                                          danny.martinez@americanoversight.org

                                          *Counsel for Plaintiffs*