# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>          *Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>          *Defendants*. | Case No. 25-cv-2463-JMC |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR STAY UNDER 5 U.S.C. § 705 OR,
## IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

I.    The Growing Humanitarian Crisis in DHS Detention Facilities.................................... 2

II.   The Duty and Authority of Members of Congress to Conduct Oversight...................... 5

III.  The Right of Members of Congress to Conduct Oversight Visits to DHS Facilities ............ 11

IV.   Defendants' Obstruction of Plaintiffs' Oversight Activities ....................................... 14

      A.    Defendants' oversight visit policy ................................................................. 14

      B.    Plaintiffs' oversight activities hindered by Defendants' oversight visit policy ........... 16

            1.    Plaintiffs' individual interests in DHS oversight ................................. 16

            2.    Plaintiffs' obstructed oversight visits to ICE facilities ....................... 19

LEGAL STANDARD ........................................................................................................... 24

ARGUMENT ....................................................................................................................... 25

I.    Plaintiffs Are Likely to Succeed on the Merits ........................................................... 25

      A.    Plaintiffs have standing to bring these claims ............................................... 25

      B.    The oversight visit policy violates the APA.................................................... 28

            1.    The policy is final agency action ........................................................ 28

            2.    The policy is contrary to law and in excess of statutory authority ................. 29

            3.    The policy is arbitrary and capricious ................................................ 32

            4.    Defendants have unlawfully withheld oversight visits from members of Congress ........... 37

      C.    The oversight visit policy is *ultra vires* ...................................................... 37

      D.    In the alternative, Plaintiffs are entitled to mandamus relief ......................... 39

II.   Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm........................ 40

III.  The Equitable Factors Strongly Favor Preliminary Injunctive Relief ........................... 43

IV.   The Court Should Stay the Oversight Visit Policy under Section 705....................... 45

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ................................................. 31

*Am. Foreign Serv. Ass'n v. Trump*,
    No. 25-cv-1030- PLF, 2025 WL 1387331 (D.D.C. May 14, 2025) .................................... 44

*Am. Hosp. Ass'n v. Burwell*,
    812 F.3d 183 (D.C. Cir. 2016) ........................................................................................ 40

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ........................................................................................................ 38

*Barenblatt v. United States*,
    360 U.S. 109 (1959) .......................................................................................................... 6

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................................................ 29

*Byrd v. EPA*,
    174 F.3d 239 (D.C. Cir. 1999) ........................................................................................ 42

*C.G.B. v. Wolf*, 4
    64 F. Supp. 3d 174 (D.D.C. 2020) .................................................................................. 44

*Chamber of Commerce of the U.S. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ................................................................................... 38, 40

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................................... 25, 41

*Coalition for Humane Immigrant Rights v. Noem*,
    No. 25-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025) ................................ 25, 35, 45

*Comm. on the Judiciary of U.S. House of Reps. v. McGahn*,
    968 F.3d 755 (D.C. Cir. 2020) (en banc) .............................................................. 25, 27, 28

*DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) ................................... 39

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
    944 F.3d 945 (D.C. Cir. 2019) ........................................................................................ 41

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) .......................................................................................................... 6

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
    416 F. Supp. 2d 30 (D.D.C. 2006) .................................................................................. 42

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   878 F.3d 371 (D.C. Cir. 2017) ............................................................................. 26

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   266 F. Supp. 3d 297 (D.D.C. 2017) ..................................................................... 41

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ............................................................................................. 35

*Ex parte Young,*
   209 U.S. 123 (1908) ............................................................................................. 38

*FEC v. Akins,*
   524 U.S. 11 (1998) ............................................................................................... 26

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ............................................................................................. 33

*Greer v. Spock,*
   424 U.S. 828 (1976) ............................................................................................. 26

*In re Ctr. for Biological Diversity,*
   (D.C. Cir. 2022) ................................................................................................... 40

*In re Nat'l Nurses United,*
   47 F.4th 746 (D.C. Cir. 2022) ............................................................................. 39

*Kendall v. U.S. ex rel. Stokes,*
   37 U.S. 524 (1838) ............................................................................................... 39

*Kingdom v. Trump,*
   No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025) .................................. 45

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 44

*Lovitky v. Trump,*
   949 F.3d 753 (D.C. Cir. 2020) ............................................................................. 40

*Maloney v. Murphy,*
   984 F.3d 50 (D.C. Cir. 2020) ............................................................................... 26

*Marbury v. Madison,*
   5 U.S. (1 Cranch) (1803) ...................................................................................... 39

*Mexichem Specialty Resins, Inc. v. EPA,* 7
   87 F.3d 544 (D.C. Cir. 2015) ............................................................................... 41

*McGrain v. Daugherty,*
   273 U.S. 135 (1927) ........................................................................................... 5, 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................33, 34, 35, 36

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) ........................................................................ 38

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) ...................................................................................... 29

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................25, 44

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ...................................................................................... 39

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ....................................................................................37, 38

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ...................................................................................... 45

*Ohio v. EPA*,
    603 U.S. 279 (2024) ...................................................................................... 33

*Payne Enters., Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ........................................................................ 42

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ...................................................................................... 35

*Raines v. Byrd*,
    521 U.S. 811 (1997) ....................................................................................27, 28

*Ramirez v. ICE*,
    471 F. Supp. 3d 88 (D.D.C. 2020) .................................................................. 37

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ........................................................................ 26

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................... 25

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ........................................................................ 40

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 5
    66 U.S. 560 (2012) ........................................................................................ 31

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................................ 45

*Toussaint v. McCarthy,*
  801 F.2d 1080 (9th Cir. 1986) ................................................................................. 26

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ................................................................................................ 26

*Trump v. Mazars USA, LLP,*
  591 U.S. 848 (2020) .............................................................................................. 5, 6

*U.S. Dep't of the Navy v. FLRA,*
  665 F.3d 1339 (D.C. Cir. 2012) .............................................................................. 45

*United States v. Fischer,*
  64 F.4th 329 (D.C. Cir.) .......................................................................................... 32

*United States v. Rumely,*
  345 U.S. 41 (1953) .................................................................................................... 5

*Va. House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019) ................................................................................................ 27

*W. Virginia v. EPA,*
  577 U.S. 1126 (2016) .............................................................................................. 45

*Wash. Post v. DHS,*
  459 F. Supp. 2d 61 (D.D.C. 2006) .......................................................................... 42

*Watkins v. United States,*
  354 U.S. 178 (1957) .............................................................................................. 5, 6

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
  No. 25-917-RJL, 2025 WL 1502329 (D.D.C. May 27, 2025) ................................ 26

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
  566 U.S. 189 (2012) ................................................................................................ 28

## U.S. Constitution and Statutes

5 U.S.C. § 706 ................................................................................................... 29, 33, 37

5 U.S.C. § 705 ........................................................................................................... 25

5 U.S.C. § 706 ....................................................................................................... 28, 29

6 U.S.C. § 205 ........................................................................................................... 43

6 U.S.C. § 272 ........................................................................................................... 43

6 U.S.C. § 345 ........................................................................................................... 43

18 U.S.C. § 2246(5) .............................................................................................................. 31

42 U.S.C. § 2000ee-1 ........................................................................................................... 43

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532,
133 Stat. 13, 42 (Feb. 15, 2019) ..................................................................................... 11

Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, div. D, title V, § 532(a),
133 Stat. 2317, 2530 ...................................................................................................13, 14

Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182,
1473 (Dec. 27, 2020) ......................................................................................................... 14

Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340
(Mar. 15, 2022) ................................................................................................................. 14

Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459,
4752 (Dec. 29, 2022) ......................................................................................................... 14

FY2024 Appropriations Act, div. C, title V, § 527(a), Pub. L. No. 118-47,
138 Stat. 460, 619 (Mar. 23, 2024) ........................................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4,
139 Stat. 9 (Mar. 15, 2025) ..........................................................................................14, 27

U.S. Const. art. I, sec. 9, cl. 7 ............................................................................................. 45

**Legislative Authorities**

H.R. Rep. No. 116-163 (2019) ..........................................................................................8, 9

H.R. Rep. No. 116-180 (2019) ............................................................................................... 9

H.R. Rep. No. 116-720 (2021) ............................................................................................. 10

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ........................................................................31, 32

Col. Nathan Cook et al., *The Congressional Delegation: A Great Opportunity to Build Trust and
Inform Strategic Decisions*, Military Rev., Mar–Apr. 2022 ............................................... 8

Jason Crow, *ICE Accountability Report*, https://perma.cc/CK4D-PXC9 ............................. 12

CRS, RL30240, "Summary," *Congressional Oversight Manual* (2022),
https://perma.cc/4V9G-P427 .....................................................................................5, 6, 10

CRS, R46113, *Department of Homeland Security Appropriations: FY2020* (Jan. 21, 2020),
https://perma.cc/C344-CDBN ........................................................................................... 14

Decl. of Alex Doe, *RFK Human Rights v. DHS*, No. 25-cv-1270
  (D.D.C. filed May 8, 2025), ECF Nos. 15-3 ........................................................................43, 44

Decl. of Anthony Enriquez, *RFK Human Rights v. DHS*, No. 25-cv-1270
  (D.D.C. filed May 8, 2025), ECF Nos. 15-11

Decl. of Kelsey Vitullo, *RFK Human Rights v. DHS*, No. 25-cv-1270
  (D.D.C. filed May 8, 2025), ECF Nos. 15-9 ........................................................................43, 44

ICE, *Performance-Based National Detention Standards 2011* (updated Dec. 2016),
  https://perma.cc/3DR5-WT5C ....................................................................................... 34

ICE, *U.S. Immigration and Customs Enforcement (ICE) Facility Visits for Members of
  Congress and Staff* (June 2025), *archived at* https://perma.cc/UL23-J4ZM ............................ 15, 35, 36

9 *Journals of the Continental Congress, 1774–1789* (Worthington C. Ford, ed., 1907)................................. 7

Levin Ctr., *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, and
  Abuse in World War II* (2021), https://perma.cc/4EJU-Z6Y4 ........................................................7, 8

Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities:
  Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC............................9, 12

*Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV ................................... 15

*Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations
  (May 14, 2025), https://perma.cc/F3ZB-HVVQ..........................................................................15, 35

2 *The Records of the Federal Convention of 1787* (Max Farrand, ed., Yale Univ. Press 1911) ...................... 5

*Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*,
  9 Op. O.L.C. 60, 60 (1985) .......................................................................................................... 5

Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties,
  *The Trump Administration's Mistreatment of Detained Immigrants* (2020),
  https://perma.cc/37NF-SFBS.........................................................................................................9, 13

*Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax
  Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) ................................ 5

ICE, Policy No. 11807.2: Operations of ERO Holding Facilities, § 5.1 (2024),
  https://perma.cc/X92C-R5NP ....................................................................................................4, 31

Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K.
  McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4......................................................... 13

Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021),
  https://perma.cc/ALL9-KB83......................................................................................................... 10

Remarks, Sen. Comm. on the Judiciary, Sen. Charles Grassley on the
Importance and Responsibility of Congressional Oversight (June 25, 2018),
https://perma.cc/N687-4XQC ................................................................................................ 6

*Senate Stories: A World War II Combat Tour for Senators*, U.S. Senate Historical Office
(Oct. 6, 2022), https://perma.cc/59UM-3LPY ...................................................................... 8

U.S. Senate Historical Office, *Special Committee to Investigate the National Defense Program*,
https://perma.cc/SY7L-ET94 ................................................................................................ 7

Webster's Unabridged Dictionary (1989 ed.) ...................................................................... 31, 32

Woodrow Wilson, *Congressional Government* 287 (1885) ................................................................ 5

## INTRODUCTION

In support of its aspiration to deport one million individuals each year, the Trump-Vance administration has directed immigration officials to apprehend and detain unprecedented numbers of people. With approximately 59,000 noncitizens in the custody of U.S. Immigration and Customs Enforcement (ICE) as of July 2025, ICE detention facilities have exceeded 140% of their capacity.

At the same time, the administration has taken unprecedented steps to evade longstanding legal mechanisms adopted to ensure public scrutiny of ICE's actions. The Department of Homeland Security (DHS) has decimated internal offices designed to identify, solve, and inform Congress about problems at immigration detention facilities. And DHS, ICE, and their respective leaders (collectively, "Defendants") have sought to prevent members of Congress from gaining access to facilities and obtaining real-time information about crises unfolding where noncitizens are being detained.

Each year since 2019, Congress has adopted, and the President has signed into law, provisions prohibiting DHS from using appropriated funds "to prevent" "[a] Member of Congress" "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens." That law, known as "section 527," further provides that a member of Congress may not be required "to provide prior notice of the intent to enter a [DHS] facility . . . for the purpose of conducting oversight."

Nevertheless, Defendants have adopted a new policy (the "oversight visit policy") that directly contravenes these clear provisions of law by requiring members of Congress to provide at least seven days' written notice before conducting oversight visits and by preventing oversight visits to facilities where noncitizens are detained that ICE does not label as "detention facilities."

Based on Defendants' new oversight visit policy, Plaintiffs, 12 members of Congress, have each been denied entry to ICE facilities for the purpose of conducting oversight over the last several weeks. For some Plaintiffs, the facilities are in or near their congressional districts, and the oversight

visits are critical to their constituent casework. Other Plaintiffs sit on committees with regulatory, oversight, and appropriations jurisdiction over DHS and ICE, and the oversight visits are critical to their individual responsibilities. For all Plaintiffs, Defendants' actions are unlawful and are causing immediate and irreparable harm to Plaintiffs' interests and responsibilities. This Court's intervention is required to vindicate the law. Plaintiffs' motion for a stay under 5 U.S.C. § 705 or preliminary injunction should be granted.

## BACKGROUND

### I.  The Growing Humanitarian Crisis in DHS Detention Facilities

A humanitarian crisis is rapidly unfolding in the nation's immigration detention system as the current administration pursues the President's goal of deporting an unprecedented number of individuals each year.[1] The number of individuals detained by ICE has exploded in the last several months. Public reporting reveals that, in February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals—and that number has continued to increase since then.[2] In March 2025, ICE reportedly held 47,600 individuals in detention and announced that immigration detention facilities had been filled to capacity.[3] This overflow did not slow ICE down: by late June 2025, the number of individuals in immigration detention had grown to about 59,000.[4] Congress last allocated 41,500 beds for detainees, meaning that ICE detention facilities exceeded 140% capacity.[5] And there is every indication that the number of ICE arrests and detentions will only continue to grow at an unmanageable rate.

---

[1] *See* Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.

[2] *See* Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

[3] *US immigration detention maxed out at 47,600 detainees, ICE official says*, Reuters (Mar. 12, 2025), https://perma.cc/6ZDL-F3JH.

[4] Camilo Montoya-Galvez, *ICE holding a record 59,000 immigrant detainees, nearly half with no criminal record, internal data show*, CBS News (June 24, 2025), https://perma.cc/48NE-TNUG.

[5] *Id.*; *see* Press Release, ICE, ICE announces ongoing work to optimize enforcement resources (June 10, 2024), https://perma.cc/Y74B-ZCLB.

Concerns regarding poor conditions in ICE facilities predate the current administration, but recent news reports suggest that detention conditions have drastically deteriorated as the number of individuals in ICE custody has risen.[6] In some cases, detainees are being denied medical care, forced to sleep on the floor in overcrowded cells, and severely underfed, with potentially deadly consequences.[7]

As the number of arrested and detained individuals grows beyond the capacity of existing ICE detention facilities, DHS has increasingly used ICE field offices to hold noncitizens, sometimes for days at a time. *See, e.g.*, Decl. of Rep. Jimmy Gomez, Ex. A. For example, members of Congress have received reports that immigrants were being detained and held in the basement of the ICE Los Angeles Field Office—some overnight—in inhumane conditions.[8] *See* Gomez Decl. ¶ 7; Garcia Decl. ¶ 15. Recent public reporting has similarly raised concerns about the conditions of detention at field offices in Baltimore and New York. Video footage captured by an individual detained in the New York facility showed significant overcrowding and a lack of safe and sanitary conditions.[9] The conditions of confinement at field offices are of particular concern because field offices are not designed to be facilities in which individuals are detained or housed for long periods of time. Indeed, ICE's own policy states that "no detainee should be housed in a holding facility" within an ICE field office "for

---

[6] Yale Law School, News, *Students Document Reports of Abuse at Immigration Detention Center* (Jan. 17, 2025), https://perma.cc/4MA4-VF6K; Jasmine Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers*, NPR (June 6, 2025), https://perma.cc/B9B6-KN2D; Tracee Wilkins & Rick Yarborough, *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Wash. (Mar. 12, 2025), https://perma.cc/MCM8-UMZP.

[7] Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers,* https://perma.cc/B9B6-KN2D; Wilkins and Yarborough, *'Like living in a dark room'*, https://perma.cc/MCM8-UMZP; Lauren Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA Today (Mar. 24, 2025), https://perma.cc/QW2W-M4XX.

[8] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[9] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

longer than 12 hours," absent "exceptional circumstances."[10]

In the administration's rush to increase its immigration detention capacity, DHS has also begun reopening previously shuttered for-profit facilities—many of which had been closed due to poor conditions.[11] One reopened facility, privately owned Delaney Hall in Newark, has already faced accusations of abusive conditions, including persistent food shortages and mistreatment of detainees.[12] Public reporting suggests that detainees there—many of whom have never been convicted of a crime—have been fed only two meals a day and have gone up to 20 hours without food; one woman did not receive her daily medication for three or four days; and dozens of family members were prevented from seeing their detained loved ones after traveling there to visit.[13]

Moreover, the recently passed reconciliation act allocates a staggering $45 billion for ICE detention capacity, including family residential center capacity. Pub. L. No. 119-21, § 90003(a), 139 Stat. 72, 358 (2025). This appropriation is more than 13 times ICE's current annual detention budget, which was already at a record high.[14] This dramatic budgetary expansion will inevitably create more opportunities for abuse and misuse of power, making robust congressional oversight even more important. This is especially true as Congress is working to determine fiscal year 2026 appropriations, including any restrictions it may place on the funding provided to DHS and ICE.

All of these circumstances mean that Congress's direct oversight role with respect to DHS and ICE is more critical than ever.

---

[10] ICE, Policy No. 11807.2: Operations of ERO Holding Facilities, § 5.1 (2024), https://perma.cc/X92C-R5NP.

[11] Amanda Hernández, *For-profit immigration detention expands as Trump accelerates his deportation plans*, Stateline (Apr. 11, 2025), https://perma.cc/TT7N-22BM; Allison McCann, Alexandra Berzon & Hamed Aleaziz, *Trump Administration Aims to Spend $45 Billion to Expand Immigrant Detention*, N.Y. Times (Apr. 7, 2025), https://perma.cc/6JNL-S6B8.

[12] Mark Crudele et al., *4 detainees remain unaccounted for following unrest at New Jersey ICE facility: Officials*, ABC News (June 13, 2025), https://perma.cc/2MAQ-CSW8.

[13] *See* Ricardo Kaulessar, *Before recent Delaney Hall uprising, detainees frequently complained about conditions*, NorthJersey.com (June 18, 2025), https://perma.cc/N8AP-JFXH.

[14] Hayes Brown, *How ICE's massive cash infusion is poised to transform America*, MSNBC (July 7, 2025), https://perma.cc/B7DS-G7NB.

## II. The Duty and Authority of Members of Congress to Conduct Oversight

Members of Congress are "meant to be the eyes and the voice" of the government and "to embody the wisdom and will of [their] constituents." Woodrow Wilson, *Congressional Government* 287 (1885). To that end, members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." *Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) (quoting *Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985)). This authority "to secure needed information . . . is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161, 174 (1927)). Indeed, "[i]t is the proper duty" of the people's representatives "to look diligently into every affair of government and to talk much about what [they] see[]," because "[u]nless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *Id.* at 865 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)); *see also* CRS, RL30240, "Summary," *Congressional Oversight Manual* (2022), https://perma.cc/4V9G-P427 ("The information that oversight can bring to Congress is essential as the body grapples with the complexities of American government and society.").

Accordingly, "[f]rom the earliest times in its history, the Congress has assiduously performed an informing function" that permits members of Congress "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (quotation marks omitted); *see also* 2 *The Records of the Federal Convention of 1787*, at 206 (Max Farrand, ed., Yale Univ. Press 1911) ("[Members of Congress] are not only Legislators but they possess inquisitorial powers."). The Supreme Court has long recognized that "the power to

investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. The power to "secure needed information" is thus firmly grounded in Congress's duty and authority to exercise "[a]ll legislative powers" under Article I of the U.S. Constitution. *Id.* at 160–61.

This power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). It "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars*, 591 U.S. at 862 (quoting *Watkins*, 354 U.S. at 187). This power extends to investigations of administrative agencies, which are creatures of statute and may use appropriated funds only in accordance with limitations that Congress places on those funds. Presidential administrations have thus duly recognized Congress's authority to investigate the executive branch, "as an adjunct to the legislative process," as far back as 1792. *Id.* at 859, 862 (quotation marks omitted); *Congressional Oversight Manual* at 4.

Congress exercises its investigative duty and authority in various ways. Through its committees, for example, it regularly requests and, when necessary, compels documents and testimony, including from executive branch officials. Individual members of Congress play distinct oversight roles, and "each member needs accurate information from the executive branch in order to make informed decisions on all sorts of matters." Remarks, Sen. Comm. on the Judiciary, *Sen. Charles Grassley on the Importance and Responsibility of Congressional Oversight* (June 25, 2018), https://perma.cc/N687-4XQC. Those matters vary by member, according to the concerns of their constituents, their committee memberships, and their issue areas of focus. For example, pursuant to

their individual oversight roles, members of Congress regularly write letters raising concerns to and requesting information from executive branch officials.[15]

This case involves a distinct means of oversight: members of Congress seeking access and information on the ground through in-person investigations. On-the-ground oversight has long been a part of federal lawmakers' factfinding work. In 1777, an appointed congressional committee traveled to the army camp at Valley Forge to assess in person the state of the force. *See* 9 *Journals of the Continental Congress, 1774–1789*, at 1029–31 (Worthington C. Ford, ed., 1907). As a result of the committee's observations, they adopted measures "to determine on the properest mode of reinforcing the Army" to help it serve its mission, including to "provide comfortable Quarters for the Officers and Soldiers" through the winter. *Id.*

The Senate Special Committee to Investigate the National Defense Program, proposed and chaired by then-Senator Harry Truman in 1941, is a prominent example of on-the-ground oversight, as its members took hundreds of trips to inspect facilities supporting the World War II effort. The committee's purpose was to investigate a range of issues related to U.S. war production, including waste, inefficiency, and profiteering. U.S. Senate Historical Office, *Special Committee to Investigate the National Defense Program*, https://perma.cc/SY7L-ET94. As part of the committee's first investigation into the construction of troop quarters, members conducted in-person oversight visits at nine domestic army camps. *Id.* at 2. Senators identified a pattern of reckless overspending through this oversight and, in response to the committee's recommendation, the army reformed its contract-awarding process, saving the U.S. government an estimated $250 million. *Id.* at 2–3; Levin Ctr., *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, and Abuse in World War II* 4 (2021), https://perma.cc/4EJU-Z6Y4. Committee members also conducted inspections of military manufacturing and parts production plants, identifying inadequate and dysfunctional inspection

---

[15] *See, e.g.*, Press Release, Sen. Charles Grassley, Grassley to Gates: Defense IG Audits Need Changes in order to Root Out Waste (Sept. 8, 2010), https://perma.cc/QH83-HUX2.

processes and negligent or intentional distribution of faulty and low-quality parts. *Special Committee to Investigate the National Defense Program* at 3. After the United States entered World War II, two members of Senator Truman's committee joined three other senators in a tour of Allied facilities in England, North Africa, the Persian Gulf, India, China, Australia, and Hawaii. *Senate Stories: A World War II Combat Tour for Senators*, U.S. Senate Historical Office (Oct. 6, 2022), https://perma.cc/59UM-3LPY. During its seven-year existence, in addition to holding 432 public hearings and issuing 51 reports, the members of the Truman Committee took hundreds of trips to inspect facilities supporting the war effort. *Portraits in Oversight* at 6.

Members of Congress and their staff also regularly travel to gather information in congressional delegations. This travel is often undertaken to conduct oversight over the military in particular, "to better inform decisions on items [members of Congress] wish to place in the defense-related bills." Col. Nathan Cook et al., *The Congressional Delegation: A Great Opportunity to Build Trust and Inform Strategic Decisions*, Military Rev., Mar–Apr. 2022, at 109, 110. This in-person oversight is mutually beneficial: it not only informs legislation and appropriations—including limitations on the use of funds—but also gives military leaders an "opportunity to provide input to those who can directly affect or introduce legislation that positively supports national defense." *Id.*

In the last several years, members of Congress and their staff have more frequently exercised the authority to conduct in-person oversight with respect to the nation's southern border and immigration detention facilities. This method of oversight became especially important for many members of Congress during the first Trump administration. In 2018, a humanitarian crisis created by the administration rapidly unfolded at the southern border, where "children and families [were] subjected to inhumane conditions, asylum seekers [were] denied access to our nation's legal ports of entry, and thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became particularly concerned about "DHS'[s] poor management of this

humanitarian crisis," *id.*, so many members traveled to DHS facilities to witness that management firsthand. In June 2018, for example, a bipartisan group of congressmembers toured a DHS facility in Tornillo, Texas, to assess the detention conditions of unaccompanied noncitizen children. Press Release, Brian Fitzpatrick, Fitzpatrick Leads Bipartisan Inspection of Tornillo Detention Center (June 22, 2018), https://perma.cc/M299-W4AD. The information obtained during such visits led to further congressional hearings and reports, including reports regarding the "conditions and care provided at ICE's civil detention facilities" and "conditions and lack of adequate infrastructure at ICE's . . . field offices and sub-offices that serve migrants." H.R. Rep. No. 116-180, at 34–35 (2019).

Congressional visits to immigration detention facilities increased in regularity as these concerns continued through 2018 and 2019. In July 2019, for example, more than a dozen members of Congress conducted tours of two Texas border facilities in response to reports that individuals, including children, were held in distressing conditions. Press Release, H. Comm. on Oversight Democrats, Raskin, Cummings, Committee Members, and Hispanic Caucus to Hold Press Conference on Treatment of Immigrant Children (July 9, 2019), https://perma.cc/X9GA-6HTZ.

Also in the summer of 2019, staff of the House Committee on Homeland Security—at the direction of Plaintiff Representative Thompson, who was then chair—conducted an investigation that involved oversight visits to eight ICE facilities across five states, to assess the conditions of confinement and adequacy of the agency's internal oversight tools. Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC ("*ICE Detention Facilities* Report"). And in August and September 2019, the House Committee on Oversight and Reform and its Subcommittee on Civil Rights and Civil Liberties—of which Plaintiff Representative Raskin was then chair—sent bipartisan staff delegations to conduct oversight visits at 22 DHS detention facilities across six states, including 12 ICE detention facilities. Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties,

*The Trump Administration's Mistreatment of Detained Immigrants* 7 (2020), https://perma.cc/37NF-SFBS ("*Mistreatment of Detained Immigrants* Report").

Members of Congress from both parties also visited the southern border to observe conditions following the COVID-19 pandemic. For example, in March 2021, a group of Republican senators visited a Customs and Border Protection (CBP) facility in Texas to witness firsthand the conditions experienced by the children and families coming into the United States from Mexico. *See* Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021), https://perma.cc/ALL9-KB83. Around the same time, seven Democratic members of the House toured a Department of Health and Human Services (HHS) facility where unaccompanied migrant children were being housed and spoke directly with agency personnel about needed resources. Congressional reports reflect that members visited several ICE detention facilities in 2021, and they "found that ICE . . . le[ft] deficiencies unidentified and uncorrected, and that ICE facilities frequently failed to meet basic standards of care." H.R. Rep. No. 116-720, at 106 (2021).

Robust and effective congressional oversight of DHS and ICE is especially important in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens. Oversight over these agencies—and over immigration detention facilities in particular, including those operated by private contractors—serves the myriad purposes of congressional oversight, including to ensure that "officers faithfully execute laws according to the intent of Congress," to improve "the accountability of agency managers," to "gather[] information to support . . . legislative work," to "assess agency and departmental expenditures" of appropriated funds, and to "help safeguard the rights and liberties of citizens and others." *Congressional Oversight Manual* at 5–7. Members of Congress have used the information gathered through in-person oversight to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds,

to draft and pass relevant legislation, to attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

## III. The Right of Members of Congress to Conduct Oversight Visits to DHS Facilities

In acknowledgment of the importance of congressional oversight regarding the government's immigration operations, federal law since 2019 has mandated that DHS allow individual members of Congress and their staff to conduct oversight at immigration detention facilities on demand.

Congress recognized that gaining access to those facilities and obtaining real-time information in person—including observing conditions and speaking directly with both DHS employees and detained individuals—plays an important role in effective oversight of the administration's use of appropriated funds and its treatment of noncitizens. But members who attempted to conduct oversight to assess the detention conditions of separated families in 2018 were often frustrated by DHS personnel in their attempts to assess on-the-ground conditions of immigration detention facilities without delay and were often denied entry to these facilities completely.[16]

To ensure that its members could assess true facility conditions without obstruction, Congress included a provision in the fiscal year 2019 appropriations act that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532, 133 Stat. 13, 42 (Feb. 15, 2019). President Trump signed that provision into law. The provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility "used to detain or otherwise house" noncitizen minors. *Id.*

Emphasizing the importance of obtaining accurate information, the provision further prohibited the use of appropriated funds "to make any temporary modification at any such facility

---

[16] *See, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA; Espaillat Decl. ¶ 5.

that in any way alters what is observed by a visiting Member of Congress, compared to what would be observed in the absence of such modification." *Id.* In enacting this law, Congress thus underscored that its members need to assess the *actual* conditions in which minor migrants were detained by DHS, without obfuscation or manipulation by executive branch officials.

Many members of Congress, including several Plaintiffs, conducted in-person oversight at DHS detention facilities after the passage of the fiscal year 2019 oversight provision. It was soon clear, however, that the need for oversight by individual members was not limited to facilities housing noncitizen minors, that unannounced oversight was sometimes necessary, and that on-the-ground oversight often required the aid of staff. Indeed, members of Congress and their staff were already actively engaged in this oversight with respect to all individuals detained or housed by DHS.

For example, by July 2019, Plaintiff Representative Crow had instituted weekly visits by him or his staff to the ICE detention facility in his district. *See* Decl. of Rep. Jason Crow ¶ 7; Jason Crow, *ICE Accountability Report*, https://perma.cc/CK4D-PXC9. Representative Crow and his office began to build a productive relationship with ICE officials that has both informed his legislative activities and allowed him to better serve his constituents through close and constructive oversight of that facility. *See id.* ¶¶ 7–11.

Also in summer 2019, Homeland Security Committee staff visited eight ICE facilities and used the information obtained to prepare a report highlighting the failures of internal ICE oversight of immigration detention facilities. *ICE Detention Facilities* Report at 1–2. The report emphasized concerns regarding the conditions of detention at some facilities and the adequacy of DHS's internal oversight tools. It also noted that when congressional staff provided advance notice of oversight visits, "ICE facilities used the advanced warning to improve the conditions within the facility." *Id.* at 8. Staff detected evidence of those improvements, including the smell of fresh paint, evidence of a major clean-up, the relocation of individuals from solitary cells to the general population, and the installation

of new guards. *Id.* at 5; Decl. of Rep. Bennie G. Thompson ¶ 10.[17] In the following months, the House Oversight Committee's bipartisan staff delegation visited 22 DHS detention facilities and examined more than 60,000 documents relating to immigration detention, culminating in a report that identified "serious risks" in ICE detention "due to deficient sanitation practices and poor handling of infectious diseases"; "systemic health and safety issues at immigration detention facilities operated by for-profit contractors," which lack "proper oversight"; and failures by ICE "to publicly release investigative reports on detainee deaths in custody." *Mistreatment of Detained Immigrants* Report at 1–4.

Congressional staff aiding members in their oversight duties also encountered difficulties accessing DHS detention facilities. *Id.* at 7; *ICE Detention Facilities* Report at 5–6. Those difficulties underscored for Congress the importance of allowing members' staff access to aid in their oversight work in DHS facilities where noncitizens are detained or otherwise housed. *See, e.g.*, Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K. McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4.

As a result, the following year, in fiscal year 2020 appropriations, Congress broadened the oversight provision to address the gaps in the previous provision. First, Congress broadened the provision to apply to DHS facilities "used to detain or otherwise house" *any* noncitizens—not just minors. Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, div. D, title V, § 532(a), 133 Stat. 2317, 2530. Second, Congress added that "[n]othing" in the provision "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a DHS facility "used to detain or otherwise house" noncitizens. *Id.* § 532(b). Finally, it broadened the applicability of the provision to designated congressional staff. *See id.* § 532(a), (c); CRS, R46113, *Department of Homeland*

---

[17] Members of Congress visiting other DHS facilities in summer 2019 also observed signs that DHS officials had "clean[ed] up" in preparation for oversight visits. Emily Cochrane, *'It Feels Like a Jail': Lawmakers Criticize Migrant Holding Sites on Border*, N.Y. Times (July 1, 2019), https://www.nytimes.com/2019/07/01/us/politics/texas-migrant-centers.html. One detained woman told a visiting member that "they had gone 15 days without a shower and were allowed to start bathing only four days ago, after the congressional visit was announced." *Id.*

*Security Appropriations: FY2020* (Jan. 21, 2020), https://perma.cc/C344-CDBN.

This expanded provision has been carried forward with identical language in DHS appropriations every year since, including in the most recent continuing resolution signed by President Trump. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Resolution"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025).[18]

Thus, since fiscal year 2020, the law has provided the following:

> **(a)** None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
> > **(1)** A Member of Congress.
> > **(2)** An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
> **(b)** Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
> **(c)** With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

FY2024 Appropriations Act, div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024).

## IV. Defendants' Obstruction of Plaintiffs' Oversight Activities

### A. Defendants' oversight visit policy

On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Acting ICE Director Todd Lyons testified that he and his staff

---

[18] *See* FY2025 Continuing Resolution, §§ 1101(a)(6), 1105; Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022).

were "fully supportive" of congressional oversight visits and committed "to ensur[ing] that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ. Less than a month later, however, ICE adopted a contrary stance with respect to in-person congressional oversight.

In mid-June, in a guidance document posted to its website, ICE indicated for the first time that it would prevent members of Congress from conducting oversight visits at ICE field offices. ICE, *U.S. Immigration and Customs Enforcement (ICE) Facility Visits for Members of Congress and Staff* (June 2025), *archived at* https://perma.cc/UL23-J4ZM ("ICE June Guidance"). Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE made the novel contention that field offices are not "used to detain or otherwise house aliens" under section 527 because individuals housed there have not yet been processed for longer-term "custody determinations." *Id.* at 2, 4.

By June 23, Defendants had finalized the oversight visit policy, broadening it to restrict oversight access to all ICE detention facilities. In addition to the previously asserted exemption to section 527 for ICE field offices, Defendants imposed a new requirement that members of Congress provide seven days' notice in advance of any congressional oversight visit to an ICE detention facility (unless waived by the secretary of DHS). *See, e.g., Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV. They posted this requirement to the ICE Office of Congressional Relations (OCR) webpage, removed the June guidance document from the ICE website, and wiped the website clean of any mention of section 527. *See id.* Neither ICE nor DHS posted a new guidance document providing details in place of the June guidance document, nor did they otherwise explain the new oversight visit policy.

Since June, DHS and ICE officials have denied Plaintiffs access to ICE detention facilities

covered by section 527 on the stated grounds that Defendants require at least seven days' notice and that ICE field offices are entirely excluded from section 527. *See infra* at 20–24.

### B. Plaintiffs' oversight activities hindered by Defendants' oversight visit policy

#### 1. Plaintiffs' individual interests in DHS oversight

Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. The information that can be obtained only through in-person access is essential to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for the upcoming fiscal year 2026.

Many Plaintiffs are leaders or members of committees with jurisdiction over DHS and ICE, and timely and accurate information regarding those agencies' activities is imperative to their committee work. Representative Garcia is the ranking member of the Oversight and Government Reform Committee. Decl. of Rep. Robert Garcia ¶ 2. Representative Thompson is the ranking member of the Homeland Security Committee, on which he has served as ranking member or chair since 2005, and on which Representatives Correa and Goldman also serve. Thompson Decl. ¶ 2; Decl. of Rep. Lou Correa ¶ 2; Decl. of Rep. Daniel S. Goldman ¶ 2. Representative Raskin is the ranking member of the Judiciary Committee, which has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. Decl. of Rep. Jamie Raskin ¶ 2. Representatives Neguse, Correa, and Goldman also serve on the Judiciary Committee. Decl. of Rep. Joe Neguse ¶ 2; Correa Decl. ¶ 2; Goldman Decl. ¶ 2. Representatives Escobar, Espaillat, and Torres all serve on the Appropriations Committee. Decl. of Rep. Veronica Escobar ¶ 1; Decl. of Rep. Adriano Espaillat ¶ 2; Decl. of Rep. Norma Torres ¶ 2. In addition, Representative Espaillat chairs the Congressional Hispanic Caucus, a group of members of

Congress of Hispanic and Latino descent, which includes six other Plaintiffs. Espaillat Decl. ¶ 2.

Several Plaintiffs have significant interest in conducting oversight over immigration detention conditions due to the presence of DHS detention facilities in or near the districts that they represent, which directly affect their constituents. Representative Escobar's district in Texas currently contains both an ICE detention facility and an ICE field office. Escobar Decl. ¶ 3. An additional ICE detention facility is located just outside her district, and yet another ICE detention facility is under construction at the Fort Bliss military base within her district and is predicted to be the largest ICE facility in the country. *Id.* Both an ICE detention facility and an ICE field office are located in Representative Crow's district—and close to Representative Neguse's district—in Colorado. Crow Decl. ¶ 3. An ICE field office and a Bureau of Prisons facility under an agreement with ICE to detain noncitizens are located in Representative Goldman's district—and close to Representative Espaillat's district—in New York. Goldman Decl. ¶ 5–6. Representative Thompson's district in Mississippi contains an ICE detention facility, and an ICE field office is located just outside of his district. Thompson Decl. ¶ 5. An ICE field office is located in Representative Correa's district in California. Correa Decl. ¶ 4. Representative Gomez's district contains an ICE field office in downtown Los Angeles, which is also near to Representative Garcia's and Representative Torres's districts. Gomez Decl. ¶ 7. An additional ICE detention facility in Adelanto, California, is not far away.

Plaintiffs have demonstrated their significant interest in and dedication to DHS and ICE oversight through various oversight and legislative activities across many years. They have sent countless letters to DHS and ICE officials raising concerns and seeking information on a vast array of topics, from the use of military assets and personnel in deportation operations, Escobar Decl. ¶ 31, to individuals' access to phones in immigration detention, *id.*, public health standards and medical care provided in immigration detention facilities, Espaillat Decl. ¶ 9; Crow Decl. ¶ 4, conditions of confinement at processing facilities, Correa Decl. ¶ 6, and more. They have also drafted and

introduced legislation relating to DHS and ICE. For example, after observing ICE agents conducting operations at the immigration courts and attempting to visit the ICE field office in his district, Representative Goldman introduced the No Secret Police Act, which would require DHS agents who are engaged in civil immigration enforcement to display certain identifying insignia and to provide proper identification, and would prohibit them from wearing masks or face coverings. Goldman Decl. ¶ 12. And based on what he observed on a 2018 visit to the ICE Elizabeth Contract Detention Facility, Representative Espaillat cosponsored legislation to facilitate access to counsel and family reunification for individuals who had been separated from their families under the Trump-Pence administration's immigration policies. Espaillat Decl. ¶¶ 5–6.

Finally, Plaintiffs have long engaged in in-person oversight at immigration detention facilities across the country. For example, Representative Escobar has conducted on-the-ground oversight of facilities in and near her district since she became a member in 2019. Escobar Decl. ¶¶ 1, 4. This includes a 2019 visit to an ICE detention facility in her district, where she met and spoke with individuals who had been force-fed while in ICE custody. *Id.* ¶ 8. During a 2019 visit to a Border Patrol facility, she observed expensive and inefficient processes that led her to work with DHS leadership to implement a discrete change that significantly improved those processes. *Id.* ¶ 22. Between 2021 and 2022, Representative Escobar and her staff conducted more than a dozen oversight visits to the Office of Refugee Resettlement Emergency Intake Site at Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the Trump administration's family-separation policy. *Id.* ¶ 7. Her continued presence at DHS and ICE facilities in the area has allowed her both to help hold officials accountable and to build a productive working relationship with those officials. *Id.* ¶¶ 19–22.

Representative Crow and his staff have likewise conducted regular oversight visits to the ICE Denver Contract Detention Facility in Aurora in his district, which is run by a private contractor, the

GEO Group. He first attempted to conduct oversight at the Aurora facility in February 2019, in light of concerning reports of disease outbreaks there. Crow Decl. ¶¶ 4–5. Several weeks passed before ICE personnel granted him entry into the facility. *Id.* Recognizing the importance of accurate, real-time information that can be gained only through accessing the facility for in-person observation and conversations, Representative Crow instituted weekly visits by him or his staff. *Id.* ¶ 7. From July 2019 to March 2020—when the COVID-19 pandemic began—and from July 2022 to July 2025, he and his staff engaged in regular, in-person oversight at the Aurora facility. *Id.* ¶ 7–8. To help keep constituents and the broader public informed, Representative Crow's office publicly shares much of the information obtained through oversight visits and correspondence with ICE and GEO Group personnel. *Id.* ¶ 8. Representative Crow and his staff have built a productive relationship with ICE field directors and other ICE and GEO personnel, and they are often able to identify issues that must be addressed before they become larger problems. *Id.* ¶ 12.

Other Plaintiffs have similarly conducted in-person oversight of immigration detention facilities over the last several years. *See, e.g.*, Gomez Decl. ¶¶ 5–6; Espaillat Decl. ¶ 5. Their access to those facilities and the information gained through those visits has been essential to Plaintiffs' further oversight work, legislative actions, constituent casework, and efforts to keep the public informed of what its government is doing.

### 2. Plaintiffs' obstructed oversight visits to ICE facilities

Based on their unlawful oversight visit policy, Defendants have denied each Plaintiff crucial information needed to conduct oversight on at least one occasion—but as to many Plaintiffs on multiple occasions—by obstructing an attempted oversight visit to a DHS facility where noncitizens are detained or otherwise housed. Defendants have denied Plaintiffs access to ICE facilities to conduct oversight visits based on both their requirement that members provide at least seven days' notice and their asserted exemption of ICE field offices from section 527, notwithstanding the presence of

detainees at those facilities.

Beginning on June 7, 2025, Defendants denied Representative Gomez entry multiple times to the ICE field office at the Roybal Federal Building in Los Angeles ("LA Field Office") for the purpose of conducting oversight. Gomez Decl. ¶ 16. Representative Gomez had become aware of "reports that immigrants showing up for routine check-ins with ICE were being detained and held in the basement" of the LA Field Office in "inhumane conditions." *Id.* ¶ 9. He—along with Representatives Torres and Correa and another member not party to this suit—attempted to visit the LA Field Office on June 7, before Defendants had adopted their oversight visit policy, and they were turned away on the basis that it was "unsafe." *Id.* ¶¶ 10–15. Representative Gomez tried again to visit on June 9 and was again turned away on the same basis. *Id.* ¶ 15.

On June 17, Representative Gomez tried a third time to conduct oversight at the LA Field Office. *Id.* ¶ 16. He was again denied entry, this time on the basis of Defendants' new policy. *Id.* ICE personnel conveyed that the LA Field Office is not a "detention facility" and that immigrants are not detained in field offices. *Id.* ICE confirmed this new policy in subsequent correspondence: on June 20, ICE personnel stated by email that "due to the high operational tempo, we are not currently facilitating any visits to ICE field offices. ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements. ICE does not house aliens at field offices," and "[a]liens determined to require detention are transferred to an ICE detention facility." *Id.*, Ex. A. The email further stated, "the Department is now requiring seven calendar days advance notice for visits to DHS detention facilities." *Id.* When Representative Gomez's staff attempted to schedule a visit by email, ICE again responded that "due to an extremely high operations tempo, we are currently unable to facilitate visits to any of our ICE field offices, including ERO Los Angeles. Also note ICE Field Offices are not detention facilities and fall outside of the Public Law 118-47 General Provisions Sec. 527 requirements." *Id.* In response to questions by Representative Gomez's staff, however, ICE

acknowledged in a later email that noncitizens may remain in detention at the LA Field Office for up to "72 hours." *Id.*

On June 18, Defendants denied Representative Goldman entry to the 10th floor of the ICE New York Field Office ("10th Floor Facility") at 26 Federal Plaza in Manhattan. Goldman Decl. ¶¶ 26–32. Representative Goldman had become aware that individuals were being detained in unacceptable conditions at the field office, and his staff had emailed ICE on June 9 and again on June 16 to provide courtesy notice of his plans to visit on June 18 to conduct oversight. *Id.* ¶¶ 22–24. On June 17, ICE personnel responded by email, stating, in relevant part, that section 527 did not apply to the 10th Floor Facility because it is a field office, not a "detention facility." *Id.* ¶ 25. When Representative Goldman and another member went to the facility in person on June 18, they were turned away on the theory that the 10th Floor Facility is a "holding and processing center." *Id.* ¶ 29.

On June 18, Defendants denied Representative Torres entry to the LA Field Office, where she attempted to conduct an oversight visit and to obtain a briefing from ICE personnel on the conditions of detention at the facility. Torres Decl. ¶ 18. Later that day, ICE OCR stated in an email response to Representative Torres's staff that ICE is "not facilitating any visits to ICE Field Offices" and that the LA Field Office "is not a detention facility and falls outside of the Sec. 527 requirements." *Id.*, Ex. B.

On June 21, Defendants denied Representative Correa entry to the ICE Santa Ana Field Office located in his district. Correa Decl. ¶ 10. After his previous unsuccessful attempt to conduct oversight at the LA Field Office on June 7, Representative Correa had become concerned about the conditions at the Santa Ana Field Office. *Id.* ¶¶ 8–9. Beginning on June 8, he had visited the Santa Ana Field Office every morning to ensure there was no overcrowding and to locate specific individuals based on requests from his constituents. *Id.* ¶ 9. During those daily visits, Representative Correa had observed the number of detainees grow from fewer than 10 to approximately 77. *Id.* When he arrived

for his daily visit on June 21, he was turned away for the first time, based on Defendants' new rule requiring seven days' written notice. *Id.* ¶ 10.

On July 9, Defendants denied Representative Escobar entry to the ICE detention facility known as the El Paso Service Processing Center (SPC) in her district. Escobar Decl. ¶ 10. Representative Escobar had become concerned about present conditions at the facility following accusations of mistreatment and inhumane conditions, including a recent Amnesty International report alleging human rights violations there. *Id.* ¶ 10. On June 8, her staff notified ICE by email that she would conduct an oversight visit at the El Paso SPC the following day. *Id.* ICE responded that it would not accommodate her visit because ICE is "now requiring requests to be made seven (7) calendar days in advance" of any congressional oversight visit. *Id.* ¶ 11. When Representative Escobar arrived at the facility as planned, ICE personnel confirmed that ICE leadership was requiring seven days' notice and that they would not permit her entry into the facility. *Id.* ¶ 12.

Because it remained important that Representative Escobar conduct this oversight in person, on July 11 her staff requested to schedule a visit to the El Paso SPC for July 18. *Id.* ¶ 14. ICE confirmed the visit by email on July 14. *Id.* ¶ 15. House votes in Washington, D.C., went late on July 17 and into the early morning hours of July 18, which prevented Representative Escobar from traveling to El Paso in time to conduct the scheduled visit. *Id.* ¶ 16. To date, she has been unable to visit the facility in person.

On July 11, Defendants denied Representatives Ruiz and Torres entry to the ICE Adelanto Processing Center in Adelanto, California, for the purpose of conducting oversight. Decl. of Raul Ruiz ¶¶ 10–12. Previously, Representative Ruiz's staff had emailed ICE OCR on July 7 requesting an oversight visit on July 11. *Id.* ¶ 8. On July 10, ICE personnel had stated by email that DHS "is now requiring seven calendar days advance notice for visits to DHS detention facilities." *Id.*, Ex. B. When Representatives Ruiz and Torres arrived at the Adelanto facility on July 11, personnel at the facility

stated that the visit had not been approved, directed them to communicate with ICE OCR, and refused the members entry. *Id.* ¶¶ 11–12.

On July 14, Defendants denied Representative Espaillat and another member entry to the 10th Floor Facility at the New York Field Office to conduct oversight. Espaillat Decl. ¶¶ 22–25. In the preceding days and weeks, Representative Espaillat had heard from his constituents that ICE was detaining individuals overnight at the 10th Floor Facility. *Id.* ¶ 17. He and another member had attempted to conduct an oversight visit to the facility on June 8 to obtain information regarding the circumstances there, but personnel at the field office refused them entry on the ground that it was a "sensitive facility." *Id.* ¶¶ 18–20. Following further concerning reports, Representative Espaillat and another member again attempted to conduct an oversight visit in person on July 14. *Id.* ¶ 22. They were again denied entry and told to contact a public affairs representative. *Id.* ¶¶ 24–26.

On July 20, Defendants denied Representative Crow entry to the ICE detention facility in Aurora for the purpose of conducting oversight. Crow Decl. ¶ 20. When Representative Crow arrived at the facility for an unannounced visit, he was made to wait nearly an hour before being told that ICE was denying his request to enter. *Id.* It was the first time since early 2019 that he had been denied access to the facility for an oversight visit. *Id.* ¶ 19. His office followed up by email with ICE OCR, which responded that "DHS requires requests be made a minimum of seven calendar days in advance for scheduling." *Id.* ¶ 21.

On July 21, Defendants denied Representatives Neguse, Raskin, and Thompson—two of whom are ranking members of committees with jurisdiction over DHS and ICE—entry to the ICE Washington Field Office in Virginia to conduct oversight. Thompson Decl. ¶¶ 13–15; Raskin Decl. ¶ 11; Neguse Decl. ¶ 9. The members had been informed that individuals were being detained in the field office in unknown conditions. Thompson Decl. ¶ 13. After they arrived, ICE officials refused to let them enter on the ground that field offices are not subject to section 527. *Id.* ¶ 15. In response to

further questions, the officials confirmed that the field office has a "12-hour holding area" where people are detained and not allowed to leave. *Id.* ¶ 16. They further confirmed that the Washington Field Office was holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. *Id.*

On July 24, Defendants denied Representative Garcia entry to the LA Field Office for the purpose of conducting oversight. Garcia Decl. ¶¶ 21–23. When he arrived at the facility, he was told that the LA Field Office is "not considered a facility" and that he would "have to go to the Adelanto Detention Facility" instead—located nearly 85 miles away. *Id.* ¶ 22.

In light of the importance of on-the-ground, real-time oversight at immigration detention facilities, Plaintiffs intend to continue conducting oversight visits to ICE facilities used to detain or otherwise house individuals, with little or no prior notice. Defendants' obstruction of Plaintiffs' efforts to access these facilities significantly harms Plaintiffs' ability to discharge their individual duties as members of Congress, by denying them information integral to completing constituent casework, to working effectively on committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in custody.

## LEGAL STANDARD

Section 705 of the APA authorizes a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.* "The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction." *Coalition for Humane Immigrant Rights v. Noem*, No. 25-872-JMC, 2025 WL 2192986, at *12 (D.D.C. Aug. 1, 2025).

To obtain this preliminary relief, "the moving party must show: (1) a substantial likelihood of

success on the merits, (2) that it would suffer irreparable injury if the [preliminary relief motion] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted). "In a case like this one, where the Government is the non-movant, the third and fourth factors merge." *Coalition for Humane Immigrant Rights*, 2025 WL 2192986, at *12 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I.   Plaintiffs Are Likely to Succeed on the Merits

####    A.   Plaintiffs have standing to bring these claims

To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Comm. on the Judiciary of U.S. House of Reps. v. McGahn*, 968 F.3d 755, 763 (D.C. Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

Plaintiffs readily satisfy this standard. Most obviously, Defendants' oversight visit policy is a direct restriction on Plaintiffs' physical access to covered facilities, which has resulted in ICE personnel literally barring Plaintiffs from entering such facilities. That sort of restriction on physical access is a classic "tangible harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Indeed, federal courts have traditionally exercised jurisdiction over suits by plaintiffs seeking to challenge restrictions on access to federal land or facilities. *See, e.g., Greer v. Spock*, 424 U.S. 828, 833–34 (1976) (challenge to ban on entering military base); *Toussaint v. McCarthy*, 801 F.2d 1080, 1109 (9th Cir. 1986) (challenge by plaintiff inmates to denial of "physical access" to law library); *Sherrill v. Knight*, 569 F.2d 124, 128 (D.C. Cir. 1977) (challenge by journalist to denial of access to White House press facilities); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-917-RJL, 2025 WL 1502329, at *7, *19 (D.D.C. May 27, 2025) (challenge by plaintiff law firm to restriction of access to federal buildings by

firm's employees).

Plaintiffs also satisfy Article III if their injury is instead viewed as the denial of the information they seek to obtain during their oversight visits. A "plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). "To carry its burden of demonstrating a sufficiently concrete and particularized informational injury, the plaintiff must show that (1) it has been deprived of information that, on [the plaintiff's] interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quotation marks omitted). Plaintiffs easily meet this standard: they have demonstrated that Defendants have deprived them of information to which they are each statutorily entitled, and, as a result of this deprivation, Plaintiffs suffer the type of harm that Congress sought to prevent by requiring that individual members have access to this information under section 527. *Cf. Maloney v. Murphy*, 984 F.3d 50, 54 (D.C. Cir. 2020), *vacated as moot sub nom. Carnahan v. Maloney*, 143 S. Ct. 2653 (2023).

Each Plaintiff is suffering an injury in fact because he or she has requested, and is being denied, access to DHS facilities used to detain or otherwise house noncitizens and on-the-ground information regarding the true conditions at those facilities. Each Plaintiff is entitled to this information upon request: section 527 ensures that each "Member of Congress" may "enter[], for the purpose of conducting oversight," any such DHS facility, without "provid[ing] prior notice of the intent to enter [such] facility," and to observe facility conditions without "modification." FY2024 Appropriations Act, div. C, title V, § 527(a)–(b); *see* FY2025 Continuing Resolution, §§ 1101(a)(6), 1105. In other words, Defendants are "required to disclose" that information—the actual conditions of confinement at DHS facilities—upon request because they are prohibited from interfering with each Plaintiff's

access to the facilities where that information is learned. *McGahn*, 968 F.3d at 766. Thus, the denial of this access and information to Plaintiffs is a concrete injury. *Id.* ("[W]hen a person seeks to obtain information the government is required to disclose, the denial of the information is a concrete injury for standing purposes.").

These injuries are also "specific to the plaintiffs" in this case. *McGahn*, 968 F.3d at 767. The right of access and to information that section 527 protects extends to individual legislators directly, not to a congressional committee or chamber of Congress or Congress as a whole. Each Plaintiff has attempted to access a facility covered by section 527 and obtain the information to which he or she is individually entitled and has been "rebuffed" by Defendants. *See supra* at 20–24. Each such denial creates an injury redressable by Article III courts. Thus, there is a perfect match here between these individual Plaintiffs and their specific injuries. *Cf. McGahn*, 968 F.3d at 767 (quoting *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019), and distinguishing *Bethune-Hill* as involving a "mismatch" between the plaintiff, a single chamber of a bicameral state legislature, and the asserted institutional injury, which belonged to the legislature as a whole).[19]

In addition, Plaintiffs' injuries are traceable to Defendants and redressable by this Court. The denial of access and deprivation of the real-time, on-the-ground information to which Plaintiffs are entitled results directly from Defendants' decisionmaking and unlawful action. And these harms can be redressed by a decision of this Court declaring unlawful Defendants' oversight visit policy, vacating the policy, preliminarily and permanently enjoining Defendants from acting pursuant to the policy, and ordering Defendants to permit oversight visits by members of Congress without prior notice to DHS facilities consistent with section 527.

---

[19] For similar reasons, this case is unlike *Raines v. Byrd*, 521 U.S. 811 (1997), in which six individual members of Congress sued the director of the U.S. Office of Management and Budget "to challenge the constitutionality of the Line Item Veto Act, which authorized the President to cancel spending provisions in enacted appropriations statutes." *McGahn*, 968 F.3d at 774–75 (citing *Raines*, 521 U.S. at 814–15). There, there was a "mismatch" between the individual members of Congress and the alleged institutional injury, which was "wholly abstract and widely dispersed." *Raines*, 521 U.S. at 829.

Finally, the "interbranch nature of this litigation," *McGahn*, 968 F.3d at 763, does not alter the conclusion that the Court may properly exercise jurisdiction over Plaintiffs' claims. Even where a lawsuit unfolds in the context of a "political battle," a federal court "has a responsibility to decide cases properly before it, even those it would gladly avoid." *McGahn*, 968 F.3d at 774 (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012)). "Once [Plaintiffs] ha[ve] met [their] burden to show that [they have] Article III standing," it is the federal court's role "to decide the case," regardless "of its political context or consequences." *Id.*

### B. The oversight visit policy violates the APA

The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Plaintiffs are substantially likely to show that Defendants' oversight visit policy—which requires individual members of Congress to provide advance notice before conducting oversight visits to certain DHS facilities and entirely excludes ICE field offices from the reach of section 527—should be set aside under section 706(2) of the APA because that policy exceeds Defendants' statutory authority, is contrary to law, and is arbitrary and capricious. Plaintiffs are also likely to show that APA section 706(1) independently entitles Plaintiffs to an order prohibiting Defendants from denying entry to DHS detention facilities by members of Congress who have not provided advance notice.

#### 1.   The policy is final agency action

The APA makes reviewable "final agency action." *Id.* § 704. Defendants' oversight visit policy is final agency action subject to APA review. Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation

marks omitted). Defendants made the oversight visit policy public on the ICE OCR website; they have cited both the seven-day-notice requirement and the field office exemption in denials of entry to members conducting oversight; and they have memorialized both aspects of the policy in writing in response to written visit requests. *See supra* at 20–24. The oversight visit policy thus "mark[s] the consummation" of Defendants' decisionmaking process because it reflects a final decision by Defendants on the matter, and the policy carries the legal consequence of the denial and obstruction of lawful congressional oversight visits under section 527.

## 2. The policy is contrary to law and in excess of statutory authority

Section 706(2) of the APA requires a court to invalidate agency action that conflicts with federal law or exceeds the authority provided to the agency by law. 5 U.S.C. § 706(2)(B)–(C); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). Plaintiffs are likely to establish that Defendants' oversight visit policy—including both its seven-day-notice requirement and prevention of field office visits—is invalid on both grounds.

**a.** Defendants' use of appropriated funds to develop and effectuate a requirement that members of Congress provide seven days' notice prior to visiting a DHS facility used to detain or otherwise house noncitizens directly contravenes the text of section 527 and exceeds Defendants' authority to use appropriated funds under the law.

The terms of the law could not be clearer: "Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent" to conduct an oversight visit under section 527. FY2024 Appropriations Act, div. C, title V, § 527(b). This provision prohibits a blanket policy by DHS requiring notice in advance of the member's oversight visit. This language also stands in contrast to the subsequent provision, which permits DHS to require advance notice of an oversight visit involving congressional *staff*—but only up to "24 hours in advance." *Id.* There is simply no way

to construe section 527 as permitting DHS to require prior notice for a member of Congress to conduct an oversight visit at any DHS facility used to detain or otherwise house noncitizens. Defendants' oversight policy, requiring at least *seven days'* notice, is therefore flatly contrary to law.[20] For the same reasons, Defendants' seven-day-notice requirement is therefore in excess of Defendants' authority to use appropriated funds under the law.

**b.** Defendants' use of appropriated funds to develop and effectuate its stated policy that ICE field offices are not subject to section 527 is likewise contrary to law and in excess of Defendants' authority. Members' right of entry under section 527 applies to "*any*" DHS facility "used to detain or otherwise house" noncitizens. FY2024 Appropriations Act, div. C, title V, § 527(a) (emphasis added). Defendants have asserted that ICE field offices are exempt from this provision because they are not "detention facilities." *See, e.g.*, Gomez Decl., Ex. A. But the broad terms of section 527 leave no doubt that Defendants must permit congressional oversight at ICE field offices, which are "used to detain or otherwise house noncitizens."

As an initial matter, ICE's own field office guidance (which predates the new oversight visit policy) uses substantially similar language to section 527 in describing ICE field office holding facilities. *See* ICE, Policy No. 11807.2: Operations of ERO Holding Facilities (2024), https://perma.cc/X92C-R5NP. That policy guidance provides ICE employees with "procedures for operating holding facilities within their respective field office." *Id.* § 1.1. It refers to noncitizens held in field offices as "*detainees*" throughout, and it refers to them as being "*housed* in a holding facility" for up to 12 hours. *Id.* § 5.1(1) (emphasis added). Thus, the language of section 527 is consistent with ICE's own guidance providing that field offices are used to detain or house noncitizens.

Even setting ICE's own terminology aside, the plain meanings of the terms of section 527

---

[20] Of course, section 527 does not prevent a member of Congress from choosing to schedule a visit in advance, and indeed a member may wish to do so in some circumstances. Many Plaintiffs have previously provided advance notice of oversight visits to immigration detention facilities. But section 527 guarantees that members may not be *required* to do so.

make clear that it encompasses field offices. *See generally Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, [courts] give the term its ordinary meaning."). As an initial matter, the term "any," used here to modify "facility," signals breadth: "[r]ead naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (quotation marks omitted). And the word "use" means "to employ for some purpose." *Use*, Webster's Unabridged Dictionary (1989 ed.). So to determine a facility is "used" for a certain purpose speaks to its actual function and not its intention or design.

Further, to "detain" is the verb form of "detention," which means "[t]he act or an instance of holding a person in custody; confinement or *compulsory delay*." *Detention*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Detention is defined by whether an individual is in "custody" or "confine[d]," *id.*—and not by the length of confinement. Other federal statutes confirm that Congress generally understands "detention" to refer to any circumstance where an individual's freedom of movement is restrained, even temporarily. *See, e.g.*, 18 U.S.C. § 2246(5) (defining "official detention" to include, e.g., "detention by a federal officer" following arrest, surrender, charges, or immigration-related custody, or "custody by a federal officer" for transportation, medical treatment, court appearances, or work or program participation incident to detention).

That is enough for the Court to conclude that Defendants' restriction on access to field offices is contrary to law, but section 527 expands even further with the phrase "otherwise house." The ordinary meaning of "otherwise" is "[i]n a different way; in another manner," or "[i]n other conditions or circumstances." *Otherwise*, Black's Law Dictionary (12th ed. 2024). "The term *otherwise* tends to be quite broad in scope." *Id.* In statutes, "the use of the introductory word 'otherwise' indicates that" a "catch-all provision" follows, which "reaches beyond the[] specific [preceding] examples . . . to myriad means that human ingenuity might devise." *United States v. Fischer*, 64 F.4th 329, 337 (D.C. Cir.) (quotation marks omitted), *vacated on other grounds sub nom. Miller v. United States*, 144 S. Ct. 2706 (2024).

Here, that catch-all provision is the word "house," which means simply "[t]o put or receive into a house, dwelling, or living quarters," or "to give shelter to." *House*, Webster's Unabridged Dictionary (1989 ed.). Section 527 therefore applies to a DHS facility, of whatever kind, functioning as a place where individuals are held in confinement in any manner.

These terms plainly encompass ICE field offices, which Plaintiffs' observations, extensive public reporting, and Defendants' own statements reveal to be facilities used to detain or house noncitizens. Significantly, even while contending that field offices are not detention facilities, Defendants have not denied that individuals are actually detained at ICE field offices, including those to which Plaintiffs have been denied entry. For example, ICE personnel stated in an email to Representative Gomez's staff that noncitizens may remain in detention at the LA Field Office up to "72 hours." Gomez Decl., Ex. A. ICE personnel at the Washington Field Office told Representatives Neguse, Raskin, and Thompson that noncitizens were held at that facility while Defendants decided whether to *"keep* them in detention," at which point they were transferred to a longer-term detention facility. Thompson Decl. ¶ 16 (emphasis added). Because these facilities are being "used to detain or otherwise house" noncitizens, they are encompassed by section 527, and ICE may not prevent Plaintiffs from accessing them for the purpose of oversight.

Plaintiffs are therefore likely to succeed on the merits of their claim that Defendants' oversight policy is contrary to law and in excess of statutory authority.

### 3.    The policy is arbitrary and capricious

Plaintiffs are also likely to succeed on their claim that the oversight visit policy is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). This provision of the APA authorizes courts to set aside agency action that is "not reasonable" or "reasonably explained."' *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). To satisfy arbitrary-and-capricious review, Defendants must "examine the relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants may not rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43. Defendants' oversight visit policy fails twice over—it is neither substantively reasonable nor reasonably explained.

**a.** As to substantive reasonableness, an agency action is not substantively "reasonable" if the agency relied "on factors which Congress has not intended it to consider" or "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Congress made clear that members of Congress were not required to give any notice at all, much less seven days' notice. It is substantively unreasonable for DHS and ICE officials to flout the nondiscretionary requirements of section 527.

Practical considerations also render the seven-day-notice requirement unreasonable. In the course of an oversight visit, a member of Congress might encounter a situation or discover an issue that requires prompt, in-person follow-up. But Defendants' oversight visit policy frustrates any timely follow-up of this nature, by ensuring that a member (or his or her staff) cannot return to the facility for at least another seven days. *See, e.g.*, Escobar Decl. ¶¶ 14–18. In addition, members of Congress travel frequently between their districts and Washington, D.C., and sometimes that travel can be unpredictable, making scheduling seven days in advance difficult or impossible. For example, on July 11, 2025, Representative Escobar scheduled an oversight visit to an ICE facility in El Paso for July 18—in compliance with Defendants' unlawful policy—but after votes in Washington, D.C., went into the early hours of July 18, she was unable to travel back to El Paso in time to attend the scheduled visit. *Id.* Similarly, on July 11, Representative Torres requested an oversight visit of an ICE facility in Adelanto, California, for July 18. Torres Decl. ¶ 19. Defendants scheduled a 90-minute tour of the

facility that morning, but travel delays while Representative Torres was coming back from Washington, D.C., caused her to arrive about an hour late. *Id.* ¶¶ 20. ICE officials refused to accommodate her schedule, and her visit was limited to only 30 minutes. *Id.*

The prevention of oversight visits to field offices is likewise unreasonable. ICE routinely holds people in its field offices. *See supra* at 20, 24. Indeed, the recent upsurge in immigration detention has led to noncitizens being detained for extended periods of time—as much as 72 hours—in field offices, raising serious concerns about the conditions of confinement. *See* Gomez Decl., Ex. A. Moreover, the fact that ICE appears to exempt field offices from its detention standards, which are intended to ensure the safety, security, and care of detainees, makes oversight of detention conditions in those facilities even more important. *See* ICE, *Performance-Based National Detention Standards 2011* (updated Dec. 2016), https://perma.cc/3DR5-WT5C (applying to service processing centers, contract detention facilities, and state or local government facilities used by ERO through intergovernmental service agreements, but not field offices).

**b.** Defendants also have not "reasonably explained" their new policy. An agency action is not reasonably explained when the agency has failed to provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). "In short, 'an agency must give adequate reasons for its decisions,' such that a reviewing court can 'evaluate the agency's rationale at the time of decision.'" *Coalition for Humane Immigrant Rights*, 2025 WL 2192986, at *30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). "This includes at least some explanation of the agency's legal 'conclusion' especially if the legal conclusion upon which the action relies conflicts with the agency's prior view." *Id.*

Defendants have articulated no "satisfactory explanation," *State Farm*, 463 U.S. at 43, for the oversight visit policy. Indeed, they have provided no explanation at all for the seven-day-notice

requirement. That is reason enough declare that the requirement arbitrary and capricious.

DHS's chaotic implementation, and unexplained departure from its prior practice, underscore the arbitrariness of the policy. In May 2025, Defendants Lyons testified he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ. Less than a month later, in mid-June, ICE stated for the first time on its website that, although advance notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be submitted as early as possible and not less than 72 hours in advance." ICE June Guidance at 1. Although ICE did not explain this new approach specifically, it issued a guidance document that referred generally to "security" and "privacy" and stated that "exigent circumstances (e.g., operational conditions, security posture, etc.) may impact the time of entry into the facility." *Id.* at 1–2. That five-page guidance document underscores the unreasoned nature of the seven-day-notice requirement, which ICE adopted less than two weeks after issuing the June guidance, which it promptly removed from its website and did not replace with new guidance. *See supra* at 15–16. This abrupt change in position without explanation—including the removal of any reference to section 527—is quintessential arbitrary and capricious agency action.

DHS's decision to generally exclude ICE field offices from congressional oversight is likewise not satisfactorily explained. This aspect of the policy currently appears nowhere on the ICE OCR website—or other DHS webpages, to Plaintiffs' knowledge—even though Defendants have continued to deny visit requests on this basis, both in person and in writing. *See, e.g.*, Thompson Decl. ¶ 15; Gomez Decl., Ex. A. When the purported field office exemption was first announced, it appeared in the since-removed guidance document, which stated that ICE field offices are supposedly "not detention facilities" because they do not "house aliens" but are offices where "personnel process

aliens to make custody determinations." ICE June Guidance at 4. Even setting aside that the statement has been removed, this justification does not satisfy the APA's requirements. ICE's explanation falls short for several reasons.

First, Defendants "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43—namely, the typically temporary nature of detention in ICE field offices. But Congress included no minimum period of detention for a facility to be subject to section 527; as explained above, it broadly defined the category of covered facilities. Defendants also "entirely failed to consider an important aspect of the problem." *Id.* Congress codified the right of its individual members to conduct oversight at DHS detention facilities largely out of concern regarding the treatment of the individuals held there. That treatment matters as soon as DHS brings individuals to a facility used for detention—not the moment DHS decides whether to "*keep* them in detention." Thompson Decl. ¶ 16 (emphasis added). Just because ICE field offices may reflect only the first stage of detention does not mean that members of Congress have a lesser interest in oversight over the use of appropriated funds in such facilities.

For similar reasons, Defendants' explanation "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43—that is, that individuals are routinely detained in ICE field offices, by protocol up to 12 hours and in practice frequently overnight at some field offices. *See, e.g.*, *supra* at 20, 24, 30. Field offices are thus facilities "used to detain or otherwise house" noncitizens.

That Defendants may be permitting oversight visits to some ICE field offices—subject to the seven-day-notice requirement—only emphasizes the arbitrary and capricious nature of the purported exemption. *See, e.g.*, Correa Decl. ¶ 11. Such inconsistent application (also without justification) demonstrates the lack of reasoning and reasoned explanation.

Accordingly, Plaintiffs are likely to succeed on their claim that Defendants' oversight policy is arbitrary and capricious.

### 4. Defendants have unlawfully withheld oversight visits from members of Congress

Plaintiffs are also likely to succeed on their claim under APA section 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." *See Ramirez v. ICE*, 471 F. Supp. 3d 88, 94, 191 (D.D.C. 2020) (finding violations of both provisions of the APA, 5 U.S.C. § 706(1) and (2), based on "the same conduct"). To prevail on a section 706(1) claim, a plaintiff must demonstrate "that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The identified legal duty must be "ministerial or nondiscretionary" and must amount to "a specific, unequivocal command." *Id.* at 63–64.

Defendants' refusal to admit individual members of Congress to DHS detention facilities without prior notice—and to some facilities entirely—satisfies that requirement. Section 527 imposes a specific and nondiscretionary duty on Defendants to admit individual members of Congress to ICE facilities to conduct oversight activities without advance notice. As explained above, in policy and practice, Defendants are not complying with their mandatory duty to allow entry by individual members of Congress to DHS facilities "used to detain or otherwise house" noncitizens "for the purpose of conducting oversight" without "prior notice." FY2024 Appropriations Act, div. C, title V, § 527(a)–(b). Defendants have thus failed to take discrete action that is required by law under section 527. *Norton*, 542 U.S. at 64. Plaintiffs are therefore likely to succeed on their claim that DHS has unlawfully withheld access to DHS facilities used to detain or otherwise house noncitizens to conduct oversight visits without advance notice.

### C. The oversight visit policy is *ultra vires*

If this Court were to find that the APA does not directly afford Plaintiffs a right of action here, then nonstatutory review would be available. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr.,*

*Inc.*, 575 U.S. 320, 327 (2015); *see Ex parte Young*, 209 U.S. 123 (1908). That principle is directly applicable here, where Defendants' oversight visit policy denies Plaintiffs their legal right of entry to DHS facilities "used to detain or otherwise house" noncitizens "for the purpose of conducting oversight" without "prior notice." FY2024 Appropriations Act, div. C, title V, § 527(a)–(b). Defendants' flouting of section 527 thwarts Plaintiffs' exercise of their individual oversight authority, and Plaintiffs are entitled to equitable relief to vindicate that authority.

Courts have applied a "general presumption of reviewability" when a plaintiff is unable to challenge executive action based on a specific or general statutory review provision. *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (tracing development of nonstatutory review). In applying this presumption of reviewability, the D.C. Circuit has long held "that a 'clear and mandatory' statutory provision is judicially enforceable." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Id.* To obtain nonstatutory review, a plaintiff must meet three requirements: "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019); *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (reiterating that nonstatutory review is available where agency action is "an attempted exercise of power that had been specifically withheld" and violated a "specific prohibition" in law).

Here, the first two requirements can be dispensed with quickly: no statute expressly precludes judicial review of Plaintiffs' claims, and if the Court were to find that Plaintiffs cannot obtain relief under the APA or mandamus (addressed below), then the second requirement for nonstatutory review

would be satisfied. As to the third requirement, section 527 is clear and specific: Defendants may not require a member of Congress to provide notice prior to visiting a facility, and Defendants may not prevent a member of Congress from entering any facility covered by that provision. Defendants' oversight visit policy is an "exercise of power that had been specifically withheld" and violates two "specific prohibition[s]" in section 527. *Nuclear Regul. Comm'n*, 605 U.S. at 681. If the Court does not issue a stay under APA section 705, therefore, it should exercise its equitable authority to preliminarily enjoin Defendants' unlawful policy.

### D.  In the alternative, Plaintiffs are entitled to mandamus relief

Federal courts have long understood that aggrieved parties are entitled to judicial review in cases brought to compel agency compliance with nondiscretionary duties. Since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), courts have recognized the availability of mandamus to compel federal officers to perform mandatory duties. *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. 524, 614–15 (1838). Section 527 itself entitles Plaintiffs to seek judicial enforcement of Defendants' mandatory duty under that section to admit members of Congress to certain DHS facilities for the purpose of oversight, without requiring prior notice.

To obtain to mandamus relief, "Plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Additionally, "a court may grant relief only when it finds compelling equitable grounds," and Plaintiffs must demonstrate their "right to issuance of the writ is clear and indisputable." *Id.*

Courts often "concurrently" consider "the first two jurisdictional elements" for mandamus relief: a "clear right to relief and clear duty to act." *Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020). If federal law "creates a peremptory obligation for the officer to act, a mandamus action will lie." *Id.* Both elements are satisfied here. As discussed, *supra* at 37–38, section 527 imposes two clear duties

on Defendants: (1) they may not require a member of Congress to provide notice prior to conducting oversight at DHS facilities, and (2) they may not deny entry to a member of Congress to "any" DHS facility used to detain or otherwise house noncitizens. Defendants' actions are the very sort of "transparent violations of a clear duty to act," that is, to admit members of Congress to DHS facilities on demand, for which the writ is reserved. *In re Nat'l Nurses United*, 47 F.4th 746, 750 (D.C. Cir. 2022).

Second, individual members of Congress have a clear right to relief. Under the plain terms of section 527, Defendants must admit members of Congress into DHS facilities, including ICE field offices, with or without prior notice. And in the event that the Court reaches this claim in the alternative, there is no other judicial remedy available to Plaintiffs to vindicate their right under section 527 to exercise their oversight authority through in-person visits. *See supra* at 37–38. Mandamus relief is therefore available if APA review is not. *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996); *Reich*, 74 F.3d at 1332.

Third, equity favors granting mandamus relief. The central question is "whether the agency's delay is so egregious as to warrant mandamus." *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022). That answer is a resounding yes. Since June 2025, Defendants have denied Plaintiffs entry to ICE facilities in contravention of section 527 on at least a dozen occasions. As detailed *infra* section III, the equities strongly favor mandamus relief. *See also supra* at 16–20.

Plaintiffs are therefore likely to succeed in establishing their entitlement, in the alternative, to a writ of mandamus, in which case the Court should issue an injunction in the form of mandamus requiring Defendants to comply with section 527. *Cf. Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (reviewing issuance of preliminary injunction where "district court rested its jurisdiction on the Mandamus Act").

## II.  Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm

Plaintiffs face irreparable harm in the absence of the requested preliminary relief. Irreparable

injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297). The denial of access and "non-disclosure of information to which a plaintiff is entitled, under certain circumstances[,] itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C.), *aff'd*, 878 F.3d 371 (D.C. Cir. 2017) (collecting cases). That is exactly the situation here: the access to DHS facilities and real-time, on-the-ground information that members of Congress require to do their jobs are highly relevant to the growing humanitarian crisis in U.S. immigration detention facilities and the highly public and concerning conduct of DHS and ICE officials in those facilities.

Members of Congress cannot wait to obtain this physical access and urgent information. The facts on the ground in detention facilities can change rapidly, rendering a week too long to wait in many circumstances. *See, e.g.*, Escobar Decl. ¶¶ 34–35; Crow Decl. ¶¶ 23–25; Ruiz Decl. ¶¶ 18, 20. While this case remains pending, the number of detainees at facilities across the country will increase, new immigration detention facilities will likely open (or previously closed facilities will reopen), members' constituents and their loved ones will be apprehended and deported, and Congress will hold hearings, craft legislation, and determine fiscal year 2026 appropriations. By the time this lawsuit reaches final judgment, it will be too late for members of Congress to obtain the real-time access and on-the-ground information to which they are entitled under section 527. The facts on the ground will have changed, and Congress will have gone about its work—including determining fiscal year 2026 appropriations—without the benefit of knowing what is occurring within DHS detention facilities.

As the D.C. Circuit has recognized, "stale information is of little value," *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), and the harm caused by delaying disclosure will not

always be redressed even if the *same* access and information are provided at some later date, *see Byrd v. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999) ("Byrd's injury . . . resulted from EPA's failure to furnish him with the documents until long after they would have been of any use to him."). As a result, the harm that members of Congress will suffer if Defendants' unlawful policy is not stayed is by definition irreparable—both because the delay itself is irreparable and because, unlike information contained in a document, the information gained from in-person oversight is unique information that cannot be learned or recreated in the future. *Cf., e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) ("EPIC will also be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program"); *Wash. Post v. DHS*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Because the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment.").

"Close, in-person oversight" is more important than ever, as Plaintiffs' ability to "communicate with, receive information from, and rely on DHS officials has drastically decreased under the Trump-Vance administration." Thompson Decl. ¶ 20; *see supra* at 2–4. Unlike during previous administrations, congressional oversight letters sent to agency heads in this administration "result in delayed answers, or no answers at all." Thompson Decl. ¶ 20. And Congress can no longer depend on information that it would previously have received from DHS's internal oversight offices. In March 2025, DHS decimated three statutorily mandated internal oversight offices: the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO).[21]

---

[21] Decl. of Alex Doe ¶¶ 11–13, Decl. of Kelsey Vitullo ¶¶ 11–12, & Decl. of Anthony Enriquez ¶17, *RFK Human Rights v. DHS*, No. 25-cv-1270 (D.D.C. filed May 8, 2025), ECF Nos. 15-3, 15-9, 15-11.

Congress assigned these three independent offices distinct roles in receiving and investigating complaints and performing other oversight functions within DHS, to ensure lawful treatment of individuals by DHS components and to provide for the investigation and resolution of DHS activities, including immigration detention. And those offices played a crucial role in ensuring that Congress remained informed of problems with and improvements to the programs and activities of DHS and its subagencies.[22] After placing nearly all employees of those three offices on administrative leave in March, DHS then terminated those employees through a reduction in force that went into effect on May 23—cutting the offices down from nearly 400 employees collectively to approximately four.[23]

As a result, much of the information that members of Congress would previously have received from the administration—either voluntarily or in response to a letter or statutory mandate—can now be obtained by the members or their staff only through in-person observations and conversations with detainees and DHS and ICE officials at immigration detention facilities.

The loss of vital information in the absence of a stay under section 705 or other preliminary relief is therefore certain and great, imminent, and beyond remediation.

## III. The Equitable Factors Strongly Favor Preliminary Injunctive Relief

The final two factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Plaintiffs' strong likelihood of success on the merits itself establishes that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful

---

[22] For example, CRCL's responsibilities include reviewing and investigating complaints of civil rights and civil liberties abuses and overseeing DHS compliance with related legal requirements. 6 U.S.C. § 345(a). OIDO is tasked, in part, with deploying individuals in the field to work independently in DHS detention facilities and to conduct unannounced inspections at DHS detention facilities, to which they are statutorily required to have unfettered access, and providing direct assistance to detained individuals. 6 U.S.C. § 205(c), (d)(2). And all three offices must provide regular reports to Congress on their investigations, case work, and recommendations. 6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

[23] *See* JSR at 1, *RFK Human Rights*, No. 25-cv-1270 (D.D.C. filed May 27, 2025), ECF No. 39; Doe Decl. ¶¶ 15, 20 & Vitullo Decl. ¶ 13, *supra* n.21.

practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks omitted). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quotation marks omitted). There is therefore "generally no public interest in the perpetuation of unlawful agency action." *Id.* That is especially so here, where the exercise of oversight authority by members of Congress in DHS detention facilities is directly in service of the public interest, to ensure that noncitizens are treated humanely while in detention, that federal funds are expended appropriately, and that Defendants are acting in accordance with federal law.

There is also a substantial public interest "in ensuring that the laws enacted by their representatives are not imperiled by executive fiat." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-1030-PLF, 2025 WL 1387331, at *15 (D.D.C. May 14, 2025) (quotation marks omitted); *see also Coalition for Humane Immigrant Rights*, 2025 WL 2192986, at *37 (observing the "public interest in enforcement of duly enacted statutes"). The Appropriations Clause, U.S. Const. art. I, sec. 9, cl. 7, vests Congress with "exclusive power over the federal purse" and is both "a bulwark of the Constitution's separation of powers among the three branches of the National Government" and "particularly important as a restraint on Executive Branch officers." *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346, 1347 (D.C. Cir. 2012) (quotation marks omitted); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424–25 (1990).

That principle is especially significant here: it is Congress's role to make spending decisions, and it is the President's role faithfully to implement those decisions. Congress, under the control of both parties, has mandated through the appropriations process that Defendants may not prevent the entry of members of Congress into certain DHS facilities to conduct oversight visits. And President Trump signed that provision into law. "The Executive Branch must follow duly enacted laws or ask Congress to change them, and the public has a strong interest in seeing that principle upheld." *Coalition*

*for Humane Immigrant Rights*, 2025 WL 2192986, at *37. It is in the public interest to see section 527 enforced as Congress intended it, to ensure that individual members of Congress may conduct oversight over immigration detention facilities.

## IV. The Court Should Stay the Oversight Visit Policy under Section 705

A stay of Defendants' oversight visit policy—including both the seven-day-notice requirement and the purported field office exemption—is the appropriate preliminary relief to preserve the *status quo ante* while this case proceeds. Section 705 of the APA allows a court to "postpone the effective date of an agency action or . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Courts—including the Supreme Court—routinely stay already-effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, e.g., *W. Virginia v. EPA*, 577 U.S. 1126 (2016)); *accord Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'— which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Accordingly, the fact that the oversight visit policy is "already in effect does not bar this Court from staying [it]—and returning things to the *status quo ante* while this case proceeds—under section 705." *Coalition for Humane Immigrant Rights*, 2025 WL 2192986, at *15.[24]

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter stay under section 705 or preliminary injunction, as set forth in the attached proposed order, or in the alternative issue a writ of mandamus.

---

[24] In the alternative, the Court should issue a preliminary injunction. Plaintiffs respectfully request that, if the Court issues a preliminary injunction, it either waive any bond requirement under Federal Rule of Civil Procedure 65(c) or set the amount at $0.

August 8, 2025

Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Lisa Newman (TX Bar No. 24107878)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ccoogle@democracyforward.org

Daniel Martinez (D.C. Bar No. 90025922)
Ronald A. Fein (D.C. Bar No. 90026641)
Katherine M. Anthony (D.C. Bar No. 1630524)
Jessica Jensen (D.C. Bar No. 1048305)

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*