IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>*Defendants*. | Case No. 25-cv-2463-JMC |

**DECLARATION OF REPRESENTATIVE DANIEL S. GOLDMAN**

I, Daniel S. Goldman, declare as follows:

1.  I am a member of the U.S. House of Representatives, representing New York's 10th congressional district. I have been a Member of Congress since 2023.

2.  I currently serve as a member of both the House Committee on Homeland Security and the House Committee on the Judiciary. I previously served on the House Committee on Homeland Security and the House Committee on Oversight during the 118th Congress.

3.  I have personal knowledge of the facts and information in this declaration. I respectfully provide this declaration to explain how the new, unlawful oversight visit policy of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) prevents me from performing my oversight duties as a Member of Congress and significantly harms my ability to serve my constituents.

**DHS and ICE Oversight Activities**

4.  As a Member of Congress serving on both House committees of jurisdiction over immigration and border security, and as a Member of Congress representing a large immigrant

1

population, I have been actively engaged in oversight of DHS and ICE since I first entered Congress.

5. ICE's New York City Field Office, located at 26 Federal Plaza in Manhattan, is located in my district. There are also immigration courtrooms in that federal building, as well as across the street at 290 Broadway, which is the building where my district office is located.

6. The Metropolitan Detention Center (MDC) in Brooklyn, which has an agreement with ICE to house immigration detainees, is also located in my district. More than 100 immigrants are detained at the MDC pursuant to this agreement, which has among the worst conditions of any federal prison in the country.

7. It is thus in my particular interest, the interest of my constituents, and important to the performance of my duties as a Member of Congress and as a member of the House Judiciary and Homeland Security Committees to conduct oversight of these facilities to ensure that any individuals detained directly by DHS and ICE, or under an agreement with DHS or ICE, are treated humanely and in compliance with all relevant federal laws.

8. In my oversight work, I have regularly led and signed oversight letters to DHS and ICE on a variety of immigration and border security issues. For example, on June 5, 2025, I led a letter joined by 85 of my colleagues to DHS Secretary Kristi Noem seeking information regarding the rise of masked, plainclothes ICE officers involved in detaining individuals without criminal records in connection with their immigration court proceedings.

9. In my oversight work, I have regularly led and signed oversight letters to other executive branch departments on issues related to immigration detention, including detention facilities located in my district. For example, on July 10, 2025, I sent an oversight letter to the Bureau of Prisons seeking information regarding a new interagency agreement with ICE to house

more than 100 immigration detainees at the MDC in Brooklyn, a facility that has long been plagued by violence, chronic understaffing, inadequate medical treatment, and inmate deaths.

10. I have been active in introducing and supporting bills on topics related to immigration and border security since I first entered Congress. For example, on November 1, 2023, I introduced the "Immigration Court Efficiency and Children's Court Act," which would establish a specialized children's court to improve the adjudication of immigration cases involving unaccompanied children.

11. My oversight of DHS and ICE has informed my decision to introduce and co-sponsor legislation during my time in Congress. For example, on June 26, 2025, I introduced the "No Secret Police Act," which would prohibit DHS law enforcement officers who are engaged in border security or civil immigration enforcement from covering their face and would require them to display or wear certain identifying insignia and to provide proper identification. My decision to introduce this bill was directly informed by my DHS oversight work, including my observance of ICE agents conducting operations at the immigration courts at 290 Broadway on May 29, 2025, and my improperly obstructed attempt to visit the 10th Floor Facility at 26 Federal Plaza on June 18, 2025.

12. My oversight work of DHS and ICE has informed my ability to support my constituents in their interactions with the federal immigration system. For example, in early 2025, I hosted and supported multiple "know your rights" trainings for my constituents, to educate them on their legal rights when they come into contact with the federal immigration system.

13. I have also led letters to the House Appropriations Committee regarding immigration and border security issues that have been informed by my oversight work. For example, in June 2025, I led a letter signed by 77 of my colleagues that urged the House Appropriations Committee to direct the Justice Department's Executive Office for Immigration

Review to submit a report to Congress detailing the status of unaccompanied children's immigration proceedings.[1]

### Defendants' Unlawful Obstruction of June 18, 2025 Oversight Visit

14. My Manhattan district office is located in the Ted Weiss Federal Building, located at 290 Broadway in Manhattan. The Ted Weiss Federal Building also houses offices of several federal government agencies, including offices of the U.S. General Services Administration, the African Burial Ground National Monument (managed by the National Park Service), and the New York–Broadway Immigration Court within the jurisdiction of the U.S. Department of Justice's Executive Office for Immigration Review.

15. On May 21, 2025, while members of my district office staff in the Manhattan district office were entering and exiting the office building in the normal course of their duties, they observed approximately 10-12 masked ICE agents waiting in the lobby of 290 Broadway. Some members of my staff witnessed these masked ICE agents making arrests of individuals who appeared to be visiting the immigration court located in the building. Members of my staff also witnessed these ICE agents moving individuals who appeared to be under arrest through the public entrance to the building. My staff immediately notified me of these observations.

16. On May 29, 2025, informed by what my staff had observed, I conducted my own visit to the immigration court located at 290 Broadway. At one point, after observing a routine immigration proceeding in a courtroom where approximately 15 people were seated, I asked if anyone in the room spoke English. Not a single person indicated they spoke English. There were no attorneys present in the room.

---

[1] Letter from Dan Goldman et al. to Chairman Rogers and Ranking Member Meng, May 16, 2025, https://goldman.house.gov/sites/evo-subsites/goldman.house.gov/files/evo-media-document/final-fy26-letter-requesting-report-language-regarding-status-of-unaccompanied-children-cases-in-immigration-courts-1%29.pdf.

17. Outside of the courtroom, I witnessed plainclothes ICE officers standing in the hallway, including one hiding around a corner from the courtroom entrance. I understood that they were waiting in that hallway for indications that the judge inside the courtroom had dismissed the removal proceedings against an individual—at the request of DHS attorneys. At that point, the agents in the hallway would notify the agents waiting in the building's lobby about which individuals whose removal proceedings had just been dismissed were about to take the elevator down to the lobby.

18. I approached two of those plainclothes ICE officers and asked them why they were waiting in the hallway outside the courtroom. They responded by saying they were not permitted to speak to me and suggested I speak to their supervisor in the lobby.

19. When I returned to the temperature-controlled lobby, I witnessed the masked ICE officers in the lobby making an arrest of an individual who appeared to be leaving the immigration court in the building. I approached a few of the masked ICE agents and asked them why they were wearing masks. One individual replied that he was wearing a mask "because it was cold." I asked him whether he would say that under oath. The ICE agent did not reply and walked away from me.

20. The ICE agents avoided answering my questions. One individual—an FBI agent—was willing to speak with me. He had served with the FBI for nearly 30 years and had been pulled from his regular duties investigating serious criminal activity in order to accompany the ICE officers in their civil immigration enforcement activities at 290 Broadway.

21. Based on these concerning personal observations, as well as reports from my constituents and community members, I sought to conduct an oversight visit to the ICE Field Office located across the street from my Manhattan district office at 26 Federal Plaza. I had heard reports that people were being held in this facility in conditions that were unacceptable.

22. On June 9, at my direction, my staff emailed personnel from ICE to request a scheduled tour for me of the 10th floor of the ICE Field Office at 26 Federal Plaza in New York City (the "10th Floor Facility"), where individuals are being detained. On June 10, ICE personnel responded via email indicating that the request was under review.

23. On June 16, my staff again emailed the ICE personnel, attaching a letter advising them that I intended to visit the 10th Floor Facility at 10:00am on June 18, pursuant to my oversight authority outlined in Section 527(a) of the Further Consolidated Appropriations Act, 2024 (Public Law 118-47).

24. On June 17, the ICE personnel responded by email, claiming that my oversight authority under Section 527(a) did not apply to the 10th Floor Facility because it was not a "detention facility." In the email, ICE personnel asserted that the New York City Enforcement and Removal Operations ("ERO") Field Office fell "outside of the Sec. 527 requirements," on the grounds that "ERO does not house aliens at field offices; rather these are working offices where ERO personnel process aliens to make custody determinations . . . ." Notwithstanding the fact that I had emailed ICE two days prior to my proposed visit, the email further stated that ICE was "unable to accommodate [my] request" to visit the facility due to unspecified "security measures in New York City," and claimed that access to field offices "requires advance coordination to preclude/minimize impact to operations."

25. On June 18 at 10:00am, I, along with my colleague, Representative Jerry Nadler, arrived at the 26 Federal Plaza building and attempted to gain entry to the 10th Floor Facility for the purposes of conducting oversight. We were told not to go to the 10th floor and were told instead to wait for ICE personnel from the ERO to meet us in the lobby.

26. While we waited for ICE personnel to come to the lobby, Representative Nadler and I decided to go to the 14th floor of the building to observe ongoing immigration court proceedings.

While walking to the courtroom, I observed approximately 10 law enforcement agents in the hallway. Most appeared to be plainclothes ICE agents wearing masks. Three of the agents were masked, uniformed agents with bulletproof vests that bore the insignia "FBI" on them.

27. I observed two court cases that day. In both cases, the DHS attorney moved to dismiss the removal proceeding against the respondent. In both cases, the respondent opposed the motion and the judge denied the motion. In one case, the judge scheduled the next hearing on the respondent's asylum claim for August 2029, more than four years away.

28. Upon returning to the lobby of 26 Federal Plaza, Representative Nadler and I met with the deputy director of the New York Field Office. The deputy director refused us entry into the 10th Floor Facility because, according to directions he received from his supervisors, the 10th Floor Facility is not a "detention facility" under the statute, but is instead a "holding and processing center."

29. The deputy director spoke with us for approximately 10 minutes. He told us that the 10th Floor Facility did not have beds or showers; that individuals were being held overnight, some for at least two nights; and that they were being fed.

30. I asked the deputy director how a facility that was holding and housing individuals for two nights or more was not being "used to detain or otherwise house" those individuals. The deputy director responded that I should ask the Office of Legislative Affairs for DHS.

31. Rep. Nadler and I were denied the ability to conduct oversight of the ICE facility at 26 Federal Plaza.

**The Significant, Irreparable Harm from Defendants' Unlawful Obstruction**

32. Federal law requires DHS to allow any Member of Congress to visit any DHS detention facility for the purpose of conducting oversight without providing advance notice. It is critical for my colleagues and me to understand how funds that Congress appropriated to DHS and

7

ICE under Article I of the U.S. Constitution are being used for immigration detention in order to ensure the physical safety of our constituents and to ensure that all DHS immigration detention activities are being conducted in accordance with the requirements of federal law.

33. The statute establishing this oversight authority specifically authorizes visits to be unannounced so that DHS does not have advance notice in order to conceal the actual conditions of a DHS facility.

34. I have sought to hold DHS and ICE accountable for the improper obstruction of my attempts to visit the ICE facility at 26 Federal Plaza.

35. For example, on June 20, 2025, I led a letter with eight colleagues from New York to the Secretary of Homeland Security and Acting Director of ICE asking them, among other things, for an explanation of the decision to deny Members of Congress access to the 10th Floor Facility. To date, we have not received a response.

36. On June 25, 2025, during a proceeding of the Homeland Security Committee, I made a motion for the Committee to issue a subpoena to Defendant Noem to testify in order to provide an opportunity for her to explain, under oath, why she denied me access to the 10th Floor Facility.[2] The chair ruled the motion out of order.[3] I asked the Chair if he would join me in requesting that Defendant Noem appear in front of the Homeland Security Committee to explain her decision to prevent Members of Congress from conducting statutorily authorized oversight. The Chair did not answer me.

37. Despite all of these efforts, I have not been able to conduct a successful oversight visit of the 10th Floor Facility at 26 Federal Plaza.

---

[2] House Committee on Homeland Security, Full Committee Markup, June 25, 2025, video at 1:02:00–1:05:10, https://democrats-homeland.house.gov/activities/markups/markup-of-various-legislation.

[3] *Id.* at 1:12:35–1:13:15.

38. Given that the 26 Federal Plaza detention facility is located in my district, it is vital that I be able to conduct oversight of this and other DHS immigration detention facilities in order to ensure the safety and well-being of my constituents and to identify further congressional actions, such as investigations and legislation, that may be necessary to meet that goal.

39. In recent weeks, I have spoken to two individuals who were detained in the 10th Floor Facility—one of whom was detained for four days. Both people described the conditions nearly identically: dozens of people crammed into separate large rooms for men and women for as long as two weeks; no beds, sheets, or mattresses to sleep on and no showers; one toilet for each sex in an open bathroom with only a short wall providing any privacy; excessively hot temperatures which, combined with no change of clothes, created a horrific stench; and minimal food and medical care.

40. Despite repeated denials of poor conditions in the 10th Floor Facility by DHS, recent public reporting has reaffirmed these witness statements and my significant concerns about the conditions of detention at the 10th Floor Facility at 26 Federal Plaza and confirmed the continued need for congressional oversight of this facility. Video footage captured by an individual detained in the facility showed significant overcrowding and a lack of safe and sanitary conditions.[4]

41. I intend to continue engaging in on-the-ground, real-time oversight of DHS facilities detaining or otherwise housing noncitizens, because timely and accurate information is critical for me to do my work to craft legislation and serve my constituents.

42. Without the ability to conduct oversight of ICE facilities—particularly those located in my district, where my constituents may be detained—I am unable to perform my obligations to ensure that my constituents are being treated humanely and in accordance with legal and

---

[4] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y. Times, July 22, 2025, https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

9

constitutional obligations when they are in federal immigration custody.  I am also unable to assist my constituents and their families to ensure they have access to legal counsel and are able to speak with their lawyers regarding their legal proceedings prior to facing potential adverse immigration consequences such as deportation.

43. My ability to visit DHS detention facilities for the purpose of conducting oversight is also vital to my work on federal legislation.  This oversight work informs my decisions to introduce, sponsor, and support or oppose federal legislation in the U.S. House of Representatives.

44. For example, in July 2025, I introduced an amendment to the partisan reconciliation bill that would have forbidden any of the bill's funds from being used to prevent or impede Members of Congress from conducting their statutorily authorized oversight of immigration enforcement and detention facilities.  This amendment was directly informed by my experiences during my improperly obstructed attempt to visit the 10th Floor Facility at 26 Federal Plaza.

45. My ability to visit DHS detention facilities for the purpose of conducting oversight is further essential to my ability to actively and effectively participate on my assigned committees.  Both of the committees of which I am a member—the House Homeland Security Committee and House Judiciary Committee—have jurisdiction over DHS.  If I am unable to monitor the work of DHS and ICE through oversight activities such as visits to immigration detention facilities, then I am not able to conduct my committee work in a manner that is fully informed by the facts on the ground.

46. DHS and ICE's refusal to permit me to conduct tours at designated detention facilities without seven days' notice, or at field offices under any circumstances, hinders my ability to perform my duties as a Member of Congress.  Based on public reporting, admissions by the Defendants, and direct reports from members of my community, it is clear that individuals are being detained in ICE field offices within my district overnight, and sometimes for multiple nights, under

overcrowded and unsafe conditions.  It is imperative that I be able to conduct unannounced visits to ICE detention facilities, including field offices where individuals are detained or otherwise housed, in order to assess the actual conditions of these facilities and to ensure that DHS and ICE do not have time to hide unacceptable conditions prior to my visit.  It is important to my duties as a Member of Congress to ensure that the conditions under which these individuals are detained are safe, humane, and in accordance with federal law.

47. A lack of adequate oversight access hinders my ability to serve my constituents, to ensure that DHS and ICE are acting consistent with the law, to carry out my work on the House Homeland Security and Judiciary Committees, and to craft relevant legislation and appropriations—including limits on such appropriations—going forward.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of August 2025 in New York, NY.

DANIEL S. GOLDMAN