IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives *et al.*,

    *Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,

    *Defendants*.

Case No. 25-cv-2643-JMC

## DECLARATION OF REPRESENTATIVE BENNIE G. THOMPSON

I, Bennie G. Thompson, declare as follows:

1. I am a member of the U.S. House of Representatives, representing Mississippi's 2nd congressional district. I have been a congressmember since 1993.

2. From 2007 to 2011 and 2019 to 2023, I served as the chair of the House Committee on Homeland Security. During all other times since 2005, I served as the ranking member, and I currently serve as the ranking member of that committee.

3. I have personal knowledge of the facts and information in this declaration. I respectfully provide this declaration to explain how the unlawful, new oversight visit policy of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) prevents me from performing my oversight duties as a member of Congress and significantly harms my ability to serve my constituents.

**DHS and ICE Oversight Activities**

4. As a longstanding member, previous chair, and previous and current ranking member of the Homeland Security Committee, I have been actively engaged in oversight of the

1

Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) since Congress created those agencies.

5.  An ICE detention facility, the Adams County Correctional Center, is located in my district, in Natchez, Mississippi. An ICE sub-field office, which is part of the New Orleans Field Office, is also located just outside of my district, in Pearl, Mississippi. My office does regular and significant case work for constituents involving ICE activities and the Adams County Correctional Center facility in particular.

6.  In the course of conducting oversight of DHS, I have performed numerous in-person visits to DHS facilities over the last several years. In April 2025, I visited the Central Louisiana ICE Processing Center and South Louisiana ICE Processing Center, along with Representative Troy Carter of Louisiana and three other members of Congress. We coordinated with ICE officials in preparation for those visits to ensure that we could speak with specific individuals who were detained there at the time. During the visits, we received tours of the detention facilities and spoke with specific detainees and gathered information about their medical care at the facility. Following those conversations, we sent written questions to ICE regarding, for example, the length of detention at those facilities, the detainees' access to appropriate food, and any recent miscarriages at the facilities. Approximately five weeks later, ICE returned written responses to our questions by email. We also sent a letter posing questions and raising concerns about the rate of miscarriages at those facilities to the acting director of ICE.[1]

7.  In April 2021, I visited U.S. Border Patrol's El Paso Central Processing Center, the Department of Health and Human Services' Emergency Intake Site at Fort Bliss for unaccompanied children, and Annunciation House's shelter, Casa del Refugiado, for immigrants in El Paso, Texas.

---

[1] Letter from Edward J. Markey et al. to Todd M. Lyons, Acting ICE Director (May 6, 2025), https://perma.cc/575X-N6Z2.

During that visit, I received tours of the facilities, observed the conditions of detention, and asked the detainees questions.

8. I have conducted many other previous oversight visits at DHS immigration detention facilities, including Border Patrol facilities in Texas and California, as well as many different Customs and Border Protection (CBP) facilities.

9. In addition, in August and October of 2019, at my direction as then-chair of the Committee on Homeland Security, committee staff visited eight ICE detention facilities in Louisiana, Mississippi, California, New Mexico, and Maryland. That investigation culminated in a comprehensive report on the conditions of confinement and the inadequacy of DHS's internal oversight tools.[2] In 2018, at my direction, committee staff also visited the El Paso Service Processing Center and the Dilley Family Residential Center in Texas.

10. Those visits allowed us not only to assess the conditions of detention and any processes in place for addressing issues as they arise, but many of them underscored the importance of having oversight access, when necessary, with little or no prior notice. For many of the 2019 investigation visits, staff gave the facilities' up to two weeks' notice, with the goal of gaining sufficient access to conduct thorough oversight. We found that this advance notice gave facilities the opportunity to improve the conditions. Officials at the facilities instituted modifications such as fresh paint on the walls, newly planted flowers, newly installed shower curtains, and an additional guard where one had not been previously. At one detention facility, detainees informed committee staff that individuals that had been confined in solitary cells were returned to the general population just prior to their arrival. These kinds of changes—and assuredly many other changes that went

---

[2] Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC.

unseen—prevent congressional oversight from assessing the true conditions of a facility as experienced by the detainees day to day.

      11.     These on-the-ground oversight visits and activities are integral to other activities I have undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. For example, I have sent oversight letters to DHS and ICE officials and contractors inquiring into the use of private prison contractors for immigration detention;[3] the treatment of especially vulnerable individuals and deaths in ICE custody;[4] the spread of COVID-19 in privately managed immigration detention facilities;[5] medical care and protocols in ICE detention facilities;[6] and the concerning conditions at an ICE detention facility in New Mexico.[7] I have also requested numerous reports by the Government Accountability Office regarding the costs and conditions of immigration detention facilities.[8]

---

[3] Letter from Bennie G. Thompson, Ranking Member of H. Comm. on Homeland Sec., to John Roth, DHS Inspector Gen. (Aug. 19, 2016), https://perma.cc/VUX8-H3G3.

[4] Letter from Bennie G. Thompson, Ranking Member of H. Comm. on Homeland Sec., to Ronald J. Vitiello, Acting ICE Dir. (Dec. 7, 2018), https://perma.cc/Q5TY-SSZQ.

[5] H. Comm. on Homeland Sec. Democrats, News, *Thompson Writes ICE Detention Center Contractors on Rising Coronavirus Cases at Their Facilities* (Apr. 30, 2020), https://perma.cc/28ET-SM26.

[6] Letter from Members of Cong. to Tony H. Pham, Rodney Cooper, and Phil Bickham (Sept. 21, 2020), https://perma.cc/ET8W-FVB5; Letter from Bennie G. Thompson, Chairman of H. Comm. on Homeland Sec., et al., to Alejandro Mayorkas, Sec'y of Homeland Sec. (Dec. 3, 2021), https://perma.cc/7AYL-LWM9.

[7] Letter from Bennie G. Thompson & Nanette Diaz Barragán to Alejandro Mayorkas, Sec'y of Homeland Sec., & Tae D. Johnson, Acting ICE Dir. (Mar. 24, 2022), https://perma.cc/6GZ4-5M59.

[8] U.S. Gov't Accountability Off., GAO-23-105366, *Immigration Detention: Actions Needed to Collect Consistent Information for Segregated Housing Oversight* (Oct. 2022), https://perma.cc/KLT4-QK92; U.S. Gov't Accountability Off., GAO-21-149, *Immigration Detention: Actions Needed to Improve Planning, Documentation, and Oversight of Detention Facility Contracts* (Jan. 2021), https://perma.cc/A489-WE8X; U.S. Gov't Accountability Off., GAO-16-514, *Immigration Detention: Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities* (May 2016), https://perma.cc/8GNE-N64T; U.S. Gov't Accountability Off., GAO-16-231, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care* (Feb. 2016), https://perma.cc/5Y7P-U7QW; U.S. Gov't Accountability Off., GAO-15-153, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standard* (Oct. 2014), https://perma.cc/6MKY-X4TW.

12. I have also introduced legislation to address issues that have arisen in the course of my oversight of DHS. In July 2019, I introduced the Strategic and Humane Southern Border Migrant Response Act, which sought to address the humanitarian crisis at the border at the time in a more humane and strategic way.[9] I also cosponsored the Short-Term Detention Standards Act, which sought to improve detention conditions in CBP facilities, which passed in the House in July 2019.

**Defendants' Unlawful Obstruction of July 21, 2025, Oversight Visit**

13. On July 21, 2025, Representative Raskin, Representative Neguse, and I traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. A few staffers accompanied us but were not there to participate in the tour. We had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions were unknown. We were also aware of reports regarding poor conditions and overcrowding at field offices across the country. Without visiting in person, we could not otherwise obtain real-time, reliable information regarding the conditions of confinement at the Washington Field Office.

14. We arrived at the field office around 10:00 a.m. and were greeted at the main entrance by a guard, who asked us to wait outside while he conferred with officials inside. After about 15 minutes, an ICE official came out. I introduced myself and Representatives Raskin and Neguse and explained that we were there to conduct a tour of the facility, without prior notice, pursuant to our statutory authority. The agent offered to show us the public lobby, and we explained that we required a tour of the entire facility. He asked if we had made prior arrangements, and I said

---

[9] H. Comm. on Homeland Sec. Democrats, News, *Chairman Thompson to Introduce Legislation to Address Border Humanitarian Crisis* (July 9, 2019), https://perma.cc/U95C-Y55U.

that we were not required to do so by law and had not done so. He wrote down each of our names, said that he would have to confer with management, and went inside.

15. About 15 minutes later, the deputy field office director and assistant field office director greeted us. They told us that their "latest guidance" was that field offices are not subject to section 527. They directed us to two ICE detention facilities nearby and stated that we could arrange oversight tours at those locations. In response, we cited the language of section 527, which provides each individual member with the right to conduct an unannounced oversight visit to any DHS facility used to detain or otherwise house noncitizens. We expressed our understanding that the Washington Field Office had a holding area where people are detained.

16. The officials confirmed that the Washington Field Office has a "12-hour holding area," where people are detained and not allowed to leave. They stated that the field office generally did not detain individuals overnight, unlike other field offices, because two detention facilities were close by. They confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. They stated that they provided meals to the detainees but had no medical personnel on site. They reiterated that we could make an appointment to tour one of the detention facilities nearby, with seven days' notice.

17. While we were there, we observed at least four individuals exit the facility, most or all of them wearing an ankle bracelet and appearing to carry personal belongings in a plastic bag.

18. We left the facility without being able to conduct oversight of the facility. We continue to lack information regarding the conditions of detention at the Washington Field Office.

**The Significant, Irreparable Harm from Defendants' Unlawful Obstruction**

19. Federal law requires DHS to allow any member of Congress to visit any DHS detention facility for the purpose of conducting oversight without providing advance notice. It is

critical for us to understand how appropriated funds are being used in real time on the ground in immigration detention. This close oversight informs each of us on how to best serve our constituents—especially those of us who represent districts where DHS facilities are located or nearby.

20. Close, in-person oversight has become more important as my ability to communicate with, receive information from, and rely on DHS officials has drastically decreased under the Trump-Vance administration. Oversight letters to the secretary of DHS and acting director of ICE lately result in delayed answers, or no answers at all. For example, other members and I sent a letter to the DHS secretary and ICE acting director on June 5, 2025, regarding immigration enforcement actions at courthouses, and although we received an acknowledgement of its receipt, we have received no substantive response.[10] This lack of responsiveness is unprecedented in my time in Congress. As a member of Congress and as the ranking member on the Homeland Security Committee, I must have adequate information to do my job. When there is a lack of response by the administration which other members and I are tasked with overseeing and appropriating funds to, we must have boots on the ground to gather information ourselves.

21. This problem is exacerbated by the sudden and near-complete absence of DHS's internal oversight offices since March 2025, including the Office for Civil Rights and Civil Liberties (CRCL) and the Office of the Immigration Detention Ombudsman. Although those offices are statutorily required, the administration fired or reassigned nearly all of their employees and essentially halted their important oversight work. I previously relied heavily on those offices for information on abuses occurring in ICE detention facilities (e.g., use of force, inadequate medical care), as well as their recommendations to correct such abuses. Oversight of immigration detention

---

[10] Rep. Dan Goldman, Press Release, *Rep. Goldman, Ranking Member Thompson Lead House Democrats in Response to President Trump's Authoritarian Crackdown on Non-Violent, Law-Abiding Immigrants* (June 5, 2025), https://perma.cc/M3CA-RCH5.

by Members of Congress is even more crucial than before, in light of the effective elimination of those internal DHS oversight offices.

22. In the absence of these previous sources of reliable oversight and information, my ability to observe operations and conditions in DHS facilities firsthand is critical.

23. This oversight is particularly important for constituents in my district, where an ICE detention facility is located. Our ability to communicate effectively with ICE officials is integral to my ability to serve constituents—and when that communication breaks down, in-person oversight is sometimes the only way to obtain necessary information to be responsive to my constituents, to inform my district, and to support my legislative work.

24. Defendants' refusal to permit me to conduct tours at detention facilities without seven days' notice, and at field offices under any circumstances, therefore hinders my ability to perform my duties as a member of Congress.

25. I intend to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both planned and unannounced visits. Without the information that can be gained only through that in-person, real-time oversight, I would be less able to serve my constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 7th day of August 2025 in Tunica, Mississippi.

BENNIE G. THOMPSON