IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>*Defendants*. | Case No. 25-cv-2463-JMC |

**DECLARATION OF REPRESENTATIVE JAMIE RASKIN**

I, Jamie Raskin, declare as follows:

1. I am a member of the U.S. House of Representatives, representing Maryland's 8th congressional district. I have been a Member of Congress since 2017.

2. I currently serve as the Ranking Member of the House Judiciary Committee. From 2023 to 2025 I served as Ranking Member of the House Oversight Committee. Before 2023 I was a member of both the Judiciary and Oversight Committees; I also served as Chair of the Subcommittee on Civil Rights and Civil Liberties of the Oversight Committee.

3. This declaration is based on facts within my personal knowledge and the knowledge I have acquired in the course of my duties as a Member of Congress. I respectfully provide this declaration to explain how the unlawful new oversight visit policy of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) prevents me from performing my oversight duties as a member of Congress and significantly harms my ability to serve my constituents.

1

**DHS and ICE Oversight Activities**

4.      Oversight of immigration matters is particularly important to my service on the House Judiciary Committee. The Committee has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. The Committee has authorized tens of billions of dollars for ICE, including for detention facilities. As Ranking Member of the Judiciary Committee, it is very important for me to have a clear and detailed understanding of ICE's detention operations, including the processes under which ICE detains individuals and the conditions under which they are detained.

5.      Immigration enforcement and detention are important to my constituents, who often reach out to my office about these matters. Some of these constituents have family members in ICE detention, and they are desperate for information about their relatives. Recently, my office was contacted by a Maryland resident whose mother is in immigration detention and is facing removal despite the fact that she fled her country of origin because of persecution on the basis of her religion and political opinions. We have also heard from constituents whose family members are in detention but who cannot be located; these constituents are frantic to reach their relatives but have received no response from ICE. One of my constituents was unexpectedly detained by ICE in front of his home on his way to work, despite having no criminal record or any removal order; he was transferred to a facility in Texas for no apparent reason. Constituents have also told us that ICE refuses to provide their detained relatives with a privacy waiver form, which is necessary to allow family members to learn about their case.

6.      In my prior capacity as Member and Subcommittee Chair of the House Oversight Committee, I, and staff under my supervision, engaged in several activities involving oversight of DHS and ICE. In August and September 2019, the Committee sent bipartisan staff delegations across the country to conduct oversight inspections of DHS immigration detention facilities.

Committee staff inspected 22 DHS facilities in six states, including 12 detention centers run by ICE and for-profit contractors, seven Border Patrol stations, and three ports of entry operated by CBP. DHS cancelled staff inspections of 11 CBP facilities a day before they were to occur.

7. A 2019 investigation by the House Oversight Committee, in which I participated, led to issuance of a staff report in 2020 on the poor treatment of detainees in detention facilities operated by private contractors, focusing especially on deaths in custody and deficient medical care. That report followed staff visits to twelve detention facilities, ten of which were operated by contractors and two by ICE. The report concluded that the detention system needs fundamental reform, including greater internal and external oversight, and the privately run facilities are particularly problematic. It also concluded that DHS and ICE had refused to release full investigative reports into detainee deaths, as required by law.

8. I have engaged in several other oversight actions during my service in Congress.

9. In July 2019, I chaired a hearing on inhumane treatment of children in detention facilities. In August 2020, I, along other Members, requested that the Government Accountability Office (GAO) prepare a report on the care of pregnant women in DHS facilities, which it did. In March 2020, I, along with another Member, requested that ICE and CBP provide documents on procedures in detention facilities to protect detainees from the virus that causes COVID-19. In September 2020, the House Oversight Committee, along with the House Homeland Security Committee, opened an investigation into a medical whistleblower complaint from an ICE detainee and requested that ICE produce documents. In May 2024, I, along with other members of the Oversight Committee, requested that GAO conduct a review of medically necessary procedures for detainees in ICE and CBP facilities.

10. More recently, during the current Trump Administration, I have sent several letters to DHS and ICE leadership, raising issues such as the detention of United States citizens, DHS

plans for detention of families, and the detention of individuals whose student visas have been revoked.

11. On July 21, 2025, I, along with Representative Thompson and Representative Neguse, traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. We had received information that individuals were being detained in that facility, and we were otherwise unable to obtain real-time, reliable information regarding the conditions of detention.

12. We arrived at the field office around 10:00 a.m. and were greeted at the main entrance by a guard, who asked us to wait outside while he conferred with officials inside. After about 15 minutes, a special agent came out. The agent offered to show us the public lobby, and we explained that we required a tour of the entire facility. He asked if we had made prior arrangements, and we explained that we were not required to do so by law and had not done so. He wrote down each of our names, said that he would have to confer with management, and went inside.

13. About 15 minutes later, the deputy field office director and assistant field office director greeted us. They told us that their "latest guidance" was that field offices are not subject to section 527. They directed us to two ICE detention facilities nearby and stated that we could arrange oversight tours at those locations. In response, we cited the language of section 527 of the fiscal year 2024 Department of Homeland Security appropriations, which provides each individual member with the right to conduct an unannounced oversight visit to any DHS facility used to detain or otherwise house noncitizens. We expressed our understanding that the Washington Field Office had a holding area where people are detained.

14. The officials confirmed that the Washington Field Office has a "12-hour holding area," where people are detained and not allowed to leave. They stated that the field office generally did not detain individuals overnight, unlike other field offices, because two detention facilities were

close by. They confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. They stated that they provided meals to the detainees but had no medical personnel on site. They reiterated that we could make an appointment to tour one of the detention facilities nearby, with seven days' notice.

15. While we were there, we observed at least four individuals exit the facility wearing an ankle bracelet and appearing to carry personal belongings in a plastic bag.

16. We left the facility without being able to conduct oversight of the facility. We continue to lack information regarding the conditions of detention at the Washington Field Office because ICE has denied us entry into this facility.

**The Significant, Irreparable Harm from Defendants' Unlawful Obstruction**

17. In-person, unannounced visits are essential to Members' ability to conduct oversight of DHS and ICE. We depend on ICE facility oversight visits to guide our ability to shape both substantive legislation and appropriations bills. Oversight visits for Members and their staff provide necessary information on how to best craft legislation, redirect funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities. Inadequate access to ICE facilities would significantly hinder our ability to engage in oversight.

18. I intend to continue engaging in on-the-ground, real-time oversight of DHS facilities detaining or otherwise housing noncitizens, because timely and accurate information is critical for me to do my work to craft legislation and otherwise serve my constituents.

19. Conditions in ICE facilities are of direct and significant interest to many of my constituents. Residents of my district have been held in those facilities, and others have family members who have been detained there.

20. Expeditious and complete access to these facilities is essential to my ability to see the conditions for myself and to advocate, within the Congress and with DHS and ICE, for safe and humane treatment of detainees there. Defendants' refusal to permit me to visit detention facilities without seven days' notice, and at field offices under any circumstances, hinders my ability to perform my duties as a member of Congress. Without adequate oversight, I am less able to serve my constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation—including authorizing legislation for ICE that falls within the jurisdiction of the Judiciary Committee—going forward.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of August 2025 in ___Maryland___.

                                                   JAMIE RASKIN