# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a
Member of the U.S. House of Representatives,
*et al.*,

                *Plaintiffs*,

      v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

                *Defendants*.

Case No. 1:25-cv-2463-JMC

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR STAY UNDER 5 U.S.C. § 705, OR IN THE ALTERNATIVE, FOR
<u>PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

      A.     Statutory and Regulatory Background ....................................................3

      B.     DHS and ICE Appropriations ................................................................5

      C.     ICE Visitation Protocols .......................................................................7

ARGUMENT .....................................................................................................................8

I.     Plaintiffs are not likely to succeed on the merits. ............................................8

      A.     Plaintiffs cannot establish that they likely have Article III standing. ............................8

      B.     Plaintiffs cannot likely overcome the doctrine of equitable discretion disfavoring their requested relief. ....................................23

      C.     Plaintiffs cannot show they likely have a cause of action. ...............24

           1. Plaintiffs lack a cause of action under the APA. ........................24

           2. Plaintiffs lack an ultra vires cause of action................................31

      D.     Plaintiffs are not likely to succeed on the merits of their APA and ultra vires claims. ................................................33

      E.     Plaintiffs are unlikely to succeed on their request for mandamus relief......................37

II.     Plaintiffs cannot establish irreparable harm. .................................................38

III.     The equitable factors strongly disfavor preliminary injunctive relief. ........................41

IV.     Relief is not available under 5 U.S.C. § 705.................................................43

V.     Any relief should be limited to the funds subject to § 527 and to these Plaintiffs.................43

VI.     Plaintiffs should be ordered to post security in connection with any emergency relief. .........45

CONCLUSION................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*AD HOC Telecom. Users Comm. v. FCC,*
   572 F.3d 903 (D.C. Cir. 2009) ................................................................................ 36

*Alcresta Therapeutics, Inc. v. Azar,*
   318 F. Supp. 3d 321 (D.D.C. 2018) ..................................................................... 39

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ............................................................................................. 16

*Allen v. Wright,*
   468 U.S. 737 (1984) ............................................................................................... 9

*Am. School of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) ............................................................................................... 32

*Am. Trucking Ass'n. v. United States,*
   755 F.2d 1292 (7th Cir. 1985) ............................................................................. 31

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
   897 F.3d 314 (D.C. Cir. 2018) ............................................................................... 8

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ............................................................................................. 32

*Asiana Airlines v. FAA,*
   134 F.3d 393 (D.C. Cir. 1998) ............................................................................. 31

*AT&T v. United States,*
   551 F.2d 384 (D.C. Cir. 1976) ............................................................................. 23

*Az. Christian Sch. Tuition Org. v. Winn,*
   563 U.S. 125 (2011) ............................................................................................. 18

*Barker v. United States,*
   404 F. Supp. 3d 251 (D.D.C. 2019) ..................................................................... 36

*Barnes v. Kline,*
   759 F.2d 21 (D.C. Cir. 1985) ................................................................... 13, 41, 42

*Block v. Community Nutrition Inst.,*
   467 U.S. 340 (1984) ................................................................................. 26, 28, 30

*Blumenthal v. Trump,*
   949 F.3d 14 (D.C. Cir. 2020) ................................................................... 10, 14, 17

*Boehner v. McDermott,*
   332 F. Supp. 2d 149 (D.D.C. 2004) ..................................................................... 21

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*,
    419 U.S. 281 (1974) ................................................................................................... 35, 36

*Braxton County Court v. West Virginia ex rel. Tax Commissioners*,
    208 U.S. 192 (1908) ............................................................................................................ 12

*Campaign Legal Ctr. v. Scott*,
    49 F.4th 931 (5th Cir. 2022) ............................................................................................ 19

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ..................................................................................... 13, 14

*Califano v. Yamasaki*,
    442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ................................................ 43, 44

*Cartier v. Sec'y of State*,
    506 F.2d 191 (D.C. Cir. 1974) ........................................................................................ 37

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................................ 39

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
    111 F.3d 1485 (10th Cir. 1997) ...................................................................................... 30

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) .................................................................................. 17, 23

*Church v. Biden*,
    573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................................ 39

*Columbia Power Trades Council v. Dep't of Energy*,
    671 F.2d 325 (9th Cir. 1982) .......................................................................................... 37

*Comm. on Judiciary of United States House of Representatives v. McGahn*,
    968 F.3d 755 (D.C. Cir. 2020) ........................................................................................ 20

*Consol. Edison Co. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002) ........................................................................................ 37

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .......................................................................................................... 9

*Clark v. Martinez*,
    543 U.S. 371 (2005) .......................................................................................................... 4

*Comm. on Jud v. McGahni*,
    973 F.3d 121 (D.C. Cir. 2020) .................................................................................. 28, 29

*Ctr. for Pub. Integrity v. United States Dep;t of Def.*,
    411 F. Supp. 3d 5 (D.D.C. 2019) .................................................................................... 38

*Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,*
  No. 25-917-RJL, 2025 WL 1502329 (D.D.C. May 27, 2025) ........................................ 17

*Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.,*
  514 U.S. 122 (1995) ........................................................................................ 24, 25

*Dist. of Columbia v. U.S. Dep't of Agric.,*
  444 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................ 8

*Dorfmann v. Boozer,*
  414 F.2d 1168 (D.C. Cir. 1969) (per curiam) ...................................................... 42

*DSE, Inc. v. United States,*
  169 F.3d 21 (D.C. Cir. 1999) ............................................................................. 45

*Elec. Priv. Info. Ctr. v. Dep't of Just.,*
  15 F. Supp. 3d 32 (D.D.C. 2014) ...................................................................... 38

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ........................................................................... 18

*Estate of Michael ex rel. Michael v. Lullo,*
  173 F.3d 503 (4th Cir. 1999) ............................................................................. 37

*FDA v. R. J. Reynolds Vapor Co.,*
  145 S. Ct. 1984 (2025) ...................................................................................... 25

*Fed. Express Corp. v. U.S. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) ....................................................................... 31, 37

*Geo Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) .......................................................................... 4, 33

*Georgia v. Stanton,*
  6 Wall. 50 (1868) ............................................................................................. 12

*Glob. Health Council v. Trump,*
  --- F. 4th ----, 2025 WL 2480618 (D.C. Cir. Aug. 13, 2025),
  *as amended* (D.C. Cir. Aug. 28, 2025) ........................................................... 2, 28

*Goldwater v. Carter,*
  444 U.S. 996 (1979) ......................................................................................... 17

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) ......................................................................................... 24

*Green Country Mobilephone, Inc. v. FCC,*
  765 F.2d 235 (D.C. Cir. 1985) .......................................................................... 36

*Greer v. Spock,*
  424 U.S. 828 (1976) ......................................................................................... 18

*Gregg v. Barrett,*
    771 F.2d 539 (D.C. Cir. 1985) ................................................................................. 23

*Guerrero v. Clinton,*
    157 F.3d 1190 (9th Cir. 1998) ............................................................................... 31

*Harrington v. Bush,*
    553 F.2d 190 (D.C. Cir. 1977) ............................................................................... 14

*Heikkila v. Barber,*
    345 U.S. 229 (1953) ............................................................................................... 26

*Hernandez v. Mesa,*
    589 U.S. 93 (2020) ................................................................................................. 32

*Hope v. Warden York Cnty. Prison,*
    972 F.3d 310 (3d Cir. 2020) ................................................................................... 4

*In re Cheney,*
    406 F.3d 723 (D.C. Cir. 2005) (en banc) ............................................................ 37

*In re Nat'l Nurses United,*
    47 F.4th 746 (D.C. Cir. 2022) ............................................................................... 37

*Ipsen Biopharmaceuticals, Inc. v. Becerra,*
    No. 20-CV-2437 (DLF), 2021 WL 4399531 (D.D.C. Sept. 24, 2021) .............. 19

*Kelly v. RealPage Inc.,*
    47 F.4th 202 (3d Cir. 2022) ................................................................................... 19

*Kim v. FINRA,*
    698 F. Supp. 3d 147 (D.D.C. 2023) ...................................................................... 40

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
    507 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................... 4, 33

*Los Angeles Cnty. v. Davis,*
    440 U.S. 625 (1979) ............................................................................................... 21

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................... 12

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................................... 43

*Make The Road New York v. Wolf,*
    962 F.3d 612 (D.C. Cir. 2020) ............................................................................... 24

*Maloney v. Murphy,*
    984 F.3d 50 (D.C. Circ. 2020) ........................................................................ 21, 22

*Marbury v. Madison,*
  1 Cranch 137 (1803) ............................................................................................ 12

*Medina v. Planned Parenthood S. Atl.,*
  145 S. Ct. 2219 (2025) ............................................................................ 13, 16, 24

*Michigan v. EPA,*
  576 U.S. 743 (2015) ............................................................................................ 4, 5

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
  453 U.S. 1 (1981) ................................................................................................. 28

*Moore v. United States House of Representatives,*
  733 F.2d 946 (D.C. Cir. 1984) ...................................................................... 12, 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................................ 35, 36

*Nat. Res. Def. Council v. Lujan,*
  768 F. Supp. 870 (D.D.C. 1991) ......................................................................... 30

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ............................................................................................. 36

*Nat'l Treasury Emp. Union v. Campbell,*
  654 F.2d 784 (D.C. Cir. 1981) ...................................................................... 16, 24

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.,*
  435 F.3d 326 (D.C. Cir. 2006) ............................................................................ 43

*Nevada Ethics Commission v. Carrigan,*
  564 U.S. 117 (2011) ............................................................................................ 12

*New York Times Co. v. DHA,*
  No. 21-CV-566 (BAH), 2021 WL 1614817 (D.D.C. Apr. 25, 2021) .............. 38, 40, 42

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................................ 42

*NRDC v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) ............................................................................ 30

*Nuclear Regul. Comm'n v. Texas,*
  605 U.S. 665 (2025) ............................................................................................ 32

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ............................................................................ 31

*Office of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ............................................................................................ 27

*O'Connor v. Donaldson,*
  422 U.S. 563 (1975) ................................................................................................ 21

*Power v. Barnhart,*
  292 F.3d 781 (D.C. Cir. 2002) ............................................................................... 37

*Raines v. Byrd,*
  521 U.S. 811 (1997) ....................................................................................... *passim*

*Reyna ex rel. J.F.G. v. Hott,*
  921 F.3d 204 (4th Cir. 2019) ............................................................................ 4, 33

*Riegle v. Fed. Open Market Comm.,*
  656 F.2d 873 (D.C. Cir. 1981) ............................................................................... 23

*Safety-Kleen Corp. v. EPA,*
  Nos. 92-1629, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ............................ 43

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020) ............................................................................................... 34

*Shays v. FEC,*
  414 F.3d 76 (D.C. Cir. 2005) ................................................................................. 25

*Sherrill v. Knight,*
  569 F.2d 124 (D.C. Cir. 1977) ............................................................................... 18

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  990 F. Supp. 2d 9 (D.D.C. 2013) .......................................................................... 38

*Smith v. Indiana,*
  191 U.S. 138 (1903) ............................................................................................... 12

*Sorenson v. Sec'y of Treasury,*
  475 U.S. 851 (1986) ............................................................................................... 43

*Switchmen's Union of N. Am. v. Nat'l Mediation Bd.,*
  320 U.S. 297 (1943) ......................................................................................... 29, 30

*Thurston v. United States,*
  696 F. Supp. 680 (D.D.C. 1988) ........................................................................... 28

*Toussaint v. McCarthy,*
  801 F.2d 1080 (9th Cir. 1986) ............................................................................... 18

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ....................................................................................... *passim*

*Treasury Emps. Union v. Devine,*
  733 F.2d 114 (D.C. Cir. 1984) ........................................................................ 13, 14

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ................................................................................ 36

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025) .................................................................................... 43, 44

*Trump v. Mazars, USA, LLP,*
    591 U.S. 848 (2020) ................................................................................... *passim*

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) ................................................................................. 8

*U.S. Dep't of Navy v. FLRA,*
    665 F.3d 1339 (D.C. Cir. 2012) ........................................................................... 27

*United States v. Adewani,*
    467 F.3d 1340 (D.C. Cir. 2006) ........................................................................... 21

*United States v. Richardson,*
    418 U.S. 166 (1974) ........................................................................................... 17

*United States v. Texas,*
    599 U.S. 670 (2023) ........................................................................................... 22

*United States v. House of Representatives,*
    556 F. Supp. 150 (D.D.C. 1983) .......................................................................... 23

*Univ. of Texas v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................................... 42

*Vermont Agency of Natural Resources v. United States ex rel. Stevens,*
    529 U.S. 765 (2000) ............................................................................................. 8

*Virginia House of Delegates v. Bethune-Hill,*
    587 U.S. 658 (2019) ..................................................................................... 15, 20

*Walker v. Cheney,*
    230 F. Supp. 2d 51 (D.D.C. 2002) ...................................................................... 41

*Walpin v. Corp. for Nat. & Cmty. Servs.,*
    630 F.3d 184 (D.C. Cir. 2011) ............................................................................ 30

*Wilbur v. United States ex rel. Kadrie,*
    281 U.S. 206 (1930) ........................................................................................... 37

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................. 8

*Wisc. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ............................................................................ 38

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ........................................................................................ 32

**U.S. Constitution**

U.S. Const. Art I, § 9, cl. 7 ........................................................................... 41

U.S. Const. Art. II, § 1, cl. 1 ......................................................................... 34

U.S. Const. Art. II, § 3 ................................................................................... 34

U.S. Const. Art. III, § 2, Cl. 1 ......................................................................... 8

**Statutes**

2 U.S.C. § 192 ................................................................................................ 29

2 U.S.C. § 194 ................................................................................................ 29

2 U.S.C. § 288d ......................................................................................... 28, 31

2 U.S.C. § 692 ................................................................................................ 10

5 U.S.C. App. II, § 10 ................................................................................... 22

5 U.S.C. § 551 ......................................................................................... 25, 30

5 U.S.C. § 552 ................................................................................................ 31

5 U.S.C. § 701 ......................................................................................... 25, 26

5 U.S.C. § 702 ................................................................................................ 24

5 U.S.C. § 704 ................................................................................................ 30

5 U.S.C. § 705 .......................................................................................... *passim*

5 U.S.C. § 2954 ........................................................................................ 21, 22

5 U.S.C. § 8337 .............................................................................................. 27

6 U.S.C. § 111 ................................................................................................. 3

6 U.S.C. § 112 ................................................................................................ 33

6 U.S.C. § 251 ................................................................................................. 3

6 U.S.C. § 252 ................................................................................................. 3

6 U.S.C. § 557 ................................................................................................. 4

8 U.S.C. § 1225 ............................................................................................... 4

8 U.S.C. § 1226 ............................................................................................... 4

8 U.S.C. § 1231 ....................................................................................... 4, 33, 38

28 U.S.C. § 1365 ....................................................................................... 28, 31

31 U.S.C. § 1301 ............................................................................................ 26

31 U.S.C. § 1341 ............................................................................................ 27

31 U.S.C. § 1349 ............................................................................................ 27

31 U.S.C. § 1350 ............................................................................................ 27

31 U.S.C. § 1342 ................................................................................................ 28

31 U.S.C. § 1351 ......................................................................................... 27, 28

52 U.S.C. § 30104 ............................................................................................. 22

Anti-Deficiency Act,
  Pub. L. No. 97-258, 96 Stat. 877 (1982) ..................................................... 5

H.R. Rep. No. 79-1980 (1946) ......................................................................... 44

Freedom of Information Act,
  Pub. L. No. 89- 487, 80 Stat. 250 (1966) ................................................... 31

Full-Year Continuing Appropriations and Extensions Act, 2025,
  Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) .......................................... 5

Full-Year Continuing Appropriations and Extensions Act, 2024,
  Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ............................. *passim*

One Big Beautiful Bill Act,
  139 Stat. 72, Pub. L. No. 119-21 (July 4, 2025) ......................................... 6

## Rules

Federal Rule of Civil Procedure 65 ................................................................. 44

## Other Authorities

*Antideficiency Act—Applicability to Statutory Prohibitions on the Use of Appropriations,*
  Comp. Gen. Dec. B-317450, 2009 WL 754042 (Mar. 23, 2009) ..................... 27

*Applicability of Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation,*
  25 Op. O.L.C. 33, 2001 WL 36175929 (2001) ............................................ 27, 28

ICE Directive 11087.2: Operations of ERO Holding Facilities (Jan. 31, 2024),
  *available at* https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf ...................................... 5

J. Gregory Sidak, *The President's Power of the Purse,*
  1989 Duke L.J. 1162 ......................................................................................... 27

U.S. Immigration and Customs Enforcement, "ERO",
  https://www.ice.gov/about-ice/ero (last accessed August 21, 2025) ........................................... 3, 4

U.S. Immigration and Customs Enforcement, "Detention Facilities",
  https://www.ice.gov/detention-facilities (last accessed August 21, 2025) .................................. 4, 5

U.S. Immigration and Customs Enforcement, "Mission",
  https://www.ice.gov/mission (last accessed August 21, 2025) ........................................... 3

U.S. Immigration and Customs Enforcement, "National Detention Standards (revised 2025)",
  https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf ........................................... 7

*Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conf.,*
   31 U.S. Op. O.L.C. 54, 2007 WL 3374332 (2007) ........................................................................... 27

## INTRODUCTION

Plaintiffs, twelve Members of the U.S. House of Representatives, bring suit in their official capacity to obtain access to detention facilities and field offices overseen by U.S. Immigration and Customs Enforcement (ICE) without providing the seven days' advance notice that ICE protocols require.  To do so, Plaintiffs attempt to transform an appropriations bar known as § 527—which prohibits ICE from using certain funds to prevent Members of Congress and their staff from visiting specified ICE facilities—into a statutory entitlement for unfettered access to those facilities.  And on an emergency basis, they now seek complete relief in the form of immediate access to the ICE facilities at issue.  But Plaintiffs fail to satisfy any of the requirements for such an extraordinary remedy.

Start with Article III standing.  In *Raines v. Byrd*, 521 U.S. 811 (1997), the Supreme Court announced the principle that controls this action: individual legislators generally  lack Article III standing to vindicate the institutional interests of the legislative body in which they serve.  Members of Congress  may invoke the power of the federal courts only to assert legal claims to "something to which they personally are entitled"—for example, their paycheck or their seat.  *Id.* at 821.  But they cannot bring suit against the Executive Branch to enforce claimed legislative prerogatives, because such "political battle[s] . . . waged between the President and Congress" are not the kinds of disputes "traditionally thought to be capable of resolution through the judicial process."  *Id.* at 819, 827.  Plaintiffs here, like those in *Raines*, bring suit as individual Members in their official capacity asserting injury to (what they claim are) the prerogatives of their office.  Like in *Raines*, they therefore have not suffered a cognizable injury.  Plaintiffs thus cannot establish that they likely possess Article III standing, and their motion should be denied on that basis alone.

Independently, the significant separations-of-powers concerns raised by Plaintiffs' action counsel against any judicial remedy here.  The D.C. Circuit has instructed that, under the doctrine of equitable discretion, courts should refrain from adjudicating disputes between the political branches

where congressional plaintiffs could obtain relief from fellow legislators and until all possibilities for settlement have been exhausted. That principle applies with full force to this dispute between certain Members of Congress and the Executive Branch, particularly at the preliminary stage.

Regardless, Plaintiffs also have no cause of action. Section 527 says absolutely nothing about enforcement or judicial review: not only does it fail to provide a cause of action, but it is best understood, in light of the panoply of statutes and rules describing how Congress can enforce both appropriations bars and requests for information, as precluding judicial review. For that reason, amongst others, and just as the D.C. Circuit recently held that there is no private enforcement of the Impoundment Control Act, *see Glob. Health Council v. Trump*, --- F. 4th ----, 2025 WL 2480618, at *10-11 (D.C. Cir. Aug. 13, 2025), *as amended* (D.C. Cir. Aug. 28, 2025), Plaintiffs here cannot enforce an appropriations rider through the Administrative Procedure Act (APA) or ultra vires doctrine.

Even if the Court were to reach the merits of Plaintiffs' claims, they would still fail. ICE requires that Members and their staff provide seven days' advance notice to ensure ICE can allocate the resources necessary for congressional visits. Those protocols therefore reasonably balance the need for safe and secure visits with Members' interest in conducting oversight. The protocols are also consistent with ICE's statutory obligations because § 527 does not prohibit ICE from deriving an advance notice requirement from some other statutory source of authority, and other statutes grant the Department of Homeland Security (DHS) and ICE broad discretion to oversee detention facilities.

Plaintiffs' motion should also be denied for failure to establish irreparable harm. When asserting Article III standing, Plaintiffs primarily claim an informational injury in the loss of access to information regarding current conditions at ICE facilities that may be relevant to congressional oversight. But it is well established in the D.C. Circuit that such an informational harm will rarely be irreparable. And Plaintiffs' claims of a developing humanitarian crisis—which concerns third parties and therefore cannot satisfy Plaintiffs' burden here—provide no basis to depart from that principle.

The balance of the equities and public interest provide an independent basis to deny Plaintiffs' motion. Most significantly, separation-of-powers principles dictate that this Court should not jump into the middle of a dispute between the political branches, particularly in an emergency posture.

Finally, and in all events, any relief afforded should be limited to these Plaintiffs and should not extend beyond the specific funds appropriated subject to § 527. Supreme Court precedent instructs that this Court lacks power in equity and under Article III to award any broader remedy.

## BACKGROUND

### A. Statutory and Regulatory Background

Defendant DHS was created through the Homeland Security Act of 2002, Pub. L. 107-296 (2002), as an executive department of the United States. DHS is tasked with preventing terrorist attacks in the United States and carrying out the functions of various entities that were transferred to DHS. 6 U.S.C. § 111. Included in those transferred functions is the detention and removal program for individuals unlawfully present in the United States. 6 U.S.C. § 251(1) & (2).

To that end, the Homeland Security Act created ICE as a federal law enforcement agency within DHS. *See* 6 U.S.C. § 252. Congress directed the Assistant Secretary of ICE to "establish the policies for performing" the "functions" that were transferred to ICE and "otherwise vested in the Assistant Secretary by law." *Id.* § 252(a)(3)(A). Congress also empowered the Assistant Secretary of ICE to "oversee the administration of such policies." *Id.* § 252(a)(3)(B).

ICE's mission is to "secur[e] our nation's borders and safeguard[] the integrity of our immigration system." U.S. Immigration and Customs Enforcement, "Mission," https://www.ice.gov/mission (last accessed August 21, 2025). ICE's Enforcement and Removal Operations (ERO) "manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully

present in the U.S." U.S. Immigration and Customs Enforcement, "ERO" https://www.ice.gov/about-ice/ero (last accessed August 21, 2025).

ICE administers Congress's mandate that certain aliens be detained during removal proceedings or pending their removal. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(c), 1231(a)(2); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 329 (3d Cir. 2020) ("Congress has deemed the detention of criminal aliens so important that it is required by statute."). As relevant here, Congress provided that "[t]he [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).[1] Additionally, Congress authorized DHS to build and operate detention facilities when "United States Government facilities" or "facilities adapted or suitably located for detention are unavailable for rental." *Id.*; *see also id.* § 1231(g)(2) (requiring DHS to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility" prior to constructing a new facility). "And there are 'significant fluctuations in the number and location' of detained individuals, requiring ICE to 'maintain flexibility.'" *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (citation omitted).

Section 1231(g) thus gives DHS broad leeway in setting policies for "appropriate places of detention." Courts have construed this statutory directive as authorizing the detention of aliens "in different kinds of facilities, either government owned or otherwise, depending on need and availability." *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 27 (D.D.C. 2020) (Jackson, J.) (quoting *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 209 (4th Cir. 2019)). "The word 'appropriate' is a broad term understood to incorporate 'multiple relevant factors.'" *Reyna*, 921 F.3d at 209 (quoting *Michigan v. EPA*, 576 U.S. 743, 755 (2015)). ICE ERO accordingly oversees civil immigration

---

[1] Following the Homeland Security Act of 2002, many references in the Immigration and Nationality Act to the "Attorney General" now refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

detention in facilities nationwide that house aliens to secure their presence for immigration proceedings or removal from the United States. *See* U.S. Immigration and Customs Enforcement, "Detention Facilities", https://www.ice.gov/detention-facilities (last accessed August 21, 2025).

Apart from detention centers, ICE also operates ERO Holding Facilities within certain ICE field offices. *See* ICE Directive 11087.2: Operations of ERO Holding Facilities (Jan. 31, 2024), available at https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf. ICE Directive 11087.2 provides ICE ERO "with policy and procedures for operating holding facilities located within their respective field offices." *Id.* § 1.1. A holding facility "contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." *Id.* § 3.2. Short-term is defined "as a period not to exceed 12 hours, absent exceptional circumstances." *Id.* § 3.2 n.3.

**B. DHS and ICE Appropriations**

Congress funds ICE and DHS through multiple appropriations sources, and a significant majority of appropriated funds are not subject to § 527's appropriations restriction.

One appropriation is the Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Resolution"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025). That statute amended the FY 2024 Appropriations Act. Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024), to increase the level of funds available. For ICE "Operations and Support," the FY 2025 Continuing Resolution made available $9,986,542,000. FY2025 Continuing Resolution § 1701(a). The FY2025 Continuing Resolution left in place the "conditions provided in applicable appropriations Acts for fiscal year 2024." FY2025 Continuing Resolution § 1101. Accordingly, the funds appropriated to DHS under the FY2025 Continuing Resolution remained subject to the condition contained in § 527 of the FY2024 Appropriations Act stating:

> (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons

from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

> **(1)** A Member of Congress.
>
> **(2)** An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

**(b)** Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

**(c)** With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

FY2024 Appropriations Act, div. C, title V, Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024).

Independently, the One Big Beautiful Bill Act ("OBBB"), 139 Stat. 72, Pub. L. No. 119-21 (July 4, 2025), appropriated $2,055,000,000 to the Secretary of Homeland Security for fiscal year 2025, to remain available through September 30, 2029. OBBB § 100051. That funding was appropriated for "immigration and enforcement activities," including "[f]unding for transportation costs and related costs associated with the departure or removal of aliens" and "the assignment of Department of Homeland Security employees . . . to carry out immigration enforcement activities." *Id.* § 100051(1)-(3). Additionally, the OBBB appropriated $29,850,000,000 to the Secretary of Homeland Security for ICE, to remain available through September 30, 2029. *Id.* § 100052. The purposes for which that funding was appropriated included "hiring and training additional [ICE] personnel . . . to carry out immigration enforcement activities"; "transportation costs and related costs associated with alien departure or removal operations"; and "facility upgrades to support enforcement and removal operations." *Id.* § 100052(1), (4), & (6). None of the funding that Congress appropriated to DHS and ICE through the OBBB is subject to the condition contained in § 527 of the 2024 Appropriations Act. *See generally* 139 Stat. 72.

### C. ICE Visitation Protocols

To balance safety with detainee rights at its detention facilities, ICE has adopted standard policies for its detention facilities. *See, e.g.*, U.S. Immigration and Customs Enforcement, "National Detention Standards (revised 2025)", https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf. Those policies address visitation rights. Standard 5.5 of the currently-operative National Detention Standards directs that "[f]acilities holding detainees shall permit authorized persons to visit detainees within security and operational constraints." *Id.* § 5.5(1). That standard further directs that, "to better inform the public about ICE/ERO detention operations, facilities may permit authorized representatives of the news media and non-governmental organizations access . . . [,] with appropriate notice, to tour facilities." *Id.* The standard also directs relevant parties to ICE's public website for guidance regarding congressional visits. *Id.*

As detailed in the Declaration of Sean Hackbarth ("Hackbarth Decl."), the Acting Assistant Director at ICE's Office of Congressional Relations, ICE's visitation protocols for Members of Congress serve to balance ICE's obligation to secure the facilities it oversees with Congress's desire to conduct oversight. To strike that balance, ICE requires that Members of Congress and their staff provide seven days' advance notice of a planned visit to any ICE facility. Hackbarth Decl. ¶¶ 5-6. This advance notice is necessary to ensure that ICE can allocate staff and resources to facilitate safe visits. *Id.* ¶¶ 7-9. Congressional visits to ICE detention facilities are particularly resource intensive because Members of Congress and their staff require screening at entry to facilities, access to locked units in facilities, and escorts between locked units in facilities. *Id.* ¶¶ 8, 10.

ICE also facilitates visits by Members of Congress and their staff to field offices, including ICE field offices containing ERO temporary holding facilities. *Id.* ¶¶ 6-7. As with visits to other ICE facilities, ICE requires that Members of Congress and their staff provide seven-day advance notice of a planned visit to an ICE field office containing an ERO temporary holding facility. *Id.* ICE requires

this advance notice so that staff and resources can be made available to ensure safe visits for visitors and the individuals at an ERO temporary holding facility. *Id.* ¶¶ 7, 9-10. If staff and resources are not available to facilitate a safe congressional visit to an ICE field office containing an ERO temporary holding facility on the requested date, ICE's Office of Congressional Relations will coordinate with the visiting Members and staff to schedule an available date and time. *Id.* ¶ 7.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.* The same factors govern the availability of relief under § 705 of the APA. *See Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (collecting authorities).

## ARGUMENT

I.    **Plaintiffs are not likely to succeed on the merits.**

   A.  **Plaintiffs cannot establish that they likely have Article III standing.**

Article III empowers federal courts to decide only "Cases" and "Controversies." U.S. Const. Art. III, § 2, Cl. 1. The case-or-controversy requirement limits the federal courts to the types of "matters that were the traditional concern of the courts at Westminster." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (citation omitted). That restriction "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is

founded," and it confines the federal courts to their "'proper—and properly limited—role . . . in a democratic society.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984) (citation omitted). Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013) (citation omitted).

The Supreme Court has implemented Article III's case-or-controversy requirement largely through the doctrine of Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 422-23 (2021). A plaintiff has standing only if she has suffered a judicially cognizable injury that was likely caused by the challenged action and that would likely be redressed by judicial relief. *Id.* at 423. The requirement of a "legally and judicially cognizable" injury serves to ensure that the dispute is of the sort "'traditionally thought to be capable of resolution through the judicial process.'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation omitted). And this standing inquiry is "especially rigorous" in suits involving the rights and duties of the political branches of the federal government. *Id.*

Plaintiffs' suit does not constitute a "Case" or "Controversy" within the meaning of Article III. The harms alleged—the denial of access or delayed access to certain ICE facilities for individual legislators in their official capacities—do not qualify as a cognizable Article III injury under controlling Supreme Court precedent in *Raines*. And our Nation's history makes clear that this informational dispute between Members of Congress and the Executive Branch is not of the sort traditionally thought to be capable of resolution through the judicial process.

1. The Supreme Court's decision in *Raines* establishes that Members of Congress do not suffer Article III injuries when the Executive Branch allegedly harms their official interests. In *Raines*, six Members of Congress challenged the Line Item Veto Act of 1996, Pub. L. No. 93-344, 110 Stat. 1200, which permitted the President to cancel appropriations authorized by Congress. 521 U.S. at 813-814. That statute specifically provided that, "[a]ny Member of Congress or any individual adversely affected

by [this Act] may bring an action, in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution." *Raines*, 521 U.S. at 815-16 (quoting 2 U.S.C. § 692(a)(1) (1996)). Invoking that provision, the *Raines* plaintiffs argued that the act had injured them by "alter[ing] the legal and practical effect of [their] votes . . . on bills containing . . . vetoable items," by "divest[ing] [them] of their constitutional role in the repeal of legislation," and by "alter[ing] the constitutional balance of powers between the Legislative and Executive Branches." *Id.* at 816 (citation omitted).

The Court held that the challengers' asserted harm—the diminution of their lawmaking powers—did not qualify as a cognizable injury, and that the challengers therefore lacked Article III standing. *Id.* at 820-821. The Court explained that the challengers had suffered that harm "solely because they [we]re Members of Congress," not "in any private capacity." *Id.* at 821. The Court further explained that the asserted injury attached to "the Member's seat": "If one of the Members were to retire tomorrow, he would no longer have a claim." *Id.* The Court determined that such an "injury to official authority or power" did not confer Article III standing. *Id.* at 826.

The D.C. Circuit recently reiterated that "*Raines* is" the "starting point when individual members of the Congress seek judicial remedies." *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020). Because *Raines* squarely controls here, it is also the ending point. Plaintiffs are "duly elected member[s] of Congress," each of whom sues in his or her "official capacity as an individual member of Congress." Compl. ¶¶ 17-28. Indeed, Plaintiffs allege injury to their right as "individual member[s] of Congress to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention." *Id.* ¶ 12. As in *Raines*, "the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress." 521 U.S. at 821. And as in *Raines*, the claimed injury runs "with the Member's seat": "If one of the Members were

to retire tomorrow, he would no longer have a claim." *Id.* As in *Raines*, therefore, the Members' "claimed injury to official authority or power" does not suffice for Article III standing. *Id.* at 826.

Plaintiffs attempt (Mem. 27 n.19)[2] to distinguish *Raines* because the Supreme Court characterized the injury asserted there as a diminution of legislative power, and Plaintiffs here claim different harms—the denial of access and information. But that both misunderstands *Raines* and mischaracterizes the nature of Plaintiffs' asserted harms. Plaintiffs ignore the Supreme Court's two-part explanation for *why* it characterized the harm in that case as a diminution of legislative power— because the challenged harm "necessarily damages all Members of Congress and both Houses of Congress equally," and because the plaintiff Members "do not claim that they have been deprived of something to which they *personally* are entitled" as the injury "is not claimed in any private capacity but solely because they are Members of Congress." *Raines*, 521 U.S. at 821. That explanation is equally applicable to Plaintiffs' injury here. The requirement to provide notice seven days in advance of a visit to an ICE facility applies to all members of Congress equally, and any ability to seek access exists solely incident to an individual's status as a Member of Congress (or as staff to a Member of Congress).

Put differently, any deprivation of information or access does not harm Plaintiffs in their personal capacities, but rather as Members of Congress (or staffers) attempting to engage in legislative oversight—*i.e.*, a diminution of legislative power. Indeed, Plaintiffs *cannot* assert any "personal" harm here, because the Supreme Court has made clear that congressional "[i]nvestigations conducted solely for the personal aggrandizement of the investigators," rather than for "a legitimate task of the Congress," are "indefensible." *Trump v. Mazars, USA, LLP*, 591 U.S. 848, 863 (2020). The congressional power to obtain information is "justified solely as an adjunct to the legislative process," *Watkins v. United States*, 354 U.S. 178, 197 (1957), and any impediment to obtaining information is therefore solely a diminution of legislative power.

---

[2] "Mem." refers to Plaintiffs' Mem. in Supp. of Pls.' Mot. for Stay or Prelim. Inj., ECF No. 17-1,

Plaintiffs' official-capacity harms thus do not qualify as Article III injuries because they are not judicially cognizable—that is, they lack the requisite "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.  In our constitutional system, the "province of the court is, solely, to decide on the rights of individuals." *Marbury v. Madison*, 1 Cranch 137, 170 (1803).  Although an individual's loss of a "private right" has traditionally provided a basis for a lawsuit, an individual legislator's "loss of political power" generally has not.  *Raines*, 521 U.S. at 821; *see Braxton County Court* v. *West Virginia ex rel. Tax Commissioners*, 208 U.S. 192, 197 (1908) ("[T]he interest . . . must be of a personal, and not of an official, nature."); *Smith v. Indiana*, 191 U.S. 138, 149 (1903) ("[T]he interest . . . should be a personal and not an official interest."); *Georgia v. Stanton*, 6 Wall. 50, 76 (1868) ("[T]he rights in danger . . . must be rights of persons or property, not merely political rights, which do not belong to the jurisdiction of a court.").

Plaintiffs' official-capacity harms also do not qualify as Article III injuries because the harms are not particularized.  The denial of a purported right to visit ICE facilities does not affect each plaintiff "in a personal and individual way," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992), but rather prevents a member of Congress from exercising a political benefit that attaches to the seat that member holds.  In our system of government, an elected Representative holds his seat "as trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S. at 821.  Thus, elected Representatives' "personal interest in full and unfettered exercise of their authority is no greater than that of all the citizens for whose benefit (and not for the personal benefit of the officeholder) the authority has been conferred." *Moore v. United States House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in result), *cert. denied*, 469 U.S. 1106 (1985).  Legislative power "is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Ethics Commission* v. *Carrigan*, 564 U.S. 117, 126 (2011).  And the notion that an elected Representative

has a personal stake in the exercise of her official authority is "alien to the concept of a republican form of government." *Barnes v. Kline*, 759 F.2d 21, 50 (D.C. Cir. 1985) (Bork, J., dissenting).

In *Raines*, the Supreme Court also emphasized the forms of recourse other than judicial relief that Members of Congress possess for redressing official-capacity harms. *See* 521 U.S. at 829 (explaining that its holding does not "deprive[] Members of Congress of an adequate remedy"). They may vote on legislation in a manner contrary to what the President wishes, oppose the President's nominees, support restrictions on ICE or DHS, and seek to persuade their colleagues to do likewise. *See id.*; *see also Barnes*, 759 F.2d at 47 (Bork, J., dissenting). In the system of government established by the Constitution, with its "restricted role for Article III courts," disputes between Members of Congress and the Executive Branch must be resolved through those political mechanisms—not by suits in federal court. *Raines*, 521 U.S. at 828; *id.* at 829 (observing that such political tools constitute "an adequate remedy"); *Campbell v. Clinton*, 203 F.3d 19, 24 (D.C. Cir. 2000), *cert denied*, 531 U.S. 815 (2000) ("Although the plaintiff legislators in *Raines* had already failed to stop passage of the Line Item Veto Act, the Court's response was the equivalent of 'if at first you don't succeed, try and try again'—either work for repeal of the Act, or seek to have individual spending bills made exempt."). That these self-help mechanisms exist here further weighs against this Court's exercise of jurisdiction.

2. Plaintiffs' alleged harms are also not sufficiently particularized to confer Article III standing because § 527's purpose is to restrict the Department of Homeland Security from using funds in a certain way, not provide any oversight-related perquisite to Members of Congress. *Cf. Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025) ("To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'") (citation omitted). That is why § 527 is a directive regarding the use of funds—"[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security may be used to

13

prevent any of the following persons from entering, for the purpose of conducting oversight, any facility . . . used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. Indeed, that is why § 527 is contained in an *appropriations* statute. *See Treasury Emps. Union v. Devine*, 733 F.2d 114, 117 n.8 (D.C. Cir. 1984) (instructing that "courts must act cautiously in interpreting appropriations measures, to avoid inferring substantive effects that were never intended").

For two independent reasons, then, any harm caused by a violation of that restriction on funding falls upon Congress as a whole. To start, a violation of a statutory prohibition on a particular expenditure of funds at most harms the Congress that enacted that prohibition, not any particular Member. That alone is sufficient to preclude standing because any violation of that funding restriction does not "single[] out" Plaintiffs and the harm "is shared by the [other] members of the Congress who did not join the lawsuit" because "their claim is based entirely on the loss of political power" held by Congress. *Blumenthal*, 949 F.3d at 19; *see also Raines*, 521 U.S. at 821 (emphasizing "appellees have not been singled out for specially unfavorable treatment as opposed to other Members").

Plaintiffs here are thus left to assert the same theory of standing that the D.C. Circuit rejected in *Campbell*, 203 F.3d 19, where various members of Congress argued that the President violated the War Powers Resolution by failing to end U.S. involvement in foreign hostilities after 60 days. At bottom, the Members here, like plaintiffs in *Campbell*, assert Article III injury based on the alleged violation of limitations that Congress had imposed on Executive Branch action. As in *Campbell*, then, this Court must hold that such an injury is insufficiently particularized to confer standing in a suit brought by individual Members. *Campbell*, 203 F.3d at 22-23; *see also Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (Member of Congress lacked standing to seek injunction prohibiting Central Intelligence Agency from using funding and reporting provisions of founding statute in connection with allegedly illegal activities).

14

Moreover, and even assuming that § 527 could be construed to create a right to conduct oversight (it does not), that right would be held by Congress as a whole. That is because any legislator who seeks information for purposes of legislative oversight necessarily does so as an agent for the entire legislative body, and any setback to that effort is thus "a type of institutional injury . . . which necessarily damages all Members . . . and both Houses of Congress equally." *Raines,* 521 U.S. at 821. The asserted harm is therefore institutional twice over, and thus insufficiently particularized to enable a group of Members to sue. *See id.*; *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019) ("individual members lack standing to assert the institutional interests of a legislature").

3. That conclusion is powerfully reinforced by our Nation's "history and tradition," which "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion*, 594 U.S. at 424 (citation omitted). In *Raines*, the Court found no Article III standing because it was "evident from several episodes in our history that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." 521 U.S. at 826. So too here, disputes about congressional demands for information from the Executive Branch traditionally have not ended up in court. "Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 859 (citation omitted).

That practice of negotiation—rather than litigation—began during the Washington Administration. *See id.* at 859. In 1792, a committee of the House of Representatives asked the Executive Branch to produce documents concerning General St. Clair's failed military campaign in the Northwest Territory. *Id.* President Washington's Cabinet concluded that the House had the authority to "call for papers," but that the President had the discretion to withhold papers whose release would be inconsistent with "the public good." *Id.* (citation omitted). Secretary of State Thomas Jefferson then negotiated with Members of Congress on behalf of the Administration. See *id.* "The

discussions were apparently fruitful, as the House later narrowed its request and the documents were supplied without recourse to the courts." *Id.*

President Jefferson carried on that tradition of negotiation and compromise. *See id.* at 859-60. In 1807, the House of Representatives asked the President to produce information concerning Aaron Burr's conspiracy to raise a private army to invade Spanish territory. *See id.* at 860. The President produced some of the documents sought, but withheld other documents that "neither safety nor justice" would allow him to disclose. *Id.* (citation omitted). "Neither Congress nor the President asked the Judiciary to intervene." *Id.* And "[e]ver since, congressional demands for the President's information have been resolved by the political branches." *Id.* Historical practice thus confirms that disputes concerning congressional requests for the Executive Branch's information should be resolved through the political process, not through litigation instituted by individual Members of Congress.

4. Two additional points confirm Plaintiffs lack standing: Congress has not purported to allow Members to sue to enforce § 527, and the House of Representatives has not purported to authorize this particular suit.

The Supreme Court has held that Congress may, within constitutional limits, "elevate" harms that were "previously inadequate in law" "to the status of legally cognizable injuries." *TransUnion*, 594 U.S. at 425-26 (citations omitted). In this case, however, Congress has not attempted to do so: Although § 527 prohibits the use of certain appropriated funds to prevent Members from visiting certain facilities, it does not purport to grant Members a legal "right" to conduct any such visits. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (statutes that impose duties do not necessarily create rights); *Medina*, 145 S. Ct. at 2229. Nor does § 527 purport to grant Members the ability to sue DHS for failing to comply with the appropriations specification. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 789-95 (D.C. Cir. 1981) (prohibitions on use of congressional appropriations for certain purpose do not supply causes of action).

16

Moreover, in *Raines*, the Supreme Court "attach[ed] some importance to the fact that [the plaintiffs] ha[d] not been authorized to represent their respective Houses of Congress in th[at] action." 521 U.S. at 829. Even if an Article III court could entertain a suit authorized by the full House, allowing suit by individual Members without that authorization "would encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict." *Goldwater* v. *Carter*, 444 U.S. 996, 997 (1979) (Powell, J., concurring in the judgment). Here, Plaintiffs did not even try to secure approval from the full House before bringing suit. The lack of such approval underscores that they lack standing.

5. Neither of Plaintiffs' theories of injury—that denial of access is a tangible harm, and that the denial of access amounts to an informational injury (Mem. 25-27)—justifies departing from controlling Supreme Court precedent.

To start, Plaintiffs' denial of access theory fails because the injury is not particularized or personal. The alleged policies prohibit *any* oversight visits to ICE facilities without providing seven days' advance notice. "The Members were not singled out" as "their alleged injury is shared by the [remaining] members of the Congress who did not join the lawsuit." *Blumenthal*, 949 F.3d at 19; *see also Raines*, 521 U.S. at 821. This type of "generalized grievance" cannot confer standing because the "impact . . . is plainly undifferentiated." *United States v. Richardson*, 418 U.S. 166, 176–77 (1974). *See also Raines*, 521 U.S. at 829 ("the institutional injury they allege is wholly abstract and widely dispersed").

The authorities that Plaintiffs marshal to support their tangible-harm theory of standing (Mem. 25-26) are not to the contrary. To start, none arise in the unique context of legislative standing, where the Supreme Court has directed a court's "inquiry" must be "especially rigorous," *Raines*, 521 U.S. at 819, and where the D.C. Circuit has directed courts to incorporate "separation of powers . . . analyses," *Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999). Indeed, only one case—*Wilmer Cutler Pickering*

*Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-917-RJL, 2025 WL 1502329, at \*7, \*19 (D.D.C. May 27, 2025)—even addressed Article III standing at all, and that case concerned a law firm's challenge to an order that restricted only that firm's employees from accessing government buildings. While the district court found that injury particularized and personal, *id.*, the targeted order at issue in *Wilmer* bears no resemblance to the universally applicable requirements at issue here. And because the remaining cases "do not mention standing," they cannot be "contrary to the conclusion" that these Plaintiffs lack standing here. *Az. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). In any event, all three cases addressed targeted—and thus particularized—access restrictions. *See Greer v. Spock*, 424 U.S. 828, 834 (1976) (prohibition on type of speech on military bases, not a universal prohibition on access); *Toussaint v. McCarthy*, 801 F.2d 1080, 1109 (9th Cir. 1986) (denial of access to a law library for specific group of prisoners committed to administrative segregation); *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) (denial of a White House press pass to a specific reporter).

Plaintiffs' purported informational harm fares no better. For one, Plaintiffs cannot satisfy their own cited test (Mem. 26) for a cognizable information injury. As explained *supra* pp. 13-14, Plaintiffs identify no statute that "requires the government . . . to disclose" any type of "information." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quotation marks omitted). Rather, § 527 bars the use of certain appropriated funds to deny physical access to certain detention facilities.

Additionally, the Supreme Court in *TransUnion* required a plaintiff asserting an informational injury to identify some "'downstream consequence' from failing to receive the required information" because "[a]n 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *TransUnion*, 594 U.S. at 442. This requirement forecloses Plaintiffs' theory of standing because they have not made any showing of particularized adverse effects from the denial of access they seek.

18

Instead, Plaintiffs argue that additional information is necessary to conduct oversight of the Executive Branch or for potential legislation. *See, e.g.*, Compl. ¶ 12 ("These illegal actions have harmed each Plaintiff's right as an individual member of Congress to conduct oversight and obtain information."). But those legislative tasks belong to Congress as a whole, not any particular legislator, *supra* pp. 11-12, and Plaintiffs cannot bootstrap their way to a cognizable injury by piling generalized harm atop generalized harm. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 213 (3d Cir. 2022) ("[A] plaintiff seeking to assert an informational injury must establish a nexus among the omitted information to which she has entitlement, the purported harm actually caused by the specific violation, and the 'concrete interest' that Congress identified as 'deserving of protection' when it created the disclosure requirement."); *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 937 (5th Cir. 2022) ("absent concrete and particularized harm to these Plaintiffs from not obtaining the requested . . . information, they assert no cognizable injury in fact"). And Plaintiffs fail to adduce evidence of any prospective legislation that requires the oversight visits, rendering the potential for legislation far too speculative to constitute a downstream consequence capable of conferring standing. *See Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 20-CV-2437 (DLF), 2021 WL 4399531, at *10 (D.D.C. Sept. 24, 2021) (no cognizable informational injury where any "downstream harm . . . would be too speculative").

More fundamentally, even if Plaintiffs could establish an informational injury (and they cannot), that would still not answer the question of whether that injury is personal and thus properly vindicated through a suit brought by individual Members of Congress. As explained *supra* pp. 9-12, at the core of *Raines* is its distinction between "personal" and "institutional" injuries. Individual Members of Congress may invoke the judicial process to assert claims for "something to which they *personally* are entitled," such as their paycheck or their seat. *Raines*, 521 U.S. at 821. But individual Members of Congress may not bring suit to assert "institutional injury" based upon impairments of

19

legislative functions. *Id.* Thus, the fundamental question under *Raines* is whether the injury forming the basis for suit is personal or institutional in character.

Here, Plaintiffs' asserted informational harm is institutional in character because their ability to access the facilities and obtain the information in question is a prerogative of their *office*. "If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead." *Id.* Indeed, to the extent a congressional demand for Executive Branch information can ever be a cognizable Article III injury, D.C. Circuit precedent confirms that it is because the deprivation of "relevant information" impairs Congress's interest in exercising its powers to legislate and conduct oversight. *Comm. on Judiciary of United States House of Representatives v. McGahn*, 968 F.3d 755, 760 (D.C. Cir. 2020) (explaining possession of that information "is an essential precondition to the effective discharge of" Congress's responsibilities "to legislative, to conduct oversight of the federal government, and, when necessary to impeach.").[3]  Accordingly, only the institution itself can seek to redress such institutional injuries through a suit in federal court. *See Virginia House of Delegates*, 587 U.S. at 667 ("[I]ndividual members lack standing to assert the institutional interests of a legislature.") (citations omitted).

For this reason, Plaintiffs' repeated citations (Mem. 26-27) to the D.C. Circuit's *en banc* decision in *McGahn* undermine their position. That case was brought by a congressional *committee* rather than individual representatives, and the court therefore concluded "[t]here [was] no 'mismatch'" because the plaintiff committee was "'an institutional plaintiff asserting an institutional injury.'" *McGahn*, 968 F.3d at 767. Indeed, the committee was "acting on behalf of the full House of Representatives," which asserted a "long-recognized right, based in the Constitution, to have [Executive Branch officials] appear to testify and produce documents." *Id.* at 760, 765. This case, by contrast, presents

---

[3] Defendants respectfully disagree that the House committee in *McGahn* had standing to sue a co-equal branch of government.

just the sort of "mismatch" between plaintiff and alleged injury that was absent in *McGahn*. Plaintiffs are individual Members of Congress who purport to sue on their own behalf. But the interests they seek to vindicate belong to the House of Representatives. *McGahn* precludes standing in those circumstances: "whereas a legislative institution may properly assert an institutional injury, an individual member of that institution generally may not." *Id.* at 776.

6. The D.C. Circuit's subsequently-vacated decision in *Maloney v. Murphy*, 984 F.3d 50 (D.C. Circ. 2020), *vacated sub nom. Carnahan v. Maloney*, 143 S. Ct. 2653 (2023), does not compel a different result. For one, that decision carries no precedential weight following its vacatur. The Supreme Court has unequivocally instructed that, "[o]f necessity our decision vacating the judgment of the Court of Appeals deprives that Court's opinion of precedential effect." *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975). And that instruction is equally applicable to judgments vacated as moot. *See Los Angeles Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979) (same).[4]

Moreover, the panel's opinion in that vacated decision has no persuasive value here because it addressed a distinguishable statutory scheme and factual context. Unlike § 527, which merely restricts the use of certain appropriated funds, the statute at issue in *Maloney* was held to create a statutory entitlement to certain information. *Compare* § 527(a), 138 Stat. at 619 ("None of the funds

---

[4] To be sure, the D.C. Circuit recognizes limited circumstances in which certain holdings of a subsequently-vacated judgment continue to have precedential effect. *See, e.g., United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006). That is the case, however, only where the Supreme Court vacates a decision containing multiple holdings based on an error concerning, or an instruction to reconsider, one particular holding. *See id.* ("As the order vacating the judgment in *Thomas* remanded the case 'for further consideration in light of' *Booker*, and as *Booker* did not address the escape issue, the Supreme Court's one-paragraph vacatur gives no cause for questioning our holding on that issue."); *Boehner v. McDermott*, 332 F. Supp. 2d 149, 156 (D.D.C. 2004) (distinguishing between "a general order of the Supreme Court vacating the judgment of the Court of Appeals," which deprives that "opinion of precedential effect" and a "grant, vacate, and remand" order, which merely "directs reconsideration" of a particular issue "in light of a new Supreme Court decision"). As "[t]he sole question before the court" in *Maloney* was "whether the members who requested agency information . . . have standing under Article III," 984 F.3d at 54, there can be no question that the Supreme Court's vacatur deprives *that* holding of precedential effect.

appropriated or otherwise made available . . . may be used to prevent any of the following persons from entering . . . any facility . . .") *with* 5 U.S.C. § 2954 ("An Executive agency, on request of . . . any seven members [of specified committee] . . . , shall submit any information requested of it relating to any matter within the jurisdiction of the committee.").

That finding of a statutory entitlement was critical to the *Maloney* court's decision: it explained that "[t]he language of Section 2954 mirrors the operative provisions in" statutes like the Freedom of Information Act (FOIA), the Government in the Sunshine Act, the Federal Election Campaign Act of 1971, the Federal Advisory Committee Act, and § 10(c) of the Endangered Species Act. *Maloney*, 984 F.3d at 60. The court emphasized that each of these statutes contains a mandatory direction to supply information. *Id.* As with § 2954's command that the Executive agency "shall submit any information requested of it," the Freedom of Information Act "analogously commands that '[e]ach agency . . . shall make the records promptly available,'" the Federal Advisory Committee Act "requires that enumerated records . . . 'shall be available,'" and the Federal Election Campaign Act provided that "'each report . . . shall disclose' to the public certain enumerated information." *Id.* (quoting 5 U.S.C. § 2954, 5 U.S.C. § 552(a)(3)(A), 5 U.S.C. App. II, § 10(b), and 52 U.S.C. § 30104(b)). Section 527 contains no such command.

Moreover, subsequent Supreme Court precedent has undercut any persuasive value that *Maloney* maintained following its vacatur. For one, *TransUnion*, 594 U.S. at 424-25, and *United States v. Texas* emphasized the centrality to standing analyses of "'history and tradition' . . . as 'a meaningful guide to the types of cases that Article III empowers federal courts to consider," 599 U.S. 670, 676–77 (2023) (citing *TransUnion*, 594 U.S. at 424-25). As detailed *supra* pp. 15-16, there exists no historical tradition of Article III courts resolving informational disputes between legislators and the Executive Branch. Additionally, *Maloney*'s conclusion that deprivation of information sought by a legislator in and of itself constitutes an injury sufficient to confer Article III standing, *see* 984 F.3d at 61, is not

tenable after *TransUnion*, which required a plaintiff to identify some "'downstream consequence' from failing to receive the required information," *TransUnion*, 594 U.S. at 442. Plaintiffs here have not made any showing of particularized adverse effects that flow from the denial of access they seek, *supra* pp. 18-19. They therefore lack standing.

### B. Plaintiffs cannot likely overcome the doctrine of equitable discretion disfavoring their requested relief.

Even if this Court were to conclude that Plaintiffs have Article III standing, the doctrine of equitable discretion strongly militates against their requested relief. That doctrine holds that "[w]hen constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted." *United States v. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983); *see also AT&T v. United States*, 551 F.2d 384, 394 (D.C. Cir. 1976). The doctrine also holds that Courts should refrain from resolving intra-Branch disputes "[w]here a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute." *Riegle v. Fed. Open Market Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981). The doctrine thus prevents courts from interfering in affairs of Congress "which properly could, and should, [be] decided by appeal to one's fellow legislators." *Gregg v. Barrett*, 771 F.2d 539, 545 (D.C. Cir. 1985); *see also Chenoweth*, 181 F.3d at 116 ("Because the parties' dispute is therefore fully susceptible to political resolution, we would . . . dismiss the complaint to avoid 'meddl[ing] in the internal affairs of the legislative branch.'") (citation omitted).

The doctrine of equitable discretion squarely forecloses Plaintiffs' requested relief. The requests for access at issue were made by a small minority of Members of Congress. Rather than convince a majority of their House colleagues that Congress should act to enforce a limitation on the use of appropriated funds that Plaintiffs allege DHS is violating, they seek relief from the courts. And they do so without obtaining authorization from the House. Whether this case is viewed as a dispute

between Plaintiffs and their colleagues in the House, or a dispute between Plaintiffs and DHS, Plaintiffs should direct their appeals to their fellow legislators, *Riegle*, 656 F.2d at 881. If they succeed in persuading their colleagues, judicial action should thereafter await the exhaustion of all possibilities for accommodation. *House of Representatives*, 556 F. Supp. at 152; *see also infra* pp. 40-42.

### C. Plaintiffs cannot show they likely have a cause of action.

Wholly apart from jurisdiction, Plaintiffs must also identify a cause of action to proceed in this Court. *See, e.g.*, *Make The Road New York v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020) ("While establishing jurisdiction gets" plaintiffs "through the courthouse door, . . . . [t]hey also need a cause of action to prosecute."). Plaintiffs do not (and cannot) contend that § 527 confers such a cause of action, as that provision does not use "right-creating terms" to create any cause of action "clearly and unambiguously." *Medina*, 145 S. Ct. at 2233 n.5 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). And the D.C. Circuit has long maintained that appropriation bars do not confer a private right of action. *See Nat'l Treasury Emp. Union*, 654 F.2d at 789-95. Plaintiffs instead assert a cause of action under the APA and the ultra vires doctrine. But Plaintiffs satisfy the requirements for neither cause of action and are therefore unlikely to succeed on those claims.

### 1. Plaintiffs lack a cause of action under the APA.

Plaintiffs lack a cause of action under the APA for three independent reasons: (a) Members of Congress in their official capacities are not "adversely affected or aggrieved" "persons" who may seek review under the APA, (b) APA review is precluded by statute, and (c) requiring advance notice for visits to certain ICE facilities is not reviewable agency action. For these reasons, Plaintiffs are both unlikely to succeed on the merits of their claim and unable to obtain relief under 5 U.S.C. § 705.

a. The APA provides that an eligible "person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute" may seek judicial review. 5 U.S.C. § 702. "The terms 'adversely affected' and 'aggrieved,' alone or in combination, have a long history in federal

24

administrative law." *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 126 (1995) ("*Newport News*"). In *Newport News*, the Court found the absence of a historical tradition "significant" in concluding that an agency head is not "'adversely affected' or 'aggrieved'" by an individual worker's benefits determination decision with which the agency's head disagreed. *Id.* at 127. The Court "sharply distinguished" such impermissible claims advanced by the agency in "its regulatory or policy-making capacity" from permissible claims in which the agency proceeds "in what might be called its nongovernmental capacity—that is, in its capacity as a member of the market group that the statute was meant to protect." *See id.* at 127-28; *see also FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1992 (2025) (understanding *Newport News* as finding absence of relevant historical analogue "telling").

Here, it is similarly "significant" and "telling" that there is no historical tradition of APA suits brought by individual legislators in their official capacities as legislators and seeking review of agency actions alleged to be contrary to those legislators' Congressional interests. *See supra* pp. 15-16. This case does not, for example, resemble a campaign finance regulation challenge in which legislator plaintiffs were held to have standing—and may also be understood as "adversely affected or aggrieved"—because a challenged regulation "diminishes" their "ability" as "candidates" to "compete or participate in the electoral process." *Cf. Shays v. FEC*, 414 F.3d 76, 87-95 (D.C. Cir. 2005) (Representatives had Article III standing under cases "applying competitor standing to politics as well as business"). The denial of access to federal facilities allegedly trenches on the capacity of the Plaintiffs as legislators who make law, not as candidates or as private persons who in other ways participate in regulated markets. As in *Newport News*, then, the absence of a historical tradition of suits by individual Members of Congress to obtain judicial orders mandating compliance with property access or information requests precludes a cause of action under the APA.

The APA's definitional provisions confirm that historically-based conclusion. Section 702 authorizes aggrieved "persons" to seek judicial review, and the APA defines "person" to include "an individual, partnership, corporation, association, or public or private organization," 5 U.S.C. § 701(b)(2); 5 U.S.C. § 551(2). There is no basis to conclude that definition encompasses Congress or its Members in their official capacity. *Dubin v. United States*, 599 U.S. 110, 124 (2023) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps.") (citation omitted).

b. APA review is also precluded by statute. *See* 5 U.S.C. § 701(a)(1). Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). Thus, Congressional intent to preclude review "may . . . be inferred from . . . the collective import of legislative and judicial history behind a particular statute." *Id.* at 349 (citing *Heikkila v. Barber*, 345 U.S. 229 (1953)). That is, when a remedial scheme permits review at the behest of some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all. *Id.*

For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed. *Id.* at 346. In holding that the statutory structure precluded consumers' attempts to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

Whether characterized as an appropriations bar or as a requirement that ICE disclose unspecified information to Members of Congress, § 527 cannot give rise to a cause of action under the APA because Congress has crafted complex, alternative schemes for review.

*First*, the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), provides an existing and exclusive remedial scheme for alleged violations of appropriations bars, such as § 527. That statute enforces the command that "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made," 31 U.S.C. § 1301(d), by forbidding federal agencies from making payments or incurring obligations unless and until Congress provides the necessary appropriation. Thus, "[t]he statutory mechanism by which Congress guards its appropriations power is the Anti-Deficiency Act." *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33 (2001), 2001 WL 36175929 at *1 (quoting J. Gregory Sidak, *The President's Power of the Purse*, 1989 Duke L.J. 1162, 1234).[5]

The Anti-Deficiency Act provides in relevant part that, except as otherwise specified, a federal officer or employee may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). A government official violating § 1341(a) "shall be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office." 31 U.S.C. § 1349(a). And a "government official who knowingly and willfully violates [§] 1341(a) is subject to criminal penalties, including imprisonment." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, Cir. J.) (citing 31 U.S.C. § 1350); *cf. Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) ("If an executive officer on his own initiative had decided that, in fairness,

---

[5] For its part, the Comptroller General (speaking through the Government Accountability Office) has noted commentary calling the statute "the cornerstone of Congressional efforts to bind the Executive branch of government to the limits on expenditure of appropriated funds." *Antideficiency Act— Applicability to Statutory Prohibitions on the Use of Appropriations*, Comp. Gen. Dec. B-317450, 2009 WL 754042, at *1 (Mar. 23, 2009) (citation omitted).

respondent should receive [disability] benefits despite" a controlling limitation in 5 U.S.C. § 8337, "the official would risk prosecution" under §§ 1341 and 1350).

Additionally, the Anti-Deficiency Act imposes reporting mandates:  It "requires reporting to the President and Congress violations of" § 1341(a), "which provide grounds for administrative discipline including removal from office."  *Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conf.*, 31 U.S. Op. O.L.C. 54, 2007 WL 3374332 at *9 (2007) (citing 31 U.S.C. § 1351).  For its part, the Office of Legal Counsel of the Department of Justice has concluded that "a violation of a condition or internal cap within an appropriation would generally constitute a violation of" the Anti-Deficiency Act.  *Applicability of the Antideficiency Act*, 2001 WL 36175929 at *1.

Accordingly, while the Anti-Deficiency Act creates an elaborate reporting system and authorizes criminal prosecution of violations, it has not been construed to authorize a private right of action to enforce its provisions.  *Thurston v. United States*, 696 F. Supp. 680, 683 (D.D.C. 1988) ("The Anti–Deficiency Act, 31 U.S.C. §§ 1342, 1351, explicitly sets forth procedures for reporting violations of the Act and enforcing its provisions.  *See* § 1351. No private right of action for declaratory, mandatory or injunctive relief exists under this statute.").  Indeed, no provision in the appropriations statute on which Plaintiffs rely or the Anti-Deficiency Act remedial provisions described provide for individual Members of Congress to enforce the appropriations bar Plaintiffs seek to enforce under the APA against Defendants.  "As in *Block*," then, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue" to resolve appropriations disputes "but *sub silentio* also provide a backdoor" for any Member of Congress to file suit through the APA to enforce an appropriations bar linked to access to information.  *Glob. Health Council*, 2025 WL 2480618, at *10; *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

*Second*, and even if § 527 were properly characterized as a disclosure-requirement statute, there exist carefully crafted mechanisms for Congress to obtain information from the Executive Branch, precluding a cause of action under the APA. In addition to Congress's various political tools and the constitutionally mandated accommodation process, *supra* pp. 12-13, those mechanisms include 2 U.S.C. § 288d and 28 U.S.C. § 1365(b), which are statutes in which "Congress has granted an express cause of action" to enforce Congressional subpoenas "to the Senate—but not to the House," *Comm. on Jud v. McGahn ("McGahn III")*, 973 F.3d 121 (D.C. Cir. 2020) (concluding Committee lacked a cause of action), *vacated pending reh'g en banc*, No. 19-5331 (Oct. 15, 2020), *and dismissed by joint motion* (July 13, 2021).[6] Indeed, in finding that a committee of the House lacked a freestanding cause of action, the *McGahn III* panel emphasized that, "[b]alancing the various policy considerations in crafting an enforcement statute is a legislative judgment," and rejected the argument that it should infer a cause of action for House committee subpoena enforcement. *Id.* at 126. "If Congress (rather than a single committee in a single chamber thereof) determines that its current mechanisms leave it unable to adequately enforce its subpoenas," the D.C. Circuit observed, Congress "remains free to enact a statute that makes the House's requests for information judicially enforceable." *Id.* Additionally, Congress has granted the Executive Branch authority to bring contempt prosecutions to enforce congressional subpoenas. *See* 2 U.S.C. §§ 192, 194.[7]

---

[6] The *en banc* Court never had occasion to rule on the merits of the panel opinion in *McGahn III*. The vacatur of that panel opinion resulted from the Court's granting of the parties' "consent motion to vacate." In that motion, the Executive Branch agreed to the vacatur request by the Committee *not* because the opinion was incorrect, but because the vacatur served "the interest of accommodation between the branches." *Compare* Order in No. 19-5331 (D.C. Cir. July 13, 2021) (Doc. 1906135), *with* Joint Mot. to Dismiss Appeal & Consent Mot. to Vacate Panel Opinion at 1, No. 19-5331 (D.C. Cir. filed June 10, 2021) (Doc. 1902017).

[7] Importantly, § 527 bears little resemblance to either the committee subpoenas discussed in *McGahn III* or to the multiple-committee member information requests in *Maloney*. Plaintiffs here rely on an appropriations enactment lacking numerous features of existing statutes in this sensitive topic of interbranch relations. They hold office in the House (not the Senate), so their claim to having a cause of action is undermined by the reasoning in *McGahn III* (since the House lacks a statute allowing

The upshot is that when Congress wants to create processes—including those that provide for judicial review—for the Legislative Branch to obtain information from the Executive Branch, it knows how to do so. The omission of any statutory provision for enforcement under § 527 compels the conclusion that Congress never meant disputes over these requests to be settled in court. *Cf. Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 305-06 (1943) (where Congress provides for judicial review in a "highly selective manner . . . it dr[aws] a plain line of distinction"); *see also Block*, 467 U.S. at 347. Rather, given the express provision for judicial enforcement of certain congressional subpoenas and the existing mechanisms for enforcing appropriation bars, "the omission of [similar] provision[s]" for judicial enforcement of § 527 is "sufficient reason to believe that Congress intended to foreclose" such actions. *Block*, 467 U.S. at 346-47.

c. Finally, Plaintiffs cannot proceed under the APA because access to agency information is not subject to judicial review under that statute. The APA permits judicial review over "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Here, no statute makes ICE visitation protocols reviewable, so Plaintiffs must proceed by identifying final agency action. And agency action is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). But the provision or denial of information to Congress does not meet this definition. Rather, when an agency makes available (or declines to make available) information for Congress, it is not exercising power delegated to it by Congress, but is instead answering to an exercise by Congress of its legislative authority over the agency. *See Walpin v. Corp. for Nat. & Cmty.*

_____

judicial enforcement of committee subpoenas). And, unlike the *Maloney* Plaintiffs, Plaintiffs here do not purport to have made particular requests for ICE oversight visits as *multiple* members of the various Committees pursuant to a specific statute authorizing such requests. Instead, each Plaintiff lists occasions on which *that particular Plaintiff* sought ICE facility access. *See, e.g.*, Decl. of Rep. Veronica Escobar ¶¶ 10-18, ECF No. 17-2; Decl. of Rep. Crow ¶¶ 20-21, ECF No. 17-3; Decl. of Rep. Goldman ¶¶ 22-30, ECF No. 17-4.

*Servs.*, 630 F.3d 184, 187–88 (D.C. Cir. 2011) (citing *NRDC v. Hodel*, 865 F.2d 288, 317–19 (D.C. Cir. 1988), as "declining to review adequacy of detail in agency's report to Congress pursuant to statutory reporting requirement that 'by its nature seems singularly committed to congressional discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements'").[8]

Tellingly, the Freedom of Information Act contains a particular provision enacted in 1966 authorizing district courts "to enjoin the agency from the withholding of agency records and to order the production of any agency records improperly withheld from the complainant." Pub. L. No. 89-487, § 3(c), 80 Stat. 250, 251 (1966) (codified as amended at 5 U.S.C. § 552(a)(4)(B)). Under Plaintiffs' approach to the APA cause of action, enacted 20 years earlier, a court would be authorized to order the same thing (compel access to records and information), which would impermissibly render the FOIA provision surplusage. *See Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) ("A cardinal principle of interpretation requires us to construe a statute 'so that no provision is rendered inoperative or superfluous, void or insignificant.'") (citation omitted).

### 2. Plaintiffs lack an ultra vires cause of action.

It is well established in the D.C. Circuit that an ultra vires claim may be brought only when "there is no alternative procedure for review." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). As detailed *supra* pp. 26-30, Congress here has addressed the question of legislative entitlement

---

[8] *See also, e.g.*, *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998) ("the report is not agency action of the sort that is typically subject to judicial review."); *Am. Trucking Ass'n. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985) (agency reports do not constitute "agency action" under APA because they do not change law or policy); *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1495 (10th Cir. 1997) ("Construing the agency action challenged as the Secretary of Defense's certification to Congress that testing was complete is similarly unhelpful" in identifying agency action); *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 870, 882 (D.D.C. 1991) ("the Report was not explicitly or implicitly intended as anything more than a vehicle to inform Congress. It is for Congress, not the courts, to determine if the Report satisfies the statutory requirements it enacted.").

to information and purported to authorize judicial review of such requests in limited circumstances. These statutes, including 2 U.S.C. § 288d and 28 U.S.C. § 1365(b), thus provide an alternative procedure that forecloses review under the ultra vires doctrine.

Contrary to Plaintiffs' contention (Mem. 37-38), *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), does not bolster their ultra vires claim. The Supreme Court there concluded that the Supremacy Clause, which "is silent regarding who may enforce federal laws in court[] and in what circumstances," "certainly does not create a cause of action." *Id.* at 325, 327. In reaching that holding, the Court recognized "that federal courts may in some circumstances grant injunctive relief against . . . violations of federal law by federal officials." *Id.* at 326-27. For that principle, *Armstrong* cited *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902), which reasoned that "[t]he acts of all . . . officers must be justified by some law, and in case an official violates the law *to the injury of an individual* the courts generally have jurisdiction to grant relief," *id.* at 108 (emphasis added).

But as explained above, Plaintiffs here only assert injury as Members of Congress—so each of them is *not* an "*individual* aggrieved by an erroneous decision of a legal question by Department officers" for whose benefit courts "have power to grant relief." *Id.* In any event, and just as fundamentally, a court's equitable powers remain "subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. Where, as here, Congress has had "specific occasion to consider" the means for enforcing appropriations law violations and congressional demands for information from the Executive Branch, *see Ziglar v. Abbasi*, 582 U.S. 120, 148 (2017), its decision not to authorize suits by individual legislators, "suggests that Congress intended to preclude" the instant suit, *Armstrong*, 575 U.S. at 328. *See also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (rejecting ultra vires review where "a statutory review scheme forecloses all other forms of judicial review"); *Hernandez v. Mesa*, 589 U.S. 93, 109 (2020) ("It would be 'anomalous to impute . . . a judicially

implied cause of action beyond the bounds [Congress has] delineated for [a] comparable express caus[e] of action.'") (citation omitted).

**D. Plaintiffs are not likely to succeed on the merits of their APA and ultra vires claims.**

Even if a cause of action were available, Plaintiffs are unlikely to succeed on the merits of their claims. Plaintiffs' APA claims alleging actions contrary to law and in excess of statutory authority fail because ICE's visitation protocols fully comport with § 527—they do not prevent any Member of Congress from visiting any ICE facility, and nothing in § 527 precludes ICE from adopting an advance-notice requirement pursuant to other statutory authorities. Plaintiffs' arbitrary-and-capricious claim fails because ICE's visitation protocols are rationally connected to their statutory obligations to maintain safety at ICE facilities. Finally, and for the same reasons that Plaintiffs cannot establish that the challenged visitation protocols are contrary to law, Plaintiffs' ultra vires claim fails.

1. ICE's visitation protocols are consistent with Defendants' statutory obligations because none of challenged visitation protocols "prevent" any "Member of Congress" "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. The requirement that Members of Congress provide seven-days advance notice does not prevent them from entering DHS facilities. Indeed, Plaintiffs' own declarations detail the access they have been provided, including to field offices. *See, e.g.*, Correa Decl. ¶ 11, ECF No. 17-6 ("I received a response that I could visit [an ICE field office] on August 12.").

To be sure, § 527(b) states that "[n]othing *in this section* may be construed to require a Member of Congress to provide prior notice of intent to enter a facility described in subsection (a) for the purpose of conducting oversight." 138 Stat. at 619 (emphasis added). But that language merely establishes that any requirement for advance notice cannot be derived from § 527—it does not preclude an advance notice requirement derived from some other statutory source of authority. And the Secretary of Homeland Security possesses wide leeway under 8 U.S.C. § 1231(g) to "arrange for

appropriate places of detention," which necessarily encompasses prescribing standards for detention such as visitation protocols. This is a broad grant of discretion: "The word 'appropriate' is a broad term understood to incorporate 'multiple relevant factors,'" *Reyna*, 921 F.3d at 209; *Las Americas*, 507 F. Supp. 3d at 27, and that statute has been read to enable ICE to "maintain flexibility," *Geo Grp.*, 50 F.4th at 751. The Secretary also possesses expansive authority under 6 U.S.C. § 112(b) to carry out the functions of the Department.

The statutory breadth of those authorizations reflects congressional recognition of the flexibility the President, in exercising his constitutional responsibility to take care that the immigration laws (and other laws) are faithfully executed, must be afforded in managing immigration facilities. *Cf. Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'— all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'") (quoting U.S. Const. Art. II, § 1, Cl. 1; *id.* § 3). Pursuant to those grants of authority, then, ICE lawfully requires that Members of Congress and their staff provide seven days' advance notice of any visit to a covered ICE facility.

Plaintiffs' claims concerning access to ICE field offices similarly fail because Plaintiffs do not (and cannot) establish the existence of any visitation protocol that prevents Members of Congress and their staff from visiting ICE field offices, including those containing ERO temporary holding facilities. To the contrary, ICE facilitates visits by Members of Congress and their staff to field offices when sufficient notice is provided and resources can be made available to enable a secure visitation. Hackbarth Decl. ¶¶ 7-9. If staff and resources are not available to facilitate a safe congressional visit to an ICE field office containing an ERO temporary holding facility on the requested date or at the requested time, ICE's Office of Congressional Relations will coordinate with the visiting Members and staff to find a date and time for a site visit. *Id.* ¶ 7. Put simply, nothing about that protocol

prevents Members of Congress and their staff from accessing the facilities at issue when sufficient notice is provided as required under the visitation protocols.

Plaintiffs' declarations are not to the contrary. The declaration from Representative Goldman, for example, recounts a June 17, 2025 email from ICE personnel in which Representative Goldman was informed that visits to ICE field offices "require[] advance coordination to preclude/minimize impact to operations." Goldman Decl. ¶ 24, ECF No. 17-4. A request for advance notice is inconsistent with Plaintiffs' claim that there exists a categorical prohibition on congressional oversight visits conducted at field offices. Representative Correa's declaration similarly establishes that visits were possible at the field office that he attempted to visit. *See* Correa Decl. ¶ 11, ECF No. 17-6 ("On August 1, my staff sent an email to ICE requesting another oversight visit at the Santa Ana field office. Later that day, I received a response that I could visit on August 12 – almost two weeks later.").

Plaintiffs' claim (Mem. 37) that the visitation protocols are unlawful under § 706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed," fails for these same reasons. Because that claim also turns on the allegation that the visitation protocols violate § 527, that claim necessarily rises and falls with the claim that ICE's visitation protocols are contrary to law or in excess of Defendants' authority.

2. Plaintiffs are also unlikely to prevail on their arbitrary-and-capricious claim. ICE's visitation protocols for Members of Congress serve to balance ICE's obligation to secure the facilities it oversees with Congress's desire to conduct oversight. The advance-notice requirement ensures that ICE can allocate sufficient resources to facilitate visits that are safe both for individuals detained at the facilities and the Members. Hackbarth Decl. ¶¶ 8-10. The APA requires no more. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29 (1983) (agency action must rest on "a 'rational connection between the facts found and the choice made'") (citation omitted); *Bowman Transp., Inc. v.*

*Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974) (court "is not empowered to substitute its judgment for that of the agency").

Plaintiffs assert (Mem. 33-34) that the visitation protocols are nonetheless unreasonable because Members of Congress may identify issues that require immediate follow-up or encounter unexpected travel. But Plaintiffs provide no evidence to support the claim that immediate follow-up requires additional visits within a week. And unexpected travel does not preclude visitations because a Member could send a staff member in his or her place.

In all events, DHS could (and did) reasonably conclude that the need for notice to ensure safe visits outweighs Members' need for immediate access. And courts "will not second-guess a reasoned determination by an agency that the advantages of rigidity outweigh the disadvantages in a given procedural circumstance." *Green Country Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985); *see also AD HOC Telecom. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (arbitrary and capricious review "is particularly deferential in matters . . . which implicate competing policy choices").

Plaintiffs' claim (Mem. 34-36) that the visitation protocols lack sufficient explanation is similarly unavailing. Plaintiffs' own declarations recount explanations for requiring advance notice or being temporarily denied access including "scheduling," Crow Decl. ¶ 21, ECF No. 17-3, "unsafe conditions," Gomez Decl. ¶ 11, ECF No. 17-7, and "extremely high operations tempo and ongoing concerns regarding the security environment," *id.* ¶ 16. Again, the APA requires no more. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (court will uphold as sufficient an agency's explanation so long as "the agency's path may reasonably be discerned") (quoting *State Farm*, 463 U.S. at 43); *Barker v. United States*, 404 F. Supp. 3d 251, 264 (D.D.C. 2019) (agency explanation "may be 'relatively simple and briefly stated'") (citation omitted).

3. Finally, the *ultra vires* claims fail on their merits for the same reasons as those described *supra* pp. 33-35 as to the APA. Because ICE does not require funds appropriated subject to § 527 to adopt

or implemented the challenged visitation protocols, Plaintiffs cannot establish that Defendants' actions are ultra vires. Indeed, "if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'" *See Fed. Express*, 39 F.4th at 766 (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).

### E. Plaintiffs are unlikely to succeed on their request for mandamus relief.

Mandamus is a "drastic" remedy that is "to be invoked only in extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002); *see also In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). To obtain mandamus relief, Plaintiffs must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022). Plaintiffs satisfy none of those requirements.

*First*, Plaintiffs do not have a clear right to relief. As explained *supra* pp. 13-14, Plaintiffs have not shown that § 527—an appropriations limitation—creates any entitlement to relief. Instead, it is clear that Congress has foreclosed the availability of relief under § 527 through the creation of alternative mechanisms to vindicate both appropriations-related interests and congressional efforts to obtain information from the Executive Branch. And ample authority provides that when judicial review is precluded, that preclusion applies equally to a request for a writ of mandamus. As the Ninth Circuit has explained in declining to issue a writ of mandamus where judicial review was precluded, "[i]t would frustrate the Congressional scheme . . . if exclusive jurisdiction could be thwarted by a party's characterization of the nature of the lawsuit." *Columbia Power Trades Council v. Dep't of Energy*, 671 F.2d 325, 328-29 (9th Cir. 1982); *see also Estate of Michael ex rel. Michael v. Lullo*, 173 F.3d 503, 506 (4th Cir. 1999) (Mandamus Act does not override statute that limits jurisdiction).

*Second*, Defendants do not have a clear duty to act. Mandamus is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C.

Cir. 2002); *see Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930). But the challenged actions here are not ministerial duties: establishing visitation protocols that maintain the safety of detainees and visitors while accommodating the desire of Members of Congress to conduct oversight falls squarely within the discretion that Congress afforded DHS through 8 U.S.C. § 1231(g)(1).

*Third*, Plaintiffs have adequate alternative remedies. *Power*, 292 F.3d at 786 ("[T]he alternative remedies that might call for refusal to resort to writ of mandamus encompass judicial remedies . . . as well as administrative ones.") (quoting *Cartier v. Sec'y of State*, 506 F.2d 191, 199 (D.C. Cir. 1974)). Plaintiffs have available the political tools that Congress brings to bear through the accommodation process including contempt proceedings, *see Mazars*, 591 U.S. at 860-61, and the alternative processes both for Congress to obtain information from the Executive Branch and to resolve appropriations-related disputes that Congress saw fit to create, *supra* pp. 26-30.

## II.    Plaintiffs cannot establish irreparable harm.

"[T]he irreparable injury requirement erects a very high bar for a movant." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013) (citation omitted); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("This court has set a high standard for irreparable injury."). "The party seeking injunctive relief must demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual and not theoretical.'" *Sierra Club*, 990 F. Supp. 2d at 38-39 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Moreover, "[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm" and "beyond remediation." *Chaplaincy*, 454 F.3d at 297.

Precedent from this District addressing irreparable harm in the context of FOIA is instructive. There, "[i]t is . . . clear from case law that a movant's general interest in being able to engage in an ongoing public debate using information that it has requested under FOIA is not sufficient to establish that irreparable harm will occur unless the movant receives immediate access to that information."

*Elec. Priv. Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 46–47 (D.D.C. 2014) (Jackson, J.).  Accordingly, to award preliminary relief in FOIA actions, courts require that the plaintiff adduce evidence establishing that "the requested records were time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would 'be lessened or lost.'"  *New York Times Co. v. DHA*, No. 21-CV-566 (BAH), 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021) (quoting *Ctr. for Pub. Integrity v. United States Dep;t of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019)).

Plaintiffs' challenge to an alleged policy that merely requires advance notice for a site visit (and therefore, at most, delays access to information) cannot clear this high bar, as Plaintiffs fail to identify any such "imminent event" that lessens the utility of future site visits.  To the contrary, the examples of past productive visits that Plaintiffs identify suggest that advance notice is fully consistent with the oversight that Plaintiffs seek to conduct.  For example, Plaintiffs note (Mem. 19) that Representative Crow "instituted weekly visits by him or his staff," which suggests that the necessary information can be obtained through visits scheduled in accordance with ICE's alleged advance-notice policy.  Plaintiffs also claim (Mem. 18) that Representative Escobar observed "expensive and inefficient processes that led her to work with DHS leadership to implement a discrete change that significantly improved those processes."  But there is simply no reason why Plaintiffs could not uncover such "expensive and inefficient processes" during visits scheduled in advance.

Plaintiffs also assert in a conclusory manner (Mem. 41) that immediate and unfettered access is "highly relevant to the growing humanitarian crisis."  But Plaintiffs cannot satisfy the irreparable-harm requirement by alleging injury to third parties.  *See, e.g.*, *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) (noting that "injuries to third parties are not a basis to find irreparable harm"); *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021) (harm to third parties "does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court").

Nor does Plaintiffs' assertion establish irreparable injury on its own terms. For one, Plaintiffs provide no basis to conclude that conditions at a detention facility change after notice of a visit is provided such that information obtained from a visit under the current policy is no longer "relevant to the" alleged "humanitarian crisis." Thus, these "bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co.*, 758 F.2d at 674. Moreover, Plaintiffs provide no basis to conclude that additional information obtained by a small number of Members of Congress visiting facilities without providing advance notice would in any way alleviate the alleged "humanitarian crisis." To the contrary, Plaintiffs concede (Mem. 41) that the allegedly "concerning conduct of DHS and ICE officials in those facilities" is "highly public." Accordingly, any steps to alleviate the alleged humanitarian crisis could be made based on this "highly public . . . concerning conduct" without need for immediate site visits. Thus, "[w]hile attention-grabbing, these purported harms to oversight . . . are all premised on theoretical injuries, with no assurance that the remedy for these cited . . . ills is" the immediate access to the facilities that Plaintiffs have "requested." *New York Times*, 2021 WL 1614817, at *8.

Plaintiffs also claim (Mem. 41) that they "cannot wait to obtain this physical access and urgent information" because "the number of detainees at facilities across the country will increase, new immigration detention facilities will likely open," apprehensions and deportations will occur, and 2026 appropriations will be made. None of these speculative outcomes amounts to irreparable harm, particularly because Plaintiffs offer no basis for the Court to conclude that their access to the facilities would impact the number of detainees at facilities or how funds for DHS and ICE are appropriated.

Plaintiffs finally argue (Mem. 42-43) that on-site visits are of particular importance because DHS has reduced the headcount of three internal oversight offices. But that does not increase the need for immediate access to detention facilities and, in any event, Plaintiffs provide no evidence that these offices have stopped supplying Congress with the information or reports required by statute.

**III.    The equitable factors strongly disfavor preliminary injunctive relief.**

Even if Plaintiffs could satisfy one or both of the first two factors necessary to obtain preliminary relief, the equitable factors weigh in Defendants' favor and are sufficient to deny injunctive relief. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors.").

As explained *supra* p. 23, the doctrine of equitable discretion strongly disfavors this Court's granting any relief whatsoever, much less emergency relief. Indeed, those separation-of-powers considerations carry even greater weight in the context of a preliminary injunction. Granting the immediate and complete relief that Plaintiffs seek at this preliminary stage would render the federal courts "not the last but the first resort," *Barnes*, 759 F.2d at 53 (Bork, J., dissenting), in disputes between the political branches such that "the system of checks and balances [would be] replaced by a system of judicial refereeship," *Moore*, 733 F.2d at 959 (Scalia, J., concurring in result). And the Supreme Court made clear in *Raines* that this is not the "restricted role for Article III courts" that our constitutional system contemplates. 521 U.S. at 828-29 (citation omitted). By avoiding the very "amorphous general supervision of the operations of government" that Plaintiffs call for, courts have "maintained public esteem for the federal courts and . . . permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.'" *Id.* at 829.

Plaintiffs contend (Mem. 43-44) that there is a public interest in an injunction that ends an allegedly unlawful practice and ensuring that Congress can exercise the "exclusive power over the federal purse" allocated under the Appropriations Clause, U.S. Const. art I, § 9, cl. 7. But that is precisely why this lawsuit should be resolved through the constitutionally mandated "give-and-take of the political process," *Mazars*, 591 U.S. at 858-59. Judicial resolution of political disputes might sometimes be more expedient than "political struggle and compromise," *Barnes*, 759 F.2d at 55 (Bork,

J., dissenting), but the separation-of-powers may not be sacrificed in the name of expediency. Indeed, political struggle and compromise are its defining feature, not some defect to be removed or avoided. *See Mazars*, 591 U.S. at 854 ("Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity.") (citations omitted). The process of negotiation and accommodation that follows from efforts by Congress to obtain information from and conduct oversight of the Executive Branch, even if contentious or difficult, protects the political branches from excessive judicial interference and the Judiciary from the undue politicization that would result from "repeated use of [its] power to negate the actions of the representative branches." *Walker v. Cheney,* 230 F. Supp. 2d 51, 65 (D.D.C. 2002).

Moreover, because it is not the proper function of preliminary relief to provide plaintiffs with a means to bypass the litigation process and achieve rapid victory, "a preliminary injunction should not work to give a party essentially the full relief he seeks on the merits." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n. 13 (D.C. Cir. 1969) (per curiam); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). Here, Plaintiffs seek immediate and unfettered access to DHS and ICE facilities, so a preliminary injunction requiring DHS and ICE to provide that access would effectively afford Plaintiffs' complete relief. And that relief is particularly disfavored where, as here, there exist alternative mechanisms for Plaintiffs to seek relief, including through the political process through which these interbranch disputes are traditionally resolved. *Dorfmann*, 414 F.2d at 1174 (equitable power to afford complete relief at the preliminary stage "should not be exercised unless it is manifest that the normal legal avenues are inadequate, [and] that there is a compelling need to give the plaintiff the relief he seeks"); *New York Times Co.*, 2021 WL 1614817, at \*4 (denying preliminary injunction that would grant complete relief in FOIA proceeding).

## IV.    Relief is not available under 5 U.S.C. § 705.

Section 705 cannot provide the relief that Plaintiffs seek because that provision authorizes a court to "postpone the effective date of an agency action," 5 U.S.C. § 705.  But such a stay would, at most, temporarily deprive the challenged visitation protocols of legal force, *see Nken v. Holder*, 556 U.S. 418, 421 (2009) ("A stay does not make time stand still, but does hold a ruling in abeyance.").  It would not create a legal basis for Plaintiffs to obtain the immediate and unfettered access to ICE detention facilities that they seek.  Only an injunction can provide such relief, and a preliminary injunction is unavailable for the reasons explained *supra*.

Independently, relief under § 705 is unavailable because that provision cannot be used to postpone an agency action that has already taken effect.  Courts have concluded that § 705's phrase "postpone the effective date" of an agency action authorizes the "postpone[ment of] the effective date of a not yet effective rule, pending judicial review"—but not suspension of a policy that is already in effect.  *See, e.g.*, *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) (emphasis added).  Section 705 uses identical language to refer to "the reviewing court . . . postpon[ing] the effective date of an agency action" as it does when addressing an agency decision to "postpone the effective date."  The use of an identical phrase in the first and second sentences of § 705 must be presumed to be intentional, and that phrase should carry the same meaning in both sentences.  *See e.g.*, *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986).

## V.    Any relief should be limited to the funds subject to § 527 and to these Plaintiffs.

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief.  But if the Court concludes otherwise, the relief granted both "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753,

765 (1994) (citation omitted).  The expansive relief that Plaintiffs seek flouts these well-established principles and (if granted) should be narrowed in two critical respects.

*First*, because Plaintiffs seek to enforce a limitation on the use of funding contained in an appropriations statute, any relief awarded must be limited to enforcing *that* limitation.  That means this Court may enjoin only the use of the particular funds appropriated subject to § 527 from preventing Members of Congress and their staff from visiting eligible ICE facilities.  In other words, an injunction cannot limit the use of funds that Congress appropriated through the OBBB because the OBBB does not contain § 527 or any analogous limitation.

*Second*, the scope of any relief awarded should be limited to these Plaintiffs.  As the Supreme Court explained in *Trump v. CASA, Inc.*, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'"  145 S. Ct. 2540, 2557 (2025); *see also Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.") (emphasis added).  Accordingly, relief may be no broader than necessary to remedy the injury suffered by these particular Members of Congress, which means at most enjoining the use of appropriated funds subject to § 527 to prevent these *Plaintiffs* from conducting visits to ICE facilities. *CASA*, 145 S. Ct. at 2557 (under complete-relief principle, "the question . . . is whether an injunction will offer complete relief *to the plaintiffs before the court*").

Section 705 provides no avenue around the equitable limitations on non-party relief identified in *CASA*.  That provision permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which incorporates constitutional and equitable limitations on non-party relief.  Indeed, the legislative history makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43

(1946).  Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant."  *Id.*

## VI.   Plaintiffs should be ordered to post security in connection with any emergency relief.

Finally, if the Court grants any injunctive relief, the Court should also order Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  If any preliminary injunctive relief issues here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such emergency order.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (court wields "broad discretion . . . to determine the appropriate amount of an injunction bond").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Stay under 5 U.S.C. § 705 or, in the alternative, for Preliminary Injunction.  If this Court grants any relief, that relief should be limited to a preliminary injunction that prohibits Defendants from expending the specific funds subject to § 527 to prevent these Plaintiffs from accessing ICE detention facilities.

Dated: August 29, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Alexander W. Resar*

INDRANEEL SUR
Senior Counsel
ALEXANDER W. RESAR
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Tel:  (202) 616-8188
E-mail: alexander.w.resar@usdoj.gov

*Counsel for Defendants*