**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>        *Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>        *Defendants*. | Case No. 25-cv-2463-JMC |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR STAY UNDER 5 U.S.C. § 705 OR,
IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.    Plaintiffs Are Likely to Succeed on the Merits ................................................... 2

      A.    Plaintiffs have standing to bring these claims ......................................... 2

            1.    Plaintiffs have standing under *Raines v. Byrd* ............................. 3

            2.    Plaintiffs assert cognizable injuries in fact ................................. 8

      B.    The doctrine of equitable discretion presents no obstacle to this suit ......... 12

      C.    The oversight visit policy is unlawful under the APA .............................. 15

            1.    Plaintiffs have a cause of action under the APA .......................... 15

            2.    The policy violates the APA .................................................... 20

      D.    In the alternative, the oversight visit policy is *ultra vires* ................... 25

      E.    In the alternative, Plaintiffs are entitled to mandamus relief ................. 26

II.   Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm ............ 27

III.  The Equitable Factors Strongly Favor Preliminary Injunctive Relief ............... 29

IV.   The Court Should Stay the Oversight Visit Policy under Section 705 ............... 30

CONCLUSION .................................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................................................... 11

*Am. First Legal Found. v. Becerra*,
  No. 24-cv-1092-RC, 2024 WL 3741402 (D.D.C. Aug. 9, 2024) .................................... 29

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016) ................................................ 27

*Am. Oversight v. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) ................................... 29

*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) ....................................... 26

*Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024) ................................ 10

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ............................................................... 29

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) .......................................... 26

*Ass'n of Data Processing Svc. Orgs. v. Camp*, 397 U.S. 150 (1970) ................................... 15

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................... 17

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984) .............................................................. 18

*Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020) ............................................................... 5

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986) ......................................... 18

*Cabrera v. U.S. Dep't of Lab.*,
  No. 25-cv-1909-DLF, 2025 WL 2092026 (D.D.C. July 25, 2025) .............................. 31, 32

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) ...................................... 2

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ............................... 25

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) ........................................................... 14

*Clark v. Smith*, 38 U.S. (13 Pet.) 195 (1839) ......................................................................... 13

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) .................................................................. 15

*Coal. for Humane Immigrant Rts. v. Noem*,
  No. 25-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025) ...................................... 31, 32

*Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*,
  968 F.3d 755 (D.C. Cir. 2020) ....................................................................... 3, 6, 7, 8, 10

*Council for Urological Ints. v. Burwell*, 790 F.3d 212 (D.C. Cir. 2015) ............................... 24

*Dellinger v. Bessent*, 766 F. Supp. 3d 57 (D.D.C. 2025) ................................................................ 30

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)..........................................................24, 25

*Dir., Office of Workers' Compensation Programs, Dep't of Lab. v. Newport News Shipbuilding &
    Dry Dock Co.*, 514 U.S. 122 (1995) ...................................................................................... 16

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n*, 878 F.3d 371 (D.C. Cir. 2017) ............................5, 9

*Estate of Michael ex rel. Michael v. Lullo*, 173 F.3d 503 (4th Cir. 1999) ........................................ 27

*FEC v. Akins*, 524 U.S. 11 (1998) ....................................................................................................... 10

*Global Health Council v. Trump*,
    No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025).........................................19, 25

*Greer v. Spock*, 424 U.S. 828 (1976)................................................................................................... 5

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) .............................................................................. 24

*Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228 (D.C. Cir. 2003) ...................................... 11, 26, 32

*Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025) ...................... 31

*L. v. Siegel*, 571 U.S. 415 (2014) ....................................................................................................... 23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ................................... 15

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .................................................................. 20

*Los Angeles v. Adams*, 556 F.2d 40 (D.C. Cir. 1977)....................................................................... 23

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)........................................................................... 18

*Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020)............................................................................ 12

*Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025)........................................................ 11

*Middlesex Cnty. Sewerage Auth. v. Sea Clammers Ass'n*, 453 U.S. 1 (1981) ................................... 19

*Mova Pharm. Corp v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)...................................................... 20

*Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157 (2004) ....................................................... 30

*Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960 (D.C. Cir. 2022) ..................................... 26

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) ....................... 32

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004).................................................................... 25

*Powell v. McCormack*, 395 U.S. 486 (1969)..................................................................................4, 5

*Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989)................................................................ 10

*Pulsifer v. United States*, 601 U.S. 124 (2024) ........................................................................... 22

*Raines v. Byrd*, 521 U.S. 811 (1997) ...........................................................................3, 4, 5, 6, 7, 8

*Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873 (D.C. Cir. 1981) ...................................... 13

*Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138 (10th Cir. 2012) ............................ 13

*Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928) .......................................... 13

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)........................................................6, 9, 10, 12

*Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025)............................................................................. 32

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ...............................................................10, 14

*United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) .......................................................... 14

*United States v. Florida*, 938 F.3d 1221 (11th Cir. 2019) ........................................................ 16

*United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983)........................... 14

*United States v. Mass. Water Res. Auth.*, 256 F.3d 36 (1st Cir. 2001) ............................... 13

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ...................................................... 11

*United States v. Richardson*, 418 U.S. 166 (1974)........................................................................ 6

*United States v. Will*, 449 U.S. 200 (1980)................................................................................ 11

*Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019) ............................................... 4

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)......................................................... 16

*Ziglar v. Abbasi*, 582 U.S. 120 (2017)....................................................................................... 26

**U.S. Constitution and Statutes**

2 U.S.C. § 192 ................................................................................................................................ 14

2 U.S.C. § 194 ................................................................................................................................ 14

2 U.S.C. § 288d ............................................................................................................................. 26

28 U.S.C. § 1365 ........................................................................................................................... 26

5 U.S.C. § 2954 ............................................................................................................................. 12

5 U.S.C. § 551 ................................................................................................................................ 16

5 U.S.C. § 552 ....................................................................................................... 9

5 U.S.C. § 701 ................................................................................................. 16, 17

5 U.S.C. § 702 ................................................................................................. 14, 15

5 U.S.C. § 705 ..................................................................................................... 31

5 U.S.C. § 706 ................................................................................................ 20, 24

6 U.S.C. § 112 ..................................................................................................... 23

8 U.S.C. § 1231 ................................................................................................... 23

31 U.S.C. § 1341 ................................................................................................. 18

31 U.S.C. § 1349 ................................................................................................. 18

31 U.S.C. § 1350 ................................................................................................. 19

31 U.S.C. § 1351 ................................................................................................. 18

42 U.S.C. § 1983 ................................................................................................. 19

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ........................................... 7

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ........................ 2, 7, 11, 15, 17, 21, 22

Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................................... 26

U.S. Const. art II, § 3 .................................................................................... 13, 23

**Other Authorities**

*Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an
    Appropriation*, 25 Op. O.L.C. 33 (2001) .................................................... 18

Black's Law Dictionary (12th ed. 2024) ........................................................... 16

Letter from DHS Sec'y Noem to Rep. Garcia (Aug. 22, 2025),
    https://perma.cc/5J7N-EGLH ...................................................................... 23

Letter from ACLU Va. & Nat'l Immigr. Project to Sec'y Kristi Noem et al. (Sept. 4, 2025),
    https://perma.cc/ST2Z-X9EA ....................................................................... 29

Letter from OMB Dir. Russell T. Vought to Chairman John Yarmuth, Comm. on
    Budget (Jan. 19, 2021), https://perma.cc/PP3N-ZDAG) ............................. 18

Majority Staff Report, H. Comm. on Homeland Sec., ICE Detention Facilities: Failing to
   Meet Basic Standards of Care (2020), https://perma.cc/W9TG-URSC .......................................... 19

*Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV ..................................................... 21

## INTRODUCTION

Individual members of Congress seek preliminary relief from this Court because the Department of Homeland Security (DHS) has adopted a policy that restricts Plaintiffs' physical access to DHS detention facilities and denies them information in violation of a law enacted to prohibit precisely such a policy. This policy has been adopted in the midst of an unprecedented humanitarian crisis in U.S. immigration detention facilities, when the importance of congressional oversight of these facilities has reached a historic zenith.

Defendants seek to evade judicial review by misapplying precedent to argue that this Court lacks jurisdiction over Plaintiffs' claims. They strain to paint this dispute as a political clash between two branches, in which Plaintiffs seek to vindicate the constitutional powers of one branch at the expense of the other. But Plaintiffs have been *individually* harmed by the denial of physical access and information to which they are entitled under federal law, and they advance no constitutional claims at all. Their injuries are traditionally redressable by federal courts, and they are individualized to Plaintiffs, who experience these injuries at different times, in different locations, and with varying adverse effects. This case is unlike the historical individual-legislator cases Defendants rely on, in which plaintiffs sought to vindicate an injury to a legislature's lawmaking power, which is by definition an institutional injury shared equally among all members of the legislative body. Defendants' contrary arguments have no basis in precedent and would leave the judiciary powerless to remedy *any* unlawful executive interference with individual members' official prerogatives—even, for example, a denial of access to the Capitol Building, or a refusal to pay any salary for a disfavored member's staff.

Plaintiffs are entitled to seek relief under the Administrative Procedure Act (APA) because they are persons aggrieved by Defendants' policy, and they are personally (and in their official capacities) entitled to the physical access and information that Defendants have restricted. The Antideficiency Act, under which any remedy lies within the voluntary discretion of the executive,

poses no obstacle to this APA suit—just as it posed no obstacle to the many other suits with APA claims that agency actions were invalid because they were taken without a valid appropriation. *See, e.g., CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024). Plaintiffs are likely to succeed on their APA claims, because the policy directly contravenes the limitation section 527 places on the expenditure of funds appropriated to DHS. *See* FY2024 Appropriations Act, div. C, title V, § 527, Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024). Similarly, Plaintiffs are likely to succeed on their alternative *ultra vires* and mandamus claims.

Plaintiffs have also satisfied the remaining factors for relief. They have demonstrated the increasing urgency of accessing DHS detention facilities and real-time, in-person information regarding their conditions and operations, without which Plaintiffs are hindered in carrying out their duties as individual members of Congress. And the equities overwhelmingly favor ensuring that Plaintiffs can conduct this lawful oversight: public reporting and federal court documents recount deteriorating conditions at immigration detention facilities, and Defendants assert little more than inconvenience from complying with this statutory limitation on the expenditure of appropriated funds.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

#### A. Plaintiffs have standing to bring these claims

In arguing that Plaintiffs lack standing, Defendants misread precedent and ignore the nature of Plaintiffs' claims. Here, Congress, in duly enacted federal law, recognized that individual members play a fundamental role in exercising Congress's oversight power, and it enlisted members in exercising that power in a particular context where Congress was not getting sufficient and timely information about immigration detention facilities. Plaintiffs challenge discrete actions by Defendants as contrary to federal law, causing Plaintiffs, individually and directly, to suffer injuries that federal courts routinely entertain: unlawful restrictions on physical access and denial of information to which Plaintiffs are

entitled. Mem. in Supp. Pls.' of Mot. for Stay ("Mot.") 25–26, ECF No. 17 (collecting cases).

### 1.    Plaintiffs have standing under *Raines v. Byrd*

Defendants dramatically overread *Raines v. Byrd*, 521 U.S. 811 (1997), as standing for the proposition that members of Congress *never* "suffer Article III injuries when the Executive Branch allegedly harms their official interests." Defs.' Opp'n 9, ECF No. 20. But no court has ever adopted such a broad theory, which conflicts with binding precedent and would yield absurd results.

The *Raines* Court "identified four considerations" underlying its holding that individual members of Congress lacked standing: "(1) the individual plaintiffs alleged an institutional injury that was 'wholly abstract and widely dispersed'; (2) plaintiffs' 'attempt to litigate th[eir] dispute at this time [wa]s contrary to historical experience'; (3) the plaintiffs 'ha[d] not been authorized to represent their respective Houses of Congress . . . , and indeed both Houses actively oppose[d] their suit'; and (4) dismissing the lawsuit 'neither deprive[d] Members of Congress of an adequate remedy . . . , nor foreclose[d] the Act from constitutional challenge.'" *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 775–76 (D.C. Cir. 2020) (en banc) (quoting *Raines*, 521 U.S. at 829). The Court emphasized that it "need not now decide" "[w]hether the case would be different if *any* of these circumstances were different." *Raines*, 521 U.S. at 829–30 (emphasis added). Here, *all* of those circumstances are different; none counsel against Plaintiffs' standing here.

***First***, Plaintiffs do not assert any "institutional injury," much less one "that is 'wholly abstract and widely dispersed.'" *McGahn*, 968 F.3d at 775 (quoting *Raines*, 521 U.S. at 829). In *Raines*, individual members of Congress challenged the constitutionality of the Line Item Veto Act on the theory that it would allow the President to undermine Congress's constitutional role in enacting legislation and "alter[] the constitutional balance of powers between the Legislative and Executive Branches." *Raines*, 521 U.S. at 816. Those members were seeking to vindicate the right of Congress as a whole to pass legislation and not have it partially vetoed by the President. Congress's right to pass legislation, by its

3

nature, cannot be delegated. Congressional oversight authority, by contrast, can be (and most often is) delegated by Congress and exercised by committees and individual members. Congress has delegated that authority to individual members with respect to DHS facilities. Plaintiffs have sought to exercise that authority—at various times and in various locations—and have been unlawfully rebuffed. Thus, Plaintiffs seek to vindicate an authority that they exercise individually.

The central problem in *Raines* was that "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019). Unlike in *Raines*, where the plaintiffs had "simply lost [a] vote" on legislation, 521 U.S. at 824—a type of injury that courts have not addressed—Plaintiffs have been denied access and information to which they are plainly entitled as individual members, Mot. 26–27. Each Plaintiff has sought and been denied access and information relevant to their *specific* legislative roles, and each has thus been harmed in a unique way.[1] *See id.* at 16–19 (detailing individual roles). There is no "mismatch" here between those "seeking to litigate" and those "to wh[om] the relevant [legal] provision" applies. *Bethune-Hill*, 587 U.S. at 667. Plaintiffs are *individual* members asserting *individual* oversight interests not shared by other members who do not seek to obtain access or information for their own oversight purposes.

Defendants contend that Plaintiffs must assert a *private* injury, rather than an official-capacity injury. Opp'n 11–12, 19–20. But that is not the relevant inquiry: again, what matters is whether the injury affects Plaintiffs' *individual* entitlements (whether in a private or official capacity), rather than affecting a right that belongs only to the collective institution of which they are members. *Raines* contrasted those plaintiffs' widely dispersed institutional harm with the personal harm to the plaintiff in *Powell v. McCormack*, 395 U.S. 486 (1969), who was "duly elected" to and yet excluded from a seat in the House and consequently denied his salary, *id.* at 493. The *Raines* Court stated that the "loss of

---

[1] For the same reasons, in conducting oversight at DHS detention facilities, each Plaintiff is acting on his or her own behalf, according to his or her distinct role, and not as an "agent" of Congress. *Contra* Opp'n 15 (citing no authority for the proposition that "any legislator who seeks information for purposes of legislative oversight necessarily does so as an agent for the entire legislative body").

a[] private right . . . would make the injury more concrete," but the Court did not suggest that members of Congress cannot satisfy Article III based on other, more concrete injuries suffered in their official capacities. 521 U.S. at 821. That is this case: unlike in *Raines* and *Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020), Plaintiffs' injuries are not based on Congress's "loss of political power" as an institution, *id.* at 19, but on the denial of access and information to Plaintiffs as individuals. *Contra* Opp'n 10.

Further, Plaintiffs' injuries are not "abstract." *Raines*, 521 U.S. at 829. A restriction on physical access to federal facilities is a classic tangible harm over which federal courts regularly exercise jurisdiction. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 833–34 (1976); Mot. 25 (collecting cases). The denial of information to which an individual is legally entitled is likewise routinely determined to be an injury in fact. Plaintiffs easily satisfy the D.C. Circuit's test, which Defendants fail to meaningfully address. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n*, 878 F.3d 371, 378 (D.C. Cir. 2017); Mot. 26. These injuries are also not "widely dispersed." *Raines*, 521 U.S. at 829. These denials occur at different times and facilities according to individual members' oversight visit attempts, and the denied information—and particular need for that information—is different for each member and each attempted visit.

For similar reasons, the asserted injuries are manifestly particularized to the individual Plaintiffs. *Contra* Opp'n 17. To be sure, Defendants' oversight visit policy would not harm Plaintiffs if they were not members of Congress—but not all members are "equally" injured by the policy. *Raines*, 521 U.S. at 812. Unlike the statute challenged in *Raines*, the policy does not impair members' *collective* exercise of the power to legislate; instead, it affects their *individual* conduct of oversight. And even then, it affects *only* those members who are engaged in oversight of DHS and who have sought access to and information regarding DHS facilities under section 527. This is a far cry from a "generalized grievance" with an "undifferentiated" impact. Opp'n 17 (quoting *United States v. Richardson*, 418 U.S. 166, 176–77 (1974)). Defendants entirely fail to contend with the facts in Plaintiffs'

declarations, which detail the distinct ways in which each Plaintiff's denial of access and information harms that Plaintiff. That harm varies based on each member's particular oversight history, district geography and constituent makeup, committee membership and leadership, and legislative focus. *See, e.g.*, Mot. 16–19. Accordingly, no two members suffer identical harms.[2]

**Second**, history and tradition support judicial review of legislators' claims of informational injury. As an initial matter, *McGahn* rejected an argument that the plaintiffs would lack standing based solely on the executive's assertion that "federal courts have not historically entertained" similar suits, explaining that "the Court's discussion of history in *Raines* informed its conclusion that individual legislator plaintiffs lacked standing, but did not append to the three-pronged standing analysis an entirely distinct historical prong." 968 F.3d at 776. *Contra* Opp'n 15. Rather, historical practice can inform a court's determination of whether an alleged injury is sufficiently concrete to constitute an injury in fact. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021).

Historical practice does not support Defendants' position here. As noted above, and as *Raines* acknowledged, there is historical precedent for litigation by individual legislators. The *Raines* suit departed from historical practice, however, in that it was "brought on the basis of claimed injury to official authority or power" belonging to Congress as a whole in the context of a "confrontation[] between one or both Houses of Congress and the Executive Branch." 521 U.S. at 826. That is not the case here, where individual members have suffered a type of harm that is traditionally redressable by courts. An executive agency has announced a blanket policy of flouting duly enacted federal law, on the apparent basis of a policy disagreement, rather than seeking to change the law or addressing its

---

[2] Defendants' conclusory contention that Plaintiffs' harms are not particularized is sharply undermined by their separate argument that "the scope of any relief awarded should be limited to these Plaintiffs." Opp'n 44. The Court should not limit relief to Plaintiffs here, *see infra* at 32, but if Plaintiffs' injuries were a generalized grievance belonging to Congress as a whole, the Court necessarily *could not* provide relief only to Plaintiffs. For example, the *Raines* Court could not have enjoined the Line Item Veto Act as to only the plaintiff congressmembers, because they could exercise their harmed interest only as part of the institutional collective.

purported policy concerns in other ways. The resulting harms—denial of access and information—to legislators affected by that policy are the same as those harms in a nonlegislative context.

Moreover, Defendants' recitation of early examples of negotiation between Congress and the President, Opp'n 15–16, offers little support for their position. Those examples demonstrate a practice of resolving disparate positions "through the political process." *Id.* at 16. Here, that process has already occurred: every year since 2019, Congress has passed, and *the President has signed*, the law on which Plaintiffs rely. The President has already agreed that DHS will not use funds to "prevent any . . . Member of Congress" "from entering, for the purpose of conducting oversight, any [DHS] facility." FY2024 Appropriations Act, div. C, title V, § 527(a); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025). It is the violation of that agreement, through the oversight visit policy, that necessitates judicial intervention. This is not unlike judicial review of any other executive agency action. Consequently, "[h]olding that [Plaintiffs] ha[ve] standing would safeguard the separation of powers" by "preserv[ing] the legal background against which the political branches have historically negotiated their informational disputes" and "enabl[ing]" members of Congress to carry out their responsibilities, including "serving as an essential check on the President and the Executive Branch." *McGahn*, 968 F.2d at 778.

**Third**, the lack of authorization to sue by the full chambers of Congress that was significant in *Raines* is irrelevant here. *See* 521 U.S. at 829. In *Raines*, Congress had not passed a law that applied to members individually. Congress has done so here, providing the entitlement that Plaintiffs seek to vindicate. And where individual members seek judicial redress of harms to their individual interests, the broader institution has no direct role to play in that litigation. *Contra* Opp'n 16–17.

**Fourth**, dismissing this lawsuit would plainly "deprive[] Members of Congress of an adequate remedy" and "foreclose[]" judicial challenges to the oversight visit policy. *Raines*, 521 U.S. at 829. In *Raines*, this was not the case: Congress—which on the plaintiffs' theory was suffering institutional

harm from the Line Item Veto Act—could "repeal the Act or exempt appropriations bills from its reach," and "someone who suffers judicially cognizable injury as a result of the Act" could bring a constitutional challenge. *Id.* But here, the accommodation process between the legislative and executive branches has already occurred, through the enactment of the appropriations bills containing section 527 with the President's signature. Plaintiffs have already done what *Raines* said that the individual members *should* have done: secured passage of legislation. And other, nonlegislative parties could not seek this relief: section 527 speaks specifically to the ability of members of Congress to enter DHS facilities, as does the oversight visit policy. Here, "a civil enforcement suit" by injured members "is the only practicable way" to obtain relief from the challenged policy. *McGahn*, 968 F.3d at 776.

### 2.    Plaintiffs assert cognizable injuries in fact

None of Defendants' additional standing arguments is persuasive. First, Defendants submit that neither the physical access restriction nor the denial of information to Plaintiffs "justifies departing from controlling Supreme Court precedent." Opp'n 17. In support, Defendants repeat their view that Plaintiffs' harms belong to the institution—which, for all the reasons discussed above, is incorrect—and otherwise wrongly suggest that Plaintiffs' harms are not cognizable injuries in fact.

As to the denial of physical access, Defendants argue that this harm is not particularized because it is not "targeted" at Plaintiffs. Opp'n 17–18. Defendants provide no support for this novel proposition, which misunderstands the meaning of the word "particularized" in the context of Article III standing. Plaintiffs' harms are certainly particularized. *See supra* at 5–6. Just because a challenged government action might also affect some nonplaintiffs does not mean that a plaintiff who is concretely and personally aggrieved lacks a particularized injury. Nor does the government need to *name* particular individuals in its policy for harmed individuals to bring suit. Again, the oversight visit policy does not harm every member of Congress, much less identically. Each Plaintiff has sought and has been denied entry to a DHS facility and has therefore been harmed in a particularized way.

Defendants distinguish other cases involving restrictions on physical access to federal property and facilities, stressing that those cases did not arise in the "context of legislative standing," Opp'n 17, but what matters here is the nature of the harm that Plaintiffs have suffered, not the particular context in which it arises. A legislator alleging a particularized, concrete injury, of the kind federal courts routinely address—like a restriction on physical access that is guaranteed by law—is not barred from court simply because the plaintiff happens to be a legislator. As addressed above, the concerns raised in *Raines* and its progeny regarding the "context of legislative standing," *id.*, do not apply in this case.

As to the denial of information to which Plaintiffs are entitled, Defendants wrongly argue that section 527 does not "'require[] the government . . . to disclose' any type of 'information.'" Opp'n 18 (quoting *Elec. Privacy Info. Ctr.*, 878 F.3d at 378). Insisting that section 527 does not require the government to disclose any information but only prohibits the denial of "physical access to certain detention facilities," Opp'n 18, is like saying that the Freedom of Information Act does not require the government to disclose information but merely requires the government to provide certain documents upon request, *see* 5 U.S.C. § 552(a)(3)(A). Information exists in myriad forms, and Defendants rightly do not argue that information cannot be acquired through personal observation or that the information Plaintiffs seek on the ground in detention facilities—including, for example, the physical state of those facilities, the nature of the detention, and the wellbeing of the detainees—is not actually "information." Moreover, appropriations law is in fact federal law, and thus limitations on appropriations are plainly "require[ments]" imposed on the government. *See also infra* at 11.

Defendants further submit that the denial of information must cause "downstream" "adverse effects" to constitute injury in fact. Opp'n 18 (quoting *TransUnion*, 594 U.S. at 442). This is not a burdensome requirement, and Plaintiffs have made this showing. *See* Mot. 26–27. Plaintiffs "desire[] information with which [they] can make an informed [legislative] decision, and the 'information deficit' created by [DHS's] policy 'hinder[s] [their] ability' to do so." *Animal Legal Def. Fund, Inc. v. Vilsack*, 111

F.4th 1219, 1229 (D.C. Cir. 2024) (quoting *TransUnion*, 594 U.S. at 442). "That is the sort of 'downstream consequence[]' that can establish Article III standing." *Id.* (quoting *TransUnion*, 594 U.S. at 442); *see also Public Citizen v. DOJ*, 491 U.S. 440, 449 (1989) (standing where advocacy organizations needed denied information to "participate more effectively in the judicial selection process"); *FEC v. Akins*, 524 U.S. 11, 21 (1998) (standing where voters alleged the information "would help them (and others to whom they would communicate it) to evaluate candidates for public office").

Defendants fall back on their unpersuasive contention that this informational harm is a "generalized harm" that belongs to Congress as an institution. Opp'n 19. But just as a congressional chamber or committee can, in some circumstances, assert an informational injury that belongs to the institution—for example, in the subpoena-enforcement context, *see, e.g.*, *McGahn*, 968 F.3d at 760—legislators may, in other circumstances, demonstrate an informational injury that belongs to them individually. The two are not mutually exclusive, nor is there any "mismatch" here. *Contra* Opp'n 20–21; *see supra* at 3–5. In section 527, Congress codified an individual role for members to play in conducting oversight over DHS detention facilities. And legislators manifestly have distinct individual roles to play, with respect to serving on committees, developing legislation, overseeing facilities in their own districts, and serving their unique constituencies—so the inability to vindicate their oversight interest injures them in distinct ways. *See, e.g.*, Mot. 16–19. Further, neither Article III nor section 527 requires members of Congress to identify specific "prospective legislation that requires the oversight visits." Opp'n 19. In addition to being relevant to members' other functions (such as constituent services), oversight visits to DHS detention facilities inform members on not only *what* to legislate but also *whether* to legislate at all, by bringing to light issues of which members may not otherwise be aware. *Cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020) (explaining that a congressional subpoena must merely "concern[] a subject on which legislation could be had" (quotation marks omitted)).

Next, Defendants incorrectly contend that the negative construction of section 527 means

that Plaintiffs have no entitlement to the information that has been denied. Opp'n 18, 21–22. This makes little sense as a practical matter. Congress often imposes an obligation on the government using a *limitation* on the expenditure of funds, which is necessarily effected using a negative construction. Congress uses such appropriation limitations to codify its chosen policies in federal law, and those limitations are enforceable by individuals whose interests they protect. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1172–73 (9th Cir. 2016) ("When Congress has enacted a legislative restriction . . . that expressly prohibits DOJ from spending funds on certain [prosecutorial] actions, federal criminal defendants may seek to enjoin the expenditure of those funds.").

The "use of *any* government resources—whether salaries, employees, paper, or buildings"— to accomplish any task "entail[s] government expenditure," and "[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation." *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (quotation marks omitted). Thus, an appropriations rider like the one in section 527 imposes an obligation on the government as surely as any other statutory provision—and no less so because it is framed as a prohibition rather than a positive mandate. *See generally, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) ("[T]here can be no doubt that [Congress] could accomplish its [legislative] purpose by an amendment to an appropriation bill, or otherwise." (quotation marks omitted)). Where an agency may not "prevent any . . . Member of Congress" "from entering" a facility, that agency, as long as it continues to rely on appropriated funds subject to section 527, is necessarily obligated to *permit* entry by any member of Congress upon request by that individual member. FY2024 Appropriations Act, div. C, title V, § 527(a).[3] In these circumstances, the individual member is entitled to entry to that facility and to the information he or she may gather as a consequence of the entry.[4]

---

[3] Defendants cite *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219 (2025), for the proposition that "statutes that impose duties do not necessarily create rights." Opp'n 16. In doing so, they confuse the requirements for Article III standing with those for a cause of action. As explained *infra* at 15–20, the APA supplies a cause of action here.

[4] For this reason, the D.C. Circuit's decision in *Maloney v. Murphy* is, while no longer controlling, extremely persuasive here. 984 F.3d 50, 60 (D.C. Cir. 2020), *vacated as moot sub nom. Carnahan v. Maloney*,

Finally, Defendants wrongly suggest that Plaintiffs purport to rely on section 527 to "'elevate' harms that were 'previously inadequate in law' 'to the status of legally cognizable injuries.'" Opp'n 16 (quoting *TransUnion*, 594 U.S. at 425). As just explained, however, section 527 entitles individual members of Congress to physical entry to certain DHS facilities and to the information obtained through that entry. The denial of physical access is a classic "tangible harm," and the denial of information to which Plaintiffs are entitled, thereby hindering their ability to do their jobs, is an "intangible harm[]" made "concrete" by its consequences. *TransUnion*, 594 U.S. at 425; *see also id.* at 441 (stating that "several of th[e] Court's precedents" recognize that plaintiffs who "allege that they failed to receive . . . required information" under a disclosure statute have standing).

**B.  The doctrine of equitable discretion presents no obstacle to this suit**

In a final effort to dissuade this Court from properly exercising its jurisdiction, Defendants urge the application of an equitable-discretion doctrine that is inapplicable here. Even assuming that this doctrine remains relevant after more recent precedent—in particular *Raines*, which addressed the courts' concerns regarding suits brought by legislators through its standing analysis—the doctrine presents no obstacle to the exercise of this Court's jurisdiction. The "doctrine of circumscribed equitable discretion" holds that "[w]here a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, th[e] court should exercise its equitable discretion to dismiss the legislator's action." *Riegle v. Fed. Open Mkt. Comm.*, 656

---

143 S. Ct. 2653 (2023); *contra* Opp'n 21. It is true that, unlike the statutory provision at issue in *Maloney*, section 527 is not written to require an executive agency to "submit" information to certain members of Congress upon request. 984 F.3d at 54 (citing 5 U.S.C. § 2954). But this difference exists for the obvious reason that one cannot submit information to an individual in the same way that the individual can personally *observe* information. Congress recognized that the information that might be obtained from an agency through written submission might be stale, inaccurate, or incomplete, which is why immediate, in-person access is often important. And what a member of Congress may learn from an in-person facility visit—through physical experience, visual observation, and conversations—is not the same information that may be contained in documents or testimony of selected personnel. Defendants do not dispute that in-person access is a legitimate exercise of oversight with deep historical roots. *See* Mot. 5–11. The effect of the provision in *Maloney* and section 527 is the same: Congress codified a right to certain information by individual members of Congress upon request.

F.2d 873, 881 (D.C. Cir. 1981); *accord Melcher v. Fed. Open Mkt. Comm.*, 836 F.2d 561, 563, 565 n.4 (D.C. Cir. 1987) (applying the doctrine articulated in *Riegle* as binding but questioning its "viab[ility]").

Defendants suggest that Plaintiffs should persuade their colleagues to act, but Congress already acted: following denials of entry to immigration detention facilities in 2018, members of Congress indeed persuaded their colleagues to draft and pass what is now section 527. *See* Mot. 11– 14. The President signed that provision into law in 2019, and it has been included in DHS appropriations every year since. Congress can always supersede principles of equity through legislation. *See Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir. 2012) (explaining that a court's assessment of equitable principles is "circumscribed to the extent Congress has already made such assessments with respect to the type of case before the court" (quoting *United States v. Mass. Water Res. Auth.,* 256 F.3d 36, 47 (1st Cir. 2001))); *cf. Clark v. Smith,* 38 U.S. (13 Pet.) 195, 203 (1839) (finding "inherent in the Courts of Equity a jurisdiction to . . . give effect to the policy of the legislature"). Here, by adopting section 527 and the APA, Congress has overridden the equitable discretion that Defendants invoke. Congress does not have to act twice for its statutes to be enforceable.

Defendants urge that "Congress should act to *enforce* [this] limitation on the use of appropriated funds," Opp'n 23 (emphasis added), but they have it backwards: it is the role of the executive branch, not the legislative branch, to enforce federal law. *See* U.S. Const. art II, § 3; *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). Where an executive agency is instead violating the law, Congress has empowered aggrieved individuals to bring suit under the APA, and in that context it is the proper role of the judiciary to check the unlawful government action.

Defendants further argue that "[w]hen constitutional disputes arise concerning the respective powers of the Legislative and Executive Branches, judicial intervention should be delayed until all possibilities for settlement have been exhausted." Opp'n 23 (quoting *United States v. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983)). This principle is inapposite. This case is brought

by individual members who allege an agency violation of a discrete provision of federal law, and not of constitutional law. The mere fact that the plaintiffs are legislators does not magically transform this case into a "constitutional dispute[]" involving the respective powers of the political branches. *Id.*

Moreover, this is not a case that lends itself to interbranch accommodation, beyond the legislative process that has already occurred. Compare this case with *United States v. House of Representatives*, on which Defendants rely, Opp'n 23–24. There, an agency administrator had refused to comply with a congressional subpoena. 556 F. Supp. at 151. Instead of following the statutorily prescribed route of criminal prosecution for contempt of Congress, the executive branch sued the House and asked the court to immediately "resolve the dispute by determining the validity of the Administrator's claim of executive privilege." *Id.* at 152. The court dismissed the case, concluding that it was "unnecessary" to "interfere with the statutory scheme" for "penalties for contempt of Congress, 2 U.S.C. § 192 and § 194, [which] constitute an orderly and often approved means of vindicating constitutional claims arising from a legislative investigation." *Id.*[5]

Here, rather than circumventing a statutory enforcement scheme, Plaintiffs are following one: the APA allows for civil suits by individuals injured by unlawful agency action. *See* 5 U.S.C. § 702. To the extent that the prior posture of accommodation has been repudiated, that has been on Defendants' part. Defendants have not attempted to persuade Congress to repeal section 527, nor did they adopt any lawful policies that might assuage their purported security and logistical concerns. Instead, Defendants adopted a blanket policy restricting all oversight visits by members of Congress in direct contravention of federal law. There is no cause for this Court to exercise its equitable discretion by dismissing this suit.

_____

[5] Likewise, in *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976), and *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), the *executive* branch sought judicial review of congressional subpoenas that teed up separation-of-powers questions not replicated here. And in *Chenoweth v. Clinton*, 181 F.3d 112, 113, 115 (D.C. Cir. 1999), members of Congress sued to enjoin an executive initiative, but they alleged a "widely dispersed," "abstract" institutional harm and, moreover, had failed to secure a congressional vote on their bill "[t]o terminate further development and implementation" of the challenged initiative.

### C.  The oversight visit policy is unlawful under the APA

#### 1.  Plaintiffs have a cause of action under the APA

Plaintiffs are "adversely affected or aggrieved" "persons" under 5 U.S.C. § 702; Defendants' oversight visit policy is final agency action; and APA review is not precluded. *Contra* Opp'n 24–26.

#### a.  Plaintiffs are adversely affected or aggrieved persons

Plaintiffs, in their official capacities as members of Congress, are "adversely affected or aggrieved" "persons" under the APA. As Defendants acknowledge, "the terms 'adversely affected' and 'aggrieved,' alone or in combination, have a long history in federal administrative law." Opp'n 24–25 (quotation marks omitted). A complainant is "aggrieved" where the interest they seek to protect "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Svc. Orgs. v. Camp*, 397 U.S. 150, 153 (1970). This test is "not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quotation marks omitted). A plaintiff fails this test only where the asserted "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Section 527 prohibits the use of appropriated funds to "prevent" any "member of Congress" from entering any DHS facility "used to detain or otherwise house aliens," or to "make any temporary modification" that would alter observations made at the facility. FY2024 Appropriations Act, div. C, title V, § 527(a). The ability of Plaintiffs, as members of Congress, to access DHS detention facilities without delay and obtain on-the-ground information is plainly within the zone of interests protected by section 527. This alone is sufficient to show that Plaintiffs are "adversely affected" or "aggrieved."

Defendants appear to argue that members of Congress are not "persons" and that they are not "aggrieved." Both arguments are wrong. The APA defines "persons" as including "individuals." 5 U.S.C. § 701(b)(2). The plain meaning of "individuals" encompasses members of Congress,

including in their official capacities. *See* Black's Law Dictionary (12th ed. 2024) (defining "individual" as "of, relating to, or involving *a single person or thing, as opposed to a group*" (emphasis added)). Plaintiffs are therefore "persons" under the APA. Consistent with this conclusion, courts have held in other statutory contexts that the term "person" applies to officials in their official capacities. *See, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under [42 U.S.C.] § 1983[.]").

Defendants rely on *Director, Office of Workers' Compensation Programs, Department of Labor v. Newport News Shipbuilding & Dry Dock Co.* to suggest that Plaintiffs are not within the "market group that the statute was meant to protect." 514 U.S. 122, 128 (1995); Opp'n 25. But *Newport News* bears no resemblance to this case. First, *Newport News* was an action brought by an agency, which is explicitly excluded by the APA. 5 U.S.C. §§ 701(b)(2), 551(2) (defining person as an "individual, partnership, corporation, association, or public or private organization *other than any agency*" (emphasis added)). Defendants further rely on *Newport News* to argue that members are not "aggrieved" persons because there is no history of APA suits by members of Congress in their individual capacity, but *Newport News* itself undermines this argument. A "key concept" in *Newport News* is that courts must "examine the nature, structure, and purpose of the relevant statutory scheme" when determining whether a plaintiff is adversely affected or aggrieved. *United States v. Florida*, 938 F.3d 1221, 1243 (11th Cir. 2019). Indeed, *Newport News* clarified that even actions brought by agencies as "statutory beneficiar[ies]" are permissible under the APA. 514 U.S. at 128. Defendants' exceedingly narrow argument that there is "no historical tradition of APA suits" by members of Congress, Opp'n 25, tellingly ignores the Court's statement that a person who is a "statutory beneficiary" is "aggrieved" under the APA. Here, each Plaintiff, as an individual member of Congress, is an obvious intended "statutory beneficiary" of section 527. Section 527's text and history make clear that its purpose is to directly and specifically confer on each "member of Congress" (and their designees) access to DHS facilities in their

unmodified forms "for the purpose of conducting oversight." *See* FY2024 Appropriations Act, div. C, title V, § 527(a); *see also* Mot. 5–14.

### b. The oversight visit policy is final agency action

Contrary to Defendants' contention, Plaintiffs do not challenge a generalized denial of information; they challenge the oversight visit policy, which is final agency action contrary to a specific statutory mandate to provide access without delay. *See* Mot. 28–29. Final agency action "must mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). Defendants' oversight visit policy constitutes final agency action because it is not "merely tentative or interlocutory in nature." *Id.* The ICE Office of Congressional Relations (OCR) website displays the seven-day-notice requirement and previously displayed the purported exemption of field offices from section 527. And Defendants concede that ICE's own National Detention Standards direct parties to ICE's website for guidance regarding congressional visits. Opp'n 7. Crucially, Defendants have repeatedly relied on the oversight visit policy, orally and in writing, to prevent Plaintiffs from entering DHS detention facilities. The policy therefore "mark[s] the consummation of [Defendants'] decisionmaking process" and carries the legal consequence of the denial and obstruction of lawful congressional oversight visits under section 527.

### c. Review under the APA is not precluded by statute

Defendants further argue that review under the APA is precluded by statute. Opp'n 26 (citing 5 U.S.C. § 701(a)(1)). But neither the Antideficiency Act (ADA) nor any other statute precludes Plaintiffs from seeking APA review of Defendants' oversight visit policy. Determining otherwise would lead to the irrational conclusion that Congress intended the executive branch to remedy its own violations of section 527 and other appropriations riders that place limits on executive power.

The APA carries a "'strong presumption' favoring judicial review of administrative action."

*Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Where, as here, no explicit language precludes review, preclusion hinges on congressional intent to preclude review. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 350–51 (1984). "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," so the presumption is rebutted only "when a statute's language or structure demonstrates that *Congress wanted* an agency to police its own conduct." *Mach Mining*, 575 U.S. at 486 (emphasis added); *see also Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986) ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

Defendants argue that the ADA "provides an existing and exclusive remedial scheme" for violations of appropriations conditions, Opp'n 27, but the ADA does not evince congressional intent to bar civil enforcement of section 527. The ADA prevents the government from making or authorizing expenditures or obligations in excess of congressionally appropriated funds or outside the bounds of authorized purposes. *See* 31 U.S.C. § 1341; *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33, 35 (2001). As Defendants concede, the ADA provides only for discretionary executive enforcement, *see* 31 U.S.C. § 1351, and the executive branch has taken the position that "the Constitution grants the President exclusive authority" to implement laws that grant such executive discretion, citing the ADA as a "prime example." Letter from OMB Dir. Russell T. Vought to Chairman John Yarmuth, Comm. on Budget (Jan. 19, 2021), https://perma.cc/PP3N-ZDAG. Individuals who violate the ADA are "subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office." 31 U.S.C. § 1349(a). These are not penalties that Congress or private plaintiffs can implement. The ADA also authorizes the imposition of criminal fines in cases of knowing and willful violations. *Id.* § 1350. Criminal actions are initiated and prosecuted by the

executive branch, not Congress. It would be irrational to assume that Congress intended, in passing section 527, to leave any remedy to the discretion of the very executive whose actions it was seeking to limit.[6] Thus, the ADA does not provide the kind of comprehensive remedial scheme that has been held to evidence congressional intent to preclude APA review.[7]

In addition, nothing in the history of section 527 indicates that Congress intended to preclude judicial review of executive branch violations of that section. As Plaintiffs detailed, congressional visits to immigration detention facilities increased beginning in 2018 after reports of concerning conditions in those facilities, but congressional oversight was less effective when members provided advance notice of their visits because there were indications that "ICE facilities used the advanced warning to improve the conditions within the facility." Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 8 (2020), https://perma.cc/W9TG-URSC; *see generally* Mot. 9–14. Congress recognized that, because such visits are vital to assessing the DHS's use of appropriated funds, it needed to prohibit the executive branch from delaying oversight visits or denying entry altogether. *See* Mot. 11–13. Defendants' argument that the ADA precludes any other enforcement of section 527 thus produces an absurd result: that Congress would pass a law intended to overcome executive resistance to oversight and yet place any possible remedy for a violation in the

---

[6] Notably, Defendants' novel ADA preclusion argument is not limited to congressional plaintiffs. It would prevent judicial review of APA claims by *any* plaintiffs asserting interests that are protected through an appropriations restriction.

[7] Defendants cite two cases that provide no support for their argument. In *Global Health Council v. Trump*, the D.C. Circuit held that the plaintiffs, grantees of foreign aid, could not bring suit under the APA to enforce the Impoundment Control Act (ICA) because the ICA "preclude[d] such review." No. 25-5097, 2025 WL 2480618, at *1 (D.C. Cir. Aug. 28, 2025). Unlike the ADA, "the ICA created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified *legislative branch* official if the executive branch violates its statutory expenditure obligations." *Id.* at *10. *Global Health* did not involve the ADA and has no bearing on this case. *Middlesex County Sewerage Authority v. National Sea Clammers Association* is even further afield. 453 U.S. 1 (1981). There, the Supreme Court found that the "unusually elaborate enforcement provisions" in the Federal Water Pollution Control Act indicated congressional intent to foreclose the availability of remedies under 42 U.S.C. § 1983. *Id.* at 13, 21. By contrast, the ADA does not provide for civil penalties or suits by any party, or indeed establish any enforcement provisions other than those in the exclusive discretion of the executive.

hands of the same executive. *See Mova Pharm. Corp v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (statutes must be read to avoid results that are "contrary to common sense").

Defendants also argue that the availability of other mechanisms for Congress to obtain information precludes review under the APA. Opp'n 29. Defendants cite statutes expressly granting the Senate a cause of action to enforce subpoenas and the executive branch the authority to bring contempt actions against parties who fail to comply with congressional subpoenas. *See* Opp'n 29–30. But this argument misinterprets Plaintiffs' claims. The statutes Defendants cite are unrelated to this matter, as Plaintiffs are not seeking to enforce a subpoena or vindicate a general right to access information. Defendants have used, and continue to use, congressionally appropriated funds to prevent Plaintiffs from accessing DHS detention facilities in direct violation of section 527, and Plaintiffs seek relief for injuries caused by these violations.

### 2.    The policy violates the APA

Plaintiffs are likely to demonstrate that the Court should "hold unlawful and set aside" the oversight visit policy because it is contrary to law, exceeds Defendants' statutory authority, and is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A)–(C); Mot. 28–37.

**a.** In support of their contention that the oversight visit policy is consistent with section 527 and within the agency's authority, Defendants suggest that the Court ignore the text of section 527 and disregard uncontested facts. The Court should reject their suggestion. Defendants' implausibly cramped interpretation of section 527 is entitled to no deference and cannot be squared with the law's text. *See generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[C]ourts must exercise independent judgment in determining the meaning of statutory provisions.").

To start, Defendants state that the oversight visit policy "does not prevent [Plaintiffs] from entering DHS facilities," Opp'n 33, boldly ignoring five pages of Plaintiffs' brief (relying on dozens of pages of sworn declarations) describing more than a dozen instances in which Defendants have,

citing the policy, in fact "prevent[ed] [Plaintiffs] from entering DHS facilities," *id.*; *see* Mot. 19–24. The policy prevents access by a member of Congress seeking to conduct an oversight visit in all cases, *unless and until* the member submits a request to conduct a visit, at least seven days in advance, and receives approval of that request. *See Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV (last visited Sept. 6, 2025) (DHS "requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities."); *accord, e.g.*, Gomez Decl., Ex. A.

This advance-notice requirement contravenes section 527, which makes clear that Defendants may not "prevent any . . . Member of Congress" "from entering, for the purpose of conducting oversight" a DHS detention facility, including temporarily. FY2024 Appropriations Act, div. C, title V, § 527(b). When an agency requires advance notice for an oversight visit—to say nothing of advance notice *and approval*—it is necessarily "prevent[ing]" the entry of any requesting member of Congress who chooses not to provide the required notice. For example, after Representative Crow arrived at the ICE detention facility in Aurora for an oversight visit on July 20, 2025, he was told that ICE was *denying* his request to enter the facility. Crow Decl. ¶ 11, ECF No. 17-3. Defendants, therefore, under any reasonable understanding of the terms, "prevent[ed]" him "from entering, for the purpose of conducting oversight," a DHS detention facility. FY2024 Appropriations Act, div. C, title V, § 527(b). Defendants provided no reason for this denial other than the existence of the challenged policy, and they required the congressman's office to follow up and negotiate with OCR over a future visit, rather than communicating with facility personnel with whom the office had an established relationship. Crow Decl. ¶ 21. This experience is consistent with Defendants' prevention of entry by all Plaintiffs in their attempts to conduct oversight visits at DHS facilities across the country. *See* Mot. 19–24.

Defendants insist that their policy of preventing members' entry for at least seven days is lawful on the theory that "any requirement for advance notice cannot be derived from § 527" but can be imposed based on authority granted elsewhere. Defendants' theory is incorrect.

In section 527(b), the law expressly provides that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent" to conduct an oversight visit. FY2024 Appropriations Act, div. C, title V, § 527(b). This subsection further defines the scope of the prohibition on DHS's use of appropriated funds. The provision says that DHS cannot construe it to impose a notice requirement on oversight visits, which means that DHS cannot use its appropriated funds to enforce such a notice requirement. It certainly does not invite DHS to search for statutory authority elsewhere to allow it to justify ignoring the limitation on expenditures in section 527; indeed, it is unclear what purpose this provision would serve if Defendants could do so. Section 527(a) further prohibits the agency from "mak[ing] any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress," underscoring the importance of accurate observations during oversight visits, which requires timely entry. *Id.* § 527(a).

Lest there remain any doubt that an advance-notice requirement is prohibited, section 527(c) then provides that, with respect to congressional employees, DHS "may require that a request be made at least 24 hours in advance of an intent to enter a [DHS] facility." *Id.* § 527(c). This subsection— which goes unmentioned in Defendants' brief—makes clear that DHS may not require more than 24 hours' notice for congressional *employees*. That, coupled with the admonition that DHS may not "construe[]" anything in section 527 to require advance notice by a member of Congress, erases any possible doubt that DHS may not require a member of Congress to provide advance notice of an oversight visit, even up to 24 hours. Defendants' reading of section 527, allowing them to require advance notice of any congressional oversight visit, would render subsection (c) entirely superfluous. "When a statutory construction" thus "render[s] an entire subparagraph meaningless, . . . the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 125 (2024).

Defendants nonetheless contend that 8 U.S.C. § 1231(g) supplies authority for their policy. *See* Opp'n 33–34. But Congress's general grant of authority allowing DHS to operate detention facilities

under section 1231(g)(1) does not in any way negate the specific, clear, and mandatory language in section 527 requiring Defendants to admit members of Congress to specific DHS facilities upon request. *See L. v. Siegel*, 571 U.S. 415, 421 (2014) ("A statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere."); *see generally Los Angeles v. Adams*, 556 F.2d 40, 49 (D.C. Cir. 1977) (stating the courts are "bound to follow Congress's last word on [a] matter even in an appropriations law"). For the same reason, the secretary's general "authority under 6 U.S.C. § 112(b) to carry out functions of the Department," does not override section 527. Defendants also invoke the Take Care Clause, *id*.., but an obligation to "take Care that the Laws be faithfully executed" cannot justify violating federal law. U.S. Const. art. II, § 3.

Finally, Defendants deny that DHS has taken the position of exempting ICE field offices from section 527, entirely ignoring Defendants' own repeated written and oral statements that visits to ICE field offices are not permitted and its denial of Plaintiffs' entry on that basis. *See, e.g.*, Gomez Decl., Ex. A ("ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements"); Letter from DHS Sec'y Noem to Rep. Garcia (Aug. 22, 2025), https://perma.cc/5J7N-EGLH. The occurrence of discrete exceptions permitting visits to certain field offices, *see* Opp'n 35, does not disprove the existence of a general policy of exempting field offices from section 527. This aspect of the oversight visit policy was originally written and available on the OCR website, *see* Mot. 15, and has more recently been repeatedly affirmed by DHS and ICE personnel. Defendants' declaration makes no mention of ICE's June guidance that memorialized this aspect, nor does it rebut the statements recounted in Plaintiffs' declarations. *See* Hackbarth Decl. ¶¶ 7–9, ECF No. 20-1. That silence speaks volumes. Defendants have forfeited any argument defending the merits of their purported exemption of ICE field offices from section 527. That aspect of the policy is unlawful. *See* Mot. 30–32.

**b.** Plaintiffs are also likely to succeed on their claim that the oversight visit policy is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A); *see* Mot. 32–36. As to substantive unreasonableness,

Defendants refer to their unpersuasive contrary-to-law arguments and otherwise fail to address Plaintiffs' explanations for why the policy flouts the concerns underlying section 527 and their specific examples of the policy preventing congressional oversight altogether. *See* Opp'n 35–36; Mot. 33–34. Defendants glibly suggest that a member "could send a staff member in his or her place," Opp'n 36, ignoring section 527's recognition of the importance of real-time, in-person oversight by individual members themselves, as well as the fact that staff members face similar travel and logistical obstacles to compliance with Defendants' unreasonable policy. At bottom, Defendants suggest that they adopted the oversight visit policy because they prefer it to the policy that Congress (and the President) codified in section 527. But an executive agency "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

As to the failure to reasonably explain the policy, Defendants offer no documentation of their decision to impose the oversight visit policy. Instead, Defendants proffer a declaration referring vaguely to "resource" and "safety" concerns. Opp'n at 35; Hackbarth Decl. ¶¶ 8–10 (stating that oversight visits are "resource intensive" to ensure members' "safety," that "ICE enforces strict security measures," and that Defendants are concerned that members may not comply with largely unidentified "visitation requirements, including limitations on recording devices"). This is grossly insufficient. As an initial matter, the explanations in Defendants' declaration cannot satisfy the requirements of the APA, because "[t]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) (quotation marks omitted); *see Council for Urological Ints. v. Burwell*, 790 F.3d 212, 222 (D.C. Cir. 2015) (courts "look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations").

Even if the Court could properly consider these *post hoc* rationalizations, Defendants still fail to explain why general concerns regarding the allocation of resources and security of DHS detention facilities required a change from their previous policy, which did not require advance notice, but

requested 72 hours' notice. *See* Mot. 35. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternative[s] that are within the ambit of the existing [policy]." *DHS*, 591 U.S. at 30. Defendants apparently did not consider any alternatives to the oversight visit policy to address their purported general concerns regarding resources and security. Moreover, Defendants have offered no specific reason why these general concerns are appropriately addressed by a blanket policy requiring at least *seven days'* notice and approval—as opposed to, say, 24 hours' notice—for any member of Congress to visit any such facility anywhere in the country. To the extent that Defendants attempt to rely on one-off "exigent circumstances," Hackbarth Decl. ¶ 9, those patently cannot justify a blanket notice policy that applies in *all* circumstances.

As to the field office aspect of the policy, Defendants fail to acknowledge its existence or application, forfeiting any argument that it is not arbitrary and capricious.

**c.** Plaintiffs are also likely to succeed on their claim under APA section 706(1). DHS "failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Defendants argue that this claim "necessarily rises [or] falls" with Plaintiffs' contrary-to-law claim. Opp'n 35. Plaintiffs are thus also likely to succeed on this claim. *See* Mot. 37.

### D.  In the alternative, the oversight visit policy is *ultra vires*

"[U]ltra vires review remains available to test presidential action alleged to violate any spending or other statute, provided that Plaintiffs can plausibly allege action contrary to a clear and mandatory statutory prohibition." *Glob. Health Council*, 2025 WL 2480618, at *8 n.14 (citing *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)). "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022).

Defendants insist that *ultra vires* review is foreclosed because 2 U.S.C. § 288d and 28 U.S.C.

§ 1365(b) provide an alternative procedure for review. But Defendants concede that these statutes

relate to legislative entitlement to information *in general*. Opp'n 31–32. Neither statute offers a suitable

alternative procedure for review of Plaintiffs' claims.

Defendants further contend that Plaintiffs cannot raise *ultra vires* claims because they are not

"*individual[s]* aggrieved." Opp'n at 32 (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94,

108 (1902)). For reasons explained, *supra* at 3–6, Defendants are incorrect, and Plaintiffs suffer injuries

as individuals. Defendants are also wrong in asserting that the Court's equitable powers are "subject

to express and implied statutory limitations" here. *Id.* (quoting *Armstrong v. Exceptional Child Ctr., Inc.*,

575 U.S. 320, 327 (2015)). Unlike in *Ziglar v. Abbasi*, 582 U.S. 120, 148 (2017), Congress did not have

"specific occasion to consider" the means of enforcement of section 527. The wrong that Plaintiffs

seek to address is the result of recent actions by the executive, whereas in *Ziglar*, Congress "had nearly

16 years to extend 'the kind of remedies sought by respondents.'" *Id.* at 123, 148.

The oversight visit policy both exceeds Defendants' authority to spend appropriated funds

and violates the specific limitation in section 527 that prohibits Defendants from preventing members

of Congress from entering DHS detention facilities for oversight purposes. *See supra* at 20–23.

Plaintiffs thus have an *ultra vires* cause of action and are likely to succeed on the merits of those claims.[8]

### E.    In the alternative, Plaintiffs are entitled to mandamus relief

Defendants fare no better in arguing that mandamus relief is precluded because section 527

does not create an entitlement to relief. Under the plain terms of section 527, Defendants must admit

---

[8] Defendants also state, without explanation, that "ICE does not require funds appropriated subject to § 527 to adopt or implemented [sic] the challenged [policy]." Opp'n 36–37. This statement is both confusing and undoubtedly incorrect. Defendants have proffered no evidence showing that funds appropriated subject to section 527 have not been used in developing and effectuating the oversight visit policy. Indeed, they could not make such showing; even if ICE is now using funds appropriated through the reconciliation bill for some purposes, *see* Pub. L. No. 119-21, § 90003(a), 139 Stat. 72, 358 (2025), there is no doubt that funds subject to section 527 are still being used in myriad ways that contribute to the effectuation of this unlawful policy. *Cf. Kimberlin*, 318 F.3d at 237 (the "use of *any* government resources—whether salaries, employees, paper, or buildings"—to accomplish any task "entail[s] government expenditure" (quotation marks omitted)).

members of Congress into DHS facilities, including ICE field offices, with or without prior notice. As explained, *supra* at 13–14, the purported alternative political mechanisms to which Defendants point do not provide an adequate remedy for Plaintiffs to vindicate their right to access DHS detention facilities. And the cases on which Defendants rely are inapposite. Opp'n 37. Those cases stand for the unremarkable proposition that certain statutes, such as the National Labor Relations Act, have long been understood to provide the exclusive mechanism for challenging certain action, and mandamus cannot be used as an end-run around such schemes. Indeed, *Estate of Michael ex rel. Michael v. Lullo* affirmed the issuance of a writ of mandamus despite the Anti-Injunction Act's jurisdictional bar to remedy the IRS's "extraordinary" and "law-less actions." 173 F.3d 503, 513 (4th Cir. 1999).

Defendants argue that "the challenged actions here are not ministerial duties" due to their general discretion to "establish[] visitation protocols" under section 1231(g)(1). Opp'n 37–38. But inquiring whether an action is "ministerial" is simply another way of asking whether Defendants have "a clear duty to act" that is "mandatory." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). And Congress's general grant of authority under section 1231(g)(1) does not in any way negate the specific language in section 527 requiring Defendants to admit members of Congress to specific DHS facilities upon request.

## II.  Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm

Plaintiffs detailed numerous irreparable harms that result from Defendants' unlawful policy of preventing members of Congress from conducting unannounced oversight visits. *See* Mot. 41. Defendants argue that a handful of statements in Plaintiffs' brief are speculative, Opp'n 39–40, but they do not address *any* of the relevant, specific examples in Plaintiffs' declarations explaining why a lack of immediate access to DHS facilities amounts to irreparable harm. *See* Mot. 41. Conditions on the ground in DHS detention facilities are changing rapidly, and it is not uncommon for Plaintiffs to receive concerning reports about conditions that require quick, in-person access to assess the situation

in those facilities. To reiterate, these include serious disease outbreaks, Crow Decl. ¶¶ 4–5, 7, and reports that constituents and other individuals lack access to food, showers, medication, and medical care, Escobar Decl. ¶¶ 34–35, ECF No. 17-2; Espaillat Decl. ¶ 32, ECF No. 17-5; Goldman Decl. ¶ 46; Correa Decl. ¶ 12, ECF No. 17-6; Ruiz Decl. ¶¶ 18, 20, ECF No. 17-9. Given the quickly changing conditions, Plaintiffs amply explained why a seven-day delay causes irreparable harm to their ability to conduct congressionally authorized oversight. *See also* Gomez Decl. ¶ 25; Espaillat Decl. ¶ 31.

Defendants also claim that "Plaintiffs provide no basis to conclude that conditions at a detention facility change after notice of a visit is provided." Opp'n 40. Not so. Plaintiffs described multiple situations in which Defendants "used advance warning to improve conditions within the facility," Mot. 12–13, including instances of individuals transferred from solitary cells to the general population just prior to the visitors' arrival, Thompson Decl. ¶ 10. These facts "underscored the importance of having oversight access, when necessary, with little or no prior notice." *id.*

Defendants further argue that Plaintiffs fail to identify an "imminent event" that will "lessen the utility" of site visits that occur after a waiting period. Opp'n 39. This argument misses the mark. Scheduled visits are important tools of congressional oversight, but so are unannounced, real-time visits. Plaintiffs provided numerous examples in which a week may be too long to wait, especially with respect to their constituent casework, given that conditions in DHS facilities can—and are—rapidly changing. Mot. 41. Defendants also ignore the examples in which DHS or ICE used advance notice to change the conditions at facilities "to prevent congressional oversight from assessing the true conditions of a facility as experienced by the detainees day to day." Thompson Decl. ¶ 10. When "'time is necessarily of the essence,' the harm in agency delay is more likely to be irreparable." *Am. Oversight v. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019). That is all the more so where the information Plaintiffs seek frequently changes by the day and may disappear entirely if Plaintiffs are not able to access DHS facilities without delay, an outcome that Congress sought to avoid in enacting

section 527. *Cf. Am. First Legal Found. v. Becerra*, No. 24-cv-1092-RC, 2024 WL 3741402, at *14–16 (D.D.C. Aug. 9, 2024) ("[T]he loss or destruction of federal records is a significant harm to both Plaintiff and the public, and that it is a harm that cannot be cured once the records are lost or destroyed." (citing *Armstrong v. Bush*, 924 F.2d 282, 288 (D.C. Cir. 1991))).

"Time is clearly of the essence here." *Id.* Since Plaintiffs filed their motion on August 8, events on the ground have only underscored the importance of immediate oversight access to DHS detention facilities. A recent lawsuit describing horrific conditions at the ICE New York Field Office—which Representative Goldman was prevented from entering for the purpose of oversight, Goldman Decl. ¶ 29—provides yet another example of conditions on the ground changing in a matter of hours. *See Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. filed Aug. 8, 2025). After that lawsuit was filed, detailed crowding and deplorable conditions, ICE transported "most of the people" detained at the facility in a matter of hours, reducing the number of detainees from an estimated 90 to 26. *See* Pls.' Reply Mem. at 3–4, *id.*, ECF No. 81. Recent reporting similarly suggests that the number of individuals detained at the ICE Washington Field Office—where three Plaintiffs were prevented from conducting oversight visits—has drastically increased with the increased presence of ICE agents and checkpoints in Washington, D.C. *E.g.*, Teo Armus et al., *ICE holding facilities overcrowded amid surge in immigration arrests*, Wash. Post (Sept. 12, 2025), https://perma.cc/KA3D-73MF. This includes allegations that 80 to 90 individuals have been detained for days in rooms designed to hold a handful of individuals. Letter from ACLU Va. & Nat'l Immigr. Project to Sec'y Kristi Noem et al. (Sept. 4, 2025), https://perma.cc/ST2Z-X9EA. Representative Correa observed a similar occurrence at the Santa Ana ICE facility, in which the numbers of detainees swelled from fewer than 10 to 77 in a matter of days. Correa Decl. ¶ 8.

### III. The Equitable Factors Strongly Favor Preliminary Injunctive Relief

Defendants spill much ink about the separation of powers, equitable discretion, and the

"proper" role of the judicial branch in this dispute (which in their view is none). Opp'n 41–43. But the executive branch cannot wield such constitutional and equitable doctrines to prevent litigation by individual members of Congress, seeking judicial redress of particularized injuries, after it has refused to abide by the restraints those doctrines place on its own authority. For nearly three months, Defendants have effectuated a policy that is in clear violation of a congressional determination, codified in federal law, that individual members of Congress must be allowed access to DHS detention facilities without prior notice for oversight purposes. They now seek to evade judicial review by gesturing to broad separation-of-powers principles not at issue here.

Plaintiffs seek a restoration of the status quo. For more than five years and across multiple administrations, Defendants have complied with section 527, and members of Congress have, without issue, conducted both announced and unannounced visits to DHS detention facilities to discharge their constitutionally vested oversight functions. Defendants will not be harmed by a stay or injunction of a policy designed to evade the limitation that section 527 places on the expenditure of funds.

Public awareness of the government's actions is "a structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004). And "[t]he loss of the ability to do what Congress specifically directed . . . cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70–71 (D.D.C. 2025), *appeal dismissed*, No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025). The equities weigh strongly in Plaintiffs' favor.

## IV. The Court Should Stay the Oversight Visit Policy under Section 705

Defendants advance multiple arguments seeking to avoid relief under 5 U.S.C. § 705 or limit the scope of that relief. None is persuasive.

First, Defendants argue that section 705 "cannot be used to postpone an agency action that has already taken effect." Opp'n 43. But, as Plaintiffs noted, Mot. 45, courts have overwhelmingly interpreted this provision to provide for stays of already-effective agency action, "to preserve status

or rights," 5 U.S.C. § 705, while litigation proceeds. *See, e.g., Cabrera v. U.S. Dep't of Lab.*, No. 25-cv-1909-DLF, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025); *Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025). Defendants do not even attempt to contend with any of these cases, instead relying on an unreported 1996 D.C. Circuit opinion discussing a section 705 stay by the *agency*. Opp'n 43. But "Defendants' argument omits the other authority that section 705 grants only courts, not agencies. While an agency may only 'postpone the effective date of action taken by it,' a court may either 'postpone the effective date of an agency action' *or* 'preserve status or rights pending conclusion of the review proceedings.'" *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *15 (quoting 5 U.S.C. § 705).[9]

Second, Defendants state that "any relief awarded must be limited to enforcing [the] limitation" in section 527. Opp'n 44. Plaintiffs do not dispute this. Nor do Plaintiffs dispute that Defendants now have another source of funds, appropriated in the recent reconciliation act, to which section 527 does not apply, which they may use for certain, specified purposes. Opp'n 6. That additional source of funds in no way undermines Plaintiffs' claims for relief: the Court should stay the oversight visit policy because it was necessarily adopted exclusively using funds subject to section 527, which applies to the annual appropriation that—*at least* past the date Plaintiffs filed their motion—provided all DHS funding for the current fiscal year. Defendants do not deny that the policy was adopted using annually appropriated funds, nor that they continue to use such funds to effectuate the

---

[9] Defendants also state that a section 705 stay "would not create a legal basis for Plaintiffs to obtain the immediate and unfettered access to ICE detention facilities that they seek." Opp'n 43. But section 527 itself "create[s] a legal basis for Plaintiffs" to enter DHS detention facilities for oversight purposes upon request, so long as Defendants are using *any* annually appropriated funds subject to section 527 in the course of permitting or denying entry (and Defendants have not asserted otherwise). Defendants have also not disputed Plaintiffs' legitimate oversight interests. Staying the unlawful oversight visit policy restricting access by members of Congress to those facilities would thus require Defendants to comply with section 527 by permitting entry by individual members seeking to conduct oversight visits, whether scheduled or unannounced (at least, to the extent that they would otherwise use *any* appropriated funds subject to section 527 in the course preventing such entry).

policy. And a section 705 stay (or, in the alternative, preliminary injunction) would prohibit Defendants from imposing a waiting period or otherwise preventing entry by members of Congress to DHS detention facilities to the extent that even a *single dollar* of annually appropriated funds would be spent in the course of delaying or preventing their entry. The "use of *any* government resources," no matter how minor, "entail[s] government expenditure," to which any appropriation restriction would apply. *Kimberlin*, 318 F.3d at 237. Defendants continue to use funds subject to section 527, and this Court can provide relief.

Third, Defendants ask the Court to limit relief to Plaintiffs, confining the APA to traditional "equitable limitations" of the kind discussed in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025). Opp'n 44. But *CASA* expressly did not address the scope of relief under the APA. 145 S. Ct. at 2554 n.10; *see id.* at 2567 (Kavanaugh, J., concurring). And "[u]nder this Circuit's precedent, the scope of relief under the APA is not party-restricted." *Cabrera*, 2025 WL 2092026, at *8; *see Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). "Defendants provide no case in which a court has granted a section 705 stay only as to the plaintiffs, rather than as against the Government and its enforcement of the challenged agency action in general," *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *38, and they provide no compelling reason for this Court to be the first.

Finally, the Court should not require a bond. Even if the Court were to issue an injunction, the "proper" amount of any bond would be $0—or a nominal bond of $1—because Defendants have not alleged or documented any cognizable "costs and damages" that might result from compliance with the limitation section 527 places on their expenditures. Fed. R. Civ. P. 65(c).

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a stay under section 705 or preliminary injunction, or in the alternative issue a writ of mandamus.

September 12, 2025

Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Lisa Newman (TX Bar No. 24107878)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ccoogle@democracyforward.org

Daniel Martinez (D.C. Bar No. 90025922)
Ronald A. Fein (D.C. Bar No. 90026641)
Katherine M. Anthony (D.C. Bar No. 1630524)
Jessica Jensen (D.C. Bar No. 1048305)

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*