**IN THE DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOE NEGUSE, in his official capacity as a | ) | |
| Member of the U.S. House of Representatives, | ) | |
| *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:25-cv-2463-JMC |
| U.S. IMMIGRATION AND CUSTOMS, | ) | |
| ENFORCEMENT, *et al.*, | ) | |
| Defendants. | ) | |

*********************************************

**<u>BRIEF OF LAWYERS DEFENDING AMERICAN DEMOCRACY AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION</u>**

Aderson Francois (D.C. Bar No. 498544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 352
Washington, DC 20001
Phone: (202) 661-6721
Fax: (202) 662-9634
Aderson.Francois@georgetown.edu

Counsel for Amicus

# TABLE OF CONTENTS

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT** ....................................................1

**IDENTITY AND INTEREST OF AMICUS** ..............................................................1

**SUMMARY OF ARGUMENT** ..........................................................................1

**ARGUMENT** ...............................................................................................3

    **I.    Member Plaintiffs have standing to bring their claims in this case** ..............................3

        A.  Member Plaintiffs' claim is based on authority contained in an express statutory delegation from Congress of oversight authority to individual Members ..............3

        B.  Being denied access without prior notice is an injury suffered by particular Plaintiff Members of Congress, not an injury in the form of an alleged diminution of the legislative power of Congress as a whole ....................................................... 8

        C.  Section 527 expressly delegates to individual members of Congress the authority to gain access to covered facilities without prior notice for any purpose encompassed in Congress's oversight authority ....................................................10

        D.  Congressional oversight authority encompasses all legislative branch functions, not only legislation ................................................................................11

        E.  Plaintiffs' access to the covered facilities at issue in this case without prior notice is crucially important to enabling effective oversight of such facilities .............. 14

        F.  Entitlement to access without prior notice is appropriate for judicial enforcement because the passage of § 527 concluded political negotiation between the legislative and executive branches ........................................................16

    **II.    The fact that § 527 delegated specific oversight authority to individual Members in appropriations legislation does not change the character of the statute**....................18

        A.  Appropriations legislation is authoritative and carries weight equal to or greater than unicameral authorizations ............................................................18

        B.  The fundamental purpose of § 527 is to delegate specific oversight authority and enable its effective exercise, not simply to place a restriction on the use of appropriated funds ....................................................................19

  **III.  Member Plaintiffs' claim is crucial to enable the functioning of a governmental system of separation of powers in which executive agencies are subject to the rule of law**....................................................................................20

**CONCLUSION** ............................................................................................21

**CERTIFICATE OF COMPLIANCE** ..................................................................22

**CERTIFICATE OF SERVICE** ..........................................................................23

i

# TABLE OF AUTHORITIES

## CASES

*Barenblatt v. United States,* 360 U.S. 109 (1959) ........................................................11

*Coleman v. Miller*, 307 U. S. 433 (1939)...................................................................9

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ...............................11, 12, 14

*In re Chapman*, 166 U.S. 661 (1897)........................................................................14

*KenAmerican Resources, Inc. v. Sec'y of Labor*, 33 F.4th 884 (6th Cir. 2022) ...........15

*Last Best Beef, LLC v. Dudas*, 506 F.3d 333 (4th Cir. 2007) ...............................18, 19

*Marshall v. Stoudt's Ferry Prep. Co.,* 602 F.2d 589 (3d Cir. 1979) ............................15

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ....................................................5, 11, 13

*Powell v. McCormack,* 395 U.S. 486 (1969) .................................................................9

*Raines v. Byrd*, 521 U.S. 811 (1997) ................................................................ *passim*

*Trump v. Mazars, USA, LLP*, 591 U.S. 848 (2019).................................11, 12, 16

*United States v. Biswell*, 406 U.S. 311 (1972)...........................................................14

*United States v. Ray*, 652 F.2d 670 (6th Cir. 1981) ...................................................15

*Watkins v. United States*, 354 U.S. 178 (1957).....................................................11, 12

*Western Oilfields Supply Co. v. Sec'y of Labor*, 946 F.3d 584 (D.C. Cir. 2020) .........15

## STATUTES

5 U.S.C. § 552a(b)(9) (2024)...........................................................................5

5 U.S.C. § 552(d) (2016) ...............................................................................5

15 U.S.C. §§ 1051 et seq. (2000)...................................................................18

30 U.S.C. § 813(a) (2006)............................................................................14

30 U.S.C. § 820(e) (2006).............................................................................14

30 U.S.C. § 1267(b)(2) (1977).........................................................................................15

**OTHER AUTHORITIES**

*Authority of Individual Members of Congress to Conduct Oversight,* 41 Op. O.L.C. 76, 79 (2017) ...............................................................................................................................3, 4

Ben Wilhelm et al., *Congressional Oversight Manual* (Congressional Research Service, 2022).12

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 532, 133 Stat. 13, 42 (Feb. 15, 2019) ....................................................................................................................................6

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 532, 133 Stat. 2317, 2530 (Dec. 20, 2019) ..................................................................................................................................6

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 532, 134 Stat. 1182, 1473 (Dec. 27, 2020) ..................................................................................................................................7

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 530, 136 Stat. 49, 340–41 (Mar. 15, 2022) ..................................................................................................................................7

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 529, 136 Stat. 4459, 4752–53 (Dec. 29, 2022) ...........................................................................................................................7

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101(6), 138 Stat. 1524, 1525 (Sept. 26, 2024).....................................................................................................7

DHS Office of Inspector General, *Final Report: Results of an Unannounced Inspection of ICE's Buffalo Federal Detention Facility in Batavia, New York* (June 3, 2025)....................................14

*Full Committee Markup of FY2020 Homeland Security, Financial Services & General Government Before the H. Appropriations Comm.*, 117th Cong. (2019) ........................................7

Further Consolidated Appropriations Act, 2024, § 527, Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024) ........................................................................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11, 12 (Mar. 15, 2025) ...................................................................1

H.R. 52, 110th Cong. §§ 101(3), 103-04, 106 (2007)...................................................................18

Letter from Rep. Jason Crow et al. to Chairwoman Lucille Roybal-Allard, Appropriations Subcomm. on Homeland Sec., and Ranking Member Chuck Fleischmann, Appropriations Subcomm. on Homeland Sec. (Apr.4, 2019) ..................................................................................6

*Requests by Individual Members of Congress for Executive Branch Information*, 43 Op. O.L.C. 42, 46–47 (2019) ...................................................................................................................4

Sam Tabachnik, *Jason Crow denied entry in surprise visit to Aurora's ICE detention site amid another rash of illnesses*, The Denver Post (Feb. 20, 2019) ...........................................................6

Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006, Pub. L. No. 109-108, 119 Stat. 2290 (Nov. 22, 2005)................................................................................18

The Federalist No. 47 (James Madison) .......................................................................................17

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Lawyers Defending American Democracy is a non-partisan tax-exempt 501(c)(3) corporation.  Amicus is not owned by any parent corporation and no publicly held company has 10% or more ownership in LDAD.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Lawyers Defending American Democracy (LDAD) is a non-profit, nonpartisan organization devoted to: encouraging the legal profession to enforce and uphold principles of democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them.  LDAD has a significant interest in this case because the U.S. Department of Homeland Security (DHS) has developed, adopted, and implemented a policy that flouts a duly-enacted federal statute that entitles members of Congress—without prior notice—to enter, for the purpose of conducting oversight, "any facility operated by or for [DHS] used to detain or otherwise house aliens."  An executive branch agency's decision that it need not comply with a duly-enacted federal statute threatens basic principles of democracy and the rule of law.  All parties have consented to our filing this brief, and a motion for leave to file it is attached.

## SUMMARY OF ARGUMENT

Plaintiffs in this case have standing to enforce their statutory entitlement to access without prior notice to "any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens," "for the purpose of conducting oversight" of such a facility.  Further Consolidated Appropriations Act, 2024, §§ 527(a)–(b), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024), as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11, 12 (Mar. 15,

1

2025) (hereinafter "§ 527" or section "527").  As the statutory language indicates, this entitlement to access reflects an explicit delegation by Congress of oversight authority over such facilities (hereinafter "covered facilities") by individual Members of Congress.  The language of the statute has been amended over the years to affirm that oversight is to be conducted without prior notice to ensure that investigations by individual Members provide accurate information about actual conditions in these facilities.

Given this explicit delegation, Member Plaintiffs who have sought and were denied such access have suffered particular individual injury that is not shared by Members who have neither sought nor been denied this authority, or by Congress as a whole.  Plaintiffs therefore do not file suit to vindicate a general Congressional interest in avoiding a diminution of its institutional legislative power, in contrast to plaintiffs in *Raines v. Byrd*, 521 U.S. 811 (1997).  Nor do they assert a claim based on their general oversight authority as individual Members of Congress, authority that the executive branch claims requires only voluntary cooperation at the discretion of that branch.  Rather, they seek redress for the particular injuries that they have suffered: denial (or in some cases, denials) of access to covered facilities without prior notice.

The delegation in § 527 came into effect through the full legislative process involving bicameralism and presentment.  Section 527 has the full force of law, and the executive branch does not have discretion to unilaterally decline to comply with it.  If the executive branch now disagrees with the requirement in the statute, it may ask Congress to amend or repeal it or otherwise express its disagreement through political negotiations during the annual appropriations or other legislative process.  The choice of DHS to impose a prior notice requirement that directly violates a duly-enacted statute rather than engage with Congress in the

legislative process is an affront to the separation of powers principles that are fundamental to the U.S. Constitution.

The fact that § 527 delegated specific oversight authority to individual Members in appropriations legislation does not change the character of the statute or Plaintiffs' standing to enforce it. Such legislation may be used explicitly to amend prior legislation and is an important way in which Congress considers annually the need for any amendments that express Congress's intention about executive branch execution of the law. The express prohibition on requiring prior notice for individual Member access to covered facilities is such an amendment, and it establishes Member entitlement to access without prior notice to these facilities. A Member who has been denied this access in violation of the statute has suffered a particular individual injury, not simply the general injury that DHS has exceeded its authority to use appropriated funds.

## ARGUMENT

### I.      Member Plaintiffs have standing to bring their claims in this case

#### A.      Member Plaintiffs' claim is based on authority contained in an express statutory delegation from Congress of oversight authority to individual Members

Plaintiffs' claim in this suit is based on an explicit delegation of specific oversight authority to individual Members of Congress, not on the general oversight authority that Members possess by virtue of membership in that body.

The Department of Justice Office of Legal Counsel (OLC) has emphasized this distinction with respect to oversight authority in providing legal advice to the executive branch on responding to requests for information from Members of Congress. A 2017 Opinion, for instance, says that executive branch policy has been to respond to individual Member requests "*in the absence of a specific delegation* by a full house, committee, or subcommittee" by exercising its discretion "in determining whether and how to respond, following a general policy

of providing only documents and information that are already public or would be available to the public through the Freedom of In-formation Act." *Authority of Individual Members of Congress to Conduct Oversight,* 41 Op. O.L.C. 76, 76, 79 (2017) (emphasis added). When individual Members have been explicitly delegated oversight authority, however, executive branch policy "has been to engage in the accommodation process by supplying the requested information 'to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch.'" *Id*. at 78. A 2019 OLC Opinion reiterated this distinction: "When a committee, subcommittee, or chairman *exercising delegated oversight authority* asks for information from the Executive Branch, that request triggers the 'implicit constitutional mandate to seek optimal accommodation . . . of the needs of the conflicting branches.'" *Requests by Individual Members of Congress for Executive Branch Information*, 43 Op. O.L.C. 42, 46–47 (2019) (emphasis added).

It is crucial to appreciate that the situation in this case is different from the one addressed in the OLC memos. This case involves a statute that has the force of law after passage by Congress and signature by the President. Unlike ordinary requests for information that are the subject of the OLC memos, the executive has *no discretion* to determine how it will respond to the passage of the statute—it has a duty to execute it. The memos nonetheless are instructive on the significance of Congress's delegation of oversight authority to individual Members of Congress. Indeed, in this case, the authority bestowed by § 527 on individual Members has been delegated not by a committee, a subcommittee, or a chair, but by Congress as a whole. While accommodations may be appropriate in certain circumstances where oversight authority is being delegated, the situation in this case is not one of those: the statute explicitly prohibits prior

notice, so the requirement of seven days' notice is a statutory violation and is not subject to an accommodations process.  § 527(b).

Visiting covered facilities is an important means for conducting effective oversight of such facilities.  As the Supreme Court recognized nearly a century ago, "[e]xperience has taught that mere requests for [information about conditions subject to legislation] often are unavailing, and also that information which is volunteered is not always accurate or complete."  *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927).

Access to facilities without prior notice necessarily enables acquisition of accurate first-hand information on conditions in those facilities.  The entitlement of individual Members to such information under § 527 contrasts with other statutes in which Congress has declined to specify entitlement to information for a "Member of Congress."  § 527(a)(1).  The Freedom of Information Act (FOIA), for instance, says that FOIA does not provide authority to withhold information from Congress."  5 U.S.C. § 552(d) (2016).  The Privacy Act states that there can be no disclosure of information unless it is "to either House of Congress, or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee."  5 U.S.C. § 552a(b)(9) (2024).  These statutes relating to disclosure of information indicate that Congress does not automatically include language relating to individual Members of Congress whenever a statute pertains to information or oversight.  Rather, Congress in this case deliberately expressed its intention to delegate to individual Members the authority to gain information about covered facilities in conducting oversight activities through visits without prior notice.  The fact that the comparison statutes specify disclosure of information while § 527 does not is irrelevant: oversight necessarily encompasses disclosure, such that disclosure need not be additionally addressed.

5

The legislative history of the statute makes clear Congress's intent. Congress adopted what is now § 527 in Fiscal Year (FY) 2019, then § 532, in full committee markup as part of a manager's amendment. The language of § 532 specified that funds may not "be used to prevent a Member of Congress from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house alien minors." Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 532, 133 Stat. 13, 42 (Feb. 15, 2019). Subsequently, Congress received reports that Members were repeatedly denied access to facilities[1], and nearly two-dozen Members found that "communication between ICE and Congress has continued to be subpar, which limits Members of Congress' ability to conduct oversight of detention facilities and monitor compliance with ICE detention standards." Letter from Rep. Jason Crow et al. to Chairwoman Lucille Roybal-Allard, Appropriations Subcomm. on Homeland Sec., and Ranking Member Chuck Fleischmann, Appropriations Subcomm. on Homeland Sec. (April 4th, 2019).[2] Congress then revised the statutory provision for the following FY to read: "None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight [of a "covered facility"] . . . [by] A Member of Congress." Additionally, Congress extended the coverage to facilities used to detain or house not only minors, but any aliens. Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 532, 133 Stat. 2317, 2530 (Dec. 20, 2019).

---

[1] *See, e.g.*, Sam Tabachnik, *Jason Crow denied entry in surprise visit to Aurora's ICE detention site amid another rash of illnesses*, The Denver Post (Feb. 20, 2019), https://www.denverpost.com/2019/02/20/jason-crow-aurora-ice-surprise-visit/

[2] Online address available at https://crow.house.gov/sites/evo-subsites/crow.house.gov/files/evo-media-document/08.05.2024,%20DHS%20OIG,%20ICE,%20Inspections_Final.pdf.

Upon revision of the language in the FY 2020 bill, the amendment's sponsor, Representative Debbie Wasserman Schultz, stated that the purpose of the bipartisan amendment was to "ensure that *all members of Congress* can fulfill our Constitutional duty to provide oversight of the executive branch" (emphasis added).  *Full Committee Markup of FY2020 Homeland Security, Financial Services & General Government Before the H. Appropriations Comm.*, 117th Cong. (2019).  Representative Wasserman Schultz explained in Committee it was necessary to add the language after Members were blocked from returning to facilities they had previously visited in which detainee conditions were deficient.[3]  Subcommittee Chairwoman Lucille Roybal-Allard added her support for the authority provided in the amendment, noting that "it is *our duty as elected members of Congress* to oversee ICE operations, especially when we are aware of the many issues that persist."  *Id*. (emphasis added).  There were no objections to the amended language, and the measure passed by voice vote.  The FY 2020 language has been passed by Congress and signed by the President every year from 2020 through 2025 and has been included in circulated proposed versions for the coming fiscal year.[4]  The deliberate

---

[3] The language in the 2020 Appropriations Act was meant to parallel language the Committee had previously included for facilities run by the HHS Office of Refugee Resettlement (ORR), which she explains was added to the separate Labor HHS Appropriations bill because "apparently we had to be quite specific" about the no notice member access provision in particular. *Full Committee Markup of FY2020 Homeland Security, Financial Services & General Government Before the H. Appropriations Comm.*, 117th Cong. (2019).

[4] FYs 2021 (Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 532, 134 Stat. 1182, 1473 (Dec. 27, 2020)), 2022 (Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 530, 136 Stat. 49, 340–41 (Mar. 15, 2022)), 2023 (Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 529, 136 Stat. 4459, 4752–53 (Dec. 29, 2022)), and 2024 (Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 527, 138 Stat. 460, 619 (Mar. 23, 2024)), and remains law pursuant to the continuing resolution (Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, § 101(6), 138 Stat. 1524, 1525 (Sept. 26, 2024)).

consistent readoption of the revised language on an annual bipartisan basis makes clear that

Congress intended to delegate specific oversight authority to individual Members of Congress.

### B.   Being denied access without prior notice is an injury suffered by particular Plaintiff Members of Congress, not an injury in the form of an alleged diminution of the legislative power of Congress as a whole

The DHS policy requiring seven days' prior notice for oversight visits by Members of

Congress to covered facilities violates § 527.  Plaintiff Members who have sought and been

denied access to covered facilities each have suffered particular individual injury as a result of

this violation.  They therefore are claiming a specific concrete injury that is distinct to them, not

an injury consisting of a general diminution of legislative power of Congress as a whole, which

the Supreme Court held did not establish standing for Plaintiff Members in *Raines*.  521 U.S. at

830.

In *Raines*, individual Representatives and Senators who had voted against the Line Item

Veto Act ("the Act") challenged its constitutionality in court.  The Act authorized the President

to "'cancel' certain spending and tax benefit measures after he has signed them into law." *Id*. at

814.  This permitted the President to rescind or prevent certain measures from going into effect.

Plaintiffs claimed that the Act (a) altered "the legal and practical effect of all votes they may

cast" on bills with items subject to the veto, (b) divested them of their constitutional role in the

repeal of legislation, and (c) altered "the constitutional balance of powers between the

Legislative and Executive Branches." *Id*. at 816.

The Court emphasized that establishing standing requires that a plaintiff  "establish that

he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is

particularized as to him." *Id*. at 819 (citation omitted).  It then held that Plaintiffs had not

demonstrated this.  The injury that they claimed was not one for which they had been singled out

for unfavorable treatment compared to other Members of Congress.  Instead, "[t]heir claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally."  *Id*. at 821. "Second, appellees d[id] not claim that they ha[d] been deprived of something to which they *personally* are entitled. . . . Rather, appellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete."  *Id*.  The Court therefore held that the alleged injury involved an "abstract dilution of institutional legislative power" that was not particular to the plaintiffs.  *Id*. at 826.

It is crucial to appreciate that the Court's use of the terms "personal" and "private" to describe the type of injury necessary to establish standing was *not* meant to distinguish it from an injury suffered by someone who is a Member of Congress.  The Court had previously found that legislators had suffered the kind of particularized personal injury required for standing in *Coleman v. Miller,* 307 U. S. 433 (1939), and *Powell v. McCormack,* 395 U.S. 486 (1969). Indeed, the Court took pains to distinguish the injury asserted by Plaintiff Members in those cases from the one claimed by Members in *Raines*.  521 U.S. at 820–26.  The prerequisite for the injuries deemed sufficient to establish standing in *Coleman* and *Powell* was that plaintiffs were Members of Congress.  That membership, however, plainly did not prevent the Court from finding that the injuries that plaintiffs suffered were personal and private.  The opposite of a "personal" injury for a Member of Congress therefore is one that is distinct, particular to that person, and concrete, as opposed to one that is suffered by Congress as a whole. It is this distinction that led the Court to conclude, "In sum, appellees have alleged no injury to themselves as individuals (*contra, Powell*), the institutional injury they allege is wholly abstract and widely dispersed (*contra, Coleman*)."  *Id*. at 829.  In contrast, Plaintiffs' Complaint

describes in painstaking detail how each of the Plaintiff Members have suffered particular concrete individual injury from denial of access without prior notice.  ¶¶94-272.

The Court also said in *Raines* that it "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id*. at 829.[5]  Member Plaintiffs are also distinct from the plaintiffs in *Raines* in that they have pursued the remedies described by the Court in that case, such as "pass[ing] or reject[ing] appropriations bills . . . vot[ing] to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act." *Id*. at 824.  Section 527 is the law: Plaintiff Members should not be expected to devise political means to ensure that DHS complies with it.  The political process repeatedly has resulted in a duly-enacted statute that has the force of law granting them access without notice, which DHS now has chosen to violate.  The appropriate recourse for Member Plaintiffs is to seek judicial enforcement of their statutory entitlement to access without prior notice.

**C.    Section 527 expressly delegates to individual members of Congress the authority to gain access to covered facilities without prior notice for any purpose encompassed in Congress's oversight authority**

---

[5] Plaintiffs in *Raines* did not have standing even though the Act provided that "[a]ny Member of Congress or any individual adversely affected by [this Act] may bring an action, in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any provision of this part violates the Constitution." 521 U.S. at 815–16. While the statutory provision allowed Members of Congress to sue, this provision could not eliminate the threshold standing requirement for a case or controversy under Article III. *See id*. at 830 n. 1 (Souter, J., concurring) ("While Congress may, by authorizing suit for particular parties, remove any prudential standing barriers, as it has in this case . . . it may not reduce the Article III minimums").  The statute thus ostensibly permitted Members to sue, but could not provide them standing to do so.  The Court characterized Plaintiff Members' claim as a general loss of legislative power by Congress as a whole; it is this claim that the Court said not only was not authorized by the respective Houses of Congress but was opposed by them.

10

The express delegation of authority to individual Members of Congress to gain access to covered facilities without prior notice encompasses all activities relating to the conduct of oversight of these facilities.  Congressional oversight is based on a long tradition of congressional investigatory powers that are regarded as inherent in the legislative powers of Congress.  As the Court stated in *Eastland v. U.S. Servicemen's Fund*, "the power to investigate is inherent in the power to make laws."  421 U.S. 491, 504 (1975).  The Court has emphasized that the "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."  *Trump v. Mazars, USA, LLP*, 591 U.S. 848, 862 (2019) (quoting *McGrain*, 273 U.S. at 174).  The Court also has recognized that in carrying out its legislative functions, "each House [of Congress] has power 'to secure needed information in order to legislate.'"  *Id.*  These powers of inquiry are "broad" and "indispensable."  *Id.* (quoting *Watkins v. United States*, 354 U.S. 178, 187, 215 (1957)).

The Court in *Barenblatt v. United States* described how Congress historically has used these powers to support its legislative functions:

> The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate; it has similarly been utilized in determining what to appropriate from the national purse, or whether to appropriate.  The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate.

360 U.S. 109, 111 (1959); *see also McGrain*, 273 U.S. at 175 (investigatory powers enable Congress to "legislate wisely [and] effectively" by providing access to information that informs the legislative process).  The Supreme Court thus has explicitly recognized that congressional investigatory powers, such as oversight, are critical for performance of the legislative functions of Congress.

11

### D.    Congressional oversight authority encompasses all legislative branch functions, not only legislation

The oversight authority of Congress is not merely pursuant to its power to legislate but pursuant to the full scope of its legislative branch functions.  The Supreme Court has described functions that are encompassed in the investigatory powers, which reflect the full scope of powers that Congress possesses under Article I:

> The power of Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.

*Watkins*, 354 U.S. at 187.  Research by the Congressional Research Service further supports the conclusion that oversight supports the full scope of legislative functions.  *See* Ben Wilhelm et al., *Congressional Oversight Manual* (Congressional Research Service, 2022), 4 ("This 'checking' [oversight] function serves to protect Congress's policymaking role and its place under Article I in the U.S. constitutional system of checks and balances.").

Measures to enforce oversight authority "must be related to, and in furtherance of, a legitimate task of the Congress," and must "concern[] a subject on which legislation 'could be had.'" *Mazars,* 591 U.S. at 864 (quoting *Eastland,* 421 U.S. at 506). It cannot be used "to inquire into private affairs and compel disclosures," to "expose for the sake of exposure," or "solely for the personal aggrandizement of the investigators." *Id.* 863 (citations omitted).

The functions for which Member Plaintiffs seek access in this case, such as informing potential legislation and appropriations and meeting constituent needs, are clearly part of the full scope of legislative powers and are "legitimate task[s] of the Congress." *Watkins,* 354 U.S. at 187.  Legislation and appropriations require that Members of Congress conduct oversight to

understand "the administration of existing laws as well as proposed or possibly needed statutes," including "surveys of defects in our social, economic or political system." *Id*. at 187. Work on behalf of constituents enables Members to conduct such surveys, because constituents can raise concerns about conditions in facilities that may require legislative attention. Constituents may also inquire about loved ones who are detained, and in following up on these inquiries Members of Congress can identify the concerns and needs of their constituents about detention or housing at covered facilities, such as a lack of transparency about detainee locations. All this can provide valuable information about how the executive branch is carrying out its responsibility to faithfully execute the law. *See, e.g.*, Compl. ¶¶ 106 ("investigat[ing] constituent complaints about access to legal information, quality of food, building conditions, access to phones, and other issues"), 116 (without investigating, "her only recourse is to submit inquiries to and wait for a response from administration officials, which is likely to be received too late—if ever"), 118 ("receiv[ing] reports that . . . detained individuals have not been fed sufficient meals, or that individuals have not been able to shower in several days"), 130 (investigating to respond to constituent complaints), 131 (investigating led to "legislation in 2020 and 2021 that sought to protect his constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities"), 162 (receiving reports that "individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility had deteriorated due to surging arrests"), 167 (receiving "reports from constituents and advocates of the inhumane conditions of the facility"), 182 (investigating "to ensure there was no overcrowding and to locate specific individuals").

In addition, since the oversight delegated by § 527 is related to areas that are "subject to regulation by congressional legislation," and the funds that support the functioning of the

facilities "are carried on under such appropriations as in the judgment of Congress are needed from year to year," gathering information about conditions in covered facilities clearly pertains to subjects regarding which legislation can be, and has been, promulgated. *McGrain*, 273 U.S. at 178 (quoting *In re Chapman*, 166 U.S. 661, 670 (1897) ("it was certainly not necessary that the resolutions should declare in advance what the Senate mediated doing when the investigation was concluded")); *see also Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces.  The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result.").

### E.    Plaintiffs' access to the covered facilities at issue in this case without prior notice is crucially important to enabling oversight of such facilities

It is well-recognized that requiring prior notice to review conditions in settings subject to regulation can limit the effectiveness of oversight.  As the Supreme Court said in *United States v. Biswell* with regard to the Gun Control Act of 1968, "if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential."  406 U.S. 311, 316 (1972).

This is why Congress has required inspections of  DHS detention facilities by the DHS Office of Inspector General without prior notice.  *See, e.g*., DHS Office of Inspector General, *Final Report: Results of an Unannounced Inspection of ICE's Buffalo Federal Detention Facility in Batavia, New York* (June 3, 2025) ("As mandated by Congress, the Department of Homeland Security Office of Inspector General conducts unannounced inspections of ICE detention facilities to ensure compliance with detention standards") (footnote omitted). In addition 6 U.S.C §205(b)(3) provides that one of the functions of the ombudsman for immigration detention "shall be" to "Conduct unannounced inspections of detention facilities holding individuals in federal

14

immigration custody, including those owned or operated by units of State or local government and privately-owned or operated facilities."

Similarly, the Mine Safety and Health Act (MSHA) prohibits requiring prior notice of statutorily-mandated inspections when they are for the purpose of determining whether an imminent danger exists or whether the mine operator is in compliance with health and safety standards. 30 U.S.C. § 813(a) (2006). Criminal penalties are imposed for violation of this prohibition. 30 U.S.C. § 820(e) (2006).

Several federal appellate courts have recognized the importance of ensuring that such notice is not required when Congress intended to ensure that it was prohibited by statute. *See Western Oilfields Supply Co. v. Sec'y of Labor*, 946 F.3d 584, 589 (D.C. Cir. 2020) (cert. denied) (acknowledging that "it is hard to understand what good [no prior notice provision] would do if any operator could delay a surprise inspection by blocking it without penalty"); *KenAmerican Resources, Inc. v. Sec'y of Labor*, 33 F.4th 884, 890 (6th Cir. 2022) (noting that "Congress saw the advance-notice prohibition as important enough to the statutory scheme to warrant both civil and criminal penalties"); *Marshall v. Stoudt's Ferry Prep. Co.,* 602 F.2d 589, 593–94 (3d Cir. 1979) (citing the legislative history to establish Congressional intent that "prior notice of inspections would undercut the Act's objectives because of the ease with which safety or health hazards could be concealed").

In addition, the Surface Mining Control and Reclamation Act (SMCRA) provides that "inspections by the regulatory authority shall . . . occur without prior notice to the permittee or his agents or employees except for necessary onsite meetings with the permittee." 30 U.S.C. § 1267(b)(2) (1977). That statute also says that "representatives of the regulatory authority, without advance notice and upon presentation of appropriate credentials" shall have the right of

15

entry onto any surface coal mining and reclamation operations or any premises. *Id.*; *see United States v. Ray*, 652 F.2d 670, 670 (6th Cir. 1981) (affirming conviction for willfully interfering with inspectors attempting to conduct inspection "without advance notice" authorized by 30 U.S.C. §1267).

As the requirement of unannounced visits by DHS Inspectors General of ICE detention facilities makes clear, the access without prior notice required by § 527 reflects concern that conditions at the time of Member visits may not accurately reflect actual ongoing conditions. That statute prohibits DHS from "mak[ing] any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification." § 527(a). Congress, concerned about denial of access to individual Members and inadequate communication with covered facilities, deemed access without prior notice necessary in order to prevent prohibited temporary modification of conditions, to enable identification of dangers such as health concerns or overcrowding conditions, and to gauge compliance with standards, such as detention condition guidelines or statutory authority. Presidents of both political parties have agreed with Congress's determination by signing the provision into law. Section 527 reflects Congress's awareness, and the executive branch's agreement, that requiring prior notice can undermine effective oversight because it can give the executive branch an opportunity to correct or conceal conditions that may require legislative attention. *See, e.g.*, Compl., ¶ 63.

Congress concluded that these concerns warranted explicitly providing for access by individual Members to covered facilities without prior notice in order to ensure effective conduct of the oversight authority over such facilities that the statute delegated to Members. Given the

16

surge in detention of individuals in covered facilities, DHS's violation of this entitlement to
access threatens to undermine such oversight precisely when it is most urgently needed.

**F.    Entitlement to access without prior notice is appropriate for judicial enforcement because the passage of § 527 concluded political negotiation between the legislative and executive branches**

Contrary to DHS's contention, this is not a case involving a dispute between the political
branches that is inappropriate for judicial resolution.  This is not a scenario in which "Congress
[is] simply walk[ing] away from the bargaining table and compel[ling] compliance in court."
*Mazars*, 591 U.S. at 867.  The political process is done.  The political branches enacted § 527,
which has the force of law.  There were, and there remain, a multitude of opportunities for DHS
to express its disagreement with requirement of access without prior notice, such as during
legislative hearings or the annual appropriations process.  DHS consistently has not pursued such
opportunities since enactment of the statute in 2020, but instead has complied with its
requirements until June 2025, when DHS suddenly—and without explanation, much less
authority—declared it would no longer comply with the law.

If DHS now has misgivings about the statute, it cannot simply violate it and insist that the
only recourse is for Congress to negotiate with the executive about how much it will comply
with its statutory obligation.  That is not how the rule of law works.  The government claims that
the seven-day notice requirement is a way to "reasonably balance the need for safe and secure
visits with Members' interest in conducting oversight."  Defendants' Memorandum of Law in
Opposition to Plaintiffs' Motion for Stay Under 5 U.S.C. § 705, or in the Alternative, for
Preliminary Injunction, 14.  DHS, however, does not have the authority to "balance" different
interests against each other to determine what it believes is "reasonable"—§ 527 already struck
that balance, and the agency is required to comply with it, as it had been doing for years.  In

17

establishing an entirely new requirement of seven days' prior notice, DHS is not faithfully

executing the law but explicitly attempting to rewrite it in furtherance of its own policy

preference. DHS's attempted usurpation of legislative power is fundamentally inconsistent with

the principle of separation of powers and the rule of law. "The accumulation of all powers,

legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very

definition of tyranny." The Federalist No. 47 (James Madison).

The appropriate recourse for the Plaintiffs aggrieved by DHS's violation of § 527 is

therefore the complaint that they filed in this Court.

## II.    The fact that § 527 delegated specific oversight authority to individual Members in appropriations legislation does not change the character of the statute

### A.    Appropriations legislation is authoritative and carries weight equal to or greater than unicameral authorizations

Appropriations legislation is just as enforceable as any other form of legislation. Indeed,

the fact that it is the product of a bicameral process means that it is an especially powerful

expression of the intent of Congress. Moreover, its inclusion in annual appropriations bills

demonstrates Congress's ongoing concern with this issue and provides an important way for

Congress to ensure on a regular basis that statutes administered and implemented by the

executive branch remain aligned with the goals of duly enacted federal statutes, and to address

this without the need for separate legislation.

The Fourth Circuit affirmed Congress's ability to change previous legislation through the

appropriations process in *Last Best Beef, LLC v. Dudas*, 506 F.3d 333 (4th Cir. 2007). In 2005,

the President signed the Science, State, Justice, Commerce, and Related Agencies

Appropriations Act of 2006. *See* Pub. L. No. 109-108, 119 Stat. 2290 et seq. (Nov. 22, 2005)

("2006 Appropriations Act"). The phrase "The Last Best Place" had become a popular phrase in

the state of Montana. The 2006 Appropriations Act stated, "Notwithstanding any other provision

of this Act, no funds appropriated under this Act shall be used to register, issue, transfer, or

enforce any trademark of the phrase 'The Last Best Place.'" *Id*. at § 206, 199 Stat. 2315. The

provision was further readopted in subsequent appropriations. *See* H.R. 52, 110th Cong. §§

101(3), 103-04, 106 (2007).

The Lanham Act, a pre-existing statute governing the United States Patent and

Trademark Office, did not contain the prohibition in § 206. *See* 15 U.S.C. §§ 1051 et seq.

(2000). Plaintiffs asked the Court strike down § 206, on the ground that it contradicted the

Lanham Act without explicitly repealing relevant provisions in it or mentioning the Act by name.

The Court rejected this argument, declaring:

> Congress has the power to amend substantive legislation through appropriations
> riders if it does so very clearly. It did so here in a duly enacted appropriations act
> with clarity and specificity. We cannot strike down such an act unless
> unconstitutional. We certainly cannot declare § 206 invalid for contravening a
> previously enacted piece of legislation … . In the face of such clarity, to declare §
> 206 'invalid' is to adopt a per se rule that Congress cannot amend or suspend
> prior legislation through appropriations riders. We decline to take such a step.

*The Last Best Beef*, 506 F.3d at 335–36, 340. Amending prior legislation through appropriations

riders therefore is a well-established exercise of legislative power that has the force of law.

Consistent with *Last Best Beef*, § 527 explicitly and unambiguously amends previous legislation

and has been readopted every year.

### B.    The fundamental purpose of § 527 is to delegate specific oversight authority and enable its effective exercise, not simply to place a restriction on the use of appropriated funds

Section 527 expressly delegates oversight authority to individual Members of Congress

by granting them access to covered facilities without prior notice. Congress's repeated inclusion

of this provision in every appropriations act since 2020, along with the President's signature on

those acts, imposes a statutory obligation on DHS to provide such access. Member Plaintiffs who have been denied such access have suffered harm that is particular to them; it is not a general injury common to every member of Congress from unauthorized use of appropriated funds. DHS blinkers reality and ignores the clear purpose of § 527 in arguing that, because that section is contained in appropriations acts, its only purpose is to limit DHS's expenditure of appropriated funds and, therefore, Plaintiffs only recourse is to rely on the executive branch to prosecute a violation of the Anti-Deficiency Act. This elevates form over substance. The fundamental intent of the statute is to provide Members with access to covered facilities without prior notice in order to conduct the oversight activity that the law delegates to them. DHS has violated the statute by depriving Member Plaintiffs of such access; their appropriate recourse for this denial is judicial enforcement.

## III.    Member Plaintiffs' claim is crucial to the functioning of a governmental system of separation of powers in which executive agencies are subject to the rule of law

Fundamental separation of powers principles require that the legislative and executive branches respect the lawful authority of each other. Fundamental rule of law principles require that the executive branch is held accountable under its constitutional duty to faithfully execute the laws. Congress has repeatedly passed, and Presidents have regularly signed, appropriations acts that unequivocally provide individual Members of Congress with statutory authority to enter covered facilities without prior notice to conduct oversight. Section 527 has the full force of law, and DHS cannot now claim that it has the discretion whether to abide by it. This is an affront to core separation of powers principles and a direct challenge to executive accountability under the rule of law.

20

## CONCLUSION

For all the reasons described in this brief, this Court should grant Plaintiffs' motion and enter a stay under 5 U.S.C. § 705, a preliminary injunction, or issue a writ of mandamus.


Respectfully submitted,

/s/ Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
Phone: (202) 662-9065
aderson.francois@georgetown.edu

Counsel for Amicus

## CERTIFICATE OF COMPLIANCE

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4),  and does not exceed 25 pages in length.

DATED this 22nd Day of September 2025.

/s/  Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2025, I electronically filed the original of this brief

with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all

attorneys of record by operation of the Court's electronic filing system.

DATED this 22nd Day of September 2025.

/s/  Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)