**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, <br><br> Defendants. | Case No. 25-cv-2463 (JMC) |

## <u>MEMORANDUM OPINION</u>

Every year since 2020, Congress has passed and the President has signed an appropriations bill that prohibits the Department of Homeland Security (DHS) from using appropriated funds "to prevent" Members of Congress "from entering, for the purpose of conducting oversight," any DHS facility "used to detain or otherwise house aliens." *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619.[1] This appropriations rider, colloquially referred to in its current form as Section 527, also prohibits DHS from using funds provided through the appropriations process to "make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress" or their staffs, "compared to what would be observed in the absence of such modification." *Id.* The rider also addresses the subject of notice requirements for entry to covered facilities. For congressional

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

staff members seeking to visit covered facilities, DHS "may require that a request be made at least 24 hours in advance of an intent to enter" the facility. *Id.* § 527(c). However, with respect to the Members of Congress themselves, the rider states that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility . . . for the purpose of conducting oversight." *Id.* § 527(b).

In June 2025, U.S. Immigration and Customs Enforcement (ICE) announced two policies regarding access of Members of Congress to ICE facilities. First, ICE posted a guidance document to its website regarding rules and procedures for congressional visits to ICE facilities covered by Section 527. *U.S. Immigration and Customs Enforcement (ICE) Facility Visit and Engagement Protocol for Members of Congress and Staff* (June 2025) [hereinafter June 2025 Visit Protocol], *archived at* https://perma.cc/UL23-J4ZM. This document, which was subsequently removed from the website without explanation, specifically noted that "ICE Field Offices" were not detention facilities that fell within the scope of Section 527's requirements because those offices did not house or detain noncitizens, and instead merely "process[ed them] to make custody determinations." *Id.* at 4. Second, later in June, ICE instituted a requirement that all Members of Congress who seek to visit ICE facilities must make the request seven calendar days in advance of the visit in order to gain access. *See, e.g.*, *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV. That requirement remains on ICE's website to this day.

Plaintiffs are twelve Members of Congress who have attempted to visit various ICE facilities, including field offices, without providing advance notice. All claim to have been denied entry to the facilities under one of the policies described above. Plaintiffs now bring this suit to challenge these policies, referred to collectively in this opinion as the Oversight Visit Policies. *See* ECF 1 ¶ 8. They allege that Defendants have acted unlawfully in creating and enforcing the

Oversight Visit Policies because the policies prevent Members of Congress from conducting unannounced, in-person oversight at ICE facilities in violation of Section 527. Plaintiffs allege that the policies are contrary to law, in excess of DHS's statutory authority, and arbitrary and capricious under the Administrative Procedure Act (APA), and that they represent an *ultra vires* violation of Section 527. *Id.* ¶¶ 273–81, 287–92. Plaintiffs also argue that Defendants have violated the APA by unlawfully withholding and unreasonably delaying access to covered facilities, *id.* at ¶¶ 282–86, and that if APA or *ultra vires* challenges are not available, they are entitled to mandamus relief, *id.* ¶¶ 293–99.

After filing suit, Plaintiffs moved to preliminarily stay the Oversight Visit Policies under 5 U.S.C. § 705 pending judicial review. ECF 17. In the alternative, they request a preliminary injunction. *Id.* Defendants—DHS, ICE, and several agency officials—oppose the motion on various grounds, including that Plaintiffs lack both standing and a cause of action to bring the suit, and that Plaintiffs' claims fail on the merits. For the reasons stated below, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of their claim that the challenged Oversight Visit Policies are contrary to law and in excess of DHS's statutory authority. Further, the remaining factors governing issuance of preliminary relief support a stay of the challenged policies. As such, the Court will **GRANT** Plaintiffs' motion for preliminary relief in the form of a stay under Section 705 of the APA.

## I.    BACKGROUND

### A.  Statutory and Regulatory Background

This case involves the application of statutes that fund Defendant Department of Homeland Security and its various sub-agencies. One of those sub-agencies is U.S Immigration and Customs Enforcement, commonly known as ICE. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005)

(describing ICE, previously named the "Bureau of Immigration and Customs Enforcement," as one of the "divisions" of DHS). DHS is tasked with carrying out the nation's "detention and removal program." 6 U.S.C. § 251(2); *see N.S. v. Dixon*, 141 F.4th 279, 282 n.1 (D.C. Cir. 2025). Under the immigration laws, certain classes of noncitizens may be detained during removal proceedings or pending their removal from the United States. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1226(c), 1231(a)(2)(A).[2] Responsibilities assigned to the Secretary of Homeland Security and delegated to ICE include "arrang[ing] for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1)[3]; *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 186, 196 (D.D.C. 2020) (noting that ICE "oversees the departure of removable immigrants from the United States," including by "oversee[ing] the civil detention of immigrants").

To effectuate that statutory duty, ICE's Enforcement and Removal Operations (ERO) oversees more than 100 civil immigration detention facilities across the country, and hundreds of thousands of adult immigrants are detained in those facilities in a given year. *See, e.g.*, *Annual Report: Fiscal Year 2024*, ICE 22–23, 23 fig. 13 (Dec. 19, 2024) [hereinafter ICE FY 2024 Report], https://perma.cc/M72B-NZLA (noting 277,913 "book-ins" to 129 detention facilities over the course of the fiscal year, with approximately 37,684 noncitizens detained as of the end of the

---

[2] The statutes in question in this case typically use the term "aliens" rather than "noncitizens." However, as this Court has previously explained, *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *3 n.3 (D.D.C. Aug. 1, 2025), it will use the term "noncitizen" unless quoting from a statute, regulation, or case that uses "alien."

[3] These, and certain other statutory authorities relating to detention of noncitizens pending removal, were originally "exercised by the Attorney General and the Immigration and Naturalization Service (INS)." *Clark*, 543 U.S. at 374 n.1. Following the Homeland Security Act of 2002, various responsibilities related to the "detention and removal program" were transferred to the Secretary of Homeland Security, *Dixon*, 141 F.4th at 282 n.1; *see Clark*, 543 U.S. at 374 n.1, and the Court treats statutory references to the Attorney General in the relevant portions of the Immigration and Nationality Act as references to the Secretary of Homeland Security, *see Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 n.6 (D.D.C. 2017).

fiscal year); *Detention Facilities*, ICE, https://perma.cc/BU8Q-LDGZ (listing 129 detention facilities as of September 30, 2025). ICE states that detention facilities are used to "house aliens to secure their presence for immigration proceedings or removal from the U.S." *Detention Facilities*, ICE, https://perma.cc/BU8Q-LDGZ.

In addition to these detention facilities, ICE also operates field offices and associated "sub-locations" of those field offices. *See* ICE FY 2024 Report at 9 (listing "25 domestic field offices and 182 sub-locations nationwide"). Field offices play a role in directing and managing immigration enforcement efforts: "ERO manages all aspects of the immigration enforcement process through the operation of 25 field offices nationwide that report to ERO headquarters." *Field Offices*, ICE, https://perma.cc/3NCM-RS2H. These offices host ICE officials and employees who oversee regional enforcement efforts. *See* Fatma Marouf, *Regional Immigration Enforcement*, 99 Wash. U. L. Rev. 1593, 1595 (2022). They also are home to administrative staff that manage individual noncitizens' immigration cases. *ICE Field Office Check-Ins*, ICE, https://portal.ice.gov/immigration-guide/check-ins (last visited Dec. 12, 2025). While these field offices are not classified as detention facilities in ICE's public materials, ICE's regulations nevertheless permit the operation of "holding facilities located within . . . field offices." *Policy Number 11087.2: Operations of ERO Holding Facilities*, ICE, Office of Enforcement and Removal Operations, § 1.1 (Jan. 31, 2024) [hereinafter ICE Policy Number 11087.2], https://perma.cc/9UD2-B9WX. The regulations state that a "holding facility" in a field office is to be "primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency" with "short-term confinement" being defined as "a period not to exceed 12 hours, absent exceptional circumstances." *Id.* § 3.2 & n.3.

Of course, operating such an extensive network of facilities requires money. DHS, like many agencies, is funded in large part through annual congressional appropriations. *See, e.g.*, Gov't Accountability Off., Principles of Federal Appropriations Law 2-17 (4th ed. 2016). In our constitutional scheme, "Congress's control over federal expenditures is absolute." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.). The Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Congress'[s] power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use." *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991). Accordingly, it is "emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

One way Congress establishes the relative priority of programs and projects is through appropriations riders. These riders are "provisions in appropriations legislation that limit (or occasionally require) the use of funds for purposes or activities an agency is authorized to undertake." Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1093 (2021). Limitations riders are often "aimed at changing governmental policy: Their prime use is to forestall the executive branch from proceeding with or developing particular agency initiatives." *Id.*; *see also* Neal E. Devins, *Regulation of Government Agencies Through Limitation Riders*, 1987 Duke L.J. 456, 464 (1987) ("Appropriations-based restrictions on agency action may also be the only realistic way to stop the Executive from launching administrative initiatives that Congress disfavors."). These riders are often successful in that goal because, without appropriated funds, which pays the salaries of agency employees and keeps the lights on at agency facilities, "the

executive branch cannot act." Metzger, *supra*, at 1077. Such riders, in addition to conditioning funds and setting policy priorities, may also involve the modification of substantive law. *See, e.g.*, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992) ("Congress . . . may amend substantive law in an appropriations statute, as long as it does so clearly."); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 183 (D.D.C. 2002) ("[T]he power of Congress to legislate substantive law through riders attached to appropriations bills and thereby bypass the usual process of development of law is established."), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).

This case concerns one specific rider regarding annual DHS appropriations and ICE's operation of detention facilities. The rider, colloquially known as Section 527, reads as follows:

> SEC. 527. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
>
> > (1) A Member of Congress.
> >
> > (2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
>
> (b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
>
> (c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

Further Consolidated Appropriations Act, 2024 ("FY2024 Appropriations Act"), Pub. L. No. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619.

The language of what is now known as Section 527 first appeared in the fiscal year 2020 appropriations bill, and has been carried forward to every subsequent DHS yearly appropriations bill since, either through direct inclusion in the appropriations package, or incorporation by reference to prior years' bills and the limitations on funding contained therein.[4] The text of the rider was most recently enacted as Section 527 of the FY2024 Appropriations Act. *See* FY2024 Appropriations Act, div. C. tit. V, § 527, 138 Stat. at 619. Section 527 was then carried forward into the fiscal year 2025 appropriations statutes, which incorporated by reference both the funding levels and applicable limitations for DHS from the FY2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Appropriations Act"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11–12. Next, those funding levels and funding limitations, including the terms of Section 527, were most recently extended until January 30, 2026, in an appropriations bill passed by Congress and signed by President Trump. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 ("FY2026 Continuing Appropriations Act"), Pub. L. No. 119-37, §§ 101, 103, 139 Stat. 495, 496–97 (2025).

While the parties dispute the various legal impacts of Section 527, the parties agree that the provision prohibits DHS from using funds appropriated under DHS's regular appropriations acts to engage in any of the activities prohibited in the rider, such as "prevent[ing]" Members of Congress or their staff members "from entering, for the purpose of conducting oversight," ICE facilities that are "used to detain or otherwise house aliens," or making "temporary modification[s]" at such facilities that "in any way alter[] what is observed by" a visiting Member

---

[4] *See, e.g.*, Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, tit. V, § 532, 133 Stat. 2317, 2530 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. F, tit. V, § 532, 134 Stat. 1182, 1473 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. F, tit. V, § 530, 136 Stat. 49, 340–41; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, tit. V, § 529, 136 Stat. 4459, 4752–53 (2022).

of Congress or designated member of their staff. FY2024 Appropriations Act, div. C. tit. V, § 527, 138 Stat. at 619; *see* ECF 20 at 28 ("[Section] 527 prohibits the use of certain appropriated funds to prevent Members from visiting certain facilities."); ECF 17-1 at 41 ("ICE may not prevent Plaintiffs from accessing [Section 527-funded facilities] for the purpose of oversight.").

However, not all of DHS's current funding comes from the FY2026 Continuing Appropriations Act. An additional source of DHS funding is the reconciliation bill passed in July 2025, which provides additional funds for DHS, including $29 billion given to ICE to "hir[e] and train[] additional [ICE] personnel, . . . to carry out immigration enforcement activities," to cover "transportation costs and related costs associated with alien departure or removal operations," and to provide "[f]unding for facility upgrades to support enforcement and removal operations." One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. 72, 388–89 (2025). These funds are not subject to Section 527's limitations.

## B. Factual Background

### 1. ICE's Changing Guidance Regarding Congressional Visits to Detention Facilities and Field Offices

This case involves a challenge to ICE's policies concerning visits by Members of Congress and their staffs to ICE facilities. ICE has implemented various policies regarding visits to its detention facilities. First, ICE's National Detention Standards "permit authorized persons to visit detainees within security and operational constraints." ICE, *National Detention Standards* § 5.5(I) (2025) [hereinafter ICE National Detention Standards], https://perma.cc/7QXS-CEA6. ICE's standards also allow the agency to "temporarily restrict visiting when necessary to ensure the security and good order of the facility." *Id.* § 5.5(II)(A). However, the National Detention Standards do not establish specific "[g]uidance regarding congressional visits to facilities." ICE

National Detention Standards, § 5.5(I). Instead, the National Detention Standards direct the reader to ICE's website. *Id.*

ICE's policies on its website regarding congressional visits have shifted considerably in the last few months. First, in mid-June 2025, ICE posted a guidance document to its website regarding ICE's protocols for visits by Members of Congress and their staff. *See* June 2025 Visit Protocol; ECF 1 ¶ 80. The document stated that Members of Congress are "not required to provide advance notice for visits to ICE detention facilities," but that ICE "require[d] a minimum of 24-hours' notice for visits by congressional staff." *Id.* at 2. The document expressly acknowledged the existence of Section 527 and reprinted the appropriations rider's text in full. *Id.* at 1. The June 2025 Visit Protocol also distinguished requests to visit ICE field offices from ICE detention facilities. The protocol stated that "ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements." *Id.* The rationale provided was that "ICE does not house aliens at field offices, rather these are working offices where Enforcement and Removal Operations (ERO) personnel process aliens to make custody determinations based on the specific circumstances of each case." *Id.* at 4.

Later that month, ICE's guidance again shifted. Around the week of June 16, 2025, ICE updated its "Office of Congressional Relations" webpage, to state the new requirement that requests to visit "DHS detention facilities" "be made a minimum of seven (7) calendar days in advance," and that "[a]ny requests to shorten that time must be approved by the DHS Secretary." *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV; ECF 20-1, Hackbarth Decl. ¶ 5. The seven-day notice requirement remains in effect to this day. ECF 20-1, Hackbarth

Decl. ¶¶ 5–6.[5] The status of the field office policy is less clear. ICE removed the document containing the June 2025 Visit Protocol from its website in mid-June, without expressly stating whether the policies in that document were rescinded. Neither ICE nor DHS has posted any new version of the Visit Protocol since June 2025.

Finally, the parties do not dispute that at the time these policies were first adopted, DHS and ICE were operating pursuant to Section 527-restricted funds, meaning that the promulgation of these policies was carried out by officials whose salaries were paid for by Section 527-appropriated funds and implemented at facilities operated with Section 527-restricted funds. *See, e.g.*, Hr'g Tr. 47:11–22 (Sept. 25, 2025); ECF 34 (stating that Section 527-restricted funds were used for "the adoption and implementation of the visitation protocols at issue in this action"); *see also infra* Section III.A.4.a.

### 2. The Trump Administration's Expanded Immigration Enforcement and Plaintiffs' Attempts to Conduct In-Person Visits to ICE Facilities

These changes in ICE's congressional oversight visit policies have occurred during a period of heightened immigration enforcement in the United States. DHS officials have claimed that in the past eight months, DHS has "turbocharg[ed] the arrest[] and deportation[] of illegal aliens." *New Milestone: Over 2 Million Illegal Aliens Out of the United States in Less than 250 Days*, Dep't of Homeland Sec. (Sept. 23, 2025), https://perma.cc/8UYV-5PF4 (noting DHS's intent to "arrest[,] detain[,] and deport[] illegal aliens"); *100 days of record-breaking immigration enforcement in the US interior*, ICE (last revised Jun. 13, 2025), https://perma.cc/ALN3-VAHJ (noting that ICE had "significantly ramped up arrests and removals" in the first 100 days of the

---

[5] The policy appears to have undergone minor revisions between June 2025 and the date of this opinion, in that the original policy stated that the notice requirement was for visits to "DHS detention facilities," but the current policy now states that the requirement applies to "DHS facilities." *Office of Congressional Relations*, ICE (last viewed Dec. 12, 2025), https://www.ice.gov/leadership/ocr.

second Trump Administration). Expanding the detention of noncitizens arrested pending deportation or the outcome of removal proceedings has been a priority of the current Administration since day one. *See* Exec. Order. No. 14,159, 90 Fed. Reg. 8443, 8445 (Jan. 20, 2025) (directing the Secretary of Homeland Security in an executive order signed on January 20, 2025 to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law").

Plaintiffs are twelve Members of Congress who all claim an interest in the Administration's immigration enforcement and detention practices.[6] *See* ECF 1 ¶¶ 17–28; ECF 17-1 at 25–28. Some are leaders or members of committees with jurisdiction over DHS and ICE, or issues of immigration, appropriations, and civil rights and civil liberties. *See* ECF 17-2, Escobar Decl. ¶¶ 1, 4; ECF 17-4, Goldman Decl. ¶ 2; ECF 17-5, Espaillat Decl. ¶ 2; ECF 17-6, Correa Decl. ¶ 2; ECF 17-8, Garcia Decl. ¶ 2; ECF 17-10, Torres Decl. ¶ 2; ECF 17-11, Thompson Decl. ¶ 4; ECF 17-12, Neguse Decl. ¶ 2; ECF 17-13, Raskin Decl. ¶¶ 2, 4. Others have DHS detention facilities either in or near the districts that they represent, or represent districts where immigrants were detained and later sent to an ICE detention facility. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 3; ECF 17-3, Crow Decl. ¶ 3; ECF 17-7, Gomez Decl. ¶¶ 7, 23; ECF 17-9, Ruiz Decl. ¶ 8.

Plaintiffs allege that the Administration's expanded immigration enforcement has "stretched the U.S. immigration detention system far beyond its capacity" and has led to "[m]ore people . . . being held by the United States in immigration detention than ever before." ECF 1 ¶ 1. Various Plaintiffs state their concerns—based on news reports, constituent outreach, and rumors— about poor conditions and mistreatment of detainees. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 10;

---

[6] The Plaintiffs are Representatives Joe Neguse, Adriano Espaillat, Bennie G. Thompson, Jamie Raskin, Robert Garcia, J. Luis Correa, Jason Crow, Veronica Escobar, Daniel S. Goldman, Jimmy Gomez, Raul Ruiz, and Norma Torres.

ECF 17-3, Crow Decl. ¶ 24; ECF 17-4, Goldman Decl. ¶¶ 39–40; ECF 17-5, Espaillat Decl. ¶ 18; ECF 17-6, Correa Decl. ¶¶ 7–8. Consistent with these concerns, all Plaintiffs have attempted to visit various ICE facilities and been denied entry under one of ICE's visitor policies. First, multiple Plaintiffs state that they have sought to conduct in-person oversight at ICE detention facilities, but were denied entry at the requested dates and times because they failed to comply with ICE's seven-day notice requirement. These attempted visits all occurred following the publication of the notice requirement on ICE's website in mid-June 2025. *See* ECF 17-2, Escobar Decl. ¶¶ 10–18; ECF 17-3, Crow Decl. ¶¶ 20–21; ECF 17-6, Correa Decl. ¶¶ 9–11; ECF 17-9, Ruiz Decl. ¶¶ 9–14; ECF 17-10, Torres Decl. ¶¶ 16–18. For example, Representative Escobar sought to visit the El Paso Service Processing Center, a detention facility in her district, based on concerns about the conditions there, including concerns about physical abuse by guards, inadequate medical care, and lack of access to legal services. ECF 17-2, Escobar Decl. ¶¶ 3, 10. On July 8, 2025, her staff emailed ICE to request a visit for the next day. *Id.* ¶ 10. In response, ICE stated that it could not accommodate the next-day visit because ICE was "now requiring requests to be made seven (7) calendar days in advance." *Id.* ¶ 11. Representative Escobar nevertheless went to the facility the next day, where she was denied access on the grounds that she failed to provide the required seven-day notice. *Id.* ¶ 12. Other Plaintiffs have had similar experiences.

Second, various Plaintiffs have also requested in-person visits to ICE facilities that they believed were housing detained immigrants, but were denied by ICE staff on the grounds that the facility that they sought to enter was a field office that was not subject to Section 527, consistent with the policy announced in the June 2025 Visit Protocol. *See* ECF 17-7, Gomez Decl. ¶¶ 15, 17–18; ECF 17-8, Garcia Decl. ¶¶ 20–23; ECF 17-10, Torres Decl. ¶ 14; ECF 17-11, Thompson Decl. ¶¶ 13–18; ECF 17-12, Neguse Decl. ¶¶ 9–14; ECF 17-13, Raskin Decl. ¶¶ 11–16; ECF 17-4,

Goldman Decl. ¶¶ 22–31; *see also* ECF 17-5, Espaillat Decl. ¶¶ 22–28 (being denied access to the same facility as Representative Goldman, but because staff described it as a "sensitive facility"). For example, Representative Gomez sought to schedule a visit to ICE's Los Angeles Field Office and was told that the office was not a "detention facilit[y]" and thus fell outside of the scope of Section 527. ECF 17-7, Gomez Decl. ¶ 17. He was told that ICE did "not house aliens at field offices," and that field offices were "working offices where [ICE] process[es] aliens to make custody determinations based on the specific circumstances of each case." *Id.* ¶ 18. However, ICE officials also told Representative Gomez's staff that immigrants could be held up to 72 hours at the "book-in facility until administrative processing is complete." *Id.* ¶ 20; *see also* ECF 17-7, Gomez Decl. Ex. A., at 12–14 (containing this exchange). Representatives Raskin, Neguse, and Thompson arrived at the ICE Washington Field Office in Chantilly, Virginia to conduct an unannounced oversight visit. ECF 17-11, Thompson Decl. ¶ 13. They arrived and requested a tour of the facility but were denied on the grounds that "field offices are not subject to [S]ection 527." *Id.* ¶ 15. However, officials confirmed to them that the Washington Field Office has a 12-hour holding area where "people are detained and not allowed to leave." *Id.* ¶ 16.

Despite these stymied attempts at in-person oversight, Plaintiffs have stated their intent to continue to visit ICE facilities without prior notice. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 37; ECF 17-3, Crow Decl. ¶ 27; ECF 17-6, Correa Decl. ¶ 12; ECF 17-7, Gomez Decl. ¶ 22; ECF 17-9, Ruiz Decl. ¶ 17; ECF 17-10, Torres Decl. ¶ 26; ECF 17-11, Thompson Decl. ¶ 25; ECF 17-12 Neguse Decl. ¶ 18; ECF 17-13, Raskin Decl. ¶ 18. Plaintiffs stress the importance of unannounced visits to their duties as Members of Congress, including their duties in drafting and passing legislation, timely serving constituents impacted by the Administration's enforcement policies, and conducting oversight of government operations. *See, e.g.*, ECF 17-9, Ruiz Decl. ¶ 20; ECF 17-

10, Torres Decl. ¶ 22; ECF 17-11, Thomspon Decl. ¶ 25. Plaintiffs also emphasize their concerns that the notice requirement provides ICE time to obscure the true conditions at a given facility, thereby diminishing the value of visits as a mechanism to determine how ICE is conducting detention operations. *See, e.g.*, ECF 17-4, Goldman Decl. ¶ 46; ECF 17-6, Correa Decl. ¶ 13; ECF 17-7, Gomez Decl. ¶ 25.

### 3. Plaintiffs' Lawsuit

Plaintiffs filed a complaint in this Court on July 30, 2025. ECF 1. They sue in their official capacities as Members of the House of Representatives, and name DHS, ICE, Secretary of Homeland Security Kristi Noem, and Acting Director of ICE Todd M. Lyons as Defendants. *See generally id.* Plaintiffs challenge as unlawful (1) ICE's seven-day advance notice requirement and (2) ICE's policy that field offices are not subject to Section 527. Plaintiffs argue that ICE's promulgation and enforcement of these policies prevents them from accessing ICE facilities in violation of the appropriations limitations in Section 527. Plaintiffs claim that the Oversight Visit Policies are contrary to Section 527 and in excess of DHS's statutory authority under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A)–(C), represent arbitrary and capricious actions in violation of the APA, *id.* § 706(2)(A), and are *ultra vires* in violation of Section 527. ECF 1 ¶¶ 273–81, 287–92. Plaintiffs also claim that the denial of access to DHS facilities, including field offices, without advance notice, represents agency action unlawfully withheld or unreasonably delayed under the APA. *See* 5 U.S.C. § 706(1); ECF 1 ¶¶ 282–86. Finally, Plaintiffs also seek mandamus and declaratory relief. ECF 1 ¶¶ 293–303.

On August 8, 2025, Plaintiffs filed a motion to stay agency action under 5 U.S.C. § 705, or in the alternative, for a preliminary injunction, to temporarily enjoin the Oversight Visit Policies pending conclusion of this litigation. ECF 17; ECF 17-1 at 54. Defendants opposed the motion,

raising myriad arguments as to why relief is improper in this case, including that Plaintiffs lack Article III standing to bring this lawsuit. *See generally* ECF 20. Plaintiffs filed a reply in support of their motion on September 12, 2025, ECF 29, and the Court held a hearing on the motion on September 25, 2025, *see* Sept. 25, 2025 Min. Entry. Then, on October 1, 2025, the Federal Government shut down due to a lapse in regular appropriations. *See* ECF 32. As a result, and following the Government's unopposed request, this Court stayed proceedings given the uncertain status of Section 527 during the lapse of appropriations. *See* Oct. 29, 2025 Min. Order. The Government shutdown ended following passage of the FY2026 Continuing Appropriations Act, which again provides appropriations funding for DHS subject to the terms of Section 527. *See* §§ 101, 103, 139 Stat. at 496–97. The Court lifted the stay, *see* Nov. 24, 2025 Min. Order, and now proceeds to resolve Plaintiffs' motion.

## II.     LEGAL STANDARD

Plaintiffs seek a stay under Section 705 of the APA, and, in the case that relief is not available, request a preliminary injunction.

Section 705 of the APA authorizes a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

The same factors governing the issuance of relief under Section 705 also govern the issuance of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not

16

granted, (3) that a[ ] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

Turning to the application of those factors, the Court holds that each favors a stay under 5 U.S.C. § 705. Plaintiffs have shown a substantial likelihood of success on their claim that the challenged Oversight Visit Policies are contrary to law and in excess of DHS's statutory authority. The Court also finds that Plaintiffs demonstrate irreparable injury from the challenged policies and that the equitable factors weigh in their favor. Because the Court finds that a stay is warranted under 5 U.S.C. § 705, the Court does not address whether Plaintiffs are also entitled to a preliminary injunction or other miscellaneous relief. The Court addresses the scope of the remedy at the close of this section.

### A.  Plaintiffs are Substantially Likely to Succeed on the Merits.

In determining whether Plaintiffs are substantially likely to succeed on the merits of their claims, the Court must not only address Plaintiffs' "substantive theories," but also threshold issues such as the "establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Defendants present various reasons why Plaintiffs fail to succeed on this prong. First, they argue that the Court likely lacks subject matter jurisdiction because Plaintiffs do not have Article III standing to bring this lawsuit. ECF 20 at 20–21. Second, Defendants contend that even if Plaintiffs could demonstrate Article III standing, the Court should decline to hear this case under principles of equitable discretion that disfavor the judiciary resolving disputes between the

political branches. *Id.* at 35. Third, Defendants argue that Plaintiffs likely lack a cause of action to bring their claims. *Id.* at 36. Fourth, Defendants argue that Plaintiffs' claims likely fail on the merits because ICE's Oversight Visit Policies comport with Section 527 and other laws governing DHS and ICE. *Id.* at 45–49.

The Court disagrees. Plaintiffs have shown a substantial likelihood of success on the issues of jurisdiction, equitable discretion, the availability of a cause of action under the APA, and the merits of at least one of their claims. The Court addresses each of these issues in turn.

### 1. Standing

The first threshold issue in this case is whether Plaintiffs, as individual Members of Congress suing in their official capacities, have standing to sue Defendants regarding the Oversight Visit Policies.

The doctrine of standing derives from Article III of the Constitution, which extends the judicial power of the United States only to "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2. "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). The standing inquiry asks whether the "plaintiff is a proper party to bring a particular lawsuit." *Id.* (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799 (2015)). "When determining whether a plaintiff has Article III standing, the court must assume that the [plaintiff] will prevail on the merits." *Id.*

To establish Article III standing, a plaintiff must allege "(1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). At issue

in this case is "injury in fact," the "first and foremost of standing's three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Injuries cognizable by Article III courts must be: "concrete, meaning . . . real and not abstract" and "particularized," meaning that the injury "must affect the plaintiff in a personal and individual way and not be a generalized grievance." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury must also be "actual or imminent, not speculative." *Id.*

The standing inquiry is "especially rigorous" when "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was" unlawful. *McGahn*, 968 F.3d at 763. Further, this lawsuit, one brought by Members of Congress against officials and agencies of the Executive Branch, "implicates considerations not always present in a standing dispute," *id.* at 768, such as the correct application of the D.C. Circuit and Supreme Court's precedents on questions of "legislative standing," and the separation of powers concerns raised by such cases, *Raines v. Byrd*, 521 U.S. 811, 820 (1997). The Court therefore addresses the standing inquiry as follows: It evaluates Plaintiffs' alleged injuries under "general principles of standing, before turning to the special considerations presented by the interbranch nature of this litigation," *McGahn*, 968 F.3d at 763, including the fact that Plaintiffs are "individual members of the Congress seek[ing] judicial remedies," *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020).

### a. Plaintiffs' Theories of Injury

Plaintiffs allege two theories of injury purportedly caused by Defendants' Oversight Visit Policies: the denial of physical access to facilities covered by Section 527, and the inability to gather in-person information regarding the on-the-ground conditions at those facilities. In this section, the Court finds that both would qualify as sufficiently concrete harms under typical Article

III injury-in-fact principles. In the following sections, the Court will address whether Plaintiffs' status as legislators justifies departing from this conclusion.

### i.   Denial of Physical Access to Facilities

Plaintiffs first argue that Defendants' Oversight Visit Policies have led to ICE personnel barring Plaintiffs from entering facilities covered by Section 527, and claim that such a "restriction on physical access is a classic 'tangible harm.'" ECF 17-1 at 34 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). Plaintiffs claim that they are entitled to this physical access under the terms of Section 527, which in their view was designed to prohibit DHS from taking action to stop them from entering and observing the conditions at Section 527-covered facilities in real time. Per Plaintiffs, Section 527's prohibition on using funds appropriated "to prevent" Members of Congress "from entering" covered ICE facilities "for the purpose of conducting oversight," and its instruction that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice" of their intent to enter such a facility, add up to an entitlement to enter those facilities under Section 527 at the time of their request. § 527, 138 Stat. at 619; ECF 17-1 at 35; ECF 29 at 16, 18 (characterizing Plaintiffs' injury as an unlawful "restriction on physical access" to which Plaintiffs are "entitled").

As a threshold objection, Defendants dispute that Section 527 creates a right of unimpeded in-person access to ICE facilities operated with Section 527 funds. *See* ECF 20 at 13 ("Plaintiffs attempt to transform an appropriations bar known as § 527 . . . into a statutory entitlement for unfettered access to those facilities."). Defendants argue that the text of Section 527 does not expressly "grant Members a legal 'right' to conduct" oversight visits. *Id.* at 28. That argument does not bear on Plaintiffs' standing. "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of" the plaintiff's legal claim. *Parker v. District*

*of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). "Whether a plaintiff has a legally protected interest that supports standing does not require that" a plaintiff show "succe[ss] on the merits; if it did, every merits loss would amount to a lack of standing." *Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019). Thus a Court evaluating a standing dispute can conclude that a plaintiff "ha[s] a cognizable interest" in a certain activity which is allegedly harmed by a defendant's actions "without considering whether the plaintiff[] ha[s] a legal right" to engage in that activity. *Parker*, 478 F.3d at 377. However, the Court also acknowledges that the analysis in the legislative standing cases discussed below often considers the nature of the alleged right at issue, and will thus "peek ahead into the merits" of Plaintiffs' arguments about the legal effect of Section 527 for the purpose of definitively resolving the legislative standing issue. *Conway Corp. v. Fed. Power Comm'n*, 510 F.2d 1264, 1269 (D.C. Cir. 1975), *aff'd*, 426 U.S. 271 (1976); *see McGahn*, 968 F.3d at 765 (discussing, in the context of evaluating legislator standing, whether the House of Representatives had a "long-recognized right, based in the Constitution" of entitlement to specific information); *Raines*, 521 U.S. at 820–830 (asking whether the plaintiff legislators' injury derived from a harm to "something to which they *personally* are entitled").

The Court's understanding of the statute supports Plaintiffs' standing. Defendants read too much into Congress's use of an appropriations bar to implement its chosen policy and ignore the practical implications of Section 527. An "appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part); *see also id.* at 232 (per curiam) (stating that the "use of any government resources—whether salaries, employees, paper, or buildings—to accomplish" a given activity "would entail government expenditure," and "therefore would run afoul of [a] statutory

moratorium on spending for" that activity (quoting *Env't Def. Ctr. v. Babbit*, 73 F.3d 867, 871–72 (9th Cir. 1995)). In Section 527, Congress prohibited DHS and ICE from using appropriated funds to "prevent" a Member of Congress from entering a covered facility for the purpose of conducting oversight. § 527(a), 138 Stat. at 619. Given that ICE cannot act other than through appropriated funds, the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member. *See, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) ("There can be no doubt that [Congress] could accomplish its purpose by an amendment to an appropriation bill, or otherwise." (quoting *United States v. Dickerson*, 310 U.S. 554, 555 (1940)). The statute's restriction on using funds "to make any temporary modification at any such facility that in any way alters what is observed" by the visiting Member "compared to what would be observed in the absence of such modification," and the additional explanatory provision noting that nothing in Section 527 "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a covered facility, § 527(a), (b), 138 Stat. at 619, clearly mean that the Member must be admitted without delay—let alone delay that would lead to modifications of conditions in the facility compared to when the visit was requested. That the Member's admission must occur upon request is also evidenced by a further provision of Section 527, which provides that DHS "may require" a notice period of 24 hours for visits by a congressperson's staff, but says nothing about such a requirement for the Members themselves. § 527(c), 138 Stat. at 619. The result of this provision, when read along with the other parts of Section 527, is that a 24-hour notice period can be acceptable for Members' staffs, but not permissible for the Members themselves. Contrary to Defendants' suggestion, then, Section 527 does entitle Members of Congress to access ICE facilities without being subject to a notice requirement.

The Court must therefore decide whether denial of access to a location to which Plaintiffs claim a right of entry upon request counts as a "cognizable injury" for the purposes of Article III. *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014). With little trouble, the Court finds that it does. Denial of access to property is a "tangible harm," which can qualify as a "concrete injury in fact." *See TransUnion*, 594 U.S. at 425. The federal courts have historically exercised jurisdiction over disputes involving the denial of access to federal property based on various claims of right, without questioning whether the parties involved had standing to bring the suit. *See Greer v. Spock*, 424 U.S. 828, 831–34 (1976) (prohibition on accessing grounds of military reservation for political speech); *Sherrill v. Knight*, 569 F.2d 124, 128 (D.C. Cir. 1977) (addressing decision to bar reporter from White House press events); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 139, 143 (D.D.C. 2025) (addressing challenge to order that restricted firm's employees from accessing government buildings); ECF 20 at 30 (Defendants acknowledging that these cases "address[] . . . access restrictions," although emphasizing that the restrictions in those cases were "targeted—and thus particularized—access restrictions"). Further, the Supreme Court has instructed that when evaluating certain types of harms, a court should consider whether there exists any "close historical or common-law analogue" to such an injury. *TransUnion*, 594 U.S. at 424. And suits about rights of entry to property—such as those over a contractually-granted license—are the kinds of disputes that are "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425.

Further, the denial of physical access to each Plaintiff, *see supra* Section I.B.2, is not only concrete but also "particularized," *TransUnion*, 594 U.S. at 423. While Defendants' Oversight Visit Policies prohibit any Member of Congress from entering a facility without seven days' prior notice, Defendants' actions in implementing the policies have nevertheless "affect[ed]" each of

"the [P]laintiff[s] in a personal and individual way." *Spokeo, Inc.*, 578 U.S. at 339. Each Plaintiff has sought to visit different facilities, at different times, for different reasons. *See supra* Section I.B.2. The alleged injuries are thus "neither abstract nor widely dispersed." *McGahn*, 968 F.3d at 776. Nor does the fact that multiple Plaintiffs allege harms arising from the Oversight Visit Policies undermine the notion that Plaintiffs' harms are particularized. "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc.*, 578 U.S. at 339 n.7.

Finally, and although it does not seem to be in serious dispute in this case, the Court finds that Plaintiffs' physical access injury also satisfies the Article III requirements of causation and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (requiring that there be a "causal connection between the injury and the conduct complained of" and that "the injury will be redressed by a favorable decision"). On various occasions, Defendants have justified their denial of Plaintiffs' access to ICE facilities by citing either the seven-day notice requirement or the claim that ICE field offices are not subject to Section 527. *See supra* Section I.B.2. Plaintiffs' harms are "fairly traceable" to Defendants' promulgation and implementation of those policies, and a "favorable decision" that those policies are unlawful is likely to redress the harm imposed by future denials. *Bethune-Hill*, 587 U.S. at 662.

### ii. Denial of Information Regarding Conditions at ICE Facilities

In the alternative, Plaintiffs also ask the Court to view their injury as an informational injury: the denial of "on-the-ground information regarding the . . . conditions at" ICE facilities covered by Section 527. ECF 17-1 at 35. Plaintiffs again claim that they are entitled to this information under Section 527. In addition to the language prohibiting ICE from using funds to prevent Members of Congress "from entering" ICE facilities, Plaintiffs also point to the language

in Section 527 which prohibits ICE from "mak[ing] any temporary modification at any [covered facility] that in any way alters what is observed by a visiting Member of Congress . . . compared to what would be observed in the absence of such modification." § 527(a), 138 Stat. at 619.

Plaintiffs are correct that certain types of informational injuries are cognizable under Article III. The Supreme Court and the D.C. Circuit have "held that when a person seeks to obtain information the government is required to disclose, the denial of the information is a concrete injury for standing purposes." *McGahn*, 968 F.3d at 766 (citing *FEC v. Akins*, 524 U.S. 11 (1998), and *Pub. Citizen v. DOJ*, 491 U.S. 440 (1989)). In such cases, a plaintiff must (1) have "been deprived of information that, on [the plaintiff's] interpretation, a statute requires the government or a third party to disclose to it, and (2) . . . suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). The Supreme Court in *TransUnion* reaffirmed the viability of informational injuries of this kind, albeit while introducing the requirement that the "informational injury . . . cause[]" either "adverse effects" or "downstream consequences" in order for the injury to be cognizable under Article III. *TransUnion*, 594 U.S. at 442 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)); *see also, e.g.*, *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1229 (D.C. Cir. 2024) (concluding informational injury was concrete where the denial of information "hinder[ed]" consumer's ability to make "an informed purchasing decision").[7]

---

[7] The D.C. Circuit has noted that *TransUnion*'s statement that a plaintiff alleging an informational injury must show a downstream adverse effect of the denial appears to be in tension with the Supreme Court's own decisions regarding information-disclosure statutes like the Freedom of Information Act which hold that a plaintiff need not show "more than that they sought and were denied specific agency records" to have standing to sue. *Pub. Citizen*, 491 U.S. at 449; *see Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) (noting that "*TransUnion* does not expressly overrule *Public Citizen*" and that the lower courts are "charged with following case law that directly controls a particular issue, 'leaving to the Supreme Court the prerogative of overruling its own decisions'" (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023))). For the purposes of this opinion, the Court assumes without deciding that such a downstream effect is required in this case, given that Plaintiffs easily meet this requirement.

Defendants again contest that Section 527 creates any entitlement to information or requires the government to "'disclose' any type of 'information'" to Plaintiffs, thus making the informational injury line of cases inapplicable. ECF 20 at 30 (citing *Elec. Priv. Info. Ctr.*, 878 F.3d at 378). Again, the scope of 527 and what it secures to Plaintiffs here is intertwined with the merits of the case and is a question on which Plaintiffs need not necessarily show success in order to prevail on the standing analysis. *See Est. of Boyland*, 913 F.3d at 123; *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (framing the standing inquiry as asking whether the party was "deprived of information that, on [the plaintiff's] interpretation, a statute requires the government . . . to disclose to it"). Nevertheless, in evaluating statutorily-grounded informational injuries, the Supreme Court's analysis in *TransUnion* indicates that it is proper at the standing analysis stage to ask whether the statute in question functions similarly to a "public-disclosure or sunshine law[] that entitle[s] . . . the public to certain information." *TransUnion*, 594 U.S. at 441; *see also McGahn*, 968 F.3d at 765–66 (evaluating, in a case regarding the purported denial of information, whether the plaintiff had been deprived of something "to which it is legally entitled").

The Court concludes that Section 527 creates an entitlement to information sufficiently analogous to the statutes featured in the informational injury cases to make those cases instructive here. Defendants are correct that Section 527 does not operate in exactly the same way as other information disclosure statutes such as the Freedom of Information Act (FOIA), given that Section 527 imposes a prohibition on the use of appropriated funds rather than a mandatory command requiring the disclosure of information upon request. *See, e.g.*, 5 U.S.C. § 552(a)(3)(A) (provision of FOIA requiring that the government "shall make . . . records promptly available to any person" following a request). But Defendants' objection that Section 527 insufficiently resembles FOIA and other disclosure provisions because it has no "mandatory direction to supply information,"

26

ECF 20 at 34, ignores that the type of information access contemplated by the statute is not records or documents created by the agency, but access to a specific ICE facility to permit the "observ[ation]" of the facility "by a visiting Member of Congress or such designated employee," § 527(a), 138 Stat. at 619. And as discussed above, Defendants overstate the implications of Congress's choice to use an appropriations limitation to facilitate Members' observations of the conditions in certain ICE facilities. Again, Congress not only prohibited DHS and ICE from preventing Members of Congress from entering covered ICE facilities upon request, but also from making temporary modifications that would alter what a visiting Member sees when they visit. The effect of Section 527 is that the facility must (1) admit the Member upon request, and, (2) thanks to the language prohibiting any "temporary modification," permit the Member to view the facilities in their current condition. Because of Section 527, the government cannot act otherwise. *See Env't Def. Ctr.*, 73 F.3d at 872. ("The government cannot make expenditures, and therefore cannot act, other than by appropriation.").

This case is therefore analogous to those cases recognizing a sufficiently "concrete and particularized" informational injury. *Jewell*, 828 F.3d at 992. Here, each Plaintiff has alleged that they have "been deprived of information" about conditions at ICE facilities "that, on [their] interpretation, a statute require[d] the government" to make available to them. *Id.* That harm is "the type of harm Congress sought to prevent by" passing the disclosure-oriented statute. *Id.* Section 527 focuses on access to specific ICE facilities and allowing visiting Members of Congress to view those facilities with the goal of preserving what may be "observed by a visiting Member of Congress." § 527(a), 138 Stat. at 619. Further, these requests for access to ICE facilities, even when construed as requests for information, occurred at different facilities, different times, and

with different motivations by each Plaintiff, and are particularized for the reasons discussed above. *See supra* Section III.A.1.a.i.

Finally, to the degree required, Plaintiffs have identified "downstream" or "adverse" effects of the denial of that information. *TransUnion*, 594 U.S. at 442. The Supreme Court has found standing when the denial of information harmed the requestors' ability to engage in the political and policymaking process. *See Pub. Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 21. Plaintiffs are Members of Congress who seek information that will aid them in their roles of assisting constituents, conducting oversight, and drafting and proposing legislation. They "desire[] information with which" to make "informed . . . decision[s], and the 'information deficit' created by" Defendants' Oversight Visit Policies "'hinder[s] [their] ability' to do so." *Animal Legal Def. Fund, Inc.*, 111 F.4th at 1229. And as with the denial of physical access, the inability of Plaintiffs to view the on-the-ground conditions of covered ICE facilities at the times they request is caused by Defendants' Oversight Visit Policies and would be redressed by a decision that these policies should be stayed or vacated.

### b.  *Raines* and Legislator Standing Principles

Plaintiffs have demonstrated the requisite injury-in-fact under "general principles of standing," but the question remains whether the Court should nevertheless depart from that conclusion because Plaintiffs are "individual members of the Congress seek[ing] judicial remedies" against the Executive Branch. *McGahn*, 968 F.3d at 763; *Blumenthal*, 949 F.3d at 19. The D.C. Circuit has instructed that the "question [of] whether [Members of Congress] have standing in federal court to challenge the lawfulness of" Executive Branch actions "was answered, at least in large part, in the Supreme Court's . . . decision in *Raines v. Byrd*," and in resolving this dispute, the Court must apply the guidance set out in *Raines* and related cases. *Campbell v. Clinton*,

203 F.3d 19, 20 (D.C. Cir. 2000); *see Blumenthal*, 949 F.3d at 19 ("*Raines* is our starting point when individual members of the Congress seek judicial remedies.").

In *Raines*, six Members of Congress challenged the constitutionality of the Line Item Veto Act. *See* 521 U.S. at 814. The Act authorized the President to "cancel" certain spending and tax benefit measures after they have been signed into law, unless the cancellation was subsequently overridden by Congress by joint resolution. *Id.* at 814–15. Plaintiffs challenged the constitutionality of the law on the grounds that it "unconstitutionally expand[ed] the President's power, and violate[d] the requirements of bicameral passage and presentment by granting to the President, acting alone, the authority to 'cancel' and thus repeal provisions of federal law." *Id.* at 816. Plaintiffs claimed that the Act "directly and concretely" injured them in their official capacities by "alter[ing] the legal and practical effects of all votes they may cast on bills containing such separately vetoable items," which "divest[ed] [them] of their constitutional role in the repeal of legislation," and "alter[ed] the constitutional balance of powers between the Legislative and Executive Branches." *Id.*

The Supreme Court found that the six Members of Congress lacked standing. *Raines*, 521 U.S. at 830. In coming to this conclusion, the Court in *Raines* emphasized that the alleged injury— "the diminution of legislative power"—was an "institutional injury," which "necessarily damage[d] all Members of Congress . . . equally," and was therefore "wholly abstract and widely dispersed." *Id.* at 821, 829. As a result, the Court found that the Members lacked a "sufficient 'personal stake' in th[e] dispute" and did not have a "sufficiently concrete injury" for Article III standing. *Id.* at 830; *see also Clinton v. City of New York*, 524 U.S. 417, 430 (1998) (distinguishing the "abstract and widely dispersed" injury in *Raines* from cases where the parties have "alleged a 'personal stake' in having an actual injury redressed").

In *Raines*, the Court addressed and distinguished *Coleman v. Miller*, 307 U.S. 433 (1939), a prior case where the Court found standing for individual "legislators . . . claiming" what the Court described as "an institutional injury." *Raines*, 521 U.S. at 821. In *Coleman*, 20 of Kansas's 40 state senators voted against ratifying a proposed amendment to the U.S. Constitution, resulting in a deadlock that would have ordinarily defeated ratification. *Raines*, 521 U.S. at 822. However, the Kansas Lieutenant Governor broke the tie by voting in favor of the amendment. *Id.* The losing state senators brought suit, and the Court held that the legislators had standing because their votes "against ratification [had] been overridden and virtually held for naught although . . . their votes would have been sufficient to defeat ratification." *Coleman*, 307 U.S. at 438. On review, the Supreme Court found the state senators to have a "plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* The Supreme Court in *Raines* reaffirmed a legislator's standing to sue on the basis of this kind of injury, but read *Coleman* narrowly, stating that "our holding in *Coleman* stands (at most) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (citation omitted); *see also Campbell*, 203 F.3d at 22–23 (noting that *Coleman* represents a "very narrow possible . . . exception" to the "*Raines* rule").

The Court in *Raines* contrasted both the alleged institutional injuries in *Raines* (which failed to establish standing) and the vote-nullification injury in *Coleman* (which did establish standing), with the injury that the Court had found judicially cognizable in *Powell v. McCormack*, 395 U.S. 486 (1969). *See Raines*, 521 U.S. at 820–21, 829. In *Powell*, the House of Representatives refused to seat Congressman Adam Clayton Powell due to alleged misconduct. *Powell*, 395 U.S.

at 490. Congressman Powell brought a suit challenging "his exclusion from the House of Representatives (and his consequent loss of salary)." *Raines*, 521 U.S. at 821. In *Raines*, the Supreme Court emphasized that Powell's injury differed from the *Raines* plaintiffs in two key regards. First, the *Raines* plaintiffs were not "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Id.* at 821. Second, the plaintiffs did not claim to have been "deprived of something to which they *personally* are entitled." *Id.* The Supreme Court thus read *Powell* to bless standing in cases where the plaintiffs alleged an "injury to themselves as individuals." *Raines*, 521 U.S. at 829.

*Raines*, as further elaborated by subsequent Supreme Court and D.C. Circuit decisions, thus provides the framework for an inquiry into "whether [Members of Congress] have standing in federal court to challenge the lawfulness of actions of the executive." *Campbell*, 203 F.3d at 20. Most critically, a court must consider whether the legislator seeks to "assert the institutional interests of a legislature," in which case the Member will generally lack standing, *Blumenthal*, 949 F.3d at 19, or an injury that is personal to the legislators "as individuals," and is thus particularized and concrete, *Raines*, 521 U.S. at 829. As the Supreme Court clarified in *Arizona Independent Redistricting Commission*, an "institutional injury" is one that is "'widely dispersed'" and does not "zero[] in on any individual Member," but "'necessarily impact[s] . . . equally'" the members of the relevant legislative body. 576 U.S. at 802 (quoting *Raines*, 521 U.S. at 821, 829). Therefore, notwithstanding the narrow potential exception recognized in *Coleman*, "unauthorized legislators" will generally "lack standing to sue the [Executive Branch] to vindicate injuries to the legislative bodies of which they are a part," *McGahn*, 968 F.3d at 775, because of a "mismatch between the [party] seeking to litigate and the body to which the" injury accrues, *Bethune-Hill*, 587 U.S. at 667. "[T]he [Supreme] Court's focus on 'mismatch' is [thus] an inquiry into whether

the claimed injury is personal to the plaintiff or else shared by a larger group of which the plaintiff

is only a component—in other words, whether the injury is particularized." *McGahn*, 968 F.3d at

767. "*Raines* stands for the proposition that whereas a legislative institution may properly assert

an institutional injury, an individual member of that institution generally may not." *Id.* at 775.[8]

The case is different for personal "injurie[s] to [Members of Congress] as individuals,"

such as ones that "deprive[] [them] of something to which they personally are entitled." *Raines*,

521 U.S. at 821, 829. Personal injuries of this kind—such as the denial of Representative Powell's

ability to sit in Congress after his constituents had "duly elected" him, *Powell*, 395 U.S. at 493—

are sufficiently particularized and concrete, *Raines*, 521 U.S. at 821. More broadly, the personal-

versus-institutional inquiry helps to ensure that there is no "mismatch" between the interests of the

plaintiff seeking to litigate and the legislative locus to which the injury attaches, whether that is

the individual legislator, their committee, or the body as a whole. *McGahn*, 968 F.3d at 767. Where

the injury is not one simply to the "larger group of which the plaintiff is only a component" but

one to the plaintiff Member of Congress themselves, the injury is sufficiently particularized under

*Raines* and its progeny. *Id.*

In addition to considering (1) whether the plaintiffs had alleged an institutional injury that

was abstract and widely dispersed rather than a personal injury that is concrete and particularized,

---

[8] The Supreme Court's discussion of institutional injury in *Arizona Independent Redistricting Commission* is in some tension with *Raines*'s characterization of the legislators' vote-nullification injuries in *Coleman* as an "institutional injury." *Raines*, 521 U.S. at 821; *see Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016) ("Describing the injury in *Coleman* as 'institutional' is difficult to square with the definition of an institutional injury provided in *Arizona*."). This is because the injury in *Coleman* was arguably not one that "necessarily impacted all Members" of a legislative body equally, *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 802 (cleaned up), but one accruing to the specific twenty Senators whose votes "would have been decisive in defeating" the resolution, *Raines*, 521 U.S. at 823 (quoting *Coleman*, 307 U.S. at 446). Thus, *Coleman* did not necessarily "concern injury to the power of the legislature as a whole," at least as contemplated in *Arizona Independent Redistricting Commission*. *Kerr*, 824 F.3d at 1215. The Court understands the discussion of institutional injury in *Arizona Independent Redistricting Commission* to be the main approach to institutional injury, and that the injury contemplated in *Coleman* and endorsed in *Raines* represents a separate, narrow species of institutional injury. *See Campbell*, 203 F.3d at 23 (describing *Coleman* as "the very narrow possible . . . exception to *Raines*").

*Raines* also considered additional factors relevant to the standing analysis, such as that: "(2) [the] plaintiffs' attempt to litigate their dispute . . . was contrary to historical experience; (3) the plaintiffs had not been authorized to represent their respective Houses of Congress, and indeed both Houses actively opposed their suit; and (4) dismissing the lawsuit neither deprived Members of Congress of an adequate remedy nor foreclosed the Act from constitutional challenge." *McGahn*, 968 F.3d at 775–76 (cleaned up) (quoting *Raines*, 521 U.S. at 829).

### c. Plaintiffs' Injuries are Not Barred by *Raines* Because They are Personal and Particularized, Rather than Institutional.

Defendants argue that this case starts and ends with *Raines*. They argue that even if Section 527 provides a right to Members of Congress to access ICE facilities and view the conditions therein, this is a right that is "held by Congress as a whole," and its infringement "necessarily damages all Members . . . and both Houses of Congress equally," making it an "institutional injury" that is insufficiently particularized under *Raines*.[9] ECF 20 at 27 (citing *Raines*, 521 U.S. at 821). Defendants also appear to argue that even if the right to access ICE facilities accrues to the Members of Congress as individuals, a lawsuit is still barred under *Raines*, because, in Defendants' reading, Members of Congress may only bring lawsuits for harms experienced in their "personal capacities." ECF 20 at 23. Per Defendants, "any deprivation of information or access" harms Plaintiffs only as "Members of Congress (or staffers) attempting to engage in legislative oversight," which is tied to Congress's legislative power, and thus their injuries represent "a diminution of legislative power" not cognizable under *Raines*. *Id.* To the extent the right to visit

---

[9] It is Defendants' view that Section 527 does not guarantee such rights to Plaintiffs, and as a result, the only injury that they could complain of is "a violation of [a] restriction on funding," which "falls upon Congress as a whole," and "at most harms the Congress that enacted that prohibition, not any particular Member." ECF 20 at 26. Because the Court disagrees with Defendants' characterization of Plaintiffs' injury, it does not address whether this framing of the injury would qualify as a sufficient injury in fact to permit standing.

ICE facilities without notice is individualized to Members, Defendants portray it as "a political benefit that attaches to the seat that [the] member holds," and cannot be considered a "personal right" that can be vindicated in a lawsuit in an Article III court. *Id.* at 24.

Plaintiffs argue that Defendants greatly overread *Raines* and subsequent cases. They contend that under *Raines*'s personal-versus-institutional dichotomy, their alleged injuries are personal and thus not barred by *Raines*. ECF 29 at 11. They also argue that for a legislator to have standing under *Raines*, the legislator need not allege an injury purely in the legislator's private capacity—personal injuries under *Raines* and its progeny can arise from injuries that the Member incurs because they are a congressperson. *Id.* at 11–12. For Plaintiffs, the proper inquiry under *Raines* is to ask whether Plaintiffs sue based on harms to their "*individual* entitlements (whether in a private or official capacity)" or based on "a right that belongs only to the collective institution of which they are members." *Id.* at 11.

The Court agrees with Plaintiffs that *Raines* does not bar this lawsuit. As discussed above, the key inquiry under *Raines* and the subsequent cases is whether the alleged injury is "personal" or "institutional." *Campbell*, 203 F.3d at 20, 21 n.2. This is because "individual members" generally "lack standing to assert the institutional interests of a legislature." *Bethune-Hill*, 587 U.S. at 667; *but see Coleman*, 307 U.S. at 438; *Raines*, 521 U.S. at 821–23 (allowing for suit by individual legislators to remedy institutional injury in limited circumstances). The key point is that there should be no "mismatch" between the party "seeking to litigate" and the party—whether it is an individual Member of Congress, congressional committee, or house of Congress as a whole—that has been harmed. *See McGahn*, 968 F.3d at 767.

Under *Raines*, Plaintiffs' injuries are personal rather than institutional. Look first to the language of Section 527: It provides access to ICE facilities for individual congresspeople or their

designated staff members. *See* § 527(a), 138 Stat. at 619. Plaintiffs are individual Members of Congress who have been denied access to Section 527-funded facilities. Thus impacted, individual Members of Congress are the appropriate parties to bring suit and there is no "mismatch." *McGahn*, 968 F.3d at 767. This is different from cases involving institutional injuries, where the right or interest harmed belonged to a committee or to the legislature as a whole, such that individual Members of Congress would not be proper plaintiffs. *See id.* (finding that the House of Representatives' constitutional right to subpoena testimony had been delegated to the plaintiff committee, which was proper plaintiff to bring suit); *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 799–800 (finding standing where state legislature sued alleging harm to its legislative "prerogative to initiate redistricting"); *Bethune-Hill*, 587 U.S. at 671 (rejecting attempt by one branch of state legislature to vindicate interests in redistricting when that power had been assigned to both branches jointly). A clear mismatch between the plaintiff and the institution injured also occurred in *Raines*, where the plaintiffs alleged abstract harms that accrued to Congress as an institution. The *Raines* plaintiffs alleged harms to the "legal and practical effect" of their votes, the loss of their "constitutional role in the repeal of legislation," and the upset of "the constitutional balance of powers between the Legislative and Executive Branches." *Raines*, 521 U.S. at 816. But as the Supreme Court noted, when taken together, these injuries qualified only as an alleged "diminution of legislative power." *Raines*, 521 U.S. at 821. That "legislative power" which had been allegedly diminished belonged to Congress as a body, which is why the Supreme Court found that the Line Item Veto Act "necessarily damage[d] all Members of Congress and both Houses of Congress equally." *Id.*

The injury was also found to be institutional in *Blumenthal v. Trump*, where 215 Members of Congress sued the Executive Branch on the ground that President Trump had failed to seek

Congress's consent to accept foreign emoluments. *See* 949 F.3d at 16–17. Like the injuries in *Raines*, the *Blumenthal* plaintiffs' inability to cast votes to "approve or disapprove [the President's] acceptance of foreign emoluments," was a "loss of political power" that impacted Congress as a whole and could not be the basis for a suit by individual legislators. *Id.* at 17, 19. This was likewise the case in *Chenoweth v. Clinton*, where legislators sued President Clinton on the ground that an executive order had "deprived the plaintiffs of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" regarding the subjects of the executive order. 181 F.3d 112, 113 (D.C. Cir. 1999). The D.C. Circuit found that this injury was properly characterized as a "dilution of their authority as legislators" and thus harmed Congress's institutional interests. *Id.* at 115; *see also id.* at 116 (noting that the plaintiffs had alleged that President Clinton had "usurp[ed] Congressional authority by implementing a program . . . in a manner contrary to the Constitution"). The same was true in *Campbell v. Clinton*, where 31 Members of Congress sued President Clinton on the grounds that he had violated the War Powers Clause and War Powers Resolution. 203 F.3d at 20. This claim was also institutional, and harmed Congress as a whole, as plaintiffs' claim boiled down to an allegation that President Clinton had acted in violation of Congress's authority by "wag[ing] war . . . without a congressional delegation." *Id.* at 22. Because the injuries in *Raines*, *Blumenthal*, *Chenoweth*, and *Campbell* were to interests of Congress as a whole, they were injuries shared not only by the plaintiffs, but also the "members of the Congress who did not join the lawsuit[s]" and therefore could not be asserted by individual legislators. *Blumenthal*, 949 F.3d at 19.

The facts here differ significantly from those in the institutional injury cases. Defendants are correct that under Plaintiffs' reading, the access granted by Section 527—access to covered ICE facilities—is not granted to a particular subset of legislators alone, and that the entitlement,

let alone the injury, would not exist were Plaintiffs not Members of Congress. *See* ECF 20 at 23. But the fact that an individual Member of Congress can claim the right to access under Section 527 does not automatically alchemize the interests at stake into institutional interests and turn Plaintiffs' individual injuries into institutional harms. As noted above, Section 527 is specifically focused on granting access to ICE facilities to individual Members of Congress and their designated staff members. § 527(a), 138 Stat. at 619. This is something they are entitled to "as individuals," rather than a right assigned to a committee or to Congress as a whole. *Raines*, 521 U.S. at 829. Further, even if the right to access is shared by all Members of Congress, Defendants' oversight policies do not "damage[] all Members of Congress . . . equally." *Id.* at 821. Not all Members of Congress could bring this suit. Plaintiffs are injured because they sought (and continue to seek) to exercise the right of access granted under Section 527 and were denied. They made requests for access for different purposes, at different facilities, at different times and were all rebuffed. Consider the analogous position of an individual requesting information under a disclosure statute such as FOIA. While all members of the public have the right to make such a request, only those who actually *do* make the request and are denied have the right to sue in federal court. *See McDonnell v. United States*, 4 F.3d 1227, 1238 (3d Cir. 1993) ("The filing of a request, and its denial, is the factor that distinguishes the harm suffered by the plaintiff in a[] FOIA case from the harm incurred by the general public."). Here, while any Member of Congress may have the ability to seek access under Section 527, they only become injured for Article III purposes when those rights have been stymied.

Defendants also argue that even if individual Members of Congress are provided the right to access facilities under Section 527, the injury worked by a denial of those rights is still an institutional injury because "any legislator who seeks information for purposes of legislative

oversight necessarily does so as an agent for the entire legislative body." ECF 20 at 27. But Defendants provide no support for that novel proposition. One way to construe Defendants' argument is to say that the inherent "constitutional power" to conduct oversight, *see, e.g.*, *McGahn*, 968 F.3d at 764, is granted to Congress (or perhaps each house of Congress) alone, and thus any injury to that oversight power is one that harms the institution, rather than any particular Member carrying out the oversight. But this ignores that Congress can, and often does, delegate its oversight responsibilities to individual committees, which then may be the proper plaintiff in an Article III lawsuit seeking to vindicate harms to that oversight power. *See generally id.* Plaintiffs argue that Congress has in fact "delegated [such] authority to individual members with respect to DHS facilities" through the operation of Section 527. ECF 29 at 11. However, the Court need not adopt Plaintiffs' stance to reject Defendants' argument on this point. It is true that Section 527 is structured such that Plaintiffs are only entitled to access if they seek to enter the covered facility "for the purpose of conducting *oversight*." § 527(a), 138 Stat. at 619 (emphasis added). But Plaintiffs' injury is not institutional in the way Defendants claim because the source of their right is not "Congress's inherent power to obtain information in aid of legislation," but "[r]ather, it is the express provision of a federal law" that is the "outcome of bicameralism and presentment," *Maloney v. Carnahan*, 45 F.4th 215, 216 (D.C. Cir. 2022) (Millett, J., concurring in denial of rehearing en banc), and the result of Congress's decision to provide specific entitlements to access through an appropriations bill.

The Court also rejects Defendants' claim that to be a personal and particularized injury under *Raines*, the injury must be one that only occurs in Plaintiffs' "personal capacities," and cannot extend to a legislator "in their official capacity asserting injury to . . . the prerogatives of their office." ECF 20 at 13, 23; *see also* Hr'g Tr. 27:17–25 (stating that *Raines* "drew a distinction

between individual legislators bringing claims in their official capacity, whether alleging official or institutional harm," and "individual legislat[ors] bringing claims in their personal capacity"). This is undermined by the text of *Raines* and its acknowledgment of the justiciability of the injury alleged in *Powell*. Congressman Adam Clayton Powell's sufficiently personal and particularized injury arose from rights he was entitled to as a congressperson—in his case, entitlement to sit in Congress and exercise the authority that attached to that seat, as well as a salary. *See Raines*, 521 U.S. at 821. While the Court in *Raines* noted that the plaintiffs had sued "in their official capacities," and acknowledged that the "loss of a[] private right" would have made the injuries in that case "more concrete," *id.*, that is far from saying that the only harms that can justify standing in the case of a Member of Congress are those which are divorced from their official roles and responsibilities. *Raines* itself noted that a legislator would be likely to have standing if the legislator had "been singled out for specially unfavorable treatment as opposed to other Members," without distinguishing whether that treatment was to the legislator's personal or official prerogatives. *Id.* Further, *Raines* implied that a Member of Congress would be injured for Article III purposes if their vote was "denied its full validity in relation to the votes of their colleagues," a harm that could only ever occur in the legislator's official capacity, and one that would be clearly personalized to the legislator, rather than to the institution of Congress as a whole. *Id.* at 824 n.7 (raising the "hypothetical law in which first-term Members were not allowed to vote on appropriations bills"). And following this discussion in *Raines*, courts have acknowledged that personal injuries to legislators may arise when they seek to exercise their official duties. For example, the Tenth Circuit has stated that a "personal injury" accruing to an "individual legislator" would include a claim that a "particular subset of legislators was barred from exercising their right to vote on bills." *Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016).

The question is thus whether the legislator is deprived of something to which they "personally are entitled." *Raines*, 521 U.S. at 821. The access granted by Section 527 and the denial of that access falls within this category, even though Plaintiffs would not experience this injury were they not Members of Congress. What makes the injury "personal" in these cases is not that the injury is to some entitlement outside of the Member's official duties, but that the injury "zeroes in on the individual and is thus concrete and particularized." *Kerr*, 824 F.3d at 1216. While it is true that if Plaintiffs resigned tomorrow, they would "no longer have a claim," the injury does not "run[] . . . with the Member's seat" in the same way as did the purported injuries in *Raines*. 521 U.S. at 821. The right to request and receive access to a Section 527 facility is secured by a Plaintiff's status as a Member of Congress, but the injury arises from the particular Member's request for access and subsequent denial by the Executive Branch. This injury would not "be possessed by [the Member's] successor" in the same way as the alleged injuries in *Raines*. *Id.* The injuries in *Raines* were so "abstract" and "institutional"—based as they were in harms to Congress's legislative power and place in the constitutional scheme—that any successor congressperson would have the exact same claim of injury as the *Raines* plaintiffs. *Id.* at 829. That is not the case here. Plaintiffs' injuries are sufficiently personalized under *Raines*, and Plaintiffs are not barred from bringing suit simply because they sue as legislators in their official capacities.

### d. The Additional Separation-of-Powers Concerns in *Raines* and Related Cases do not Prohibit Finding Standing Here.

While the personal-versus-institutional inquiry is the key one, the D.C. Circuit has identified additional factors that militated against finding Article III standing in *Raines*. *See McGahn*, 968 F.3d at 775–76 (citing *Raines*, 521 U.S. at 829–30). The Court finds that none of those considerations bar Plaintiffs' suit.

First, the Court does not find that "plaintiffs' attempt to litigate their dispute at this time [is] contrary to historical experience." *McGahn*, 968 F.3d at 775 (citing *Raines*, 521 U.S. at 829). *Raines* itself acknowledged historical precedent for individual legislator suits that were premised on "injur[ies] to themselves as individuals." *Raines*, 521 U.S. at 829 (citing *Powell*, 395 U.S. 486). "[H]istorical practice is constitutionally significant even when it does not extend as far back into the past as the Founding." *McGahn*, 968 F.3d at 777. This dispute is not the kind of "confrontation[] between one or both Houses of Congress" (i.e., institutional plaintiffs with institutional grievances) "and the Executive Branch . . . brought on the basis of claimed injury to official authority or power" that *Raines* viewed as unsuitable for judicial intervention. *Raines*, 521 U.S. at 826. It is more analogous to disputes over an individual's entitlement to information based on a congressionally passed and presidentially-signed statute, which courts have long held provide grounds for standing. *See, e.g.*, *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–18 (D.C. Cir. 2006); *Akins*, 524 U.S. at 21; *Pub. Citizen*, 491 U.S. at 449.

Second, the fact that Plaintiffs "have not been authorized to represent their respective Houses of Congress" in this lawsuit does not weigh the same way as it did in *Raines*. 521 U.S. at 829. In *Raines*, the plaintiffs sought to vindicate injuries to the institution of Congress as a whole. Here, the Court has found that the injuries are not institutional but personal to Plaintiffs, and thus authorization to sue by the House of Representatives is not relevant to the analysis.

Third, unlike in *Raines*, a finding that Plaintiffs would lack standing would "deprive[] Members of Congress of an adequate remedy" and "foreclose[] the [Oversight Visit Policies] from . . . challenge (by someone who suffers judicially cognizable injury as a result of the [Policies])." *Raines*, 521 U.S. at 829. Defendants resist this conclusion. They argue that this case should be remedied through "political mechanisms" rather than judicial intervention. ECF 20 at

25. In *Raines*, similar self-help mechanisms included legislative action by Congress as a whole to "repeal[] the [Line Item Veto] Act or exempt appropriations bills from its reach." 521 U.S. at 829. In *Chenoweth* and *Campbell*, the prospect of passing additional legislation also served as an adequate remedy. In *Chenoweth*, it was "uncontested that the Congress could terminate [the President's actions] were a sufficient number in each House so inclined." 181 F.3d at 116. And in *Campbell*, "Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign." 203 F.3d at 23.

Defendants also analogize this case to a type of information dispute between Congress and the Executive Branch—such as those regarding the proper scope of a response to a subpoena of presidential or agency documents—which are often resolved through the "process of accommodation." *Trump v. Thompson*, 20 F.4th 10, 37 (D.C. Cir. 2021); *see* ECF 20 at 27. Accommodation is a "flexible, dynamic process that could involve interlocking and contingent negotiations over multiple different requests for information," with Congress exercising pressure on a recalcitrant Executive Branch through its ability to influence or stymie "the President's legislative priorities, nominations and confirmations." *Thompson*, 20 F.4th at 37. The Supreme Court has emphasized that information disputes "have been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020).

But Defendants' citation to *Mazars* and the like ignore that here, the "hurly-burly's done": "the battle's lost and won." William Shakespeare, Macbeth act 1, sc. 1, l. 3–4. Section 527 is a result of the very "self-help" mechanisms and political rough-and-tumble that Defendants espouse. ECF 20 at 25. The text of Section 527 reflects a congressional concern with access to, and information about, conditions within ICE facilities. In order to remedy that concern, Congress

undertook the most classic of political remedies: both the House and the Senate have repeatedly passed legislation guaranteeing that access to individual Members. If the Executive Branch thought that Section 527 was bad policy, it could have employed its own political tools—including the bully pulpit and the veto—to ensure that Section 527 was not included in the various appropriations acts. Instead, President Trump assented to Section 527 as recently as November 12, 2025. *See* FY2026 Continuing Appropriations Act, §§ 101, 103–04, 105, 139 Stat. at 496–97. Accepting Defendants' characterization of this action—in reality, a lawsuit alleging violation of a duly enacted law—as instead a political dispute to be resolved solely with "political mechanisms," ECF 20 at 25, would extend the logic of accommodation to a context where it is totally inapposite. Assuming that Plaintiffs are right on the merits, Defendants are violating the law. To address that violation, Defendants suggest that Members of Congress must essentially start over: despite having already passed a statute to secure its Members' access to ICE facilities, Defendants argue that Plaintiffs should convince their colleagues in Congress to go back to the well and do the same thing again, either through further appropriations legislation or other full-House action. ECF 20 at 25 (citing with approval the "political tools" mentioned in *Raines*); *see also id.* at 35 (suggesting that Plaintiffs would be able to secure substantial relief by "convinc[ing] a majority of their House colleagues that Congress should act to enforce" Section 527). Defendants cite with approval *Campbell*, which found that the plaintiff Members of Congress had alternative remedies because they "retain[ed] appropriations authority and could have cut off funds for" the allegedly illegal actions. 203 F.3d at 23.

With Section 527, Congress has done just that, and the dispute before the Court regards ICE's alleged failure to comply with that funding limitation. In light of the injury alleged by Plaintiffs, it cannot be the case that Congress's power to implement further appropriations

limitations or legislate other obligations on the Executive Branch is plausibly an adequate remedy. As Plaintiffs aptly put it, "Congress does not have to act twice for its statutes to be enforceable." ECF 29 at 20. "Without the possibility of enforcement" of an appropriations rider like Section 527, "the Executive Branch faces little incentive," *McGahn*, 968 F.3d at 771, to adhere to other of Congress's decisions regarding "legislative policies[,] . . . programs[,] and projects" as laid out in appropriations bills, *Tenn. Valley Auth.*, 437 U.S. at 194. Finding this case justiciable "preserve[s], rather than disrupt[s]," the longstanding practice of bicameralism and presentment. *McGahn*, 968 F.3d at 771.

Defendants' arguments regarding alternative remedies and Congress's political tools are misguided for a broader reason: They again assume that this case presents an institutional injury to Congress as a whole. But the injuries here are to individual Members of Congress. As a result, the analogy to the information dispute cases does not work. Those cases involve two, co-equal branches pitted against each other and the balancing of constitutionally-derived interests— Congress's in "obtaining information through appropriate inquiries," and the Executive Branch's in confidentiality. *Mazars*, 591 U.S. at 870; *see, e.g.*, *United States v. Nixon*, 418 U.S. 683, 706 (1974). In such cases, Congress is exercising an inherent power to conduct oversight that belongs to the institution, and has the stamp of approval from the institution, whether through delegation or direct authorization. *See McGahn*, 968 F.3d at 767, 776 (finding standing to enforce congressional subpoena where the committee that had issued the subpoena was authorized to do so by the House rules). Here, individual Members of Congress are exercising a right given to them by statute to access ICE facilities. It is difficult to see how requiring an individual Member of the House to seek action of the entire body to vindicate an individual entitlement of access can qualify as an "adequate remedy." *Raines*, 521 U.S. at 829. That the twelve Plaintiffs here would have to

mobilize majorities of Congress to act on their individual injuries further demonstrates why the injuries are personal, rather than institutional, under *Raines*.

*     *     *

In sum, the Court finds that Plaintiffs have shown the "substantial likelihood of standing" required to maintain a request for preliminary relief. *Food & Water Watch, Inc.*, 808 F.3d at 913. Section 527 provides an entitlement to individual Members of Congress to enter facilities funded with Section 527 funds and observe the conditions within. And whether construed as the denial of physical access to those facilities, or the denial of information about the conditions therein, Plaintiffs have sufficiently alleged "concrete and particularized" injuries that are "fairly traceable to the challenged conduct" of Defendants and are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338–39. Plaintiffs' status as legislators, which requires that the Court's standing inquiry be "especially rigorous," does not change this conclusion. *Raines*, 521 U.S. at 819. Defendants make much out of the fact that this case involves political actors and figures from both the Legislative and Executive Branches, but the "Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). An Article III court cannot decline to hear a case "merely because the issues have political implications." *Id.* at 196 (citing *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

### 2. Equitable Discretion

Notwithstanding the judiciary's "virtually unflagging" "obligation" to hear cases that are properly before it, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013), Defendants argue that this Court should nevertheless decline to hear this case. Defendants ground this request in the D.C. Circuit's "equitable discretion" doctrine. ECF 20 at 35–36. This doctrine states that "[w]here a congressional plaintiff could obtain substantial relief from . . . fellow legislators through the

enactment, repeal, or amendment of a statute, [a] court should exercise its equitable discretion to dismiss the legislator's action." *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981). While the D.C. Circuit has never overruled *Riegle*'s "creat[ion] [of this] doctrine of 'circumscribed equitable discretion,'" it has questioned its viability and suggested that the work done by this doctrine has been to a certain extent superseded by, and is properly considered as part of, the jurisdictional analysis in *Raines*. *Chenoweth*, 181 F.3d at 114, 116; *see also Melcher v. Fed. Open Mkt. Comm.*, 836 F.2d 561, 565 n.4 (D.C. Cir. 1987) (questioning whether *Riegle*'s "court-fashioned doctrine of equitable discretion" is "viable").

Even assuming the continued viability of this doctrine after *Raines*, the Court finds no grounds to exercise this discretion. Defendants' arguments on this point overlap significantly with their arguments regarding historical practice and adequate alternative remedies for legislator plaintiffs under *Raines*, *see* ECF 20 at 24–25, 27–28, and the Court rejects them for similar reasons. Defendants argue that the Court should refrain from exercising its jurisdiction pending the resolution of "all possibilities for settlement" between the "Legislative and Executive Branches." ECF 20 at 35 (citing *United States v. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983)). But as the Court has explained, this is not the kind of case to which the process of accommodation applies, and if it was, that process has been settled by Congress's passage of Section 527. *See supra* Section III.A.1.d. Defendants also suggest, as discussed above, that Plaintiffs ought to "convince a majority of their House colleagues that Congress should act to enforce" Section 527. ECF 20 at 35. But it is Defendants, not Congress, who are tasked with enforcing the laws enacted by Congress and signed by the President. U.S. Const. art. II, § 3 ("[The President] shall take Care that the Laws be faithfully executed."); *see Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). Where the issue of access to ICE facilities has

already been the subject of negotiation between the political branches and resolved through the passage of a presidentially-signed appropriations bill, one which Plaintiffs allege is now being ignored, the Court does not find that this dispute is "fully susceptible to political resolution," as Defendants claim. *Chenoweth*, 181 F.3d at 116. The Court will not decline to exercise jurisdiction on the basis of equitable discretion.

### 3. Cause of Action Under the Administrative Procedure Act

In addition to establishing a likelihood of jurisdiction, which gets Plaintiffs "through the courthouse door," Plaintiffs must also show a substantial likelihood that they have a "cause of action to prosecute" their case. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020). Plaintiffs invoke the judicial review provision of the APA, which "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). Defendants argue that Plaintiffs cannot show a likelihood of a cause of action under the APA because they are (a) not "adversely affected or aggrieved" "persons" who may seek APA review, (b) APA review is precluded by statute, and (c) the challenged Oversight Visit Policies are not reviewable agency action. ECF 20 at 36 (citing 5 U.S.C. § 702). The Court addresses these objections in turn.

#### a. Plaintiffs are Adversely Affected or Aggrieved Within the Meaning of the APA.

A "person . . . adversely affected or aggrieved" by "agency action within the meaning of a relevant statute" is entitled to invoke the APA's judicial review provision. 5 U.S.C. § 702. The APA further defines a "person" to include "an individual." *Id.* §§ 701(b)(2), 551(2).

The Court has no difficulty finding that Plaintiffs satisfy this provision. The requirement that a "person" be "adversely affected or aggrieved" under the APA is "not especially demanding,"

*FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232–33 (2025). This requirement is interpreted "broadly as covering anyone even '*arguably* within the zone of interests to be protected or regulated by the statute in question.'" *Id.* at 233 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

Plaintiffs' APA challenge to the Oversight Visit Policies is based on violations of the terms of Section 527. ECF 17-1 at 37. Again, Section 527 prohibits DHS from using appropriated funds to "prevent" any "Member of Congress" from "entering" specific DHS facilities, or to "make any temporary modification" to alter conditions at that facility that would be observed by those Members. § 527(a), 138 Stat. at 619. While DHS "may require that a request" to visit a facility by congressional staff members "be made at least 24 hours in advance of an intent to enter" the facility, *id.* § 527(c), "[n]othing in [Section 527] may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility . . . for the purpose of conducting oversight," *id.* § 527(b).

Plaintiffs are Members of Congress whose requests to enter covered facilities have been denied. They are plainly within the zone of interests protected by Section 527, which "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Further, while this test does not require any "indication of congressional purpose to benefit the would-be-plaintiff," *id.*, such purpose is clearly evident here, where the language of Section 527 expressly protects the access rights of Members of Congress and their staffs.

Defendants' two arguments to the contrary are unavailing. First, Defendants appear to argue that a "person" or "individual" under the APA cannot include "Congress or its Members in

their official capacity." ECF 20 at 38. But the definition of "individual," whether prior to the APA's enactment or in the present day, plainly covers a Member of Congress. *See, e.g.*, *Individual*, Black's Law Dictionary (3d ed. 1933) ("[A] single person as distinguished from a group or class, and also . . . a private or natural person."); *Individual*, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving a single person or thing, as opposed to a group.").

Second, Defendants argue that the logic of the Supreme Court's decision in *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.* ("*Newport News*"), 514 U.S. 122 (1995), supports the proposition that Members of Congress suing over matters relating to their official capacity could not be persons adversely affected or aggrieved under the APA. In *Newport News*, the Supreme Court interpreted a provision of the Longshore and Harbor Workers' Compensation Act (LHWCA) which allowed for judicial review of decisions by a Benefits Review Board within the Department of Labor. *Id.* at 125–26. Like the APA, that statute provided for judicial review at the request of "any person adversely affected or aggrieved by" the Board's order. *Id.* at 126. The Court held that a "person" "adversely affected or aggrieved" did not include the Director of the Office of Workers' Compensation Programs—an office within the Department of Labor—who had sought review of a Board decision denying a specific worker's compensation claim. *Id.* at 126–29. Defendants seize on the Court's statement that it had found no historical examples of "an agency" invoking the APA "in its regulatory or policy-making capacity" as a person "adversely affected or aggrieved." *Id.* at 127. They argue that the lack of similar historical examples of Members of Congress bringing APA suits in their official capacities points against finding the Plaintiffs here to be "adversely affected or aggrieved." ECF 20 at 37.

*Newport News* does not stand for the broad proposition that Defendants claim. *Newport News* was decided, first and foremost, on the textual ground that agencies are expressly excluded

under the APA from invoking the judicial review provision, and that throughout the U.S. Code, "when an agency in its governmental capacity" is meant to be able to sue under a statute's judicial review provision, "Congress says so." *Newport News*, 514 U.S. at 129. The Supreme Court considered the history of similar suits only in determining whether to depart from that basic textual assumption when interpreting the LHWCA. *Id.* at 127. Here the situation is reversed: Members of Congress—whether in their personal or official capacities—have not been expressly excluded from the APA's scope and, moreover, squarely fit within the plain definition of a "person . . . adversely affected or aggrieved." 5 U.S.C. § 702. And *Newport News* even acknowledged that the "Government" could invoke "administrative and judicial protection" if it were occupying a status similar to a "statutory beneficiary." 514 U.S. at 128. Plaintiffs are the statutory beneficiaries of Section 527 in their official capacities as "Member[s] of Congress." § 527(a)(1), 138 Stat. at 619. If anything, *Newport News* supports Plaintiffs' cause of action argument.

### b.  APA Review is Not Precluded by Statute.

Even if a plaintiff is "adversely affected or aggrieved by agency action within the meaning of a relevant statute," the APA's cause of action will not be available "to the extent the relevant statute 'preclude[s] judicial review.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. §§ 701(a)(1), 702). Defendants argue that the existence of the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), along with other methods through which Congress may seek information from the Executive Branch, indicates that Congress has intended to preclude review of the appropriations-related claims at issue here.

Defendants wage an uphill battle from the start. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," and courts therefore apply a "'strong

presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). That presumption is, of course, just a presumption, which may be rebutted when a "statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Id.* But even so, an agency bears a "'heavy burden' in attempting to show that Congress 'prohibited all judicial review' of the agency's compliance with a legislative mandate." *Id.* (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block*, 467 U.S. at 345. Here, those factors all indicate a lack of preclusion.

Start with Section 527, the text of which says nothing about the preclusion of judicial review. Nor do Defendants point to anything in Section 527's legislative history that undermines the "strong presumption" that violations of its provisions are judicially reviewable. *Mach Mining, LLC*, 575 U.S. at 486. Section 527's text indicates that Congress was concerned with DHS actions that were inhibiting individual Members' access to ICE facilities and was skeptical of the Executive Branch's voluntary compliance with its requests. Thus, this is not a situation where the statutory text and context demonstrate that "Congress wanted an agency to police its own conduct." *Id.* And the "nature of the administrative action" challenged—in this case, the promulgation of polices that impact the access granted in the statute to the parties contemplated by the statute— indicates that a suit by these particular Plaintiffs is not impliedly precluded. *Block*, 467 U.S. at 345.

Defendants urge the Court to look beyond Section 527 to the Anti-Deficiency Act (ADA), which they claim is the "exclusive remedial scheme for alleged violations of appropriations bars, such as § 527." ECF 20 at 39. Among other prohibitions, the ADA states that any "officer or employee of the United States Government" may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). If an officer or employee has violated this provision, the ADA provides that they "shall be subject to appropriate administrative discipline," and a knowing and willful violation subjects that person to criminal penalties. *Id.* §§ 1349(a), 1350. In the case of a violation of the Act by "an officer or employee of an executive agency," the "head of the agency" is obligated to report the violation to the President and Congress. *Id.* § 1351.

The ADA does not preclude Plaintiffs' ability to bring an APA claim alleging that Defendants have violated the terms of Section 527. This kind of preclusion is inferred when, for example, a statute creates a "complex and delicate administrative scheme" that would be disrupted by letting specific parties seek judicial review under the APA. *Glob. Health Council v. Trump*, 153 F.4th 1, 18 (D.C. Cir. 2025) (quoting *Block*, 467 U.S. at 348). Defendants analogize to the Impoundment Control Act (ICA), which the D.C. Circuit recently found precluded an APA cause of action for a contrary-to-law claim to enforce the ICA's limitations on the Executive Branch's ability to decline to spend appropriated funds.[10] *Id.* at 19; ECF 20 at 14. Similar to the ADA, which prohibits the Executive Branch from spending money not appropriated, the ICA imposes limits on the Executive Branch's ability to delay or withhold the spending of appropriated funds. *See Glob.*

---

[10] In *Global Health Council*, foreign aid grantees and associations sued to challenge the Executive Branch's decision to freeze foreign aid spending by the State Department and the U.S. Agency for International Development. 153 F.4th at 7. Plaintiffs brought contrary to law claims based on multiple statutes, including (1) the ICA, on the grounds that the defendants had violated the ICA's limitations on the Executive Branch's ability to decline to spend appropriated funds, as well as (2) the 2024 Appropriations Act, on the grounds that defendants had violated its specific provisions *Id.* at 18, 20 n.17.

*Health Council*, 153 F.4th at 8. But this is unpersuasive for multiple reasons, the first being that *Global Health Council* addressed whether plaintiffs had an APA cause of action to enforce the Impoundment Control Act itself. *Id.* at 17 (addressing whether the "ICA precludes the grantees from bringing suit under the APA to enforce its provisions"). But as *Global Health Council* acknowledged, this holding did not extend to the question of whether the existence of the Impoundment Control Act also precluded "contrary-to-law claims . . . based on" other "substantive provisions," such as appropriations acts. *Id.* at 20 n.17 ("[W]e need not and do not decide whether the ICA precludes suits under the APA to enforce appropriations acts."). And the other cases that Defendants cite similarly involved plaintiffs bringing claims under the very statute that precluded other avenues of judicial review. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981); *Block*, 467 U.S. at 345–48. Here, Plaintiffs seek not to enforce the ADA's provisions for administrative discipline and criminal prosecution, but to invoke the terms of Section 527 in their APA contrary to law claim. Defendants' citations are inapposite.

The mere existence of the scheme established by the ADA does not indicate a congressional intent to preclude Plaintiffs' suit. As the Office of Legal Counsel has noted in an opinion cited by Defendants, the ADA is only "one of *several means* by which Congress has sought to enforce" its appropriations instructions. *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33, 33 (2001) (emphasis added); ECF 20 at 39 (citing this opinion, erroneously, for the proposition that the ADA is the "exclusive remedial scheme for alleged violations of appropriations bars"). The text of the ADA's remedial provisions indicate that it is a limited scheme that empowers Executive Branch officials to enforce internal compliance with appropriations laws, but not one meant to preclude the kind of dispute presented here. The ADA creates penalties imposed by superior Executive Branch actors

against subordinate Executive Branch actors. *See* 31 U.S.C. § 1349(a). True, the remedial scheme created by the ADA implicates Congress in that the "head of the agency" whose "officer or employee" violated the statute must notify Congress upon any violation of the ADA. 31 U.S.C. § 1351. But the notice provision, along with the other provisions of the statute, all assume that the enforcing officials in the Executive Branch have decided that a violation of the ADA exists. The ADA provides no avenue for relief when an Executive Branch agency has decided as a matter of policy, as is the alleged case here, that its actions do not represent a violation of an appropriations bar. This distinguishes the ADA from the Impoundment Control Act, which created a "complex scheme of interbranch dialogue," which included Congress's right to sue, exercised by "a specified legislative branch official if the executive branch violates its statutory expenditure obligations." *Glob. Health Council*, 153 F.4th at 18–19 (citing 2 U.S.C. § 682 *et seq.*). Holding that the ADA precludes Plaintiffs' suit under these circumstances would "threaten [the] realization of the fundamental objectives" of Section 527. *Block*, 467 U.S. at 352.[11]

Setting aside the ADA, Defendants venture even further afield when they suggest that Plaintiffs' suit is precluded because other statutory mechanisms exist for Congress to obtain information from the Executive Branch, such as the statutory causes of action granted to the Senate to bring civil lawsuits to enforce congressional subpoenas. *See* ECF 20 at 41 (citing 2 U.S.C. § 288d and 28 U.S.C. § 1365(b)). These mechanisms are irrelevant to this analysis as they concern requests for documents and testimony by committees. Plaintiffs' case is about the access to ICE facilities by individual Members of Congress under the terms of Section 527 and the ability to observe the conditions within. The existence of statutory causes of action to vindicate Congress's

---

[11] The specific question before the Court is whether the existence of the ADA precludes the Plaintiff Members of Congress from bringing an APA claim based on a separate "substantive provision[]," that is, Section 527. *Glob. Health Council*, 153 F.4th at 20 n.17. As a result, the Court need not and does not determine whether the scheme set up by the ADA would preclude an APA claim that Defendants' conduct was contrary to the ADA itself.

general powers of inquiry are not sufficient to overcome the presumption that APA review is available in this case.

### c. Plaintiffs Challenge Final Agency Action.

Defendants also claim that the APA claims are barred because Plaintiffs do not challenge "final agency action" under 5 U.S.C. § 704. ECF 20 at 42–43. Final agency action under the APA is action that "mark[s] the consummation of the agency's decisionmaking process," and one "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The Oversight Visit Policies are final agency action. The seven-day notice requirement for detention facilities has been posted on ICE's Office of Congressional Relations webpage since June 2025 with no indication that it was tentative, interlocutory, or undergoing revision. The policy has been cited by DHS and ICE officials when denying Plaintiffs' access to ICE facilities on various occasions. The same website previously displayed the field office policy which, while no longer publicly posted, Plaintiffs attest also continues to be enforced to prevent their entry into specific facilities. Both policies are final because they "mark the consummation" of DHS's "decisionmaking process" regarding Members' visits to ICE facilities and have had an impact on the Members' "rights," the agency's "obligations," and led to the "legal consequence[]" of the denial of access to Section 527-funded facilities. *Bennett*, 520 U.S. at 178.

Defendants' only argument to the contrary is to construe the actions challenged by Plaintiffs as the "provision or denial of information to Congress," which Defendants claim are unreviewable under the APA. ECF 20 at 42. The Court rejects Defendants' attempt to mischaracterize the gravamen of Plaintiffs' challenge. Plaintiffs clearly challenge the Oversight Visit Policies, which are final agency action under the APA.

### 4.    Plaintiffs Are Likely to Succeed on the Merits of their APA Contrary-to-Law and Statutory Authority Claim.

Having satisfied itself of likely jurisdiction and rejected Defendants' threshold objections regarding equitable discretion and the availability of a cause of action under the APA, the Court proceeds to the merits of Plaintiffs' claim that the Oversight Visit Policies are contrary to law and in excess of statutory authority. Section 706 of the APA requires the Court to "hold unlawful and set aside agency action" that is "not in accordance with law," or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Plaintiffs challenge Defendants' seven-day notice requirement to enter ICE facilities and the purported policy excluding ICE field offices from the scope of Section 527. The Court finds Plaintiffs likely to succeed the merits of both.[12]

### a.    The Seven-Day Notice Requirement Violates Section 527.

Section 527(a) prohibits the Department of Homeland Security from using any appropriated funds in the relevant appropriations acts "to prevent" a "Member of Congress" or that Member's designated staff "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. Defendants deny that their notice policy prevents Members of Congress from entering a facility because Members were in a number of cases later allowed to enter the facilities. In their view, a delayed entry is not a "prevent[ed]" entry. *See* ECF 20 at 45. That is not a plausible interpretation of "prevent" as used in the statute. To "prevent," means to "keep from happening," or "to hold or keep back: hinder, stop." *See Prevent*, Merriam-Webster Dictionary, https://perma.cc/GF9Y-L2J4. The notice requirement as implemented by ICE officials does just

---

[12] Because the Court finds Plaintiffs substantially likely to prevail on the merits of this claim and that this claim merits granting a stay of the Oversight Visit Policies, the Court declines to address the merits of Plaintiffs' remaining APA claims and their mandamus claim at this preliminary juncture.

that: it stops visiting Members of Congress from entering a facility unless they have provided seven days of advance notice. Plaintiffs have identified numerous examples where their requests to enter facilities at a given date and time were rebuffed by ICE for failure to provide that notice and they were not allowed access to the facility. *See, e.g.*, ECF 17-2, Escobar Decl. ¶¶ 12–13; ECF 17-3, Crow Decl. ¶ 20; ECF 17-6, Correa Decl. ¶ 9; ECF 17-9, Ruiz Decl. ¶¶ 9–12; ECF 17-10, Torres Decl. ¶¶ 17–18.

Any indication that a seven-day advance notice policy is permissible under the definition of "prevent" as used in Section 527(a) is dispelled by Section 527(b), which states that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter" a covered facility. § 527(b), 138 Stat. at 619. The final subsection of the statute also points against the permissibility of a notice requirement. That subsection provides specifically that for "individuals described in subsection (a)(2)"—the designated employees of Members of Congress—DHS "may require that a request be made at least 24 hours in advance of an intent to enter" a covered facility. *Id.* § 527(c), 138 Stat. at 619. That the statute appears to carve out the permissibility of an advance notice requirement for congressional employees while saying nothing about Members of Congress further supports Plaintiffs' reading of the statute that such advance notice requirements are not permissible for Members of Congress. To adopt Defendants' interpretation of Section 527 to allow a seven-day notice requirement would also render subsection (c)'s grant of license to issue a one-day notice requirement to congressional employees superfluous, which counsels against the interpretation. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (rejecting statutory reading when the reading would "render[] an entire subparagraph meaningless").

Defendants argue that other statutory authorities allow for the promulgation and enforcement of the notice requirement, such as the assignment to the DHS Secretary of the responsibility for "arrang[ing] for appropriate places of detention" of detained noncitizens, 8 U.S.C. § 1231(g), on the theory that this responsibility includes "prescribing standards for detention such as visitation protocols," ECF 20 at 46 (also citing 6 U.S.C. § 122(b)). But these highly general, prior-in-time statutes cannot reasonably be construed to overcome the prohibition in the highly-specific, later-passed Section 527. *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[A] statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere."). "[A]n agency" like DHS "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). What Congress giveth, Congress may taketh away. Even if statutory authority had previously been provided to DHS to implement a notice requirement, Section 527 has now limited that authority with respect to Members of Congress and their designated staffs.

Nor can Defendants justify the notice requirement under the President's Article II responsibility to take care that the immigration laws are "faithfully executed." U.S. Const. art. II, § 3. That argument ignores that Section 527 is itself one of the "[l]aws" that must be "faithfully executed." *Id.*; *see Glob. Health Council*, 153 F.4th at 8 ("[T]he Take Care Clause 'charges the Executive Branch with enforcing federal law,' including spending-power laws." (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025)); *see also City of Los Angeles v. Adams*, 556 F.2d 40, 49 (D.C. Cir. 1977) ("[W]e are bound to follow Congress's last word . . . even in an appropriations law.").

Finally, although they do not press this as a reason that Plaintiffs' claims fail on the merits, Defendants note in their briefing that DHS and ICE have access to funds that are not subject to

Section 527. They observe that DHS currently receives funding from not only the FY2026 Continuing Appropriations Act, but also from the additional spending bill passed in July 2025, which does not include the Section 527 rider. *See* OBBBA, § 100052, 139 Stat. at 388–89; ECF 20 at 18. There is no present dispute that the Oversight Visit Policies were created and first implemented before the passage of that bill. Further, days before the recent Government shutdown, Defendants conceded that OBBBA funds had not been used for "the operation of detention facilities and access to detention facilities,"—meaning that the only funds being used were Section 527-restricted funds—and promised to inform the Court if that fact had changed. Hr'g Tr. 47:11–24. And Defendants' declaration regarding ICE's funding during the shutdown indicated that OBBBA funding alone was insufficient to cover the costs of ICE's continuing operations during the shutdown, including detention operations, with ICE funding itself in part by "incur[ring] obligations in advance of FY2026 appropriations." ECF 32-1, Ferguson Decl. ¶¶ 5–7. Finally, in a joint status report, Defendants appear to concede that following the conclusion of the lapse in appropriations and the passage of the FY2026 Continuing Appropriations Act, Section 527-restricted funds are currently being used for "detention operations, including the adoption and implementation of the visitation protocols at issue in this action." ECF 34 at 2.

The Court thus finds that Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority.

### b. The Policy of Categorically Excluding ICE Field Offices from the Requirements of Section 527 is Also Contrary to Section 527.

Plaintiffs also challenge ICE's policy of categorically excluding ICE field offices from the scope of Section 527. The Court finds on this record that Defendants' policy exists, and it rests on

an incorrect understanding of Section 527, which requires ICE to permit access to "any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619.

Recall that the June 2025 Visit Protocol briefly posted to ICE's Office of Congressional Relations website stated that "ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements" because "ICE [did] not house aliens at field offices[;] rather these are working offices where Enforcement and Removal Operations (ERO) personnel process aliens to make custody determinations based on the specific circumstances of each case." June 2025 Visit Protocol at 4. While the June 2025 Visit Protocol was removed from ICE's website sometime in June 2025, Plaintiffs claim that this aspect of the Protocol continues to be ICE's official policy. *See* ECF 17-1 at 39. They present evidence showing that ICE officials have rebuffed visits to specific field offices following June 2025 on the grounds stated in the June 2025 Visit Protocol. *See* ECF 17-7, Gomez Decl. Ex. A at 13 (rejecting request to visit field office on July 7, 2025, because, among other reasons, "ICE Field Offices are not detention facilities" covered by Section 527 because "ICE does not house aliens at field offices"); ECF 17-8, Garcia Decl. ¶¶ 20–23 (denying access to Los Angeles field office on the grounds that it was "not considered a facility"); ECF 17-11, Thompson Decl. ¶¶ 13–16 (denying access on July 21, 2025, to full Washington Field Office facility, including "12-hour holding area," on the grounds that the "'latest guidance' was that field offices are not subject to" Section 527). Plaintiffs also direct the Court to a letter from August 2025 from DHS Secretary Kristi Noem to Plaintiff Representative Garcia in which Secretary Noem states that "ICE Field Offices are not detention facilities and fall outside of Section 527 requirements. ICE does not house aliens at field offices, rather these are working offices where

[ERO] administratively processes aliens." Letter from DHS Sec'y Noem to Rep. Garcia (Aug. 22, 2025) [hereinafter August 2025 Noem Letter], https://perma.cc/5J7N-EGLH.

It is telling that Defendants do not substantively contest that certain ICE field offices are facilities "operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. Instead, Defendants simply deny the existence of "any visitation protocol that prevents Members of Congress and their staff from visiting ICE field offices, including those containing ERO temporary holding facilities." ECF 20 at 46. At oral argument, counsel for Defendants answered affirmatively to the Court's question about whether Members of Congress are "being permitted access to those facilities," and represented that "[s]ubject to the same seven days' advance notice requirement for any detention facilities, [Members of Congress] can access field offices." Hr'g Tr. at 46:17–25. But Defendants' answers subtly shift the terrain. The question is whether ICE has a policy that "ICE field offices are not subject to [S]ection 527." ECF 17-1 at 39. Defendants' admission that ICE is currently allowing Members of Congress into certain field offices is not necessarily a concession that ICE considers field offices to be covered by Section 527. To put it another way, ICE's allowing of congressional visits to certain field offices could be completely consistent with a policy that "entirely excludes ICE field offices from the reach of section 527." *Id.* at 37. If a facility is covered by Section 527, Defendants are *required* to let Members of Congress visit. A departmental policy that field offices are exempt from Section 527 would still allow ICE officials to *voluntarily* admit Members of Congress to field offices; but such a policy would also allow ICE to deny access when it chooses. Defendants' assertion that Members of Congress are currently being allowed to visit field offices thus does not disprove the existence of a policy categorically excluding field offices from the scope of Section 527. And again, the evidence submitted by Plaintiffs indicates that Defendants have

indeed adopted a policy that ICE field offices "fall outside of Section 527 requirements" and are relying on that policy, even if inconsistently, to deny access to ICE field offices. August 2025 Noem Letter.

Defendants' failure to substantively respond to the merits of Plaintiffs' argument that certain ICE field offices are in fact covered by the terms of Section 527 is grounds to treat the argument as conceded under Local Civil Rule 7(b) of this Court. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("The rule is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (declining to "resolve the merits of [an] issue because [plaintiff] conceded it" by failing to "respond in any way to defendant's argument"). But even if Defendants had not conceded the point, the Court would find that a policy categorically excluding field offices from the scope of Section 527 is contrary to the terms of the statute.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). Section 527 applies to "any" "facility," which indicates breadth. "Read naturally, the word 'any' has an expansive meaning, that is one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). To "use" means to "employ for the accomplishment of a purpose." *Use*, Black's Law Dictionary (12th ed. 2024); *Smith v. United States*, 508 U.S. 223, 228–29 (1993) (noting the "everyday meaning" of "use" is "to employ"). The definition of a covered facility is thus not governed by its labelling by DHS but by how it is employed in practice.

Next, Section 527 applies to any facility used to "detain or otherwise house" noncitizens. "Detain" is the verb form of "detention," which means the "act or an instance of holding a person in custody; confinement or compulsory delay." *Detention*, Black's Law Dictionary (12th ed. 2024); *Jennings v. Rodriguez*, 583 U.S. 281, 307–08 (2018) (collecting this, and other definitions of "detain," which include "to hold or keep in or as if in custody," "to keep in confinement or under restraint; to keep prisoner" (citations and emphasis omitted)). Plaintiffs argue that the custody or confinement contemplated by Section 527 extends to "any circumstance[s] where an individual's freedom of movement is restrained, even temporarily." ECF 17-1 at 40. The Court agrees that the plain meaning of "detain" lacks any clear temporal element as to the length of the detention—it focuses on whether the individual is subject to legal confinement or restraint, regardless of the time spent in that condition. And in various other places in the law, the language of detention is frequently used to describe types of restraint and confinement that are for a brief duration. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (describing the brief investigative police stops discussed in *Terry v. Ohio*, 392 U.S. 1 (1968), as "detain[ing] the individuals"); *see Terry*, 392 U.S. at 10 (discussing whether the "police should be allowed to 'stop' a person and detain him briefly for questioning").

However, Section 527 also uses "detain" as part of the full phrase "detain or otherwise house" noncitizens. "Otherwise" means "[i]n a different way; in another manner," or "[i]n other conditions or circumstances." *Otherwise*, Black's Law Dictionary (12th ed. 2024). "House" means "to provide with living quarters or shelter," or "serve as a shelter or container for." *House*, Merriam-Webster Dictionary, https://perma.cc/7WCY-CERA; *see also House*, Oxford English Dictionary, https://perma.cc/Q4AY-V4T9 (meaning "[t]o shelter, contain, or accommodate as a house; to be a house for"). Plaintiffs argue that "otherwise" serves as a "catch-all" provision that

expands the scope of the statute through the addition of the term "house," meaning that Section 527 applies to a "DHS facility, of whatever kind, functioning as a place where individuals are held in confinement in any manner." ECF 17-1 at 41. Plaintiffs' interpretation, while plausible, gives short shrift to the statute's use of "house," a verb which implies an association with living quarters, and ignores the way that "otherwise" links the two verbs together. Based on the definitions for "otherwise" above, the statute is best read to mean "detain or [in a different way] house," or "detain or [in another manner] house," which indicates that the detentions contemplated by the statute are similar in nature to the act of housing. *See Otherwise*, Merriam-Webster Dictionary, https://perma.cc/WTP4-HHCD (providing the example of "[a]ll of the books had been burned or *otherwise* destroyed," a sentence in which the word "destroyed" makes clear that burning of the books resulted in their destruction, rather than cosmetic or other minor damage). As a result, the Court finds that the detentions contemplated by the statute likely have a prolonged or residential aspect, more akin to an overnight stay at a jail rather than an hour-long interrogation at a police office.

The present record demonstrates that ICE field offices featuring ERO holding facilities appear to be "used to detain or otherwise house" noncitizens as contemplated by Section 527. § 527(a), 138 Stat. at 619. As noted above, ICE's own internal guidance permits "holding facilities" within field offices, and states that such holding facilities are used for the "short-term confinement of individuals who have recently been *detained*." *ICE Policy Number 11087.2*, §§ 1.1, 3.2 (emphasis added). The policies regarding those holding facilities indicate that they are generally supposed to be used for detentions shorter than 12 hours—already a lengthy period of time—but the policies also acknowledge that individuals may in fact be held for longer. *See id.* § 3.2 n.3 (noting that detainees may be held at the holding facility for longer than 12 hours in

"exceptional circumstances"). And the evidence in the record indicates that detainees are indeed in practice being held in ERO holding facilities for far longer than 12 hours. Take the Los Angeles field office, which multiple Plaintiffs have sought to enter for the purpose of conducting oversight. Plaintiffs have been told by ICE officials that ICE holds noncitizens "in custody" in that office "until administrative processing is complete," and that in some cases, processing "may take up to 72 hours." ECF 17-7, Gomez Decl. ¶¶ 19–20; *id.* Ex. A. at 12; *see also id.* at 12–14 (noting also that Plaintiff Gomez's requests to visit the Los Angeles field office were denied, in part, because "ICE Field Offices are not detention facilities and fall outside of [Section 527]"). Plaintiff Garcia sought to enter the same facility after receiving reports that individuals were being held overnight there, but was denied on July 24, 2025, on the ground that the field office was "not considered a facility," and was instead directed to the "Adelanto Detention Facility." ECF 17-8, Garcia Decl. ¶¶ 15, 20–23. Plaintiff Goldman's request to visit the 10th floor of the ICE New York Field Office was denied by ICE on June 17, 2025, on the ground that the facility was not a "detention facility" and it "fell outside the Sec. 527 requirements." ECF 17-4, Goldman Decl. ¶ 24. However, Goldman states that he spoke with an individual who was detained in the 10th floor facility for four days. *Id.* ¶ 39 ("I have spoken to two individuals who were detained in the 10th Floor Facility—one of whom was detained for four days.").

ICE's own policies also indicate that the field office holding facilities have the indicia of detention as contemplated by the statute. The policy document governing the operation of those facilities uses the language of not only detention but also "hous[ing]," when it states that "[a]bsent exceptional circumstances, no detainee should be *housed* in a holding facility for longer than 12 hours." *ICE Policy Number 11087.2*, § 5.1 (emphasis added). And depending on the amount of time the detainee is held in the facility, staff operating the facility are supposed to provide other

residential-type functions, like meals every six hours. *See id.* § 4.4.1(2) (requiring that detainees be "provided a meal at least every six hours"); *see also id.* § 5.2(1) (requiring that minors and pregnant women be provided with "regular access to meals, snacks, milk, and juice").

The Court need not at this preliminary juncture determine the full scope of which ICE facilities fall under the terms of Section 527—such as field offices without the types of holding facilities described above—because the current record demonstrates that at minimum, ICE field offices with ERO holding facilities are currently being "used to detain or otherwise house" noncitizens as contemplated by the statute. Defendants' purported exemption of field offices from Section 527 as a categorical matter is therefore contrary to the statute. Based on the evidence before the Court at this stage and the plain text of Section 527, the Court finds that Plaintiffs are substantially likely to succeed on the merits of their claim that the field office policy exists, and that it is contrary to Section 527.

### B.  Plaintiffs Have Demonstrated Irreparable Harm.

Success on the merits of Plaintiffs' APA claim will not alone justify preliminary relief. Plaintiffs must also establish that they face irreparable injury absent the requested preliminary relief. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297).

Plaintiffs claim that the Oversight Visit Policies cause "irreparable harm to their ability to conduct congressionally authorized oversight." ECF 29 at 35. Their argument is that "access to DHS facilities and real-time, on-the-ground information" about those facilities is required for

Plaintiffs to carry out their responsibilities, which include serving "members' constituents and their loved ones," "hold[ing] hearings, craft[ing] legislation, and determin[ing] fiscal year 2026 appropriations." ECF 17-1 at 50. According to Plaintiffs, the "information gained from in-person oversight is unique information that cannot be learned or recreated in the future," and that conditions in "detention facilities can change rapidly, rendering a week too long to wait" for that information. *Id.* In response, Defendants argue that this case is analogous to FOIA cases which have required a showing that information denied be "time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which the utility of the records would 'be lessened or lost.'" ECF 20 at 51 (quoting *N.Y. Times Co. v. DHA*, No. 21-cv-566, 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021)). In Defendants' view, Plaintiffs have not shown that any "imminent event" lessens the utility of site visits after seven days. *Id*. Defendants also challenge as speculative Plaintiffs' concern that conditions in ICE facilities change in the seven days between a Member's request to visit and their visit. *Id.* at 52. Defendants argue that to the extent that conditions improve at a given facility between a Member's notice of intent to visit and their arrival at the facility, this cannot qualify as a harm—if anything, Defendants argue, this shows that oversight visits are working as intended. *See* Hr'g Tr. 51:9–18 ("[I]f the facilities are being changed for the better, that seems like something Plaintiffs would be okay with. . . . [I]f the conditions are being improved, I think that goes some way to . . . resolving Plaintiffs' irreparable injury assertion.").

The Court finds Plaintiffs' argument more persuasive. First, while this case is analogous to those involving FOIA and the release of agency records, the analogy only goes so far. Plaintiffs are not requesting agency records, which the agency is obligated to preserve in accordance with the Federal Records Act, *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 555

(D.C. Cir. 1996), so will therefore be available "at some later date," *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C.), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017). Here, Section 527 concerns the ability of Members of Congress to review on-the-ground conditions at a covered facility at the time of their request. Plaintiffs have an interest in facts about whether facilities are overcrowded or unsanitary, whether the staff is engaging in abuse, or the location of constituents or their family members. *See, e.g.*, ECF 17-4, Goldman Decl. ¶ 40; ECF 17-2, Escobar Decl. ¶ 10. This kind of information is not static like an agency record, but can vary widely based on ICE's pace of arrests and decisions regarding housing of detainees. Nor is it speculative that these conditions could change over the course of seven days. For example, before Defendants initiated the Oversight Visit Policies, Representative Correa conducted daily visits during which he personally observed that an ICE facility went from holding fewer than ten detainees to 77 detainees over the course of several days. ECF 17-6, Correa Decl. ¶ 8 ("I was told that the increase was due to the Los Angeles facilities being temporarily closed."). The better analogy is to the cases involving the potential disposal or destruction of agency records. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 565 F. Supp. 2d 23, 30 (D.D.C. 2008) ("[Plaintiffs] would have absolutely no recourse in the event that records potentially responsive to its FOIA requests were destroyed."). The changing conditions within ICE facilities means that it is likely impossible for a Member of Congress to reconstruct the conditions at a facility on the day that they initially sought to enter. This issue is even more pronounced to the extent that Defendants' policies—such as the field office policy— prohibit Plaintiffs from entering certain facilities at all. Such information about the on-the-ground conditions is "lost forever to history," and cannot be retroactively provided to Plaintiffs following

resolution of the merits of this litigation. *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 29 (D.D.C. 2025).

But even under the logic of the FOIA cases cited by Defendants, Plaintiffs demonstrate irreparable harm. The information that Plaintiffs seek about ICE facility conditions is "time-sensitive and highly probative" to the Members' ongoing duties, which include "imminent event[s], after which . . . the utility of the [information will] be lessened." *N.Y. Times Co.*, 2021 WL 1614817, at *8. Plaintiffs identify upcoming legislative deadlines to which updated and accurate knowledge of the conditions in ICE facilities will be critical, such as Congress's upcoming deadline to pass full-year 2026 appropriations for DHS and ICE. ECF 17-1 at 25. For those impending deadlines, "stale information is of little value." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). Further, Plaintiffs note that they use their visits to ICE facilities to engage in constituent casework, including to locate or check on the status of detained constituents or their constituents' detained family members. *See, e.g.*, ECF 17-2, Escobar Decl. ¶¶ 26, 34; ECF 17-4, Goldman Decl. ¶ 42; ECF 17-5, Espaillat Decl. ¶ 32; ECF 17-6, Correa Decl. ¶ 8. But given ICE's representations to Plaintiffs that certain facilities only hold detainees for periods of time shorter than seven days before transferring them elsewhere, Defendants' notice requirement necessarily "lessen[s]" the "utility of" such an oversight visit. *N.Y. Times Co.*, 2021 WL 1614817, at *8; ECF 17-7, Gomez Decl. ¶ 20 (noting that custody in field office holding area was "not to exceed 72 hours absent exceptional circumstances"); ECF 17-11, Thompson Decl. ¶ 16 (Representative Thompson noting he was told that field office had a "12-hour holding area"). When "time is necessarily of the essence, the harm in agency delay is more likely to be irreparable." *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019).

Accordingly, Plaintiffs have shown that they suffer irreparable harm due to the Oversight Visit Policies.

### C.  The Equitable Factors Support Preliminary Relief.

The public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs their requested relief. *See Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (noting that these factors "merge when, as here, the Government is the opposing party"). There is little "public interest in the perpetuation of unlawful agency action," and the "public interest therefore favors [Plaintiffs]," given that the Court has found that the Government's actions are likely unlawful. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102–03 (D.C. Cir. 2021) (finding Plaintiffs likely to succeed on a claim that the Secretary of the Treasury was "distributing congressionally appropriated funds in violation of the authorizing statute"). Further, this case involves the Government's violation of an appropriations statute passed by Congress and signed by the President. The public has an interest in ensuring that "statutes enacted by their representatives are not imperiled by executive fiat." *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019); *see U.S. Dep't of Navy*, 665 F.3d at 1347 (noting the importance of the government appropriations process "as a restraint on Executive Branch officers").

In response to these weighty concerns, Defendants point to the same kinds of separation-of-powers concerns raised in *Raines* and discussed previously in this opinion. *See* ECF 20 at 53 (arguing that "separation-of-powers considerations carry even greater weight in the context of a preliminary injunction"); *see supra* Section III.A.1.c., d; *supra* Section III.A.2. But the Court has previously rejected Defendants' claim that this case is one that must be resolved through the

process of negotiation and accommodation between the political branches rather than through the judicial system and finds it again unpersuasive at this stage of the analysis.

Finally, the Court rejects the Government's argument that this Court should not grant preliminary relief because doing so would be tantamount to granting full relief on the merits. ECF 20 at 54. Preliminary relief of the kind requested by Plaintiffs is designed to reestablish the status quo, or "the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). In this case, that is the status before Defendants began enforcing the Oversight Visit Policies. Based on the record before the Court, between the first enactment of Section 527 in 2020 and June 2025, DHS did not impose notice requirements for Members of Congress seeking entry into covered facilities or take the stance that field offices were categorically exempt from Section 527. *See* June 2025 Visit Protocol, at 2 ("Member[s] of Congress are not required to provide advance notice for visits to ICE detention facilities."); ECF 17-7, Gomez Decl. ¶¶ 7, 15 (noting staff members' visit to ICE field office was permitted on June 6, 2025, but a visit to the same office was prohibited on June 17, 2025, on the grounds that the "LA Field Office is a field office[,] not a 'detention facility'"). And victory on this motion is far from a total victory for Plaintiffs. "[W]hile the record establishes that preliminary relief is warranted, this decision in no way prejudges the Government's ability going forward to defend its policy on the merits." *Singh*, 56 F.4th at 109. Here, the Court has found Plaintiffs substantially likely to succeed on the merits of their APA contrary to law claims based on the present record. Should that record change—for example, should the Government demonstrate different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies, *see supra* Section III.A.4.a—the Court's conclusions on the merits might well be different. Plaintiffs will receive relief sufficient to reestablish the status quo, not "full

relief . . . on the merits," as Defendants claim. *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam).

**D.  The Court Stays the Oversight Visit Policies Under Section 705 of the APA.**

All the relevant factors support a grant of preliminary relief. Both DHS's seven-day notice requirement, and its policy of excluding ICE field offices from the scope of Section 527 are stayed under Section 705 of the APA. Such a stay is consistent with Defendants' request that "any relief awarded must be limited to enforcing" the "limitation on the use of funding contained in" Section 527. ECF 20 at 56. The challenged Oversight Visit Policies violate the APA and are contrary to the terms of Section 527 because the evidence currently before the Court demonstrates that the Policies were promulgated with Section 527 funds, and they continue to be implemented and enforced through the use of Section 527 funds. Unless and until Defendants show that no Section 527 funds are being used for these purposes, a stay of the policies is consistent with the scope of Defendants' violation and Plaintiffs' requested relief.

Defendants ask that if this Court grants relief, it limit the stay to these Plaintiffs. But as the D.C. Circuit has repeatedly held, vacatur of the agency action is the normal remedy under APA section 706. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court and courts in this and other circuits have applied that same rule to section 705 stays. *See Make the Rd. N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908, at \*22 (D.D.C. Aug. 29, 2025); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at \*37–38 (D.D.C. Aug. 1, 2025); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020); *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (collecting cases). The Court also rejects Defendants' claim that Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), prohibits a stay of the challenged Oversight Visit Policies. As this Court

has held and the D.C. Circuit has also concluded, "CASA is *not* a case about the scope of relief for agency review authorized by the APA." *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.) ("The Department . . . does next to nothing to advance the ball by pointing to CASA as the source of its purported limitation on the scope of stay relief under the APA."). Finally, the Court rejects Defendants' request that Plaintiffs put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). That rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A stay under APA section 705 is neither a preliminary injunction nor a temporary restraining order, and Rule 65(c) therefore does not apply. *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *38; *Make the Rd. N.Y.*, 2025 WL 2494908, at *23.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 17, is **GRANTED**. The challenged Oversight Visit Policies are **STAYED** pending conclusion of these review proceedings.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: December 17, 2025