# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>        *Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>        *Defendants*. | Case No. 25-cv-2463-JMC |

## PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE AND REQUEST FOR EMERGENCY HEARING

Once again, the U.S. Department of Homeland Security (DHS) has blocked members of Congress from conducting oversight at an Immigration and Customs Enforcement (ICE) facility. This time, DHS blocked three members of Congress from conducing oversight at a facility near Minneapolis, Minnesota, pursuant to a newly imposed seven-day-notice policy for congressional oversight visits. Defendants blocked these members despite this Court's order of December 17, 2025, which stayed, pursuant to 5 U.S.C. § 705, DHS's unlawful policy of restricting oversight by members of Congress because it violates section 527 in DHS's appropriations act. The Court was clear in its December 17 order that "the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, *a facility operated with or staffed using Section 527 funds must admit that Member.*" Op. at 21–22, ECF No. 36 (emphasis added). The Court stayed Defendants' oversight visit policy, including the seven-day-notice requirement, "*[u]nless and until* Defendants show that no Section 527 funds are being used for these purposes." Op. at 72 (emphasis added).

And yet, on Thursday, January 8, 2026, DHS secretly reimposed the same seven-day-notice notice requirement ("duplicate notice policy") for congressional oversight visits to ICE facilities. Defendants have not shown that "no Section 527 funds are being used" for purposes of this duplicate notice policy. Indeed, Defendants did not notify Plaintiffs, Plaintiffs' counsel, or the Court of DHS's duplicate notice policy, despite the fact that the policy was immediately effective. ECF No. 39-1.

On Saturday, January 9—three days after U.S. citizen Renee Good was shot dead by an ICE agent in Minneapolis—three members of Congress from the Minnesota delegation, with this Court's order in hand, attempted to conduct an oversight visit of an ICE facility near Minneapolis.[1] ICE denied those members access to the facility under their duplicate notice policy. Only after this denial, and following outreach from Plaintiffs' counsel to Defendants' counsel, did Defendants notify Plaintiffs and the Court of the duplicate notice policy.

DHS purports to be implementing this duplicate notice policy using a funding source other than annually appropriated funds, and therefore purports not to be subject to the limitations of section 527. But, in light of the purposes of the relevant appropriations and the vast and varied scope of the costs that necessarily contribute to a policy like this at DHS, it is practically impossible that the development, promulgation, communication, and implementation of this policy has been, and will be, accomplished—as required—without using a single dollar of annually appropriated funds subject to section 527.

The duplicate notice policy is a transparent attempt by DHS to again subvert Congress's will (demonstrated by repeatedly enacting section 527, including as recently as November 2025) and this Court's stay of DHS's oversight visit policy. Plaintiffs therefore respectfully request that the Court issue an order to show cause why the duplicate notice policy is not in violation of section 527, and

---

[1] *See* Aaron Rupar (@atrupar), X (Jan. 10, 2025, at 11:48 AM ET), https://perma.cc/7ZNR-VPA8 (https://x.com/atrupar/status/2010030900201804230).

therefore this Court's section 705 stay order, and specifically how the duplicate notice policy was developed and promulgated and will be implemented without using any funds subject to section 527.

Plaintiffs also request an emergency hearing on this matter at the Court's earliest convenience.[2] DHS's annual appropriations expire on January 30, 2026. Members of Congress are actively negotiating over the funding of DHS and ICE, including consideration of the scope of and limitations on DHS's funding for the next fiscal year. And ICE continues to expand its operations, including immigration detention and enforcement. This is a critical moment for oversight, and members of Congress must be able to conduct oversight at ICE detention facilities, without notice, to obtain urgent and essential information for ongoing funding negotiations.

## BACKGROUND

**1.** Since fiscal year 2020, the law has guaranteed that members of Congress can conduct oversight of immigration detention facilities, with or without notice, and that congressional staff members can do so with up to 24 hours' notice. The relevant provision of law, known as "section 527," provides the following:

> **(a)** None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
> > **(1)** A Member of Congress.
> > **(2)** An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
> **(b)** Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

---

[2] Plaintiffs regret the necessity of requesting an emergency hearing before this Court. However, Plaintiffs were not made aware of the duplicate notice policy until late in the afternoon of January 10, after the policy had already been enforced against members of Congress. Plaintiffs moved expeditiously to request relief from this Court.

> **(c)** With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

FY2024 Appropriations Act, div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025).

In June 2025, ICE announced a new policy regarding access by members of Congress to ICE facilities. In relevant part, ICE instituted a requirement that any member of Congress must submit a request at least seven days in advance and obtain approval before conducting an oversight visit at any ICE detention facility.[3] *See Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV (captured July 8, 2025).

Plaintiffs, twelve individual members of Congress, filed this lawsuit on July 30, 2025, challenging the oversight visit policy as unlawful and in excess of Defendants' authority. They moved for a stay under section 705 or, in the alternative, for a preliminary injunction, to ensure that members of Congress could continue to conduct critical oversight visits during the pendency of this litigation.

While Plaintiffs' motion remained pending, a lapse in government appropriations occurred, resulting in a government shutdown. During that shutdown, Defendants submitted a declaration regarding ICE's funding stating that, during the shutdown, "OBBBA funding alone was insufficient to cover the costs of ICE's continuing operations during the shutdown, including detention operations, with ICE funding itself in part by 'incur[ring] obligations in advance of FY2026 appropriations.'" Op. at 59 (quoting Ferguson Decl. ¶¶ 5–7, ECF No. 32-1).[4] Following the end of the shutdown, in a joint status report submitted on November 17, Defendants stated that "Defendants' actions funded by [the fiscal year 2026] continuing resolution [enacted on November

---

[3] The policy also purported to exempt ICE field offices from the requirements of section 527.
[4] *Neguse v. ICE*, No. 25-cv-2463, 2025 WL 3653597 (D.D.C. Dec. 17, 2025).

12, 2025,] are subject to section 527." JSR ¶ 2, ECF No. 34. They further conceded that "Defendants are currently using funds appropriated through that continuing resolution for detention operations, including the adoption and implementation of the visitation protocols at issue in this action." *Id.* ¶ 3.

This Court granted Plaintiffs' motion and stayed Defendants' policy on December 17. Once it "satisfied itself of likely jurisdiction and rejected Defendants' threshold objections" to Plaintiffs' claims, the Court concluded that "Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority." Op. at 59. In particular, the Court determined that "a seven-day notice policy is [not] permissible under" section 527(a) and is not otherwise authorized by law. Op. at 56–58. The Court further held that Plaintiffs had "shown that they suffer irreparable harm" due to the oversight policy and that the "public interest and the balance of equitable considerations weigh[ed] strongly in favor of granting Plaintiffs their requested relief." Op. at 70. The Court thus stayed the oversight visit policy under section 705 pending the conclusion of this litigation. Op. at 73. Indeed, the Court left no question about the practical import of the limitations of section 527: "the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member." Op. at 22.

Relevant here, the Court stated the following in staying the oversight visit policies:

> The challenged Oversight Visit Policies violate the APA and are contrary to the terms of Section 527 because the evidence currently before the Court demonstrates that the Policies were promulgated with Section 527 funds, and they continue to be implemented and enforced through the use of Section 527 funds. *Unless and until Defendants show that no Section 527 funds are being used for these purposes,* a stay of the policies is consistent with the scope of Defendants' violation and Plaintiffs' requested relief.

Op. at 72 (emphasis added).

Defendants have not appealed the Court's order staying the policy, including the seven-day-notice requirement. Nor did Defendants seek to clarify or modify the Court's order—nor to make any showing to the Court respecting their use of non–section 527 funds—prior to promulgating an identical notice requirement and implementing that duplicate notice policy, including by denying three members of Congress entry to an ICE facility near Minneapolis on January 10.

**2.** After the Court issued its order staying Defendants' unlawful oversight visit policy, Plaintiffs and other members of Congress immediately recommenced their oversight duties at ICE facilities across the country.[5] Those visits have occurred without incident, *contra* Mem. from Secretary Noem, *Congressional Access to Alien Detention Facilities – Access Policy and Use of Appropriations for Enforcement* 1–2, ECF No. 39-1 ("Noem Memo") (asserting, without support, a need for advance notice to "protect[]" persons during oversight visits), and have provided valuable information to members. Members conducting oversight over the last few weeks have identified serious deficiencies in detention conditions and obtained timely information critical to determining laws and appropriations relating to DHS and ICE.[6]

**3.** On January 8, 2026, Secretary of Homeland Security Kristi Noem issued a memorandum to Todd Lyons, the acting director of ICE, and Holly Mehringer, a senior officer performing the

---

[5] *See, e.g.*, Luis Ferré-Sadurní and Olivia Bensimon, *ICE Allows Democratic Lawmakers Inside Migrant Cells in New York City*, N.Y. Times (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/nyregion/ice-congress-detention-nyc.html; Matt Materson, *'Accountability Is Not Optional': Illinois Congressional Reps Tour Broadview Ice Facility Monday*, WTTW (Dec. 22, 2025), https://news.wttw.com/2025/12/22/accountability-not-optional-illinois-congressional-reps-tour-broadview-ice-facility; Jordan Rynning, *Rep. Jimmy Gomez inspects ICE facility in LA during unannounced visit*, LAist (Dec. 19, 2025), https://laist.com/news/politics/rep-jimmy-gomez-inspects-ice-facility-in-la-during-unannounced-visit.

[6] *See, e.g.*, U.S. Representatives Goldman and Espaillat Conduct Oversight of ICE Facilities at 26 Federal Plaza Following Court Win (Dec. 22, 2025), https://goldman.house.gov/media/press-releases/us-representatives-goldman-and-espaillat-conduct-oversight-ice-facilities-26 (detailing the conditions they observed, including that "immigrants are still kept for up to three days without showers or beds and often no way to contact their families or lawyers").

duties of the chief financial officer, setting out a purported "new policy," "effective immediately." Noem Memo at 1. The memorandum reimposes the same seven-day-notice requirement that this Court stayed and states that congressional oversight "[f]acility visit requests must be made a minimum of seven (7) calendar days in advance." *Id.* at 2. Such requests must be made "during normal business hours" and "are not considered actionable until [ICE Office of Congressional Relations (OCR)] acknowledges receipt of the request." *Id.* In an attempt to circumvent both section 527 and this Court's stay order, the secretary instructed ICE to "ensure that this policy is implemented and enforced exclusively with money appropriated by" the One Big Beautiful Bill Act (OBBBA), and she stated that she "anticipate[s]" that the OBBBA provides adequate funding. *Id.*; *see* OBBBA, Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. 72, 388–89 (2025). She further instructed that "the Chief Financial Officer, in consultation with the General Counsel, shall ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." Noem Memo at 2.

This memorandum was issued in secret. Defendants did not immediately notify Plaintiffs or the Court of the duplicate notice policy. And as of this filing, the policy is not posted to the ICE OCR website. *See Office of Congressional Relations*, ICE, https://perma.cc/HW4Y-TFAN (last updated Dec. 19, 2025) (captured Jan. 11, 2026).

**4.** On the morning of January 10—three days after an ICE officer shot and killed Renee Good, an unarmed U.S. citizen, in Minneapolis—three members of Congress representing nearby districts attempted to conduct an oversight visit at an ICE facility near Minneapolis.[7] They were unaware of the duplicate notice policy that had quietly gone into effect two days earlier. Although they were briefly able to gain entry into the ICE facility, two ICE officials ultimately prevented the members from conducting the oversight visit. These ICE officials told the members that they were

---

[7] *See* Aaron Rupar (@atrupar), X (Jan. 10, 2025, at 11:48 AM ET), https://perma.cc/7ZNR-VPA8 (https://x.com/atrupar/status/2010030900201804230).

being denied access because OBBBA funds were being used. The members were forced to leave and were unable to conduct oversight at the facility at a critical moment for their constituents and communities in and around Minneapolis.

On the afternoon of January 10, when undersigned counsel became aware of this oversight visit denial, they contacted counsel at the U.S. Department of Justice raising concerns and seeking more information as to the basis for the denial. Only in response to that email did Defendants' counsel inform Plaintiffs' counsel of the duplicate notice policy that had gone into effect two days earlier. Several hours later, Defendants filed a notice of the policy. ECF No. 39.

Defendants' duplicate notice policy once again obstructs congressional oversight of ICE detention facilities at a time of continuing reports of increasingly violent behavior by ICE in communities across the country.[8] Most immediately, the current continuing resolution will expire before the end of this month, and members of Congress are actively negotiating the appropriate levels of appropriations for DHS and ICE, including any limitations on DHS's funding. The ability of members of Congress to continue conducting timely and thorough oversight of ICE detention facilities is critical to these negotiations and provides necessary information that allows members to propose legislation or other constraints on appropriations to hold ICE accountable for its actions and conditions in detention facilities.

## ARGUMENT

Defendants' duplicate notice policy is a brazen attempt to nullify the limitations placed on DHS by law in section 527 and to subvert this Court's section 705 stay order. Plaintiffs respectfully request that this Court order Defendants to explain in detail how the development, promulgation, and implementation of this notice policy comply with section 527 and this Court's stay order,

---

[8] *See, e.g.*, Chris Hippensteel, Albert Sun, & Jill Cowan, *Deadly Minneapolis Encounter Is the 9th ICE Shooting Since September*, N.Y. Times (Jan. 9, 2026), https://www.nytimes.com/2026/01/07/us/ice-shootings-minneapolis-other-cities.html.

including how this policy was effectuated and will be implemented without using a single dollar of

annually appropriated funding subject to the restrictions in section 527.

**I.    Defendants Have Not Shown That No Section 527 Funds Were or Will be Used for the
Duplicate Notice Policy**

This Court already held that "Plaintiffs are likely to succeed on their claim that Section 527

funds are being used to implement a seven-day notice requirement for Members of Congress

seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in

excess of DHS's statutory authority." Op. at 59. The Court articulated clearly that "the result of

Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an

oversight visit, *a facility operated with or staffed using Section 527 funds must admit that Member.*" Op. at 22

(emphasis added). Thus, the Court unequivocally stated that it would stay Defendants' seven-day-

notice policy during this litigation "[u]less and until Defendants show that *no Section 527 funds* are

being used." Op. at 72 (emphasis added).

Defendants made no attempt, in the secretary's memorandum or in their later-filed notice to

the Court, to show that no section 527 funds have been or will be used to create and implement the

duplicate notice policy. And for good reason: as explained below, it is practically and administratively

impossible for Defendants to have used exclusively OBBBA funds in creating and implementing the

duplicate notice policy.

In order for Defendants to have complied with the prohibition in section 527 in the course

of developing and implementing the reimposed notice policy, they would have had to ensure, for

example, that every salary and expense used in the development, drafting, and communication of the

policy was exclusively paid for by OBBBA funds; every salary and expense used for the

implementation of the policy is, and will be, exclusively paid for by OBBBA funds; and every salary

and expense used for the tracking of such salaries and expenses is, and will be, exclusively paid for

by OBBBA funds. It is practically impossible for Defendants to have ensured that OBBBA funds

were exclusively used up to this point and to ensure that only such funds are used going forward.
Even if it were possible for DHS to promulgate and implement this policy using exclusively OBBBA
funds, Defendants would further have to ensure that every such expense is accounted for under one
of the specific purposes enumerated in the OBBBA. Absent a showing by Defendants that they did
not use a single dollar of annually appropriated funding, their reimposed notice policy—a duplicate
of the stayed seven-day-notice requirement—violates section 527 for the same reasons.

**A.** "[T]here can be no doubt that Congress could accomplish" a legislative purpose, and
carry out "its chosen policy," through limitations placed on an agency in an appropriations bill,
including the substantive limitations placed on DHS through section 527. Op. at 22 (quoting *United
States v. Will*, 449 U.S. 200, 222 (1980)). Congress has made its policy aims clear in each
appropriations bill since fiscal year 2020: DHS may not use appropriated funding to prevent
members of Congress from conducting oversight visits at ICE facilities or to require advance notice
of such visits.

DHS contends that its new policy "effectuates the clear intent of Congress not to subject
OBBBA funding to section 527's limitations," but that justification does not withstand even a
moment's scrutiny. Noem Memo at 2. Consider, for example, the timing of the enactment of
OBBBA and the most recent continuing resolution providing annual appropriations. Although
Defendants are correct that the OBBBA does not include section 527's limitations, Congress (with
the signature of the President) once again subjected DHS to those limitations through the
continuing resolution enacted in November 2025, four months *after* the OBBBA. To accept
Defendants' arguments, this Court would have to believe that Congress intended OBBBA funds to
be used for the purpose of allowing DHS to evade Congress's repeatedly and later-expressed policy
that members of Congress must be allowed to visit ICE facilities without notice.

Moreover, Defendants' contentions in the memorandum simply do not reflect how congressional appropriations work. Congress appropriated general funds for the operation of DHS and, in doing so, provided that DHS may not use those funds to prevent members of Congress from conducting oversight visits to detention facilities. Congress separately provided supplemental funds to DHS for specific purposes, while DHS continues to use annually appropriated funds for the operation of the agency and its components. Defendants suggest that they can now ignore the funds for DHS's operation and exclusively use that supplemental funding, to do the very thing that Congress has prohibited in DHS's general funding. This is simply not the case: Congress provided money for operating DHS, pursuant to which DHS cannot prevent members of Congress from entering detention facilities for the purposes of oversight. The existence of additional funding for certain specific purposes in no way alters that reality. In other words, a supplemental appropriation is not an invitation for the relevant agency to evade the policies chosen by Congress and enacted with the President's signature through the annual appropriations.

**B.** As this Court reiterated in its opinion, "appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." Op. at 21 (quoting *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part)). And, as the D.C. Circuit has also made clear, "the 'use of any government resources—whether salaries, employees, paper, or buildings—to accomplish' a given activity 'would entail government expenditure,' and 'therefore would run afoul of [a] statutory moratorium on spending for' that activity." *Id.* (quoting *Kimberlin*, 318 F.3d at 232 (per curiam)).

Defendants are thus prohibited under section 527 from imposing a waiting period or otherwise preventing entry by members of Congress to DHS detention facilities to the extent that even a *single dollar* of annually appropriated funds would be spent to delay or prevent their entry.

Accordingly, the prohibition in section 527 covers every aspect of the development, promulgation, communication, and implementation of the duplicate notice policy.

**C.** DHS is again attempting to subvert the clear restrictions that Congress placed on the agency in section 527. In her memorandum communicating the duplicate notice policy, Secretary Noem instructed ICE to "ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA." Noem Memo at 2. She stated that she "*anticipate[s]* that there is more than sufficient funding available for the limited expenses associated with implementing and enforcing these policies." *Id.* (emphasis added).

The suggestion that this policy can be promulgated and implemented without at any point being subject to the limitations of section 527 is practically impossible and misunderstands the manner in which an agency expends appropriated funding. As soon as *any* annually appropriated funds are used in service of the duplicate notice policy, a violation of law has occurred. In order to avoid this, the salaries and expenses that would have to be covered by OBBBA funds are vast in scope. And where the policy must be known by innumerable DHS employees and could be enforced at any ICE facility in the country—as members of Congress may attempt to conduct oversight at any facility essentially at any time without notice—*all* such salaries and operational and facility expenses must be preemptively paid from OBBBA funds, and not annually appropriated funds subject to section 527.

For Defendants to avoid a violation of section 527 and this Court's stay order, Secretary Noem and all DHS employees who played any role in developing the policy and drafting the memorandum would have to have already been paid using OBBBA funds, and the purchase or maintenance of any equipment they used to do so, including any information technology systems, would have had to be paid for using OBBBA funds. Next, the policy has to be communicated to and understood by most, if not all, employees at every DHS facility, so therefore the money for

those employees' salaries and any relevant equipment used in the implementation and communication of the policy would have had to have come from OBBBA funds. Indeed, their salaries, any equipment expenses (e.g., uniforms and arms), costs incurred by communication systems (including email, internet, cell phones, computers, and land lines to name a few), and any detention facility security infrastructure purchases and maintenance would have to be paid for by OBBBA funds essentially at all times going forward, because a member of Congress could show up without notice to *any* facility and be denied entry at any time. For facilities that are operated by contractors—such as the Denver Contract Detention Facility, run by GEO Group—those contracts would have to be paid for by OBBBA to the same extent. Further, any salaries and expenses of the chief financial officer and general counsel, and any aides thereto, would have to be covered by OBBBA funds to the extent that they are tracking the use of funds in the implementation and enforcement of the policy. The same is true of all personnel, equipment, and systems of ICE OCR, which is responsible for fielding congressional visit requests under the policy.

The same is also true of the funding of ICE facilities and all other federal buildings in which the duplicate notice policy was created and will be communicated and enforced. The members' unsuccessful attempt to visit the Minneapolis ICE facility provides a helpful example. When the members arrived, they were met by a phalanx of DHS employees dressed in fatigues, masks, and bulletproof vests who were carrying weapons and pepper spray.[9] All salaries and relevant expenses for those employees, including the equipment they wore, must have been funded by OBBBA funds. The same is true of the salaries and relevant expenses of the two ICE employees who communicated the denial of entry and all other DHS employees involved in denying the members entry into the facility.

---

[9] Aaron Rupar (@atrupar), X (Jan. 10, 2025, at 11:48 AM ET), https://perma.cc/7ZNR-VPA8 (https://x.com/atrupar/status/2010030900201804230).

Even if DHS had already solved this vast accounting problem, there are limitations in the OBBBA itself that present problems for DHS's purported workaround. The OBBBA represents a supplemental appropriation, as distinct from a general appropriation. Congress commonly provides such supplemental appropriations to agencies, outside the omnibus appropriations legislation, for specific purposes. Accordingly, unlike the more general annual appropriations, funds appropriated to DHS and ICE in the OBBBA were appropriated only for specific purposes. DHS is currently funded principally through the continuing resolution expiring on January 30. Pub. L. No. 119-37, § 106, 139 Stat. at 497. Outside of the purposes enumerated in the OBBBA for which that supplemental funding may be used, DHS must use annually appropriated funds subject to section 527. *See* 31 U.S.C. § 1301 ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *see also* GAO, *Principles of Federal Appropriations Law* 3-25 (4th ed. 2017) (citing 18 Comp. Gen. 285 (1938) (highlighting that an agency's justification of an expenditure "may not transcend the statutes, nor be exercised in conflict with law, nor for the accomplishment of purposes unauthorized by the appropriation")). DHS otherwise must use annually appropriated funds, including for the agency's general operations. Defendants have not attempted to make any showing as to how expending money for their duplicate notice policy would be consistent with the purposes expressed in the OBBBA.[10]

## II. Defendants Should Be Required Show How This Policy Complies with Section 527

It is deeply implausible that all DHS salaries and other expenses that have already been and will be used for the development, promulgation, communication, and implementation of the

---

[10] In the duplicate notice policy, Defendants cite only section 100052 of the OBBBA for the proposition that the funds used for the policy are not subject to section 527. *See* Noem Memo at 1 n.4. But no interpretation of section 10052—which includes funding for items such as recruitment, facility upgrades, information technology, and transportation, and whose purpose is to assist ICE to "carry out immigration enforcement activities" and to "support enforcement removal operations"— authorizes Defendants to deny members of Congress access to DHS facilities. OBBBA, Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. at 388–89.

duplicate notice policy are derived exclusively from OBBBA appropriations. To the extent that Defendants submit this to be the case, the Court should order them to explain, with specificity and evidentiary support, how this is so. They would have had to make these determinations in order to ensure compliance with section 527 before taking even a single step towards the creation of this policy. Therefore, although ensuring that this policy was done in a lawful manner would presumably have been a herculean task, providing this information to the Court should not be a significant burden at this stage.

First, Defendants should be required to demonstrate all relevant accounting to show that every dollar used in the creation, development, promulgation, communication, and implementation of the duplicate notice policy was and will be from OBBBA funds. This accounting should include, but not be limited to

(1) the salaries and expenses, including the supply or maintenance of technology systems and other equipment, used by Secretary Noem and any other DHS officials and aides, including agency counsel, who played any role in developing the reimposed notice policy, drafting the memorandum, and otherwise communicating about the policy;

(2) the salaries and expenses, including the supply or maintenance of technology systems and other equipment, used by ICE OCR, to field congressional visit inquiries and otherwise implement the reimposed notice policy;

(3) the salaries and expenses, including the supply or maintenance of technology systems and other equipment, of every employee at DHS, including at every ICE detention facility, who has been or will be informed of the reimposed notice policy and could potentially play a role in its enforcement;

(4) the supply or maintenance of all other relevant security equipment and infrastructure, including any communication or alert systems, at ICE detention facilities that may be used in any way to prevent entry by members of Congress;

(5) any contracts related to operating or providing security or any relevant systems or services for ICE detention facilities; and

(6) the salaries and expenses, including the supply or maintenance of technology systems and other equipment, used by the chief financial officer and agency counsel, and any aides thereto, to identify and track the use of funds in the implementation and enforcement of the policy and ensure the avoidance of any violations of law.

Second, Defendants should be required to explain how these accountings are reconcilable with the OBBBA's specific purposes. At a minimum, Defendants must demonstrate (1) which provision in the OBBBA provides the relevant specific purpose for each of the items listed above and (2) how each of those items serves the relevant specific purpose.

If Defendants are unable to provide this information to the Court, with evidentiary support, then they almost certainly have already violated section 527 by reimposing the unlawful seven-day-notice requirement that is stayed by this Court's order.

\*      \*      \*

For these reasons, Plaintiffs request that the Court issue an order to show cause, hold an emergency hearing at the Court's earliest convenience, and require Defendants to provide these specific explanations, with evidentiary support, for how the duplicate notice policy complies with section 527 and this Court's stay order.[11]

---

[11] On the evening of January 11, undersigned counsel informed Defendants' counsel of this forthcoming request for relief and the basis for this motion and requested Defendants' position. As of this filing, Defendants have not responded with their position on this motion.

January 12, 2026

Respectfully submitted,

*/s/ Lisa Newman*
Lisa Newman (TX Bar No. 24107878)
Christine L. Coogle (D.C. Bar No. 1738913)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ccoogle@democracyforward.org

Daniel Martinez
D.C. Bar No. 90025922
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Jessica Jensen
D.C. Bar No. 1048305

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*