IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,

    *Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,

    *Defendants.*

Case No. 25-cv-2463-JMC

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................................1

ARGUMENT.........................................................................................................................................2

I.      Defendants' Actions Violate the Appropriations Limitations in Section 527 .............................2

        A.      Defendants' submissions to the Court confirm that Defendants are in violation of section 527 ........................................................................................................2

        B.      Defendants cannot lawfully impose a notice requirement under the appropriations laws ...............................................................................................................6

II.     The Court Should Immediately Issue an Order Enforcing Its Section 705 Stay Order ......... 11

        A.      This Court has the authority to enforce its own orders ................................................. 11

        B.      The seven-day-notice requirement in the Noem memorandum is the same agency action Plaintiffs challenged in their complaint and this Court stayed ............. 12

**INTRODUCTION**

Pursuant to this Court's minute order of January 14, 2026, Plaintiffs submit this supplemental memorandum. Plaintiffs respectfully request that the Court immediately enforce its 5 U.S.C. § 705 stay order as applicable to Defendants' latest attempt, and any future attempt, to impose a notice requirement on members of Congress attempting to conduct oversight at ICE detention facilities.

In yesterday's hearing, Defendants could not answer one simple—but critical—question posed by the Court: did the Department of Homeland Security (DHS) use funds subject to section 527 in promulgating and implementing the notice requirement that it covertly reimposed six days earlier? Defendants' declarations answer that question: Defendants *did* use funds subject to section 527. This Court has sufficient information to determine that Defendants are in violation of section 527 and of the Court's stay order.

DHS's actions of the last week continue a pattern of gamesmanship with respect to the restrictions imposed by section 527. Every year since fiscal year 2020, Congress has made clear that DHS cannot use the funds annually appropriated for its existence and operations to prevent members of Congress from conducting oversight in ICE facilities without prior notice. But last June, DHS began subverting the law to do just that. In December, this Court made clear that the law repeatedly passed by Congress and signed by the President means what it says: DHS cannot in any way use funds from its annual appropriations to prevent members of Congress from entering ICE facilities to conduct oversight. But now, yet again, DHS is attempting to subvert the law. In doing so, this time it is also violating an order of this Court.

This Court wrote in its stay opinion that "Congress does not have to act twice for its statutes to be enforceable." Op. at 44, ECF No. 36. The same is true of judicial orders: the first order of this Court should have sufficed to secure Defendants' compliance. Accordingly, Plaintiffs respectfully

ask that this Court issue their proposed order to confirm that the section 705 stay applies to the reimposed seven-day-notice requirement—and any notice requirement—*unless and until* Defendants show that they have not used, are not using, and will not in any way use funds subject to section 527. *See* ECF No. 40-1.

## ARGUMENT

### I. Defendants' Actions Violate the Appropriations Limitations in Section 527

Reduced to its essence, Defendants' contention in their declarations appears to be that they can cure their violations of section 527 with after-the-fact accounting tricks—that even though they are using funds subject to section 527 to develop and enforce a policy of preventing congressional oversight, they can tally up those expenditures and later deem them to be funded by the reconciliation act rather than DHS annual appropriations. But, as a matter of law, this gambit constitutes using funds in prohibited ways and so violates both section 527 and this Court's order.

### A. Defendants' submissions to the Court confirm that Defendants are in violation of section 527

Defendants' declarations confirm that they are acting in violation of the law and this Court's order. The premise of the Noem memorandum and Defendants' declarations is that there have been no material changes to the funding of DHS operations. And with good reason: DHS has no basis to know *ex ante* which facilities will receive oversight requests, which personnel will be involved in efforts to exclude members of Congress from conducting oversight, and which department tools and assets (facilities, IT systems, and the like) will be parts of those operations. The declarations therefore speak only to *future* actions that could be deployed purportedly to fix whatever Defendants may be doing in violation of the law today. Secretary Noem wrote that she "anticipate[s]" that there is sufficient reconciliation funding for their desired purposes, and she assigned the chief financial officer and general counsel to "ensure appropriate funding" going forward. Noem Memo at 2, ECF No. 39-1. Secretary Noem said nothing of steps that DHS may have taken prior to the development

of the memorandum and promulgation of the reimposed notice requirement. The secretary's omissions speak volumes. Her memorandum indicates that DHS took no such steps, and it was—and surely still is—using section 527 funds to promulgate and implement the notice requirement.

Defendants' declarations corroborate this inference. The Mehringer declaration states that "it is *possible* to track the costs incurred to issue and enforce the [reimposed notice] policy" and *then* DHS "can adjust its accounting ledgers to ensure that these costs are properly recorded." Mehringer Decl. ¶ 6, ECF No. 42-1 (emphasis added). She then submits that "[g]oing forward," DHS "will track the costs incurred enforcing the policy." *Id.* ¶ 7. There is a glaring omission in that statement: she does not say that DHS had tracked any such costs during the preceding week—that is, the costs to develop, promulgate, and distribute the memorandum, or the costs of implementation and enforcement through January 13. What the Mehringer declaration implies is that DHS *did* use funds subject to section 527 (in unknown amounts) to promulgate and implement the policy.

As to *future* incurred expenses, the Mehringer declaration states that those will be "tracked" and "recorded against the appropriate [appropriation] accounts." *Id.* ¶ 9. This could be accomplished, she submits, "no later than the end of the fiscal year"—approximately nine months from now. *Id.* ¶ 11. In other words, DHS can "reconcile" its books to channel those already-incurred costs to another source of funds. *Id.* This again confirms that DHS did *not* ensure ahead of time that funds subject to section 527 would not be used, and one week after the policy was put into effect has *still* not taken steps halt the ongoing violations.

The Easterwood declaration is similarly revealing in its omissions. It explains that the three members of Congress who attempted an oversight visit in Minnesota were told "they were unable to enter the facility absent prior authorization." Easterwood Decl. ¶ 6, ECF No. 42-2. Undoubtedly various resources, and therefore funds, were used in the course of denying their entry, including physical infrastructures (including any related electrical and other utilities) and at least two ICE

3

employees who communicated the denial and prevented their entry. *See* Pls.' Mot. at 7–8, ECF No. 40.[1] And yet, the only relevant statement the Easterwood declaration provides is that a *single* ICE "employee whose position is funded by [the reconciliation act] . . . advised they were unable to enter the facility." Easterwood Decl. ¶ 6. The only reasonable inference is that the (at least one) other employee involved is paid from annual appropriations, as are other resources "used" to prevent the members of Congress from entering. FY2024 Appropriations Act, div. C, title V, § 527(a).

Furthermore, Defendants entirely ignore that a violation of an appropriations rider like section 527 occurs the moment that government resources are *used* beyond the limits set by Congress, even if the money could be moved on the back end to true the accounts. The term "use[]" is extremely broad: "to 'use' confiscated property suggests that a person must make that property of service to them, avail themselves of that property, or carry out some action in connection with the property, either directly or indirectly." *Fernandez v. Seaboard Marine Ltd.*, 135 F.4th 939, 954 (11th Cir. 2025) (collecting definitions); Br. for Appellants, 2002 WL 34244718, *Kimberlin* (D.C. Cir. filed Aug. 15, 2002) (government explaining that the primary definition of "use" in Webster's Dictionary is "[t]o bring or put into service or action" (quoting Webster's II New Riverside University Dictionary 1271 (1994))). In other words, when a government resource is at an agency's disposal—whether it is salaried time, a computer program, a utility, or a pencil—it is necessarily applied to a particular appropriation at that time. If the agency uses that resource for a purpose beyond the limitations of the relevant appropriations—i.e., spends salaried time, creates a document with a word processing program, sends an email, works in a building with utilities, or writes with a pencil—the agency is in violation of the appropriations law in the moment that resource is being used.[2]

---

[1] Aaron Rupar (@atrupar), X (Jan. 10, 2025, at 11:48 AM ET), https://perma.cc/7ZNRVPA8 (https://x.com/atrupar/status/2010030900201804230).

[2] The Court's preliminary ruling is consistent with this principle: the Court ordered that Defendants have to show that "no section 527 funds *are being used*" for the purpose of requiring notice, Op. at 72 (emphasis added)—not that they will ultimately not be expended for that purposes, but that they are not being used. *See also* Lieutenant Colonel (Ret.) Michael J. Davidson, SJD, *Putting*

4

The Antideficiency Act can also serve as a useful guide. 31 U.S.C. §§ 1341–1342, 1511–1519. The act makes it unlawful for any federal employee to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." *Id.* § 1341(a)(1)(A) (emphasis added).[3] Whereas an expenditure occurs when funds leave the government's possession, an obligation of funds occurs when the agency makes a "commitment that creates a legal liability of the government for the payment of goods and services ordered or received." *Obligational Practices of the Corporation for National and Community Service* 3–4, B-300480 (Comp. Gen. Apr. 9, 2004), https://www.gao.gov/products/b-300480-0; *see* 42 Comp. Gen. 733, B-151613 (June 24, 1963), https://www.gao.gov/products/b-151613. In other words, an agency employee does not have to actually cause funds to leave the government's possession in order to be in violation of the Antideficiency Act.

The limitations of section 527 are unambiguous: "[n]one of the funds appropriated or otherwise made available to [DHS] by this Act may be used to prevent" members of Congress from conducting oversight in immigration detention facilities. FY2024 Appropriations Act, div. C, title V, § 527(a). Congress chose broad language in section 527 for a reason: again, it did not want DHS engaging in the activity prohibited, i.e., preventing members of Congress from conducting immediate oversight at detention facilities. "None" means "none." *See* "None," Webster's Third New International Dictionary (1971) (defined as "not any," "not one," and "not any such thing").

---

*the Genie Back in the (Muddy) Bottle: Curing the Potential ADA Violation*, 78 A.F. L. Rev. 27, 68 (2018) ("The GAO has not been forgiving when discussing amount violations and the general consensus is that an amount violation cannot be cured. Once that fiscal genie has left the bottle, an agency cannot put it back in."). As another example, the Department of Justice in *Kimberlin* argued that "with appropriations riders, it is generally understood that payment of the salaries of prison personnel for providing [prohibited instruments] to prisoners is enough to run afoul of the funding ban." Br. for Appellants, 2002 WL 34244718.

[3] The Antideficiency Act is a useful reference when considering a violation of a limitation on appropriations, but an agency action does not have to rise to the level of an Antideficiency Act violation in order to constitute a legal violation of an appropriations rider like section 527.

5

Tellingly, at the hearing, counsel for Defendants was unable to make any representations regarding whether Defendants had used funds subject to section 527. The notice requirement was reimposed six days before the hearing. If DHS had done what was necessary to avoid a violation, it would have already done that work, and it would have had answers ready for the Court.

The presumption of regularity may ordinarily err in favor of giving DHS some benefit of the doubt. "The presumption of regularity, however, is just that, a presumption." *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 89 (D.D.C. 2025). And Plaintiffs have provided "clear evidence"—including the undisputed events of the past eight days and Defendants' own declarations—to rebut any such presumption. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

The evidence before the Court makes clear that DHS has already used funds subject to section 527 in service of reimposing the notice policy—and, by all indications, is continuing to do so.[4] That is enough for the Court to enforce its stay order and issue Plaintiffs' proposed order.

### B. Defendants cannot lawfully impose a notice requirement under the appropriations laws

It is practically impossible for Defendants to ensure that all funds used for a notice policy are attributable *only* to reconciliation act funds, much less do so ahead of time in the span of a few weeks. *See also* JSR ¶ 3, ECF No. 34 (DHS was still "using funds appropriated through th[e] continuing resolution for detention operations."). First, Defendants' attempt to evade a substantive prohibition on certain activity through some kind of appropriations ploy is flatly inconsistent with broader principles of appropriations law. Second, Defendants' ploy is doomed to fail: they cannot fix a violation of appropriations limitations by moving funds around in the middle of a fiscal year, and, as a practical matter, they cannot avoid violating the section 527 limitation in terms of resources used.

---

[4] Even if Defendants were able to satisfy the insurmountable burden of showing that they will not use any annually appropriated funds to implement the policy from this point on, they have still been in violation of this Court's stay order for more than one week.

*First*, Defendants' gambit is completely inconsistent with basic principles of federal appropriations law and how Congress has chosen to appropriate funds to DHS and ICE. Each fiscal year, Congress appropriates funds to DHS to operate the agency and its components, including ICE. *See, e.g.*, FY2024 Appropriations Act, div. C, title V, Pub. L. No. 118-47. That annual funding provides the resources without which DHS and its components could not exist or operate. Until the reconciliation act passed in July 2025, annual appropriations were the only source of funding for the vast range of expenses that could be used to prevent members of Congress from conducting oversight. As a result, when Congress commanded in section 527 that "*[n]one* of the funds appropriated or otherwise made available to [DHS] by this Act may be used to prevent" members of Congress from conducting oversight in immigration detention facilities, *id.* § 527(a), there can be no doubt that this provision "amount[ed] to a substantive ban on" that activity, Op. at 21 (quoting *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part)); *see* Op. at 27 ("The government cannot make expenditures, and therefore cannot act, other than by appropriation." (quoting *Env't Def. Ctr. v. Babbit*, 73 F.3d 869, 871–72 (9th Ct. 1995)).

When Congress provided additional funding through the reconciliation act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72, 358 (2025)—for such purposes as ICE "detention capacity," *id.* § 90003, and "reimbursement" for certain "costs incurred" to "safeguard the borders," *id.* § 90007—Congress in no way suggested that it intended to implicitly repeal the substantive ban on ICE preventing members of Congress from conducting oversight at detention facilities. Nor did Congress suggest that those additional funds could be devoted to general agency operations for which it had already provided funding through its annual appropriations. Lest there be any doubt, Congress reaffirmed its intention to continue the ban on preventing congressional oversight in immigration detention facilities through the passage of the continuing resolution that is currently intended to fund the agency's operations. *See* Continuing Appropriations, Agriculture, Legislative

7

Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025).

"When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978). Likewise, when Congress voted to provide reconciliation funding, it was "entitled to operate under the assumption," *id.*, that ICE would not devote those funds to a purpose that was otherwise forbidden—that is, to prevent members of Congress from conducting oversight in ICE detention facilities.[5] By purporting to displace their general operating funds, at least in part, with reconciliation funds provided for other purposes, Defendants are trying to make a game out of violating the law and then attempting to paper over the violation after the fact. But appropriations are not a game. They are the law.

**Second**, Defendants could not have lawfully avoided section 527 in the way they suggest for several reasons. To start, they could not have changed the appropriation used for all the funds necessary to promulgate and implement the seven-day-notice requirement from annual appropriations to reconciliation funds because of a core doctrine in appropriations law known as the "pick and stick" rule. This rule holds that when an agency "ha[s] two appropriations that may arguably be available for the same purpose," the "agency must elect to use a single appropriation." *Application of the Antideficiency Act to a Lapse in Appropriations*, B-330720 (Comp. Gen. Feb. 6, 2019), https://www.gao.gov/products/gao-19-372t. "Once that election has been made, the agency must continue to use the same appropriation for that purpose unless the agency informs Congress of its

---

[5] *See also generally Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (the Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress"); Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343, 1353 (1988) ("All appropriations thus may be conceived of as lump-sum grants with 'strings' attached. These strings, or conditions of expenditure, constitute legislative prescriptions that bind the operating arm of government.").

8

intent to change for the next fiscal year." GAO, *Principles of Federal Appropriations Law* 3-410 (4th ed. 2017).

Even if, in theory, DHS could try to legalize its notice requirement by retroactively shifting the source of funds for those actions, the "pick and stick" rule would prevent it from moving funds around in the way that it proposes to do. For those expenses that could arguably be paid by either an annual appropriation or a reconciliation appropriation, DHS will have already selected the appropriations for this fiscal year. It cannot move those selections around in the next nine months in an attempt to make lawful what Congress chose to make unlawful.[6]

Further, it is practically impossible for Defendants to avoid violating section 527 by using exclusively reconciliation funds for that purpose. As this Court put it in the preliminary ruling, "the 'use of any government resources—whether salaries, employees, paper, or buildings—to accomplish' a given activity 'would entail government expenditure,' and 'therefore would run afoul of [a] statutory moratorium on spending for' that activity." Op. at 21 (quoting *Kimberlin*, 318 F.3d at 232 (per curiam)). This means, as the government has previously argued to the D.C. Circuit, that a "ban on using appropriated funds for" a certain purpose—there, "for 'the use or possession' of electric and electronic instruments" by federal inmates—"may reasonably be construed to prohibit paying for costs incidental to such use or possession, notably, those incurred for storage, supervision and electricity." *Kimberlin*, 318 F.3d at 232. The number and variety of DHS resources that must necessarily be used, even "incidental[ly]," to promulgate and implement a notice policy, which begins with the secretary and affects all ICE detention facilities, including in unexpected facilities at unexpected times, are almost too vast to contemplate.

---

[6] Almost certainly, for some expenses paid from annual appropriations, lawfully applying different appropriations would not be possible regardless of the timing because the expenses are authorized by a purpose set forth *only* in the annual appropriations, and not by any purpose in the reconciliation act.

9

The Mehringer declaration breezily states that DHS "has determined that it is possible to track the costs incurred" for the policy and then "adjust its accounting ledgers to ensure that these costs are properly recorded." Mehringer Decl. ¶ 6. But the notion that Defendants can somehow account for this perfectly on the back end is not credible, because there are surely resources that have been and will be used that have already been paid for, such as paper, pens, computer programs, and physical infrastructure. And the scope of the task of tracking all resources used—much less anticipating and reobligating funds before violations occur—is monumental. The absurdity of the scope of this task reflects the absurdity of what DHS is purporting to do here to circumvent a clear prohibition of law.

For instance, look to the development of the Noem memorandum, the object of which is to prevent members of Congress from conducting oversight at ICE detention facilities. Beyond the salaries of the secretary and other individuals involved, the secretary's office surely used building utilities (like lights in the office), the payment for which would have to be from reconciliation funds; they mostly likely used computer programs to type up or communicate the notice policy, such as Microsoft 365, the licenses for which would have to be paid using reconciliation funds; and they may have used pens or papers that must have been purchased using reconciliation funds. That is to say nothing of the funding used for ICE facilities themselves and the personnel working there, the contracts that DHS has with companies like GEO Group that operate ICE detention facilities, and the leases of certain ICE facilities paid to the General Services Administration.

"[T]here is no de minimis exception to appropriation limitations . . . . Appropriations for federal agencies, like conditions in spending programs for nonfederal entities, are important sources of regulatory authority because the expenditure of any and all monies is conditioned upon compliance with prescribed policy. Where Congress prohibits use of any appropriated funds for an activity, the Executive simply has no authority to finance the prohibited activity[.]" Stith, *Congress's*

10

*Power of the Purse*, 97 Yale L.J. at 1362–63 (footnotes omitted). It is simply not the case that DHS can lawfully prevent members of Congress from entering ICE facilities for the purpose of oversight.

**II. The Court Should Immediately Issue an Order Enforcing Its Section 705 Stay Order**

If Defendants have used funds subject to section 527 to promulgate or implement a notice requirement for congressional oversight visits—which, as explained, they certainly have—they violated this Court's order. Plaintiffs request that the Court issue an order to enforce its previous order and ensure that members of Congress are able to immediately resume their oversight duties.

**A. This Court has the authority to enforce its own orders**

"[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "It is well established that 'a court's powers to enforce its own injunction by issuing additional orders is broad, particularly where,' as here, 'the enjoined party has not fully complied with the court's earlier orders.'" *Garcia Ramirez v. ICE*, No. 18-cv-508-RC, 2025 WL 3563183, at *17 (D.D.C. Dec. 12, 2025) (quoting *Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 26–27 (D.D.C. 2000)).[7] As such, courts "necessarily have the power to enter 'such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise.'" *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1441 (D.D.C. 1986) (quotation marks omitted); *see also Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C. 2015). Enforcement of a "court's mandate 'is particularly appropriate in a case . . . where an administrative agency plainly neglects the terms of [the] mandate.'" *Garcia Ramirez*, 2025 WL 3563183, at *17 (quoting *Int'l Ladies' Garment Workers' Union*, 733 F.2d 920, 922 (D.C. Cir. 1984)). Accordingly, this Court can and should enforce the terms of its order where Plaintiffs have

---

[7] Several of the cases in this district in which plaintiffs are similarly seeking enforcement of a court order involved ICE failing to comply with court orders and injunctions. *See, e.g.*, *Garcia Ramirez*, 2025 WL 3563183, at *17; *Damus v. Nielsen*, 328 F.R.D. 1, 4 (D.D.C. 2018); *Heredia Mons v. Wolf*, No. 19-cv-1593-JEB, 2020 WL 4201596, at *2 (D.D.C. July 22, 2020).

11

"demonstrate[d]" that Defendants have "not complied with a judgment entered against it." *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724-RC, 2019 WL 3253685, at *3 (D.D.C. July 19, 2019).

### B. The seven-day-notice requirement in the Noem memorandum is the same agency action Plaintiffs challenged in their complaint and this Court stayed

The Court requested briefing on "whether the January 8, 2026 Memorandum constitutes a new agency action, and whether the scope of the Court's stay issued under 5 U.S.C. § 705 may reach that memorandum." Minute Order (Jan. 15, 2026). In short, the Noem memorandum articulates a seven-day-notice requirement that does not constitute new agency action.[8] Rather, the notice requirement is the same seven-day-notice requirement that Plaintiffs challenge in their complaint and that this Court stayed. Even if it were construed as a new agency action, this notice requirement—and any notice requirement that DHS might try to impose—is well within the scope of the Court's section 705 stay order.

Section 705 provides a Court with authority to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Defendants began preventing members of Congress from visiting ICE facilities in June 2025, through a series of shifting policies, including by instituting a seven-day-notice requirement. *See* Compl. ¶¶ 8, 79–88, ECF No. 1. Plaintiffs challenged the seven-day-notice requirement, along with a purported exemption from oversight for ICE field offices, collectively as "Defendants' oversight visit policies." *Id.* ¶ 277. Plaintiffs alleged that the "final agency action" was "Defendants' oversight visit policy, which requires individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens." *Id.* ¶ 275. Plaintiffs alleged that this was "contrary to the requirements of section

---

[8] To be clear, Plaintiffs challenge the policy reimposed through the Noem memorandum, rather than the memorandum itself.

527," *id.* ¶ 276, and that "no statute or other source of law provides Defendants with the authority to prohibit unannounced oversight visits by individual members of Congress to any DHS facilities that detain or otherwise house noncitizens," *id.* ¶ 277. Those allegations apply equally to the seven-day-notice requirement in the Noem memorandum: the terms of the requirement as articulated in both the June website and the January Noem memorandum are identical. *Compare* Office of Congressional Relations, ICE, https://perma.cc/P6XD-4HNV, *with* Noem Memo at 2.

Thus, the agency action that Plaintiffs challenged and this Court stayed is DHS's requirement that members of Congress provide notice and receive approval prior to conducting an oversight visit and DHS's enforcement of that requirement. The same is true today of the same requirement.[9]

Reinstituting an identical agency action (a seven-day-notice requirement) through a new memorandum does not transform the notice requirement into new agency action beyond the scope of the Court's stay order. The *form* in which that agency action was memorialized—whether it was enforced orally, posted on a website, or memorialized in a memo by the secretary—does not define the final agency action. The seven-day-notice requirement is the same agency action.

Plaintiffs anticipate that Defendants will assert that the notice requirement is now carried out using a different source of funds and is therefore a different action. Any such assertion is incorrect. While the source of funding used is a fact relevant to the merits of the legal questions at issue—i.e., whether Defendants' notice requirement is unlawful—the action challenged and the legal questions involved are the same today as when Plaintiffs filed their complaint. The question is whether DHS's requirement that members provide prior notice "prevent[s] Members of Congress from conducting unannounced, in-person oversight at ICE facilities in violation of Section 527." Op. at 3. The Court

---

[9] In the hearing, counsel for Defendants did not attempt to distinguish the policy reimposed through the Noem memorandum as new in any substantive way; they asserted only that the funding source is different.

13

determined that the answer to that question is "yes" as of December 17, and the Court can again determine that the answer to that same question is "yes" today.

The seven-day-notice requirement is also within the scope of the Court's order that prevented enforcement of DHS's notice requirement, in order to preserve the status quo for members of Congress as it has existed for more than five years: members can conduct oversight visits of ICE facilities without notice. This Court agreed that Plaintiffs were substantially likely to show that the notice requirement was unlawful because "the evidence currently before the Court demonstrates that the Policies"—including Defendants' seven-day-notice requirement—"were promulgated with Section 527 funds, and they continue to be implemented and enforced through the use of Section 527 funds." Op. at 73. The Court therefore held unequivocally that "[u]nless and until Defendants show that no Section 527 funds are being used for these purposes, a stay of the policies"—including the notice requirement—"is consistent with the scope of Defendants' violation and Plaintiffs' requested relief." *Id.* The Court granted Plaintiffs' request for a section 705 stay and further "ORDERED that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and *enforcement of* the challenged Oversight Visit Policies" were to be "immediately postponed and stayed." Order (Dec. 17, 2025), ECF No. 37 (emphasis added).

Defendants have once again enforced a seven-day-notice requirement against at least four members of Congress on at least two occasions to prevent their entry into ICE facilities.[10] And they did so without first attempting to comply with this Court's mandate that they show that no section 527 funds were used to create an identical notice policy and enforce that policy by obstructing members of Congress from entering ICE facilities to conduct oversight.[11] Any contrary contention

---

[10] Plaintiff Goldman was also denied entry to an ICE facility this week. *See* https://www.instagram.com/reel/DTd69hxABWh/.

[11] Even if the notice requirement were altered to appear like a new agency action—for example, to require five days' notice instead of seven—it would still run afoul of section 527 and this Court's

14

by Defendants presents an obvious risk: a Court's stay order would be functionally useless if the federal government were able to re-issue a materially identical policy to the one challenged and stayed by a federal court and immediately begin enforcing that policy on the grounds that it is a "new" agency action.

Indeed, at least one district court recently rejected an attempt by the federal government to "covertly" get around that court's injunction by relying on different authorities to carry out the same enjoined action. *New York v. Trump*, 777 F. Supp. 3d 112, 117 (D.R.I. 2025). After a court issued an injunction to prevent a challenged freeze of federal funding, the government attempted to freeze funding by relying on other "independent authorities to implement" processing and disbursement of funding subject to the court's injunction, and not the authorities challenged by plaintiffs. *Id.* The plaintiffs moved to enforce the Court's injunction. The Court did not require the plaintiffs to amend their complaint in order to affirm that this new review process "violates the Court's preliminary injunction order" and "reaffirm[ed] its preliminary injunction," without requiring that the plaintiffs amend their complaint. *Id.* at 119. This Court should likewise reaffirm that any attempt by Defendants to create, implement, or enforce a notice requirement without making a showing to this Court about the use of section 527 funds is agency action within the scope of the Court's 705 stay order.

\*   \*   \*

For these reasons, Plaintiffs respectfully request that the Court swiftly issue Plaintiffs' proposed order to make clear today that the Court's section 705 stay order applies to the reimposed seven-day-notice requirement—and any notice requirement—*unless and until* Defendants show that they have not, are not, and will not in any way using funds subject to section 527. *See* ECF No. 40-1.

---

stay order for the same reasons. Plaintiffs would raise precisely the same arguments, and the Court should come to the same conclusion.

| | |
|---|---|
| January 15, 2026 | Respectfully submitted,<br><br>*/s/ Christine L. Coogle*<br>Christine L. Coogle (D.C. Bar No. 1738913)<br>Lisa Newman (TX Bar No. 24107878)<br>Paul R.Q. Wolfson (D.C. Bar No. 414759)<br>Brian D. Netter (D.C. Bar No. 979362)<br>Josephine T. Morse (D.C. Bar No. 1531317)<br>Skye L. Perryman (D.C. Bar No. 984573)<br><br>DEMOCRACY FORWARD FOUNDATION<br>P.O. Box 34553<br>Washington, D.C. 20043<br>(202) 448-9090<br>ccoogle@democracyforward.org<br><br>Daniel Martinez<br>D.C. Bar No. 90025922<br>Ronald A. Fein<br>D.C. Bar No. 90026641<br>Katherine M. Anthony<br>D.C. Bar No. 1630524<br>Jessica Jensen<br>D.C. Bar No. 1048305<br><br>AMERICAN OVERSIGHT<br>1030 15th Street NW, B255<br>Washington, DC 20005<br>(202) 897-2465<br>danny.martinez@americanoversight.org<br><br>*Counsel for Plaintiffs* |