IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, et al.,

    *Plaintiffs*

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

    *Defendants*

No. 25-cv-2463-JMC

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO SHOW CAUSE AND RESPONSE TO COURT'S QUESTIONS**

On December 17, 2025, this Court issued an order staying two Department of Homeland Security (DHS) policies imposing seven-day notice requirements on certain congressional visits to U.S. Immigration and Customs Enforcement (ICE) facilities.  ECF No. 37 (Stay Order).  The Court stayed those policies on the ground that the undisputed record before the Court at the time showed that that Defendants were using restricted funds to enforce them.  The Court's reasoning held open the possibility that Defendants could adopt a similar policy, provided they did so using non-restricted funds.  On January 8, 2026, Secretary Noem issued a new policy requiring agency personnel to impose a notice requirement using only non-restricted funds from the One Big Beautiful Bill Act, Pub. L. 119-21, 139 Stat. 72 (2025) (OBBBA).  ECF No. 39-1 (January 8 policy).

The Court asked the parties to address: (i) whether the January 8, 2026, Memorandum constitutes a new agency action; (ii) whether that Memorandum lies beyond the scope of the

1

Court's stay issued under 5 U.S.C. § 705; and (iii) whether any Section 527 funds have been "obligated or expended" in connection with "creating, promulgating or enforcing" the January 8 Memorandum.  Minute Order, Jan. 14, 2026.

The promulgation and implementation of the January 8 policy is a new agency action that does not violate the Stay Order.  As another District Court recognized two days ago in a materially identical posture, a stay of one policy cannot reach a later policy that "did not exist at the time this Court issued the stay and which Plaintiff's complaint did not challenge."  Letter Order, *Asylum Seeker Advocacy Project v. U.S. Citizenship & Immigration Services*, No. SAG-25-3299, ECF No. 70 (D. Md.) (Jan. 13, 2026) (*ASAP v. USCIS*) (reproduced at ECF No. 42-3).  Indeed, this Court explicitly rejected Plaintiffs' request for more expansive relief that would have enjoined Defendants from taking remedial action to cure legal infirmities the Court found in their original policies.  If Plaintiffs wish to challenge the new policy, they must seek leave to amend their complaint, then demonstrate that they have satisfied *their* burden of proof.  *See, e.g., Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008).  For that reason alone, the Court should deny Plaintiff's Motion for an Order to Show Cause.  ECF No. 40.

In all events, Defendants' actions comply with applicable Federal statutes and appropriations law.  The January 8 policy explicitly directs agency officials to only use non-restricted funds for the policy; Defendants have also placed into the record a declaration from DHS's Senior Official Performing the Duties of the Chief Financial Officer (CFO) confirming this understanding and explaining with particularity how officials will ensure that accounting books accurately reflect this sourcing.  Plaintiffs' objections to that approach are without merit.

**ARGUMENT**

I. **The January 8 Memorandum Constitutes A New Agency Action Beyond the Scope of The Court's Stay Order**

The Court's Stay Order does not limit the ability of Defendants to formulate or promulgate new policies, including the January 8 policy. The Court's Order provides only that "to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the challenged Oversight Visit Policies, as identified in the accompanying memorandum opinion, are immediately postponed and stayed." Stay Order, ECF No. 37 at 1. By its text, this Order concerns only the two "Oversight Visit Policies" issued in 2025 and provides only that their "effective dates" are "immediately postponed and stayed." ECF No. 37 at 1. Plaintiffs now challenge a new policy issued in 2026, which was not in existence at the time of the Court's Order. The Stay Order by its terms does not reach that new policy.

Moreover, Defendants complied with the Court's Stay Order. As Plaintiffs acknowledge, DHS permitted congressional visits after the Stay Order went into effect and before the January 8 memorandum was signed. *See* ECF No. 40 at 6 & n.6. Defendants also took seriously the Court's interpretation of Section 527 and crafted a new policy that complied with the limitations explained by the Court in its opinion, as explained further below. This represents new agency action, and Plaintiffs may challenge this separately through the normal process—such as by amending their complaint and filing a motion for a preliminary injunction. But to answer another question posed by the Court at the January 14 hearing: if plaintiffs filed such a motion, the burden would be squarely on *them*, as always, to demonstrate that they are likely to succeed on the merits. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). Plaintiffs' unadorned speculation that the government will not properly segregate funds would not suffice.

Plaintiffs' attempt to frame the January 8 policy as "the same" agency action as before, rather than new agency action, fails. *See, e.g.*, ECF No. 40 at 2 (arguing that the policy is not new because it contains a similar seven-day notice requirement). A recent case is illustrative. In *ASAP v. USCIS*, a District Court stayed USCIS and Executive Office for Immigration Review (EOIR) policies imposing fees on asylum applicants. Letter Order, ECF No. 42-3. EOIR rescinded its stayed policy and replaced it with a new policy that also imposed fees on asylum applicants. *See id.* Plaintiff criticized EOIR for "re-implement[ing] the annual asylum fee without seeking to lift the Court's stay" and sought clarification that the stay order precluded EOIR's new policy too. *See id.* ECF 64 at 4. Just two days ago, the District Court said no—EOIR issued a new policy, and the plaintiff had to amend its complaint and file a new motion. *Id.* at ECF 70. Specifically, the Court explained: "The stay of the July 17 Memo, which is no longer in force, cannot reach the January 2 Memo, which did not exist at the time that this Court issued the stay and which Plaintiffs' complaint did not challenge." *Id.* Accordingly, the Court explained that: "If Plaintiff wishes to challenge the January 2 Memo, it may seek leave to amend its complaint." *Id.* The same logic applies here: the January 8 memorandum did not exist at the time this Court issued its Stay Order, Defendants have made a new determination of their ability to fund the activities under the January 8 policy by charging OBBBA funds rather than 527-restricted funds, and Plaintiffs have made no effort to satisfy their burden of showing that they are entitled to judicial relief against this new policy. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 810-11 (2022); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) ("[T]he agency can 'deal with the problem afresh' by taking *new* agency action.") (quoting *SEC v. Chenery Corp.* 332 U.S. 194, 201 (1947)).

Plaintiffs' arguments to the contrary fail to show that the new policy is inconsistent with the Memorandum Opinion, ECF No. 36, that accompanied this Court's separate Stay Order. *See*

ECF 37.  While Plaintiffs' Proposed Order asks this Court to hold that Defendants violated the Stay Order, they fail to specify in their brief how Defendants supposedly violated the Stay Order. Contrary to Plaintiffs' assertions, the Memorandum Opinion merely re-enforced the limited nature of the relief granted Plaintiffs in the separate Order.  The Court's Opinion explains: "Both DHS's seven-day notice requirement, and its policy of excluding ICE field offices from the scope of Section 527 are stayed under Section 705 of the APA."  ECF No. 36 at 72.  Again, Plaintiffs challenged only two policies, and the Court stayed only those two policies.  Thus, by both the text of the Court's Stay Order and its rationale as described in the accompanying Opinion, the new policy is beyond the scope of the Stay Order.

Significantly, the Court expressly considered and expressly rejected Plaintiffs' previous request for injunctive relief that would have enjoined Defendants from promulgating new policies. Specifically, Plaintiffs in their Motion for a Preliminary Injunction attached a proposed order requesting the following relief:

> that Defendants shall not effectuate any similar policy under a different name purporting to prevent oversight visits by members of Congress to any U.S. Department of Homeland Security (DHS) facility used to detain or otherwise house noncitizens, including ICE field offices, or require prior notice of such oversight visits.

ECF No. 17-15.  The Court's Stay Order omits this language.  In its Opinion, the Court explained its decision to issue more limited relief as responsive to Defendants' request that "'any relief awarded must be limited to enforcing' the 'limitation on the use of funding contained in' Section 527."  ECF No. 36 at 72 (quoting ECF No. 20 at 56).  Thus, the Court considered but rejected Plaintiffs' request for injunctive relief.  The Court should similarly reject the Plaintiffs' proposed Order seeking such broad injunctive relief.

## II. The January 8 Memorandum Does Not Violate the Stay Order Because It Requires Funding Only Using OBBBA Funds

Even assuming that the Court may address Plaintiffs' challenge to the January 8 policy in this procedural posture, Defendants' actions promulgating and enforcing this new policy comply with Federal appropriations statutes by relying solely on OBBBA funds.

### A. The January 8 Memorandum Relies Exclusively on OBBBA Funds

The Stay Order's rationale relies on the restrictions in Section 527.  The plain text of Section 527 provides that: "None of the funds appropriated or otherwise made available to the Department of Homeland Security **by this Act** may be used to prevent any of the following persons from entering … any facility…." Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619 (emphasis added).  By its own terms, that limitation applies only to the funds appropriated in that bill.  *See, e.g.*, GAO, B-146820 (June 2, 1967) (applying reasoning where "funds … used for formulating and administering the sale of" product "were not appropriated in" the statute containing the rider at issue, "the proviso in question would not" apply); *see also* Government Accountability Office's Redbook, at 2-88 (4th ed. 2016) ("GAO Redbook") (explaining how Congress sometimes chooses more expansive language applying riders to "this or any other act").  It does not forever constrain the ability of Congress to appropriate future funds through different bills without any such limitation.  In fact, this is just what Congress did.  In July 2025, Congress passed and the President signed the OBBBA, which does not contain any such limitation.  Thus, those funds, at least, may be used to enforce the January 8 policy and others like it.

The Court acknowledged that "DHS and ICE have access to funds that are not subject to Section 527," namely, OBBBA, which "does not include the Section 527 rider." ECF No. 36 at 59.  Notwithstanding the general availability of OBBBA funds, the Court also recognized that the

6

challenged policies that were the subject of the Stay Order were issued in June 2025, prior to OBBBA's enactment on July 4, 2025. For that reason, the Court observed that there was "no present dispute that the Oversight Visit Policies were created and implemented before the passage of that Bill." *Id.* For example, the Court summarized the record before it as showing that "Defendants conceded that OBBBA funds had not been used for the operation of detention facilities and access to detention facilities—meaning that the only funds being used were Section 527-restricted funds…." *Id.* (citing Hearing Tr. 47:11-24). But the Court left open the possibility that Defendants could return to enforcing the stayed policies if and when Defendants could "show that no Section 527 funds are being used for these purposes." *Id.* at 72. This reasoning expressly contemplates that Defendants' use of OBBBA funds to require notice of congressional visits would comply with Federal statutes, but that it would have been impossible for Defendants to use OBBBA funds prior to their enactment at the time the original policy was issued. The evidence before the Court at the time simply indicated that that restricted funds had been used to enforce the stayed policies because there was no other funding option prior to OBBBA's enactment. That is not so here.

Unlike Defendants' prior policies that were the subject of the Stay Order, the January 8 memorandum issued after OBBBA's enactment, at a time when OBBBA funds were (and are) available to implement the new policy. Moreover, the memorandum expressly directs that "ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA" and further directs that "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." ECF No. 39-1 at 2. The memorandum further explains that "[t]his policy is consistent with and effectuates the clear intent of Congress to not subject OBBBA funding to Section 527's

limitations," and expressly directs the "Chief Financial Officer, in consultation with the General Counsel" to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." *Id.*  The memorandum thus establishes a policy that reflects the statutory limits identified by the Court in its Opinion.  Accordingly, the policy on its face complies with this Court's interpretation of Federal statutes and directs agency officials to comply with it at all times—including with respect to the promulgation of the policy itself.  Plaintiffs offer nothing but speculation that the government will fail to do so.

Defendants have also filed a declaration from the Senior Official Performing the Duties of the Chief Financial Officer at DHS.  ECF No. 41-1 (CFO Declaration).  This declaration states that non-527-restricted funds "were available" for the Department on January 8; it confirms the understanding of agency staff that the policy "be implemented and enforced using only funds appropriated to the Department by H.R. 1"; and it explains that "[f]rom an accounting perspective, the Department has determined that it is possible to track the costs incurred to issue and enforce the January 8 policy."  ECF No. 41-1 at 3.  As the declaration further explains:

> Once those costs are captured, the Department can adjust its accounting ledgers to ensure that these costs are properly recorded against an available, and appropriate, H.R. 1 appropriation and not one of the Department's annual appropriations accounts. To the extent that the obligations for these costs would ordinarily be recorded against the Department's annual appropriations, the Department can adjust its accounting ledgers so that they are properly recorded against H.R. 1 appropriations.
>
> Going forward, to ensure that ICE complies with the Secretary's direction and to ensure that the appropriate H.R. 1 funding source is sued to enforce the January 8 policy, the Department will track the costs incurred enforcing the policy.
>
> For instance, ICE will track the time spent by ICE employees responding to requests by Members of Congress to visit ICE facilities, including time spent planning such visits. The Department will accordingly track the costs associated with those time records.

*Id.* at 3-4. Thus, Defendants' new policy lies beyond the scope of the Stay Order because it relies only on funds from non-restricted sources.

### B. Plaintiffs' Arguments to the Contrary Are Without Merit.

First, Plaintiffs focus on the possibility that 527-restricted funds may have been "used in the creation, development, promulgation," and "communication" of Defendants' new policy—even if not its "implementation." ECF No. 40 at 15. As a threshold matter, the plain text of Section 527 does not implicate the former actions or support Plaintiffs' expansive theory that, for example, using electricity constitutes a prohibited use of Section 527 funds. But Section 527 provides that, "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used **to prevent any of the following persons from entering** … any facility…." Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619 (emphasis supplied). The plain text of the statute does not say anything about agency deliberations, communications, or policy formulation. It does not include the terms "creation," "development," "promulgation," or "communication." Rather, it speaks only of "prevent[in]g … persons from entering." Neither the policymaking process preceding the January 8 policy nor the issuance of the January 8 memorandum prevented anyone from entering any building. In sum, Section 527 does not apply to such policy formulation—only to Defendants' enforcement of such policies as to non-compliant visits.

Even if Section 527 could be read to cover a policymaking process and if Defendants used non-OBBBA funds for that process, the OBBBA necessarily implies authority to fashion policies to implement Section 527's exclusion from the OBBBA. "[A] text does include not only what is express but also what is implicit." Antonin Scalia & Bryan Garner, *Reading Law* 96 (2012). "For example, when a text authorized a certain act, it implicitly authorizes whatever is a necessary

9

predicate of that act." *Id.*; *see also id.* 192-93; *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring); 1 J. Kent, Commentaries on American Law 464 (13th ed. 1884) ("[W]henever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied"). The OBBBA was the product of legislative deliberations and negotiations with the Executive. Congress and the President chose to omit the 527 rider from funds its appropriated to DHS in the OBBBA. That choice necessarily implies all authority needed for DHS to utilize those funds in ways that Section 527 otherwise may have precluded—including to produce policy memoranda. Were it otherwise, Section 527 would negate and override Congress's later decision to make millions of dollars available to DHS without the rider. *See also, e.g.*, *Matter of: United States Consumer Prod. Safety Comm'n, 2023 U.S. Comp.,* 2023 U.S. Comp. Gen. LEXIS 33 *6-7 (Feb. 8, 2023) ("Thus, an appropriation available for a specific purpose may also be available for expenses necessary for the agency to ensure that it carries out that purpose in a manner consistent with all applicable law.").

In any event, even on Plaintiffs' interpretation of Section 527, the record shows that Defendants will account for the promulgation of the January 8 policy solely from OBBBA funds. As the face of the memorandum itself explains, the CFO and General Counsel are directed to "ensure appropriate funding for the **promulgation** of this policy, including use of OBBBA funding where appropriate." ECF No. 39-1 (emphasis added). And as the CFO Declaration documents, that is what agency officials are doing.

Moreover, Plaintiffs incorrectly contend that the moment an expenditure is made is the moment when an appropriations "violation" occurs. Indeed, Plaintiffs went so far as to suggest that Defendants may never revise agency accounting ledgers to accurately reflect the flow of Federal dollars, and that to do so would result in a violation of the Anti-Deficiency Act. But this

fundamentally misunderstands Federal appropriations law and the longstanding Executive Branch practice of reconciling accounts.  As the CFO Declaration explains:

> The Department will reconcile its accounts to ensure that the tracked costs related to the access policy are charged to and recorded against the appropriate H.R. 1 accounts. To the extent it is necessary for the H.R. 1 appropriations to reimburse annual appropriations so that all of these expenses are properly recorded and accounted for against an H.R. 1 appropriation, the Department will establish interagency agreements to effectuate any transfers that are necessary to reimburse annual appropriations for payroll and other expenses.
>
> Any transfers that are necessary to ensure payroll and other tracked charges are obligated against appropriate H.R. 1 accounts related to enforcement of the access policy will be processed on a monthly basis. A consolidated report will be compiled by the DHS Budget Director for audit purposes.
>
> Using this process to reconcile its accounts, the Department will ensure that all charges related to enforcement of the January 8 access policy are properly recorded against H.R. 1 accounts no later than the end of the fiscal year, when the Department's annual appropriations accounts expire.

ECF No. 42-1 at 3-4.

When a federal agency uses its appropriated funds, it is said to "obligate" them.  An obligation of funds occurs when an agency takes an action that creates, "a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received." *To the Hon. John Tuber*, B-116795 (Comp. Gen. June 18, 1954), *see also Corporation for Nat'l and Community Service*, B-300480.2 (Comp. Gen. Jun 6, 2003).  An agency expends its appropriations by liquidating obligations it has incurred, such as through a contract or for employee salaries, and making payments.  Relatedly, agencies are required to account for and track their obligations by recording them in the agency's accounting records. *See* 31 U.S.C. § 1501.  Although agencies must record their obligations, it is not the act of recording that creates the obligation – the obligation is created by the legal liability to pay. *See e.g., Obligating Letter Contracts*, B-197274 (Comp. Gen. Sept. 23, 1983) ("reservation and notification" letter held not to constitute an obligation, act of recording notwithstanding, where

letter did not impose legal liability on government). Conversely, failing to record an obligation, or recording it incorrectly, does not diminish its validity or affect to which appropriation it is properly chargeable. *See e.g. Kavouras, Inc.*, B-226782 (Comp. Gen. Oct. 20, 1987) (letter of intent, executed in fiscal year 1985 and found to constitute a contract, obligated fiscal year 1985 funds, notwithstanding agency's failure to treat it as an obligation).

As a legal matter, when a Federal agency incurs an obligation, it incurs that obligation against whatever appropriations it has that are available for that obligation, regardless of whether it properly records the obligation against the proper appropriation, an improper appropriation, or fails to record the obligation at all. When an agency has available multiple appropriations, and one of those appropriations may be used for a certain activity and another may not, any use of funds towards the activity in question is treated as flowing from the legally permissible fund and obligating the correct appropriation. To the extent the agency's accounting does not properly record the obligation against the correct appropriation, the agency must correct its accounting records administratively so that its obligations are properly recorded. Incorrect accounting does not affect the validity of a proper obligation when an agency has funds available that can be used for that obligation. Incorrect accounting does require the agency to correct its accounting.

The Comptroller General and the Government Accountability Office (GAO) have long accepted that agencies can, and must, correct their accounting, and that improper accounting does not make valid obligations otherwise improper. Indeed, the GAO's *Principles of Federal Appropriations Law* ("Red Book"), available at https://www.gao.gov/legal/appropriations-law/red-book, appears to reflect Congressional understanding that reconciliation of accounts is not only available, but a longstanding practice. Thus, for instance, the Red Book provides at length:

> First, suppose an agency charges an obligation or expenditure to the wrong appropriation account, either charging the wrong appropriation for the same time period, or charging the wrong fiscal year. The above passage from 63 Comp. Gen. 422 provides the answer—if the appropriation that should have been charged in the first place has sufficient available funds to enable the adjustment of accounts, there is no Antideficiency Act violation. **The decision in 73 Comp. Gen. 259 (1994) illustrates this point. In that case, an agency had erroneously charged a furniture order to the wrong appropriation account, but had sufficient funds in the proper account to support an adjustment correcting the error. Thus, GAO concluded, there was no violation of the Antideficiency Act. Id. at 261**. On the other hand, a violation exists if the proper account does not have enough money to permit the adjustment, and this includes cases where sufficient funds existed at the time of the error but have since been obligated or expended. See also 70 Comp. Gen. 592 (1991); B-222048, Feb. 10, 1987; B-95136, Aug. 8, 1979. Other cases illustrating or applying this principle are 57 Comp. Gen. 459 (1978) (grant funds charged to wrong fiscal year); B-224702, Aug. 5, 1987 (contract modifications charged to expired accounts rather than current appropriations); and B-208697, Sept. 28, 1983 (items charged to General Services Administration Working Capital Fund which should have been charged to other operating appropriations). **Actually, the concept of "curing" a violation by making an appropriate adjustment of accounts is not new**. See, e.g., 16 Comp. Dec. 750 (1910); 4 Comp. Dec. 314, 317 (1897). The Armed Services Board of Contract Appeals also has followed this principle. New England Tank Industries of New Hampshire, Inc., ASBCA No. 26474, 88-1 BCA ¶ 20,395 (1987).83 83 Although the Board's decision was vacated and remanded on other grounds by the Court of Appeals for the Federal Circuit, New England Tank Industries of New Hampshire v. United States, 861 F.2d 685 (Fed. Cir. 1988), the court noted its agreement with the Board's Antideficiency Act conclusions. Id. at 692 n.15."

GAO Redbook at 6-80 (emphasis added).

At bottom, then, Plaintiffs are simply wrong when they argue that the new policy violates the Stay Order based on the CFO Declaration's explanation of accounting. Federal appropriations law provides for an accounting that ensures only the appropriate source of funding is charged. To do so after an initial expenditure does *not* constitute an appropriations violation. To the contrary, the practice of "making an appropriate adjustment of accounts is not new." GAO Red Book at 6-80. Indeed, contrary to Plaintiffs' contention, when funds are "obligated," they are not permanently assigned at that time to any particular appropriation; so long as multiple appropriations are available and contain sufficient funds, an agency may adjust its accounts. *See,*

13

*e.g.*, *Matter of: United States Consumer Prod. Safety Comm'n, 2023 U.S. Comp.,* 2023 U.S. Comp. Gen. LEXIS 33 *8 (Feb. 8, 2023).[1] So long as sufficient funds exist in the funding sources, and so long as any expenditure made to implement and enforce the January 8 policy is reconciled to OBBBA accounts, that money has been "obligated or expended" from OBBBA funds.

Thus, in focusing on whether 527-encumbered funds were used, Plaintiffs raise the wrong question, with potentially misleading results. Rather, to understand whether the January 8 policy violates the Stay Order, the dispositive question is whether all money supporting the policy will be assigned to the OBBBA, which the agency has confirmed it will ensure through the reconciliation of accounts. ECF No. 42-1 at 3-4; *see also* GAO Red Book at 6-80.

### III. Plaintiffs' Proposed Order Is Not Supported by the Record and Is Overbroad

Even were the Court to disagree with each of the arguments above, which it should not, Plaintiffs overreach in the broad injunctive relief they seek through their proposed order.

To start, the proposed Order would have the Court make factual findings that are not supported by the record. For example, the proposed language states that the January 8, 2026 Memorandum is "identical to that which this court stayed in its December 17 order." ECF No. 43-1 at 2. The material difference here, however, is that the 2025 policies were sourced from Section 527-restricted funds, whereas implementation of the policy pursuant to the January 8 memorandum is sourced from OBBBA funds that were not available in June 2025. As noted above, this reflects a serious and substantive consideration of the issues and thus a new policy. Accordingly, it is

---

[1] Plaintiffs also argued that the OBBBA funds were more "general" than the annual appropriation, and the specific must control the general. That GAO principle, while contained in the Redbook, has been rejected when the appropriations statute makes clear that the appropriation is "in addition to amounts ordinarily available" to the agency. The OBBBA contains that precise language. Pub. L. No. 119-21 at § 100052, 139 Stat. 387; *see also Matter of SEC*, 2011 U.S. Comp. Gen. LEXIS 189 *12 (Dec. 5, 2011).

*Plaintiffs'* burden to bring a challenge to the policy and to make the requisite showing in support of that claim. Plaintiffs should not be allowed to shift their burden to Defendants by styling their challenge to the policy as a show-cause order.

Similarly, the proposed Order would incorrectly find that the record does not support Defendants' contention that the January 8 policy is in fact being sourced from OBBBA funds. ECF No. 43-1 at 2. But the record before the Court in fact includes support for this contention, and those documents are entitled to a favorable presumption of good faith and regularity. *See, e.g.*, *Am. Immigration Council v. United States Immigration & Custom Enf't*, 464 F. Supp. 3d 228, 245 (D.D.C. 2020) ("These declarations are accorded a presumption of regularity."); *see also Comcast Corp. v. F.C.C.*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008) ("We must presume an agency acts in good faith . . . .") (citing *Thomas v. Baker*, 925 F.2d 1523, 1525 (D.C. Cir. 1991)); *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) ("[G]overnment officials are presumed to act in good faith . . . . [P]laintiff must present 'well-nigh irrefragable proof' of bad faith or bias on the part of governmental officials in order to overcome this presumption.") (internal quotations and citation omitted). The January 8 Memorandum by its express terms establishes the policy and directs agency officials to source its funds solely through non-restricted funds. ECF No. 39-1. In addition, the CFO Declaration confirms this understanding and explains with specificity the steps officials are taking to ensure only OBBBA funds are used. ECF No. 41-1. Plaintiffs offer nothing to overcome the presumption of good faith but instead rely on speculation that Defendants may not do what they have sworn they will in fact do.

Beyond the problems with the factual premise, Plaintiffs' proposed Order also requests overbroad relief. The proposed Order would exceed the scope of the Stay Order by enjoining, rather than staying, Defendant's January 8 policy (or any other future policy). The proposed Order

thus would impose a burdensome preclearance requirement before Defendants could adopt policies that comply with Federal statutes as interpreted by the Court. Imposing this additional procedural limitation is not supported by the APA. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978).

Plaintiffs' principal objection appears to involve a dispute about Defendants' accounting under Federal appropriations law. Plaintiffs argue that Defendants have not structured their accounting to accurately reflect that only OBBBA funds have been used for electricity and other costs associated with the promulgation, communication, and enforcement of the January 8 policy. But even assuming, for the sake of argument, that Plaintiffs could sustain their burden to make this factual showing, the Court should limit any potential remedy (if the Court had jurisdiction and Plaintiffs' claims were otherwise reviewable) to requiring Defendants to update their accounting books to comply with the January 8 policy and practices described in the CFO Declaration. If the real issue is an accounting problem, Defendants should be able to cure any alleged defect by correcting their books to align with Federal statutes and the Secretary's directives in her January 8 policy. The resolution of any accounting dispute between the Plaintiffs and Defendants regarding which specific costs should be charged to OBBBA should result in an adjustment of accounting – not an order preventing Defendants from taking substantive actions for which Defendants have determined that unencumbered appropriations are available.

Finally, because Plaintiffs are seeking injunctive relief, any relief should be limited to named Plaintiffs who have standing. The language in the proposed Order would extend relief to any "members of Congress." ECF No. 43-1 at 2. But the Court cannot directly grant such a universal injunction that would exceed the scope of Plaintiffs' APA claim. *See Trump v. CASA*,

606 U.S. 831, 856 (2025). Plaintiffs have not sought joinder or obtained class certification. *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] properly conducted class action … can come about in federal courts in just one way—through the procedure set out in Rule 23."). At most, any relief should be limited to staying the new policy—even assuming the Court may adjudicate the merits of the new policy in this procedural posture, despite Defendants' objection, as explained above, that this exceeds the scope of the Stay Order.

## **CONCLUSION**

For all the foregoing reasons, the Court should deny Plaintiffs' Motion for an Order to Show Cause.

Dated: January 15, 2026                          Respectfully submitted,

                                                                BRETT A. SHUMATE
                                                                Assistant Attorney General
                                                                Civil Division

                                                                ELIZABETH J. SHAPIRO
                                                                Deputy Director
                                                                Federal Programs Branch

                                                                 */s/ Amber Richer*
                                                                AMBER RICHER (CA Bar No. 253918)
                                                                Trial Attorney, U.S. Department of Justice
                                                                Civil Division, Federal Programs Branch
                                                                1100 L Street, NW
                                                                Washington, DC 20005
                                                                Ph: (202) 514-3489
                                                                Email: amber.richer@usdoj.gov

                                                                *Counsel for Defendants*