**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>   *Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>   *Defendants*. | Case No. 25-cv-2463-JMC |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER OR,
IN THE ALTERNATIVE, FOR STAY UNDER 5 U.S.C. § 705**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I. The Expanding Humanitarian Crisis in DHS Detention Facilities ......................... 2

II. Congressional Appropriations and Oversight .................................................... 5

    A. Plaintiffs' individual interests in DHS oversight ...................................... 6

    B. The restrictions in the oversight rider ..................................................... 7

III. Defendants' Repeated, Unlawful Obstruction of Oversight Visits to DHS Facilities ............. 9

    A. Initial promulgation and implementation of Defendants' oversight visit policies ........... 9

    B. Recent congressional appropriations to DHS and ICE ................................. 10

    C. This Court's section 705 stay order ...................................................... 11

    D. The promulgation of the January 8 oversight visit policy .......................... 13

LEGAL STANDARD .................................................................................................... 15

ARGUMENT ................................................................................................................ 16

I. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims ...................... 16

    A. Plaintiffs properly challenge the oversight visit policy under the APA .......... 16

    B. The oversight visit policy is contrary to law and in excess of statutory authority ........ 17

        1. The oversight visit policy is contrary to the oversight rider ........... 18

        2. Defendants' appropriations gambit exceeds their authority and is contrary to the appropriations act, the reconciliation act, and the purpose statute ........ 19

        3. Defendants' effort to paper over violations of the oversight rider with accounting tricks cannot remedy their ongoing legal violations ........... 27

        4. In any event, Defendants' gambit is a practical impossibility ........... 32

    C. The oversight visit policy is arbitrary and capricious .......................... 35

II. Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm ............... 42

III. The Equitable Factors Strongly Favor Preliminary Injunctive Relief ................. 43

IV. The Court Should Issue an Immediate TRO and, Subsequently or in the Alternative, Stay the Oversight Visit Policy under Section 705 ........ 43

CONCLUSION ............................................................................................................. 45

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Fed. Labs. Rels. Auth.*,
 25 F.4th 1 (D.C. Cir. 2022) ................................................................................................. 39

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
 No. 25-cv-4505 (BAH), 2026 WL 80796 (D.D.C. Jan. 11, 2026) .................................... 43

*Am. Fed'n of Teachers v. U.S. Dep't of Educ.*,
 1:25-cv-628-SAG (D. Md. 2025), ECF No. 83 ............................................................ 36, 39

*Barenblatt v. United States*,
 360 U.S. 109 (1959) ............................................................................................................ 5

*Bldg. Trades Unions v. Dep't of Def.*,
 783 F. Supp. 3d 290 (D.D.C. 2025) ................................................................................... 43

*Bridgeport Hosp. v. Becerra*,
 108 F.4th 882 (D.C. Cir. 2024) .......................................................................................... 31

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ........................................................................................... 15

*Coalition for Humane Immigrant Rights v. Noem*,
 No. 25-872-JMC, 2025 WL 2192986 (D.D.C. Aug. 1, 2025) ........................ 15, 36, 42, 43

*Ctr. for Biological Diversity v. EPA*,
 141 F.4th 153 (D.C. Cir. 2025) .......................................................................................... 31

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
 591 U.S. 1 (2020) ............................................................................................................... 37

*Eastland v. U.S. Serviceman's Fund*,
 421 U.S. 491 (1975) ............................................................................................................. 6

*Env't Def. Ctr. v. Babbit*,
 73 F.3d 869 (9th Ct. 1995) ................................................................................................. 19

*FDA v. Wages & White Lion Invs., LLC*,
 604 U.S. 542 (2025) ..................................................................................................... 35, 37

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
 636 F.2d 755 (D.C. Cir. 1980) ........................................................................................... 43

*Goodyear Atomic Corp. v. Miller*,
 486 U.S. 174 (1988) ........................................................................................................... 21

*Hall v. Johnson*,
 599 F. Supp. 2d 1 (D.D.C. 2009) ....................................................................................... 15

*Kimberlin v. DOJ*,
  318 F.3d 228 (D.C. Cir. 2003) (per curiam),
  *reh'rg en banc denied*, 351 F.3d 1166 (2003) ..................................................................20, 32

*L.G.M.L. v. Noem*,
  800 F. Supp. 3d 100 (D.D.C. 2025)................................................................................ 43

*League of United Latin Am. Citizens v. Exec. Off. of President*,
  No. CV 25-0946 (CKK), 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ............................ 43

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .......................................................................................... 42

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ...................................................................................................... 21

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) ...................................................................................... 42

*Moreno Gonzalez v. Noem*,
  1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF No. 49 ....................................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................35, 36, 37, 39

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  775 F. Supp. 3d 100 (D.D.C. 2025)............................................................................... 43

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022) ...................................................................................................... 17

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................................... 37

*Office of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ................................................................................................ *passim*

*Ohio v. EPA*,
  603 U.S. 279 (2024) ..................................................................................................35, 36

*Pugin v. Garland*,
  599 U.S. 600 (2023) ...................................................................................................... 22

*Reeside v. Walker*,
  52 U.S. (11 How.) 272 (1850) .........................................................................................5

*Sergio Alberto Barco Mercado v. Noem*,
  No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97 ..............................................4

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ............................................................................ 16

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)........................................................................................... 23

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ...................................................................23, 25

*United States v. MacCollom*,
    426 U.S. 317 (1976) (plurality opinion) .............................................................. 26

**U.S. Constitution and Statutes**

5 U.S.C. § 705 ........................................................................................................ *passim*

5 U.S.C. § 706 ...............................................................................................16, 17, 35

31 U.S.C. § 1301(a)........................................................................................... 19, 23

Antideficiency Act ............................................................................................16, 23, 31

Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, 133 Stat. 2317........................................7

Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260,
    134 Stat. 1182, 1473 (Dec. 27, 2020)..........................................................................7

Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103,
    136 Stat. 49, 340 (Mar. 15, 2022) ................................................................................7

Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328,
    136 Stat. 4459, 4752 (Dec. 29, 2022)..........................................................................8

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4,
    139 Stat. 9 (Mar. 15, 2025) ...........................................................................................8

FY2024 Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) .......................... *passim*

Reconciliation Act of 2025, Pub. L. No. 119-21, 139 Stat. 72 (2025)................................... *passim*

**Legislative Authorities**

*Application of the Antideficiency Act to a Lapse in Appropriations*, B-330720 (Comp. Gen.
    Feb. 6, 2019), https://www.gao.gov/products/gao-19-372t............................................. 26

Cong. Research Serv., RL30240, *Congressional Oversight Manual* (2022),
    https://perma.cc/4V9G-P427.........................................................................................6

Cong. Research Serv., R48731, *Full-Year Continuing Resolutions: Frequently Asked
    Questions* (2025), https://perma.cc/6TE3-Y9ZQ ....................................................... 19

GAO, *Principles of Federal Appropriations Law* (4th ed. 2017),
https://www.gao.gov/legal/appropriations-law/red-book ................................24, 26, 30

H.R. 7147, 119th Cong. (2026) ................................................................................ 11, 23

Oversight Hearing—U.S. Immigration and Customs Enforcement, H. Comm. on
Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ .............................. 9, 38

**Other Authorities**

*Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y
Gen. 230 (1955) .................................................................................................................5

"Capacity," Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/capacity .................................................................................... 24

Federal Rule of Civil Procedure 65(c) ................................................................................ 43

Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075 (2021) ........................... 20

Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343 (1988) ......................................... 23, 34

*Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That
Support International Terrorism*, 33 Op. O.L.C. 221 (2009), https://perma.cc/K7F2-
VG9G ............................................................................................................................ 34

*Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9
Op. O.L.C. 60 (1985) ......................................................................................................5

*Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax
Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) ...............................5

**INTRODUCTION**

As part of its campaign of mass deportation, the Trump-Vance administration has stretched the U.S. immigration detention system far beyond its capacity and has created a humanitarian crisis in detention facilities across the country. Over the past year, the Department of Homeland Security (DHS) and its component Immigration and Customs Enforcement (ICE) have conducted violent crackdowns targeting perceived immigrants and arresting huge numbers of individuals in cities across the country. DHS and ICE's immigration enforcement operations and resulting detention conditions have had deadly consequences—both for Americans and for noncitizens in immigration detention. As a result of DHS's violent and indiscriminate tactics, the number of individuals detained by ICE has exploded to an all-time high, and there is every indication that the number of ICE arrests and detentions will only continue to grow at a dangerous rate.

The vital importance of congressional oversight at immigration detention facilities has escalated along with the number of detainees and resulting deterioration of conditions. And yet, over the past year, DHS has assiduously worked to avoid oversight of any kind. DHS has decimated internal offices designed to identify, solve, and inform Congress about problems at immigration detention facilities. And DHS, ICE, and their respective leaders (collectively, "Defendants") have sought to ensure that members of Congress have little or no visibility into its operations or detention centers, by attempting to sidestep a law that codifies legislators' right to conduct that oversight.

In June 2025, Defendants adopted new policies and practices that, in part, required members of Congress to provide a minimum of seven days' notice of oversight visits. Plaintiffs, individual members of Congress, immediately challenged Defendants' new oversight visit policies as unlawful. This Court agreed and, in December 2025, stayed the policies.

On January 8, 2026, mere weeks after this Court's stay order, DHS secretly reimposed the

same requirement that members of Congress give at least seven days' notice and receive approval for oversight visits to ICE facilities. DHS quickly began enforcing this January 8 oversight visit policy, blocking at least four members of Congress from conducting oversight visits at ICE facilities within days after its promulgation. The first such denial occurred when three members of the Minnesota delegation attempted to conduct an unannounced oversight visit to the Whipple Federal Building outside of Minneapolis, in the wake of the deadly shooting of Renee Good and reports of deplorable conditions at that facility.

The January 8 oversight visit policy is DHS's latest transparent attempt to subvert Congress's will and shroud its facilities in secrecy. But make no mistake: Defendants' second attempt at shutting ICE's doors to oversight is just as unlawful as their first: it is contrary to law, in excess of Defendants' statutory authority, and arbitrary and capricious. The information that this oversight would provide is more crucial than ever, and Plaintiffs are irreparably harmed every day that this information, and access to detention facilities, is lost to them.

Plaintiffs therefore respectfully ask this Court to immediately, temporarily restrain Defendants from enforcing their unlawful oversight visit policy. Subsequently, or in the alternative, Plaintiffs request that the Court set aside Defendants' policy under 5 U.S.C. § 705.

## BACKGROUND

### I. The Expanding Humanitarian Crisis in DHS Detention Facilities

The number of individuals detained by ICE has exploded in the past year, and with it, an urgent need for congressional oversight. In February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals[1]—and that number has only continued to increase since then. In January 2026, the number of individuals detained in ICE custody hit an all-time high: at least 69,000 individuals—and, according to some reports, as many as 73,000

---

[1] Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

individuals—were detained in ICE custody.[2] There is every indication that the number of ICE arrests and detentions will only continue to grow at an unmanageable rate, in service of the administration's stated goal of deporting more than one million people each year.[3]

Over the past year, DHS has moved from one city to the next, conducting massive operations targeting perceived immigrants. During these chaotic operations, federal agents arrest huge numbers of individuals—a mix of citizens and noncitizens, with a variety of immigration statuses.[4] They are arrested for alleged immigration and non-immigration-related offenses through targeted operations, random dragnet-style stops, and while protesting ICE operations. *See, e.g.*, Morrison Decl. ¶¶ 4–6. Most recently, DHS launched what they describe as "the largest DHS operation ever," called "Operation Metro Surge," focused on the Twin Cities area in Minnesota.[5]

As the number of arrested and detained individuals grows beyond the capacity of existing ICE detention facilities, DHS has resorted to using ICE field offices and other federal buildings to detain or otherwise house noncitizens. Defendants transport these individuals to overcrowded, under-resourced facilities that are not suited to hold large numbers of individuals for extended periods of time. *See, e.g.*, Temporary Restraining Order, *Moreno Gonzalez v. Noem*, 1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF No. 49. Detainees in DHS and ICE custody have been held in horrific conditions and subjected to abusive treatment.[6] *See, e.g.*, Mem. Op. at 2–3, *Moreno Gonzalez*

---

[2] Camilo Montoya-Galvez, *ICE's detainee population reaches new record high of 73,000, as crackdown widens*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/; *Detention Statistics*, ICE, https://www.ice.gov/detain/detention-management (last updated January 8, 2026).

[3] Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.

[4] *See, e.g.*, Catherine E. Shoichet, Sarah-Grace Mankarious, Caroll Alvarado, & Mark Chacón, *There's a battle on three fronts as DHS turbocharges its immigration offensive*, CNN (Jan. 9, 2026) https://www.cnn.com/interactive/2026/01/09/us/dhs-immigration-crackdown-ice-arrests-protests-vis (updated Jan. 19, 2026).

[5] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* AP (Jan. 6, 2026), https://perma.cc/KA2E-DW7X.

[6] Letter from ACLU et al. to Acting ICE Director Lyons et al. (Oct. 22, 2025), https://perma.cc/W2XP-CFJC.

(Nov. 17, 2025), ECF No. 87 (recounting conditions at ICE facility in Chicago, including "[l]ack of adequate food," "sufficient clean water," and "personal hygiene products"; "[e]xtremely overcrowded" and "dirty holding cells"; "[n]o access to sufficient bedding or space to sleep" or "to showers or other bathing facilities"; "[i]nsufficient and dirty toilet facilities"; "[l]ack of access to medication"; and "systemic lack of access to counsel").

These shocking and unlawful detention conditions have directly affected facilities where Plaintiffs and other members of Congress have attempted to conduct oversight. For example, the conditions at the ICE New York Field Office—which Representatives Goldman and Espaillat were prevented from visiting between June and December 2025 and again in January 2026—led to the issuance of a preliminary injunction requiring ICE to supply adequate space, hygienic products, clean sleeping mats, and access to counsel. *See* Preliminary Injunction, *Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97.

Defendants' detention practices have had deadly consequences. At least 32 people died in ICE custody in 2025, a two-decade high and nearly triple the number of deaths in ICE custody in 2024.[7] At least five people have reportedly died in ICE custody in just the first few weeks of 2026, including two individuals who died while detained at the Camp East Montana Detention Facility in El Paso, Texas.[8] One of the two deaths in El Paso involved a detainee who reportedly was choked to death by guards, and whose death was classified by the medical examiner as a homicide.[9]

All of these circumstances mean that Congress's direct oversight role with respect to DHS and ICE is more critical than ever. And yet, DHS is, once again, attempting to prevent congressional

---

[7] Maanvi Singh et al., *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, Guardian (Jan. 4, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline.

[8] Victoria Bekiempis, *Second man dies at Texas ICE detention facility in two weeks*, Guardian (Jan. 19, 2026), https://www.theguardian.com/us-news/2026/jan/19/second-death-ice-facility-texas.

[9] Douglas MacMillan, *Medical examiner likely to classify death of ICE detainee as homicide, recorded call says*, Wash. Post (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/.

oversight of ICE detention facilities.

## II. Congressional Appropriations and Oversight

The Appropriations Clause of the Constitution, art. I, § 9, cl. 7, provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This clause grants Congress sweeping control, not just to decide how much money may be spent by federal agencies, but also to dictate for what purposes those funds may be expended, and under what conditions. *See, e.g.*, *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion."). The Appropriations Clause thus "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955) ("It is recognized that Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted."). Unless an appropriations rider violates some independent constitutional provisions—and Defendants have never argued in this case that the oversight rider does—it lies within Congress's plenary authority to dictate the terms on which appropriated funds may, and may not, be used.

"[A]s penetrating and far-reaching as the potential power to enact and appropriate under the Constitution" is Congress's power to investigate. *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." *Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) (quoting *Scope of Congressional Oversight and*

*Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985)); *see Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("[T]he power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change" (cleaned up)); Cong. Research Serv., RL30240, "Summary," *Congressional Oversight Manual* (2022), https://perma.cc/4V9G-P427 ("The information that oversight can bring to Congress is essential as the body grapples with the complexities of American government and society.").

In the last several years, members of Congress have frequently exercised the authority to conduct in-person oversight with respect to the nation's southern border and immigration detention facilities. Robust and effective congressional oversight of DHS and ICE is especially important in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens. Members of Congress have used the information gathered through in-person oversight to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds, to draft and pass relevant legislation, to attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

### A. Plaintiffs' individual interests in DHS oversight

Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. *See* Mem. in Support of Pls.' Mot. for Stay under 5 U.S.C. § 705 at 16–19, ECF No. 17-1("First Stay Mot."). The information that can be obtained only through in-person access is essential to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE

activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for fiscal year 2026, which are under consideration by Congress at this very moment.

Many Plaintiffs are leaders or members of committees with jurisdiction over DHS and ICE, or related issues, and over appropriations for those agencies. Timely and accurate information regarding those agencies' activities is imperative to their committee work. *See* Op. at 12, ECF No. 36; Second Decl. of Rep. Robert Garcia ¶ 2; Second Thompson Decl. ¶ 2; Second Decl. of Rep. Lou Correa ¶ 2; Second Decl. of Rep. Daniel S. Goldman ¶ 2; Second Decl. of Rep. Jamie Raskin ¶ 2; Second Decl. of Rep. Joe Neguse ¶ 2; Second Decl. of Rep. Veronica Escobar ¶ 1; Second Decl. of Rep. Adriano Espaillat ¶ 2; Second Decl. of Rep. Norma Torres ¶ 2. Several Plaintiffs have significant interest in conducting oversight over immigration detention conditions due to the presence of DHS detention facilities in or near the districts that they represent, which directly affect their constituents. Decl. of Rep. Kelly Morrison ¶¶ 2–3; Second Escobar Decl. ¶ 3; Second Crow Decl. ¶ 3; Second Goldman Decl. ¶¶ 5–6; Second Thompson Decl. ¶ 5; Second Correa Decl. ¶ 4; Second Gomez Decl. ¶ 7. And Plaintiffs have long engaged in in-person oversight at immigration detention facilities across the country. *See* First Stay Mot. at 18–19. Their access to those facilities and the information gained through those visits has been essential to Plaintiffs' further oversight work, legislative actions, constituent casework, and efforts to keep the public informed of what its government is doing.

### B. The restrictions in the oversight rider

In acknowledgment of the importance of congressional oversight regarding the government's immigration operations, every year since 2019, federal law—passed by Congress and signed by the President, including President Trump—has mandated that DHS allow individual members of Congress and their staff to conduct oversight at immigration detention facilities on

demand. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116–93, div. D, title V, § 532, 133

Stat. 2317, 2530.[10]

Specifically, since fiscal year 2020, the law has guaranteed that members of Congress can

conduct oversight of immigration detention facilities, with or without notice, and that congressional

staff members can do so with up to 24 hours' notice. The relevant provision of law, the oversight

rider contained in section 527 of the most recent DHS appropriations act, provides the following:

> **(a)** None of the funds appropriated or otherwise made available to the
> Department of Homeland Security by this Act may be used to prevent any of
> the following persons from entering, for the purpose of conducting
> oversight, any facility operated by or for the Department of Homeland
> Security used to detain or otherwise house aliens, or to make any temporary
> modification at any such facility that in any way alters what is observed by a
> visiting member of Congress or such designated employee, compared to
> what would be observed in the absence of such modification:
> > **(1)** A Member of Congress.
> > **(2)** An employee of the United States House of Representatives or the
> > United States Senate designated by such a Member for the purposes of
> > this section.
> **(b)** Nothing in this section may be construed to require a Member of
> Congress to provide prior notice of the intent to enter a facility described in
> subsection (a) for the purpose of conducting oversight.
> **(c)** With respect to individuals described in subsection (a)(2), the
> Department of Homeland Security may require that a request be made at
> least 24 hours in advance of an intent to enter a facility described in
> subsection (a).

Further Consolidated Appropriations Act, 2024 ("FY2024 Appropriations Act)", div. C, title V,

§ 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024).

---

[10] *See* Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022); FY2024 Appropriations Act, div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11 (Mar. 15, 2025); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, 139 Stat. 495, 496 (Nov. 12, 2025).

**III. Defendants' Repeated, Unlawful Obstruction of Oversight Visits to DHS Facilities**

    **A.  Initial promulgation and implementation of Defendants' oversight visit policies**

On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Acting ICE Director Todd Lyons testified that he and his staff were "fully supportive" of congressional oversight visits and committed "to ensur[ing] that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ. Less than a month later, however, in a guidance document posted to its website, ICE indicated for the first time that it would prevent members of Congress from conducting oversight visits at ICE field offices. ICE, *U.S. Immigration and Customs Enforcement (ICE) Facility Visits for Members of Congress and Staff* (June 2025), *archived at* https://perma.cc/UL23-J4ZM ("ICE June Guidance"). Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE made the novel contention that field offices are not "used to detain or otherwise house aliens" under the oversight rider because individuals housed there have not yet been processed for longer-term "custody determinations." *Id.* at 2, 4.

By June 23, Defendants had begun restricting oversight access to all ICE detention facilities. In addition to the previously asserted exemption to the oversight rider for ICE field offices, Defendants imposed a new requirement that members of Congress provide a minimum of seven days' notice in advance of, and receive approval for, any congressional oversight visit to an ICE detention facility. *See, e.g.*, *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV (archived July 8, 2025); Hackbarth Decl. ¶ 5, ECF No. 20-1. They posted this requirement to the ICE Office of Congressional Relations (OCR) webpage, removed the June guidance document from the ICE website, and wiped the website clean of any mention of section 527. *See id.* Neither ICE nor

DHS posted a new guidance document providing details in place of the June guidance document, nor did they otherwise explain the new oversight visit policies.

Between June 17 and July 24 (and continuing until the Court's December 17 stay order), Defendants consistently denied Plaintiffs access to ICE facilities across the country to conduct oversight visits based on the requirement that members provide at least seven days' notice (and in some instances based on their asserted exemption of ICE field offices from the oversight rider). *See* Op. at 12–13; First Stay Mot. at 19–24.

### B.  Recent congressional appropriations to DHS and ICE

In July 2025, Congress provided DHS and ICE with additional funds for specified purposes in a reconciliation act. Pub. L. No. 119-21, 139 Stat. 72 (2025). For example, the act provided $45 billion to ICE, "[i]n addition to any amounts otherwise appropriated," "for single adult alien detention capacity and family residential center capacity," *id.*, tit. X, § 90003, 139 Stat. at 358, and $10 billion to DHS, "[i]n addition to amounts otherwise available," "for reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States," *id.*, tit. X, § 90007, 139 Stat. at 361. The act further provided $2.055 billion to DHS, "[i]n addition to amounts otherwise available," for such purposes as the hiring and training of certain CBP and DHS personnel, transportation costs related to deportation or return of certain migrants, and "[i]nformation technology investments to support immigration purposes." *Id.*, tit. X, § 100051, 139 Stat. at 385–87. Finally, the act provided an additional $29.850 billion to ICE, "[i]n addition to amounts otherwise available," for such purposes as "[h]iring and training" certain ICE personnel; "[p]roviding performance, retention, and signing bonuses for qualified [ICE] personnel"; "[f]acilitating the recruitment, hiring, and onboarding of additional [ICE] personnel"; transportation and "related costs associated with" migrant departure and removal; information technology investments, facility upgrades, fleet modernization; and

"[p]romoting family unity." *Id.*, tit. X, § 100052, 139 Stat. at 387–89.

The reconciliation act provided funds for these purposes "in addition" to the annually appropriated funds provided as the initial and principal source of funds for operating DHS and its components. *E.g.*, Pub. L. No. 119-21, tit. X, § 90003, 139 Stat. at 358. The act did not provide that any of the additional funds it made available could be used to prevent members of Congress from entering DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight. Nor did the act provide more generally that Congress intended that DHS or its components could use the additional funds to disregard restrictions on their operations imposed through the annual appropriations laws.

Four months later, on November 12, Congress reaffirmed its intention to continue the ban on preventing congressional oversight in immigration detention facilities through the passage of the continuing resolution that currently funds the agency's operations. *See* Pub. L. No. 119-37, div. A, 139 Stat. 495, 496 (Nov. 12, 2025). That funding expires on January 30, 2026.

A few days ago, on January 22, 2026, the House passed a bill providing fiscal year 2026 appropriations for DHS and ICE. H.R. 7147, 119th Cong. (2026). The House bill maintains the oversight rider, unchanged, at section 547. *Id.* § 547. The bill is currently under consideration in the Senate.

### C. This Court's section 705 stay order

On December 17, the Court issued a stay of the oversight policy under 5 U.S.C. § 705. Op. at 73. Once it "satisfied itself of likely jurisdiction and rejected Defendants' threshold objections" to Plaintiffs' claims, the Court concluded that "Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority." Op. at 59. In particular, the Court determined that "a

seven-day notice policy is [not] permissible under" the oversight rider and is not otherwise authorized by law. Op. at 56–58. The Court further held that Plaintiffs had "shown that they suffer irreparable harm" due to the oversight policy and that the "public interest and the balance of equitable considerations weigh[ed] strongly in favor of granting Plaintiffs their requested relief." Op. at 70. The Court thus stayed the oversight visit policies under section 705 pending the conclusion of this litigation. Op. at 73. Indeed, the Court left no question about the practical import of the limitations of the oversight rider: "the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member." Op. at 22.[11]

After the Court stayed Defendants' unlawful oversight visit policies, Plaintiffs and other members of Congress, as well as their staff, immediately recommenced their oversight duties at ICE facilities across the country. *See, e.g.*, Second Escobar Decl. ¶¶ 20–22; Second Crow Decl. ¶¶ 24–27; Second Goldman Decl. ¶¶ 32–37. Those visits have occurred without incident, *contra* Mem. from Secretary Noem, *Congressional Access to Alien Detention Facilities – Access Policy and Use of Appropriations for Enforcement* 1–2, ECF No. 39-1 ("Jan. 8 Memo") (asserting, without support, a need for advance notice to "protect[]" persons during oversight visits), and have provided valuable information to members. *See, e.g.*, Second Escobar Decl. ¶¶ 20–22. Those visits have been particularly important because information from DHS to Congress about conditions at ICE detention facilities has slowed to a trickle; DHS has taken down much public information and engages in long delays in responding to questions from members. *See, e.g.*, Second Crow Decl. ¶¶ 36–37. Members conducting oversight over the last few weeks have identified serious deficiencies in detention conditions and have obtained timely information critical to determining laws and appropriations relating to DHS and

---

[11] Defendants have not appealed or sought a stay of the Court's order staying the oversight visit policies, including the notice requirement. And Defendants did not seek to clarify or modify the Court's section 705 stay order—nor to make any showing to the Court respecting their use of funds—prior to promulgating and enforcing the notice policy in the January 8 memorandum.

ICE. *See, e.g.*, Second Goldman Decl. ¶¶ 32–37.

### D. The promulgation of the January 8 oversight visit policy

On January 8, 2026, Secretary of Homeland Security Kristi Noem issued a memorandum to Todd Lyons, the acting director of ICE, and Holly Mehringer, a senior officer performing the duties of the chief financial officer, setting out a purported "new policy," "effective immediately." Jan. 8 Memo at 1, ECF No. 39-1. The memorandum reimposes the same seven-day-notice requirement that was posted to the ICE OCR website in June 2025. It states that congressional oversight "[f]acility visit requests must be made a minimum of seven (7) calendar days in advance." *Id.* at 2. Such requests must be made "during normal business hours" and "are not considered actionable until [ICE Office of Congressional Relations (OCR)] acknowledges receipt of the request." *Id.*

In an attempt to circumvent the oversight rider, the secretary instructed ICE to "ensure that this policy is implemented and enforced exclusively with money appropriated by" the reconciliation act, and she stated that she "anticipate[s]" that the reconciliation act provides adequate funding. *Id.* She further instructed that "the Chief Financial Officer, in consultation with the General Counsel, shall ensure appropriate funding for the promulgation of this policy, including use of [reconciliation act] funding where appropriate." *Id.* But the memorandum does not deny—indeed, it essentially acknowledges—that funds subject to the oversight rider were used when the new oversight visit policy was promulgated, and it provides no explanation of how DHS will retroactively ensure that all costs involved in the policy's promulgation and implementation will be retroactively assigned to reconciliation act funds.

The secretary also asserted, without support, that "advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." *Id.* She stated that "[u]nannounced visits require pulling ICE officers away from their normal duties," and that "there is an increasing trend of replacing legitimate oversight activities with circus-

like publicity stunts." *Id.* She cited no support for these disparate, conclusory assertions.

This memorandum was issued in secret. Defendants did not immediately notify Plaintiffs or the Court of the January 8 policy, nor did they promptly post it to the ICE OCR website. *See Office of Congressional Relations*, ICE, https://perma.cc/HW4Y-TFAN (archived Jan. 11, 2026). The new policy was first enforced on January 10 against Plaintiff Representative Kelly Morrison and Representatives Ilhan Omar and Angie Craig at the Whipple facility outside of Minneapolis, in the midst of "Operation Metro Surge" and three days after an ICE agent shot and killed Renee Good. Morrison Decl. ¶¶ 19–34. ICE informed Plaintiff Representative Morrison that she was being denied access to the ICE facility because the "operation is being funded by OB3 funds." *Id.* ¶ 27. Only after Plaintiffs became aware of that denial of congressional access to an ICE detention facility did Defendants inform Plaintiffs and the Court of the January 8 policy that had gone into effect days earlier. Notice, ECF No. 39. Defendants have since enforced this policy at several ICE facilities and against multiple members, including Plaintiff Representatives Goldman and Escobar. *See* Second Goldman Decl. ¶ 38; Second Escobar Decl. ¶ 23.

Pursuant to this policy, even once a member of Congress is granted access to an ICE facility, Defendants now restrict Plaintiffs' ability to speak or visit with specific detainees once inside a facility. ICE states that members cannot "have any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters." *See* Second Neguse Decl., Ex. B at 2. This includes a prohibition on "meetings with detainees in detention facilities without valid, signed privacy releases." *Id.* If a Member or staff "would like to meet with a specific detainee or set of detainees," they must "provide names, alien registration numbers, and valid, signed privacy releases with [the] request," which must be made seven days in advance. *Id.*

In light of the importance of on-the-ground, real-time oversight at immigration detention

facilities, Plaintiffs intend to continue conducting oversight visits to ICE facilities used to detain or otherwise house individuals, with little or no prior notice. Defendants' repeated obstruction of Plaintiffs' efforts to access these facilities, particularly in a moment of national crisis surrounding immigration enforcement, significantly harms Plaintiffs' ability to discharge their individual duties as members of Congress, by denying them information integral to completing constituent casework, to working effectively on committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the rights of individuals in custody.

## LEGAL STANDARD

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation marks omitted); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (quotation marks omitted)). "In a case like this one, where the Government is the non-movant, the third and fourth factors merge." Op. at 17 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Section 705 of the Administrative Procedure Act (APA) authorizes a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.* "The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction" or temporary restraining order. *Coalition for Humane Immigrant Rights v.*

*Noem*, No. 25-872-JMC, 2025 WL 2192986, at *12 (D.D.C. Aug. 1, 2025).

## ARGUMENT

### I.   Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

For the reasons articulated in Plaintiffs' previous briefs and the Court's December 17 opinion, Plaintiffs are likely to establish that neither Article III standing doctrine nor the doctrine of equitable discretion is an obstacle to the exercise of this Court's jurisdiction.[12]

Plaintiffs are also likely to succeed on the merits of their APA claims. The APA provides that a court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). Plaintiffs are substantially likely to show that Defendants' January 8 oversight visit policy should be set aside under section 706(2) of the APA because that policy exceeds Defendants' statutory authority, is contrary to law, and is arbitrary and capricious.

### A.   Plaintiffs properly challenge the oversight visit policy under the APA

Plaintiffs are also substantially likely to show that they properly challenge Defendants' January 8 oversight visit policy under the APA. First, Plaintiffs have a cause of action under the APA because they are "adversely affected or aggrieved" "persons" who may seek APA review, and neither the Antideficiency Act nor any other statute "preclude[s] judicial review." 5 U.S.C. § 705; *see* Op. at 47–55. In addition, like the previous oversight visit policies—including the seven-day-notice requirement—posted on the ICE OCR webpage in June 2025, the oversight visit policy articulated in the January 8 memorandum is final agency action. *See* Op. at 55 (quoting *Bennett v.*

---

[12] The Court's rulings in its stay order are law of the case. *See Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012). For that reason, and because the Court is already familiar with many of the legal issues in this case, Plaintiffs do not repeat their arguments on those points at length, and instead focus here mostly on new issues raised by DHS's January 8 oversight visit policy.

*Spear*, 520 U.S. 154, 178 (1997)); *Office of Congressional Relations*, ICE, https://perma.cc/V973-2MHA (updated Jan. 15, 2026).[13]

### B.  The oversight visit policy is contrary to law and in excess of statutory authority

Section 706(2) of the APA requires a court to invalidate agency action that conflicts with federal law or exceeds the authority provided to the agency by law. 5 U.S.C. § 706(2)(B)–(C); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). Plaintiffs are likely to establish that Defendants' oversight visit policy, as articulated in the January 8 memorandum, is invalid on both grounds.

First, to the extent that the oversight rider applies, Defendants' requirement that members of Congress provide at least seven days' notice prior to visiting a DHS facility used to detain or otherwise house noncitizens "is contrary to law and in excess of DHS's statutory authority." Op. at 59. Second, Defendants' attempt to circumvent the restrictions of the oversight rider pursuant to the January 8 memorandum is inconsistent with the text and purposes of both the annual appropriations act and the reconciliation act, as well as foundational background principles of appropriation law, against which Congress appropriates and the executive branch spends funds. Third, Defendants' own attestations indicate that they have already used funds subject to the oversight rider to promulgate and implement the oversight visit policy, and they wrongly contend that fixing the accounting on the back end would remedy their ongoing violations. Fourth, even assuming Defendants' proposed after-the-fact fix could theoretically pass muster, the exclusive use of reconciliation act funds for the implementation and enforcement of this policy is likely impossible in practice.

---

[13] In support of Plaintiffs' argument that they have a cause of action to challenge Defendants' notice policy under the APA, which constitutes final agency action, Plaintiffs also incorporate by reference their arguments in their previous motion for stay under section 705 (at 28–29) and reply in support of that motion (at 15–20), as well as the reasons articulated in the Court's opinion, Op. at 55.

### 1.    The oversight visit policy is contrary to the oversight rider

As a threshold matter, to the extent the oversight rider applies, Defendants' notice requirement directly contravenes the text of that provision of law and exceeds Defendants' authority to use appropriated funds under the law. *See* Op. at 56–59.

The terms of the law could not be clearer: "no[]" such funds may be "used to prevent" any "Member of Congress" "from entering, for the purpose of conducting oversight, any" DHS facility "used to detain or otherwise house aliens." As the Court concluded, Defendants' view that "a delayed entry is not a 'prevent[ed]' entry . . . is not a plausible interpretation of 'prevent' as used in the statute." Op. at 56. Moreover, "[a]ny indication that a seven-day advance notice policy is permissible under the definition of 'prevent' as used in Section 527(a) is dispelled by Section 527(b), which states that '[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter' a covered facility." *Id.* (quoting FY2024 Appropriations Act, div. C, title V, § 527(b)). This provision prohibits a policy by DHS requiring notice in advance of the member's oversight visit.

The language of section 527(b) also stands in contrast to the subsequent provision, which permits DHS to require advance notice of an oversight visit involving congressional *staff*—but only up to "24 hours in advance." *Id.* § 527(c). "That the statute appears to carve out the permissibility of an advance notice requirement for congressional employees while saying nothing about Members of Congress further supports [a] reading of the statute that such advance notice requirements are not permissible for Members of Congress."[14] Op. at 57.

Thus, it is clear that, to the extent that the oversight rider applies to the promulgation and implementation of Defendants' January 8 oversight visit policy—which it certainly does, as

---

[14] Of course, the oversight rider does not prevent a member of Congress from choosing to schedule a visit in advance, and indeed a member may wish to do so in some circumstances. Many Plaintiffs have previously provided advance notice of oversight visits to immigration detention facilities. But section 527 guarantees that members may not be *required* to do so.

explained below—that policy is contrary to law and in excess of Defendants' authority under the law.[15]

### 2. Defendants' appropriations gambit exceeds their authority and is contrary to the appropriations act, the reconciliation act, and the purpose statute

Defendants are attempting to circumvent the restrictions of the oversight rider by purporting to use only funds provided under the reconciliation act—and no funds at all from DHS's or ICE's annual appropriations—to promulgate and implement the January 8 oversight visit policy. This attempt fails. As an initial matter, even if that gambit were technically feasible—and, as explained below, it almost certainly is not—this transparent scheme is inconsistent with the texts and purposes of both the annual appropriations act and the reconciliation act, as well as fundamental principles of federal appropriations law. Neither the annual appropriations act nor the reconciliation act authorizes DHS to use appropriated funds to prevent members of Congress from conducting oversight visits without prior notice, and DHS's purported attempt to promulgate and implement a policy to achieve that outcome would independently violate the "purpose statute," 31 U.S.C. § 1301(a).

**a.** The text and context of the passage of the oversight rider and the reconciliation act make Congress's intent plain: the oversight rider constitutes an ongoing substantive restriction on DHS operations. "Spending controlled through the appropriations process—known as discretionary spending—generally consists of funding for the operations of most federal agencies and most of the programs, projects, and activities each carries out." Cong. Research Serv., R48731, *Full-Year Continuing Resolutions: Frequently Asked Questions* 1 (2025), https://perma.cc/6TE3-Y9ZQ. This means that annual appropriations acts, and the continuing resolutions that sometimes serve as stopgaps

---

[15] In support of Plaintiffs' argument that the notice policy is contrary to law and in excess of statutory authority, Plaintiffs also incorporate by reference their arguments in their previous motion for stay under section 705 (at 28–32) and reply in support of that motion (at 15–23), as well as the reasons articulated in the Court's opinion, Op. at 56–59.

19

between such acts, provide the baseline funding without an agency could not carry out its most basic activities, such as paying for salaries, infrastructure, and the full scope of agency systems and operations. *See* Fleischaker Decl. ¶¶ 13–14; *cf. Env't Def. Ctr. v. Babbit*, 73 F.3d 869, 871–72 (9th Ct. 1995) ("The government cannot make expenditures, and therefore cannot act, other than by appropriation."). Reconciliation acts, on the other hand, provide *additional* funding, appropriated not to supplant the baseline funding of an agency but to add to that funding for specific congressionally determined purposes. *See* Fleischaker Decl. ¶¶ 15–16; *see also* Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1091 (2021) (explaining that the reconciliation process was historically "intended as a streamlined means for aligning the enacted budget with fiscal items such as revenue, direct spending, and the debt ceiling"). Accordingly, Congress does not provide reconciliation funding in a vacuum: rather, it does so only on top of the foundation of annual appropriations.

When Congress first passed the current language of the oversight rider in fiscal year 2020, annual appropriations were the only source of funding available to DHS for the vast range of expenses that could be used to prevent members of Congress from conducting oversight. As a result, when Congress commanded in the oversight rider that "*[n]one* of the funds appropriated or otherwise made available to [DHS] by this Act may be used to prevent" members of Congress from conducting oversight in immigration detention facilities, that command limited the actions that DHS could take rather than the funds it could use. FY2024 Appropriations Act, div. C, title V, § 527(a) (emphasis added). Congress enacted this provision in the midst of the Trump-Pence administration's family-separation policy and related humanitarian crisis, to ensure that individual members could visit detention facilities in person, without prior notice, to obtain accurate and timely information regarding DHS detention conditions. First Stay Mot. 8–14 (explaining context in which the oversight rider arose); *Kimberlin v. DOJ*, 318 F.3d 228, 232 (D.C. Cir. 2003) (per curiam) (referring to

appropriations rider prohibiting use of funds for prisoners' use or possession of electronic instruments as "blanket ban on" those instruments, "consistent with the rationale underlying the [rider]"), *reh'rg en banc denied*, 351 F.3d 1166 (Mem.) (2003). Accordingly, there can be no doubt that this rider "amount[ed] to a substantive ban on" that activity. Op. at 21 (quoting *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part)).

The reconciliation act that passed in July 2025 provided lump-sum appropriations "[i]n addition" to DHS's baseline funding, for such purposes as ICE "detention capacity," Pub. L. No. 119-21, § 90003, 139 Stat. at 358, and "reimbursement" for certain "costs incurred" to "safeguard the borders," *id.* § 90007, 139 Stat. at 361. Congress appropriated funds only for very specific, enumerated purposes. Congress did not appropriate additional funds for every substantive agency function that might touch on congressional oversight of detention facilities, nor did Congress appropriate funds that would authorize preventing members of Congress from conducting oversight. Nothing in the reconciliation act suggests that Congress intended to implicitly repeal the existing substantive ban on ICE preventing members of Congress from conducting oversight at detention facilities. *See generally Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) ("[R]epeals by implication are not favored," and the judicial "aversion to implied repeals is especially strong in the appropriations context." (quotation marks omitted)); *cf. Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176 (1988) (courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts").

Nor did Congress suggest that those additional funds could be used to displace baseline agency appropriations—with all the various limitations, conditions, and riders that Congress attached to those appropriations—that it had already provided for the agency's existing operations. To the contrary, the provisions of the reconciliation act make clear they are intended to fund "addition[al]" personnel, functions, and activities. *See* Pub. L. No. 119-21, §§ 100051–100052, 139

21

Stat. at 385–89.

The oversight rider was in place at the time of the reconciliation act's passage, and again, it applied to all of DHS's and ICE's baseline funding for their salaries, infrastructure, and operations. In November 2025, Congress reaffirmed the ban on preventing congressional oversight in immigration detention facilities by adopting the continuing resolution that restarted the agency's baseline operations after the government shutdown. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, 139 Stat. 495, 496 (Nov. 12, 2025). This later-in-time reenactment only confirms Congress's intent that DHS could not rely on any source of appropriated funding to lawfully prevent members of Congress from conducting oversight at DHS facilities used to detain or otherwise house noncitizens. *See Pugin v. Garland*, 599 U.S. 600, 605 (2023) ("the most rudimentary rule of statutory construction" is "that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes" (quoting *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality opinion of Scalia, J.))).

Consider an example of a similar appropriations rider in DHS's annual appropriations, which states that "none of the funds made available in this Act may be used to place restraints on a woman in the custody of [DHS] . . . who is pregnant or in post-delivery recuperation." FY2024 Appropriations Act, div. C, title V, § 528(a). Like the oversight rider, this rider was in place in fiscal year 2024 appropriations, was maintained through the subsequent continuing resolutions, and is not separately included in the reconciliation act. Defendants' argument in this case would lead to the conclusion that, in omitting the rider from the reconciliation act, Congress intended the law to allow DHS to chain pregnant women in DHS custody, so long as the agency did so using only reconciliation act funds. The text and the context of the appropriations act and reconciliation act preclude this absurd result. Congress was not concerned with the source of funds that might be used

22

to restrain pregnant women in DHS custody. And Congress did not provide DHS with reconciliation funds for the purpose of restraining pregnant women in DHS custody.

Rather, Congress intended that the rider attached to DHS's baseline appropriations— without which DHS could not exist or function—would restrict DHS from taking the substantive actions that the rider proscribes, regardless of any additional funding that Congress may provide for certain other purposes. There was no need for Congress to add the rider to DHS's additional reconciliation act funding, which exists only on top of the annual appropriations for baseline agency operations. And if Congress had intended or expected the reconciliation act funds to be used to circumvent the rider and allow DHS to place restraints on pregnant women in custody, there would have been no point in passing the rider again four months later in the current continuing resolution and *again* in the fiscal year 2026 appropriations act that passed the House last week. *See* H.R. 7147 § 527. The same is true of the oversight rider.

As the Supreme Court has explained, "[w]hen voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978). Likewise, when Congress voted to provide reconciliation funding, it was "entitled to operate under the assumption," *id.*, that DHS would not devote those funds to a purpose that was otherwise forbidden—that is, to prevent members of Congress from conducting oversight in ICE detention facilities.[16]

**b.** It cannot be the case that DHS could use exclusively reconciliation act funding to circumvent the restrictions of the oversight rider for the additional reason that any effort to do so

---

[16] *See also generally Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (the Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress"); Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343, 1353 (1988) ("All appropriations thus may be conceived of as lump-sum grants with 'strings' attached. These strings, or conditions of expenditure, constitute legislative prescriptions that bind the operating arm of government.").

runs headlong into the "purpose statute," 31 U.S.C. § 1301(a), which codifies a "core tenet of

appropriations law" that "[a]ppropriations shall be applied only to the objects for which the

appropriations were made except as otherwise provided by law." *U.S. Dep't of Navy v. Fed. Lab. Rels.

Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (quoting 31 U.S.C. § 1301(a)); *see generally* ICE, Financial

Management Policy Manual, ch. 2, sec. 2.5, at 11 (2021), https://perma.cc/LTZ2-DRCZ

(recognizing that ICE must "limit[] the obligation and expenditure of funds to the amounts currently

available for the purposes authorized and spent in accordance with all laws, regulations, OMB

direction, and Congressional intent," including in accordance with "the ADA, the Bona Fide Needs

Rule, and the Purpose Statute"). "The purpose statute prohibits charging authorized items to the

wrong appropriation, and unauthorized items to any appropriation. Anything less would render

congressional control largely meaningless." GAO, *Principles of Federal Appropriations Law* 3-10 (4th ed.

2017) ("Red Book"), https://www.gao.gov/legal/appropriations-law/red-book.

    An examination of the relative purposes for the funds appropriated in the reconciliation act

and the annual appropriations act, respectively, confirms that Congress did not intend to displace

any existing annual appropriations with reconciliation funding, and DHS lacks funding to obstruct

congressional oversight. For example, the reconciliation act provides a large sum to ICE "for single

adult alien detention capacity and family residential center capacity," Pub. L. No. 119-21, tit. X,

§ 90003, 139 Stat. at 358. The term "capacity" means "the potential or suitability for holding,

storing, or accommodating," here, individuals in ICE custody. "Capacity," Merriam-Webster.com,

https://www.merriam-webster.com/dictionary/capacity; *see generally* Red Book at 3-11 ("[A]bsent a

clear indication to the contrary, the common meaning of the words in the appropriation act . . .

governs the purposes to which the appropriation may be applied."). This funding is dedicated

specifically to increasing the number of individuals that can be held in immigration detention and

does not encompass the myriad costs associated with ICE detention facilities, which are funded by

24

the annual appropriations. *See* Fleischaker Decl. ¶ 16(a). Nor does this expressed purpose authorize imposing restrictions on congressional access to detention facilities.

The reconciliation act further provides a sum of money "for reimbursement of costs incurred in undertaking activities in support of [DHS's] mission to safeguard the borders of the United States." *Id.*, tit. X, § 90007, 139 Stat. at 361. Safeguarding our national borders does not include obstructing congressional oversight visits to ICE detention facilities. In any event, this appropriation did not create a new account that may be used for any activities that might be justified as "safeguarding the borders"; rather, these funds are available as a "reimbursement" to existing DHS appropriation accounts, which are available for other specified purposes. *See* Fleischaker Decl. ¶ 16(b). Funds appropriated in section 90007 must therefore be used for already authorized purposes that support DHS's "mission to safeguard the borders."

In addition, the reconciliation act provides funds for such additional narrowly defined purposes as the hiring and training of certain DHS personnel and "[i]nformation technology investments to support immigration purposes," *id.*, § 100051, 139 Stat. at 385–87; "[h]iring and training" certain ICE personnel; "[p]roviding performance, retention, and signing bonuses for qualified [ICE] personnel"; "[f]acilitating the recruitment, hiring, and onboarding of additional [ICE] personnel"; transportation and "related costs associated with" migrant departure and removal; information technology investments, facility upgrades, fleet modernization; "[p]romoting family unity"; and "[h]iring additional attorneys and the necessary support staff within the Office of the Principal Legal Advisor to represent [DHS] in immigration enforcement and removal proceedings," *id.*, § 100052, 139 Stat. at 387–89. Again, these funding purposes do not go to, and therefore cannot replace, ICE's baseline operations and the many resources that have been and will be used in service of the oversight visit policy (such as, for example, the existing salaries and expenses of ICE OCR). Nor can any of these purposes be stretched so far as to authorize obstructing congressional

oversight visits to immigration detention facilities. *Cf. U.S. Dep't of Navy*, 665 F.3d at 1349 (an

"expenditure's 'relationship to an authorized purpose or function' may be 'so attenuated as to take it

beyond that range' of permissible discretion." (quoting *Implementation of Army Safety Program*, B-

223608 (Comp. Gen. Dec. 19, 1988))).

Consider another specific example: attorneys in the ICE Office of the Principal Legal

Advisor have likely spent some of their salaried time and their office resources advising on the

oversight visit policy and communicating with agency leadership, colleagues, and Department of

Justice attorneys regarding this lawsuit. But the reconciliation act funds that speak to OPLA may be

used only for "[h]iring additional attorneys and . . . staff," specifically "to represent [DHS] in

immigration enforcement and removal proceedings." Pub. L. No. 119-21, Pub. L. No. 119-21, tit. X,

§ 10005(11), 139 Stat. at 389. The more specific appropriation funding excludes the activities and

salaries of existing OPLA attorneys and for work other than representing DHS in such proceedings

is in the annual appropriations. *See* ICE CBJ, O&S 4–5; *cf. United States v. MacCollom*, 426 U.S. 317,

321 (1976) (plurality opinion) ("Where Congress has addressed the subject as it has here, and

authorized expenditures where a condition is met, the clear implication is that where the condition is

not met, the expenditure is not authorized.").

**c.** Furthermore, even if the purpose statute posed no obstacle, Defendants could not change

the source of the appropriation for all the funds necessary to promulgate and implement the January

8 oversight visit policy to reconciliation funds because of a core doctrine in appropriations law

known as the "pick and stick" rule. This rule holds that when an agency "ha[s] two appropriations

that may arguably be available for the same purpose," the "agency must elect to use a single

appropriation." *Application of the Antideficiency Act to a Lapse in Appropriations*, B-330720 (Comp. Gen.

Feb. 6, 2019), https://www.gao.gov/products/gao-19-372t. "Once that election has been made, the

agency must continue to use the same appropriation for that purpose unless the agency informs

Congress of its intent to change for the next fiscal year." Red Book at 3-410. Thus, even setting aside the purposes of the funds, the "pick and stick" rule would prevent DHS from moving funds around within the same fiscal year, as it proposes to do here. For any expenses that could arguably be paid by either an annual appropriation or a reconciliation appropriation, DHS will have already selected the appropriation for this fiscal year. It cannot move those selections around in the next nine months in an attempt to make lawful what Congress chose to make unlawful.

Defendants therefore cannot have used, and cannot use, exclusively reconciliation act funds to promulgate and implement the oversight visit policy, because doing so would violate DHS's annual appropriations, the reconciliation act, and the purpose statute.

### 3. Defendants' effort to paper over violations of the oversight rider with accounting tricks cannot remedy their ongoing legal violations

Defendants' January 8 oversight visit policy is contrary to law and in excess of DHS's authority for the additional reason that (a) they have already "used," and are continuing to use, annual appropriations to reimpose and enforce the notice requirement in violation of the oversight rider, and (b) they cannot remedy that deliberate and ongoing violation of law by papering it over after the fact.

a. As an initial matter, Defendants have all but conceded that they used, and are using, funds subject to the oversight rider to promulgate and implement the oversight visit policy. The very premise of the January 8 memorandum and the Mehringer and Easterwood declarations is that DHS had not, at the time, taken any actions to ensure ahead of time that no funds subject to the oversight rider would be used. And with good reason: DHS has no basis to know *ex ante* which facilities will receive oversight requests, precisely which personnel will be involved in efforts to exclude members of Congress from conducting oversight, and which department programs, tools, and assets will be "used" to that end. Naturally, therefore, Defendants' declarations speak only to *future* actions that could be deployed purportedly to fix whatever Defendants may be doing in violation of the law

today.

Secretary Noem wrote that she "anticipate[s]" that there is sufficient reconciliation funding for their desired purposes, and she assigned the chief financial officer and general counsel to "ensure appropriate funding" going forward. Jan. 8 Memo at 2. Secretary Noem said nothing of steps that DHS may have taken prior to the development of the memorandum and promulgation of the reimposed notice requirement. The secretary's omissions speak volumes. Her memorandum indicates that DHS took no such steps, and it was—and surely still is—using annually appropriated funds to promulgate and implement the notice requirement in plain violation of the oversight rider.

Defendants' declarations corroborate this inference. The Mehringer declaration states, without support or elaboration, that "it is *possible* to track the costs incurred to issue and enforce the [reimposed notice] policy" and *then* DHS "can adjust its accounting ledgers to ensure that these costs are properly recorded." Mehringer Decl. ¶ 6, ECF No. 42-1 (emphasis added). She then submits that "[g]oing forward," DHS "will track the costs incurred enforcing the policy." *Id.* ¶ 7. There is a glaring omission in that statement: she does not say that DHS had tracked any such costs during the preceding week—that is, the costs to develop, promulgate, and distribute the memorandum, or the costs of implementation and enforcement through January 13. This all but confirms that DHS did use funds subject to the oversight rider (in unknown amounts) to promulgate and implement the policy.

As to future incurred expenses, the Mehringer declaration states that those will be "tracked" and "recorded against the appropriate [appropriation] accounts." *Id.* ¶ 9. This could be accomplished, she submits, "no later than the end of the fiscal year"—approximately nine months from now. *Id.* ¶ 11. In other words, DHS asserts that it can "reconcile" its books to retroactively charge those already-incurred costs to another source of funds, *id.*—but that does not obviate the fact that DHS has *already* used funds subject to the rider to incur those costs.

28

The Easterwood declaration is similarly revealing in its omissions. It explains that the three members of Congress who attempted an oversight visit in Minnesota were told "they were unable to enter the facility absent prior authorization." Easterwood Decl. ¶ 6, ECF No. 42-2. Undoubtedly various resources, and therefore funds, were used in the course of denying their entry, including physical infrastructures and any related electrical and other utilities, and at least two ICE employees who communicated the denial and prevented their entry. *See* Morrison Decl. ¶¶ 23, 28. And yet, the only relevant statement the Easterwood declaration provides is that a *single* ICE "employee whose position is funded by [the reconciliation act] . . . advised they were unable to enter the facility." Easterwood Decl. ¶ 6. The only reasonable inference is that the (at least one) other employee involved is paid from annual appropriations, as are the other resources that were "used" to prevent the members of Congress from entering. FY2024 Appropriations Act, div. C, title V, § 527(a).

**b.** In light of these apparent concessions, Defendants' argument in defense of the January 8 oversight visit policy appears to be twofold: (1) DHS can lawfully promulgate and implement this policy as long as certain aspects of its enforcement are paid for using reconciliation act funds, and (2) they can ensure payment for those enforcement aspects through reconciliation act funds by fixing the books retroactively. *See* Defs.' Mem. at 9–14, ECF No. 45. They are wrong on both counts.

*First*, Defendants are violating the oversight rider by taking an unreasonably cramped view of the scope of the prohibition. They contend that, because the rider "does not include the terms 'creation,' 'development,' 'promulgation,' or 'communication,'" it does not apply to any "policy formulation—only to Defendants' enforcement of such policies." *Id.* at 9. But the rider sweepingly says that none of the appropriated funds "may be used to prevent" members "from entering" immigration detention facilities for oversight. FY2024 Appropriations Act, div. C, title V, § 527(a). Funds that were used to formulate and promulgate the policy under which members have been

"prevent[ed]" "from entering" ICE facilities were necessarily "used" to "prevent" members "from entering" those facilities. *Cf.* Op. at 56 (rejecting argument that "a delayed entry is not a 'prevent[ed]' entry"). In light of Defendants' indication that annual appropriations were already used to promulgate the oversight visit policy, and therefore to "prevent" entry, all activities undertaken in pursuit of the promulgation and implementation of the policy—and not merely narrow aspects of its enforcement—were taken in violation of the oversight rider.

Defendants argue that an agency policy directing employees to carry out unlawful actions is not itself unlawful, nor is the development, promulgation, or dissemination of that unlawful policy; only the on-the-ground enforcement of that policy is unlawful. Defs.' Mem. at 9. They offer no support for this incredible contention. Instead, Defendants submit that "[w]henever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied." *Id.* at 10 (quoting 1 J. Kent, *Commentaries on American Law* 464 (13th ed. 1884)). It follows that whenever a power is *prohibited* by statute, "everything necessary to the making of it effectual or requisite to attain the end" is also impliedly prohibited. *Id.* Thus, everything necessary to effectuating the unlawful policy and practice of preventing members of Congress from conducting oversight without notice—including the promulgation of that policy through the development and dissemination of a memorandum and the agency-wide implementation of that memorandum's directive—is unlawful.

*Second*, Congress prohibited the "use[]" of funds for a certain purpose, and funds have been "used" long before the accounts are trued up at the end of the fiscal year. Congress did not prohibit only the ultimate "expenditure," much less the final accounting for such expenditure, nor did it reference the fiscal year. The language of the oversight rider is intentionally broad to make unlawful specified actions—i.e., preventing members of Congress from conducting oversight visits—in the moment that those actions are taken.

When a government resource is at an agency's disposal—whether it is salaried time, a computer program, or facility utilities—it is necessarily charged to a particular appropriation at that time. If the agency uses that resource for a purpose beyond the limitations of the relevant appropriations—i.e., spends salaried time, creates a document with a word processing program, sends an email, or writes with a pencil in the course of preventing members of Congress from conducting oversight visits without prior notice—the agency is in violation of the law in the moment that resource is being "used" in excess of the limitations (including the purpose limitations) that Congress imposed.[17] *See* Red Book at 3-12 ("deliberately charging the wrong appropriation for purposes of expediency or administrative convenience, with the expectation of rectifying the situation by a subsequent transfer from the right appropriation, violates the purpose statute. The fact that the expenditure *would* be authorized under some other appropriation is irrelevant." (emphasis added) (citations omitted) (collecting GAO cases)).

Ignoring this reality, Defendants plan to later paper over their deliberate use of annually appropriated funds pursuant to the January 8 oversight notice policy. Defs.' Mem. at 10–14. Defendants argue that they may solve the policy's legal problems by fixing the books retroactively to make their scheme look lawful at the end of each fiscal year. Defendants point to the Antideficiency Act (ADA), arguing that in some cases a violation of the ADA—such as charging an appropriation in excess of the limitations on that appropriation—may later be cured with respect to federal employees' liability under that act. *Id.* at 10–13. But Plaintiffs do not bring any claim based on the ADA; they bring a contrary-to-law claim under the APA, based on violations of the annual appropriations act, the reconciliation act, and the purpose statute. Whether or not DHS and ICE employees may avoid liability under the ADA by later "adjust[ing] [the agency's] accounting ledgers"

---

[17] For example, say a private employee takes $20 out of the company till and uses it to buy lunch, and then later returns $20 to the till. The employee still "used" funds belonging to the company, notwithstanding that the accounting worked out in the end.

is irrelevant to the question whether Defendants are currently acting contrary to appropriations laws and in excess of their authority, in violation of the APA. Mehringer Decl. ¶ 6.

Defendants *are* currently acting contrary to appropriations laws and in excess of their authority. Under the APA, once the Court makes that determination, the Court must "vacate that unlawful agency action." *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 182 (D.C. Cir. 2025); *see Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024).

### 4.    In any event, Defendants' gambit is a practical impossibility

Defendants' argument that, pursuant to the January 8 policy, they will—by the end of the fiscal year—have used only funds subject to the reconciliation act to promulgate and implement the oversight visit policy fails for another reason: doing so is a practical impossibility. At this preliminary stage, this Court should conclude that Defendants likely cannot implement their policy without using prohibited funds.

As this Court has recognized, "the 'use of any government resources—whether salaries, employees, paper, or buildings—to accomplish' a given activity 'would entail government expenditure,' and 'therefore would run afoul of [a] statutory moratorium on spending for' that activity." Op. at 21 (quoting *Kimberlin*, 318 F.3d at 232). This means that a "ban on using appropriated funds for" a certain purpose—there, "for 'the use or possession' of electric and electronic instruments" by federal inmates—"may reasonably be construed to prohibit paying for costs incidental to such use or possession, notably, those incurred for storage, supervision and electricity." *Kimberlin*, 318 F.3d at 232. The number and variety of DHS resources that must necessarily be used, even "incidental[ly]," to promulgate and implement the January 8 oversight visit policy—which begins with the secretary, continues down through ICE leadership and middle management, and affects all ICE detention facilities, including in unexpected facilities at unexpected times—are almost too vast to contemplate. *See* Fleischaker Decl. ¶¶ 20–23.

The Mehringer declaration breezily states that DHS "has determined that it is possible to track the costs incurred" for the policy and then "adjust its accounting ledgers to ensure that these costs are properly recorded." Mehringer Decl. ¶ 6. But the notion that Defendants can somehow account for this perfectly on the back end is not credible, because there are surely resources that have been and will be used that have already been paid for or must be paid for at regular intervals, such as paper, pens, information technology systems and contracts, security contracts, facility utilities, and physical infrastructure. And the scope of the task of tracking all resources used is monumental—even crediting Defendants' contention that they need not anticipate those resources and change the source of funds *before* violations occur. *See* Fleischaker Decl. ¶ 23. The absurdity of the scope of this task reflects the absurdity of what DHS is purporting to do here to circumvent a clear prohibition of law.

For instance, look to the development of the January 8 memorandum, the object of which is to prevent members of Congress from conducting oversight at ICE detention facilities. Beyond the salaries of the secretary and other individuals involved, the secretary's office used building utilities (like lights in the office), the payment for which would have to be from reconciliation funds; they used computer programs to type up and communicate the oversight visit policy, such as Microsoft 365, the licenses for which would have to be paid using reconciliation funds; and they used pens or papers that must have been purchased using reconciliation funds. That is to say nothing of the funding used for ICE facilities themselves and the personnel working there, the contracts that DHS has with companies like GEO Group that operate ICE detention facilities, and the leases of certain ICE facilities paid to the General Services Administration. *See generally* Fleischaker Decl. ¶ 21.

The attempted visit by Representatives Morrison, Omar, and Craig to Whipple on January 10 provides a useful illustration. Myriad resources were "used" to prevent her and her fellow members of the Minnesota delegation from entering the facility for the purpose of oversight that

day. These include the salaried time and expenses for every ICE or DHS employee or contractor in the "phalanx" of agents that encountered the members outside, with teargas and arms; both the executive associate director and the deputy director who communicated the denial of entry; the management and other personnel who informed the executive associate director and deputy director of the oversight visit policy and directed them to comply; whatever technology and equipment those personnel used to communicate regarding the policy and regarding the representatives' unannounced visit on that date; and the detention facility itself. *See* Morrison Decl. ¶¶ 23–27. If Defendants could lawfully track those resources and fix the accounting on the back end, as the Mehringer declaration contemplates, that would be an enormous task—requiring DHS to determine which individuals were involved, how much of each of their salaried time was spent, and what other resources were used, directly or indirectly, to prevent the members from conducting the oversight visit. And after determining those resources—which would likely require detailed paperwork and a thorough investigation if DHS were to have any hope of ensuring accuracy—Defendants would then have to change the source of the precise amount of funding for each of those individual costs.

This was just one attempted visit, at one facility. This single example does not include any of the resources used in corresponding with members' offices regarding visits and approving and scheduling those visits, *see, e.g.*, McClain Delaney Decl. ¶¶ 3–13, and it does not include any of the resources that might, at any moment, be put to use preventing a member of Congress from entering any ICE detention facility across the country, including field offices and holding facilities. Those resources would differ in nature and volume with every ICE facility. And maintaining the policy and communicating about enforcement of the policy would require *ongoing* activity up and down the chain at DHS. Further, all of the time and resources spent tracking and rebooking the above-referenced time and resources used are likewise necessary to the enforcement of the notice and approval policy, and would therefore also need to be tracked and rebooked against reconciliation act

appropriations accounts. The plan that Defendants purport to undertake, even if were not so plainly unlawful, is practically infeasible.

"[T]here is no de minimis exception to appropriation limitations . . . . Appropriations for federal agencies, like conditions in spending programs for nonfederal entities, are important sources of regulatory authority because the expenditure of any and all monies is conditioned upon compliance with prescribed policy. Where Congress prohibits use of any appropriated funds for an activity, the Executive simply has no authority to finance the prohibited activity[.]" Stith, *Congress's Power of the Purse*, 97 Yale L.J. at 1362–63 (footnotes omitted). Here, Congress's prohibition—"None of the funds appropriated or otherwise made available [DHS] by this Act may be used . . . "—"is unambiguously phrased in mandatory terms": "[n]one" means "none," and there is "no evidence that Congress intended the word 'may' to mean 'should.'" *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225 (2009), https://perma.cc/K7F2-VG9G.

Plaintiffs are therefore likely to succeed on the merits of their claim that Defendants' January 8 oversight visit policy is contrary to law and in excess of statutory authority.

## C. The oversight visit policy is arbitrary and capricious

Plaintiffs are also likely to succeed on their claim that Defendants' January 8 oversight visit policy, regardless of the source of the funds used, is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). This provision of the APA authorizes courts to set aside agency action that is "not reasonable" or "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Additionally, when an agency changes policy, it must "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025). "Once a change in agency position is identified" a court must ask whether the agency "display[ed] awareness that it is changing position" and "offer good reasons for the new policy." *Wages & White Lion*, 604 U.S. at 570.

Defendants' policy demonstrates nearly every hallmark of arbitrary and capricious agency decisionmaking. It entirely disregards Congress's clearly and repeatedly expressed intent to provide members of Congress access to ICE detention facilities without the need for advance notice and fails to articulate not only why the oversight visit policy is necessary in the first place, but also why a sudden reversal of its prior position is warranted.

*First*, DHS "relied on factors which Congress has not intended for it to consider" and "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. DHS stated that the policy "is consistent with and effectuates the clear intent of Congress not to subject OBBBA funding to Section 527's limitations." Jan. 8 Memo at 2. But this wholly ignores that Congress, in November 2025, four months after the reconciliation act, once again included the oversight rider as a limitation on DHS's annual appropriations. It also disregards the fact that this continuously imposed limitation applies to all of DHS's baseline funding necessary for the ongoing operations of the department and its components. *See supra* at 19–20. Although an agency "is entitled to develop and pursue its own enforcement priorities within the law," "it is not entitled to misrepresent the law's boundaries, and must at a minimum acknowledge and consider the relevant legal framework as it is." Mem. Op. at 49, *Am. Fed'n of Teachers v. U.S. Dep't of Educ.*, 1:25-cv-628-SAG (D. Md. 2025), ECF No. 83 (finding that agency misapprehension of the relevant law rendered policy arbitrary and capricious).

*Second*, Defendants also have not "reasonably explained" their chosen policy requiring at least

seven days' notice and approval, at DHS's and ICE's discretion, before allowing congressional oversight visits. *Ohio*, 603 U.S. at 292. An agency action is not reasonably explained when the agency has failed to provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). "In short, 'an agency must give adequate reasons for its decisions,' such that a reviewing court can 'evaluate the agency's rationale at the time of decision.'" *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *30 (D.D.C. Aug. 1, 2025) (quoting *Encino Motorcars*, 579 U.S. at 22, and *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)).

DHS's purported basis for the notice requirement "is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike," and "[u]nannounced visits require pulling ICE officers away from their normal duties." Jan. 8 Memo at 2. That justification is wholly specious. Secretary Noem levies a baseless accusation at members of Congress that "there is an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions." *Id.* But she cites no support for this claim—and indeed, there had been no incidents or issues in the course of congressional oversight visits during the period between December 17 and January 8 when Defendants were complying with the oversight rider and this Court's stay order. *See, e.g.*, Second Correa Decl. ¶¶ 13–14; Second Crow Decl. ¶¶ 22-30; Second Escobar Decl. ¶¶ 20-25; Second Espaillat Decl. ¶¶ 29–32; Second Goldman Decl. ¶¶ 32–40; Second Gomez Decl. ¶ 23.

Even in their second bite at the apple, Defendants have articulated no "satisfactory explanation" for the oversight visit policy. *State Farm*, 463 U.S. at 43. They have provided only unsupported, conclusory assertions that are, at best, tenuously related to congressional oversight visits. *See* Jan. 8 Memo at 2. They have provided no reasoned justification why any notice is

necessary, much less seven days, and why oversight visits must occur at the whim of DHS and ICE officials. That is reason enough to find the policy arbitrary and capricious.

In addition, Defendants' January 8 memorandum still fails to explain why generalized security and staffing concerns required a change from their mid-June policy, which did not require advance notice but instead merely requested 72 hours' notice. *See* First Stay Mot. at 35. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the alternative[s] that are within the ambit of the existing [policy]." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020). Defendants failed to "offer 'good reasons for the new policy,'" first in June and now again in the January 8 memorandum. *Wages & White Lion*, 604 U.S. at 570. The January 8 memorandum also does not suggest that the agency considered any alternatives to the notice requirement to address their purported general concerns regarding resources and security. Nor did Defendants show awareness of, or take into consideration, the members' "serious reliance interests" in being able to conduct unannounced visits to carry out their legislative duties, which has been a tool consistently used by members since at least fiscal year 2020. *Fox Television Stations, Inc.*, 556 U.S. at 515.

Moreover, Defendants have offered no specific reason why these general concerns are appropriately addressed by a blanket policy requiring at least seven days' notice and approval in all cases for any member of Congress to visit any such facility anywhere in the country. To the extent that Defendants may again attempt to rely on one-off "exigent circumstances," Hackbarth Decl. ¶ 9, ECF No. 20-1, those patently cannot justify a blanket notice requirement that applies in all circumstances. Nor do Defendants attempt to explain why unannounced visits require DHS to expend any more resources than announced visits or why this is relevant given the number of individuals going in and out of ICE facilities each day, including lawyers and visitors.

*Third*, Defendants' shifting public statements and inconsistent justifications for their departure from prior practice underscore the arbitrariness of their new policy. In May 2025,

Defendant Lyons testified he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ. Less than a month later, DHS began its implementation of policies to restrict that very oversight. In mid-June, ICE stated for the first time on its website that, although advance notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be submitted as early as possible and not less than 72 hours in advance." ICE June Guidance at 1. That guidance document generally referred to "privacy," and that "operational conditions" and "security posture," "may impact the time of entry into the facility." *Id.* Shortly thereafter, ICE implemented the first seven-day-notice and approval policy for members of Congress. And the January 8 memorandum explains that it is based, in part, on the "increasing trend of replacing legitimate oversight activities with circus-like publicity stunts"—with no mention of those operational conditions and time of entry concerns purportedly undergirding the June policy. Jan. 8 Memo at 2. DHS's shifting rationalizations for its policy positions—from first being "fully supportive" of congressional oversight, to concerned with "privacy" to blaming "circus-like publicity stunts" make clear that this is a pretextual notice-and-approval requirement in search of a justification.

*Fourth*, DHS's justification for imposing the notice requirement is also contrary to the evidence before the agency. *State Farm*, 463 U.S. at 43. Secretary Noem accuses members of Congress of engaging in "circus-like publicity stunts" that "create a chaotic environment and heightened emotions," but she does not explain how or why. Jan. 8 Memo at 2. Plaintiffs have been able to visit ICE detention facilities without prior notice for more than five years, including between December 17 and January 8 of this year, without incident. Second Correa Decl. ¶¶ 13–14; Second Crow Decl. ¶¶ 22–30; Second Escobar Decl. ¶¶ 20–25; Second Espaillat Decl. ¶¶ 29–32; Second

Goldman Decl. ¶¶ 32–40; Second Gomez Decl. ¶ 23. No Plaintiff members have had any threats to their safety during their visits, including Plaintiffs like Representative Crow and Escobar who have made many visits to DHS facilities since 2019. Second Crow Decl. ¶¶ 3–11, 22–30; Second Escobar Decl. ¶¶ 20–34. Defendants provide no evidence to the contrary in their memo. This change in policy is therefore arbitrary and capricious because it lacks a "factual basis," *AFL-CIO v. Fed. Labs. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022), "make[s] factual assertions without support," and "fail[s] to consider facts at all," *Am. Fed'n of Teachers*, ECF No. 83 at 47. The secretary's unsupported assertions are inadequate, contradicted by a consistent record of congressional oversight visits occurring without incident, and do not support the agency's notice requirement.

*Fifth*, Defendants' notice requirement is inherently arbitrary. It provides that members must provide "a minimum" of seven days' notice, with no guarantee that a request will be granted. ICE maintains that it retains "sole and unreviewable discretion to deny a request or otherwise cancel, reschedule or terminate a tour or visit," including if "facility management or other ICE officials deem it appropriate to do so." Second Neguse Decl., Ex. B at 2. ICE has already exercised this discretion arbitrarily in rescheduling members' visits without reason, even when members have attempted to schedule visits more than seven days in advance. For example, on December 11, 2025, Representative McClain Delaney attempted to schedule a visit to a Baltimore ICE facility. *See* McClain Delaney Declaration ¶ 3. ICE waited 6 days to confirm receipt of her email; offered her dates more than one month later; and then, days before the scheduled visit, cancelled her visit without providing a reason. *Id.* ¶¶ 6, 11–12. She is scheduled to visit on January 27, 47 days after her office originally made the request. *Id.* ¶ 14. This "approve it when we feel like it and cancel when we don't" policy makes it impossible for members to plan for and conduct visits when they are back in their districts. It also frustrates a member's ability to engage in timely follow-up visits. In the course of a visit, a member might encounter a situation or discover an issue that requires prompt, in-person

follow-up, but this policy ensures that a member or her staff cannot return to the facility for at least another seven days—and, in practice, often much longer. It also allows ICE time to improve the conditions at a facility. Indeed, Congress added subsections (b) and (c) to the oversight rider because, prior to fiscal year 2020, DHS used advance warning to improve conditions within the facilities scheduled for oversight. *See* Second Thompson Decl. ¶ 10; First Stay Mot. at 12–13. And Defendants are again using advance warning of congressional oversight visits, under their arbitrary oversight visit policy, to alter conditions of detention in violation of the rider. *See* Second Escobar Decl. ¶ 19.

*Finally*, ICE's policy and practice of restricting members' ability to conduct oversight once in a DHS facility is also arbitrary and capricious. ICE states that members cannot "have any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters." Second Neguse Decl., Ex. B at 2. This includes a prohibition on "meetings with detainees in detention facilities without valid, signed privacy releases." *Id.*

If a member or staff "would like to meet with a specific detainee or set of detainees," they must "provide names, alien registration numbers, and valid, signed privacy releases with your request," which must be made seven days in advance. *Id.* In other words, an individual in ICE's custody must somehow send a completed privacy release to a member outside the facility so that the member may be permitted to visit the facility, erecting a catch-22-inspired barrier to oversight. Previously, ICE had permitted members to identify individuals with whom they wanted to visit and then complete privacy releases in real time, during their visit. Defendants have offered no justification for changing this requirement. In practice, this has thwarted members' ability to gather information and speak with detainees even if they are able to gain access.

Accordingly, Plaintiffs are likely to succeed on their claim that Defendants' January 8 oversight visit policy is arbitrary and capricious.

## II.  Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm

Defendants' oversight visit policy is inflicting significant harm on Plaintiffs, who are once again being prevented from visiting ICE detention facilities because of Defendants' unlawful notice requirement, at a time when prompt information about the conditions in ICE detention facilities is paramount. *See* Op. at 67–70 (finding irreparable harm); *see supra* at 4–5, 14. As this Court has already recognized, Plaintiffs are harmed by the denial of *timely* oversight in ICE detention facilities; it is far from "speculative that the[] conditions" in a facility "could change over the course of seven days." Op. at 68.

It is a matter of even greater urgency that members of Congress be able to recommence engaging in oversight at ICE detention facilities today than it was when Plaintiffs filed their original complaint. ICE statistics show that, as of January 8, the agency was detaining 69,000 people nationwide.[18] The reports that Representative Morrison has received regarding ICE detention at Whipple underscore the disastrous effects of ICE's operations on detention conditions and the need for oversight. These reported conditions include violent treatment by agents, shackling of detainees for the duration of their detention, verbal abuse by guards, failures to provide necessary medication and medical care, and a lack of blankets, pillows, adequate food and water, hygienic products, showers, and access to counsel. Morrison Decl. ¶¶ 11–17. Every day that Representative Morrison is denied access to the facility for oversight, and the information that she could obtain and observe through an oversight visit, irreparably harms her ability to serve her constituents and fulfill her role as a member of Congress. *Id.* ¶ 18.

Without timely, in-person oversight, members of Congress cannot fulfill their duties to their committees and to their constituents. This loss of vital information and access in the absence of a temporary restraining order and stay under section 705 is certain and great, imminent, and beyond

---

[18] *See Detention Statistics*, ICE, https://www.ice.gov/detain/detention-management (last updated Jan. 8, 2026).

remediation. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)

## III. The Equitable Factors Strongly Favor Preliminary Injunctive Relief

As the Court previously concluded, again, "[t]he public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs their requested relief." Op. at 70. Plaintiffs' strong likelihood of success on the merits itself establishes that the equities and public interest favor preliminary relief. "[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," and "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quotation marks omitted). That is especially so in this case, which "involves the Government's violation of an appropriations statute passed by Congress and signed by the President," because "the public has an interest in ensuring that 'statutes enacted by their representatives are not imperiled by executive fiat.'" Op. at 70 (quoting *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019)).

Congress, under the control of both parties, has mandated through the appropriations laws that Defendants may not prevent the entry of members of Congress into certain DHS facilities to conduct oversight visits. And President Trump signed that provision into law. "The Executive Branch must follow duly enacted laws or ask Congress to change them, and the public has a strong interest in seeing that principle upheld." *Coalition for Humane Immigrant Rights*, 2025 WL 2192986, at *37. It is therefore in the public interest to see the oversight rider enforced as Congress intended it, to ensure that individual members of Congress may conduct oversight over immigration detention facilities.

## IV. The Court Should Issue an Immediate TRO and, Subsequently or in the Alternative, Stay the Oversight Visit Policy under Section 705

Plaintiffs request that this Court immediately temporarily restrain Defendants from enforcing the January 8 oversight visit policy as to Plaintiffs. As Plaintiffs have explained, *supra* at

40–41, and this Court has already found, Op. at 45, Plaintiffs suffer an ongoing and irreparable injury each day that they are unable to engage in timely, in-person oversight at ICE detention facilities. It is well within this Court's equitable powers to grant the relief necessary to provide complete relief to each plaintiff with standing to sue. *See League of United Latin Am. Citizens v. Exec. Off. of President*, No. 25-cv-0946-CKK, 2025 WL 3042704, at \*36 (D.D.C. Oct. 31, 2025) (granting injunction tailored to the irreparable harm that plaintiffs in consolidated cases would suffer in the absence of an injunction).[19]

In the alternative, or subsequent to an immediate temporary restraining order, a stay of Defendants' January 8 oversight visit policy is the appropriate preliminary relief to preserve the status quo ante while this case proceeds. *See* 5 U.S.C. § 705. As this court recognized in its December 17 opinion, a section 705 stay is the appropriate remedy "to preserve status or rights pending conclusion of the review proceedings." Op. at 16. A section 705 stay would preserve the status quo in place under this Court's December 17 order, ECF No. 37, guaranteeing members of Congress access to ICE detention facilities for oversight purposes without providing advance notice. Plaintiffs have demonstrated that they are likely to succeed on their claim that the oversight visit policy is an unlawful agency action, and in such cases where vacatur of the agency action would be the normal remedy, a stay of the unlawful agency action provides the proper relief in the interim. *See*

---

[19] Should this Court grant a temporary restraining order, it should require no more than a minimal bond. As the D.C. Circuit has recognized, Federal Rule of Civil Procedure 65(c) provides district courts broad discretion "not only to set the amount of security but to dispense with any security requirement whatsoever." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *see also Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505-BAH, 2026 WL 80796, at \*24 (D.D.C. Jan. 11, 2026). "In cases where the government is the enjoined party and no concrete economic injury is established, as is the case here, courts routinely waive the bond requirement." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025); *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (requiring no bond); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872-JMC, 2025 WL 2192986, at \*38 (D.D.C. Aug. 1, 2025) (same); *see also L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 134 (D.D.C. 2025) (requiring a bond of $1.00). Plaintiffs do not have unlimited funds and are engaged in this lawsuit in their capacities as representatives of their constituents and members of the House of Representative.

Op. at 72 (citing *Make the Rd. N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *22 (D.D.C. Aug. 29, 2025); *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *37–38; *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020); *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (collecting cases)).

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a temporary restraining order, and subsequently, or in the alternative, enter a stay under 5 U.S.C. § 705, as set forth in the attached proposed order.

January 26, 2026

Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Lisa Newman (TX Bar No. 24107878)
Anna L. Deffebach (D.C. Bar No. 241346)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ccoogle@democracyforward.org

Daniel Martinez (D.C. Bar No. 90025922)
Ronald A. Fein (D.C. Bar No. 90026641)
Katherine M. Anthony (D.C. Bar No. 1630524)
Jessica Jensen (D.C. Bar No. 1048305)

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*

46