**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>*Defendants*. | Case No. 25-cv-2643-JMC |

**DECLARATION OF DEBORAH FLEISCHAKER**

I, Deborah Fleischaker, declare as follows:

1.  I am over the age of 18 and competent to testify to the matters described below.

2.  I served in various capacities within the U.S. Department of Homeland Security (DHS) for over 13 years.

3.  A lawyer by training, I first came to DHS in March 2011 as a career civil servant in the Office for Civil Rights and Civil Liberties (CRCL), an internal oversight arm of the agency that advised on civil rights and civil liberties issues and investigated allegations of civil rights and civil liberties violations. CRCL has subsequently been significantly reduced in size and scope. I worked in various positions in CRCL from March 2011 until September 2021, with the exception of several details to other offices at DHS and to Senator Patrick J. Leahy's Judiciary Committee staff. I worked on immigration issues in all of these positions.

4.  Between September 2021 and November 2023, I served as a political appointee at U.S. Immigration and Customs Enforcement (ICE). I was an Assistant Director and headed ICE's

1

Office of Regulatory Affairs and Policy for one year, and I served as the acting ICE Chief of Staff for one year.

5. As the head of ICE's Office of Regulatory Affairs and Policy, I spearheaded policy and regulatory initiatives for the agency, with a significant focus on immigration enforcement, detention, and removal. In this role, I also oversaw all aspects of budget, financial management, and operations as pertinent to the Office of Regulatory Affairs and Policy that I directed.

6. As the acting ICE Chief of Staff and a senior agency official, I oversaw agency-wide activities, including ICE's approximately $9 billion budget and 20,000 employees across law enforcement and investigations. In this role, I worked with the ICE and DHS Offices of the Chief Financial Officers to oversee the implementation of the existing budget, report on budget activities to the White House and Congress, and participated in the appropriations process for new or supplemental budget requests and any necessary budget reprogramming.

7. I also oversaw the activities in the ICE Office of the Director, including ICE's Office of Congressional Relations (OCR), Office of Public Affairs, and Office of Public Engagement.

8. As part of my role as acting ICE Chief of Staff, I was aware of the restrictions of the statutory provision prohibiting DHS and ICE from preventing members of Congress from entering DHS facilities used to detain or otherwise house noncitizens for oversight, and that members of Congress were not required to provide notice. I am not aware of any situation in which ICE failed to respect this prohibition, and ICE accommodated congressional visits, whether or not they had advance notice, with the understanding that it was the agency's obligation under the law.

9. Following this role, I moved to DHS, where I served as the DHS Executive Secretary from November 2023 to August 2024 and the acting DHS Chief Privacy Officer and Chief FOIA Officer from August 2024 through January 2025. In each of these roles, I directed an office

within the DHS Office of the Secretary and therefore oversaw all aspects of budget, financial management, and operations as pertinent to these offices. In addition, in my role as DHS Executive Secretary, I had oversight of all aspects of budget and financial management regarding each of the offices within the DHS Office of the Secretary.

10. I provide this declaration based on my experience with and knowledge of DHS and ICE, as well as my review of the following documents filed in this case, *Neguse v. ICE*, No. 25-cv-2463-JMC:

    a. This Court's memorandum opinion of December 17, 2025, ECF No. 36

    b. Secretary Noem's policy memorandum of January 8, 2026, ECF No. 39-1

    c. Plaintiffs' motion of January 12, 2026, ECF No. 40

    d. Declaration of Holly C. Mehringer, ECF No. 42-1

    e. Declaration of David Easterwood, ECF No. 42-2

    f. Plaintiffs' supplemental memorandum of January 15, 2026, ECF No. 44

    g. Defendants' memorandum of January 15, 2026, ECF No. 45

11. The Government has indicated in this case that it anticipates using only funds appropriated to DHS in the Reconciliation Act of 2025, Pub. L. No. 119-21, and no funds appropriated to DHS or any of its components under DHS's annual appropriations acts, for the myriad expenses that are involved in (a) formulating and developing a policy to prevent members of Congress from conducting oversight visits to ICE facilities, without seven days' notice to DHS, and (b) implementing that policy by denying visits that do not comply with that notice requirement.

**DHS and ICE Appropriations**

12. ICE is a component within DHS charged with disrupting transnational crime and with immigration enforcement in the interior of the U.S. ICE is organized into four directorates. There are two operational directorates—Homeland Security Investigations (HSI) and Enforcement

and Removal Operations (ERO)—and two additional directorates—Office of the Principal Legal Advisor (OPLA), and Management and Administration (M&A)—that support the entire agency.

13. DHS is operated with annual appropriations from Congress, which enumerates with specificity the purposes for which funds can be spent. Funds are appropriated by Congress to specific components and offices within DHS and for certain purposes. For example, on an annual basis, Congress appropriates funding to DHS's Management Directorate (which among other things includes the Offices of the Chief Financial Officer and Chief Human Capital Officer); U.S. Customs and Border Protection; and, as particularly relevant here, ICE. For each of these appropriations, Congress additionally specifies the amounts that can be spent on "operations and support" and "procurement, construction, and improvements." Consistent with the budget justifications that DHS provides to Congress, the "operations and support" appropriation funds, among other things, core operational expenses including items like salaries and expenses, while the "procurement, construction, and improvements" appropriation funds, among other things, agency assets, infrastructure, and human resources and information technology systems.

14. Within ICE, this means that the "operations and support" appropriation funds salaries and expenses of the various directorates, including ERO and OPLA, and that the "procurement, construction, and improvements" appropriation is dedicated to funding assets, infrastructure investments, and human resources and information technology systems.

15. Reconciliation funding, by contrast, is additive to an agency's annual appropriations, usually provided to achieve certain congressional policy goals. Reconciliation funds typically differ from annual appropriations in that they are designed to fund specific purposes over and above an agency's annually appropriated funds, and are passed through an expedited set of congressional procedures. Only 24 reconciliation bills have been enacted into law, the most recent of which was the Reconciliation Act of July 4, 2025, Pub. L. No. 119-21, 139 Stat. 72 (2025) (OBBBA).

16. Consistent with that typical distinction, the Reconciliation Act does not contain funding for general "operations and support" or "procurement, construction, and improvements," but instead funds specific programs and operations. For example:

   a. Section 90003 provides "addition[al]" funding to ICE for "detention capacity," specifically "single adult alien detention capacity and family residential center capacity." In this context, for ICE, "capacity" refers specifically to the number of individuals who can be held in immigration detention facilities.

   b. Section 90007 provides "addition[al]" funding to ICE "for reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States." A "reimbursement of costs" in this context refers to funds that may "reimburse" existing DHS annual appropriations, which are available for other specified purposes.

   c. Section 100052 provides "addition[al]" funding to ICE for certain new hires, investments, and modernization activities, such as "[h]iring and training additional U.S. Immigration and Customs Enforcement personnel"; "[h]iring additional attorneys and the necessary support staff within [OPLA] to represent the Department of Homeland Security in immigration enforcement and removal proceedings"; "signing bonuses"; and "facility upgrades."

17. These reconciliation funds for specific, circumscribed purposes in no way displace DHS's and ICE's annual appropriated funding streams, which are necessary for the continued operation of those agencies.

18. The DHS and ICE budgets are enormously complicated, and their components and offices each have their own complicated budgets. Congress appropriates amounts at the Program,

5

Project, or Activity (PPA) level, as well as sub-PPA levels. A sub-PPA may include numerous offices. For example, the ICE Executive Leadership and Oversight sub-PPA includes the budgets of all Office of the Director programs including the Office of Congressional Relations, Office of Public Affairs, Office of Regulatory Affairs and Policy, and others. ICE will track expenditures in more granularity than the sub-PPA level, including by office, budget line, and contract/purchase order.

19.  DHS and ICE must provide monthly budget reports to Congress that outline various budget data points, including how much has been used out of each sub-PPA, how much funding remains in each sub-PPA, the burn rate, and any reprogramming of funds (up to a certain threshold).

**The DHS Oversight Visit Policy**

20.  The promulgation, implementation, and enforcement of DHS's current policy on advance notice and approval for Congressional oversight visits would necessarily involve personnel, assets, infrastructure, and resources from components and offices funded through DHS's annual appropriation. To name just a few, this would include personnel from the ICE Office of Congressional Relations, DHS Office of Legislative Affairs, ICE Office of Regulatory Affairs and Policy, DHS Office of Policy, ICE ERO, the DHS Office of General Counsel and ICE OPLA whose salaries are funded from the "operations and support" annual appropriation, as well as information technology systems and contracts, office supplies, utilities, and building infrastructure that are funded by the "procurement, construction, and improvements" annual appropriation.

21.  Several different management functions would also necessarily be involved in scheduling visits under the oversight visit policy and enforcing the policy against unannounced visits at facilities. All of those management functions at DHS and ICE receive annual appropriations, and most, if not all, of those management personnel and operations cannot be funded by the

Reconciliation Act. The same is true of ICE OCR, whose operations are funded through annual appropriations. Finally, most of the detention facilities that were owned, operated, or utilized by ICE prior to the OBBBA have contracts or agreements that predate the Reconciliation Act, and funds for improvements, staffing, and other expenses come from annual appropriations. Separating them out to replace those funds with Reconciliation Act funds would be impossible.

22. I understand that DHS has represented that although funding for these expenses is specifically provided by the agency's annual appropriation, it nonetheless anticipates re-assigning the expenses associated with the promulgation, implementation, and enforcement of DHS's current policy to the Reconciliation Act at some future date.

23. As an operational matter, it would be nearly impossible for ICE to engage in the tracking and back-end accounting that re-assigning the expenses would require. This is both because there are so many, varied inputs involved and because these inputs are constantly subject to change, given that oversight visits by members of Congress could and do happen at facilities across the country, including without notice, making the expenses even more difficult to track. And because this policy involves both DHS—which promulgated the oversight visit policy and holds approval authority for any exceptions to the policy—and ICE—which enforces the policy—this further increases how complicated the task of tracking the relevant salaries and expenses would be.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 26th day of January 2026.

_____
DEBORAH FLEISCHAKER