**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,

*Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,

*Defendants*.

</td><td>

Case No. 25-cv-2463

</td></tr>
</table>

**SECOND DECLARATION OF REPRESENTATIVE JASON CROW**

I, Jason Crow, declare as follows:

1. I am a member of the U.S. House of Representatives, representing Colorado's 6th congressional district. I have been a member of Congress since 2019.

2. The information in this declaration is based on my personal knowledge or on information provided to me by my Congressional staff concerning the exercise of my oversight duties as a member of Congress and my efforts to serve my constituents. I provide this declaration to explain how the unlawful, new oversight visit policy of the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") prevents me from performing my oversight duties as a member of Congress and significantly harms my ability to serve my constituents.

**Oversight of ICE Facilities in Aurora, Colorado**

3. Both an ICE detention facility, the Denver Contract Detention Facility in Aurora ("Aurora Facility"), and a field office, the Denver Field Office in Centennial, are located in the district I represent. I have been deeply and consistently engaged in oversight of the conditions of immigration detention in my district since I became a member of Congress.

1

4.  In January and February 2019, I received information from individuals and community groups regarding the conditions of detention at the Aurora Facility, which is run by a private contractor, The GEO Group, Inc. ("GEO"). The Aurora Facility had recently increased its capacity by nearly 40%, without coordination with local government agencies, and my understanding was that it retained only one physician on staff to serve more than 1,500 detainees, despite recent chicken pox outbreaks. On February 20, 2019, I sent a letter to then-Secretary of Homeland Security Kirstjen Nielsen raising concerns about the Aurora Facility's responses to disease outbreaks and other medical and public health concerns, as well as the contractual relationship between ICE and GEO.[1] That same day, I visited the Aurora Facility without prior notice to assess the conditions on the ground, in person. Officials at the Aurora Facility denied my request for entry and for a tour of the Aurora Facility.

5.  Following my attempted visit and letter, ICE revealed that there was currently a mumps outbreak at the Aurora Facility and that approximately 260 detainees were in quarantine. I followed up with a letter signed by multiple members of Congress seeking answers from ICE leadership regarding the public health risks, treatment of detainees at ICE detention facilities and contract facilities, like the Aurora Facility, and protocols related to the inter-facility transfer of detainees.[2] I requested to tour the Aurora Facility three more times before ICE granted my request and finally allowed me to tour the Aurora Facility on March 15, 2019.

6.  Nearly four months later, on June 25, 2019, I received a response from ICE to my February 28, 2019, letter, in which ICE denied responsibility for developing policies and protocols

---

[1] Letter from Rep. Jason Crow to Secretary Kirstjen Nielsen (Feb. 20, 2019), https://crow.house.gov/sites/evo-subsites/crow-evo.house.gov/files/02-20-2019-Crow-Letter-to-DHS-regarding-Denver-Contract-Detention-Facility.pdf.

[2] Letter from Rep. Jason Crow et al. to ICE Acting Director Ronald D. Vitiello (Feb. 28, 2019), https://crow.house.gov/sites/evo-subsites/crow-evo.house.gov/files/02-28-2019-Letter-to-ICE-Detention-Center-Oversight-SIGNED.pdf.

for managing infectious and communicable diseases at the Aurora Facility.[3] That response underscored the importance of my role as a member of Congress in overseeing the Aurora Facility and ensuring that GEO, pursuant to its contract with ICE, was treating detainees humanely, complying with public health guidance, and acting consistent with the law.

7. Recognizing the need for increased congressional oversight of the Aurora Facility, in July 2019, I instituted weekly visits to the Aurora Facility, to be conducted by me or my staff, along with regular communication with local ICE officials. Some visits have been scheduled one to seven days in advance, and some of my visits were without prior notice. On January 6, 2020, for example, I conducted an oversight visit without prior notice and was able to tour the facility. In connection with these visits, we document responses to specific questions—including, for example, the number of detainees present, the number of arrivals and departures that week, the number of detainees and employees currently in medical quarantine, the number and type of medical personnel employed at the Aurora Facility, and detainee use of the law library, among other information. We also request copies of documents such as the building temperature logs and daily checklists concerning the conditions of kitchen spaces and equipment. We post completed accountability reports to my congressional office website.[4]

8. During the COVID-19 pandemic, my office suspended in-person visits between March 2020 and July 2022, with limited exceptions. We continued oversight through electronic requests for information, and we were able to receive consistent responses from ICE personnel with whom we had established a productive relationship through our regular oversight visits. We continued to post those reports to the ICE Accountability Report page of my congressional office's

---

[3] *See* 116 Cong. Rec. E877 (daily ed. July 9, 2019) (extensions of remarks by Rep. Crow), https://www.congress.gov/116/crec/2019/07/09/165/114/CREC-2019-07-09.pdf.

[4] *ICE Accountability Report*, Jason Crow, https://crow.house.gov/transparency/ice-accountability-report.

website. My staff and I resumed regular in-person oversight visits at the Aurora Facility in August 2022. During 2025, my office conducted 20 oversight visits, frequently with one or two days' notice, before the seven days' notice policy was implemented.

9. I have continued to have concerns about the conditions at the Aurora Facility, particularly with respect to public health. In April 2025, for example, detainees at the Aurora Facility were quarantined due to possible tuberculosis exposure. My continued congressional oversight has been intended to ensure that conditions at the Aurora Facility do not deteriorate, protect the health of detainees and the broader community, confirm detainees have access to legal counsel, and ensure that federal law is being followed.

10. In many instances, my staff and I are able to identify issues that need to be addressed before they become larger problems. We have built a productive relationship with the field directors and other ICE and GEO personnel, with whom we can effectively communicate the issues that come to our attention during our visits and development of the accountability reports. For example, we noticed that telephones were in poor condition and non-functional in the visitation area; after we raised the issue with the Aurora Facility, the telephones were replaced or repaired, and we now ensure their functionality during our visits. When we began our weekly visits, there were several vacancies for critical medical personnel; within a few months, the Aurora Facility had added to their medical staff and were in the process of hiring additional medical and health administration personnel. And after we raised concern about access to legal counsel for individuals in quarantine during mumps and chicken pox outbreaks, the Aurora Facility installed a video relay system to allow detainees to meet with their legal counsel by video conference during quarantine.

11. I inform other members of Congress, my constituents, and the public when information gained from our visits is cause for concern—and therefore a potential basis for legislation or further oversight. I also inform them of positive and productive information obtained

through oversight. For example, about three months after I established our practice of weekly visits at the Aurora Facility, I issued a press release highlighting the improvements that I had observed in the conditions of detention during that time, in the areas of phone access, food safety, medical services, infectious disease treatment, and access to legal counsel.[5]

**The Importance of Facility Visits to My Oversight and Legislative Work**

12.    The oversight visits that my staff and I have regularly conducted have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities. For example, I introduced legislation in December 2024, alongside a Republican representative from Florida, that would codify the statutory right of members of Congress and our designated staff to conduct critical oversight visits, including unannounced visits, to oversee facility operations. I previously introduced similar legislation in 2019. And I worked with other members of Congress to secure similar language guaranteeing members of Congress access to all DHS immigration detention facilities for oversight without prior notice, beginning in Fiscal Year 2020. This guarantee has been carried forward in DHS appropriations every year since.

13.    My oversight visits at the Aurora Facility have also contributed to further oversight efforts. During the COVID-19 pandemic, for example, I repeatedly sought information from ICE on COVID-19 cases, detention conditions, and disaster response plans in its facilities. I have regularly communicated with DHS and ICE, raising concerns and seeking specific information

---

[5] Jason Crow, Press Release, Three Months Since the Start of Weekly Visits to Aurora ICE Facility, Rep. Crow Highlights Improvements to Facility and Importance of Governmental Oversight (Oct. 17, 2019), https://crow.house.gov/media/press-releases/three-months-start-weekly-visits-aurora-ice-facility-rep-crow-highlights.

during both the Biden and Trump administrations.[6] Based on my concerns with the Aurora Facility, I have also led letters calling to end private immigration detention.[7]

14.     These oversight efforts further informed my legislative work. For example, in 2020 and again in 2021, I introduced the End Transfers of Detained Immigrants Act, which imposed certain requirements on ICE relating to individuals in its custody during the COVID-19 pandemic, preventing their transfer between facilities depending on the COVID-19 transmission rate. This legislation sought to protect my constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities and, by extension, in the surrounding communities.

15.     I am also in the process of drafting legislation that would amend certain aspects of ICE reporting requirements following the death of a detainee. I obtained the information necessary to inform this new legislation through regular oversight visits and consistent engagement with ICE, which led to accessing, and identifying the gaps in, existing reports. I have also submitted an amendment to DHS appropriations that would prohibit funding for contract facilities where a

---

[6] *See, e.g.*, Letter to Acting ICE Field Office Director John Fabbircatore (Mar. 17, 2020), https://crow.house.gov/media/press-releases/coronavirus-hits-colorado-crow-demands-ice-detention-center-make-clear; Letter to Acting ICE Director Matthew Albence (Mar. 27, 2020), https://crow.house.gov/media/press-releases/crow-calls-ice-grant-humanitarian-parole-detainees-risk-coronavirus-facing-non; Letter to Acting ICE Director Matthew Albence (Apr. 20, 2020), https://crow.house.gov/media/press-releases/congressman-jason-crow-demands-increased-transparency-ice-covid-19-cases; Letter to Acting ICE Director Tae D. Johnson (Nov. 22, 2022), https://crow.house.gov/sites/evo-subsites/crow.house.gov/files/evo-media-document/11.22.2022-ice-follow-up-letter.pdf; Letter to Acting ICE Director Patrick Lechleitner (Sept. 14, 2023), https://crow.house.gov/sites/evo-subsites/crow.house.gov/files/evo-media-document/9.14.2023-final-ice-foia.pdf; Letter to DHS Inspector General Joseph V. Cuffari et al. (Aug. 5, 2024), https://crow.house.gov/sites/evo-subsites/crow.house.gov/files/evo-media-document/08.05.2024%2C%20DHS%20OIG%2C%20ICE%2C%20Inspections_Final.pdf.

[7] Letter to Acting DHS Secretary Devid Pekoske (Jan. 28, 2021), https://crow.house.gov/sites/evo-subsites/crow-evo.house.gov/files/01.28.21%20-%20Letter%20to%20Acting%20Secretary%20Pekoske%20Regarding%20Phasing%20Out%20Privately%20Operated%20Immigration%20Detention%20Facilities.pdf; Press Release, Crow Calls for the Abolishment of Private, For-Profit Immigration Detention Centers (July 8, 2019), https://crow.house.gov/media/press-releases/crow-calls-abolishment-private-profit-immigration-detention-centers.

detainee death has occurred and the medical care provided at the facility was determined to have been a contributing factor to the death. These legislative efforts are the result of my oversight work following the October 2022 death of an individual detained at the Aurora Facility, my efforts to ensure an investigation of that death, and the eventual report's conclusion that the medical care at the Aurora Facility directly contributed to the individual's death.

16. Notwithstanding my continued concerns about the conditions at the Aurora Facility—in particular the public health conditions—my consistent oversight of the Aurora Facility has also had a positive impact on the ground. Conditions of detentions at the Aurora Facility have appeared better over time than the reported conditions at other ICE facilities around the country. Our regular presence and generally positive relationship with ICE officials at the Aurora Facility have contributed to a sense that we are paying attention to concerns we have raised related to the critical needs of the detainees, and that problems can be addressed before they become significant or systemic.

17. Our in-person visits to the Aurora Facility also allow us to respond to and follow up on constituent casework. Immigration, including immigration detention, is the most frequent topic of concern raised to my district office by my constituents. We use the oversight visits as an opportunity to investigate constituent complaints we receive with regard to access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes we uncover issues, and sometimes we determine that the situation is acceptable and are able to respond to my constituents' concerns. We can get the needed information through our observations, conversations with detainees, and conversations with ICE employees on the ground.

18. In-person visits also allow my staff and me to have detained individuals sign ICE Form 60-001, commonly referred to as a privacy waiver, which allows us to receive certain information about that detainee from DHS. This information enables us to better understand the

7

reason for an individual's detention, track his or her next steps in the immigration enforcement process, and communicate this information as relevant with his or her loved ones or legal representatives.

**Defendants' Unlawful Obstruction of July 2025 Oversight Visit**

19.     Since 2019, I had not been denied access to the Aurora Facility for an oversight visit until July 2025.

20.     On July 20, 2025, I attempted to conduct an unannounced oversight visit of the Aurora Facility shortly after 2:00 p.m. I presented my Congressional identification card and explained that I was a member of Congress there to conduct an unannounced visit pursuant to federal law. After about 10 minutes, an Aurora Facility employee placed the assistant warden (an employee of GEO) on speakerphone, who told me that the contracted facility staff were seeking ICE approval to permit the visit. Nearly an hour later, I was told that ICE had denied my request and I was not permitted to conduct the oversight visit. I explained that I had the right to visit the Aurora Facility for oversight under the oversight rider at section 527 of Public Law 118-47 and that this denial was in violation of that right. I presented a printed copy of this provision of the law to the contracted Aurora Facility staff for their review and further explained my legal rights as a member of Congress pursuant to that law. The contracted Aurora Facility staff did not deny that I had legal rights pursuant to federal law, but made it clear they were taking direction from ICE.

21.     My office followed up by email to the ICE Office of Congressional Relations. We received a response stating that "DHS requires requests be made a minimum of seven calendar days in advance for scheduling."

**Developments Following This Court's December 17 Order**

22.     The need for oversight into conditions at the Aurora Facility has increased since I filed my original declaration in this case and since this Court entered its order granting a stay of

8

ICE's seven days' notice policy on December 17, 2025. Since that time, I and members of my staff have heard significant concerns from the community about conditions at the Aurora Facility. Among these concerns were those impacting public health, in particular reports of detainees suffering from gastrointestinal illnesses and other ailments for which they may not have been receiving timely medical treatment.

23.    I and members of my staff also heard concerns about an increase in the total number of detainees held at the Aurora Facility. We observed that due to the increased number of individuals detained at the Aurora Facility, Special Management Units, including segregated housing and units for vulnerable populations, are now being used for general housing to accommodate additional detainees. These concerns make it imperative that I and my staff be able to conduct timely in-person visits to obtain an accurate assessment of conditions and to ensure that the Aurora Facility is adhering to the Performance-Based National Detention Standards that govern ICE detention at this facility.

24.    My congressional staff observed during a December 20, 2025, oversight visit that privacy waivers—documents that facilitate a detainee's ability to seek assistance from a congressional office—in the law library at the Aurora Facility were available only in English. Failing to make these forms accessible in other languages creates a barrier for detainees seeking to better understand their legal situation and the resources that are available to them while held in detention. My staff raised concerns about the accessibility of these forms with officials during the December 20, 2025, oversight visit and subsequently observed during a January 5, 2026, congressional oversight visit that the forms were available to detainees in additional languages. This is an example of how timely in-person oversight visits can lead directly to improvement in conditions for detainees.

25.    On December 18, 2025, members of my staff requested a visit for December 19, 2025, with 24 hours' notice as the oversight rider at Section 527 anticipates. This request was

approved, but the visit was subsequently delayed until December 20, 2025, due to shifting availability of staff from another congressional office who accompanied my staff on this oversight visit. Similarly, members of my staff visited the Aurora Facility on January 5, 2026, after having given 24 hours' notice to ICE OCR (on a Sunday), and were admitted.

26.      Following both visit requests that were submitted after the Court's order, we were able to enter the Aurora Facility and conduct oversight without incident.

27.      I originally intended to make an unannounced visit to the Aurora Facility on January 16, 2026, a date that was specifically selected to avoid conflict with any Congressional duties requiring me to be in Washington. However, on January 8, 2026, DHS once again implemented a policy requiring seven days' advance notice of a visit, claiming the policy was or would be implemented using funds appropriated by Pub. L. No.  119-21, the reconciliation act enacted in July 2025, rather than funds appropriated by DHS's annual appropriations and subject to restrictions under the oversight rider at Section 527. I was not made aware of this policy by DHS and learned that DHS was using this policy to deny members of Congress oversight access to ICE facilities as a result of public reporting on January 10 and January 11, 2026.

28.      On January 13, 2026, my office sent a notice to ICE OCR, informing ICE that on January 16, I and members of my staff intended to conduct an oversight visit at the Aurora Facility. Despite language in the oversight rider in Section 527 guaranteeing members of Congress the right to conduct unannounced oversight of these facilities, OCR informed me that my request was denied because I had not provided seven days' advance notice, as the January 8 policy purports to require.

29.      My office later informed ICE that members of my staff intend to conduct an oversight visit at the Aurora Facility on January 28, 2026.  ICE OCR confirmed that visit.

30.      Oversight of ICE detention facilities remains a critical part of my work as a Member of Congress. Given the serious concerns about conditions at the Aurora Facility and a lack of

responsiveness from ICE to information requests about the facility's operations, immediate and timely visits to the Aurora Facility are essential to my ability to conduct oversight. Requiring seven days' notice of both Member and staff-level oversight visits to the Aurora Facility also prevents me from effectively representing my constituents by providing them with information about their family members who are detained at the Aurora Facility and hinders our ability to complete constituent casework.

**The Significant, Irreparable Harm from Defendants' Unlawful Obstruction**

31.     Federal law requires DHS to allow any member of Congress to visit any DHS detention facility for the purpose of conducting oversight without providing advance notice. It is critical for me to understand how appropriated funds are being used in real time on the ground in immigration detention. This close oversight informs each of us on how to best serve our constituents—especially those of us who represent districts where DHS facilities are located.

32.     My constituents frequently contact my office with immigration-related issues and concerns, many of which involve the Aurora Facility. When we receive reports that, for example, detainees at the Aurora Facility are not receiving needed medications, it is important that we are able to go there in person, in a timely fashion, to inquire about the circumstances and opportunities for resolution—rather than submitting inquiries to and waiting on a response from administration officials and simply taking their word for it in all instances.

33.     As another example, when my staff visited the Aurora Facility on July 3, 2025, they noticed that the housing pod they visited was abnormally warm. We subsequently received reports that the facility was too warm and that the air conditioning may not have been functioning for an extended period of time. Because DHS's new policy prevented me from assessing the conditions on the ground without delay, I was unable to verify or act on these reports. I was therefore deprived of important information that my staff and I would previously have been able to obtain in a timely way.

34. That oversight needs to happen in real time. Emergencies don't happen with seven days' notice. Nor do the realities on the ground often allow for seven days' delay. If there is an outbreak of a communicable disease that is not handled appropriately, that affects detainees, the people who work there, and the people they interact with outside of the facility in the broader community.

35. Congressional oversight may also be the only true oversight available at the Aurora Facility and others. This is especially true since the Trump administration gutted DHS's internal oversight offices, including the Office of Civil Rights and Civil Liberties and the Office of the Immigration Detention Ombudsman, which regularly inspect and handle complaints involving contract detention facilities like the Aurora Facility. And this administration has been less responsive to formal and informal requests for information. In many circumstances, personal oversight visits may be the only remaining way that timely and accurate information can be obtained. And conducting visits without prior notice on some occasions allows me to ensure that I'm not getting a sanitized view but am able to assess the true conditions at the Aurora Facility.

36. Immediate and timely in-person oversight is also necessary because responses from DHS and ICE to Congressional inquiries can be so delayed that the information is no longer actionable, especially given the pace at which detainees are being transferred, deported, or released from facilities in the United States. Additionally, congressional oversight visits were not permitted during the 43-day period when there was a lapse in federal appropriations, rendering it impossible for me to raise concerns from community members and observe real-time conditions at the Aurora Facility.

37. Members of my staff submit regular written requests for information to ICE OCR following in-person visits, as directed by GEO and ICE officials at the Aurora Facility. These are routine requests for data the agency should have readily available, including the total number of

detainees housed in the facility, the top five countries detainees in the facility come from, and the total number and classification of medical staff, among other data. These requests for information are submitted in a written format because, at the direction of ICE OCR, local officials will no longer answer these questions orally or make the information available to myself and my staff during oversight visits.  On January 6, 2026, my staff finally received responses to our requests for information dating back to September 8, 2025. On August 22, 2025, I and other Members sent ICE a letter following an August 11, 2025, congressional oversight visit seeking information regarding conditions of detention and facility operations. Over 150 days later, we still have not received a response.

38.    I intend to continue engaging in on-the-ground, real-time oversight of the Aurora Facility, because timely and accurate information is critical for me to conduct oversight, craft legislation, and otherwise serve my constituents.

39.    Defendants' refusal to permit me to conduct tours at the Aurora Facility without seven days' notice thus significantly hinders my ability to perform my duties as a member of Congress.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 26th day of January 2026 in Washington, DC.

 

 

_____
JASON CROW