IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>*Defendants*. | Case No. 25-cv-2463-JMC |

**SECOND DECLARATION OF REPRESENTATIVE VERONICA ESCOBAR**

I, Veronica Escobar, declare as follows:

1. I am a member of the U.S. House of Representatives, representing Texas's 16th congressional district. I have been a Member of Congress since 2019. I currently serve on the Committee on Appropriations and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies.

2. I have personal knowledge of the facts and information in this declaration. I provide this declaration to explain how the unlawful, new oversight visit policy of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) prevents me from performing my oversight duties as a member of Congress and significantly harms my ability to serve my constituents.

**Oversight of DHS and ICE Detention Facilities in El Paso, Texas**

3. My district currently contains two ICE facilities: an ICE detention facility known as the El Paso Service Processing Center (SPC) and the ICE El Paso Field Office. In addition, the ICE Enhanced Hardened Facility (EHF) was located just outside my district until its closure in August

1

2025. There is also a new ICE facility in my district called Camp East Montana, which is located at the Fort Bliss military base in El Paso. It is currently the largest ICE facility in the country

4.      As a member of Congress representing El Paso, a vibrant city on the United States–Mexico border with a large binational population, I have been actively engaged in oversight of the conditions of immigration detention in my district since becoming a member of Congress, including numerous in-person oversight visits to immigration detention facilities. That includes DHS facilities operated for and by U.S. Customs and Border Protection and ICE, as well as Department of Health and Human Services Office of Refugee Resettlement facilities. Additionally, as a member of Congress serving on two House committees with jurisdiction over immigration and border matters, I have been actively engaged in oversight of DHS and ICE.

5.      On June 17, 2025, at my direction, my staff emailed ICE personnel to inform them that two staff members and I planned to visit the ICE Enhanced Hardened Facility the next day, June 18, to conduct oversight. As my staff relayed to ICE personnel, local attorneys had contacted our office to inform us that there had been an increase in clients being held at EHF. Because the facility was not listed online, attorneys were having trouble contacting their clients. Additionally, I was interested in learning whether the facility was being used to detain individuals with final deportation orders, or whether individuals had been transferred to the EHF from other ICE facilities, which is not what my staff was told the facility was to be used for on their May 15 visit to the EHF.[1] During this visit I was able to visit with two female detainees, and I was informed by ICE staff that about half of the more than 900 detainees on site that day had final deportation orders and the other half would be transferred to other ICE facilities.

---

[1] https://elpasomatters.org/2025/06/15/ice-moves-detainees-to-el-paso-after-escape-at-new-jersey-delaney-hall/

2

6. Throughout my tenure, as part of my oversight duties and as a member representing a border district, I have led multiple congressional delegations to El Paso, including to the El Paso EHF in February 2024 and to the Border Patrol Central Processing Center in February 2023. In the February 2023 visit, members were able to speak with LGBTQ migrants in custody. Additionally, in August 2023, Representative Allred and I visited the Paso del Norte Port of Entry, a small holding facility used by Border Patrol near the Port of Entry, and then we visited the border wall.

7. Additionally, between 2021 and 2022, I conducted multiple oversight visits to the Emergency Intake Site (EIS) on Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the first Trump administration's family separation policy. To provide consistent oversight of this facility, I personally visited the EIS five times, and my staff visited eight times. I observed significant improvements in processes at the EIS over the course of my visits as a result of my oversight from April 2021 to August 2021.

8. In 2019, after hearing reports of a hunger strike and forced intubation of detainees at the El Paso SPC for more than three months, I made an unannounced oversight visit to the facility to meet with those detainees. ICE denied my request for entry during that visit and successive days. Eventually, I was able to visit the facility and meet with all of these detainees. Before and after I gained entry for that visit, I sent letters to ICE raising concerns about the treatment of those detainees.

9. My staff have also consistently visited ICE and Customs and Border Protection (CBP) facilities throughout my tenure in Congress to aid my oversight of DHS, including most recently to EHF on May 15, 2025, and the El Paso SPC on March 18, 2025.

**Defendants' Unlawful Obstruction of July 9, 2025, Oversight Visit**

10. On July 8, 2025, my staff notified ICE via email that I would be conducting an oversight visit of the El Paso SPC the next day, July 9, accompanied by one staff member. That

3

facility had recently been plagued by accusations of mistreatment and inhumane conditions, including a recent Amnesty International report detailing nearly thirty pages of alleged human rights violations at that facility.[2] This included reports of physical abuse by guards, use of solitary confinement, unsanitary and overcrowded living spaces including dysfunctional toilets, inadequate medical care, expired or poor quality food, and lack of access legal services. Family members and legal representatives of detainees at SPC had also raised concerns with my office about detainees' access to telephones and their responsiveness. It was important that I visit the facility in person to see the conditions myself; to inquire about the concerns raised in the Amnesty Internal report and about detainees' access to their legal representatives and communication with family; and to speak to detainees directly about their experiences.

11. In response, ICE stated that it could not accommodate my July 9 visit because ICE is "now requiring requests to be made seven (7) calendar days in advance." I explained that I had the right to visit the facility for oversight without notice under the oversight rider at section 527 of the Fiscal Year 2024 DHS appropriations bill, and I presented a printed copy of the rider. I told them that I looked forward to visiting the facility the next day and being able to speak with ICE officials and detainees in person.

12. On July 9, two of my staff members and I traveled to the El Paso SPC to conduct the oversight visit. We identified ourselves and informed ICE personnel that we were there to conduct an oversight visit of the facility. Two personnel apologetically explained that they would let us in but could not because ICE headquarters had told them that I must provide seven days' notice. I presented a printed copy of the oversight rider, and I explained that I had the right to visit the facility for oversight without providing notice under that rider and that this denial violated that right.

---

[2] https://www.amnestyusa.org/wp-content/uploads/2025/05/Dehumanized-by-Design-Human-Rights-Violations-in-El-Paso.pdf

13. Because ICE denied my entry into the El Paso SPC, I was forced to leave without being able to conduct any oversight of the facility or assess the conditions alleged at this facility in the Amnesty International report. In six years, since the passage of the oversight rider, I had never been denied entry to a DHS facility.

14. Because I had been denied entry into the facility, and oversight of this facility is imperative to my job as a member of Congress with this facility in my district, my staff emailed ICE on July 11 to provide seven days' notice that staff members and I intended to visit the El Paso SPC on July 18. My staff requested that I be allowed to speak to individuals in custody, including men and women who had been held in custody the longest. My staff noted, however, that I might not be able to make the July 18 visit because there was a chance that Congress would extend votes late on July 17, and I might not have enough time to travel back to El Paso from Washington, D.C.

15. On July 14, ICE confirmed the visit and advised of facility visitation protocols in effect, including the seven day policy. My staff confirmed on July 17 that I would be still attending the visit, but informed ICE that House votes had been extended on July 17 and that I had a flight on the morning of July 18. My staff asked whom I should contact if there were delays in my arrival at the facility.

16. House voting extended late into the evening of July 17 and into the early morning hours of July 18. After a week of several late-night votes in the House, I was not able to make my early-morning flight from D.C. to El Paso in order to visit the facility on July 18.

17. Although three of my staff members were able to visit the facility and speak with detainees, because ICE denied my entry when I attempted an in-person visit on July 9 and required seven-days' notice prior to my next visit to the facility, I was not able to conduct an oversight visit of this facility or speak with ICE personnel and detainees myself.

18. My schedule and the timing of House votes can often be unpredictable, posing issues with DHS's unlawful requirement that I provide seven days' notice, as my several attempts to visit the El Paso SPC demonstrate.

19. Given the importance of in-person oversight, however, my staff and I persisted in conducting oversight in compliance with Defendants' unlawful policy. That oversight revealed that Defendants have used the notice as an opportunity to alter conditions of detention in advance of a visit, also in violation of the oversight rider. During an oversight visit in November 2025, for example, I spoke with a group of women detainees. Every woman we interacted with shared that ICE had been cleaning up the facility in the days leading up to the oversight visit. They shared that, in light of the unusual cleaning, they anticipated the visit.

**Developments Following This Court's December 17 Order**

20. After the Court issued an order on December 17, 2025, staying Defendants' seven-day-notice policy, I was again able to conduct oversight at immigration detention facilities without issue.

21. On December 19, I conducted an oversight visit with a member of my staff, without prior notice at Camp East Montana. We were able to enter the facility and conduct oversight without incident. During that visit, I spoke with a group of women in one detention pod, who expressed concerns with the food quality and quantity, lack of consistent cleaning, deportation delays even after individuals signed a voluntary departure form, and a general lack of information on their own cases.

22. I also spoke with an ICE staff member in the medical unit at the facility. I had heard concerning reports regarding a high number of 911 calls coming from the facility, many related to suicide attempts. I expressed concern to the ICE staff member regarding recent reports of suicide attempts. The staff member initially denied that this was a concern. When pressed, he conceded that

6

calls to emergency medical services had been made in response to additional attempted suicides in the facility but asserted that this was usually an attempt to "get attention." I then spoke with the behavioral health professional within the medical unit, who answered my questions and informed me that the facility has sent some detainees to behavioral health hospitals when they exhibited more than suicidal ideation. They were unable to provide the number of individuals who had been sent to behavioral hospitals.

23. On Monday, January 12, 2026, my office emailed ICE Office of Congressional Relations (OCR) requesting to conduct an oversight visit by two members of my staff and me on the afternoon of Friday, January 16. We did not receive a reply until Thursday, January 15. OCR did not respond to our specific request but instead informed us that, on January 8, Secretary Noem had "issued a directive mandating that any request for a Congressional visit to ICE detention facilities must be made seven (7) days in advance." OCR did not offer any alternative dates for an oversight visit.

24. Recent public reporting and reports from my constituents regarding conditions in DHS detention facilities and concerning incidents underscore the importance of my ability to engage in in-person oversight, to observe the conditions in these facilities and speak to the individuals there in person. Three deaths have been reported at Camp Montana. The death of a detainee at Camp Montana on January 3 was determined by the El Paso County Medical Examiner to be a homicide. ICE reported another detainee death at the facility on January 14 as a suicide.[3]

25. Congressional oversight remains critical to holding the agency accountable and crafting legislative policy going forward.

---

[3] ICE reports death of illegal alien in custody in El Paso, ICE (Jan. 18, 2026), https://www.ice.gov/news/releases/ice-reports-death-illegal-alien-custody-el-paso.

7

**The Importance of Facility Visits to My Oversight and Legislative Work**

26.     I have historically had an extremely effective and respectful working relationship with local DHS and ICE personnel who work on the ground in El Paso. This working relationship is critical given the number of DHS facilities within my border district and the importance of immigration-related issues to my constituents. Over the years, in-person visits by my staff and I have been critical to building and maintaining these relationships, and these visits have informed my oversight and legislative work. Often my staff and I are able to discover issues that need to be addressed before they become larger problems. We have built a productive relationship with the field directors and other ICE personnel, with whom we can effectively communicate the issues that come to our attention during our visits. Additionally, because of our working relationship with DHS local leadership, when there have been surges in border crossings, our office has been able to closely coordinate with ICE and to connect DHS leadership with local nonprofits, border patrol, and city and county law enforcement. For example, in February 2025, I hosted a meeting with all local DHS leadership and the city mayor, local school board leaders, and other city officials to discuss certain changes under the current administration and how local DHS agencies would implement new directives.

27.     Many of my visits have been scheduled at least one day in advance to allow one of my staff members to join me, but some of my visits were made without advance notice. Both announced and unannounced visits are critical to my oversight work as a Congresswoman.

28.     For example, in 2019, I learned of disturbing reports that individuals being held in ICE custody in El Paso were being force-fed, and it was imperative that I find out what was happening on the ground at a facility in my district through an unannounced visit. Although I was initially denied entry to the facility, when I was finally able to meet with the individuals who were being force-fed, I learned of horrific situations in which these individuals were being tied down and,

8

without their consent, had feeding tubes painfully forced through their nostrils and into their stomachs. My staff and I further investigated and learned that a single doctor had the ability to make the decision that an individual should be intubated and force-fed, with no formalized process for making that determination. As a result of the visit and subsequent investigation, I worked with ICE to institute a consultation process, in which more than one doctor would have to be involved to make a decision. As a result of this oversight visit, future conditions for detainees were improved. Visits like this one are also critical to ensuring that ICE is treating people in U.S. custody with humanity, and that the U.S. holds itself to the highest possible standard when we have individuals in our custody, including following applicable federal law.

29.     As another example of a practical and positive outcome for the agencies and the public fisc, in 2019, I learned during oversight visits that Border Patrol had very expensive and inefficient processes at its facilities. At the time, the Border Patrol was deploying highly trained and highly paid law enforcement officers to do only data entry at their facilities. I worked with Acting DHS Secretary Kevin McAleenan under the previous Trump administration to add a position for a special civilian employee to do this data entry at facilities. After making this change, nearly every Border Patrol Sector Chief I've spoken to on subsequent visits has praised the implementation of this position because it frees up their agents to focus on their jobs. It is also far less expensive and creates a civilian pipeline for future Border Patrol agents.

30.     Another oversight visit in 2019 helped to sound the alarm on severe overcrowding at ICE facilities during the first Trump administration. At that time, the number of individuals being detained exceeded the capabilities of ICE facilities already at maximum capacity. As a result, Border Patrol put up chain-link fences at the back of their facilities, forcing women and children to sleep on rocks in over 100-degree temperatures, without beds, toothbrushes, or other basic items. Although we tried to work with Border Patrol to create guardrails and urge alternatives to detention, our

9

concerns were not addressed. When that didn't succeed, my only avenue was to amplify the horrific conditions to inform the public about what was going on at ICE facilities in my district.

31.     I inform other members of Congress, my constituents, and the public when information gained from our visits is cause for concern—and therefore a potential basis for legislation or further oversight. I also inform them of positive and productive information obtained through oversight and when I've observed that things are going well. For example, after my June 18 visit, I had several press interviews in which I communicated what I had learned from the women detained in the El Paso EHF. They shared that the conditions and treatment in El Paso were far better than what they received in other facilities in other parts of the country where they were mistreated.

32.     Notwithstanding my continued concerns about the conditions at the El Paso facilities, my consistent oversight of these facilities has had a positive and noticeable impact on the ground. This is in part because our regular presence and generally positive relationship with DHS officials at the facilities ensure that they are paying attention to the critical needs of the detainees, and problems are often solved before they become significant or systemic. For example, as the result of my consistent and continued oversight visits to the EIS between 2021 and 2022, that facility significantly improved because of concerns that I raised during my visits. This included severe issues under the Biden administration at the EIS with respect to the intake of minors, and on oversight visits, I learned that minors were not being allowed to step foot outside the tents in which they were kept, they did not have access to social workers, and other issues that we were able to raise with Border Patrol and CBP, as well as the Department and Health and Human Services, that were ultimately resolved.

33.     Our in-person visits to El Paso facilities also allow us to respond to and follow up on constituent casework. Immigration, including immigration detention, is a huge issue of concern

within my border district. We use oversight visits as an opportunity to investigate constituent complaints we receive with regard to access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes we uncover issues, and sometimes we determine that the situation is okay and are able to assuage my constituents' concerns. We can get the needed information through our observations, conversations with detainees, and conversations with ICE employees on the ground. Additionally, we get a significant amount of constituent outreach about constituents or family members that are being held in ICE facilities, but about which they have no information. Recently, a young man was detained at the El Paso airport and his American family had no idea where he was located. My office was able to work with ICE to locate him and provide this information to his family.

34. My positive working relationship with ICE officials in El Paso has also allowed me to get information about constituents and other individuals being held at El Paso facilities. For example, one of my colleagues representing New Mexico had a constituent being held in the El Paso SPC but had been unable to learn any information from ICE about this individual. My staff was able to engage with local ICE officials, to visit and meet with the individual in person, and to share updates about this individual.

35. The oversight visits that my staff and I have regularly conducted have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also to legislative activities. For example, as a result of my denial of entry into the ICE facility in 2019 to visit with the detainees being force-fed, I successfully worked with the chairwoman of the Subcommittee on Homeland Security of the House Appropriations Committee to include in the appropriations bill the provision that ensured that members of Congress had the authority conduct oversight visits of DHS facilities without providing advance notice. That oversight rider, now

section 527, has been included in every appropriations bill since 2019 and is the basis on which we bring this lawsuit.

36.     Additionally, throughout my tenure in Congress I have introduced legislation and added amendments to bills and DHS appropriations related to immigration detention and ICE accountability that have been informed by my oversight visits. This includes the Homeland Security Improvement Act, which I have introduced every term I have served in Congress. The bill implements transparency and accountability measures for DHS, including ICE. I introduced the Dignity Act of 2025, which includes transparency provisions for ICE, including requiring the agency to update its Online Detainee Locator every 24 hours; to notify a detainee's family or relatives of their apprehension and the location of the facility where they are being detained; to notify a detainee's family or relatives if the detainee will be moved to a different facility and the name and location of that facility; and to allow detainees to call their family or relatives once their transfer is complete. The bill also codifies a series of protected locations where ICE is prohibited from conducting civil immigration enforcement action, including courthouses. I included language in the Dignity Act that would prohibit DHS from barring Members and their staff entry to detention facilities run by or for DHS for the purposes of conducting oversight.

37.     Recently, I offered an amendment to the House Appropriations FY26 Homeland Security appropriations bill to prohibit ICE from using appropriated funds to detain and deport U.S. citizens as part of civil immigration enforcement actions; the amendment was adopted by unanimous voice vote during markup, although it was not ultimately included in the version of the bill that the House passed. I also offered an amendment to the House Appropriations FY26 Homeland Security appropriations bill to require ICE agents conducting civil immigration enforcement actions to wear badges and display identifiable information.

38. My oversight visits at the El Paso facilities have also prompted further oversight efforts through hearings, letters, and requests for information. For example, I learned that ICE has forms that allow immigrant parents in custody with a U.S. citizen child to designate a caretaker for their child while the parent is being detained in custody. As a result of one of my oversight visits, however, I discovered that ICE was not often using them. When DHS Secretary Noem testified before the Appropriations Committee, I specifically asked questions about the use of these forms and the opportunity for parents in custody to designate caretakers for their children. I have also regularly sent letters to DHS and ICE leadership under both the Biden and Trump administrations raising concerns based on my visits and seeking specific information.[4]

39. More recently, I sent three letters to DHS raising serious concerns with dangerous and inhumane conditions at the Camp Montana facility based on visits that my office conducted and reports that I was receiving from constituents.[5] These included reports that a detainee did not receive adequate medical care for a known medical condition who then died of organ failure while in detention. My letters also include persistent reports that detention conditions have become increasingly dirty and unhygienic, and detainees do not have access to their medications and have been given rotten food and water that has made them sick.

---

[4] *See, e.g.*, Letter to DHS on Migrant Deportation Operations Using Military Assets and Personnel (February 2025); Letter to CBP, DHS, and ICE regarding reproductive healthcare access in immigrant communities in Texas (April 2023); Letter to DHS Regarding Phone Access for Detainees in El Paso, TX (March 2021); Letter to President Biden on ICE Deportations Despite 100-Day Moratorium (February 2021).

[5] Letter to DHS Secretary Noem and Acting ICE Director Lyons (Sept. 26, 2025), https://escobar.house.gov/uploadedfiles/9.26.25_letter_to_ice_on_urgent_concerns_regarding_camp_east_montana.pdf; Letter to DHS Secretary Noem and Acting ICE Director Lyons (Nov. 7, 2025), https://escobar.house.gov/uploadedfiles/10.27.25follow_up_letter_to_dhs_on_camp_east_montana.pdf; Letter to DHS Secretary Noem and Acting ICE Director Lyons (Dec. 18, 2025), https://escobar.house.gov/uploadedfiles/letter_to_dhs_on_additional_issues_at_cem.pdf

**The Significant, Irreparable Harm from Defendants' Unlawful Obstruction**

40. Federal law requires DHS to allow any member of Congress to visit any DHS detention facility for the purpose of conducting oversight without providing advance notice. It is critical for me to understand how appropriated funds are being used in real time on the ground in immigration detention. This close oversight informs each of us on how to best serve our constituents. This is especially important for me as a member of Congress with three ICE facilities and four additional DHS facilities located in my district.

41. DHS's new policy has created severe friction between my office and our local ICE officials and undermined a largely respectful and effective working relationship that we established and have maintained during the first Trump administration, the Biden Administration, and the first part of second Trump administration.

42. My constituents frequently contact my office with immigration-related issues and concerns, many of which involve the El Paso facilities. When we receive reports that, for example, detained individuals haven't been fed sufficient meals, or that individuals haven't been able to shower in several days, it is important that we are able to go there in person, in a timely fashion, to ensure public safety and investigate the circumstances—rather than submitting inquiries to and waiting on a response from administration officials and simply taking their word for it in all instances.

43. That oversight needs to happen in real time. Emergencies don't happen with seven days' notice. Nor do the realities on the ground often allow for seven days' delay. If individuals lack food, showers, and basic medical care, those are situations that need to be rectified immediately to ensure that individuals in custody in facilities in my district are being treated humanely and consistent with federal law.

44. Additionally, requiring seven days' notice can present a significant and sometimes insurmountable scheduling barrier to conducting an oversight visit. As my attempts to visit the facility between July 9 and 18 demonstrate, my work as member of Congress—including unpredictable votes, scheduling, and travel between D.C. and my district—may make it impossible to schedule and attend an oversight visit with more than a couple of days' notice, if that. Moreover, my office's email exchange with OCR from January 12 to 15 demonstrates that, in practice, if a request is not promptly approved, an oversight visit might not be able to occur for much longer than seven days. OCR did not respond to our email request for three days and did not offer any alternative dates. Under the DHS notice policy, any subsequent request would restart the seven-day minimum, meaning that after OCR responded the earliest date we could have requested to visit was January 22.

45. I intend to continue engaging in on-the-ground, real-time oversight of the El Paso facilities, because timely and accurate information is critical for me to conduct oversight, craft legislation, and otherwise serve my constituents.

46. Defendants' refusal to permit me to conduct tours at the detention facility without seven days' notice thus significantly hinders my ability to perform my duties as a member of Congress.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 26th day of January 2026.

_____
VERONICA ESCOBAR