**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JOE NEGUSE, in his official capacity as a
Member of the U.S. House of
Representatives, *et al.*,

    *Plaintiffs*

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

    *Defendants*

No. 25-cv-2463-JMC

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A TEMPORARY RESTRAINING ORDER OR STAY**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 2

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 7

    I.    Plaintiffs Are Unlikely To Succeed On the Merits Of Their Claims .................. 7

        A. Plaintiffs Cannot Establish Standing ........................................................... 7

        B. Plaintiffs Lack a Cause of Action ................................................................ 9

        C. The January 8 Memorandum is Not Contrary to Law ................................ 11

        D. The January 8 Memorandum Is Not Arbitrary or Capricious. .................. 20

    II.    Plaintiffs Will Not Suffer Irreparable Harm ................................................... 24

    III.   The Public Interest and Balance of the Equities Weigh Against Issuing Injunctive
       Relief ............................................................................................................... 25

    IV.   Any Relief Should be Limited To Parties With Standing and Should be Stayed Pending
       Appeal. ............................................................................................................ 26

    V.    Plaintiffs Should be Ordered to Post Security in Connection with Any Injunctive
       Relief…. ........................................................................................................... 28

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*AD HOC Telecom. Users Comm. v. FCC,*
572 F.3d 903 (D.C. Cir. 2009) ............................................................................. 22

*Am. Fed'n of Gov't Employees, AFL-CIO v. Reagan,*
870 F.2d 723 (D.C. Cir. 1989) ....................................................................... 24, 25

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018) ............................................................................... 6

*Blumenthal v. Trump,*
949 F.3d 14 (D.C. Cir. 2020) ................................................................................. 8

*Cal. Indep. Sys. Operator Corp. v. FERC,*
372 F.3d 395 (D.C. Cir. 2004) ............................................................................. 13

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................................................. 27

*Campbell v. Clinton,*
203 F.3d 19 (D.C. Cir. 2000) ................................................................................. 8

*Chenoweth v. Clinton,*
181 F.3d 112 (D.C. Cir. 1999) ............................................................................... 8

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................................. 14

*Deaf Smith Cnty. Grain Processors, Inc. v. Glickman,*
162 F.3d 1206 (D.C. Cir. 1998) ........................................................................... 23

*Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.,*
514 U.S. 122 (1995) ............................................................................................... 9

*Dist. of Columbia v. U.S. Dep't of Agric.,*
444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 6, 7

*DSE, Inc. v. United States,*
169 F.3d 21 (D.C. Cir. 1999) ............................................................................... 28

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ....................................................................................... 20, 22

*Fletcher v. Peck*,
10 U.S. (6 Cranch) 87 (1810)................................................................................................. 13

*Glob. Health Council*,
2025 WL 2480618 ................................................................................................................. 10

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002)................................................................................................................. 9

*Green Country Mobilephone, Inc. v. FCC*,
765 F.2d 235 (D.C. Cir. 1985)............................................................................................... 21

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977).......................................................................................... 8, 16

*Hulli v. Mayorkas*,
549 F. Supp. 3d 95 (D.D.C. 2021) ........................................................................................... 6

*INS v. Chadha*,
462 U.S. 919 (1983)......................................................................................................... 14, 16

*Jifry v. F.A.A.*,
370 F.3d 1174 (D.C. Cir. 2004) ............................................................................................. 21

*Luis v. United States*,
578 U.S. 5 (2016)................................................................................................................... 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).................................................................................................................. 7

*Make The Road New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ................................................................................................. 9

*McGrain v. Daugherty*,
273 U.S. 135 (1927)............................................................................................................... 24

*Medina v. Planned Parenthood S. Atl.*,
145 S. Ct. 2219 (2025)............................................................................................................. 9

*Michigan v. EPA*,
576 U.S. 743 (2015)............................................................................................................... 22

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981).......................................................................................................... *passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................................... 20, 21, 22

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........................................................................ 10

*Nat'l Treasury Emp. Union v. Campbell*,
654 F.2d 784 (D.C. Cir. 1981) .......................................................................... 9

*Nat'l Treasury Employees Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ........................... 28

*New England Tank Industries of New Hampshire v. United States*,
861 F.2d 685 (Fed. Cir. 1988) ........................................................................ 19

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................... 25, 27, 28

*Noble v. Nat'l Ass'n of Letter Carriers*,
103 F.4th 45 (2024) ........................................................................................ 13

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......................................................................................... 24

*Petal Gas Storage, L.L.C. v. FERC*,
496 F.3d 695 (D.C. Cir. 2007) ........................................................................ 23

*Raines v. Byrd*,
521 U.S. 811 (1997) ...................................................................................... 7, 8

*Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............................................................................................. 5

*Reichelderfer v. Quinn*,
287 U.S. 315 (1932) ....................................................................................... 13

*Smith v. Bayer Corp.*,
564 U.S. 299 (2011) ....................................................................................... 27

*State v. Musk*,
769 F. Supp. 3d 1 (D.D.C. 2025) ...................................................................... 6

*Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*,
762 F. Supp. 2d 8 (D.D.C. 2011) ...................................................................... 6

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) ................................................................................... 27

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ............................................................................. 6

*Watkins v. United States,*
354 U.S. 178 (1957) ........................................................................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, 22 (2008) ................................................................................... 24, 26

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......................................................................... 25

**Statutes**

5 U.S.C. § 704 ................................................................................................... 10

5 U.S.C. § 705 ............................................................................................ *passim*

5 U.S.C. § 706 ................................................................................................... 24

5 U.S.C. § 706 ................................................................................................... 11

31 U.S.C. § 1301 ............................................................................................... 10

31 U.S.C. § 1501 ............................................................................................... 17

Anti-Deficiency Act,
Pub. L. No. 97-258, 96 Stat. 877 (1982) .......................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) .......................... *passim*

One Big Beautiful Bill Act,
139 Stat. 72, Pub. L. No. 119-21 (July 4, 2025) ............................... *passim*

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................ 28

**Other Authorities**

*Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*,
25 O.L.C. 33 (2001) ......................................................................................... 10

*Department of the Treasury Office of Inspector General—Availability of Appropriations for Pandemic Emergency Rental Assistance Program Oversight and Recoupment*,
B-336626, at 7 (Jan. 15, 2026) ....................................................................... 14

*Funding an Agency's Functions from Its Working Capital Fund*,
6 O.L.C. 384, 386 (1982) ........................................................................... 14, 15

Government Accountability Office's Redbook (4th ed. 2016)..............................................*passim*

*Matter of SEC*,
2011 U.S. Comp. Gen. LEXIS 189 (Dec. 5, 2011) .................................................... 20

*Matter of: United States Consumer Prod. Safety Comm'n*
2023 U.S. Comp. Gen. LEXIS 33  (Feb. 8, 2023) ................................................ 16, 20

*The President's Power of the Purse*,
1989 Duke L.J. 1162 ............................................................................................ 10

## INTRODUCTION

On December 17, 2025, this Court issued an order staying two Department of Homeland Security ("DHS") policies imposing notice requirements on certain congressional visits to U.S. Immigration and Customs Enforcement ("ICE") facilities. ECF No. 37 (Stay Order). The Court stayed those policies, concluding that restricted funds were improperly used to enforce them. The Court's reasoning held open the possibility that Defendants could adopt a similar policy using non-restricted funds. On January 8, 2026, Secretary Noem issued a new policy requiring agency personnel to impose a notice requirement using only non-restricted funds from the One Big Beautiful Bill Act, Pub. L. 119-21, 139 Stat. 72 (2025) ("OBBBA"). ECF No. 39-1 ("January 8 Memorandum"). This Memorandum took seriously the Court's reasoning and was drafted, promulgated, and implemented to be consistent with the Court's opinion.

Plaintiffs now seek a temporary restraining order enjoining the January 8 Memorandum. The Court should deny this motion because Plaintiffs are unlikely to succeed on the merits. As before, individual legislators lack standing to enforce appropriations riders, and plaintiffs' claims are otherwise precluded for a variety of reasons set out in defendants' opposition to plaintiffs' initial motion for injunctive relief. But even assuming that this Court may reach the merits, Defendants' actions comply with applicable Federal statutes and appropriations law. The January 8 Memorandum explicitly directs agency officials to use only non-restricted funds for policy implementation. Defendants have also placed into the record a declaration from DHS's Senior Official Performing the Duties of the Chief Financial Officer confirming this understanding and explaining with particularity how officials will ensure that accounting books accurately reflect this OBBBA sourcing. Plaintiffs' entirely speculative objections to that approach are without merit, are based on mistaken notions of accounting rules, and entirely fail to meet plaintiffs' burden of showing that they are likely to succeed on the merits. Moreover, Plaintiffs err in their contention

that DHS cannot rely on OBBBA funds due to alleged limitations on that appropriation that do not apply.

In addition to failing to establish a likelihood of success on the merits, Plaintiffs have failed to establish irreparable harm because speculative allegations regarding the future threat that they may be unable to access ICE facilities are insufficient to carry their burden at this stage. And the balance of the equities and public interest also counsel against granting the requested emergency relief.

Finally, if this Court should grant preliminary relief, Defendants respectfully request that the Court limit any relief to those Plaintiffs who have demonstrated standing under the new January 8 Memorandum. And for all the reasons that preliminary relief is inappropriate, defendants further request that this Court stay pending appeal any order staying the Memorandum or otherwise restricting Defendants from enforcing the Memorandum.

## **<u>BACKGROUND</u>**

In July 2025, ICE issued a policy titled "Facility Visit and Engagement Protocol for Members of Congress and Staff" and posted a policy requiring congressional visits to DHS detention facilities to "be made a minimum of seven (7) calendar days in advance." The purpose of the 7 day notice requirement was to ensure adequate security for visiting Members of Congress, DHS staff and detainees. *See* Hackbarth Decl., ECF No. 20-1. Plaintiffs sued to preliminarily stay this policy under 5 U.S.C. § 705 pending judicial review. ECF No. 17. On December 17, 2025, this Court granted Plaintiffs' motion for a stay and ordered "that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the challenged Oversight Visit Policies, as identified in the accompanying memorandum opinion, are immediately postponed and stayed." ECF No. 37 at 1.

The Court's accompanying Memorandum Opinion explained its reasoning.  ECF No. 36. The Court began with "Section 527" or the appropriation rider attached to the FY 2024 Appropriations Act providing that "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent," among others, "[a] Member of Congress," from "entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." *Id*. at 7.  The Court contrasted this with "[a]n additional source of DHS funding" provided by the OBBBA and explained that "[t]hese funds are not subject to Section 527's limitations."  *Id*. at 9.

The Court concluded that Plaintiffs were likely to succeed on the merits of their APA claims because DHS's policies in effect at the time violated Section 527.  *Id*. at 57-58.  The Court observed that Defendants received access to additional funding through the OBBBA but emphasized that "[t]here is no present dispute that the Oversight Visit Policies were created and first implemented before the passage of that bill" and that the record showed "Section 527-restricted funds" were being used to implement the challenged policies.  *Id*. at 59.  The Court therefore granted a stay under the APA, 5 U.S.C. § 705, "because the evidence currently before the Court demonstrated that the Policies were promulgated with Section 527 funds, and they continue to be implemented and enforced through the use of Section 527 funds."  *Id*. at 72.  The Court nevertheless held open the possibility that Defendants could implement the same policies with unrestricted funds.  Specifically, the Court explained that, "[u]nless and until Defendants show that no Section 527 funds are being used for these purposes, a stay of the policies is consistent with the scope of Defendants' violation and Plaintiffs' requested relief."  *Id*. at 72.

On January 8, 2026, Secretary Noem issued a memorandum titled "Congressional Access to Alien Detention Facilities—Access Policy and Use of Appropriations for Enforcement."  *See*

ECF No. 39-1 at 1-2 (the "January 8 Memorandum").  The January 8 Memorandum summarized the history of the June 2025 policy.  *Id.* at 1.  It acknowledged this Court's Stay Order and stated that, although the Secretary "disagree[d] with this decision," *id.* at 1, she relied on what "even the district court explicitly acknowledged," namely, that "funds derived from the [OBBBA] 'are not subject to Section 527's limitations.'"  *Id.* (quoting ECF No. 36 at 9).  The January 8 Memorandum explained that "to ensure compliance with this court order," the Secretary was "issuing this new policy." *Id.*

The January 8 Memorandum requires that "[f]acility visit requests must be made a minimum of seven (7) calendar days in advance" and provides a mechanism to submit requests to the agency's Office of Congressional Relations.  *Id.* at 2.  The Memorandum explained that, "[t]he basis for this policy is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike."  *Id.*  That is because "[u]nannounced visits require pulling ICE officers away from their normal duties."  *Id.*  The Memorandum is also a response to "an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions."  *Id.*

The Memorandum further directs that "ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA."  *Id.*  To ensure compliance with this directive, the policy further directs that "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding."  *Id.*  The Memorandum further explained the feasibility of this approach, on the grounds that "there is more than sufficient funding available for the limited expenses associated with implementing and enforcing these policies" in light of "the funding made available to ICE

through the OBBBA." *Id.* As a result, "[t]he policy is consistent with and effectuates the clear intent of Congress to not subject OBBBA funding to Section 527's limitations." *Id.* To ensure an appropriate accounting, the policy went further and specifically directed "the Chief Financial Officer, in consultation with the General Counsel," to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." *Id.*

Plaintiffs initially attempted to challenge this policy by filing a motion for an order to show cause, alleging that the new policy violated the Court's prior stay. ECF No. 40. The Court denied the motion, explaining that "Plaintiffs use the wrong procedural vehicle to challenge the January 8, 2026 memorandum and policy . . . which is a new agency action not subject to the Court's prior stay order." ECF No. 46 at 2. The order further explained that, "[w]hile the Court did not have the occasion to address whether the June 2025 notice policy would be permissible if promulgated and implemented using *only* OBBBA funds—given that Defendants had conceded that, prior to the Court's order, Section 527 funds were in fact being used to implement the notice requirement, ECF No. 34 at 1-2—the Court's order did not foreclose Defendants from 'deal[ing] with the problem afresh' by taking *new* agency action' that was consistent with the legal principles as articulated in the Court's opinion." ECF No. 46 at 2-3 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21 (2020) (emphasis in original)). The Court's order recognized that "Defendants' new policy differs facially from the one announced in June 2025," because it "instructs DHS officials to implement and enforce the notice requirement solely with OBBBA funds." ECF No. 46 at 3. But the Order clarified that Plaintiffs' motion was denied "only because it is not the proper avenue to challenge Defendants' January 8, 2026 memorandum … rather than based on any kind of finding that the policy is lawful." ECF No. 46 at 4.

Consistent with the Court's order, Plaintiffs sought leave to amend their complaint, ECF No. 48, and filed a motion for a temporary restraining order, ECF No. 49. The Court granted their motion to file an amended and supplemental complaint. Minute Order (Jan. 26, 2026). The next day, the Court entered a briefing schedule on the pending motion for a temporary restraining order. Minute Order (Jan. 27, 2026).

## LEGAL STANDARD

"A temporary restraining order is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, 769 F. Supp. 3d 1, 4 (D.D.C. 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)). "[T]he same substantive standard generally applies to both temporary restraining orders and preliminary injunctions." *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011). To warrant relief, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.* The same factors govern the availability of relief under the APA, 5 U.S.C. § 705. *See Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (collecting authorities).

## ARGUMENT

**I.    Plaintiffs Are Unlikely To Succeed On the Merits Of Their Claims.**

Plaintiffs are unlikely to succeed on the merits of their claims because they lack standing and a cause of action.  Additionally, the January 8 Memorandum is not contrary to law or in excess of statutory authority and is not arbitrary or capricious.  In response to Plaintiffs' pending motion, Defendants reassert and reincorporate all arguments made in opposition to Plaintiffs' first Motion for Stay or Preliminary Injunction, *see* ECF No. 20, and only address below the issues unique to the January 8 Memorandum.

### A.  Plaintiffs Cannot Establish Standing.

Plaintiffs ask that the Court temporarily restrain Defendants from enforcing the January 8 Memorandum, which they claim precludes them from discharging their official responsibilities of "engag[ing] in timely, in-person oversight at ICE detention facilities." ECF No. 49 at 44.  Plaintiffs also request a stay of the January 8 Memorandum to guarantee "members of Congress access to ICE detention facilities for oversight purposes without providing advance notice." *Id*.  Again, Plaintiffs do not seek to vindicate any individual rights but instead purport to secure general Congressional oversight over ICE facilities.  Plaintiffs do not allege that they have suffered individualized harm in their personal capacity, but only as Members of Congress attempting to engage in legislative oversight and resulting in, at most, a diminution of legislative power.  The imposition of certain prerequisites prior to an ICE facility visit does not affect each plaintiff "in a personal and individual way," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). Plaintiffs lack standing because they argue that they have suffered harm only in their capacity as Members of Congress attempting to exercise a political benefit that attaches to the seats those Members hold.  *See Raines v. Byrd*, 521 U.S. 811, 829 (1997).

Plaintiffs' alleged harms are also not sufficiently particularized under Article III because an alleged violation of an appropriations restriction is at most a generalized harm, not a particularized harm to individual Members.  A violation of a statutory prohibition on a particular expenditure of funds harms all taxpayers equally, not any particular Member.  That alone is sufficient to preclude standing because any violation of that funding restriction does not "single[] out" Plaintiffs, whose "claim is based entirely on the loss of political power" held by Congress. *Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020); *see also Raines*, 521 U.S. at 821 (emphasizing "appellees have not been singled out for specially unfavorable treatment as opposed to other Members").  Thus, Plaintiffs' challenge to the January 8 Memorandum is insufficiently particularized to confer standing in a suit brought by individual Members of Congress.  *See Campbell v. Clinton*, 203 F.3d 19, 22-23 (D.C. Cir. 2000); *see also Chenoweth v. Clinton*, 181 F.3d 112, 117 (D.C. Cir. 1999) (Members of Congress lacked standing to argue that an executive order exceeded the president's statutory and constitutional authority); *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (Member of Congress lacked standing to seek injunction prohibiting Central Intelligence Agency from using funding and reporting provisions of founding statute in connection with allegedly illegal activities).

This Court's prior decision finding that Plaintiffs had standing involved a rationale not applicable to their challenge to the January 8 Memorandum.  *See* ECF No. 36 at 22-23 (finding standing based on provisions of Section 527).  This Court previously determined that "Section 527 does entitle Members of Congress to access ICE facilities without being subject to a notice requirement" and that denial of entry upon request constitutes a cognizable injury under Article III.  *Id.*  But Plaintiffs' present challenge to the January 8 Memorandum relies upon the theory that Defendants have violated other legal provisions, including the OBBBA and the APA, none of

which confer upon these Plaintiffs any such particularized cognizable interest. *Cf., e.g.*, ECF No. 49 at 16 (relying upon "the reasons articulated in Plaintiffs' previous briefs and the Court's December 17 opinion" to assert that "Plaintiffs are likely to establish" standing). Unlike their prior claim, which alleged a violation based on allegedly improper use of restricted funds, the only grievance Plaintiffs can allege here is based on a generalized grievance over DHS' accounting practices. But Plaintiffs offer nothing to establish that after Congress passes an appropriations law, its Members have a cognizable interest in DHS' reconciliation of accounts between appropriations. Thus, although the Court previously found that the Plaintiffs had standing to challenge the policies that relied on Section 527-restricted funds, Plaintiffs here lack standing to challenge Defendants' policy that relies on the use of unrestricted OBBBA funds.

### B. Plaintiffs Lack a Cause of Action.

In addition to jurisdiction, Plaintiffs must also identify a cause of action to proceed in this Court. *See, e.g.*, *Make The Road New York v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020) ("While establishing jurisdiction gets" plaintiffs "through the courthouse door, . . . . [t]hey also need a cause of action to prosecute."). Plaintiffs do not (and cannot) contend that Section 527 confers such a cause of action, as that provision does not use "right-creating terms" to create any cause of action "clearly and unambiguously." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2233 n.5 (2025) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)). And the D.C. Circuit has long maintained that appropriation bars do not confer a private right of action. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 789-95 (D.C. Cir. 1981).

Plaintiffs instead assert a cause of action under the APA and the ultra vires doctrine. However, the historical tradition of APA suits does not support Plaintiffs' claims. *See Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 126, 127-28 (1995) (absence of a historical tradition of suits precludes a cause of action

under the APA). Additionally, Plaintiffs cannot proceed under the APA because they fail to challenge a final agency action. *See, e.g.*, 5 U.S.C. § 704; ECF No. 20 at 30-31; *see also, e.g.*, *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

And the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), provides an existing and exclusive remedial scheme for alleged violations of appropriations bars, such as Section 527. That statute enforces the command that "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made," 31 U.S.C. § 1301(d), by forbidding federal agencies from making payments or incurring obligations unless and until Congress provides the necessary appropriation. Thus, "[t]he statutory mechanism by which Congress guards its appropriations power is the Anti-Deficiency Act." *Applicability of the Antideficiency Act to a Violation of a Condition or Internal Cap Within an Appropriation*, 25 O.L.C. 33 (2001), 2001 WL 36175929 at *1 (quoting J. Gregory Sidak, *The President's Power of the Purse*, 1989 Duke L.J. 1162, 1234). However, no provision in the appropriations statute on which Plaintiffs rely or the Anti-Deficiency Act remedial provisions described provide for individual Members of Congress to enforce the appropriations bar Plaintiffs seek to enforce under the APA against Defendants. "As in *Block*," then, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue" to resolve appropriations disputes "but *sub silentio* also provide a backdoor" for any Member of Congress to file suit through the APA to enforce an appropriations bar linked to access to information. *Glob. Health Council*, 2025 WL 2480618, at *10; *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

Finally, for the reasons explained in Defendants' prior briefing, Plaintiffs' ultra vires claim fails. *See* ECF No. 20 at 31-32.

### C. The January 8 Memorandum is Not Contrary to Law.

Under the APA, an agency's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs chiefly allege that the January 8 Memorandum is contrary to law and in excess of statutory authority based on the contention that the Memorandum is subject to Section 527's limitations.

This Court previously explained that its order staying the July 2025 policy was premised on the factual record showing that Section 527-restricted funds were being used to implement those policies, ECF No. 36 at 59, that OBBBA "funds are not subject to Section 527's limitations," ECF No. 36 at 9, and that Defendants remained open to achieving the same policy goals so long as "no Section 527 funds are being used for these purposes," *id*. at 72. The Court explicitly "did not foreclose Defendants from dealing with the problem afresh by taking new agency action that was consistent with the legal principles as articulated in the Court's opinion." ECF No. 46 at 2-3 (quotation omitted and emphasis altered). Accordingly, Defendants crafted a new policy consistent with the Court's decision. The January 8 Memorandum does not violate any appropriations rider or other provision of law because, by its terms, the Memorandum and its implementation rely exclusively on OBBBA funds.

First, Plaintiffs claim that the limitations contained in Section 527 "constitute[] an ongoing substantive restriction on DHS operations." ECF No. 49 at 19. Plaintiffs argue that DHS's "baseline appropriation" contains the subject rider and the subsequent reconciliation package— the OBBBA—does not displace the rider because it only applies to activities "in addition to DHS's baseline funding." *Id*. at 20-22 (alterations adopted). Plaintiffs interpret this provision to mean that through the OBBBA, "Congress appropriated funds only for very specific, enumerated

purposes" and "did not appropriate additional funds for every substantive agency function that might touch on congressional oversight of detention facilities." *Id*. at 21. This interpretation is not supported by Section 527 or the OBBBA's plain text.

The plain text of Section 527 provides that, "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security *by this Act* may be used to prevent any of the following persons from entering … any facility…." 138 Stat. at 619 (emphasis added). By its own terms, that limitation applies only to the funds appropriated in that bill. *See, e.g.*, GAO, B-146820 (June 2, 1967) (reasoning that where "funds … used for formulating and administering the sale of" a product "were not appropriated in" the statute containing the rider at issue, "the proviso in question would not" apply); *see also* Government Accountability Office's Redbook, at 2-88 (4th ed. 2016) ("GAO Redbook") (explaining how Congress sometimes chooses more expansive language applying riders to "this or any other act"). As a threshold matter, the January 8 Memorandum does not implicate Section 527 because the promulgation of policies regarding access to ICE facilities do not amount to preventing access to those facilities. But even if Section 527 applies, it does not forever constrain the ability of Congress to appropriate future funds through different bills without any such limitation. In fact, this is just what Congress did. In July 2025, Congress passed and the President signed the OBBBA, which does not contain any such limitation.

Plaintiffs argue incorrectly that the OBBBA "appropriated funds only for very specific enumerated purposes." ECF No. 49 at 21. To the contrary, the OBBBA appropriated $2,055,000,000 to DHS, "to remain available through September 29, 2029," for purpose including "immigration and enforcement activities," "[f]unding for transportation costs and related costs associated with the departure or removal of aliens," and "the assignment of Department of Homeland Security employees . . . to carry out immigration enforcement activities." 139 Stat.

385-86 at § 100051(1)-(3). "In addition to amounts otherwise available," the OBBBA appropriated $29,850,000,000, "to remain available through September 30, 2029," for ICE activities, including "hiring and training additional [ICE] personnel . . . to carry out immigration enforcement activities"; "transportation costs and related costs associated with alien departure or removal operations"; and "facility upgrades to support enforcement and removal operations." *Id.* § 100052(1), (4), & (6). The OBBBA plainly appropriates funds for DHS's immigration enforcement activities, which include the operation of detention centers—which necessarily includes providing security at such facilities, including who may enter and on what terms.

Second, Plaintiffs argue that even if the OBBBA lacks a similar appropriations rider, the Court should nevertheless interpret the appropriations rider in other statutes to apply to OBBBA funds. ECF No. 49 at 19-23. But this legal proposition would violate longstanding principles of statutory interpretation. To start, the plain text of the appropriations rider at issue expressly limits its application to funds in that "act." *See, e.g.*, *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (2024) ("In addressing a question of statutory interpretation, we begin with the text."); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) (The "first step" in statutory construction is to "begin with a 'plain language' analysis of the statutory text."). Further, one Congress cannot bind a future Congress. *See, e.g.*, *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810). Under Plaintiffs' view, the inclusion of an appropriations rider once would forever bind future appropriations. This lacks any limiting principles. But it also lacks any legal basis. Unsurprisingly, Plaintiffs cite no case law for this proposition, and Defendants are not aware of any.

More pragmatically, Plaintiffs' proposition would undermine the central dynamics of bicameralism and presentment. Under our Constitution, legislators must negotiate with each other

over the text to include in the statute.  The decision to include or exclude specific language is bargained-for consideration.  Just as the Supreme Court struck down the President's line-item veto, *Clinton v. City of New York*, 524 U.S. 417 (1998), and the legislature's unicameral veto provisions, *INS v. Chadha*, 462 U.S. 919 (1983), the Constitution does not permit a minority to effectuate their preferred policy that was rejected by their peers and not contained with the text of the statute that ultimately was passed by Congress and signed by the President.

Third, Plaintiffs invoke a rule they call the "pick and stick" rule.  ECF No. 49-1.  Under this rule, they argue, when an agency has two appropriations that may arguably be available for the same purpose, the agency must elect to use a single appropriation.  Not so.  If Congress "makes an appropriation available in addition to other appropriations available for the same object," then "an agency may elect to use both appropriations for the particular expense."  GAO, *Department of the Treasury Office of Inspector General—Availability of Appropriations for Pandemic Emergency Rental Assistance Program Oversight and Recoupment*, B-336626, at 7 (Jan. 15, 2026); *Funding an Agency's Functions from Its Working Capital Fund*, 6 O.L.C. 384, 386 (1982) (In the lump-sum appropriation context, an agency may choose to pay for an item out of one of two generally available appropriations, and it is not required to use the first appropriation in perpetuity)  And even assuming the validity and applicability of this rule, it fails on its own terms. The January 8 Memorandum expressly provides that Section 527-restricted funds are not available for its implementation; only OBBBA or "unrestricted" funds are.  Thus, the necessary premise of the pick-and-stick rule (*i.e.*, availability of multiple appropriations) is lacking here, as in fact only *one* source of funds is available for the January 8 Memorandum, namely, the OBBBA funds. Pursuant to the terms of the Memorandum itself, the Secretary has directed that only those OBBBA funds be used.  Indeed, the Court has already found that the January 8 Memorandum constitutes

14

"new agency action." ECF No. 46 at 2. Notably, the pick-and-stick rule– to the extent it is viable at all—is a hyper technical provision in appropriations law that is more appropriately considered and applied under by the Comptroller General under the Anti-Deficiency Act. Defendants are not aware of any instance in which an Article III court has applied this rule, and Plaintiffs have cited none. *See* 6 O.L.C. at 386 n.9 (casting doubt on continued viability of pick-and-stick rule).

Fourth, Plaintiffs focus on the possibility that Section 527-restricted funds may have been used in the creation, development, promulgation, and communication of Defendants' new policy. ECF No. 49-1 at 33. As a threshold matter, the plain text of Section 527 does not support Plaintiffs' expansive theory that, for example, using electricity constitutes a prohibited use of Section 527 funds. Section 527 provides that, "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used *to prevent any of the following persons from entering . . . any facility . . . .*" 138 Stat. at 619 (emphasis supplied). The plain text of the statute does not say anything about agency deliberations, communications, or policy formulation. It does not include the terms "creation," "development," "promulgation," or "communication." Rather, it speaks only of "prevent[in]g … persons from entering." Neither the policymaking process preceding the January 8 policy nor the issuance of the January 8 Memorandum prevented anyone from entering any building. In short, Section 527 at the outset does not apply to such policy formulation—only to Defendants' enforcement of such policies as to non-compliant visits.

Even if Section 527 could be read to cover a policymaking process, and even if Defendants used non-OBBBA funds for that process, the OBBBA necessarily implies authority to fashion policies that would otherwise be limited by provisions in other appropriation bills (*i.e.*, Section 527). "[A] text [ ]include[s] not only what is express but also what is implicit." Antonin Scalia &

Bryan Garner, *Reading Law* 96 (2012). "For example, when a text authorized a certain act, it implicitly authorizes whatever is a necessary predicate of that act." *Id.*; *see also id.* 192-93; *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring); 1 J. Kent, Commentaries on American Law 464 (13th ed. 1884) ("[W]henever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied"). The OBBBA was the product of legislative deliberations and negotiations with the Executive. Congress and the President chose to omit the 527 rider from funds appropriated to DHS in the OBBBA. That choice necessarily implies all authority needed for DHS to utilize those funds in ways that Section 527 otherwise may have precluded—including to promulgate the January 8 Memorandum. Were it otherwise, Section 527 would negate and override Congress's later decision to make millions of dollars available to DHS without the rider. *See also, e.g.*, *Matter of: United States Consumer Prod. Safety Comm'n*, 2023 U.S. Comp. Gen. LEXIS 33 *6-7 (Feb. 8, 2023) ("Thus, an appropriation available for a specific purpose may also be available for expenses necessary for the agency to ensure that it carries out that purpose in a manner consistent with all applicable law.").

In any event, even on Plaintiffs' interpretation of Section 527, the record shows that Defendants will account for the promulgation of the January 8 Memorandum solely from OBBBA funds. As the face of the Memorandum itself explains, the CFO and General Counsel are directed to "ensure appropriate funding for the *promulgation* of this policy, including use of OBBBA funding where appropriate." ECF No. 39-1 (emphasis added). And as the CFO Declaration documents, that is what agency officials are doing. *See* ECF No. 42-1.

Moreover, Plaintiffs incorrectly contend that the moment an expenditure is made is the moment when an appropriations "violation" occurs. Indeed, Plaintiffs go so far as to suggest that Defendants may never revise agency accounting ledgers to accurately reflect the flow of Federal

dollars, and that to do so would result in a violation of the Anti-Deficiency Act. But this fundamentally misunderstands Federal appropriations law and the longstanding Executive Branch practice of reconciling accounts. As the CFO Declaration explains:

> The Department will reconcile its accounts to ensure that the tracked costs related to the access policy are charged to and recorded against the appropriate H.R. 1 accounts. To the extent it is necessary for the H.R. 1 appropriations to reimburse annual appropriations so that all of these expenses are properly recorded and accounted for against an H.R. 1 appropriation, the Department will establish interagency agreements to effectuate any transfers that are necessary to reimburse annual appropriations for payroll and other expenses.

> Any transfers that are necessary to ensure payroll and other tracked charges are obligated against appropriate H.R. 1 accounts related to enforcement of the access policy will be processed on a monthly basis. A consolidated report will be compiled by the DHS Budget Director for audit purposes.

> Using this process to reconcile its accounts, the Department will ensure that all charges related to enforcement of the January 8 access policy are properly recorded against H.R. 1 accounts no later than the end of the fiscal year, when the Department's annual appropriations accounts expire.

*Id*. at 3-4.

When a federal agency uses its appropriated funds, it is said to "obligate" them. An obligation of funds occurs when an agency takes an action that creates "a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received." *To the Hon. John Tuber*, B-116795 (Comp. Gen. June 18, 1954), *see also Corporation for Nat'l and Community Service*, B-300480.2 (Comp. Gen. Jun 6, 2003). An agency expends its appropriations by liquidating obligations it has incurred, such as through a contract or for employee salaries, and making payments. Relatedly, agencies are required to account for and track their obligations by recording them in the agency's accounting records. *See* 31 U.S.C. § 1501. Although agencies must record their obligations, it is not the act of recording that creates the obligation – the obligation is created by the legal liability to pay. *See e.g.*, *Obligating Letter Contracts*, B-197274 (Comp. Gen. Sept. 23, 1983) ("reservation and

17

notification" letter held not to constitute an obligation, act of recording notwithstanding, where letter did not impose legal liability on government). Conversely, failing to record an obligation, or recording it incorrectly, does not diminish its validity or affect to which appropriation it is properly chargeable. *See e.g. Kavouras, Inc*., B-226782 (Comp. Gen. Oct. 20, 1987) (letter of intent, executed in fiscal year 1985 and found to constitute a contract, obligated fiscal year 1985 funds, notwithstanding agency's failure to treat it as an obligation).

As a legal matter, when a Federal agency incurs an obligation, it incurs that obligation against whatever appropriations it has that are available for that obligation, regardless of whether it records the obligation against the proper appropriation, an improper appropriation, or fails to record the obligation at all. When an agency has available multiple appropriations, and one of those appropriations may be used for a certain activity and another may not, any use of funds towards the activity in question is treated as flowing from the legally permissible fund and obligating the correct appropriation. To the extent the agency's accounting does not properly record the obligation against the correct appropriation, the agency must correct its accounting records administratively so that its obligations are properly recorded. Incorrect accounting does not affect the validity of a proper obligation when an agency has funds available that can be used for that obligation. Incorrect accounting does require the agency to correct its accounting.

The Comptroller General and GAO have long accepted that agencies can, and must, correct their accounting, and that improper accounting does not make valid obligations otherwise improper. Indeed, the GAO's *Principles of Federal Appropriations Law* ("Red Book"), available at https://www.gao.gov/legal/appropriations-law/red-book, appears to reflect Congressional understanding that reconciliation of accounts is not only available, but a longstanding practice. Thus, for instance, the Red Book provides at length:

18

First, suppose an agency charges an obligation or expenditure to the wrong appropriation account, either charging the wrong appropriation for the same time period, or charging the wrong fiscal year. The above passage from 63 Comp. Gen. 422 provides the answer—if the appropriation that should have been charged in the first place has sufficient available funds to enable the adjustment of accounts, there is no Antideficiency Act violation. *The decision in 73 Comp. Gen. 259 (1994) illustrates this point. In that case, an agency had erroneously charged a furniture order to the wrong appropriation account, but had sufficient funds in the proper account to support an adjustment correcting the error. Thus, GAO concluded, there was no violation of the Antideficiency Act. Id. at 261.* On the other hand, a violation exists if the proper account does not have enough money to permit the adjustment, and this includes cases where sufficient funds existed at the time of the error but have since been obligated or expended. See also 70 Comp. Gen. 592 (1991); B-222048, Feb. 10, 1987; B-95136, Aug. 8, 1979. Other cases illustrating or applying this principle are 57 Comp. Gen. 459 (1978) (grant funds charged to wrong fiscal year); B-224702, Aug. 5, 1987 (contract modifications charged to expired accounts rather than current appropriations); and B-208697, Sept. 28, 1983 (items charged to General Services Administration Working Capital Fund which should have been charged to other operating appropriations). *Actually, the concept of "curing" a violation by making an appropriate adjustment of accounts is not new.* See, e.g., 16 Comp. Dec. 750 (1910); 4 Comp. Dec. 314, 317 (1897). The Armed Services Board of Contract Appeals also has followed this principle. New England Tank Industries of New Hampshire, Inc., ASBCA No. 26474, 88-1 BCA ¶ 20,395 (1987).83 83 Although the Board's decision was vacated and remanded on other grounds by the Court of Appeals for the Federal Circuit, New England Tank Industries of New Hampshire v. United States, 861 F.2d 685 (Fed. Cir. 1988), the court noted its agreement with the Board's Antideficiency Act conclusions. Id. at 692 n.15."

GAO Redbook at 6-80 (emphasis added).

At bottom, then, federal appropriations law provides for an accounting that ensures only the appropriate source of funding is charged. To do so after an initial expenditure does *not* constitute an appropriations violation. To the contrary, the practice of "making an appropriate adjustment of accounts is not new." GAO Red Book at 6-80. Indeed, contrary to Plaintiffs' contention, when funds are "obligated," they are not permanently assigned at that time to any particular appropriation; so long as multiple appropriations are available and contain sufficient funds, an agency may adjust its accounts. *See, e.g., Matter of: United States Consumer Prod.*

*Safety Comm'n*, 2023 U.S. Comp. Gen. LEXIS 33 *8 (Feb. 8, 2023).[1]  So long as sufficient funds exist in the funding sources, and so long as any expenditure made to implement and enforce the January 8 Memorandum is reconciled to OBBBA accounts, that money has been "obligated or expended" from OBBBA funds.

Thus, in focusing on whether Section 527-encumbered funds have been used, Plaintiffs raise the wrong question, with potentially misleading results.  Rather, the dispositive question is whether all money supporting the policy will be assigned to the OBBBA, which the agency has confirmed it will ensure through the reconciliation of accounts.  ECF No. 42-1 at 3-4; *see also* GAO Red Book at 6-80.

**D.  The January 8 Memorandum Is Not Arbitrary or Capricious.**

The scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency.  *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

---

[1] Plaintiffs also argued that the OBBBA funds were more "general" than the annual appropriation, and the specific must control the general.  That GAO principle, while contained in the Redbook, has been rejected when the appropriations statute makes clear that the appropriation is "in addition to amounts ordinarily available" to the agency.  The OBBBA contains that precise language. Pub. L. No. 119-21 at § 100052, 139 Stat. 387; *see also Matter of SEC*, 2011 U.S. Comp. Gen. LEXIS 189 *12 (Dec. 5, 2011).

The January 8 Memorandum plainly meets the deferential APA standard. The Memorandum explains that its objective is to "ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." ECF No. 39-1 at 2. To advance that objective, the Memorandum seeks to ensure that "ICE officers away from their normal duties" are appropriately available to attend to "legitimate oversight activities." *Id*. at 2. To that end, members of Congress must submit visit requests at least seven days in advance along with necessary information required to coordinate the visit, including "the date of the proposed visit, the visit location, the duration of the visit, and the names and titles of all participants." *Id*.

The connection between the January 8 Memorandum's objective and its direction was plain: because there is an "increasing trend" of oversight activities that create a "chaotic environment with heightened emotions," the procedures for scheduling a visit contemplated by the January 8 Memorandum are necessary to ensure that the visit is adequately staffed by ICE officers who would otherwise be performing their official duties and that security measures are adequately implemented to ensure the safety of all parties.

At the same time, the January 8 Memorandum took reasonable steps to achieve its objectives. The policy ensures that ICE facilities are afforded a reasonable opportunity to implement safety measures prior to any visit by requiring a minimal seven-day notice period and only requires information necessary to coordinate the visit. *See* ECF No. 39-1 at 2. This calibrated approach—particularly for the purpose of ensuring human safety—easily satisfies the APA's reasonableness standard and should be afforded adequate deference. *See Jifry v. F.A.A.*, 370 F.3d 1174, 1180 (D.C. Cir. 2004) ("Nor is the court in a position to second-guess the [agency]'s judgment that imposing stricter procedures for coordinating security risks and restricting individuals who pose security threats . . . was necessary . . . ."); *see also Green Country*

21

*Mobilephone, Inc. v. FCC*, 765 F.2d 235, 237 (D.C. Cir. 1985) (courts "will not second-guess a reasoned determination by an agency that the advantages of rigidity outweigh the disadvantages in a given procedural circumstance."); *AD HOC Telecom. Users Comm. v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (arbitrary and capricious review "is particularly deferential in matters . . . which implicate competing policy choices").

In arguing otherwise, Plaintiffs demand additional justifications. *See* ECF No. 49 at 36-41. But DHS need only articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation and citation omitted). And the agency appropriately relies on its experience in exercising its judgment. *See id.* at 52 ("It is not infrequent that the available data does not settle a regulatory issue[,] and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."). Thus, a reviewing court's task is only to determine whether an agency has engaged in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (internal citation and quotation marks omitted); *see Prometheus Radio Project*, 592 U.S. at 423 ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision").

Plaintiffs also argue that Defendants allegedly "relied on factors which Congress has not intended for it consider" and "entirely failed to consider an important aspect of the problem." ECF No. 49-1 at 36 (quoting *State Farm*, 463 U.S. at 43). This argument is coterminous with their contrary to law claim and, as previously explained, the Memorandum states that only OBBBA funds shall be used for its implementation. *See* ECF No. 39-1. Because the OBBBA is not subject to Section 527's limitations or any similar limitations imposed by any subsequent appropriations, the January 8 Memorandum relies only on funds from non-restricted sources in implementing

visitation safeguards. Indeed, ICE has ensured that only OBBBA funds are utilized to implement and enforce the January 8 Memorandum. *See* ECF No. 41-1 at 3-4. Defendants' implementation of the OBBBA's plain text is thus neither arbitrary nor capricious. *See Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) (noting that under the arbitrary -and-capricious standard, the agency was "not required to choose the best solution, only a reasonable one"); *Deaf Smith Cnty. Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1215 (D.C. Cir. 1998) (noting that the arbitrary-and-capricious standard demands a reasonable decision, not the best or most reasonable decision).

Indeed, the Memorandum on its face considered the legal arguments Plaintiffs now raise. For example, the policy acknowledges this Court's opinion dated "December 17, 2025, in *Neguse v. ICE*," *id.* at 1, explained that the new policy was issued "to ensure compliance with this court order," *id.* at 1, and based on the legal analysis provided, was "consistent with and effectuates the clear intent of Congress to not subject OBBBA funding to Section 527's limitations." *Id.* at 2. Plaintiffs may disagree with the policies embodied in the OBBBA, and they may disagree with the policy or legal reasoning of the January 8 memorandum, but it is implausible to claim that Defendants "failed to consider" the legality of the policy. A cursory glance at the memorandum proves the contrary.

Additionally, Plaintiffs allege that Defendants have not "reasonably explained" their policy. ECF No. 49-1 at 36-37 (quotation omitted). This, too, is wrong. The policy on its face explains that it was issued in response to "significant and sometimes violent incidents at ICE facilities," the passage of the OBBBA, and this court's ruling; the policy explicitly explained "[t]he basis for this policy is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." *Id.* at 2. Further, the

Memorandum observes that "[u]nannounced visits require pulling ICE officers away from their normal duties." *Id.* at 2. Moreover, the Memorandum explains that "there is an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions." *Id.* at 2. Plaintiffs' disagreement with Defendants' characterizations of their visits as "publicity stunts," ECF No. 49-1 at 45, fails to show that the Memorandum lacks an explanation of its reasoning.[2]

## II.    Plaintiffs Will Not Suffer Irreparable Harm

Plaintiffs cannot bear their burden to make "a clear showing" that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). As a threshold matter, Plaintiffs' claimed harms are not cognizable because they entirely stem from their roles as Members of Congress. *See supra* part (I)(A). And Congress's powers to conduct oversight are limited to the extent that they are in aid of legislation. *Watkins v. United States*, 354 U.S. 178, 187 (1957); *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). Further, there are many other avenues by which Congress can obtain the information it requests. Even to the extent that Plaintiffs believe that in-person visits to these facilities provides unique access to information, they may still access these sites pursuant to the January 8 Memorandum, provided they give adequate notice. Plaintiffs' speculation that the condition of ICE facilities could drastically change in the period between their notice and the scheduled visit is belied by the presumption of regularity afforded to agency operations, *Am. Fed'n of Gov't Employees, AFL-CIO*

---

[2] Although the Amended Complaint asserts an unreasonable withholding or delay claim under 5 U.S.C. § 706(1), ECF No. 48-1 at 83, the instant Motion does not seek relief on that basis. In any event, Plaintiffs are not entitled to relief under § 706(1) because "[t]he only agency action that can be compelled under the APA is action legally required." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). As previously explained, because Section 527's limitations do not apply to the January 8 Memorandum, Defendants are not legally required to comply with those limitations in implementing the Memorandum's policies.

*v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989), and could be mitigated by periodic visits or through interbranch negotiations regarding ICE operations.

For example, Plaintiff Neguse's declaration states that another representative recently requested an oversight visit that included members of his staff and that ICE confirmed that visit. *See* Neguse Decl., ECF No. 49-3, ¶ 17.  The request was confirmed by ICE within a few hours of submission.  *See id.*, Exhibit A, at 14-17; *see also* Thompson Decl., ECF No. 49-5, at 15 (approving Rep. Thompson's visitation request within one day).  Plaintiff Neguse does not identify any harm stemming from the oversight request, but instead generally claims that prospective relief from the January 8 Memorandum is necessary to fulfill his duties as a member of Congress.  *See* Neguse Decl. ¶ 18 ("Oversight visits for myself as a member and my staff provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.").

Plaintiffs make conclusory allegations that "[w]ithout timely, in-person oversight, members of Congress cannot fulfill their duties to their committees and to their constituents."  ECF No. 49-1 at 42.  But these speculative allegations are not sufficient to establish irreparable harm. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Ironically, if Plaintiffs had simply submitted a request to visit any particular entity at the same time they filed for this relief, their visits could already have been facilitated.

## III.  The Public Interest and Balance of the Equities Weigh Against Issuing Injunctive Relief.

The last two factors for issuing preliminary injunctive relief—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  To start, Plaintiffs fail to justify the need for the extraordinary relief of a

temporary restraining order.    The Court therefore should deny Plaintiffs' request for emergency relief as unnecessary.

Most importantly, the challenged Memorandum is consistent with the Court's rationale as stated in its December 17 opinion.  The Memorandum reflects the reasoning of the Court's decision and the contours of its holding.  Moreover, the Court's decision allowed the agency to address the issue afresh in light of the new unrestricted appropriations provided by the OBBBA.  *See* ECF No. 46 at 2-3.

Additionally, the January 8 Memorandum aims to ensure that adequate safety measures are in place to protect Members of Congress, congressional staff, detainees, and ICE employees alike. *See* ECF No. 39-1 at 2.  Implementation of these safety measures is squarely in the public interest. *See Winter*, 555 U.S. at 26 (engaging in safety considerations as part of the public interest analysis).

Finally, Plaintiffs could pursue alternative remedies.  For instance, Congress as a whole, through its power to pass appropriations acts (particularly relevant here in light of upcoming funding deadline), could address Plaintiffs' dissatisfaction with the Memorandum.[3]  As the Congress considers funding DHS, Members of Congress, including the Plaintiffs, have the opportunity to take other remedial actions.  These opportunities further counsel against issuance of injunctive relief at this preliminary stage and in an emergency context.

## IV.    Any Relief Should be Limited To Parties With Standing and Should be Stayed Pending Appeal.

Plaintiffs' proposed order would extend relief to any "members of Congress."  ECF No. 43-1 at 2.  To the extent the Court is inclined to grant any relief, it should be narrowly tailored to

---

[3] *See, e.g.*, Michael Gold, *Republicans Gave ICE a Slush Fund. Democrats Want to Limit It*, N.Y. TIMES, Jan. 28, 2026, *available at* https://www.nytimes.com/2026/01/28/us/politics/ice-funding-congress.html.

the Plaintiffs who have shown that they have submitted a visitation request and have been denied entry to an ICE facility.  *See Trump v. CASA*, Inc., 145 S. Ct. 2540, 2557 (2025); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (explaining that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").  Indeed, Plaintiffs have not sought joinder or obtained class certification.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] properly conducted class action … can come about in federal courts in just one way—through the procedure set out in Rule 23.").

Defendants dispute that Plaintiffs are entitled to any relief.  If the Court is inclined to grant relief, Defendants respectfully request that such order be stayed pending the government's appeal to the D.C. Circuit.

In considering a stay pending appeal, the Court must examine "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556 U.S. at 426.

Here, for the reasons previously articulated, Plaintiffs' claims fail on the merits. Defendants rely on binding Supreme Court precedent in arguing that Plaintiffs lack standing as members of Congress.  Defendants have, therefore, made a strong showing that they are likely to prevail on appeal.  Additionally, Defendants would be irreparably harmed absent a stay because if the Court of Appeals agrees with Defendants' jurisdictional arguments, then this case would be entirely precluded.  In the interim, Defendants would be prohibited from effectuating the January 8 Memorandum, which Defendants maintain was properly issued pursuant to DHS's authority under the OBBBA and which is necessary to ensure the safety of ICE personnel, detainees, and

members of Congress.  *See, e.g.*, *Nat'l Treasury Employees Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (granting stay pending appeal where the district court's injunction impeded Executive power).  The equitable factors likewise weigh in Defendants' favor, and the public interest and balance of equities factors merge where, as here, an injunction is sought against the government.  *Nken*, 556 U.S. at 435.  This balance squarely tips in Defendants' favor because any injunctive relief would preclude effectuation of an Executive policy issued pursuant to authority afforded by Congress.

**V.    Plaintiffs Should be Ordered to Post Security in Connection with Any Injunctive Relief.**

The Court should order security with any injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order, or, in the Alternative, for Stay Under 5 U.S.C. § 705.

Dated: January 29, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

 */s/ Amber Richer*
AMBER RICHER (CA Bar No. 253918)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Ph: (202) 514-3489
Email: amber.richer@usdoj.gov

*Counsel for Defendants*