IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,<br><br>*Defendants*. | Case No. 25-cv-2463-JMC |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER OR,
IN THE ALTERNATIVE, STAY UNDER 5 U.S.C. § 705**

Plaintiffs are entitled to immediate relief from Defendants' new and unlawful oversight visit policy. Most of Defendants' arguments are nonresponsive to Plaintiffs' submissions; Defendants' remaining arguments are unpersuasive. *See generally* Defs.' Opp'n (Jan. 29, 2026), ECF No. 50. Crucially, Defendants still do not contest that they used annually appropriated funds subject to the oversight rider for the promulgation and implementation of the January 8 policy—and the evidence makes clear that they did, in fact, use those funds to promulgate and implement that policy, *at least* through January 13, and they are almost certainly continuing to use those funds to enforce the policy. *See* Pls.' Mot. at 27–35 (Jan. 26, 2026), ECF No. 49-1. That fact alone is fatal to the challenged oversight visit policy.

Defendants also fail to provide any evidence to address any of the several ways in which Plaintiffs demonstrated their policy is arbitrary and capricious. DHS's shifting rationalizations for their notice requirement—from first being fully supportive of congressional oversight in May 2025 congressional testimony, to being concerned with "privacy" in June, to blaming unidentified "circus-like publicity stunts" in the January 8 policy—make clear that this is a pretextual notice-and-approval

requirement in search of a justification. Pls.' Mot. at 38–39. On this independent basis, the Court can conclude that the oversight visit policy is arbitrary and capricious and enjoin or stay the policy.

Plaintiffs principally rely on their previous memorandum in support of their emergency motion but submit the following additional points in reply.

**1.** Defendants' arguments (at 7–9) that Plaintiffs lack standing are largely duplicative of arguments that the Court already considered and rejected. *See* Op. at 19–45, ECF No. 36. The Court should reject those arguments again. Significantly, Defendants still do not squarely contest that they used annually appropriated funds to (at least) develop and promulgate that policy, thereby causing the same injuries to Plaintiffs based on the same violations of law as resulted from the June policy. *See* Pls.' Mot. at 29–35. Nor do Defendants contest that, notwithstanding any new hires or new investments that may have been paid for using reconciliation act funds, ICE immigration detention facilities are still principally "funded with Section 527 funds." Op. at 45; *see* Pls.' Mot. at 33; Fleischaker Decl. ¶¶ 20–23, ECF No. 49-2.

Further, even if Defendants could promulgate, implement, and enforce the January 8 oversight visit policy without using annually appropriated funds—and, again, they could not and have not—their purported use of reconciliation act funds for the implementation and enforcement of the policy still violates the oversight rider because Defendants cannot lawfully do what the memorandum states they will do (i.e., use "exclusively" reconciliation act funds, Jan. Mem. at 2, ECF No. 39-1). Defendants submit (at 8–9) that Plaintiffs cannot challenge that aspect of the policy because they allege a "generalized grievance" and "[a] violation of a statutory prohibition on a particular expenditure of funds harms all taxpayers equally." Defendants are incorrect. The January 8 oversight visit policy injures Plaintiffs specifically because Plaintiffs have individually been "prevent[ed]" "from entering" DHS detention facilities pursuant to the secretary's directive in the

2

January 8 memorandum. Further Consolidated Appropriations Act, 2024, div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024); *see* Pls.' Mot. at 14.

An agency cannot avoid being sued over a violation of one provision of law by violating a different provision of law. *See* Pls.' Mot. at 23–27 (explaining why Defendants cannot lawfully redirect funds in the way that the January 8 memorandum demands).[1] Plaintiffs have standing because they are injured by the January 8 oversight visit policy, which denies them both physical access and information to which they are entitled under the oversight rider; the oversight visit policy, as articulated in the January 8 memorandum, is the cause of that injury; and the Court can redress that injury by restraining or staying, and ultimately vacating, the oversight visit policy.[2]

**2.** Defendants ignore (at 11–20) the bulk of Plaintiffs' arguments in support of their claim that the January 8 oversight visit policy is contrary to law and in excess of statutory authority. Plaintiffs do not repeat those arguments but submit a few responses.

*First*, it remains uncontested that Defendants "use[d]" funds subject to the oversight rider to promulgate and implement the January 8 policy—and, evidently, are still using those funds in the enforcement of the policy. Defendants state summarily (at 16) that the Mehringer declaration "documents" that DHS and ICE are "account[ing] for the promulgation of the January 8 memorandum solely from [reconciliation act] funds," but Plaintiffs already explained that the Mehringer declaration does no such thing, Pls.' Mot. at 28.

Defendants entirely disregard the text of the oversight rider. They first fail to respond to Plaintiffs' arguments regarding the meaning of "prevent" in the oversight rider. *See* Pls.' Mot. at 29–

---

[1] Moreover, the oversight rider gives rise to an entitlement for Plaintiffs to enter DHS facilities used to detain or otherwise house noncitizens; for the reasons explained, Pls.' Mot. at 17–23, that entitlement equates to a substantive limitation on Defendants' activities so long as that rider is attached to Defendants' baseline appropriations, without which Defendants could not exist or operate.

[2] Defendants half-heartedly contend (at 9–10) that Plaintiffs lack a cause of action under the Administrative Procedure Act, but they raise exclusively arguments that this Court has already considered and rejected. *See* Op. at 47–55.

3

30. The restrictions of the rider plainly extend to the promulgation of a policy directing its violation. *Id.*; *see, e.g.*, *Massachusetts v. Nat'l Insts. of Health*, No. 25-1343, 2026 WL 26059 (1st Cir. Jan. 5, 2026) (finding that a supplemental guidance promulgated by the agency violated an appropriations rider and affirming district court's permanent injunction against enforcement of that guidance); *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) (finding challenged State Department policy suspending review and adjudication of certain visas "'not in accordance with law' and 'in excess of statutory . . . authority'" because the agency "[had] not identified any statutory authority that would permit the suspension of this ordinary process" (quoting 5 U.S.C. § 706(2)).[3]

Defendants next ignore the meaning of the word "use" in the oversight rider, going so far as to state (at 20) that "whether section 527-encumbered funds have been used" is "the wrong question." But "use" is the word that Congress chose for the oversight rider, and Defendants cannot and do not seriously contend that no funds subject to that rider have been "used" in promulgating and implementing the notice policy. Instead, Defendants misstate (at 16–18) Plaintiffs' arguments and discuss the meaning of the word "obligate," as used in the Antideficiency Act (ADA). If anything, Congress's choice to use a different and more expansive word in the oversight rider ("use") than in the ADA ("obligate" or "expend") only underscores that the oversight rider applies more broadly and is not concerned with an agency's financial accounting.

Even if Defendants were correct that the language of the ADA is controlling here rather than the language of the oversight rider itself, their proposed "accounting" solution falls far short. Plaintiffs submitted evidence demonstrating the myriad ways annually appropriated funds would be

---

[3] *See also, e.g.*, *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 12 (D.D.C. 2019), *rev'd and remanded on other grounds*, 962 F.3d 612 (D.C. Cir. 2020); *see, e.g.*, *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 32 (D.D.C. 2020) (vacating agency rule because it was "unlawfully promulgated" and noting that the "relief that the APA plainly prescribes is a targeted restriction that, by statute, essentially treats an unlawfully promulgated agency rule as void *ab initio* due to the agency's failure to adhere to the APA's procedural mandates"); *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("Ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation cannot be afforded the force and effect of law." (quotation marks omitted)).

expended in the course of implementing and enforcing the January 8 oversight visit policy, and they showed that tracking all of the relevant expenses would be virtually impossible. *See* Pls.' Mot. at 27, 32–35; Fleischaker Decl. ¶¶ 20–23, ECF No. 49-2. Defendants rebut these points with neither legal arguments nor evidentiary support. Instead, they essentially ask (at 18) the Court to trust the agencies to "correct" some unspecified "[i]ncorrect accounting" at some unspecified time in the future—without even attempting to describe what that accounting would entail.

*Second*, Defendants attack a straw man in stating (at 13) that "[u]nder Plaintiffs' view, the inclusion of an appropriations rider once would forever bind future appropriations." Not so. The oversight rider does not bind any future appropriations or any future Congress. Congress can always choose *not* to include the oversight rider in DHS's annual appropriations acts (or affirmatively to authorize the conduct that previous Congresses have prohibited)—but, year after year, it *has* included the oversight rider. And Plaintiffs explained that the statutory and temporal context of the oversight rider—including its later-in-time reenactment relative to the reconciliation act and the entire body of the DHS appropriations act in which it lies—demonstrates Congress's intent that the rider operate as a substantive ban against certain actions by DHS and ICE. Pls.' Mot. at 19–23.

Defendants also repeat (at 16) the contention that Congress "chose to omit the [oversight] rider from" the reconciliation act, but they offer no response to the points that (1) Congress did not need to repeat the rider in that act because the rider already applied to DHS's and ICE's baseline appropriations, and (2) if Congress intended Defendants to use the reconciliation act funds to circumvent the oversight rider, there would have been no point in again passing that rider in the current continuing resolution that expires after today and *again* in the version of the next annual appropriations law that the House passed earlier this week. *See* Pls.' Mot. at 11 (citing H.R. 7147, § 547, 119th Cong. (2026)); *cf.* Defs.' Opp'n at 16 (incorrectly referring to the reconciliation act as "later" in time than the currently applicable oversight rider).

5

*Third*, Defendants misleadingly describe (at 12–13) the purposes of the appropriations provided in the reconciliation act and do not seriously address their limitations, *see* Pls.' Mot. at 24–26. To take just one example, Defendants state that the reconciliation act appropriated more than $2 billion "for purpose[s] including 'immigration and enforcement activities.'" Defs.' Opp'n at 12–13 (quoting Pub. L. No. 119-21, § 100051(1), 139 Stat. 72, 385 (2025)). But "immigration and enforcement activities" is a subheading under which the purpose provided is "[h]iring and training of additional *U.S. Customs and Border Protection* agents, and the necessary support staff, to carry out immigration enforcement activities." Pub. L. No. 119-21, § 100051(1), 139 Stat. at 385 (emphasis added). That provision does not appropriate funds to ICE at all. *Id.* The reconciliation act provides funding for specifically delineated purposes that do not encompass all potential categories of funding necessary for Defendants to promulgate and enforce the oversight visit policy. Defendants' failure to address the limited nature of the reconciliation act's appropriations confirms that they could not lawfully implement and enforce the January 8 oversight visit policy using exclusively reconciliation act funds even if doing so were possible.

**3.** Plaintiffs demonstrated that the oversight visit policy is arbitrary and capricious in several ways, including that Defendants failed to provide an adequate explanation or evidentiary support for their claim that a seven-day-notice requirement is necessary to ensure the safety of members of Congress. Pls.' Mot. at 36–40. Specifically, Defendants failed to cite any evidence that would support the safety concerns that purportedly justify the seven-day-notice requirement—even though the oversight rider has been in law for more than five years, and oversight visits by Plaintiffs and other members have consistently occurred without incident. Pls.' Mot. at 37 (citing eight Plaintiff declarations attesting that no incidents occurred during announced and unannounced oversight visits between December 17 and January 8).

Instead, Defendants restate the same conclusory justification offered by the January 8 memorandum: that the connection between the memorandum's objective and the notice requirement is "plain" and that Defendants "took reasonable steps to achieve its policy objectives" to ensure that "ICE facilities are afforded a reasonable opportunity to implement safety measures." Defs.' Opp'n at 21. An assertion that a justification is "plain" does not substitute for a reasoned explanation, supported by evidence, as to why purported safety measures were, in fact, necessary. Plaintiffs submitted multiple unrebutted declarations attesting that no safety incidents have occurred during any of their visits, unannounced or otherwise. Pls.' Mot. at 39–40. Defendants ignore these declarations and provide no example of a single relevant incident during the past five-plus years of congressional oversight visits under the oversight rider. In essence, they ask this Court to rely on the agency's unsupported say-so. That is plainly insufficient in light of the now-unrebutted factual evidence.

Defendants also entirely fail to respond to Plaintiffs' showing that, even when members of Congress have attempted to comply with the (unlawful) notice requirement, Defendants have, on multiple occasions, arbitrarily rescheduled members' visits without reason. Defendants state (at 24) that Plaintiffs "may still access these sites pursuant to the January 8 Memorandum, provided they give adequate notice." But that is incorrect and controverted by evidence in the record, including ICE's 47-day delay in scheduling Representative McClain Delaney's visit to an ICE facility. *See* Pls.' Mot. at 40. In an attempt to minimize the well-established harms detailed in Plaintiffs' declarations, Defendants say (at 25) that "[i]ronically, if Plaintiffs had simply submitted a request to visit any particular entity at the same time they filed for this relief, their visits could have already been facilitated." But that is, again, incorrect. Just two days ago, Plaintiff Representative Ruiz was denied entry into the Adelanto ICE detention facility despite having requested to conduct an oversight visit of that facility more than seven days in advance. On January 20, his office requested an oversight

7

visit of the Adelanto facility for January 28, and, after ICE failed to respond, his office followed up to confirm the visit. Decl. of Raul Ruiz ¶ 17, ECF No. 49-14. However, when Representative Ruiz showed up at the facility on January 28, ICE denied his entry on the ground that they never confirmed receipt of his email.[4] These examples only underscore the continued arbitrary nature of Defendants' policy and why relief is needed now.

Defendants otherwise fail to meaningfully respond to, much less rebut, the remainder of Plaintiffs' arguments as to why the oversight visit policy is arbitrary and capricious. *See* Pls.' Mot. at 38–41. Defendants did not consider alternatives or the reliance interests of Plaintiffs in being able to conduct unannounced visits to carry out their legislative duties. Pls.' Mot. at 38. Defendants also wholly fail to respond to Plaintiffs' argument (at 41) that Defendants' policy and practice of prohibiting meetings with detainees without a valid signed privacy waiver is arbitrary and capricious.

On this record alone, the Court can and should conclude that Plaintiffs are substantially likely to show that the oversight visit policy is arbitrary and capricious.

**4.** Defendants' arguments about the remaining equitable factors (at 24–26) are duplicative of arguments that this Court rightly rejected when it concluded that Plaintiffs are irreparably harmed by Defendants' oversight visit policy and that the balance of the equities favored staying the policy. Op. at 67–70. The Court should reject those arguments once more.

Defendants contend that Plaintiffs' harms are speculative, but this Court already concluded that it is far from "speculative that the[] conditions" in a facility "could change over the course of seven days." Op. at 68. In recycling this argument, Defendants ignore the examples that Plaintiffs provided in their declarations of conditions changing within a detention facility after notice was given of an intent to visit. These include a recent example in which detainees told Representative Escobar that they knew an oversight visit would be happening because ICE had begun cleaning up

---

[4] Congressman Paul Ruiz (@RepRaulRuizMD), X (Jan. 28, 2026, 10:47 P.M.), https://x.com/RepRaulRuizMD/status/2016719882591883493.

the facility in the days prior to her visit. *See* Second Escobar Decl. ¶ 19; *see also* Second Decl. of Bennie G. Thompson ¶ 10, ECF No. 49-5; Second Decl. of Daniel S. Goldman ¶¶ 32–33, ECF No. 49-11; First Stay Mot. at 12–13, ECF No. 17-1.

To take just one tragic example from the past week, after DHS officers shot and killed Alex Pretti, Plaintiff Representative Morrison immediately began receiving reports that ICE had snatched observers of the shooting off the street and took them to Whipple. *See* Decl. of Kelly Morrison at ¶ 43, ECF No. 49-13. Because Representative Morrison was in Minneapolis when this happened, she would have immediately conducted an oversight visit to investigate why ICE officers had put observers to a shooting in ICE custody. Being able to conduct immediate, unannounced oversight is of paramount importance to Plaintiffs. And although Defendants point to discrete examples in which the ICE Office of Congressional Relations timely confirmed a visit more than seven days in advance, that does nothing to remedy the irreparable harms that Plaintiffs continue to face from the denial of access and information to which they are entitled between the time they request a visit and the time they are able to actually conduct that visit. *See* Pls.' Mot. at 42–43; Op. at 67–70.

**5.** Finally, this Court can and should quickly grant Plaintiffs' emergency motion, notwithstanding any potential lapse in annual appropriations to DHS and ICE. Any shutdown that may result from a lapse in appropriations would not affect the conclusions that, for the reasons articulated in Plaintiffs' motion, Defendants' January 8 oversight visit policy is (1) contrary to law and in excess of their authority and (2) arbitrary and capricious. *See* Pls.' Mot. at 16–41.

First, the Court can and should conclude that Plaintiffs are substantially likely to succeed on their claim that the policy is contrary to law and in excess of Defendants' authority. Specifically, the oversight visit policy is contrary to the annual appropriations law because, at the very least, Defendants developed and promulgated the policy using those baseline appropriations and so "used" appropriations subject to the oversight rider for an unlawful purpose; and the policy is

contrary to the reconciliation act and purpose statute because Defendants' purported "exclusive[]" use of reconciliation act funds, Jan. 8 Mem. at 2, to implement and enforce the policy would exceed the statutory limitations on those funds. Pls.' Mot. at 16–35.

These conclusions do not depend on any future events, and any potential impending lapse in appropriations would not render the January 8 policy lawful. The government cannot continue to implement and enforce a policy that was promulgated in violation of the law. *See id.* at 30; *supra* at 4 & n.3. The Court should therefore temporarily restrain Defendants from implementing and enforcing the oversight visit policy—and, alternatively or subsequently, stay that policy under 5 U.S.C. § 705—regardless of what occurs with respect to DHS and ICE funding going forward.

Second, the Court can also rule in Plaintiffs' favor regarding the likelihood of success on their arbitrary-and-capricious claim, which does not depend in any way on what funds Defendants use to implement and enforce their unlawful January 8 oversight visit policy. As Plaintiffs explained, Pls.' Mot. at 35–41, the oversight visit policy—including the requirement that members provide notice of and receive approval for oversight visits—is inherently unreasonable and not reasonably explained. And it remains imperative that members of Congress be able to access immigration detention facilities and obtain the information necessary to make informed policy and appropriation decisions. The harm to Plaintiffs from the continued enforcement of Defendants' arbitrary and capricious policy grows every single day that the policy remains in effect.[5]

\* \* \*

For these reasons, and the reasons provided in Plaintiffs' memorandum in support of their motion, the Court should grant Plaintiffs' motion and immediately enter a temporary restraining order and subsequently, or in the alternative, enter a stay under 5 U.S.C. § 705.

---

[5] If the Court grants the relief Plaintiffs seek, the Court should not stay its decision pending appeal. There is no basis—and Defendants cite none—to issue a preemptive stay. Any order granting emergency relief would be issued only after a finding that Plaintiffs satisfied each of the factors for injunctive relief, undermining any basis for a stay.

January 30, 2026 — Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Lisa Newman (TX Bar No. 24107878)
Anna L. Deffebach (D.C. Bar No. 241346)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

Daniel Martinez
D.C. Bar No. 90025922
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Jessica Jensen
D.C. Bar No. 1048305

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*