UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>　　　　　　　　Defendants. | Case No. 25-cv-2463 (JMC) |

**ORDER**

Pending before the Court is Plaintiffs' motion for a temporary restraining order, or in the alternative, for a stay under 5 U.S.C. § 705. ECF 49.[1] For the reasons discussed below, the Court **GRANTS** the motion for a temporary restraining order pending further proceedings on Plaintiffs' request for a Section 705 stay.

Plaintiffs are thirteen Members of the House of Representatives who bring suit to challenge Defendants' polices regarding congresspersons' access to Immigration and Customs Enforcement (ICE) facilities used to detain or otherwise house noncitizens. Among other policies, Plaintiffs challenge ICE's requirement that Members of Congress must provide a minimum of seven days' notice before being allowed to enter ICE facilities. *See, e.g.*, ECF 48-1 ¶ 395. The Court assumes familiarity with the factual and legal history of this litigation, including as discussed in the Court's

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this order, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

December 17, 2025, memorandum opinion and order. *See* ECF 36; ECF 37. The Court's prior opinion found that the seven-day notice requirement as initially announced by ICE in June 2025 was likely contrary to the terms of a limitations rider attached to the Department of Homeland Security's (DHS) annual appropriated funds. ECF 36 at 56–58. The rider, often referred to as Section 527, prohibits DHS from "us[ing]" appropriated funds "to prevent" Members of Congress from "entering, for the purpose of conducting oversight," facilities "used to detain or otherwise house" noncitizens. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619. The Court found that the June 2025 notice requirement had been "promulgated with Section 527 funds" and "continue[d] to be implemented and enforced through the use of Section 527 funds." ECF 36 at 72. Accordingly, the Court issued an order under 5 U.S.C. § 705 staying the "effective date[] of implementation and enforcement" of the notice requirement. ECF 37.

On January 8, 2026, Defendant Secretary of Homeland Security Kristi Noem issued a memorandum purporting to reinstitute the seven-day notice requirement. ECF 39-1 at 2. Secretary Noem acknowledged this Court's December 17, 2025, opinion and order, but claimed in her memorandum that the January 8 policy was to be "implemented and enforced exclusively with money appropriated" for DHS and ICE by the July 2025 reconciliation bill, also known as the OBBBA, the text of which does not contain the Section 527 rider. *Id.*; *see* One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. 72, 387–89 (2025); ECF 36 at 9. On January 26, 2026, Plaintiffs moved for leave to amend and supplement their complaint to incorporate a challenge to this new policy, which the Court granted. *See* ECF 48; January 26, 2026, Min. Order.[2] That same day, Plaintiffs filed their motion for a temporary restraining order. ECF 49.

---

[2] The First Amended and Supplemental Complaint has expanded the list of Plaintiffs to include Representative Kelly Morrison. ECF 48-1.

Plaintiffs argue that despite Secretary Noem's statements in the January 8 memorandum, the current version of the notice requirement is unlawful under the Administrative Procedure Act (APA) for similar reasons as the old policy: the notice requirement prevents Members of Congress from entering covered facilities, and the requirement was promulgated, implemented, and continues to be enforced using funds subject to the Section 527 rider. ECF 49-1 at 23–41.[3] Plaintiffs seek a temporary restraining order or, in the alternative, request a stay of the notice requirement under 5 U.S.C. § 705. The Court has considered Defendants' response, ECF 50, and Plaintiffs' reply, ECF 51.[4]

"The purpose of a temporary restraining order is to preserve the status quo for a limited period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction," or in this case, Plaintiffs' request for a stay of the January 8 policy under Section 705 of the APA. *Barrow v. Graham*, 124 F. Supp. 2d 714, 715–16 (D.D.C. 2000). Motions for temporary restraining orders and preliminary injunctions are analyzed using the same standards. *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 81 (D.D.C. 2018). A movant must show (1) "likely success on the merits," (2) "likely irreparable harm in the absence of preliminary relief," (3) "a balance of the equities in its favor," and (4) "accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The final two factors merge when the government is the non-movant. *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

All four factors weigh in favor of granting a temporary restraining order pending any

---

[3] Plaintiffs also argue that the policy is arbitrary and capricious under the APA, an argument that the Court declines to address at this juncture. *See* ECF 49-1 at 41–48.

[4] The Court has also considered the declarations and memoranda provided by the Parties regarding Plaintiffs' motion for an order to show cause. *See* ECF 40; ECF 42-1; ECF 42-2; ECF 44; ECF 45.

additional briefing and a hearing on Plaintiffs' request for preliminary relief in the form of a stay under 5 U.S.C. § 705. First, the Court concludes that Plaintiffs have shown a likelihood of success on the merits. The Court's decision on this prong is made significantly easier given that many of the threshold issues implicated by this motion are identical to the ones addressed in the Court's December 17 opinion and resolved in favor of the Plaintiffs. Defendants' argument that the standing analysis should come out differently, ECF 50 at 15–16, relies on a mischaracterization of Plaintiffs' current challenge, which like their first challenge, is premised upon the theory that the January 8, 2026, policy violates the terms of Section 527. As a result, and based on the facts as stated in Plaintiffs' initial and second round of declarations,[5] the Court finds that Plaintiffs have shown a likelihood of Article III jurisdiction and a cause of action under the APA to challenge Defendants' January 8 policy. *See* ECF 36 at 18–45, 47–55.

The Court also finds, based on the record before it at this preliminary juncture, that Plaintiffs have shown a strong likelihood of success on their claims that the January 8, 2026, version of the notice requirement is also contrary to Section 527 and thus violates the APA. The Court has already found that DHS's promulgation, implementation, and enforcement of a nearly identical requirement qualified as Defendants "us[ing]" funds "to prevent" Members of Congress from entering facilities as is prohibited by Section 527. ECF 36 at 56–59. Because the evidence before the Court demonstrated that the only funds used to promulgate, implement, and enforce the prior notice requirement were DHS's annually appropriated funds, the Court found that Defendants' adoption and enforcement of the policy was likely contrary to Section 527. *Id.* at 58–

---

[5] These declarations include the declaration of Representative Morrison, who was not party to the suit at the time of the Court's December 17 decision, but whose declaration sufficiently supports her Article III standing to bring the suit under the principles discussed in that opinion. *See* ECF 49-13 (discussing Representative Morrison's interest in conducting oversight of ICE facilities, her denial of access to an ICE facility on January 10, 2026, and her intent to continue pursuing oversight visits to such facilities).

4

59. Plaintiffs have made a strong showing that the January 8, 2026, notice requirement was also promulgated, implemented, and is presently being enforced with the use of Section 527 funds.

Because "[t]he government . . . cannot act[] other than by appropriation," the "use of any government resources—whether salaries, employees, paper, or buildings—to accomplish a" purpose "entail[s] government expenditure" for that purpose. *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871–72 (9th Cir. 1995). Plaintiffs present evidence regarding the vast numbers and types of expenditures—including portions of the salaries of a wide array of DHS and ICE personnel—likely necessary to devise and enforce the notice policy. *See* ECF 49-2 ¶¶ 20–23. The types of expenditures implicated also likely extend to the more incidental but nevertheless necessary ones that make creation and enforcement of the policy possible. *See id.* ¶ 20 (suggesting that relevant expenditures would include "salaries" as well as "information technology systems and contracts, office supplies, utilities, and building infrastructure"); *Babbitt*, 73 F.3d at 871 (discussing use of "paper" and "buildings" as the types of expenditures prohibited by a similar limitation rider); *Kimberlin v. DOJ*, 318 F.3d 228, 232 (D.C. Cir. 2003) (finding that a ban "on using appropriated funds" for a specific purpose "may reasonably be construed to prohibit paying for costs incidental to" that purpose, which in that case included "storage, supervision[,] and electricity"). Defendants argue that funds used in the process of promulgating the policy, separate from its enforcement, cannot be considered funds "used to prevent" Members of Congress from entering covered facilities as contemplated by the rider. § 527(a), 138 Stat. at 619; *see* ECF 50 at 19. The Court disagrees. Funds used to develop the very policy which the Court has found prevents Members' entry to covered facilities are properly considered funds "used to prevent" entry as contemplated by Section 527. § 527(a), 138 Stat. at 619; *see* ECF 36 at 56–57.

Plaintiffs have presented evidence in the form of testimony by a former DHS and ICE legal

5

and budgeting official stating that it would be logistically difficult, if not impossible, for DHS to identify and segregate the relevant expenditures to ensure that only funds from the OBBBA were used to first promulgate and enforce the January 8 policy or will be used to enforce it going forward. *See* ECF 49-2 ¶ 23 (stating the view that it "would be nearly impossible for ICE to engage in the tracking and back-end accounting" due to the "many, varied inputs involved"). Defendants make no attempt to disprove the specific factual claims made by Plaintiffs' declarant. Instead, Defendants claim that these objections to the logistical feasibility of separating out funding for the notice policy are "entirely speculative," ECF 50 at 8, and refer to a previously submitted declaration by a DHS budget official claiming that it is indeed "possible to track the costs incurred to issue and enforce the January 8 policy," ECF 42-1 ¶ 6. But Defendants' declarant provides almost no details or specifics as to how DHS and ICE would accomplish this task in the face of the practical challenges raised by Plaintiffs.

Perhaps reflecting that difficulty, Defendants have not seriously attempted to argue that DHS and ICE ensured that only OBBBA-funded resources were used *before* promulgating and first implementing the January 8 policy. Indeed, the language of the Noem memorandum anticipates that steps to ensure compliance with Section 527 will occur in the future. ECF 39-1 at 2 (stating that DHS officials "shall ensure appropriate funding for the promulgation of this policy"); *id.* ("ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA"). Defendants' argument on this point appears to be that any funds or resources used to promulgate the policy can be tracked on the back end and subsequently "assigned to the OBBBA" through the reconciliation of accounts, and thus will not qualify as a use of funds under federal appropriations principles. ECF 50 at 27. But in addition to Plaintiffs' arguments about the practical infeasibility of such tracking, Plaintiffs raise other reasons why such

purported back-end accounting is not likely possible as a mechanism for DHS and ICE to avoid using Section 527-restricted funds for the January 8 policy. Without addressing all of Plaintiffs' theories at this early juncture, the Court notes that it finds compelling Plaintiffs' argument—one not presently disputed by Defendants—that at least some of these resources that either have been or will be used to promulgate and enforce the notice policy have already been funded and paid for with Section 527-restricted annual appropriations funds, including pursuant to contracts or agreements that predate the OBBBA. *See* ECF 49-2 ¶ 21 ("[M]ost of the detention facilities that were owned, operated, or utilized by ICE . . . have contracts or agreements that predate the [OBBBA], and funds for improvements, staffing, and other expenses come from annual appropriations."); *see* ECF 49-1 at 39 (arguing that to legally promulgate the policy, the Secretary and DHS staff would have had to use "pens or papers," "computer programs," and "building utilities" all funded by reconciliation funds rather than annual appropriations).

Plaintiffs have accordingly shown, based on the limited record before the Court at this juncture, a likelihood of success on the key factual issue of the use of Section 527-restricted funds to promulgate, implement, and enforce the January 8 notice policy. As for the other factors for preliminary relief, the Court finds that they are easily satisfied. The Court previously found that the policy imposes irreparable harm upon the Plaintiffs in denying them the ability to carry out timely oversight of covered facilities. ECF 36 at 66–69. If anything, the strength of that finding has become greater over the intervening weeks, given that ICE's enforcement and detention practices have become the focus of intense national and congressional interest. And as before, the public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs the limited preliminary relief of a temporary restraining order.[6] *See* ECF 36 at 70–72.

---

[6] The Court finds issuance of a temporary restraining order proper even though the DHS appropriations to which Section 527 is attached have currently lapsed. *See* Continuing Appropriations, Agriculture, Legislative Branch,

The Court will therefore issue an order temporarily restraining Defendants from enforcing the January 8 notice requirement as to the Plaintiffs in this case. In issuing a temporary restraining order, the Court will grant Plaintiffs' request to waive the bond requirement under Federal Rule of Civil Procedure 65(c), given that Defendants have failed to identify quantifiable costs that they will incur as a result of being temporarily restrained from enforcing the challenged policy against these thirteen Plaintiffs. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) ("In cases where the government is the enjoined party and no concrete economic injury is established, as is the case here, courts routinely waive the bond requirement."). Defendants have also requested that the Court proactively grant a stay of its ruling pending appeal, presumably because Plaintiffs' motion sought a stay under 5 U.S.C. § 705 as an alternative to a temporary restraining order. ECF 50 at 34. Because the Court has granted only a temporary restraining order and Plaintiffs' Section 705 stay request is still pending, it is premature to rule on a stay pending appeal given that this temporary restraining order is not appealable. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (noting that "[t]he grant of a temporary restraining order . . . is generally not appealable," particularly where the order "merely preserve[s] the status quo pending further proceedings").

Accordingly, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order, ECF 49, is **GRANTED**; and it is further

---

Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, § 106(3), 139 Stat. 495, 497 (2025) (stating that "funds made available and authority granted pursuant to this Act shall be available until . . . January 30, 2026"). The present record shows that it is likely that Section 527-restricted funds were previously used to promulgate and implement the January 8 policy, which, if confirmed at the end of merits litigation, would provide a sufficient basis to vacate and set aside the policy. *See* 5 U.S.C. § 706(2)(C) (requiring a reviewing court to "hold unlawful and set aside agency action" found to be "in excess of statutory . . . authority[] or limitations"). This likely violation provides sufficient basis to support a temporary restraining order halting enforcement of the January 8 policy against Plaintiffs even if the limitation rider is presently inactive.

**ORDERED** that Defendants are **TEMPORARILY ENJOINED** from enforcing against the Plaintiffs the oversight visit policy as announced on January 8, 2026, or otherwise requiring any Plaintiff to provide advance notice before conducting oversight visits at any facility operated by or for DHS used to detain or otherwise house aliens; and it is further

**ORDERED** that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2); and it is further

**ORDERED** that, pursuant to Rule 65(b)(2), this Order shall expire in 14 days, subject to any further order from the Court; and it is further

**ORDERED** that, should Defendants intend to file a supplemental brief in support of their opposition to Plaintiffs' request for a Section 705 stay, they shall have until February 8, 2026, to do so. Plaintiffs shall have until February 11, 2026, to file any additional reply in support of their request for a Section 705 stay. The Court will shortly contact the Parties regarding a hearing. Should the Parties confer and agree on an alternative briefing schedule, they may request alternative dates by submitting a joint status report.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: February 2, 2026