# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his capacity as a Member of the
U.S. House of Representatives,
2400 Rayburn House Office Building
Washington, D.C. 20515,

ADRIANO ESPAILLAT, in his capacity as a
Member of the U.S. House of Representatives,
2332 Rayburn House Office Building
Washington, D.C. 20515,

BENNIE G. THOMPSON, in his capacity as a
Member of the U.S. House of Representatives,
2466 Rayburn House Office Building
Washington, D.C. 20515,

JAMIE RASKIN, in his capacity as a Member of
the U.S. House of Representatives,
2242 Rayburn House Office Building
Washington, D.C. 20515,

ROBERT GARCIA, in his capacity as a Member
of the U.S. House of Representatives,
109 Cannon House Office Building
Washington, D.C. 20515,

J. LUIS CORREA, in his capacity as a Member of
the U.S. House of Representatives,
2082 Rayburn House Office Building
Washington, D.C. 20515,

JASON CROW, in his capacity as a Member of the
U.S. House of Representatives,
1323 Longworth House Office Building
Washington, D.C. 20515,

VERONICA ESCOBAR, in her capacity as a
Member of the U.S. House of Representatives,
2448 Rayburn House Office Building
Washington, D.C. 20515,

DANIEL S. GOLDMAN, in his capacity as a
Member of the U.S. House of Representatives,
245 Cannon House Office Building
Washington, D.C. 20515,

Case No. 25-cv-2463-JMC

JIMMY GOMEZ, in his capacity as a Member of
the U.S. House of Representatives,
506 Cannon House Office Building
Washington, D.C. 20515,

RAUL RUIZ, in his capacity as a Member of the
U.S. House of Representatives,
2342 Rayburn House Office Building
Washington, D.C. 20515,

NORMA TORRES, in her capacity as a Member of
the U.S. House of Representatives,
2227 Rayburn House Office Building
Washington, D.C. 20515,

KELLY MORRISON, in her capacity as Member
of the U.S. House of Representatives, 1205
Longworth House Office Building Washington,
D.C. 20515,

    *Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St. SW
Washington, D.C. 20536,

TODD M. LYONS, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
500 12th St. SW
Washington, D.C. 20536,

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

    *Defendants*.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

## INTRODUCTION

1.      As part of its campaign of mass deportation, the Trump-Vance administration has stretched the U.S. immigration detention system far beyond its capacity and created a humanitarian crisis in detention facilities across the country.

2.      Over the past year, the Department of Homeland Security (DHS) and its component Immigration and Customs Enforcement (ICE) have moved from one city to the next, conducting violent crackdowns targeting perceived immigrants and arresting huge numbers of individuals. Through increasingly violent and indiscriminate tactics by the agencies, the number of individuals detained by ICE has exploded. The number of individuals in ICE custody is at an all-time high. And there is every indication that the number of ICE arrests and detentions will only continue to grow at a dangerous rate, in service of the administration's stated goal of deporting more than one million people each year.

3.      DHS and ICE's immigration enforcement operations and resulting detention conditions have had deadly consequences.

4.      In the last few weeks, DHS officials shot and killed two U.S. citizens in Minneapolis in the course of a massive, brutal DHS operation targeting that city.

5.      At least 31 people died in ICE custody in 2025, a two-decade high and nearly triple the number of deaths in ICE custody in 2024. At least five people have died in ICE custody in just the first few weeks of 2026, one of which was classified by a medical examiner as a homicide. Firsthand accounts from detainees, extensive reporting, federal court orders, and congressional visits to ICE facilities have revealed a pattern of horrifying detention conditions and calculated cruelty towards those in the custody of the U.S. government.

6.      These numbers are staggering and shameful. Congressional oversight of immigration detention facilities is urgently important at this moment in time. And yet, over the past year, DHS

has assiduously worked to avoid oversight of any kind and has made every effort to ensure that members of Congress have little or no visibility into its operations or detention facilities by attempting to sidestep a law that codifies legislators' right to conduct that oversight.

7.    Individual members of Congress have an essential role to play in oversight of immigration detention facilities. And they have a clear legal right to conduct that oversight.

8.    This oversight informs potential legislation on the subject of immigration detention, ensures that funds appropriated to DHS and ICE are being used lawfully on the ground, ensures that administration officials are carrying out their responsibilities consistent with federal law, and—critically—exposes when they are not.

9.    Congress and the President have historically agreed that individual members of Congress have the right to visit any DHS facilities that detain or house individuals. They have determined that the need to conduct real-time oversight of the true conditions of these facilities means that members must not be required to provide advance notice of their visits. Congress has passed bills to ensure this critical access, and Presidents of both parties have signed those bills into law.

10.    In June 2025, Defendants adopted a new policy and practice that, in part, required members of Congress to provide notice "a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities," absent authorization by the secretary of DHS.

11.    Plaintiffs immediately challenged DHS's new oversight visit policy as unlawful. This Court agreed and, in December 2025, stayed the policy. ECF No. 36.

12.    On January 8, 2026, DHS secretly reimposed the same requirement that members of Congress give at least seven days' notice and receive approval for oversight visits to ICE facilities. DHS subsequently blocked at least four members of Congress from conducting oversight visits at ICE facilities under this new oversight visit policy. The first such denial occurred when three

members of the Minnesota delegation attempted to conduct an unannounced oversight visit to the Whipple Federal Building outside of Minneapolis, in the wake of the deadly shooting of Renee Good and reports of unacceptable conditions at that facility.

13.     It is no coincidence that DHS is, once again, attempting to prevent congressional oversight of ICE detention facilities at the height of its violent "immigration enforcement" surge in Minneapolis.

14.     The January 8 oversight visit policy is DHS's latest attempt to subvert Congress's will and shroud its facilities in secrecy. But make no mistake: Defendants' policy is unlawful.

15.     Plaintiffs, 13 members of the U.S. House of Representatives, file this amended and supplemental complaint against Defendants ICE and its acting director, Todd M. Lyons, and DHS and its secretary, Kristi Noem, to obtain relief from Defendants' unlawful obstruction of Plaintiffs' attempts to obtain information through visits to ICE facilities for congressional oversight purposes.

16.     Defendants' illegal actions harm each Plaintiff's right as an individual member of Congress to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention. These harms are significant, irreparable, and ongoing as long as Defendants continue to block such visits pursuant to their unlawful policy.

17.     Adherence to the rule of law requires that Plaintiffs be permitted to conduct their statutorily authorized oversight activities, notwithstanding DHS's unlawful and repeated efforts to thwart scrutiny of its facilities.

## JURISDICTION AND VENUE

18.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*

19.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

20.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because Defendants reside in this district.

## THE PARTIES

21.     Plaintiff Joe Neguse is a duly elected member of Congress representing the 2nd congressional district in Colorado. He sues in his capacity as an individual member of Congress.

22.     Plaintiff Adriano Espaillat is a duly elected member of Congress representing the 13th congressional district in New York. He sues in his capacity as an individual member of Congress.

23.     Plaintiff Bennie G. Thompson is a duly elected member of Congress representing the 2nd congressional district in Mississippi. He sues in his capacity as an individual member of Congress.

24.     Plaintiff Jamie Raskin is a duly elected member of Congress representing the 8th congressional district in Maryland. He sues in his capacity as an individual member of Congress.

25.     Plaintiff Robert Garcia is a duly elected member of Congress representing the 42nd congressional district in California. He sues in his capacity as an individual member of Congress.

26.     Plaintiff J. Luis Correa is a duly elected member of Congress representing the 46th congressional district in California. He sues in his capacity as an individual member of Congress.

27.     Plaintiff Jason Crow is a duly elected member of Congress representing the 6th congressional district in Colorado. He sues in his capacity as an individual member of Congress.

28.     Plaintiff Veronica Escobar is a duly elected member of Congress representing the 16th congressional district in Texas. She sues in her capacity as an individual member of Congress.

29.     Plaintiff Daniel S. Goldman is a duly elected member of Congress representing the 10th congressional district in New York. He sues in his capacity as an individual member of Congress.

30.     Plaintiff Jimmy Gomez is a duly elected member of Congress representing the 34th congressional district in California. He sues in his capacity as an individual member of Congress.

31.     Plaintiff Raul Ruiz is a duly elected member of Congress representing the 25th congressional district in California. He sues in his capacity as an individual member of Congress.

32.     Plaintiff Norma Torres is a duly elected member of Congress representing the 35th congressional district in California. She sues in her capacity as an individual member of Congress.

33.     Plaintiff Kelly Morrison is a duly elected member of Congress representing the 3rd congressional district in Minnesota. She sues in her capacity as an individual member of Congress.

34.     Defendant ICE is a component of DHS, a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is headquartered in Washington, D.C.

35.     Defendant Todd M. Lyons is the acting director of ICE. He is sued in his official capacity.

36.     Defendant DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is headquartered in Washington, D.C.

37.     Defendant Kristi Noem is the secretary of DHS. She is sued in her official capacity.

## BACKGROUND

### I.     Congressional Authority to Appropriate Money and Conduct Oversight

38.     There can be no dispute that Congress may, through the exercise of its constitutional authority over public funds, prevent DHS from denying members of Congress immediate access to

ICE detention facilities. The Appropriations Clause of the Constitution, art. I, § 9, cl. 7, provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." That clause grants Congress sweeping control, not just to decide how much money may be spent by federal agencies, but also to dictate for what purposes those funds may be expended, and under what conditions. As the Supreme Court explained, "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of Congressional control over funds in the Treasury." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990); *see Knote v. United States*, 95 U.S. 149, 154 (1877) (even the President's pardon power "cannot touch moneys in the treasury of the United States, except as expressly authorized by act of Congress"); *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion.").

39.     Under the Appropriations Clause, Congress has plenary power to limit not just how much money may be spent by the executive, but also when the funds may be spent, and for what purposes. "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government. It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213–14 (1833)); *see also* The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed. 1961).[1] In *Department of*

---

[1] *See also U.S. House of Representatives v. Mnuchin*, 978 F.3d 1, 8 (D.C. Cir. 2020) (The Appropriations Clause is "a core structural protection of the Constitution—a wall, so to speak, between the branches of government that prevents encroachment of the House's and Senate's

*the Navy v. Federal Labor Relations Authority*, for example, the D.C. Circuit concluded that the Appropriations Clause and federal appropriations statutes, including the purpose statute, 31 U.S.C § 1301(a), barred the Navy from providing free bottled water to its employees when safe drinking water was otherwise available for free. Because Congress had made no provision that authorized the purchase of bottled water, the court concluded that that purchase would exceed the limited and specific purposes for which Congress had appropriated funds to the Navy. 665 F.3d at 1348–49.

40.    It is *a fortiori* the case when Congress *prohibits* appropriated funds from being used for any purpose, the executive branch has no discretion—none—to spend one dollar of those funds for that purpose. The Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress." *Richmond*, 496 U.S. at 428; Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343, 1353 (1988) ("All appropriations thus may be conceived of as lump-sum grants with 'strings' attached. These strings, or conditions of expenditure, constitute legislative prescriptions that bind the operating arm of government."). As the Department of Justice's Office of Legal Counsel has recognized, "Congress's spending power is undoubtedly broad, and, as a general matter, Congress may decline to appropriate money altogether for a particular function, or place binding conditions on the appropriations it does make." *Constitutionality of Section 7054 of the Fiscal Year 2009 Foreign Appropriations Act*, 33 Op. O.L.C. 221, 235–36 (2009), https://perma.cc/K7F2-VG9G; *see also Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233, 1955 WL 3675 (1955) ("It is recognized that Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted."). Unless an appropriations rider violates some independent constitutional provisions—and Defendants have never argued in this case that

_____

power of the purse."), *judgment vacated as moot sub nom. Yellen v. U.S. House of Representatives*, 142 S. Ct. 332 (2021).

the oversight rider does—it lies within Congress's plenary authority to dictate the terms on which appropriated funds may, and may not, be used.

41.    "[A]s penetrating and far-reaching as the potential power to enact and appropriate under the Constitution" is Congress's power to investigate. *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).

42.    "From the earliest times in its history, the Congress has assiduously performed an informing function" that permits members of Congress "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (quotation marks omitted). The Supreme Court has long recognized that "the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1924). The power to "secure needed information" is thus firmly grounded in Congress's duty and authority to exercise "[a]ll legislative powers" under article I of the U.S. Constitution. *Id.* at 160–61. It "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump v. Mazars*, 591 U.S. 848, 862 (2020) (quoting *Watkins*, 354 U.S. at 187).

43.    Congress exercises its investigative duty and authority in various ways. Through its committees, for example, it regularly requests and, when necessary, compels documents and testimony, including from executive branch officials. Individual members of Congress play distinct oversight roles, and "each member needs accurate information from the executive branch in order

to make informed decisions on all sorts of matters."[2] Those matters vary by member, according to the concerns of their constituents, their committee memberships, and their issue areas of focus. For example, pursuant to their individual oversight roles, members of Congress regularly write letters raising concerns to and requesting information from executive branch officials, and they seek information on the ground through in-person investigations.[3]

44.    Congressional oversight over DHS and ICE is particularly important because those agencies have received significant—and increasing—appropriated funds, which they use to apprehend, detain, and remove individuals from the United States.

## II. Each Member of Congress Has a Right to Conduct Oversight Visits at DHS Facilities

### A. The oversight rider provides an individual right for members of Congress to conduct oversight visits

45.    Robust and effective congressional oversight of DHS and ICE is critical, particularly in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens.

46.    To that end, Republican and Democratic members alike have sought information about ICE facilities through requests for information, hearing testimony, and in-person member and staff oversight visits.[4] And they have used that information to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds, to draft and pass relevant legislation, to

---

[2] *See, e.g.*, Press Release, Sen. Charles Grassley, Grassley on the Importance and Responsibility of Congressional Oversight (June 25, 2018), https://perma.cc/N687-4XQC.

[3] *See, e.g.*, Levin Center for Oversight and Democracy, *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, & Abuse in World War II*, https://perma.cc/4EJU-Z6Y4; Press Release, Sen. Charles Grassley, Grassley to Gates: Defense IG Audits Need Changes in order to Root Out Waste (Sept. 8, 2010), https://perma.cc/QH83-HUX2.

[4] *See, e.g.*, Brian Fitzpatrick, Press Release, Fitzpatrick Leads Bipartisan Inspection of Tornillo Detention Center (June 22, 2018), https://perma.cc/M299-W4AD; Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021), https://perma.cc/ALL9-KB83.

attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

47.    Members of Congress have also long engaged in on-the-ground, in-person oversight to obtain relevant information.

48.    This method of oversight became especially important for many members of Congress during the first Trump administration.[5] In 2018, a humanitarian crisis created by the administration rapidly unfolded at the southern border, where "children and families [were] subjected to inhumane conditions, asylum seekers [were] denied access to our nation's legal ports of entry, and thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became particularly concerned about "DHS'[s] poor management of this humanitarian crisis." *Id.*

49.    Members of Congress who attempted to conduct oversight to assess the detention conditions of separated families in 2018 were routinely frustrated in their attempts to assess on-the-ground conditions of immigration detention facilities without delay and often denied entry to these facilities completely.[6] This included members of Congress who are now Plaintiffs in this lawsuit.

50.    Congress recognized that obtaining real-time information in person at those facilities, including speaking directly with both DHS employees and detained individuals, played an important role in effective oversight of the administration's use of appropriated funds and its treatment of noncitizens.

---

[5] *See, e.g.*, H.R. 6256, 115th Cong. (2d Sess. 2018) (proposed bipartisan bill to "require the Secretary of Homeland Security and the Secretary of Health and Human Services to allow Members of Congress to tour detention facilities that house foreign national minors"); *They Are Not Letting Us In': Nelson, Wasserman Schultz Denied Entry to Kid Migrant Shelter*, CBSMiami (June 19, 2018), https://perma.cc/F6QD-FTY6.

[6] *See, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

51.     To ensure its members' ability to assess true facility conditions without obstruction, Congress included a provision in the fiscal year 2019 appropriations bill that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532, 113 Stat. 13, 42 (Feb. 15, 2019).

52.     President Trump signed that provision into law. The provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility used to detain or otherwise house noncitizen minors. *Id.*

53.     Emphasizing the importance of obtaining accurate information about immigration detention, the provision further prohibited the use of appropriated funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress, compared to what would be observed in the absence of such modification." *Id.*

54.     In enacting this provision, Congress was thus focused on the ability of its members to assess the *actual* conditions in which minor migrants are detained by DHS, without alteration or manipulation by executive branch officials.

55.     This provision was a direct response to DHS's obstruction of congressional oversight of its facilities.

56.     Many members of Congress, including several Plaintiffs, exercised their right to conduct in-person oversight at DHS detention facilities in the weeks and months following the passage of the fiscal year 2019 oversight provision.

57.     It was soon clear, however, that the need for oversight by individual members of Congress was not limited to facilities housing noncitizen minors. Indeed, members of Congress were already actively engaged in this oversight with respect to all individuals detained or housed by DHS.

58.     For example, by July 2019, Plaintiff Representative Crow had instituted weekly visits by him or his staff to the ICE detention facility in his district. Representative Crow and his office began to build a productive relationship with ICE officials that has both informed his legislative activities and allowed him to better serve his constituents through close and constructive oversight of that facility.

59.     Members on committees with jurisdiction over DHS and ICE likewise actively exercised their oversight visit rights after the provision's passage. In the summer of 2019, under Plaintiff Representative (then-Chairman) Thompson's direction, the House Committee on Homeland Security staff conducted an investigation that involved oversight visits to eight ICE facilities across five states, to assess the conditions of confinement and adequacy of the internal oversight tools.[7] And in August and September of 2019, the House Committee on Oversight and Reform and its Subcommittee on Civil Rights and Civil Liberties—of which Plaintiff Representative Raskin was then chair—sent bipartisan staff delegations to conduct oversight visits at 22 DHS detention facilities across six states, including 12 ICE detention facilities.[8]

60.     In addition, although members were provided a right of access to DHS facilities housing noncitizen minors for oversight purposes, staff did not have the same statutory protection in the fiscal year 2019 oversight provision. Congressional staff occasionally encountered difficulties accessing DHS detention facilities in the course of aiding members in their oversight duties.[9] Those difficulties underscored for Congress the importance of allowing members' staff to aid in their oversight work in DHS facilities where noncitizens of all ages are detained or otherwise housed.[10]

---

[7] Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC ("*ICE Detention Facilities* Report").

[8] Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* (2020), https://perma.cc/37NF-SFBS.

[9] *Id.*; *ICE Detention Facilities* Report, *supra* n.7, at 5–6.

[10] *See, e.g.*, Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K. McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4.

61.     As a result, the following year, in fiscal year 2020 appropriations, Congress expanded members' right of oversight access in multiple ways.

62.     First, Congress broadened the provision to apply to DHS facilities used to detain or otherwise house *any* noncitizens—not just minors. Consolidated Appropriations Act, 2020, div. D, title V, § 532(a), 133 Stat. at 2530.

63.     Second, Congress added that "[n]othing" in the provision "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a DHS facility used to detain or otherwise house noncitizens. *Id.* § 532(b).

64.     Finally, it "broadened the applicability" of the provision "to designated congressional staff," providing that "while Members need not provide prior notice of their visit, DHS can require at least 24 hours' notice for designated staff to visit."[11] *See id.* § 532(a), (c).

65.     This expanded provision has been carried forward with identical language in DHS appropriations every year since, including in the most recent continuing resolution signed by President Trump. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, §§ 101, 103, 139 Stat. 495, 496–97, 504 (2025).[12]

66.     On January 22, 2026, the House passed a bill providing fiscal year 2026 appropriations for DHS and ICE. H.R. 7147, 119th Cong. (2026). The House bill maintains the oversight rider, unchanged, at section 547. *Id.* § 547. The bill is currently under consideration in the Senate.

---

[11] CRS, R46113, *Department of Homeland Security Appropriations: FY2020* (Jan. 21, 2020), https://perma.cc/C344-CDBN.

[12] *See* FY2024 Appropriations Act, div. C, title V, § 527; Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022); FY2025 Continuing Resolution, §§ 1101(a)(6), 1105.

67.     Thus, since 2019, the law has provided that no funds appropriated to DHS "may be used to prevent . . . [a] member of Congress" or their designated congressional employee "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens," nor may funds be used "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification." *Id.* § 527(a).

68.     The law further provides, in no uncertain terms, that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter [such] a facility . . . for the purpose of conducting oversight." *Id.* § 527(b). The provision allows a narrow exception, however, that DHS "may require that a request be made at least 24 hours in advance of an intent to enter a facility" by a designated congressional employee—but not for the members themselves. *Id.* § 527(c).

69.     Lest there be any doubt, in November 2025, and again in January 2026, Congress reaffirmed its intention to continue the ban on preventing congressional oversight of immigration detention facilities through the passage of the continuing resolution that currently funds the agency's operations. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025).

**B.  Congressional oversight at DHS facilities is critical**

70.     As the oversight rider currently in section 527 reflects, the information gained from congressional visits to facilities where individuals are detained or otherwise housed—through both scheduled and unannounced visits—is essential to effective congressional oversight of DHS and ICE. This oversight is critical today.

71.     In recent years, congressional reports have expressed particular concern regarding "conditions and care provided at ICE's civil detention facilities" and "conditions and lack of adequate infrastructure at ICE's . . . field offices and sub-offices that serve migrants."[13] Congressional visits to several ICE detention facilities in 2021 "found that ICE . . . le[ft] deficiencies unidentified and uncorrected, and that ICE facilities frequently failed to meet basic standards of care."[14] Reflecting these concerns, since fiscal year 2018, Congress has mandated that ICE publicly report all deaths that occur in immigration custody within 90 days.[15]

72.     Members of Congress and their staff have continually sought timely information on the ground regarding the conditions of DHS facilities used to detain or otherwise house noncitizens.

73.     For example, the 2020 Homeland Security Committee staff oversight report highlighted the failures of internal ICE oversight of immigration detention facilities.[16] The report emphasized that when congressional staff provided advance notice of oversight visits, "ICE facilities used the advanced warning to improve the conditions within the facility."[17] Staff detected evidence of those improvements, including the smell of fresh paint, evidence of a major clean-up, the relocation of individuals from solitary cells to the general population, and the installation of new guards.[18]

74.     Congressional findings regarding the failures of internal DHS oversight underscore the critical role of direct congressional oversight on the ground, and members' and staff's experiences demonstrate the importance of conducting that oversight in real time, without prior notice.

---

[13] H.R. Rep. No. 116-180, at 34–35 (2019).
[14] H.R. Rep. No. 116-720, at 106 (2021).
[15] *Detainee Death Reporting*, ICE, https://perma.cc/3TST-Q5EX.
[16] *ICE Detention Facilities* Report, *supra* n.7, at 1–2.
[17] *Id.* at 8.
[18] *Id.* at 5.

75.    The need for congressional oversight over immigration detention facilities has never been more dire.

76.    The number of individuals detained by ICE has exploded in the past year. In February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals[19]—and that number has only continued to increase since then. In March 2025, ICE held 47,600 individuals in detention and announced that immigration detention facilities had been filled to capacity.[20] In January 2026, the number of individuals detained in ICE custody hit an all-time high: as many as 73,000 individuals were detained in ICE custody.[21] There is every indication that the number of ICE arrests and detentions will only continue to grow at an unmanageable rate, in service of the administration's stated goal of deporting more than one million people each year.[22]

77.    Unsurprisingly, multiple federal judges have concluded that ICE has repeatedly violated the rights of noncitizens and citizens under the guise of immigration enforcement operations that have become increasingly violent. Numerous U.S. citizens have been mistakenly detained, with no opportunity to prove their citizenship.[23] For example, a 25-year-old citizen and U.S. Army veteran was wrongfully detained by ICE during a raid at the farm where he works as a

---

[19] Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

[20] *US immigration detention maxed out at 47,600 detainees, ICE official says*, Reuters (Mar. 12, 2025), https://perma.cc/6ZDL-F3JH.

[21] Camilo Montoya-Galvez, *ICE's detainee population reaches new record high of 73,000, as crackdown widens*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/

[22] Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.

[23] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily J. (June 19, 2025), https://perma.cc/CNQ6-2CC4; Dani Anguiano, *US citizen arrested during Ice raid in what family describes as 'kidnapping'*, Guardian (June 26, 2025), https://perma.cc/L98U-NMA9; Judd Legum, *US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False*, Mother Jones (Apr. 23, 2025), https://perma.cc/NP4S-926K.

security guard.[24] At another raid, multiple American citizens were detained by ICE with no due process, and a lawyer representing one of them was not permitted to speak with his client while the client was in a detention facility.[25] In December 2025, a 22-year-old Maryland woman spent 25 days in ICE custody despite her attorneys providing documentation that showed she was born in the United States.[26]

78.     Over the past year, DHS has moved from one city to the next, conducting crackdowns targeting perceived immigrants. During these chaotic operations, federal agents indiscriminately arrest huge numbers of individuals—a mix of citizens and noncitizens, with a variety of immigration statuses. They are arrested for alleged immigration and non-immigration-related offenses through targeted operations, random dragnet-style stops, and while protesting ICE operations.

79.     As the number of arrested and detained individuals has grown far beyond the capacity of existing ICE detention facilities, DHS has resorted to using ICE field offices and other federal buildings to detain or otherwise house individuals. Defendants transport these individuals to overcrowded, under-resourced facilities that are not suited to hold large numbers of individuals for extended periods of time.

80.     The conditions of confinement at field offices are of particular concern because field offices are not designed or set up to be facilities in which individuals are detained or housed, nor are field offices subjected to the same audits and inspections as larger ICE detention centers. ICE generally does not consider field offices subject to its detention standards and exempts field offices

---

[24] Angelique Brenes, *Disabled veteran detained during immigration raid speaks out, alleges civil rights violations*, KTLA5 (July 15, 2025), https://perma.cc/SY64-2DX6.

[25] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://perma.cc/C5FN-KXUD.

[26] Marina Dunbar, *Maryland woman who says she is US citizen finally released from ICE custody*, The Guardian (Jan. 9, 2026), https://www.theguardian.com/us-news/2026/jan/09/maryland-woman-us-citizen-released-ice-custody.

from requirements to uphold certain standards for safety, security, and care and from attendant internal oversight.

81.     As DHS's enforcement operations have moved around the country, they have led to unequivocal judicial orders from federal courts in California, New York, Illinois, and Maryland finding that the DHS and ICE have violated the law.[27] Multiple federal courts have confirmed that detention conditions at challenged facilities drastically deteriorated as the number of individuals in ICE custody rose.[28] Multiple federal courts have also determined that detainees in ICE facilities are unlawfully being denied medical care, forced to sleep on the floor in overcrowded cells, severely underfed, and denied access to counsel. *See, e.g.*, Temporary Restraining Order, *Moreno Gonzalez v. Noem*, No. 1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF No. 49; Preliminary Injunction, *Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97.[29]

82.     These shocking and unlawful detention conditions have directly affected facilities where Plaintiffs and other members of Congress have attempted to conduct oversight. In June 2025, for example, members of Congress received reports that immigrants were being detained and held

---

[27] *See, e.g.*, Order, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Apr. 11, 2025), ECF No. 61; *Moreno Gonzalez v. Noem*, No. 1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF Nos. 49 (Temporary Restraining Order, Nov. 5, 2025), 87 (Memorandum Opinion, Nov. 17, 2025); Preliminary Injunction, *Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97; Order Granting Motion for Preliminary Injunction, *Pedro Vasquez Perdomo v. Noem*, No. 2:25-cv-5605 (C.D. Cal. Nov. 13, 2025), ECF No. 256.

[28] Yale Law School, News, *Students Document Reports of Abuse at Immigration Detention Center* (Jan. 17, 2025), https://perma.cc/4MA4-VF6K; Jasmine Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers*, NPR (June 6, 2025), https://perma.cc/B9B6-KN2D; Tracee Wilkins & Rick Yarborough, *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Wash. (Mar. 12, 2025), https://perma.cc/MCM8-UMZP.

[29] Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers,* https://perma.cc/B9B6-KN2D; Wilkins and Yarborough, *'Like living in a dark room'*, https://perma.cc/MCM8-UMZP; Allen Cone, *Acting head of ICE clashes with Democrats, says agency funding assured through fiscal 2026*, UPI (May 14, 2025), https://perma.cc/K9XG-ZKRN; Lauren Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA Today (Mar. 24, 2025), https://perma.cc/QW2W-M4XX.

overnight in the basement of the ICE Los Angeles Field Office in inhumane conditions. News reporting corroborated the stories they were hearing from constituents.[30]

83.    In July 2025, video footage captured by an individual detained at the ICE New York Field Office in Manhattan showed significant overcrowding and a lack of safe and sanitary conditions.[31] After a lawsuit was filed challenging the conditions in this field office, ICE transported "most of the people" detained at the facility in a matter of hours, reducing the number of detainees from an estimated 90 to 26. *See also Barco Mercado*, No. 1:25-cv-6568, ECF No. 81. However, a 62-year-old man was reportedly held inside the New York Field Office for two and a half months.[32]

84.    The conditions at the ICE New York Field Office—which Representative Goldman and Espaillat were prevented from visiting between June and December 2025—led to the issuance of a preliminary injunction requiring ICE to supply adequate space, hygienic products, clean sleeping mats, and access to counsel. *See* Preliminary Injunction, *Barco Mercado*, No. 1:25-cv-6568, ECF No. 97.

85.    In September 2025, reporting suggested that the number of individuals detained at the ICE Washington Field Office—where three Plaintiffs were prevented from conducting oversight visits prior to this Court's December stay order—drastically increased with the surge of ICE agents

---

[30] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[31] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

[32] José Olivares & Will Craft, *Revealed: ICE violates its own policy by holding people in secretive rooms for days or weeks*, The Guardian (Oct. 30, 2025), https://www.theguardian.com/us-news/2025/oct/30/ice-hidden-detention-sites.

and checkpoints in Washington, D.C.[33] This included allegations that 80 to 90 individuals were detained for days in rooms designed to hold a handful of individuals.[34]

86.     In November 2025, a federal judge in Chicago issued a temporary restraining order related to the ICE facility in Broadview because of "deplorable conditions," which included "[l]ack of adequate food," "[l]ack of sufficient clean water," "[l]ack of personal hygiene products," "[e]xtremely overcrowded holding cells," "[n]o access to sufficient bedding or space to sleep," "dirty holding cells that are rarely or never cleaned," "[i]nsufficient and dirty toilet facilities," "[l]ack of access to medication, including those that detainees arrived with on their person or that were provided by family members," "[n]o access to showers or other bathing facilities," and "systemic lack of access to counsel." Mem. Op. at 2–3, *Moreno Gonzalez*, No. 1:25-cv-13323, ECF No. 87. The conditions prompted the judge to take the extraordinary step of assessing the conditions of the Broadview facility in person. Minute Entry, *id.*, ECF No. 59.

87.     In Louisiana and Georgia, there are allegations that pregnant women were detained in ICE custody, in violation of agency guidance, and mistreated while there.[35] These women reported disturbing accounts, including the shackling and use of restraints when women were being transported to the hospital while profusely bleeding from a miscarriage, placement in solitary confinement, denial of prenatal vitamins, inadequate food, delayed or substandard medical care, and lack of interpretation during medical visits leading to multiple invasive procedures without their consent. One woman experienced a dangerous infection after a miscarriage due to the lack of care she received in ICE custody.

---

[33] *E.g.*, Teo Armus et al., *ICE holding facilities overcrowded amid surge in immigration arrests*, Wash. Post (Sept. 12, 2025), https://perma.cc/KA3D-73MF.

[34] Letter from ACLU Va. & Nat'l Immigr. Project to Sec'y Kristi Noem et al. (Sept. 4, 2025), https://perma.cc/ST2Z-X9EA.

[35] Letter from ACLU et al. to Acting ICE Director Lyons et al. (Oct. 22, 2025), https://perma.cc/W2XP-CFJC.

88.     ICE's detention practices have had deadly consequences. At least 31 people died in ICE custody in 2025, a two-decade high and nearly triple the number of deaths in ICE custody in 2024.[36] At least five people have reportedly died in ICE custody in just the first few weeks of 2026, including two individuals who died while detained at the Camp East Montana Detention Facility in El Paso, Texas.[37] One of the two deaths in El Paso involved a detainee who reportedly was choked to death by guards, and whose death was classified by the medical examiner as a homicide.[38]

89.     In the Trump-Vance administration's latest attempt to weaponize ICE and terrorize communities, ICE has been engaged in a brutal crackdown in Minneapolis, Minnesota, following much the same playbook as it did in Portland, California, New York, Chicago, and Washington, D.C.

90.     Beginning in December 2025, DHS launched what they describe as "the largest DHS operation ever," called "Operation Metro Surge," sending thousands of federal law enforcement agents to Minnesota, with the primary focus on the Twin Cities metro area.[39]

91.     In this surge, Secretary Noem claims to have arrested thousands of individuals in a matter of weeks.[40]

92.     ICE has engaged in brutal and increasingly violent arrest tactics in Minneapolis. ICE has arrested U.S. citizens in the Twin Cities for observing law enforcement operations or otherwise

---

[36] Maanvi Singh et al., *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, Guardian (Jan. 4, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline.

[37] Victoria Bekiempis, *Second man dies at Texas ICE detention facility in two weeks*, The Guardian (Jan. 19, 2026), https://www.theguardian.com/us-news/2026/jan/19/second-death-ice-facility-texas.

[38] Douglas MacMillan, *Medical examiner likely to classify death of ICE detainee as homicide, recorded call says*, Wash. Post (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/.

[39] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* AP (Jan. 6, 2026), https://perma.cc/KA2E-DW7X.

[40] Sec. Kristy Noem (@Sec_Noem), X (Jan. 19, 2026, 9:40 AM CT), https://perma.cc/D74M-VJFR.

engaging in lawful protest, *see, e.g.*, *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at *2–14 (D. Minn. Jan. 16, 2026). DHS has arrested parents dropping their children off at school, and high school children at school.[41] DHS detained a five-year-old boy after using him as bait to locate other family members,[42] and arrested a father holding his two-year-old daughter in his arms.[43]

93.     In just the past few weeks, DHS officers in Minneapolis have shot and killed two Americans under the guise of immigration enforcement.

94.     On January 7, DHS shot and killed Renee Good while she was in her vehicle. On January 24, DHS shot and killed Alex Jeffrey Pretti as he was protesting ICE's activities.

95.     It is no coincidence that DHS is, once again, attempting to prevent congressional oversight of ICE detention facilities at the height of its violent "immigration enforcement" surge in Minneapolis.

96.     Because of this surge in immigration detention around the country, close congressional oversight of DHS facilities is critical to ensure that members of Congress are fully informed about the conditions in these facilities and can address them as appropriate through legislation and appropriations.

97.     The consequences of congressmembers' inability to personally conduct oversight on the ground are compounded by the administration's gutting of three DHS oversight offices—the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO).

---

[41] Beth Hawkins, *As ICE targets Twin Cities schools & bus stops even citizens keep kids home*, MinnPost (Jan. 22, 2026), https://www.minnpost.com/education/2026/01/as-ice-targets-twin-cities-schools-bus-stops-even-citizens-keep-kids-home/.

[42] Andrew Jeong, *ICE detains four children from Minnesota school district, including 5-year-old*, Wash. Post (Jan. 22, 2026)**,** https://www.washingtonpost.com/immigration/2026/01/22/minnesota-ice-columbia-heights-school/.

[43] Emma Tucker, *Minnesota toddler taken into ICE custody with father and flown to Texas is returned to mother next day, lawyer says*, CNN (Jan. 25, 2026), https://www.cnn.com/2026/01/24/us/elvis-tipan-echeverria-toddler-ice-arrest-minnesota.

Congress tasked these three independent offices with distinct roles in receiving and investigating complaints and performing other oversight functions within DHS, to ensure lawful treatment of individuals by DHS components and to provide for the investigation and resolution of DHS activities, including immigration detention.

98.     For example, CRCL's responsibilities include reviewing and investigating complaints of civil rights and civil liberties abuses; overseeing DHS compliance with legal requirements related to the civil rights and civil liberties of people affected by DHS programs and activities; and helping DHS develop and implement policies and procedures for that compliance. 6 U.S.C. § 345(a). OIDO is tasked with deploying individuals in the field to work independently in DHS detention facilities and to conduct unannounced inspections at DHS detention facilities, to which they are statutorily required to have unfettered access, and providing direct assistance to detained individuals. 6 U.S.C. § 205(c), (d)(2). And all three offices must provide regular reports to Congress on their investigations, case work, and recommendations. 6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

99.     In March 2025, DHS placed essentially all employees of OIDO, CRCL, and the CIS Ombudsman's Office on administrative leave. Those three critical internal oversight offices ceased performing nearly all oversight functions. DHS then separated nearly all employees of those offices through a "reduction in force" that went into effect in May.

100.     As a result of these reductions of staff in these offices, OIDO conducted only two-thirds the number of detention facility inspections in 2025 as it had the prior year—102 facility inspections in 2025, compared to 160 in 2024.[44]

---

[44] *See ODO ICE Facility Inspections*, U.S. Customs & Immigration Enforcement, https://www.ice.gov/foia/odo-facility-inspections (last accessed Jan. 21, 2026).

101.    The absence of statutorily required administrative oversight personnel on the ground in DHS facilities deprives Congress of important information that it would ordinarily receive from those internal DHS oversight offices. Congress's direct oversight role is therefore even more critical than ever.

102.    Members of Congress have both a statutory right and a duty to assess how federal appropriations are being used at DHS facilities that detain or otherwise house noncitizens. Such a dramatic expansion of detention within ICE facilities has created more opportunities for abuse and misuse of power, making robust congressional oversight more important than ever.

## III. Defendants' Repeated, Unlawful Obstruction of Plaintiffs' Oversight Visits to DHS Facilities

### A. Defendants adopt and enforce a policy and practice of obstructing congressional oversight

103.    On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Lyons testified that he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ; *see also id.* ("[W]e have proper access and oversight from the men and women of your committee and Congress to oversee what Immigration and Custom Enforcement are doing in our detention centers [because] we have nothing to hide.").

104.    In mid-June, however, ICE stated on its website, for the first time, that it would prohibit members of Congress from conducting oversight visits at ICE field offices.

105.    Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE issued a guidance document that contained the novel contention that field offices are not "used to detain or otherwise house aliens"

because the individuals housed there have not yet been processed for longer-term "custody

determinations."[45]

106.    Pursuant to this unfounded interpretation, Defendants prevented Plaintiffs from

conducting oversight visits to DHS facilities, including ICE field offices, where individuals are being

detained or otherwise housed.

107.    The guidance document and ICE's website further provided that, although advance

notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be

submitted at least 72 hours in advance."[46] It also reiterated, consistent with the statute, that staff

members must provide at least 24 hours' notice.

108.    By June 23, Defendants removed the guidance document and changed the language

on its website.

109.    Despite ICE's acknowledgment that members of Congress "are not required to

provide advance notice for visits" by law, under their policy, Defendants "require[] requests be made

a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. Any

requests to shorten that time must be approved by the DHS Secretary."[47]

110.    ICE did not post a new guidance document providing details or otherwise explaining

its oversight visit policies.

111.    In June, DHS and ICE officials began denying Plaintiffs access to DHS facilities on

the stated grounds that Defendants require at least seven days' notice and that some facilities,

including ICE field offices, are entirely exempt from congressional oversight.

---

[45] DHS, U.S. Immigration and Customs Enforcement (ICE) Facility Visits and Engagement
Protocol for Members of Congress and Staff (June 2025), https://perma.cc/UL23-J4ZM.

[46] *Id.*

[47] *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV.

**B.  Recent Congressional Appropriations to DHS and ICE**

112.    Congress enacted the Reconciliation Act in July 2025. Pub. L. No. 119-21, 139 Stat. 72 (2025). In relevant part, the act provided additional funding to DHS and ICE for specific purposes. For example, the act provided $45 billion to ICE "for single adult alien detention capacity and family residential center capacity,", *id.*, tit. X, § 90003, 139 Stat. at 358, and $10 billion to DHS "for reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States," *id.*, tit. X, § 90007, 139 Stat. at 361. The act further provided $2.055 billion to DHS for such purposes as the hiring and training of certain CBP and DHS personnel, transportation costs related to deportation or return of certain migrants, and "[i]nformation technology investments to support immigration purposes." *Id.*, tit. X, § 100051, 139 Stat. at 385–87. Finally, the act provided an additional $29.850 billion to ICE for such purposes as "[h]iring and training" certain ICE personnel; "[p]roviding performance, retention, and signing bonuses for qualified [ICE] personnel"; "[f]acilitating the recruitment, hiring, and onboarding of additional [ICE] personnel"; transportation and "related costs associated with" migrant departure and removal; information technology investments, facility upgrades, fleet modernization; and "[p]romoting family unity." *Id.*, tit. X, § 100052, 139 Stat. at 387–89.

113.    The reconciliation act provided funds for these purposes in addition to the annually appropriated funds provided as the initial and principal source of funds for operating DHS and its components.

114.    The act did not provide that any of the additional funds it made available could be used to prevent members of Congress from entering DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight. Nor did the act provide authority for DHS or its components to use the additional funds to ignore restrictions on their operations otherwise imposed through the annual appropriations laws.

115.    Four months after the passage of the reconciliation act, Congress unequivocally reaffirmed its intention to continue the ban on preventing congressional oversight in immigration detention facilities through the passage of the continuing resolution that is currently intended to fund the agency's operations. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, 139 Stat. 495, 496 (Nov. 12, 2025). That funding expires on January 30, 2026.

116.    On January 22, 2026, the House passed a bill providing fiscal year 2026 appropriations for DHS and ICE. H.R. 7147, 119th Cong. (2026). The House bill maintains the oversight rider, unchanged, at section 547. *Id.* § 547. The bill is currently under consideration in the Senate.

### C.  This Court's Section 705 Stay

117.    In Plaintiffs' original complaint in this action, twelve individual members of Congress challenged the oversight visit policies as unlawful and in excess of Defendants' authority. They moved for a stay of that policy under section 705 or, in the alternative, for a preliminary injunction, to ensure that members of Congress could continue to conduct critical oversight visits during the pendency of this litigation.

118.    This Court granted Plaintiffs' motion and stayed Defendants' policy on December 17, 2025. The Court concluded that "Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority." Op. at 59.

119.    In particular, the Court determined that "a seven day notice policy is [not] permissible under" the oversight rider and is not otherwise authorized by law. Op. at 56–58. The Court further held that Plaintiffs had "shown that they suffer irreparable harm" due to the oversight

policy and that the "public interest and the balance of equitable considerations weigh[ed] strongly in favor of granting Plaintiffs their requested relief." Op. at 70. The Court thus stayed the oversight visit policy under section 705 pending the conclusion of this litigation. Op. at 73.

120.    Defendants have not appealed the Court's order staying the policy.

121.    Defendants' answer to Plaintiffs' original complaint was due on January 16, 2026. *See* Minute Order (Aug. 15, 2025). Defendants failed to file any response to the complaint by that date.

### D.  Plaintiffs conduct oversight visits without issue between December 17 and January 8

122.    After the Court issued its order staying Defendants' unlawful oversight visit policies, Plaintiffs and other members of Congress immediately recommenced their oversight duties at ICE facilities across the country, including field offices.[48]

123.    Those visits occurred without incident, *contra* Mem. from Secretary Noem, *Congressional Access to Alien Detention Facilities – Access Policy and Use of Appropriations for Enforcement*, ECF No. 39-1 ("Jan. 8 Memo") (asserting, without support, a need for advance notice to "protect[]" persons during oversight visits).

124.    These visits provided valuable information to members who have identified serious deficiencies in detention conditions and obtained timely information that aided Members' determinations of laws and appropriations relating to DHS and ICE.

125.    For example, Representatives Goldman and Espaillat visited the 10th floor detention facility at 26 Federal Plaza in New York City on December 19, 2025, at 9:00 am. A member of

---

[48] *See, e.g.*, Luis Ferré-Sadurní and Olivia Bensimon, *ICE Allows Democratic Lawmakers Inside Migrant Cells in New York City*, N.Y. Times (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/nyregion/ice-congress-detention-nyc.html; Matt Materson, *'Accountability Is Not Optional': Illinois Congressional Reps Tour Broadview Ice Facility Monday*, WTTW (Dec. 22, 2025), https://news.wttw.com/2025/12/22/accountability-not-optional-illinois-congressional reps-tour-broadview-ice-facility; Jordan Rynning, *Rep. Jimmy Gomez inspects ICE facility in LA during unannounced visit*, LAist (Dec. 19, 2025), https://laist.com/news/politics/rep-jimmy-gomez-inspects ice-facility-in-la-during-unannounced-visit.

Representative Goldman's staff provided one day's notice of the representatives' intent to visit the facility.

126.    The visit occurred at the planned time. Representatives Goldman and Espaillat observed detainees sleeping on the floor on thin mats and blankets and with toilets in the same areas where they sat, waited, and slept. They also saw that there were no showers in the facility.

127.    Representatives Goldman and Espaillat also observed multiple staff members mopping and cleaning the detention space, and Representative Goldman noted that conditions were generally clean and orderly, in contrast to conditions shown in videos of the facility during the summer of 2025, when his oversight access had been obstructed.

128.    An ICE official told Representative Espaillat that some detainees could stay in the facility as long as 72 hours before they were transferred to other facilities.

129.    Representative Goldman made an unannounced visit to the same facility on January 5, 2026. He was admitted without incident and again observed individuals sleeping without beds, on the same thin mats with thin foil blankets. He noted that the conditions were again clean.

130.    Representative Crow's office conducted an oversight visit of the Aurora facility and observed that due to the increased number of individuals detained there, special management units, including segregated housing and units for vulnerable populations, are now being used for general housing to accommodate additional detainees.

131.    During one visit, Representative Escobar learned from female detainees that ICE had been cleaning up the facility in the days leading up to the oversight visit that had been scheduled in advance. They shared that, in light of the unusual cleaning, the detainees anticipated a visit.

132.    Representative Gomez learned that the ICE field office at the Roybal Federal Building ("LA Field Office") that he visited did not have a kitchen, did not have medical personnel on site, and stocked only some nonrefrigerated medications.  He also learned that, although the LA

facility is not designed to hold people for longer than 12 hours, some people had been in custody for longer than 12 hours, some for up to 72 hours.

133.    Plaintiff Representatives Correa, Escobar, Espaillat, Goldman, and Gomez conducted oversight visits at ICE detention facilities without incident during the time in which this Court's stay was in place.

### E.  Defendants again impose a policy to obstruct congressional oversight

134.    On January 8, 2026, Secretary of Homeland Security Kristi Noem issued a memorandum to Todd Lyons, the acting director of ICE, and Holly Mehringer, a senior officer performing the duties of the chief financial officer, setting out a purported "new policy," "effective immediately." Jan. 8 Memo at 1.

135.    The memorandum reimposes an identical seven-day-notice requirement and states that congressional oversight "[f]acility visit requests must be made a minimum of seven (7) calendar days in advance." *Id.* at 2. Such requests must be made "during normal business hours" and "are not considered actionable until [ICE Office of Congressional Relations (OCR)] acknowledges receipt of the request." *Id.*

136.    In an attempt to circumvent both the oversight rider and this Court's stay order, the secretary instructed ICE to "ensure that this policy is implemented and enforced exclusively with money appropriated by" the reconciliation act, and she stated that she "anticipate[s]" that the reconciliation act provides adequate funding. *Id.* She further instructed that "the Chief Financial Officer, in consultation with the General Counsel, shall ensure appropriate funding for the promulgation of this policy, including use of [reconciliation act] funding where appropriate." *Id.*

137.    DHS's stated "basis" for the duplicate policy "is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE

employees alike," and that "[u]nannounced visits require pulling ICE officers away from their normal duties." *Id.*

138.    Despite the fact that there had been no issues with congressional visits between the time of the stay and the reimposition of a notice requirement, ICE stated that "there is an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions." *Id.*

139.    Additionally, even once a member of Congress is granted access to an ICE facility, Defendants now restrict Plaintiffs' ability to speak with or visit with specific detainees once inside a facility.

140.    Previously, ICE had permitted members to identify individuals with whom they wanted to visit and then complete privacy releases in real time, during their visit.

141.    ICE now states that members cannot "have any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters." This includes a prohibition on "meetings with detainees in detention facilities without valid, signed privacy releases."

142.    If a member or staff "would like to meet with a specific detainee or set of detainees," they must "provide names, alien registration numbers, and valid, signed privacy releases with [the] request," which must be made seven days in advance. In other words, an individual in ICE's custody must somehow send a completed privacy release to a member outside the facility so that the member may be permitted to visit the facility, erecting a catch-22-inspired barrier to oversight.

### F.    Defendants used funds subject to the oversight rider to prevent members of Congress from conducting oversight of ICE facilities

143.    Within two days, Defendants began enforcing the January 8 memorandum.

144.    Defendants have continued to prevent members of Congress from conducting oversight at ICE facilities pursuant to the reimposed notice requirement.

145.    The January 8 memorandum, and the notice requirement it repromulgates, has been enforced both by physically denying members of Congress from entering ICE facilities and also by approving or denying visit requests submitted by email to ICE OCR.

146.    The development and promulgation of the memo, and the implementation and enforcement actions that followed, required the use of funds appropriated through DHS's annual appropriations and funds otherwise subject to the oversight rider.

147.    Defendants have therefore used funds subject to the oversight rider to create, promulgate, implement, and enforce the January 8 oversight visit policy.

### G. Defendants are once again obstructing Plaintiffs' lawful oversight activities using funds subject to the oversight rider

148.    Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. The information that can be obtained only through in-person visits is critical to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for the upcoming fiscal year 2026.

149.    Defendants have denied each Plaintiff crucial information needed to conduct oversight on at least one occasion—but in many instances on multiple occasions—by obstructing a requested or attempted oversight visit to a DHS facility where noncitizens are detained or otherwise housed.

150.    Defendants denied Plaintiffs access to DHS facilities to conduct oversight visits on the basis of their oversight visit policies, requiring at least seven days' notice and prohibiting any oversight visits to certain facilities, including ICE field offices, notwithstanding the presence of detainees at those facilities.

151.    In practice, ICE has arbitrarily rescheduled members' visits without reason, even when members have attempted to schedule visits more than seven days in advance. For example, on December 11, 2025, Representative McClain Delaney attempted to schedule a visit to a Baltimore ICE facility. ICE waited 6 days to confirm receipt of her email; offered her dates more than one month later; and then, days before the scheduled visit, cancelled her visit without providing a reason. She is scheduled to visit on January 27, 47 days after her office originally made the request. ICE also, again, maintained that field offices were exempt.

152.    In repromulgating and implementing their notice and approval policy, Defendants used "funds appropriated or otherwise made available to" DHS "to prevent" each Plaintiff "Member of Congress" "from entering, for the purpose of conducting oversight, a[] facility operated by or for [DHS] used to detain or otherwise house aliens"—in direct contravention of the oversight rider.

153.    Defendants' obstruction of Plaintiffs' efforts to conduct in-person, real-time oversight at DHS detention facilities significantly harms Plaintiffs' ability to satisfy their individual duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody.

### 1.    Representative Escobar

154.    Representative Escobar represents Texas's 16th congressional district. She has been a member of Congress since 2019 and currently serves on the Appropriations Committee and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies.

155.    As a member of Congress representing El Paso, Texas, a vibrant city on the United States–Mexico border with a large binational population, Representative Escobar has been actively engaged in oversight of the conditions of immigration detention in her district since becoming a member of Congress, including by conducting numerous in-person oversight visits to immigration detention facilities. That includes visits to DHS facilities operated for and by U.S. Customs and Border Protection (CBP), ICE, and the Department of Health and Human Services Office of Refugee Resettlement (ORR). Additionally, as a member of Congress who has served on House committees with jurisdiction over immigration and border matters, she has been actively engaged in oversight of DHS and ICE.

156.    Representative Escobar's district currently contains two ICE facilities: an ICE detention facility known as the El Paso Service Processing Center (SPC) and the ICE El Paso Field Office. In addition, the ICE Enhanced Hardened Facility (EHF) was located just outside her district until its closure in August 2025. There is also a new ICE facility in Representative Escobar's district called Camp East Montana, which is located at the Fort Bliss military base in El Paso. It is currently the largest ICE facility in the country.

157.    Historically, Representative Escobar has maintained an effective and respectful working relationship with local DHS and ICE personnel who work on the ground in El Paso. This relationship is critical given the number of DHS facilities within her border district and the importance of immigration-related issues to her constituents. Over the years, in-person visits have been critical to building and maintaining these relationships, including with the field directors and other ICE personnel, with whom she can effectively communicate issues that arise during visits.

158.    Both announced and unannounced visits to DHS facilities are necessary to Representative Escobar's oversight work. Many of her visits have been scheduled at least one day in

advance to allow one of her staff members to join, but some of her visits have been made without advance notice.

159.    In-person oversight visits allow Representative Escobar and her staff to discover issues that need to be addressed before they become larger problems. Additionally, because of their working relationship with DHS local leadership, when there have been surges in border crossings, her office has been able to closely coordinate with ICE and to connect DHS leadership with local nonprofits, Border Patrol, and city and county law enforcement, most recently in February 2025.

160.    Between 2021 and 2022, Representative Escobar conducted multiple oversight visits to the ORR Emergency Intake Site (EIS) at Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the Trump administration's family separation policy. To provide consistent oversight of this facility, she and her staff visited the EIS more than a dozen times. On oversight visits, she learned that minors were not allowed to leave the tents in which they were kept and did not have access to social workers. She raised these and other issues with Border Patrol and CBP, as well as the Department and Health and Human Services. As a result of her oversight, she observed significant improvements in processes and facility conditions at the EIS because of concerns that she raised during her visits.

161.    Representative Escobar also informs other members of Congress, her constituents, and the public when information gained from visits is cause for concern—and therefore a potential basis for legislation or further oversight. She also informs them of positive and productive information obtained through oversight and when she observes that things are going well. For example, after a June 18, 2025, visit, Representative Escobar shared with the press positive comments from women detained at the El Paso EHF.

162.    In-person visits to El Paso facilities also allow Representative Escobar to respond to and follow up on constituent casework. Immigration, including immigration detention, is a huge

issue of concern within her border district. Her office receives a significant amount of constituent outreach about constituents or family members that are being held in ICE facilities, but about which they have no information. Representative Escobar uses oversight visits as an opportunity to investigate constituent complaints about access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes her office uncovers issues, and sometimes they determine that the situation is acceptable and are able to assuage her constituents' concerns. She receives necessary information through her observations, conversations with detainees, and conversations with ICE employees on the ground.

163.    The oversight visits that Representative Escobar conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities.

164.    After ICE denied Representative Escobar entry into an ICE facility in 2019 to visit with detainees being force-fed, she worked with the Appropriations Committee to include a provision ensuring that members of Congress had the right to conduct oversight visits of DHS facilities without providing advance notice. That provision, the oversight rider at section 527 in the fiscal year 2024 DHS appropriations act, serves as the basis for this suit.

165.    Defendants' unlawful oversight visit policies abruptly halted Representative Escobar's consistent oversight of the ICE detention facilities in her district.

166.    On July 9, 2025—for the first time since 2019—ICE denied Representative Escobar entry into an ICE facility.

167.    On July 8, 2025, Representative Escobar's staff notified ICE via email that she would be conducting an oversight visit of the El Paso SPC the next day, July 9, accompanied by one staff member. That facility had recently been plagued by accusations of mistreatment and inhumane conditions, including a recent Amnesty International report detailing nearly thirty pages of alleged

human rights violations at that facility. This included reports of physical abuse by guards, use of solitary confinement, unsanitary and overcrowded living spaces including dysfunctional toilets, inadequate medical care, expired or poor quality food, and lack of access to legal services. Family members and legal representatives of detainees at the El Paso SPC had also raised concerns with Representative Escobar's office about detainees' access to telephones. It was important that Representative Escobar visit the facility in person to see the conditions firsthand, to inquire about the concerns raised in the Amnesty Internal report and about detainees' access to their legal representatives and communication with family, and to speak to detainees directly about their experiences.

168.    In response, ICE stated that it could not accommodate Representative Escobar's July 9 visit because ICE is "now requiring requests to be made seven (7) calendar days in advance."

169.    On July 9, Representative Escobar and two staff members traveled to the El Paso SPC to conduct the oversight visit announced the previous day. Representative Escobar identified herself and informed ICE personnel of her intention to conduct an oversight visit of the facility under the oversight rider. ICE denied her entry because of the oversight visit policies.

170.    Given the disturbing allegations in the Amnesty International report about the El Paso SPC facility, it was imperative for Representative Escobar to be able to visit the facility in person. On July 11, her staff requested a second visit on July 18, providing seven days' notice. However, votes at the House went into the early morning of July 18, and Representative Escobar was unable to travel to El Paso from Washington, D.C., in time to conduct the scheduled visit to the facility on July 18 to personally assess conditions and speak with detainees herself.

171.    Given the importance of in-person oversight, however, Representative Escobar and her staff persisted in conducting oversight in compliance with Defendants' unlawful policy.

172.    That oversight revealed that Defendants have used the notice as an opportunity to alter conditions of detention in advance of a visit, also in violation of the oversight rider. During an oversight visit in November 2025, for example, Representative Escobar spoke with a group of women detainees. Every woman she interacted with shared that ICE had been cleaning up the facility in the days leading up to the oversight visit. They shared that, in light of the unusual cleaning, they anticipated the visit.

173.    After the Court's December 17 order staying Defendants' seven-day-notice requirement, Representative Escobar resumed conducting oversight at immigration detention facilities without issue.

174.    On December 19, Representative Escobar conducted an oversight visit with a member of her staff, without prior notice at Camp East Montana. They were able to enter the facility and conduct oversight without incident. During that visit, Representative Escobar spoke with a group of women in one detention pod, who expressed concerns with the food quality and quantity, lack of consistent cleaning, deportation delays even after individuals signed a voluntary departure form, and a general lack of information on their own cases.

175.    Representative Escobar also spoke with an ICE staff member in the medical unit at the facility. She had heard concerning reports regarding a high number of 911 calls coming from the facility, many related to suicide attempts. Representative Escobar expressed concern to the ICE staff member regarding recent reports of suicide attempts. The staff member initially denied that this was a concern. When pressed, he conceded that calls to emergency medical services had been made in response to additional Representative Escobar attempted suicides in the facility but asserted that this was usually an attempt to "get attention."

176.    Representative Escobar then spoke with the behavioral health professional within the medical unit, who answered questions and informed her that the facility sent some detainees to

behavioral health hospitals when they exhibited more than suicidal ideation. They were unable to provide the number of individuals who had been sent to behavioral hospitals.

177.    On Monday, January 12, 2026, Representative Escobar's office emailed ICE OCR requesting to conduct an oversight visit with her and two members of her staff on the afternoon of Friday, January 16. She did not receive a reply until Thursday, January 15. OCR did not respond to her specific request but instead informed her that, on January 8, Secretary Noem had "issued a directive mandating that any request for a Congressional visit to ICE detention facilities must be made seven (7) days in advance." OCR did not offer any alternative dates for an oversight visit.

178.    Recent public reporting and reports from Representative Escobar's constituents regarding conditions in DHS detention facilities and concerning incidents underscore the importance of Representative Escobar's ability to engage in in-person oversight, to observe the conditions in these facilities and speak to the individuals there in person. Three deaths have been reported at Camp Montana. The death of a detainee at Camp Montana on January 3 was determined by the El Paso County Medical Examiner to be a homicide. ICE reported another detainee death at the facility on January 14 as a suicide.[49]

179.    Defendants' oversight visit policies and practices have significantly hindered Representative Escobar's ability to perform her duties as the member of Congress serving Texas's 16th congressional district by depriving her of information necessary for that role.

180.    The oversight visit policies significantly diminish Representative Escobar's ability to understand how funds Congress appropriates are being used at facilities in her district. Without immediate, accurate information, she is less able to ensure that detainees at the facility are being treated consistent with federal law. She is less able to work effectively on the Appropriations

---

[49] ICE reports death of illegal alien in custody in El Paso, ICE (Jan. 18, 2026), https://www.ice.gov/news/releases/ice-reports-death-illegal-alien-custody-el-paso.

Committee and its Subcommittee on Homeland Security and Subcommittee on Military
Construction, Veterans Affairs, and Related Agencies. And she is less able to assess the health and
safety of her constituents and to address constituent inquiries and complaints. Without in-person
visits by Representative Escobar and her staff, her only recourse is to submit inquiries to and wait
for a response from administration officials, which is likely to be received too late—if ever.

181.    It is important that Representative Escobar be able to conduct timely oversight. The
realities on the ground often do not allow for a seven-day delay to her oversight and investigation.
Her constituents frequently contact her office with pressing immigration-related issues and
concerns, many of which involve the El Paso facilities. When her office receives reports that, for
example, detained individuals have not been fed sufficient meals, or that individuals have not been
able to shower in several days, it is important that she is able to visit that facility in person, in a
timely fashion, to investigate the circumstances. If individuals lack food, showers, and basic medical
care, those are situations that need to be rectified immediately to ensure that individuals in custody
in facilities in Representative Escobar's district are being treated humanely and consistent with
federal law.

182.    Additionally, requiring seven days' notice and approval can present a significant and
sometimes insurmountable barrier to conducting an oversight visit. As Representative Escobar's
attempts to visit the facility between July 9 and 18 demonstrate, her work as a member of
Congress—including unpredictable votes, scheduling, and travel between Washington, D.C., and her
district—may make it impossible to schedule and attend an oversight visit with more than a couple
of days' notice, if that.

183.    In light of the importance of this on-the-ground, immediate oversight at the El Paso
facilities, Representative Escobar intends to continue conducting oversight visits to DHS facilities

that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit her to do so thwarts her ability to perform her duties.

### 2. Representative Crow

184.    Representative Crow represents Colorado's 6th congressional district, where the ICE Denver Contract Detention Facility in Aurora ("Aurora Facility"), and a field office, the Denver Field Office in Centennial, are located. The Aurora Facility is operated by a private contractor, the GEO Group, on behalf of ICE. Representative Crow has been deeply and consistently engaged in oversight of the conditions of immigration detention in his district since he became a member of Congress more than six years ago.

185.    In response to concerning reports regarding the Aurora Facility, including reports of disease outbreaks, Representative Crow attempted his first in-person visit to the facility, without prior notice, in February 2019. He was denied entry. That same day, he sent a letter to the secretary of DHS raising his concerns about conditions at the facility, particularly with respect to medical care and public health.

186.    Representative Crow requested to tour the Aurora Facility three more times before his request was granted, and he finally conducted an oversight visit on March 15, 2019.

187.    Nearly four months after sending a letter to ICE raising concerns regarding medical conditions at the Aurora Facility, in June 2019, Representative Crow received a response in which ICE denied responsibility for developing policies and protocols for managing infectious and communicable diseases at the facility.

188.    Representative Crow recognized the need for increased oversight over the Aurora Facility. He instituted regular visits to the facility, conducted by him or his staff, generally scheduled one to seven days in advance, and sometimes without prior notice. On January 6, 2020, for example, he conducted an oversight visit without prior notice and was able to tour the facility as usual.

189.    These regular visits have allowed Representative Crow and his staff to track conditions closely, including, for example, the number of detainees, their medical care, and their access to counsel. To keep his constituents and the public informed, he regularly posts accountability reports to his website with the information gained through both in-person visits and regular communication with ICE officials.

190.    These visits have also demonstrated to ICE and GEO Group personnel that Representative Crow will hold the Aurora Facility accountable for maintaining adequate public health conditions within the facility whenever concerning circumstances arise, such as a potential tuberculosis exposure that occurred in April 2025 that led to detainees being quarantined as a precautionary measure. In this way, his oversight allows him to monitor the medical care of detainees, protect the broader community, and ensure that federal law is being followed.

191.    Representative Crow's and his staff's regular visits—sometimes with notice and sometimes without—have also shown him that advance notice can sometimes result in the member or staff getting a curated view of the facility. This hinders his ability to assess the true conditions of detention and thereby engage in real oversight with accurate information to inform his legislative functions.

192.    Representative Crow's on-the-ground oversight has also allowed him and his staff to build a productive relationship with the ICE and GEO Group personnel and to discover issues that need to be addressed before they become larger problems. For example, after raising specific concerns, Representative Crow has seen improvements to detainees' telephone access, to the number of medical staff at the facility, and to access to counsel for detainees in quarantine.

193.    In addition, Representative Crow and his staff are better able to respond to and follow up on constituent casework through on-the-ground oversight. Immigration, including immigration detention, is the most frequent topic of concern raised to his district office, and he uses

the oversight visits as an opportunity to investigate constituent complaints. He can get the needed information through observations, conversations with detainees, and conversations with ICE employees on the ground.

194.    The oversight visits that Representative Crow regularly conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities. For example, he introduced legislation in 2020 and 2021 that sought to protect his constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities and, by extension, in the surrounding communities.

195.    Defendants' unlawful oversight visit policies and practices have hindered Representative Crow's ability to conduct comprehensive oversight of the Aurora Facility.

196.    On July 20, 2025—for the first time since he began conducting oversight visits in February 2019—Representative Crow was denied in his attempt to visit the Aurora Facility. He traveled there in person and identified himself, his oversight purpose, and his right to conduct that oversight under the oversight rider. After waiting some time, he was told that ICE had denied his request, and he was not permitted to enter.

197.    ICE OCR later confirmed by email to Representative Crow's staff that his request was denied because "DHS requires requests be made a minimum of seven calendar days in advance for scheduling."

198.    On August 22, 2025, in another attempt to obtain some information about conditions at the Aurora Facility, Representative Crow sent ICE a letter following an August 11, 2025, congressional oversight visit seeking information regarding conditions of detention and facility operations. Over 150 days later, he still has not received a response.

199.    The need for oversight into conditions at the Aurora Facility has only increased since this Court stayed Defendants' notice requirement on December 17, 2025. Since that time,

Representative Crow and members of his staff have heard significant concerns from the community about conditions at the Aurora Facility. Among these concerns were those impacting public health, in particular reports of detainees suffering from gastrointestinal illnesses and other ailments for which they may not have been receiving timely medical treatment.

200.    Representative Crow and members of his staff also heard concerns about an increase in the total number of detainees held at the Aurora Facility. His office observed that due to the increased number of individuals detained at the Aurora Facility, Special Management Units, including segregated housing and units for vulnerable populations, are now being used for general housing to accommodate additional detainees. These concerns make it imperative that Representative Crow and his staff be able to conduct timely in-person visits to obtain an accurate assessment of conditions and to ensure that the Aurora Facility is adhering to the Performance-Based National Detention Standards that govern ICE detention at that facility.

201.    Representative Crow's staff made several visits to the Aurora facility between December 17, 2025, and January 8, 2026, without incident.

202.    Before Representative Crow became aware of the January 8 memorandum, he intended to make another unannounced visit to the Aurora facility on January 16, 2026, a date that was specifically selected to avoid conflict with any congressional duties requiring him to be in Washington.

203.    On January 13, Representative Crow's office sent a notice to ICE OCR, informing ICE that on January 16, Representative Crow and members of his staff intended to conduct an oversight visit at the Aurora Facility. OCR informed Representative Crow that his request was denied because he had not provided seven days' advance notice, as the January 8 policy purports to require.

204.    Defendants' oversight visit policies and practices that resulted in this obstruction of Representative Crow's lawful oversight significantly hinder his ability to perform his duties as the member of Congress serving Colorado's 6th congressional district. He is less able to understand how appropriated funds are being used at the facility. He is less able to ensure that detainees at the facility are being treated consistent with federal law. And he is less able to ensure the health and safety of his constituents and to address constituent complaints. Without in-person visits by him or his staff, his only recourse is to submit inquiries to and wait on a response from administration officials, which is likely to be received too late—if ever.

205.    In light of the importance of this on-the-ground, immediate oversight at ICE facilities in his district, Representative Crow intends to continue conducting oversight visits of DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit him to do so thwarts his ability to perform his duties.

### 3.    Representative Goldman

206.    Representative Goldman represents New York's 10th congressional district. He currently serves as a member of both the Homeland Security Committee and the House Judiciary Committee. As a member of these committees, he has been actively engaged in oversight of DHS and ICE.

207.    The ICE New York Field Office, located at 26 Federal Plaza in Manhattan, is located in his district. The Metropolitan Detention Center (MDC) in Brooklyn, which has an agreement to house immigration detainees, is also located in his district. Both the New York Field Office and MDC are used to detain or otherwise house immigrants.

208.    Representative Goldman has engaged in oversight related to immigration detention at both facilities through in-person visits and letters to executive branch officials.

209.    Representative Goldman's previous oversight activities include regularly leading and signing oversight letters to DHS and ICE on a variety of immigration and border security issues. For example, on June 5, 2025, he led a letter joined by 85 House colleagues to DHS Secretary Kristi Noem seeking information regarding the rise of masked, plainclothes ICE officers involved in detaining individuals without criminal records in connection with their immigration court proceedings. Representative Goldman has also led letters to the chair and ranking member of the Appropriations Committee regarding immigration and border security issues that have been informed by his oversight work.

210.    Representative Goldman has also introduced legislation to address issues that have arisen in the course of his oversight of DHS. For example, after observing ICE agents conducting operations at the immigration courts at 290 Broadway in May 2025 and experiencing obstruction during an attempted visit to ICE's New York Field Office at 26 Federal Plaza in June 2025, he introduced the No Secret Police Act, which would require DHS agents who are engaged in civil immigration enforcement to display certain identifying insignia and to provide proper identification, and would prohibit them from wearing masks or face coverings.

211.    On June 9, 2025, Representative Goldman's staff emailed ICE personnel on his behalf to request a scheduled tour of the 10th floor of the ICE New York Field Office (the "10th Floor Facility"), where individuals were reportedly being detained. On June 10, ICE personnel responded to the email indicating that the tour request was being reviewed.

212.    On June 16, Representative Goldman's staff again emailed ICE personnel to notify the agency of Representative Goldman's intended visit on June 18, pursuant to his statutory oversight authority under the oversight rider.

213.     On June 17, ICE personnel responded by email to the June 16 email, claiming that Representative Goldman's statutory oversight authority did not apply to the 10th Floor Facility at the New York Field Office because it was not a "detention facility."

214.     On June 18 at 10:00 a.m., as noticed in the June 16 email, Representative Goldman, along with Representative Jerry Nadler, arrived at 26 Federal Plaza and attempted to gain entry to the 10th Floor Facility for the purpose of conducting oversight, consistent with their authority under the oversight rider.

215.     Representative Goldman was not allowed to enter and observe the 10th Floor Facility and was instead met in the lobby by the deputy director of the New York Field Office. The deputy director refused Representative Goldman entry into the 10th Floor Facility. The deputy director stated that the reason for the denial of the visit was because, according to directions the deputy director received from his supervisors, the 10th Floor Facility is not a "detention facility" under the statute and is instead a "holding and processing center."

216.     The deputy director told Representative Goldman that the 10th Floor Facility did not have beds or showers; that individuals were being held overnight, some for at least two nights; and that they were being fed. Representative Goldman asked the deputy director how a facility that was holding and housing individuals for two nights or more was not being "used to detain or otherwise house" those individuals. The deputy director responded that Representative Goldman should ask the DHS Office of Legislative Affairs.

217.     Representatives Goldman and Nadler were unable to conduct oversight of the ICE facility at 26 Federal Plaza, based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

218.     They were entitled to conduct such oversight under the oversight rider.

219.     As described above, Representative Goldman made two visits to the 10th Floor Facility between December 17, 2025, and January 8, 2026, without incident.

220.     During one of those visits, on December 19, Representative Goldman spoke with a Pakistani father of four U.S. citizens who had no criminal convictions, had lived in the country since 1995, and was arrested at his annual check-in with ICE.

221.     On January 5, Representative Goldman's office notified ICE that three of his staff intended to visit the facility on January 7, providing the requisite 24-hours' notice. ICE did not respond until January 8, informing the office they could visit on January 9.

222.     However, by the time Representative Goldman's office confirmed a visit for January 12, the new policy requiring seven days' notice had gone into effect.

223.     On January 13, 2026, Representative Goldman attempted to make an unannounced visit to the 26 Federal Plaza facility. He was denied entry.

224.     The director met him outside the detention facility and stated that because of the new policy, Representative Goldman was required to make a request through the ICE Office for Congressional Relations seven days in advance.

225.     Subsequently, on January 13, Representative Goldman provided notice to ICE that he intended to visit the next week, on January 20, with two staffers.

226.     ICE informed him they could not accommodate Representative Goldman at the time he requested to visit on January 20.

227.     The alternative dates and times ICE offered, many of which were while the House was in session, did not work, and so he was not able to conduct a visit.

228.     Both announced and unannounced oversight visits by Representative Goldman provide necessary information on how appropriated funds are being used in real time on the ground in immigration detention, in order to ensure the physical safety of his constituents and to ensure that

DHS immigration detention activities are being conducted in accordance with the requirements of federal law. It is also vital to his work on legislation and his ability to actively and effectively participate on his assigned committees, both of which have jurisdiction over DHS.

229.    Without the ability to conduct oversight of ICE facilities—particularly those located in his district, where his constituents may be detained—he is unable to ensure his constituents are being treated humanely and have access to legal counsel.

230.    Representative Goldman's ability to conduct unannounced visits at ICE facilities where individuals are being detained or otherwise housed is imperative for him to assess the actual conditions of these facilities and to ensure that DHS and ICE do not have time to hide unacceptable conditions prior to his visit.

231.    His observations of staff cleaning the detention facility during his December 2025 visit confirmed the importance of his oversight, as the conditions were dramatically better than in videos of the facility that were circulating during the summer of 2025.

232.    Representative Goldman intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and serve his constituents.

233.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 4.    Representative Espaillat

234.    Representative Espaillat represents New York's 13th congressional district. From 2021 to the present, he has served on the Appropriations Committee. Since 2023, he has served as the ranking member of the Subcommittee on the Legislative Branch. He is also the chairman of the Congressional Hispanic Caucus (CHC), a group of more than 40 members of Congress of Hispanic

and Latino descent. As part of his role as a member of Congress and his committee assignments, he has been actively engaged in oversight of DHS and ICE since he was elected to Congress.

235.    The 10th Floor Facility at the New York Field Office, 26 Federal Plaza, is located near his district. This facility is used to detain or otherwise house immigrants.

236.    Representative Espaillat's office does regular and significant case work for constituents involving ICE activities and detention, including for individuals detained at the New York Field Office's 10th Floor Facility. In the course of conducting oversight of DHS and ICE, Representative Espaillat has performed multiple in-person visits to ICE facilities in New York, New Jersey, and Georgia.

237.    For example, in May 2025, Representative Espaillat visited the Elizabeth Contract Detention Facility in New Jersey, where he met with noncitizens who had been detained despite having attended all their required appointments.

238.    In September 2020, he visited the Irwin County Detention Center in Ocilla, Georgia, after a whistleblower complaint alleged that the medical staff there had performed invasive and unnecessary medical procedures, including hysterectomies, on detained women. Following that visit, he wrote a letter to the then-acting director of ICE detailing his concerns about those practices and requesting an investigation at other facilities.

239.    Those on-the-ground oversight visits are integral to other activities Representative Espaillat has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

240.    On June 8, 2025, Representative Espaillat and his colleague Representative Nydia

Velázquez traveled to the 10th Floor Facility. Their purpose was to conduct an unannounced

oversight visit.

241.    They had received information from multiple organizations that individuals were

being detained in that facility, even though it is a field office, and that the conditions in the facility

had deteriorated due to surging arrests. An in-person oversight visit was necessary to obtain prompt,

reliable information regarding the conditions of confinement at the 10th Floor Facility.

242.    Upon arrival, Representatives Espaillat and Velázquez were greeted outside of the

building around 3:00 p.m. by a DHS officer. Representative Espaillat and his colleague said that they

were members of Congress, and that they were interested in visiting the 10th floor at 26 Federal

Plaza, pursuant to their authority under the oversight rider, because they had heard from

constituents that detainees were being held there overnight.

243.    At first, the DHS officer denied them entry to the building entirely, but after 15

minutes, they were allowed to enter alone, without their staff members. Once they were inside the

lobby of 26 Federal Plaza, the DHS officer said that he was going to check with the acting deputy

field office director (deputy FOD).

244.    Representative Espaillat spoke with the deputy FOD on the phone and told her that

he had a right to gain access to the facility on the 10th floor. The deputy FOD told Representative

Espaillat that he and his colleague could not enter the 10th Floor Facility, because it was a "sensitive

facility."

245.    Representative Espaillat and his colleague left the building without being able to

conduct oversight to which they are entitled under the oversight rider.

246.    The following month, on July 14, 2025, Representative Espaillat returned with

Representative Velázquez to the 10th Floor Facility to conduct an oversight visit. He did not

provide advance notice of his visit. He conducted this visit because he had continued to hear reports from constituents and advocates of the inhumane conditions of the facility.

247.    Representatives Espaillat and Velázquez arrived at 26 Federal Plaza and told a DHS officer that they wanted to go to the 10th floor to conduct an oversight visit, consistent with their authority under the oversight rider. They stated that they understood individuals were being held there overnight. They were instructed to wait but were not met by any DHS official.

248.    Representative Espaillat and Representative Velázquez proceeded on their own volition to the 10th floor to conduct the oversight visit. Once on the 10th floor, Representatives Espaillat and Velázquez were denied access to the area where DHS was detaining the individuals.

249.    Representatives Espaillat and Velázquez waited approximately 45 minutes. Multiple DHS staff informed them that someone would speak to them shortly. DHS staff also told the representatives that the deputy FOD was informed of their presence but that the deputy FOD would not speak with them herself. DHS staff informed them that they could not enter because the 10th Floor Facility was a "sensitive facility."

250.    One of the security officials told Representatives Espaillat and Velázquez to contact a public affairs representative. The same security official denied them access to the 10th Floor Facility to conduct oversight.

251.    Representative Espaillat's oversight visits to ICE facilities, including the 10th Floor Facility, are critical to his legislative work, including his work on the Appropriations Committee. The information that can be obtained only through in-person oversight is also essential to his ability to serve his constituents, because many of them are detained in or impacted by these and other DHS and ICE facilities.

252.    Defendants' oversight visit policies and practices, which bar Representative Espaillat from conducting oversight visits, hinder his ability to perform his duties as a member of Congress.

253.    After this Court's stay order, Representative Espaillat visited the 10th Floor Facility on December 19, 2025, at 9:00 am.

254.    Representative Espaillat observed detainees sleeping on the floor on thin mats and blankets and with toilets in the same areas where they sat, waited, and slept. He also saw that there were no showers in the facility.

255.    Representative Espaillat also observed multiple staff members mopping and cleaning the detention space.

256.    Representative Espaillat intends to conduct both announced and unannounced visits to DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight and to address the concerns of his constituents.

257.    Without obtaining necessary information through this oversight, Representative Espaillat is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 5.    Representative Correa

258.    Representative Correa represents California's 46th congressional district. He is a member of the Judiciary Committee and the Homeland Security Committee. In 2023, he was named ranking member of the Homeland Security Committee's Subcommittee on Border Security and Enforcement. As part of that role, he has been actively engaged in oversight of DHS and ICE.

259.    The ICE Santa Ana Field Office at 34 Civic Center Plaza in Santa Ana, California, is located in his district. This facility is used to detain or otherwise house immigrants.

260.    Representative Correa's previous oversight activities include numerous in-person oversight visits to DHS facilities where noncitizens were detained or otherwise housed over the last several years. These on-the-ground oversight visits are integral to other activities he has undertaken

to investigate immigration detention and to craft relevant legislation, including DHS appropriations. He has sent oversight letters to DHS, ICE, and the Government Accountability Office, calling for greater transparency regarding ICE arrests, the conditions of detention facilities and processing facilities at ports of entry, and the processing of asylum claims, and expressing concern regarding the denial of entry by members of Congress into detention facilities for oversight purposes.

261.    On June 7, 2025, Representative Correa, along with Representatives Gomez, Rivas, and Torres traveled to the LA Field Office in downtown Los Angeles to conduct an oversight visit, consistent with their authority under the oversight rider. The LA Field Office is used to detain or otherwise house immigrants.

262.    After they arrived, Representative Torres contacted an ICE liaison officer and informed the officer that members of Congress were requesting a briefing on the previous day's ICE operations. After numerous attempts to communicate with ICE officials in the facility, the representatives were told they would not be granted access to the LA Field Office and would not receive the requested briefing.

263.    The representatives remained within the vicinity and were later told by ICE officials they needed to return during regular business hours and that they were being denied access because of "unsafe conditions" related to a protest that had started outside the facility. A short time later, while they were still in the vicinity, someone inside the building deployed a chemical agent that caused irritation to their throats and lungs, making them cough. They did not see who sprayed the chemical agent and remain uncertain as to what it was.

264.    Beginning on June 8, 2025, Representative Correa began visiting the Santa Ana Field Office in his district on a daily basis to ensure there was no overcrowding and to locate specific individuals based on requests from his constituents. Representative Correa often conducted these visits with one day's notice, and sometimes, with no notice at all. Over the course of his visits, he

54

witnessed a surge in the number of detainees at the field office, from fewer than 10 to approximately 77 individuals, housed in about eight holding cells.

265.    After conducting these visits without issue for about 12 days, Representative Correa was denied entry to the Santa Ana Field Office on June 21, 2025. When he arrived that morning, ICE officials informed him of a new rule requiring his office to provide written notice at least seven days in advance in order to visit the facility. He was therefore unable to obtain immediate, reliable information regarding the conditions of confinement.

266.    Representative Correa left the Santa Ana Field Office without being able to conduct oversight of the facility. He was also told that he could no longer use his regular contacts to schedule visits to the Santa Ana Field Office but had to submit requests to a centralized email address.

267.    After the Court's December 17 order, Representative Correa was again able to conduct an oversight visit at an immigration detention facility without issue.

268.    On December 19, Representative Correa conducted an oversight visit with a member of his staff at the ICE Santa Ana Field Office. Before the visit, Representative Correa's office called the assistant field office director to inform her that he would be stopping by to conduct oversight following this Court's ruling. She claimed she had not been given any information about the decision and would most likely deny entry. Representative Correa's office emailed her a copy of the decision and informed her that he would be carrying a copy with him during the visit. Within ten minutes, she replied, "Good morning Cynthia, There is no issue at this time. Congressman Correa may resume his visit."

269.    When Representative Correa arrived, the assistant field officer director additionally informed Representative Correa that he would be able to visit the facility at any time to conduct oversight without advance notice provided he check in at the front window before entry.

270.    During that visit, Representative Correa observed a total of eight people detained, and the assistant field officer director informed him that no one was being held overnight at that facility.

271.    Representative Correa's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. It is also directly relevant to his role as ranking member of the Subcommittee on Border Security and Enforcement, which requires close oversight to inform him on the topic of immigration detention and to ensure that funds are being adequately appropriated to immigration agencies.

272.    Representative Correa therefore intends to continue conducting in-person oversight at DHS facilities that detain or otherwise house immigrants, including both planned and unannounced visits.

273.    Defendants' refusal to permit Representative Correa to conduct oversight visits at the Santa Ana Field Office without seven days' notice hinders his ability to perform his duties as a member of Congress.

274.    Without the information that can be obtained through timely, in-person oversight, Representative Correa is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations—including limits on such appropriations—going forward.

### 6.    Representative Gomez

275.    Representative Gomez represents California's 34th congressional district. He previously served as the vice chair of the House Committee on Oversight and Government Reform.

276.    The LA Field Office is located in Representative Gomez's district.

277.     Representative Gomez has conducted in-person oversight visits to the United States–Mexico border to monitor CBP interactions with asylum seekers in 2020 and twice to CBP facilities in 2018 and 2020. In June 2025, his staff, at his direction, aided his oversight duties by visiting the LA Field Office following reports that attorneys and family members were being denied access to the individuals detained in the basement of the building. He has issued statements and written letters to DHS and ICE leadership raising a number of concerns, including claims of mistreatment by detainees in CBP custody and the illegal rejection of asylum seekers at official ports of entry.

278.     On June 7, 2025, Representative Gomez, along with Representatives Torres, Rivas, and Correa, traveled to the LA Field Office to conduct an oversight visit, consistent with their authority under section 527. As alleged above, they requested a briefing and access to the facility. Their requests were denied.

279.     Over the following several weeks, Representative Gomez and his staff attempted to conduct oversight visits at the LA Field Office and were repeatedly denied access.

280.     On June 9, Representative Gomez and his staff returned to the LA Field Office. They identified themselves and requested access for Representative Gomez for the purpose of conducting oversight consistent with the oversight rider. He was again denied entry and given the same reason that it was "unsafe."

281.     On June 17, Representative Gomez and his staff returned to the LA Field Office. Representative Gomez presented himself to officials on site and requested access. While he was waiting, an ICE official contacted by phone told his staff that she did not have authority to speak to them. A second ICE official contacted by phone told them that they needed to provide 72 hours' notice to conduct a visit and that ICE had previously emailed this information to his team. Representative Gomez's staff informed the ICE official that the representative had the legal

authority under the oversight rider to conduct a site visit for oversight purposes. The ICE official told Representative Gomez and his staff that the LA Field Office is not a "detention facility," but rather a field office, and that ICE does not detain immigrants in field offices. They denied him entry on that basis.

282.    On June 19, Representative Gomez's staff contacted an ICE official via email to follow up on a request to schedule an oversight visit to the LA Field Office. ICE denied this request and cited the new DHS oversight visit policies. ICE stated that the new policy requires seven days' notice for congressional oversight visits. ICE further stated that because the LA Field Office is not a "detention facility," there was no legal basis for Representative Gomez's oversight request. Representative Gomez's staff had observed vans transporting detainees earlier in the month, while they had been on site seeking access to the LA Field Office.

283.    On July 7, after receiving repeated reports of poor facility conditions, Representative Gomez's staff once again attempted to schedule a visit to the LA Field Office for the purposes of conducting oversight. ICE again responded that the field office was not a "detention facility" and denied their request on that basis.

284.    After the Court's December 17 order, Representative Gomez was again able to conduct oversight at an immigration detention facility.

285.    On December 19, Representative Gomez conducted an oversight visit without prior notice at the LA Field Office.[50] He was able to enter the facility and conduct oversight without incident. During that visit, Representative Gomez learned that there were 110 people in the facility, some of whom had been held for over 12 hours. Some had been held up to 72 hours even though the LA Field Office is not designed to hold people for longer than 12 hours. Additionally, he

---

[50] Jordan Rhynning, *Rep. Jimmy Gomez inspects ICE facility in LA during unannounced visit*, LAist (Dec. 19, 2025), https://laist.com/news/politics/rep-jimmy-gomez-inspects-ice-facility-in-la-during-unannounced-visit.

observed that the LA Field Office did not have a working kitchen, and was feeding people chips, cookies, and frozen burritos. Further, the LA Field Office did not have medical personnel on site, and stocked only some non-refrigerated medicines.

286.    Oversight visits by Representative Gomez and his staff provide necessary information on how to serve his constituents impacted by ICE raids and detention. His district is especially diverse; he represents temporary protected status (TPS) recipients, asylum seekers, undocumented immigrants, and their families. The reported inhumane treatment and conditions of those detained in the LA Field Office directly affect the wellbeing of his constituents. The uptick in the number of those detained has already begun to take an emotional and economic toll on the communities he represents.

287.    Defendants' refusal to permit Representative Gomez to conduct immediate oversight visits at the LA Field Office therefore significantly harms his ability to perform his duties as a member of Congress.

288.    Representative Gomez intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

289.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation that would require ICE to be transparent and accountable for resolving poor facility conditions.

### 7.    Representative Garcia

290.    Representative Garcia represents California's 42nd congressional district. He has been a member of Congress since 2023, and as of June 2025 he is the ranking member of the

59

Oversight and Government Reform Committee. Prior to serving in that role, he served on both the Oversight Committee and the Homeland Security Committee. As part of his roles, he has been actively engaged in oversight of DHS and ICE.

291.    The LA Field Office is located near Representative Garcia's district. This facility is being used to detain or otherwise house immigrants.

292.    In-person oversight visits to this and other facilities, both announced and unannounced, are essential to Representative Garcia's ability to conduct oversight of DHS and ICE. These visits permit him to directly observe conditions with his own eyes and speak directly with impacted individuals in these environments.

293.    On-the-ground oversight visits and activities are also interconnected with activities Representative Garcia has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent various oversight letters to DHS and ICE officials, as well as to private contractors, regarding issues related to immigration detention and enforcement operations, as well as recent obstruction of oversight by the Trump administration. He has also introduced legislation to address issues he has observed and identified through his oversight of DHS.

294.    On July 23, 2025, Representative Garcia's staff provided ICE with written notice of his intent to travel to the LA Field Office to conduct an oversight visit.

295.    He had received information that individuals were being detained in that facility and that the conditions in the facility were bleak, with many individuals crammed in a small concrete room without basic necessities. He had also seen reports that many individuals have been held overnight at the LA Field Office without beds or general medical care.

296.    An in-person oversight visit was necessary for Representative Garcia to obtain timely, reliable information regarding the conditions of confinement at the LA Field Office.

297.    The written notice specifically stated that Representative Garcia was "authorized by Sec. 527 of PL 118-47" to visit the facility and conduct oversight.

298.    The facility's assistant field office director (AFOD) responded to the written notice by email the same day, referencing Defendants' recent oversight visit policies, stating "the Department requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. . . . Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate." The AFOD did not schedule or confirm a visit for Representative Garcia.

299.    On July 24, 2025, Representative Garcia traveled to the LA Field Office. His purpose in doing so was to conduct oversight. Upon arrival, Representative Garcia presented himself at the intercom controlling access to a locked door that visitors are known to use. After identifying himself as a member of Congress, he stated his intent to conduct an oversight walk-through, consistent with the oversight rider. However, he was not permitted to enter. A voice on the intercom told Representative Garcia that they had asked their "management" and stated, "We're not considered a facility. You will have to go to the Adelanto Detention Facility," a facility located about 85 miles from downtown Los Angeles.

300.    Representative Garcia responded that he was taking that as a denial from ICE of his request to conduct oversight at a detention facility. Representative Garcia reiterated that members of Congress have the right to conduct such oversight and ended the conversation. Representative Garcia left the facility without being able to conduct the oversight he is entitled by statute to perform.

301.    Oversight visits by Representative Garcia and his staff provide necessary information on how to best craft legislation, understand how appropriated funds are being used for immigration detention, and ensure humane and legal treatment of detainees within the facilities. These visits also

inform him on how to best serve his constituents when he hears about issues or concerns about immigration detention and enforcement actions. The information obtained through in-person oversight is also directly relevant to his work as ranking member of the Oversight and Government Reform Committee.

302.    Representative Garcia intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

303.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 8.    Representative Ruiz

304.    Representative Ruiz represents California's 25th congressional district. He has a medical degree from Harvard Medical School and a Master of Public Heath from the Harvard School of Public Health.

305.    Representative Ruiz's previous oversight activities include in-person oversight visits to an ICE field office in 2014 and to multiple Border Patrol facilities in 2018, 2019, and 2023. As a physician trained in humanitarian aid, he has focused his oversight on ensuring that those in ICE and CBP custody have access to adequate healthcare. He has issued statements and written letters to DHS and ICE leadership raising these concerns, among others.

306.    In-person oversight visits to DHS facilities are integral to Representative Ruiz's legislative work. He has used the information obtained from those visits in drafting legislation, including the Humanitarian Standards for Individuals in Customs and Border Protection Custody

Act, which calls on CBP to conduct health assessments, provide emergency medical care and humane living conditions, and ensure access to adequate water and nutrition.

307.    On July 11, 2025, Representative Ruiz, along with Representative Torres, traveled to the ICE Adelanto Processing Center in Adelanto, California, to conduct an oversight visit. An in-person oversight visit was necessary to obtain immediate, reliable information regarding the conditions of confinement at the Adelanto Processing Center.

308.    Upon arrival, Representative Ruiz and Representative Torres identified themselves and were greeted by a guard at the fence surrounding the facility. While they explained that they were authorized to tour the facility under the oversight rider, an individual whom they believe to be an employee of the GEO Group (the private prison company that contracts with ICE to manage the Adelanto facility) met them at the gate. He told them that it was his understanding that they had been given notice that they were not approved for a visit that day.

309.    Representative Torres explained that she had made prior arrangements and provided ICE with notice of the visit the previous week. The individual then handed the representatives a piece of paper with DHS contact information and suggested they contact DHS. Representative Ruiz reiterated that it was their legal right to conduct an unannounced oversight visit, and he asked to speak to an ICE agent. The individual told them he would let the ICE officials in the facility know and then walked back to the building. No one from the facility came out to speak with the representatives.

310.    Because of Defendants' oversight visit policies and practices, Representatives Ruiz and Torres left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

311.    After the Court's December 17 order, and after Secretary Noem issued the January 8 memorandum reimposing a notice requirement, Representative Ruiz sought to conduct further oversight visits.

312.    On January 20, 2026, Representative Ruiz's office contacted ICE OCR by email for the purpose of scheduling an oversight visit to the Adelanto Processing Center. Although his office requested confirmation of receipt, as of January 23, they had received no response from ICE.

313.    Representative Ruiz's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. Defendants' refusal to permit Representative Ruiz to conduct immediate oversight visits at the Adelanto Processing Center, and other ICE facilities, therefore significantly harms his ability to perform his duties as a member of Congress.

314.    He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both scheduled and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Ruiz is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation.

### 9.    Representative Torres

315.    Representative Torres represents California's 35th congressional district. She is a member of the Appropriations Committee and Administration Committee. She also previously served on the Homeland Security Committee.

316.    The LA Field Office is located near Representatives Torres's district, as is the Adelanto ICE Processing Center. The LA Field Office is being used to detain or otherwise house noncitizens.

317.     In the course of conducting oversight of DHS, Representative Torres has performed previous in-person visits to immigration detention facilities in California, New Mexico, and Texas. Representative Torres conducted oversight visits of these facilities to assess conditions of minors and families being held at CBP and ICE facilities based on reports of inhumane treatment of minors and families.

318.     For example, while at the ICE Otay Mesa Detention Center in San Diego, California, in June 2018, Representative Torres observed toddlers huddled under aluminum blankets in freezing cold cells as they waited to be processed. In June 2019, she conducted oversight visits, along with colleagues from the Congressional Hispanic Caucus, of El Paso Border Patrol Station 1 and Clint Border Patrol Station, both located in Texas and operated by CBP, to investigate reports of inhumane conditions faced by children and families. During this visit she observed appalling conditions in which children were being held in groups of 10 to 15 in cells with no furniture and without access to basic necessities. She has conducted numerous visits to ensure that DHS and ICE adhere to the law and provide a safe environment for detained individuals.

319.     For example, on February 19, 2025, Representative Torres visited the LA Field Office following reports that unidentified federal agents had removed her constituents from their homes and detained them in the facility. During her visit, Representative Torres was able to have a conversation with ICE officials about how to safely execute their duties without endangering local communities.

320.     Representative Torres's on-the-ground visits and activities are integral to her other legislative duties. For example, these visits have informed relevant legislation she has crafted, including the Fairness to Freedom Act, introduced in April 2025, which seeks to establish a universal right to legal representation for individuals facing deportation.

321.    On June 7, 2025, Representative Torres joined Representatives Gomez, Rivas, and Correa in an unannounced oversight visit at the LA Field Office. Representative Torres had seen reports of violent ICE operations taking place in the Los Angeles area, and information from constituents suggested that individuals detained in the operations were being held in the LA Field Office. She was also aware of credible reports that individuals were being detained in the LA Field Office under inhumane conditions. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the LA Field Office.

322.    As alleged above, the representatives were denied access to the LA Field Office. While the representatives stood in the vicinity of the field office, someone from inside the building deployed a chemical agent that caused irritation to the representatives' throats and lungs. Representative Torres's exposure to the chemical agent required her to visit the hospital emergency room for respiratory treatment.

323.    Representatives Torres, Gomez, Rivas, and Correa left the LA Field Office without being able to conduct the oversight which they are entitled to perform under the oversight rider.

324.    On June 18, Representative Torres again attempted to conduct an oversight visit at the LA Field Office. She identified herself as member of Congress at an entrance to the building and requested access to tour the facility pursuant to her authority under the oversight rider. Representative Torres was denied access to the LA Field Office. In later correspondence, an ICE representative asserted that she was denied entry because the LA Field Office did not "house aliens." This information was directly contrary to the reports she had received regarding the detention of individuals at that location.

325.    Representatives Torres again left the LA Field Office without being able to conduct the oversight which she is entitled by statute to perform.

326.    On July 11, Representative Torres traveled to the Adelanto Processing Center to conduct an oversight visit with Representative Ruiz, as described above.

327.    Representatives Torres and Ruiz were denied entry and left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

328.    On July 11, after Representative Torres was denied entry to the Adelanto Processing Center, her staff emailed ICE requesting an oversight visit on a future date.

329.    On July 16, Representative Torres received a communication from ICE informing her that she was "approved" for a 90-minute tour of the Adelanto Processing Center to take place on July 18 at 10:00 a.m. PT. Due to travel delays, Representative Torres was unable to arrive at the Adelanto Processing Center until approximately 11:00 a.m. PT, whereupon she was informed that the length of the tour could not be extended. She was given a tour of the Processing Center's health unit, kitchen, and processing area, but she was unable to see other parts of the facility, including where detained individuals are housed.

330.    Representative Torres's tour of the Adelanto Processing Center ended before she was able to see all parts of the facility necessary to conduct the oversight that she is entitled by statute to perform.

331.    Representative Torres's staff immediately placed another request for a full visit of the facility, which ICE scheduled for July 28, 2025—10 days after the request was made. The visit took place as scheduled at 10:00 a.m. PT on July 28. Representative Torres and her staff reviewed the East Wing and West Wing facilities, the latter of which holds female detainees. They also observed the female health clinic and an ongoing immigration court proceeding, which was taking place virtually. Representative Torres was told that she was not allowed to speak with detainees, and that neither she nor her staff could have access to detained constituents unless names were sent in

advance along with a privacy release form with the detainee's own signature. The staff located at the facility indicated that the number of detainees was well below capacity. Representative Torres observed low-risk and medium-risk detainees, but not high-risk detainees.

332.    Representative Torres's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents, who are directly affected by the presence of ICE facilities near her district. The information obtained through in-person oversight is also directly relevant to her work on the Appropriations Committee.

333.    Representative Torres intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Torres is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 10.    Representative Thompson

334.    Representative Thompson represents Mississippi's 2nd congressional district and is the ranking member of the Homeland Security Committee. From 2007 to 2011 and 2019 to 2023, he served as chair of the committee; during all other times since 2005, he has served as the ranking member. As part of that role, he has been actively engaged in oversight of DHS and ICE since Congress created those agencies.

335.    An ICE detention facility, the Adams County Correctional Center, is located in his district, and an ICE field office is located just outside of his district in Mississippi. His office does regular and significant case work for constituents involving ICE activities and detention, at the Adams County Correctional Center facility in particular.

336.    In the course of conducting oversight of DHS, Representative Thompson has performed many in-person visits to immigration detention facilities, including ICE facilities and many CBP facilities.

337.    For example, in April 2025, Representative Thompson visited the Central Louisiana ICE Processing Center and South Louisiana ICE Processing Center, where he received tours of the facilities and spoke with detained individuals about their medical care and other concerns. In addition, at his direction as then-chair of the Homeland Security Committee, committee staff visited eight ICE detention facilities in Louisiana, Mississippi, California, New Mexico, and Maryland, leading to the 2020 committee staff report on the conditions of confinement and the inadequacy of DHS's internal oversight tools.[51]

338.    Those on-the-ground oversight visits and activities are integral to other activities Representative Thompson has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

339.    On July 21, 2025, Representative Thompson, along with Representatives Raskin and Neguse, traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility were unknown. They were also aware of reports regarding poor conditions and overcrowding at ICE field offices across the country. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the Washington Field Office.

---

[51] *ICE Detention Facilities* Report, *supra* n.7.

340.    Upon arrival, Representative Thompson and the others identified themselves and were greeted at the door around 10:00 a.m. by a guard, who asked them to wait outside while he conferred with officials inside. An ICE official offered to show them only the public lobby. After the representatives explained that they intended to and were authorized under the oversight rider to tour entire facility, the ICE official returned inside to confer with management. Eventually, the deputy field office director and assistant field office director informed them that their latest guidance was that field offices are not subject to the oversight rider. On that basis, ICE denied Representatives Thompson, Neguse, and Raskin entry to conduct an oversight visit.

341.    In answer to questions from the representatives, the ICE officials confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. The Washington Field Office is being used to detain or otherwise house noncitizens.

342.    Representatives Thompson, Neguse, and Raskin left the facility without being able to conduct the oversight which they are entitled by statute to perform.

343.    After the Court's December 17 order, and after Secretary Noem issued the January 8 memorandum reimposing a notice requirement, Representative Thompson sought to conduct further oversight visits.

344.    On January 19, 2026, Representative Thompson's office requested an oversight visit to the New Orleans Field Office for January 26. That request was approved.

345.    Representative Thompson's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Homeland Security Committee and to his ability to serve his constituents, who are directly affected by the presence of ICE facilities in and nearby his district. He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both planned and unannounced visits.

346.     Without the information that can be obtained only in those circumstances, Representative Thompson is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 11.    Representative Neguse

347.     Representative Neguse represents Colorado's 2nd Congressional district. He has served as the Assistant Democratic Leader in the House since 2024 and is a member of the Judiciary Committee. He also previously served on the Immigration Subcommittee of the Judiciary Committee. As a member of the Judiciary Committee, he has been actively engaged in oversight of DHS and ICE.

348.     Representative Neguse's previous oversight activities include in-person oversight visits to ICE facilities where noncitizens were detained or otherwise housed in 2019 and 2020, and his staff has, at his direction, aided his oversight duties by visiting ICE facilities in 2019, 2023, and 2024. As a member of the Colorado delegation, he has focused his concerns in particular on the use of private contractor facilities to detain noncitizens, including at the ICE detention facility in Aurora, Colorado. He has issued statements and written letters to DHS and ICE leadership raising those concerns.

349.     On July 21, 2025, Representative Neguse joined Representatives Thompson and Raskin in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Neguse based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

350.     Oversight visits by Representative Neguse and his staff provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place

conditions on funding through the appropriations process, and ensure humane and legal treatment of staff and detainees within the facilities.

351.    Representative Neguse intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

352.    Without obtaining necessary information through this oversight, Representative Neguse is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

353.    The need for oversight into conditions at the Aurora Facility has increased since this Court entered its order staying ICE's seven-day-notice requirement. Accordingly, Representative Neguse's staff is scheduled to conduct an oversight visit of the Aurora facility on January 28.

### 12.    Representative Raskin

354.    Representative Raskin represents Maryland's 8th congressional district. He currently serves as the ranking member of the Judiciary Committee. From 2023 to 2025 he served as ranking member of the House Oversight Committee. Before 2023, he was a member of both the Judiciary and Oversight Committees; he also served as chair of the Subcommittee on Civil Rights and Civil Liberties of the Oversight Committee.

355.    Oversight of immigration matters is particularly important to Representative Raskin's service on the Judiciary Committee. The Judiciary Committee has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. The committee has authorized tens of billions of dollars for ICE, including for detention facilities. Because Representative Raskin is the ranking member of the

Judiciary Committee, it is very important for him to have an accurate and detailed understanding of ICE's detention operations, including the processes under which ICE detains individuals and the conditions in which they are detained. In-person oversight visits, both announced and unannounced, are critical to this understanding of ICE detention facilities.

356.    Immigration enforcement and detention are important issues to Representative Raskin's constituents, who often reach out to his office about these matters. Some of these constituents have family members in ICE detention, and they are desperate for information about their relatives. Recently, his office was contacted by a Maryland resident whose mother is in immigration detention and is facing removal despite the fact that she fled her country of origin because of persecution on the basis of her religion and political opinions. Another of his constituents was unexpectedly detained by ICE in front of his home on his way to work, despite having no criminal record or any removal order; he was transferred to a facility in Texas for no apparent reason. Constituents have also told Representative Raskin's office that ICE refuses to provide their detained relatives with a privacy waiver form, which is necessary to allow family members to learn about their case.

357.    Representative Raskin also engaged in oversight of DHS and ICE in his prior capacity as member and subcommittee chair of the House Oversight Committee. In August and September 2019, the Oversight Committee sent bipartisan staff delegations across the country to conduct oversight inspections of DHS immigration detention facilities. Committee staff inspected 22 DHS facilities in six states, including 12 detention centers run by ICE and for-profit contractors, seven Border Patrol stations, and three ports of entry operated by CBP. DHS cancelled staff inspections of 11 CBP facilities a day before they were to occur.[52]

---

[52] *ICE Detention Facilities* Report, *supra* n.7.

358.    A 2019 investigation by the Oversight Committee, in which Representative Raskin participated, led to issuance of a staff report in 2020 on the poor treatment of detainees in detention facilities operated by private contractors, focusing especially on deaths in custody and deficient medical care. That report followed staff visits to 12 detention facilities, 10 of which were operated by contractors and two by ICE. The report concluded that the detention system needs fundamental reform, including greater internal and external oversight, and that privately run facilities are particularly problematic. It also concluded that DHS and ICE had refused to release full investigative reports into detainee deaths, as required by law.

359.    Representative Raskin's oversight visits have also led to oversight actions during his service in Congress. In July 2019, he chaired a hearing on inhumane treatment of children in detention facilities. In August 2020, he requested that the Government Accountability Office (GAO) prepare a report on the care of pregnant women in DHS facilities, which it did. In March 2020, Representative Raskin requested that ICE and CBP provide documents on procedures in detention facilities to protect detainees from the virus that causes COVID-19.

360.    In September 2020, the Oversight Committee, along with the Homeland Security Committee, opened an investigation into a medical whistleblower complaint from an ICE detainee and requested that ICE produce documents. In May 2024, Representative Raskin, along with other members of the Oversight Committee, requested that GAO conduct a review of medically necessary procedures for detainees in ICE and CBP facilities.

361.    More recently, during the current Trump administration, Representative Raskin has sent several letters to DHS and ICE leadership, raising issues such as the detention of U.S. citizens, DHS plans for detention of families, and the detention of individuals whose student visas have been revoked.

362.     On July 21, 2025, Representative Raskin joined Representatives Thompson and Neguse in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Raskin based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

363.     Representative Raskin's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Judiciary Committee and to his ability to serve his constituents. These visits provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

364.     Representative Raskin intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation, serve on relevant committees, and otherwise serve his constituents.

365.     Without obtaining necessary information through this oversight, Representative Raskin is less able to serve his constituents, ensure that DHS and ICE are acting consistently with the law, and craft relevant legislation and appropriations, including limits on such appropriations.

### 13.     Representative Morrison

366.     Representative Morrison represents Minnesota's 3rd congressional district, which includes the west metro area of the Twin Cities.

367.     Representative Morrison's constituents have been among those violently arrested and detained in Operation Metro Surge despite having committed no crime.

368.    The majority of individuals arrested and detained in Operation Metro Surge are being held, at least initially, at an ICE holding facility called the Bishop Henry Whipple Federal Building (Whipple) in Fort Snelling, Minnesota. That facility is located near Representative Morrison's district.

369.    Whipple is not set up to detain a large number of individuals, or to hold people for any extended period of time.

370.    Representative Morrison's office has received numerous reports about unsafe, cruel, and unlawful conditions inside of Whipple, including from constituents who have been detained there.

371.    One constituent, who is a U.S. citizen, had just dropped his parents off at the airport when he took a wrong turn. His car was swarmed by ICE agents, and he was dragged out of his car and detained at Whipple for multiple hours. He was patted down at least eight times, shackled by his ankles in a cell, and taunted, belittled, and threatened by guards. He was eventually released without charge.

372.    An Army veteran and Purple Heart recipient was tackled and aggressively arrested by ICE agents while peacefully observing ICE agents just a few blocks from where Renee Good was killed. He was detained in a cell at Whipple for more than 8 hours and not allowed to contact a lawyer. He was released without charge.

373.    Representative Morrison is a physician, and she has a particular concern about reports that ICE is not providing adequate medical care to detainees at Whipple. She has heard reports that there is *no* medical care being provided at Whipple, and that individuals do not have access to necessary medications.

374.    For example, Representative Morrison heard a report that one individual had what was described as a significant seizure while in custody. She was motionless when the seizure ended.

76

Instead of immediately calling 911, the guards debated whether or not she was faking a seizure before finally calling for emergency help.

375.    Representative Morrison has also heard reports that a man arrested by ICE in Minnesota had a heart attack. Instead of receiving necessary medical care, he was transported to another detention facility in Texas where he died. Representative Morrison has also received reports that a man who was detained at Whipple was injured and taken to a local hospital, where nurses reported that he had a skull fracture, and would either be permanently brain injured or not survive.

376.    Representative Morrison has also heard disturbing reports about other unacceptable conditions at Whipple. These include individuals sleeping on a concrete floor with no blanket or pillow; inadequate food; lack of access to counsel; extreme overcrowding; a communal toilet in view of all detainees; a lack of toothbrushes, soap, and other hygienic products; and no showers. She has been told that individuals have been held in these conditions for multiple days at a time. She has also received reports that ICE shackles the feet of individuals while they are in custody and that, at one point, approximately 130-140 individuals were being detained in a room that is only supposed to hold 20-30 people.

377.    Representative Morrison has also received reports that many of the new agents coming into Whipple from out of state are not adequately trained and are roughing up the detainees, swearing at them, calling them names, belittling them, and generally behaving in an unprofessional manner.

378.    However, Representative Morrison has no way to confirm any of this information because ICE has refused to allow her to access Whipple.

379.    It is in Representative Morrison's interest, in the interest of her constituents, and important to the performance of her duties as a member of Congress representing the suburbs of Minneapolis that she be able to conduct oversight of DHS facilities to ensure that any individuals

detained directly by DHS and ICE are treated humanely and in compliance with all relevant federal laws. Given the number of DHS arrests in the Twin Cities area from Operation Metro Surge, and the outpouring of reports she is receiving, including from constituents who have been detained at Whipple, it is important that she be able to conduct oversight of this facility immediately and without notice.

380.    On January 10, 2026, Representative Morrison joined Representatives Ilhan Omar and Angie Craig for an unannounced oversight visit to the Whipple federal facility.

381.    The executive associate director for ICE Enforcement and Removal Operations (ERO) and the deputy director for ICE ERO informed the representatives that they could not conduct an oversight visit because the "operation is being funded by OB3 funds." When Representative Morrison repeatedly asked for an explanation, they said she was being denied access because "it" was being funded by the reconciliation act without providing any additional explanation.

382.    During this conversation, the directors relayed that a privacy waiver release form would be required, but they did not explain why such a form would be required or what it would be required for. Also during this conversation, one employee repeatedly interrupted the representatives and aggressively demanded to know whether they had taken any pictures of the facility.

383.    Representative Morrison told the directors that ICE's presence in Minnesota was raising tensions in the community and that the Members' ability to conduct oversight of this facility would go a long way to bringing down the temperature. This request was ignored.

384.    ICE denied entry to Representative Morrison based on Defendants' unlawful oversight visit policy.

385.     Representative Morrison was not able to conduct an oversight visit of this facility or speak with ICE personnel or detainees about the conditions in the facility. Nor was she able to assess the medical care being provided to detainees.

386.     Representative Morrison's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents. This is especially important for Representative Morrison as a member of Congress representing the suburbs of Minneapolis: tensions within her community are very high because of ICE's surge in operations, violent arrest tactics, and detentions in Minneapolis.

387.     Representative Morrison has participated in legislation related to the conduct of ICE officers and transparency measures to improve the public's safety and trust. She is cosponsor of the No Secret Police Act, which would require agents detaining or arresting individuals in connection with a border security or immigration enforcement function to clearly identify the agency they are with and ban the use of face coverings. She is also a cosponsor of the Stop Excessive Force in Immigration Act, which would codify standards for appropriate use of force by immigration enforcement personnel. Representative Morrison has also signed letters to the Administration regarding the treatment of pregnant women in detention and ICE enforcement efforts against service members, veterans, and their families.

388.     As a member of Congress, it is Representative Morrison's duty to advance policies that meet the most pressing needs of her constituents. Her office has received a significant amount of outreach from constituents who are concerned about ICE's conduct in Minnesota, especially since the beginning of Operation Metro Surge. These inquiries have included first-hand accounts of the harmful impact of ICE's presence and behavior on schools, businesses, hospitals, and families in her district. ICE agents are violating Minnesotans' constitutional rights, unlawfully detaining and arresting United States citizens, racially profiling people, terrorizing communities, forcing schools,

restaurants, and businesses to close, preventing Minnesotans from seeking essential medical care, and using increasingly aggressive, excessive, and even lethal force against Minnesotans that has now killed two 37-year-old United States citizens.

389.     Representative Morrison has also heard from constituents who have described the overwhelming fear and stress that Operation Metro Surge has inflicted on their community. It is clear that oversight of ICE is a top priority for her constituents.

390.     Representative Morrison intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Morrison is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

391.     It is critical that this oversight happen in real time. After DHS officers shot and killed Alex Pretti, who was observing ICE along with other residents on January 24, Representative Morrison immediately began receiving reports that DHS arrested witnesses who had filmed the shooting and took them to Whipple (along with their phones). But for ICE's unlawful oversight visit policy, because Representative Morrison was in Minneapolis, she would have immediately conducted an oversight visit to investigate why ICE had kidnapped witnesses and detained them at Whipple.

392.     Additionally, requiring seven days' notice can present a significant and sometimes insurmountable scheduling barrier to conducting an oversight visit. Representative Morrison's work as a member of Congress causes her schedule to be very fluid due to unpredictable vote schedules, unexpected Committee activity, and constant travel between D.C. and her district. Minnesota also experiences extreme weather, which can impact travel ability and plans. This unpredictability often

makes it impossible to schedule and attend an oversight visit with more than a couple of days' notice, if that.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA—Contrary to Law and in Excess of Statutory Authority

393.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

394.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

395.    Defendants' oversight visit policies, including their requirement that individual members of Congress provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and their prohibition against members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, are final agency action.

396.    Defendants' oversight visit policies are "not in accordance with law" under 5 U.S.C. § 706(2)(A) because they are contrary to the requirements of the oversight rider in DHS's annual appropriations, which imposes a substantive ban on Defendants' preventing members of Congress from entering DHS facilities used to detain or otherwise house noncitizens.

397.    Defendants' oversight visit policies, including the use of reconciliation act funds, pursuant to the January 8 memorandum, for the development, promulgation, implementation, or enforcement of the notice requirement violates the reconciliation act and the purpose statute, 31 U.S.C. § 1301, as well as foundational principles of appropriations law, and exceed Defendants' authority under that statute.

398.    In any event, Defendants have used annually appropriated funds subject to the oversight rider for the development, promulgation, implementation, and enforcement of the notice requirement and the bar on oversight visits at certain DHS facilities. Defendants' policies are therefore also contrary to the oversight rider in DHS's annual appropriations and in excess of Defendants' authority under that law.

399.    Defendants' oversight visit policies are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because no statute or other source of law provides Defendants with the authority to prohibit unannounced oversight visits by individual members of Congress to any DHS facilities that detain or otherwise house noncitizens.

## COUNT II

### Violation of the APA—Arbitrary, Capricious, and an Abuse of Agency Discretion

400.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

401.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

402.    Defendants' oversight visit policies—which require individual members of Congress to provide advance notice and obtain approval, at DHS's and ICE's discretion, before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibit members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices—are final agency action.

403.    Defendants' oversight visit policies are arbitrary and capricious because they lack a lawful basis and because Defendants have not articulated an adequate, reasoned, or lawful basis for requiring at least seven days' notice for individual members of Congress to inspect DHS facilities or

for denying members of Congress access to ICE field offices, where noncitizens are detained or otherwise housed, for the purpose of conducting oversight.

## COUNT III

### Violation of the APA—Unlawfully Withheld or Unreasonably Delayed

404.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

405.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

406.    The oversight rider imposes a mandatory duty on Defendants to admit individual members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

407.    Defendants have not complied with their nondiscretionary duties to admit individual members of Congress without advance notice to DHS facilities, including ICE field offices, used to detain or otherwise house noncitizens for the purpose of conducting oversight.

408.    This court should compel Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

## COUNT IV

### *Ultra Vires* / Violation of the Oversight Rider

409.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

410.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a

federal officer has acted "beyond th[e] limitations" set by federal statute, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

411.    Plaintiffs have a nonstatutory right of action to ask a court to enjoin and declare unlawful official action that is *ultra vires*. The oversight rider establishes a nondiscretionary duty on the part of Defendants to admit members of Congress to DHS facilities used to detain or house noncitizens.

412.    Each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding the oversight rider.

413.    Defendants' oversight visit policies, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, violate the oversight rider.

414.    Plaintiffs are entitled to equitable relief to remedy Defendants' ongoing violation of federal law.

## COUNT V

### Mandamus Act and All Writs Act

415.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

416.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

417.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

418.    The oversight rider imposes a mandatory duty on Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens.

419.    Defendants' oversight visit policies, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, are contrary to the oversight rider.

420.    Defendants have not complied with their nondiscretionary duty under the oversight rider to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

421.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 to compel Defendants' nondiscretionary legal duty to admit members of Congress, without advance notice, to DHS facilities used to detain or otherwise house noncitizens.

## COUNT VI

## Declaratory Judgment Act

422.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

423.     Defendants' refusal to admit individual members of Congress to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, to conduct oversight activities without advance notice violates Plaintiffs' rights under the oversight rider.

424.     The Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such a declaration," in addition to any injunctive or other available relief.

425.     Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter the following relief:

A.     Declare unlawful, vacate, and set aside Defendants' oversight visit policies, requiring members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, as contrary to law, in excess of statutory authority, arbitrary and capricious, and *ultra vires*.

B.     Declare unlawful, vacate, and set aside Defendants' withholding and unreasonable delays of performing their mandatory duties to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

C.     Grant preliminary and permanent injunctive relief to enjoin Defendants from enforcing, implementing, maintaining, or giving effect to any policy that would deny individual members of Congress entry to conduct oversight visits, without prior notice, at any DHS facilities that detain or otherwise house noncitizens.

D.      Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate relief pending review, barring Defendants from enforcing or otherwise giving effect to the oversight visit policy.

E.      Enter an order in exercise of the Court's equitable powers that directs Defendants to immediately take all steps necessary to ensure that individual members of Congress may conduct oversight visits, without advance notice, at all DHS facilities that detain or otherwise house noncitizens.

F.      Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate.

G.      Grant such other relief as the Court deems just, equitable, and proper.

January 26, 2026

Respectfully submitted,

*/s/ Lisa Newman*
Lisa Newman (TX Bar No. 24107878)
Christine L. Coogle (D.C. Bar No. 1738913)
Anna L. Deffebach (D.C. Bar No. 241346)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
lnewman@democracyforward.org

Daniel Martinez
D.C. Bar No. 90025922
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Jessica Jensen
D.C. Bar No. 1048305

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*