## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his capacity as a Member of
the U.S. House of Representatives, *et al.*,

     *Plaintiffs*,

v.                                                              Case No. 25-cv-2463-JMC

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT *et al.*,

     *Defendants.*

### SUPPLEMENTAL REPLY IN SUPPORT OF
### PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705

In the temporary restraining order issued on February 2, 2026, this Court concluded that Plaintiffs had "made a strong showing that the January 8, 2026, notice requirement was . . . promulgated, implemented, and is presently being enforced with the use of" funds subject to the oversight rider currently at section 527. Order at 5 (Feb. 2, 2026), ECF No. 52 (TRO). Despite having yet another opportunity to rebut Plaintiffs' evidentiary showings, Defendants still have made "no attempt to disprove the specific factual claims made by Plaintiffs' declarant." TRO at 6. The Court can infer from that deafening silence that there is nothing Defendants *can* say to disprove the factual evidence that Plaintiffs have proffered. And Defendants' supplemental brief provides no legal argument that should alter the conclusions that the Court has already reached. The Court should therefore grant Plaintiffs' request for preliminary relief against Defendants' oversight visit policy, and any notice requirement, while this litigation proceeds.

Plaintiffs principally rely on their previous memoranda in support of their request for a stay under section 705 but address a few discrete points in this supplemental reply. First, the February 2 memorandum did not promulgate any new policy and is properly subject to a section 705 stay by

this Court. Second, Defendants still have not shown—and cannot show—that the oversight visit policy was or will be lawfully promulgated, implemented, or enforced. Third, Defendants have failed to respond to most of Plaintiffs' arguments in support of their claim that the policy is arbitrary and capricious, including the requirement that members provide advance notice of detainees they wish to speak with during visits. Finally, the Court should issue an order staying the oversight visit policy and making clear that Defendants may not require members of Congress to provide advance notice prior to an oversight visit to any DHS facility used to detain or house noncitizens.

## I.  The February 2 Memorandum Does Not Disturb Plaintiffs' Request for Relief

Defendants revealed in their supplemental brief that, for the second time in the span of a few weeks, the secretary of DHS secretly issued a memorandum directly relevant to this case without alerting Plaintiffs, members of Congress, or this Court. *See* Defs.' Suppl. Br. at 2–3, ECF No. 55. On February 2, 2026, DHS Secretary Kristi Noem sent a memorandum to the heads of ICE and U.S. Customs and Border Protection (CBP), the general counsel, and the chief financial officer, entitled "Congressional Access to Alien Detention Facilities – Ratification of Access Policy and Use of Appropriations for Enforcement." ECF No. 55-1 (Feb. 2 Mem.). The secretary briefly, and disdainfully, acknowledged the TRO this Court had issued earlier that day, expressing her view that the decision was "odd" in light of the lapse in appropriations, *id.*, but not engaging with the Court's basis for doing so, *see* TRO at 7–8 n.6. She then stated that, in light of the lapse in appropriations at that time, she was "issuing this new policy that is identical in substance to the January 8 access policy." Feb. 2 Mem. (referencing Jan. 8 Mem., ECF No. 39-1). The secretary stated that the "General Counsel will provide further guidance regarding the effective date of this policy in light of the court's order." *Id.* That guidance has apparently not yet been issued, but the secretary appears to intend for this purportedly "new" policy to go into effect upon the dissolution of the Court's TRO. *See* Defs.' Suppl. Br. at 6.

This weak attempt to draw Plaintiffs and this Court into a game of whack-a-mole—for the second time in this case—cannot succeed. The new memorandum is the functional equivalent of the secretary crossing out "January 8" and writing "February 2" over it. Slapping a new date on an "identical" policy does not make it a new policy. Feb. 2 Mem. The secretary did not even attempt to distinguish it in any way from the January 8 policy: the February 2 memorandum is entitled "*Ratification* of Access Policy" and, instead of laying out an actual policy, expressly refers to and incorporates the January 8 memorandum and the oversight visit policy it promulgated.[1] *Id.* (emphasis added). This is not a new agency action; this is an express reiteration of the agency action that this Court preliminarily concluded was unlawful. Moreover, the reasoning underlying the Court's previous conclusion that the January 8 memorandum promulgated a new policy is inapplicable here; the policy ratified in the February 2 memorandum differs in neither substance nor justification from the January 8 policy. *Cf.* Order at 3–4 (Jan. 19, 2026), ECF No. 46 (identifying ways in which the January 8 policy "differs" from the June policy).

The inevitable conclusion that the February 2 memorandum does not constitute a new policy is equally true with respect to the purported extension of the oversight visit policy to CBP. That extension is likewise undertaken *only* by reference to the policy set out in the January 8 memorandum, and the February 2 memorandum does not—and indeed could not—provide reasoning that might distinguish the policy's application to CBP from its application to ICE, both components of DHS.[2] Any actions taken on or after February 2 to ratify, implement, enforce, or

---

[1] To be clear, repeating the terms of the oversight visit policy promulgated on January 8 in the February 2 memo would not have magically turned those same terms into a new policy. But it is all the more glaring that the secretary could not be bothered even to do that much, instead setting out the policy *only* by reference to the January 8 memorandum.

[2] Lest there remain any doubt, even though the January 8 memorandum was directed to ICE, Plaintiffs' amended and supplemental complaint, ECF No. 53, and motion for TRO or section 705 stay, ECF No. 49-1, expressly challenged any requirement that members of Congress provide advance notice prior to visiting a *DHS* facility used to detain or otherwise house noncitizens. And the Court adopted that broader construction in the TRO. *See* TRO at 9 (applying temporary injunction to "any facility operated by or for DHS used to detain or otherwise house aliens").

extend the oversight visit policy, including the requirement that members of Congress provide at least seven days' notice, are properly viewed as taken pursuant to the January 8 memorandum.

Further, the February 2 memorandum independently violates the oversight rider. Just as the January 8 memorandum unlawfully "use[d]" funds subject to the oversight rider to restrict congressional oversight visits to immigration detention facilities, the February 2 memorandum does the same. Even setting aside the actions taken on February 2, the new memorandum expressly incorporates and relies upon a policy that was incontrovertibly formulated using annually appropriated funds subject to the rider. As such, the February 2 memorandum exacerbates the unlawful use of restricted funds to achieve the prohibited policy objective.

Moreover, with respect to the actions taken on February 2 itself, the memorandum appears to be premised on the idea that cabinet secretaries—and presumably all non-furloughed employees—at federal agencies in the midst of an appropriations lapse operate in a law-free zone, in which they may spend resources without consequence or restraint. That is incorrect.

The legislative and executive branches have long agreed that, "on a lapse in appropriations, federal agencies may incur no obligations that cannot lawfully be funded from prior appropriations unless such obligations are otherwise authorized by law." *Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation*, 43 Op. Att'y Gen. 224, 229 (1980); *accord* GAO, *Principles of Federal Appropriations Law* 6-148–49 (4th ed. 2017), https://www.gao.gov/legal/appropriations-law/red-book; *Operation in the Absence of Appropriations*, GSA Order ADM 4220.1S, at 1 (Sept. 30, 2025), https://perma.cc/JWT7-N6VW. The preceding annual appropriations laws—including the provided purposes and restrictions on those appropriations—therefore apply during the pendency of a shutdown caused by a lapse in appropriations. And when the lapse in appropriations ends, Congress generally retroactively funds the excepted activities through the passage of new annual appropriations (including through a continuing resolution). The current continuing resolution

providing DHS's current general appropriations does exactly this: it provides that it covers the lapse "which began on or about January 31, 2026," and that "[a]ll obligations incurred and in anticipation of the appropriations made and authority granted by" the continuing resolution, "for the purposes of" continuing "essential" government activity and other authorized purposes during the lapse "are hereby ratified and approved *if otherwise in accord with the provisions of*" the continuing resolution. Further Continuing Appropriations Act, 2026, div. H, § 104, Pub. L. No. 119-75, 140 Stat. 173 (Feb. 3, 2026) (emphasis added). Therefore, any resources used during a lapse in appropriations that can be paid for only using annual appropriations—including myriad resources that were necessarily used in the issuance, dissemination, and receipt of the February 2 memorandum, *see* TRO at 5—are ultimately subject to the restrictions provided in those annual appropriations.

The continuing resolution enacted on February 3 did not disturb the oversight rider at section 527: the oversight rider applied to the annually appropriated funds available one business day before and one business day after the February 2 memorandum was issued, and it therefore applied to the annual appropriations used to fund the secretary's activities, and any resources used, on February 2. The issuance of the February 2 memorandum therefore falls into the same unlawful trap as the January 8 memorandum.

## II. Defendants Have Not Provided Any Evidence or Persuasive Law in Defense of the Policy

The oversight visit policy promulgated in the January 8 memorandum is contrary to law and in excess of Defendants' authority, as the Court rightly concluded in the TRO. In their supplemental memorandum, Defendants state (at 6) that they "disagree" with the Court's conclusions, but they offer neither evidence nor persuasive legal arguments that might fill the gaping holes that the Court identified in their previous defenses of the oversight visit policy.

Defendants' supplemental arguments against this claim are largely repetitive of their previous arguments and again misconstrue or otherwise fail to address Plaintiffs' arguments. *See* Defs.' Suppl.

Mem. at 6–10. Plaintiffs have shown that the rider restricts DHS from "us[ing]" *any* annually appropriated funds in service of "prevent[ing]" members of Congress "from entering" DHS detention facilities, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619, and provided both evidence and case law on which the Court relied in its TRO, *see, e.g.*, TRO at 5 (citing *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871–72 (9th Cir. 1995), *Kimberlin v. DOJ*, 318 F.3d 228, 232 (D.C. Cir. 2003) (per curiam), and Fleischaker Decl. ¶¶ 20–23, ECF No. 49-2). Defendants counter this with neither facts nor law.

Defendants again fail to respond to Plaintiffs' arguments regarding the text of the oversight rider and how the words "prevent" and "use" in that rider restrict DHS's operations. *See, e.g.*, Pls.' TRO Reply at 3–4, ECF No. 51; Pls.' TRO Mem. at 29–30. Instead, Defendants fall back on their unsupported theory that DHS can "adjust its accounting ledger" by the end of the fiscal year. Defs.' Suppl. Mem. at 10 (quoting Mehringer Decl. ¶ 6, ECF No. 42-1). They attempt (at 9) to recast this general plan as an administrative "reimburse[ment]" from "one federal appropriation" to "another," generally citing various decisions of the Government Accountability Office (GAO) that have no bearing on this situation. Defendants' use of the term "reimburse" gives up the game: a reimbursement to an appropriations account is appropriate where funds in that account were *already used*. If the funds had not been used, no reimbursement would be necessary. *Cf.* Fleischaker Decl. ¶ 16(b). The funds are "use[d]," and the oversight rider is therefore violated, when the policy is promulgated and implemented, before any reimbursement can occur.

Contrary to Defendants' suggestion, the decisions of GAO support Plaintiffs' interpretation of the rider and its application. Those decisions make clear that "[t]he use of a specific appropriation for one program to pay obligations under another program during a temporary exhaustion of funds is in contravention of 31 U.S. Code [§ 1301], which requires appropriations to be used only for the objects for which made, *even though repayment of the appropriation is contemplated* after supplemental

appropriations are made." *Appropriations—Availability—Use of Specific Appropriations for Objects Other than Specified*, 36 Comp. Gen. 386, 386 (Nov. 9, 1956) (emphasis added); *see id.* at 388 ("Public expenditures are required to be charged directly to the funds which are provided for them and not to some other funds with the hope or expectancy of a subsequent adjustment."). Accordingly, "an administrative officer may not, for the sake of an administrative expediency, deliberately charge the wrong appropriation with the expectation of obtaining subsequently an adjustment thereof by transfer of applicable appropriations." *Comptroller Gen. McCarl to the Adm'r, Fed. Emergency Relief Admin.*, 14 Comp. Gen. 103, 103 (Aug. 8, 1934). "Such practice results in the rendition of false accounts and obviously should not be indulged in merely on the basis of alleged administrative expediencies," in addition to being "in contravention of [the purpose statute], which provides that all sums for the various branches of expenditure in the public service shall be applied solely to the objects for which they are respectively made, and for no other." *Id.* at 104.[3]

    The recent lapse in appropriations also provides a useful illustration of Plaintiffs' unrebutted point that appropriated funds are *used* whenever an agency "act[s]," *Babbitt*, 73 F.3d at 872, and certainly well before the accounts are trued up at the end of a month or a fiscal year. ICE Office of Congressional Relations (OCR) is central to the implementation and enforcement of the oversight visit policy because members of Congress are required under Defendants' policy to submit any requests to conduct oversight visits to that office and must receive approval through that office. *See* Third Escobar Decl., Ex. A. OCR thus plays an integral role in "prevent[ing]" members of Congress "from entering" DHS detention facilities to conduct oversight without prior notice. And Plaintiffs

---

[3] *See also Assistant Comptroller Gen. Yates to the Sec'y of the Navy*, 26 Comp. Gen. 902, 906 (June 5, 1947) ("This office consistently has held that an administrative office may not, for the sake of administrative expediency, deliberately charge the wrong appropriation with the expectation of thereafter obtaining an adjustment by a transfer of funds from another appropriation."); *Comptroller Gen. Brown to the Sec'y of the Treasury*, 19 Comp. Gen. 395, 395 (Sept. 25, 1939) (citing "the sound accounting practice, required under [the purpose statute], that public expenditures be charged directly to the funds which are provided for them, and not to some other funds with the hope or expectancy of a subsequent adjustment").

previously noted that the funding purposes in the reconciliation act "do not go to, and therefore cannot replace, ICE's baseline operations and the many resources that have been and will be used in service of the oversight visit policy (such as, for example, the existing salaries and expenses of ICE OCR)." Pls.' TRO Mem. at 25. Defendants have remained entirely silent on this point, and the additional evidence Plaintiffs attach to this memorandum confirms the veracity of that statement: during the brief lapse in appropriations earlier this month, and by Defendants' own admission, OCR was entirely shut down, because the operation of that office and its employees depends upon the availability of appropriated funds subject to the oversight rider. *See* Third Torres Decl. Exs. A–C.

In any event, Defendants still have not shown that their proposed tracking and accounting trick is either possible or lawful. Plaintiffs "presented evidence in the form of testimony by a former DHS and ICE legal and budgeting official that it would be logistically difficult, if not impossible, for DHS to identify and segregate the relevant expenditures to ensure that only funds from the OBBBA were used to first promulgate and enforce the January 8 policy or will be used to enforce it going forward." TRO at 5–6 (citing Fleischaker Decl. ¶ 23). Defendants had yet another opportunity to counter that factual showing, yet they still have "ma[d]e no attempt to disprove the specific factual claims made by Plaintiffs' declarant," instead continuing to rely on their previous declarant, who provided "almost no details or specifics as to how DHS and ICE would accomplish this task in the face of the practical challenges raised by Plaintiffs." *Id.* at 6. That failure speaks volumes.[4]

## III. Defendants Fail to Defend the Policy Against Plaintiffs' Arbitrary-and-Capricious Claim

Defendants also waste their final opportunity at this stage to oppose Plaintiffs' claim that the oversight visit policy is arbitrary and capricious. Plaintiffs made multiple arguments in support of

---

[4] In a last-ditch effort to avoid a stay, Defendants suggest (at 10) that the Court "limit any relief to requiring Defendants to use a reasonable methodology to capture" costs. They cite no authority to support this extraordinary suggestion, which would in no way remedy Plaintiffs' harms or make their scheme lawful. Nor do Defendants even attempt to suggest any possible "reasonable methodology" that might accomplish this task.

this claim that Defendants failed to respond to in their opposition brief, *see* Pls.' TRO Reply at 6–8, and Defendants remain effectively silent on this claim in their supplemental brief. Defendants therefore not only have forfeited those arguments but have ultimately failed to dispute persuasively that the policy is arbitrary and capricious.

In particular, Defendants have failed to present—and have therefore forfeited—any arguments in defense of the aspect of DHS's oversight visit policy restricting members' ability to obtain information through speaking with detainees, as they have long done in the usual course of conducting oversight visits. Pls.' TRO Mem. at 41; Second Neguse Decl., Ex. B at 2, ECF No. 49-3; Am. & Suppl. Compl. ¶¶ 139–42, 331, 382, ECF No. 53. As Plaintiffs explained, DHS is obstructing members' oversight visits by prohibiting members from speaking with individual detainees unless they have requested to speak with individual detainees, obtained signed forms from such detainees at least seven days in advance of their visit, and had that request approved by ICE headquarters. *See* Second Neguse Decl., Ex. B at 2.

This aspect of the oversight visit policy, which remains entirely unexplained and undisputed, is a stark departure from previous DHS and ICE policies. *See, e.g.,* Third Escobar Decl. ¶ 7. It is designed to undermine oversight by members of Congress and to compel them to provide advance notice of visits to DHS facilities in order to engage in meaningful oversight once in those facilities. The explanations by ICE personnel to Plaintiff Representative Escobar on her most recent oversight visit to Camp East Montana last week underscore the arbitrary and capricious nature of this requirement: they stated that members of Congress are not permitted speak with any individual detainees during a visit without prior approval *because* of their status as members of Congress, but that a noncongressional visitor or lawyer may, without notice, meet and speak with an individual detainee upon request. Third Escobar Decl. ¶ 14. This unexplained change in position—like other aspects of the oversight visit policy—is arbitrary and capricious, and it is yet another example of

Defendants' repeated attempts at preventing members of Congress from conducting unannounced oversight at every turn.

**IV.  The Court Should Grant Plaintiffs' Requested Relief under Section 705**

Plaintiffs respectfully request that the Court issue an order staying the January 8 oversight visit policy (including the February "ratification" of that policy) and making clear that Defendants may not, consistent with the orders of this Court, implement or enforce any policy that alters the status quo as it existed in June 2025 by requiring members of Congress to provide advance notice prior to conducting oversight visits to any DHS facilities used to detain or otherwise house noncitizens. Defendants' troubling pattern of gamesmanship in their attempts to circumvent this Court's previous orders demonstrates why an unequivocal order is necessary under section 705 to preserve the status quo and rights of members of Congress to conduct unannounced oversight visits while this litigation proceeds.

Section 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," this Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Defendants have made clear that they will continue to draw Plaintiffs and this Court into a game of whack-a-mole, in which Plaintiffs challenge and the Court enjoins or stays a policy, Defendants reissue a "new" policy that is substantially or actually identical to the one already enjoined by the Court, and Plaintiffs and the Court must then scramble to address yet another attempt by DHS to obstruct lawful oversight visits by members of Congress. This pattern drains the resources of the Court and counsel, undermines the relief that Plaintiffs obtain at each turn, causes irreparable harm to Plaintiffs, and allows DHS to act repeatedly contrary to the law and the public interest.

The February 2 memorandum constitutes Defendants' second attempt to play this game, underscoring why additional relief is necessary under section 705. The Court first stayed Defendants' oversight visit policies on December 17, 2025. Defendants then secretly reissued a substantially similar notice requirement on January 8. After emergency briefing by both parties and a hearing before the Court, Plaintiffs ultimately supplemented their complaint to challenge the January 8 policy, which—after another round of briefing—this Court temporarily enjoined on February 2. Defendants *for a third time* have purported to issue the same notice requirement, this time hours after this Court temporarily enjoined that very policy, and once again failed to notify either this Court or Plaintiffs about the new memorandum until they were compelled to.

This case is not unique: it fits neatly into a pattern of noncompliance by DHS with court orders over the past year, including most recently before several district judges in Minnesota, as an attorney representing ICE in that state recently conceded at a show cause hearing. *See, e.g.*, Order, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Apr. 11, 2025), ECF No. 61; Mem. Op. & Order, *Castanon Nava v. DHS*, No. 1:18-cv-3757 (N.D. Ill. Oct. 7. 2025), ECF No. 214; Order, *D.V.D. v. DHS*, No. 1:25-cv-10676 (D. Mass. May 21, 2025), ECF No. 119; Mem. Op., *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Apr. 6, 2025), ECF No. 81; Order, *Vasquez Perdomo v. Noem*, No. 2:25-cv-5605 (C.D. Cal. Nov. 13, 2025), ECF No. 256; Order at 3, *Marco M. v. Bondi*, 25-cv-4816-MJD-JFD (D. Minn. Jan. 25, 2026), ECF No. 11 ("There has been an undeniable move by the Government in the past month to defy court orders or at least to stretch the legal process to the breaking point[.]"); Order, *Juan T.R. v. Noem*, No. 26-cv-107-PJS-DLM (D. Minn. Jan. 28, 2026), ECF No. 10 (identifying "96 court orders that ICE has violated in 74 cases"); Tr. of Show Cause Hr'g at 30:18–20, *Segundo A.P.G. v. Bondi*, 26-cv-603-JWB-LIB (D. Minn. Feb. 3, 2026) (admission by attorney for DHS attempting to "make sure that the agency understand[s] how important it is to comply with all the court orders, which they have not done in the past or currently").

11

Section 705 properly encompasses the relief that Plaintiffs seek, to preserve the status quo ante—as it existed prior to June 2025 and again in December 2025—to ensure that members of Congress are able to continue to conduct unannounced oversight visits "pending conclusion of the review proceedings." 5 U.S.C. § 705. Federal courts may properly fashion relief under section 705 where simply staying an agency action is not "sufficient to redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). For example, additional relief may be warranted where the agency has "enacted similar guidance in the past and may attempt to do so again as an end-run to the Court's relief." *Texas v. Cardona*, 743 F. Supp. 3d 824, 897 (N.D. Tex. 2024) (enjoining defendants from "implementing or enforcing" the guidance documents at issue, as well as any future guidance documents promoting a similar interpretation against plaintiffs); *see also, e.g.*, *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 612 (D. Mass. 2020) (staying and enjoining enforcement of a rule "to preserve the status quo" as it existed prior to the adoption of the rule); *Thein v. Trump*, No. 25-cv-2369 (SLS), 2025 WL 2418402, at *19 (D.D.C. Aug. 21, 2025) (section 705 "includes 'the power to compel agency inaction when necessary "to preserve status or rights"'" (quoting *Gomez v. Trump*, 485 F. Supp. 3d 145, 203 (D.D.C. 2020))); Order, *Nat'l Alliance to End Homelessness v. HUD*, No. 1:25-cv-636-MSM (D.R.I. Dec. 23, 2025), ECF No. 52. Relief that maintains the status quo for members of Congress as it existed prior to June 2025 is "necessary" to "preserve" the "status" and "rights" of these members and to prevent DHS from imposing identical or substantially identical policies that purport to prevent oversight visits by members of Congress, including by requiring prior notice of such visits.

Thus, in addition to staying all challenged aspects of Defendants' oversight visit policy, Plaintiffs request the following relief authorized by section 705:

(1) Defendants may not enforce, implement, extend, or give effect to any policy, under any name, that alters the status quo that existed prior to June 2025 by requiring members of Congress to

provide advance notice before conducting oversight visits to any DHS facility used to detain or otherwise house noncitizens, including ICE field offices, or any policy otherwise preventing such oversight visits; and

(2) Defendants may not require members of Congress to provide previously signed forms or otherwise provide advance notice of individual detainees the members wish to speak to before allowing members to speak with identified individual detainees, in accordance with the status quo as it existed for members of Congress prior to June 2025.

Alternatively or additionally, the Court may order the following to prevent continued gamesmanship by DHS: if Defendants intend to effectuate a new oversight visit policy that alters the status quo as it existed prior to June 2025, Defendants are directed to notify the Court and Plaintiffs at least seven days in advance and provide the legal basis for doing so. *Cf., e.g.*, Mem. Order, *Abrego Garcia v. Noem*, No. 8:25-cv-2780 (D. Md. Dec. 12, 2025), ECF No. 114 (reiterating previous order that the government "provide written notice" to plaintiff and all counsel of record prior to his intended removal).

Finally, Defendants request (at 12) a stay of any relief granted pending appeal and an administrative stay to "allow the parties time to address more fully whether the Court's decision to issue a Section 705 stay should, itself, be stayed pending appeal." No stay is warranted because Plaintiffs are not requesting an injunction, and Defendants cannot demonstrate likely success on appeal or that they will suffer any irreparable harm to warrant a stay. *See* TRO at 7; Op. at 70–72. The absence of irreparable harm to Defendants is underscored by the fact that they opted not to appeal the Court's first stay issued nearly two months ago, and they cannot claim that they suddenly face an urgent situation of their own making. Defendants do not provide any details (at 13) about what "issues" the parties would need to address more fully or the Court would need additional time to deliberate over—a doubtful assertion given the Court's previous opinion spanning more than 70

pages and the extensive additional briefing and two hearings that the Court will have considered before ruling on a stay of the January 8 oversight visit policy. Neither of the two cases on which Defendants rely involve factually analogous situations in which a section 705 stay and a temporary restraining order had previously been in place but not appealed.

\*      \*      \*

For these reasons, and the reasons provided in Plaintiffs' previous memoranda in support of their motion, the Court should grant Plaintiffs' request for preliminary relief under 5 U.S.C. § 705.

February 11, 2026                              Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Lisa Newman (TX Bar No. 24107878)
Anna L. Deffebach (D.C. Bar No. 241346)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

Daniel Martinez
D.C. Bar No. 90025922
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Jessica Jensen
D.C. Bar No. 1048305

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*