IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,

*Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT *et al.*,

*Defendants.*

Case No. 25-cv-2463-JMC

**THIRD DECLARATION OF REPRESENTATIVE VERONICA ESCOBAR**

I, Veronica Escobar, declare as follows:

1. I am a member of the U.S. House of Representatives, representing Texas's 16th congressional district. I have been a Member of Congress since 2019.

2. I have personal knowledge of the facts and information in this declaration. I provide this declaration to explain further how the unlawful oversight visit policies of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) prevents me from performing my oversight duties as a member of Congress and significantly harms my ability to serve my constituents.

3. On Friday, February 6, 2026, I conducted an unannounced oversight visit at Camp East Montana, which is an ICE detention facility located in my district, at the Fort Bliss military base in El Paso.

4. I arrived at the facility with two members of my staff, one of whom had prepared a list of detainees we wished to speak with. That list included detainees we had spoken with during a previous visit.

1

5. The acting field office director, Vanessa Martinez, and two other ICE personnel told us that, although I was permitted to enter, my staff members were not allowed to accompany me on the tour.

6. I gave Ms. Martinez the list of detainees that we wished to speak with before we, along with other ICE and contractor staff, proceeded to a part of the facility called the Echo wing. When we arrived there, I sat down with a group of women detainees and began to engage with them, as I have routinely done during previous oversight visits. One woman told me that her son was also detained at Camp East Montana but that she had not been allowed to speak with him. I noticed that the women had their street clothing hanging out to dry in the room, and I asked them if they had washed their own clothes. They said yes and that they had to use their shampoo to wash their clothes. When I asked why they didn't have the facility launder their clothes, they looked perplexed and said no one had told them their clothes could be washed by facility staff.

7. At that point, Ms. Martinez abruptly interrupted and said that I wasn't allowed to speak to the detainees without providing prior notice. I told her I had always been allowed to speak to detainees during oversight visits, and she said "they" told her I could not do so without prior notice. I asked multiple times who "they" were, but she didn't respond to that question. I asked for the policy in writing, but Ms. Martinez did not have a written policy to show me.

8. I asked Ms. Martinez about the detainees washing their own clothes, and she responded that detainees prefer to wash their own clothes because they are worried that if they give their clothes to laundry services, they won't get them back. I asked whether she could confirm that the facility contractor is not charging for the laundry services that it was not providing. She did not answer my question.

9. We then walked over to the next pod where a group of men were still in their street clothing. I was told they had arrived the previous day and had not yet been processed.

2

10. We walked over to another pod, where there was a group of men still in their street clothes. I was told that they had arrived on Monday, four days previously, so they had been in the same clothes for at least five days. The guard told me that I could not enter the pod because the men had not yet been tested for tuberculosis. No one was wearing a mask or other personal protective equipment.

11. I witnessed facility staff enter that pod, also without wearing any personal protective equipment. I asked Ms. Martinez why they were not wearing appropriate equipment to enter the pod, and she told me that it was the staff's personal choice whether to do so, and that staff are informed of this choice at muster every morning. I asked whether Ms. Martinez had personally attended muster to confirm this, and she said she had not. This underscores that ICE personnel are not verifying the contractor's claims about work performed at the facility, including when it risks harm to the health and wellbeing of both detainees and staff.

12. I asked the guard whether any of the pods in Echo had tablets. During my previous visit, I had spoken with detainees who had been at Echo for three weeks and were allowed to use a cellphone one once a week for two minutes, and they did not have access to tablets. This time, the guard told me that none of the Echo pods have tablets. He claimed that tablets are available but that because detainees in Echo are only in that wing for 24–36 hours they do not need tablets. I reminded him that the men in the pod behind him had been in that same pod for more than four days. The guard said that they had been assigned PINs to use phones, but indicated they had not had access yet, but would at some point.

13. I then asked to be taken to the cafeteria. My office had heard from our sources that food portions had been diminished and no fresh fruit had been provided to detainees for multiple days, so there had been a protest inside the facility that triggered a three-day lockdown. I asked the ICE staff about that incident, and they denied it. I then asked the gentleman in charge of the

cafeteria area if there had been a protest because of the food and a subsequent three-day lockdown and he nodded. I asked to see the portions, and he showed me the menu. I asked to see the fruit, and there was plenty.

14. We then returned to the area where my staff members were waiting. I thought we would next be speaking to the detainees on the list we had provided, but ICE personnel stated that we had to give advance notice to speak to detainees; only visitors and lawyers could request an immediate visit with an individual detainee. I asked if I could, as a visitor, see just *one* person on the list. They said "no," because they know I am a member of Congress. I pressed further, asking for clarification that I were someone off the street, I could visit an individual detainee, but because I am a member of Congress I am not permitted to do the same. They confirmed that was correct.

15. My staff members explained that we typically filled out a form provided by ICE staff to speak with detainees, according to a process laid out by the ICE Office of Congressional Relations. Prior to this visit, either myself or my staff would have the detainees fill out the forms in person during the visit, so that we can later make inquiries to ICE on their behalf.

16. ICE personnel responded that we are now required to submit requests to speak with detainees to, and receive prior approval from, ICE Office of Congressional Relations.

17. This change in policy frustrates my ability to conduct oversight. Detainees at Camp East Montana generally do not have access to those forms at the facility, and Camp East Montana does not have a working mailing address for us to be able to mail forms to detainees directly. Having the detainees fill out the forms in person during our visits is the only feasible option, and ICE is now obstructing that only feasible option.

18. While we were there, we also spoke with two visitors. One was an Italian American man who had traveled from New York to El Paso to visit his 70-year-old father who had been detained in New York City. The other a former Marine and Veterans Affairs employee who had

driven to El Paso to visit his wife who had been detained during a check-in with DHS in Minnesota. We provided each of them with an ICE privacy waiver to have their family members sign. ICE requires a detainee to sign an ICE privacy waiver before ICE will release information about that detainee to any third party. ICE also uses this form to allow congressional offices to inquire to ICE on the detainees' behalf. Later, each of them separately contacted my office and said that ICE had confiscated the form that we had given them. The former Marine said that he was told it was against ICE policy for him to have the form.

19. After my visit on February 6, ICE Office of Congressional Relations emailed my office the current ICE "visitation policy." That policy states that congressional visitors may not "[h]ave any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters." *See* Ex. A.

20. ICE continues to change the rules for congressional oversight visits. Their refusal to allow my staff to accompany me on the visit and to allow us to speak with identified detainees restricts my ability to do meaningful oversight at the facility, even as conducting these visits and obtaining information regarding detainees' treatment and detention and employment conditions is more critical than ever.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of February 2026.

                                                        VERONICA ESCOBAR

# EXHIBIT A

|  |  |
|---|---|
| **From:** | CongressToICE <CongresstoICE@ice.dhs.gov> |
| **Sent:** | Friday, February 6, 2026 2:54 PM |
| **To:** | |
| **Cc:** | |
| **Subject:** | ICE Facility Visitation Policy |
| **Attachments:** | Memo from S1 - Facility Access.pdf |
| **Importance:** | High |

▬▬▬▬▬▬▬▬ – good afternoon –

It has come to our attention there may be some ambiguity regarding the ICE facility visitation policy. As a reference, please review the following:

> Ensuring Members of Congress have appropriate access to detention facilities through tours, visits, or tours with visitation remains a top priority for ICE. On January 8, 2026, due to escalating riots and political violence targeting buildings and facilities used by ICE, DHS issued a new directive regarding Congressional access to ICE detention facilities using funds derived from the One Big Beautiful Bill Act (OBBA).
>
> Per the Secretary's directive (attached), to visit an ICE detention facility, a request must be submitted at least seven (7) days in advance. Any request to shorten that time must be approved by DHS. Visit requests should be submitted during normal business hours to the Office of Congressional Relations (OCR) at [CongressToICE@ice.dhs.gov](mailto:CongressToICE@ice.dhs.gov). Visit requests are not considered actionable until OCR acknowledges receipt of the request to the requestor. Requests received after hours or on weekends/holidays will be confirmed on the next business day. OCR will work with the appropriate ICE Field Office to coordinate the visit request and will confirm details as soon as practicable.
>
> In compliance with the February 2, 2026 Neguse v. ICE, No. 25-2463 order (https://democracyforward.org/wp-content/uploads/2026/02/Neguse-TRO-Opinion.pdf), all 13 plaintiffs may visit ICE field offices, detention centers, and temporary holding facilities without advance notice. However, ICE requires a minimum of 24-hour advance notice for congressional staff from these 13 offices seeking to visit ICE facilities. ICE facility visit requests for all other Member offices must be made a minimum of seven (7) calendar days in advance.
>
> Visit requests should include the date of the proposed visit, the visit location, the duration of the visit, and the names and titles of all participants. Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate. ICE will continue to maintain a secure perimeter and screen all visitors to ICE facilities prior to entry, as required by ICE's detention standards. All visitors will be required to comply with identity verification and security screening requirements prior to entry. This policy is implemented to ensure the safety of Members of Congress, staff, law enforcement, visitors, and detainees alike.

In advance of any facility visits, please also review the following facility visitation protocol, including identification requirements:

> **Access:** Members of Congress (Members), Congressional Member Delegations (CODELs), and Congressional Staff Delegations (STAFFDELs) are afforded special access to ICE facilities. These visits are limited to Members and congressional staff <u>only</u>; ICE will not accommodate special access for mixed

1

groups. All other requests for tours (e.g., media representatives, local officials, clergy/religious groups, non-governmental organizations, members of the public, etc.) should be directed to the ICE Field Office with jurisdiction over the facility for coordination and approval.

**Conduct**: Safety, security, and good order are always primary considerations in a detention facility, and visitors must be properly identified and attired. All visitors are subject to screening and/or other search of their person and belongings for security reasons upon entering the facility and at any other time during the tour/visit. Introduction of contraband or other criminal violations may lead to criminal prosecution of a visitor. ICE retains the sole and unreviewable discretion to deny a request or otherwise cancel, reschedule or terminate a tour or visit if: 1) an emergency arises; 2) the safety, security, and orderly operations of the facility are potentially jeopardized; 3) any violation(s) of this Protocol occur; 4) any other identified operational concerns exist; 5) facility management or other ICE officials deem it appropriate to do so.

**Facility Entry Requirements:**
- Members and Congressional staff: Unless specifically approved by DHS Secretary Noem or for the 13 plaintiffs of *Neguse* v. ICE, No. 25-2463, all other requests to visit ICE detention facilities must be made a minimum of seven (7) calendar days in advance and be coordinated through the ICE Office of Congressional Relations (OCR) to schedule. Failure to meet this requirement will result in denied access to the facility. All visitors must comply with facility entry requirements.
- Identification: All visitors must present a valid, verifiable government-issued picture identification card to enter an ICE detention facility. To preclude potential delays, Members should be prepared to show valid identification identifying him/her as a Member of Congress (Member Voting Cards with picture ID are sufficient; Member pins which change from Congress to Congress and are not associated with a specific individual are not). Congressional staff should be prepared to show valid congressional identification issued by either the House or Senate Sergeant at Arms Identification Office. Identification will be checked prior to entering the facility. If the facility is unable to validate the identity of a visitor (e.g., the individual is not in possession of valid congressional identification), that individual will not be allowed to enter the facility.
- Magnetometers: All visitors are required to pass through a magnetometer prior to entry—and may be subject to additional nonintrusive inspection technology or pat downs—to preclude the introduction of contraband into the facility. Please allow additional time for screening.
- Recording Devices: For the safety, security, and order of the facility, and to protect the privacy rights of those in custody (to include the right to not be photographed or recorded without consent), as well as visitors and the employees, contractors, and volunteers who work in these facilities, ==no electronic recording devices or picture taking will be permitted inside ICE detention facilities==. Before attempting to enter any ICE detention facility, all visitors ==should leave cell phones, Ray-Ban Meta AI glasses, and other electronics in their vehicles==.
- Weapons, Illegal Controlled Substances, Other Contraband: No weapons of any kind—to include knives, sharp objects, or firearms—are permitted in ICE detention facilities. Furthermore, no controlled substances under federal law, drugs, or other prohibited contraband are permitted in ICE detention facilities.

**Interactions with Persons in ICE Detention Facilities or ICE Personnel:** Visitors shall not:
- Enter, move about, or leave the facility without being properly escorted by ICE staff.
- Have any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters. Physical and verbal contact with persons in ICE detention facilities is limited to safeguard privacy and to ensure the engagement progresses on schedule.
- Have any physical or verbal contact with persons in ICE detention facilities and/or staff not involved in delivery of the tour absent express consent of the persons and approval in advance from ICE.
- Engage in commercial solicitation, distribution of materials, or any activity for the purpose of financial gain.

- Coerce or intimidate any person in ICE detention facilities or ICE personnel.

**Other Considerations**:
- Impact Considerations: Group size or visit itinerary may be modified to reduce operational impacts at the time of the visit while still accommodating the visit request. Smaller facilities may limit tour group size.
- Hatch Act: ICE employees may not authorize the use of ICE detention facilities or Field Offices for political activities, which are defined as activities directed towards the success or failure of a political party, candidate for partisan political office, or partisan political group. This includes town hall meetings, political rallies, speeches, fundraisers, press conferences, photo opportunities, or other similar events for campaign purposes. No media, photographers, campaign pins, distribution of campaign literature, campaign consultants, or campaign volunteers will be permitted with CODEL or STAFFDEL tours/visits. Note, this restriction is not intended to impede elected officials from appropriately representing their constituents.
- Visit Duration: Each respective ICE Field Office sets visit durations based on operational requirements of the day of the visit.
- Detainee Visitation/Meetings: ICE will not facilitate meetings with detainees in detention facilities without valid, signed privacy releases. If Members and/or Congressional staff would like to meet with a specific detainee or set of detainees, please provide names, alien registration numbers, and valid, signed privacy releases with your request. If Members and/or Congressional staff would like to meet with non-specific detainees, a minimum of 48-hours' advanced notice is needed for the facility to post sign-up sheets, identify detainees who wish to participate (if any), and execute required privacy waivers. Note, the facility staff may, while providing a reasonable amount of privacy, maintain a physical presence in the meeting room to maintain safety and security. ICE is unable to provide interpreter or translations services for CODELs/STAFFDELs.
- Donations: No donations of any kind can be accepted at ICE facilities.

If you have questions or need additional information, please contact us at CongresstoICE@ice.dhs.gov.

V/R,
ICE Office of Congressional Relations