**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>Defendants. | Case No. 25-cv-2463 (JMC) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs are thirteen Members of the House of Representatives who bring suit to challenge policies instituted by the Department of Homeland Security (DHS) and U.S. Customs and Immigration Enforcement (ICE) regarding congresspersons' access to DHS immigration detention facilities.[1] Since June 2025, DHS has imposed various requirements that Plaintiffs argue unlawfully limit Members' ability to perform oversight of these facilities, including a requirement that Members provide seven days of advance notice before being allowed into a facility. At the heart of this dispute is an appropriations rider attached to DHS's annually appropriated funds which prohibits DHS from "us[ing]" appropriated funds "to prevent" Members of Congress from "entering, for the purpose of conducting oversight," specific DHS facilities. Further Consolidated Appropriations Act, 2024 (FY2024 Appropriations Act), Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619. The Court previously held that a prior version of the notice

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

requirement was likely contrary to the terms of the rider and stayed the policy, but on January 8, 2026, Defendant Secretary of Homeland Security Kristi Noem issued a memorandum purporting to reinstitute the requirement, albeit claiming to do so with funds not subject to the rider. Plaintiffs, filed an amended complaint and moved for a stay of the January 8 policy under 5 U.S.C. § 705, arguing that the notice requirement is contrary to the rider and federal appropriations law and arbitrary and capricious. For the reasons discussed below, the Court will **GRANT** Plaintiffs' motion and stay the January 8 policy, which necessarily includes Secretary Noem's purported February 2 ratification of the policy.

## I.    BACKGROUND[2]

### A.  Statutory Background

This case centers on the statutes funding Defendant DHS and its various sub-agencies, including ICE. The Constitution's Appropriations Clause commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "For most federal agencies, Congress provides funding on an annual basis," *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024), and annually passed appropriations bills provide funding for agencies like DHS "and most of the programs, projects, and activities [they] carr[y] out." Cong. Rsch. Serv., R48731, *Full-Year Continuing Resolutions: Frequently Asked Questions* 1 (2025). Congress will also frequently fund agencies through continuing resolutions, which function as stopgap measures that provide "funding for ongoing programs pending enactment of a formal" appropriations act, often by incorporating the prior appropriations act's provisions by reference. *Com. of Pa. v. Weinberger*, 367 F. Supp. 1378, 1380 (D.D.C. 1973);

---

[2] The Court assumes familiarity with the background of this dispute as discussed in the Court's prior opinion, which the Court incorporates by reference and refers to only as is relevant to explaining its decision on the present motion. *See Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-cv-2463, 2025 WL 3653597, at *1–7 (D.D.C. Dec. 17, 2025).

*see, e.g.*, Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 (2026 Continuing Appropriations Act), Pub. L. No. 119-37, div. A, §§ 101, 103, 139 Stat. 495, 496–97 (2025) (providing for a short-term extension of funding to DHS and other agencies until January 30, 2026).

"Congress's control over federal expenditures is absolute," and one way that Congress exercises that power is through the Purpose Statute, which commands that "'[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)). Recent DHS appropriations bills have provided fixed amounts to be used by the Department for specific purposes, such as funds provided to the "Office of the [DHS] Secretary and for executive management for operations and support," as well as funds for "necessary expenses of [ICE] for operations and support." FY2024 Appropriations Act, div. C, tit. I, 138 Stat. at 593; *id.* div. C, tit. II, 138 Stat. at 598.

In addition to being limited to finite amounts and for specific purposes, appropriated funds are also often time-limited, meaning that they can lapse if Congress has not provided additional funds beyond the deadline set by statute. *See, e.g.*, 2026 Continuing Appropriations Act, § 106, 139 Stat. at 497 (providing appropriations until January 30, 2026).

Because the Anti-Deficiency Act "expressly prohibits agencies from incurring obligations in excess of appropriations," *Navajo Nation v. U.S. Dep't of Interior*, 852 F.3d 1124, 1128 (D.C. Cir. 2017); *see* 31 U.S.C. §§ 1341(a), 1342, when the agency lacks available funds to continue functioning, the agency will enter a "lapse in appropriations—more commonly known as a government shutdown." *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*, No. 25-cv-3553, 2025 WL 3123707, at *1 (D.D.C. Nov. 7, 2025).

Congress frequently provides appropriated funds subject to conditions limiting how those funds may be used by the agency. *See Neguse*, 2025 WL 3653597, at *3 (discussing statutory provisions imposing such conditions, often known as "[l]imitations riders" or "appropriations riders"). As readers of the prior opinion and orders in this case are aware, the present dispute centers on an appropriations rider commonly known as Section 527, which has been attached to every one of DHS's annual appropriations bills since 2020, either through direct incorporation or incorporation by reference. *See id.* at *4 & n.4. The text of the rider reads as follows:

> SEC. 527. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
>
> > (1) A Member of Congress.
> >
> > (2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
>
> (b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
>
> (c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

§ 527, 138 Stat. at 619.

Not all of DHS's funding comes from the annual appropriations process. In July 2025, Congress passed a bill through the reconciliation process that provided additional funds to DHS and its components. *See* One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025). For example, the bill, commonly known as the OBBBA, provided to ICE, "[i]n addition

to any amounts otherwise appropriated," $45 billion dollars to be used for "single adult alien detention capacity," to be available through September 30, 2029. *Id.* § 90003(a), 139 Stat. at 358. The OBBBA also provided funds to ICE to hire and train "additional [ICE] personnel, . . . to carry out immigration enforcement activities," to cover "transportation costs and related costs associated with alien departure or removal operations," and to provide "[f]unding for facility upgrades to support enforcement and removal operations." *Id.* § 100052(1), (4), (6), 139 Stat. at 387–89. The OBBBA does not itself contain the text of Section 527 or expressly incorporate it by reference.

### B. Factual and Procedural Background

This case began in June 2025, when ICE began enforcing two policies regarding congresspersons' access to ICE facilities. First, ICE began requiring Members of Congress to provide a minimum of seven days' notice before being allowed to enter ICE detention facilities for the purpose of conducting oversight, even those facilities which squarely fell within the scope of Section 527 as "facilit[ies] operated by or for the Department of Homeland Security used to detain or otherwise house" noncitizens. § 527, 138 Stat. at 619; *see Neguse*, 2025 WL 3653597, at *5. Second, ICE also took the position that certain ICE facilities, namely ICE Field Offices, were categorically exempt from Section 527's requirements because they did not "detain or otherwise house" noncitizens as was contemplated by the rider. *Id.* at *7, *27–29. Shortly after these policies were first implemented, twelve Members of the House of Representatives sued to challenge the policies. As discussed at length in the prior opinion, each Plaintiff Member demonstrated an interest in the present Administration's immigration enforcement and detention practices, and each had requested and been denied access to DHS facilities based on Defendants' oversight visit policies. *Id.* at *6–7.

On December 17, 2025, the Court granted Plaintiffs' request for a stay of the June 2025 policies under Section 705 of the APA. ECF 37. First, the Court found that Plaintiffs had shown a substantial likelihood of standing to bring their suit. *Id.* at \*9–20. The Court found that Section 527 entitled Members of Congress to enter ICE facilities without being subject to a notice requirement, and to view the facilities in their condition at the time of the request. *Id.* at \*10–13. The Court noted that this entitlement of access was tied to whether the agency's actions in attempting to bar Plaintiffs utilized "appropriated funds." *Id.* at \*10 ("Given that ICE cannot act other than through appropriated funds, the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member."). The Court then found that Plaintiffs' injuries—whether characterized as the denial of physical access to facilities or to the information they would glean upon entry—were sufficiently concrete, personal, and particularized to each Member, such that the caselaw regarding legislative standing did not bar their lawsuit. *Id.* at \*10–20 (discussing, among other cases, *Raines v. Byrd*, 521 U.S. 811 (1997)). As for other threshold issues, the Court also found that the doctrine of equitable discretion did not counsel in favor of declining jurisdiction, and that Plaintiffs had a substantial likelihood of a cause of action for, at minimum, their APA claims. *Id.* at \*20–24.

As for the merits of those APA claims, the Court found that Plaintiffs were likely to succeed on their arguments that the challenged oversight policies were contrary to the terms of Section 527 and in excess of Defendants' statutory authority. As for the seven-day notice requirement, the Court found that requiring a seven-day delay before entry to a covered facility clearly qualified as "prevent[ing]" a "Member of Congress . . . from entering" a covered facility as was prohibited by the rider. *Id.* at \*25 (quoting § 527(a), 138 Stat. at 619). Additionally, a separate subdivision of the

rider indicated that "prevent[ing]" entry included instituting notice requirements. *See id.* (citing § 527(b), 138 Stat. at 619). As for the categorical exclusion of some ICE facilities from the scope of Section 527, the Court found that the policy was contrary to Section 527 because the record indicated that ICE field offices with holding facilities were being "used to detain or otherwise house" noncitizens as was contemplated by the statute. *Id.* at *27–29.

Finally, and as is critical to this iteration of the litigation, the Court's December 17 opinion found that the factual record demonstrated that the challenged policies were "promulgated with" appropriated funds subject to Section 527, "and they continue[d] to be implemented and enforced through the use of" those funds. *Id.* at *31. The Court noted that the likely unlawfulness of the policy arose from the "limitation on the use of funding contained in Section 527." *Id.* In so ruling, the Court acknowledged Defendants' claims that they had access to the OBBBA funds which did not contain Section 527's limitations. *Id.* at *26. The Court indicated that its views as to the lawfulness of the policies might well be different if the government could "demonstrate different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies." *Id.* at *31. However, the Court had no occasion to determine whether Defendants could lawfully promulgate and implement similar policies by relying solely on funds from the OBBBA— or if Defendants had the ability to do so as a factual matter—given that all parties agreed that Defendants were using Section 527-restricted appropriated funds for the "adoption and implementation" of the June 2025 policies. *Id.* at *26; ECF 34 ¶ 3. The Court accordingly issued an order temporarily staying the effective dates of implementation and enforcement of the policies. ECF 37. Defendants did not appeal that order.

But heeding the old adage that if you don't succeed, try, try again, on January 8, 2026, Defendant Secretary of Homeland Security Kristi Noem issued a memorandum purporting to

reinstitute the seven-day notice requirement. ECF 39-1 at 1–2. The "new" policy was almost identical to the prior notice requirement, in that Members of Congress were required to make facility visit requests seven days in advance, and with exceptions to be approved only by the Secretary. *Id.* However, the notice policy contained some significant differences from the prior one. The Secretary claimed in her memorandum that the January 8 policy was to be "implemented and enforced exclusively with money appropriated" for DHS and ICE by the OBBBA. *Id.* at 2. The Secretary instructed that "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding," and that she "anticipate[d] that there [was] more than sufficient funding available for the limited expenses associated with implementing and enforcing these policies." *Id.* Unlike the prior policies, the memorandum also included a rationale for the notice requirement: "to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." *Id.* In the memorandum, Secretary Noem also condemned what she called "circus-like publicity stunts . . . which create[] a chaotic environment" at facilities. *Id.*

The timing of the January 8 memorandum was perhaps not a coincidence. Between December 17, 2025 and January 8, various Plaintiffs had been making oversight visits to DHS facilities without providing seven days' advance notice without incident. *See, e.g.*, ECF 49-4 ¶¶ 29–32; ECF 49-8 ¶¶ 12–14; ECF 49-9 ¶¶ 22–26; ECF 49-10 ¶¶ 20–22; ECF 49-11 ¶¶ 32–36. But during the period between the Court's order and Secretary Noem's memorandum, DHS had also continued to expand its detention and removal operations around the country, including a massive increase in enforcement in Minnesota, which DHS called the "largest DHS operation ever." ECF 49-13 ¶ 4. The day before the January 8 memorandum was issued, a DHS officer in Minnesota shot and killed Renee Good, an event which inflamed "[t]ensions . . . between

immigration authorities and protesters" and focused national attention on DHS's enforcement and detention practices. *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at \*13 n.18 (D. Minn. Jan. 16, 2026) (noting this event as "an incident of wide notoriety"); *see also* ECF 49-13 ¶ 13; ECF 53 ¶ 94. Two days after the memorandum was issued (but before it was made public or filed with this Court), a group of Members of Congress, including Representative Kelly Morrison, sought to conduct an unannounced oversight visit of the Whipple Federal Building in the greater Minneapolis area. ECF 49-13 ¶¶ 9, 19–20. Upon arriving at the facility, they were met by two ICE officials who denied their request to tour the facility, on the ground that the "operation [was] being funded by [OBBBA] funds." *Id.* ¶ 26–27. Subsequently various Plaintiffs were also denied entry to ICE facilities based on the policy as stated in the January 8 memorandum. ECF 49-9 ¶ 28; ECF 49-10 ¶ 23; ECF 49-11 ¶ 38.

During this time period, ICE has also been taking actions that affect Members' ability to speak with detainees once the Member is inside a facility. According to an email sent by ICE's Office of Congressional Relations to Plaintiff Representative Escobar's office regarding the "ICE facility visitation policy," ICE currently prohibits Members of Congress from "[h]av[ing] any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters," and that a Member may only meet with detainees if the detainee has a "valid, signed privacy release[]." ECF 57-2 at 8–10. If Members "would like to meet with a specific detainee or set of detainees," they must provide a "valid, signed privacy release[]" along with their visit request, meaning, in advance of the visit. *Id.* at 10. According to Representative Escobar, ICE had previously allowed Members and their staffs to provide these releases in person to detainees during the visit to allow them to speak with the Member at the time.

ECF 57-2 at 2 ¶ 15. Representative Escobar also maintains that Members of Congress had previously been allowed to speak to detainees during oversight visits. *Id.* at 2 ¶ 7.

Predictably, these new developments brought the Parties back to Court. On January 12, Plaintiffs moved for an order requiring Defendants to show why the January 8 memorandum purporting to reinstitute the seven-day notice requirement was not in violation of the Court's December 17 order, and asked the Court to enjoin enforcement of the requirement. ECF 40; ECF 43-1. After briefing and a hearing on the request, the Court denied the motion on procedural grounds, agreeing with Defendants that the January 8 policy was a new policy that must be challenged through an amended or supplemental complaint. ECF 46; *see* Jan. 14, 2026 Min. Entry; *see also* ECF 42; ECF 44; ECF 45. Plaintiffs shortly afterwards moved for leave to amend and supplement their complaint, which the Court granted. Jan. 26, 2026 Min. Order.

The Amended Complaint has expanded the list of Plaintiffs to include Representative Morrison, and again challenges as unlawful ICE's oversight visit policies, which again include the seven-day notice requirement as imposed by the January 8 memorandum, and ICE's exclusion of certain facilities, including field offices, from the scope of congressional visits. *See* ECF 53 ¶¶ 33, 393–425. The same day they filed their Amended Complaint, Plaintiffs also filed their motion for a temporary restraining order (TRO), and in the alternative, requested that the Court issue a stay under Section 705 of the APA. ECF 49. Plaintiffs sought to block enforcement of the January 8 notice policy, as well as DHS's policy regarding privacy releases. As to the notice policy, Plaintiffs again contended that it was contrary to law, in violation of not only Section 527, but also the terms of the OBBBA itself and the Purpose Statute, 31 U.S.C. § 1301(a). *See* ECF 49-1 at 25; ECF 53 ¶¶ 396–98. Defendants opposed the motion, and Plaintiffs submitted a reply. ECF 50; ECF 51.

On February 2, the Court issued a two-week TRO in order to preserve the status quo pending consideration of Plaintiffs' request for a Section 705 stay. ECF 52. On the limited record before it at the time, the Court found that Plaintiffs were likely to prevail on their arguments that the January 8 notice requirement violated the APA, because it seemed highly likely that Section 527-restricted annually appropriated funds had been used to promulgate and initially enforce that version of the policy. *Id.* at 5–6. The Court found that issuance of a TRO was appropriate even though the appropriations to which Section 527 had applied lapsed on January 30, 2026. *Id.* at 7 n.6. The Court found the fact that Section 527-restricted funds were likely used in the promulgation of the policy prior to the lapse in funding would provide a basis for setting that specific policy decision aside even if the Section 527 limitation did not exist going forward. *Id.*

That same day, and in response to the Court's TRO order, Secretary Noem issued another memorandum. ECF 55-1 at 2. This February 2 memorandum noted that annually appropriated funds had lapsed and purported to "issue [a] new policy that [was] identical in substance to the January 8 access policy." *Id.* However, the memorandum did not state an effective date for the policy, and instead instructed the DHS general counsel to "provide further guidance regarding the effective date of this policy in light of the Court's order." *Id.* The next day, Congress ended the lapse in DHS appropriations by passing another continuing resolution, subsequently signed into law by President Trump, which extended DHS's annual appropriations through February 13, 2026 and incorporated the Section 527 rider by reference. Consolidated Appropriations Act, 2026, div. H, § 101, Pub. L. No. 119-75, 140 Stat. 173, 628. The Court sought additional briefing and held a hearing on Plaintiffs' request for a Section 705 stay. ECF 55; ECF 57; *see* Feb. 12, 2026 Min. Entry. The Court also extended the TRO until March 2, 2026 to provide time to rule on the significant legal issues raised by the motion. ECF 58.

11

Two days later, on February 14, 2026, Defendants notified the Court that DHS's annual appropriated funds once again lapsed after Congress failed to pass an updated DHS appropriations bill by the statutory deadline. ECF 59. They remain lapsed as of the date of this opinion.

The Court now proceeds to resolve Plaintiffs' motion.

## II.    LEGAL STANDARD

Section 705 of the APA authorizes a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

The factors governing the issuance of relief under Section 705 are the same as those for the issuance of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[ ] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

The Court finds that each of these four factors favors granting a stay of the January 8 memorandum and its purported February 2 ratification under Section 705. This section addresses each of those factors in turn, as well as the scope of the relief granted.

## A. Plaintiffs are Substantially Likely to Succeed on the Merits.

Plaintiffs have demonstrated a substantial likelihood of success on their claim that the January 8 notice policy is contrary to law and in excess of Defendants' statutory authority.[3] In the Court's view, various threshold issues such as the Court's likely jurisdiction and the availability of a cause of action have been largely resolved by the Court's prior opinion, *see Neguse*, 2025 WL 3653597, at *9–24, but this section will address them in brief to address any issues that are not covered by the Court's prior reasoning. The Court will then proceed to address the merits of Plaintiffs' contrary to law claim.

### 1. No Jurisdictional or Other Threshold Issues Block Plaintiffs' Requested Stay.

### a. Plaintiffs Continue to Have Article III Standing to Bring this Suit.

The Court's prior opinion exhaustively addressed the issue of whether Plaintiffs, individual members of Congress suing to challenge an action of the Executive Branch, have standing to bring this lawsuit, and the Court fully reincorporates the analysis here. *Neguse*, 2025 WL 3653597, at *9–20. Defendants did not appeal that decision, but in their opposition to Plaintiffs' motion, they reiterate their objections to Plaintiffs' standing. Most of Defendants' objections, including that Plaintiffs' injuries are insufficiently concrete, personal, and particularized to each Member, such that they cannot overcome the precedents regarding legislator standing, ECF 50 at 14–15, are squarely covered by the analysis in the prior opinion.

---

[3] In addition to Plaintiffs' challenge to the January 8 notice policy, Plaintiffs also argue in a single page of their stay motion that Defendants' policy regarding privacy releases violates the APA as arbitrary and capricious action. *See* ECF 49-1 at 47. While Plaintiffs discuss the privacy release policy in their complaint, ECF 53 ¶¶ 140–42, it was not obvious to the Court that they were bringing an independent arbitrary and capricious challenge to this policy. This privacy release policy appears to be a discrete policy separate from the January 8 notice requirement and is not encompassed in Plaintiffs' challenge to that policy, despite Plaintiffs framing the privacy release requirement in their stay motion as part of "Defendants' January 8 oversight visit policy." ECF 49-1 at 47. Plaintiffs have also not attempted to satisfy threshold questions regarding this policy, such as whether they have standing to challenge the requirement or whether it qualifies as final agency action. For that reason, the Court does not fault Defendants in their failure to separately raise their objections to Plaintiffs' challenge to the release policy, and declines to address the issue at this time.

Defendants do have one new argument: They argue that the analysis in the Court's prior opinion should not govern the current state of the case because the prior opinion focused on Plaintiffs' alleged entitlements pursuant to Section 527, and in their view, the Plaintiffs' current complaint "relies upon the theory that Defendants have violated other legal provisions, including the OBBBA and the APA, none of which confer upon these Plaintiffs any such particularized cognizable interest." ECF 50 at 15–16.

The Court finds that Defendants are not properly characterizing Plaintiffs' theory of injury and current legal challenge, which remains premised on the interests secured by Section 527 and Defendants' alleged violation of that statute. The Court's prior opinion found that Plaintiffs had standing because Section 527 had the effect of providing Plaintiffs with a legally protected interest regarding access to DHS facilities—whether considered as an entitlement to physical access to the facilities or to the information about conditions therein. This interest arose from the fact that, under the terms of the rider, DHS was prohibited from taking any actions using annually appropriated funds to prevent Plaintiffs' access to these facilities. *Neguse*, 2025 WL 3653597, at *10; § 527(a), 138 Stat. at 619. At the time of the Court's prior opinion, there was no factual dispute that all of Defendants' actions taken to prevent Plaintiffs from entering ICE facilities were being funded by annually appropriated funds subject to Section 527, and Defendants lacked the ability to use any other funds for the policy, functionally entitling Plaintiffs to enter without notice. *Id.* at *10. However, this was not the only basis for the Court's holding: The Court also found that other provisions in the rider specifically addressed, and rejected, the permissibility of Defendants using Section 527 funds to implement a notice requirement as a mechanism of preventing Members' entry. § 527(b), (c), 138 Stat. at 619; *see Neguse*, 2025 WL 3653597, at *10. Thus, under the rider, Plaintiffs are entitled to seek entry to the facilities covered by Section 527 without DHS taking

actions to stop them that were funded by annually appropriated funds (including by imposing a notice requirement).

Defendants are right that things are slightly different this time around. Defendants now argue that they are legally and logistically capable of using solely OBBBA funds to promulgate and implement the January 8 notice policy. ECF 50 at 8–9. Were it the case that Defendants had established that every expenditure used to prevent Plaintiffs' entry into a given facility was funded by the OBBBA and not by appropriated funds, the Court thinks it unlikely that Plaintiffs would have standing to sue on a theory that Defendants had exceeded their authority to spend funds under the OBBBA. This is because it is only Section 527, rather than anything in the OBBBA, which limits DHS's ability to hinder Plaintiffs' entry to DHS facilities.[4] But as the Court will discuss in more detail below, *infra* Section III.A.2.b.ii.(a), Plaintiffs are likely to succeed in showing that, as a factual matter, Section 527-restricted annual appropriated funds were indeed used by DHS to promulgate the January 8 policy and have been used by Defendants to enforce it, and that as a result, the notice requirement is again contrary to law. To the extent that Plaintiffs raise legal issues regarding Defendants' ability to spend funds under the OBBBA and Defendants' potential violation of the Purpose Statute, the Court considers these arguments not as independent challenges for which Plaintiffs are required to show standing, but as additional legal bases to conclude that Defendants have acted in violation of Section 527 and could not cure those violations through the retroactive shifting of funds or other proposed mechanisms.

The Court sees no basis to revise its conclusion that Plaintiffs have standing to bring this suit. *Neguse*, 2025 WL 3653597, at *9–20. As a result, and based on the facts as stated in Plaintiffs'

---

[4] As discussed below, *infra* Section III.A.2.b.i., the Court rejects Plaintiffs' claim that Section 527 applies beyond the funds in the annual appropriations act and serves as a freestanding substantive ban on using any appropriated funds to prevent congressmembers' entry to DHS facilities that also applies to the OBBBA appropriations.

first, second, and third round of declarations, the Court finds that Plaintiffs have shown a likelihood of Article III jurisdiction.[5] Plaintiffs are all members of Congress who have demonstrated an interest in the present Administration's immigration enforcement and detention practices, and each has requested and been denied access to DHS facilities based on the challenged oversight visit policies in the suit. And, although it is again not in dispute in this case, the Court finds that Plaintiffs' injuries meet the Article III requirements of causation and redressability. *See Neguse*, 2025 WL 3653597, at *11, *13. Secretary Noem's January 8 memorandum lays out the details of the notice requirement and directs various DHS and ICE officials to implement and enforce it. ECF 39-1. A vacatur of the notice requirement would deprive that policy of legal effect and is thus likely to redress Plaintiffs' harms.

### b. Plaintiffs Have a Cause of Action Under the APA.

Defendants again contest whether Plaintiffs lack a cause of action under the APA but raise nearly identical arguments to ones the Court has already addressed and rejected. ECF 50 at 16–17. The Court again rejects them for the same reasons. *See Neguse*, 2025 WL 3653597, at *21–24.

### 2. Plaintiffs are Likely to Succeed on the Merits of their APA Contrary-to-Law and Statutory Authority Claim Against the January 8 Notice Policy.

The Court proceeds to the merits of Plaintiffs' claim that the January 8 notice policy is contrary to law and in excess of statutory authority. Section 706 of the APA requires the Court to "hold unlawful and set aside agency action" that is "not in accordance with law," or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In Plaintiffs' view, the January 8 policy prevents Members of Congress from entering covered

---

[5] These declarations include the declaration of Representative Morrison, who was not party to the suit at the time of the Court's December 17 decision, but whose declaration sufficiently supports her Article III standing to bring the suit under the principles discussed in that opinion. *See* ECF 49-13 (discussing Representative Morrison's interest in conducting oversight of ICE facilities, her denial of access to an ICE facility on January 10, 2026, and her intent to continue pursuing oversight visits to such facilities).

facilities just as did the June 2025 notice policy. ECF 49-1 at 7–8. Plaintiffs claim that this policy is still contrary to Section 527 because, despite Secretary Noem's instructions that the new policy be promulgated and implemented with solely OBBBA funds, DHS could not legally use OBBBA funds for that purpose and has in fact used Section 527-restricted annually appropriated funds to promulgate and enforce the policy. The Court agrees and finds that Section 527-restricted funds have likely been used in a manner contrary to law in reimposing the seven days' notice requirement.

### a. The January 8 Policy Prevents Members of Congress from Entering Covered Facilities.

Section 527 commands that "[n]one of the funds appropriated" by the DHS annual appropriations bill "may be used to prevent" Members of Congress "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house" noncitizens. § 527(a), 138 Stat. at 619. The Court previously found that the seven-day notice requirement clearly functioned to "prevent" a member from entering a facility, as the term was used in Section 527. *Neguse*, 2025 WL 3653597, at *25. Here, the Court is faced with a new policy that, at least with respect to the notice requirements imposed on Members of Congress, is nearly identical to the one the Court considered in June 2025. *Compare Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV, *with*, ECF 39-1 at 1–2. The Court has no difficulty finding that the enforcement of this policy again continues to "prevent" Members of Congress from accessing facilities. The Court also reiterates that this finding applies not only to funds used in the enforcement of this policy, but also funds used in the creation and promulgation of the policy, which also counts as DHS "prevent[ing]" Members' entry as is contemplated by Section 527. Defendants argue that the process of promulgating the policy, separate from its enforcement, cannot be considered "prevent[ing]" Members of Congress from

entering covered facilities as contemplated by the rider. § 527(a), 138 Stat. at 619; *see* ECF 50 at 19. The Court disagrees. It is hard to fathom that promulgation of the very policy which is employed to deny Members' access to facilities would not be included in the scope of Section 527's prohibition. So, on that score, the new policy shares the same defect as the June 2025 policy that the Court previously stayed.

### b. Defendants Have Used Section 527-Restricted Funds to Promulgate and Enforce the January 8 Policy.

Of course, whether the policy "prevent[s]" Members of Congress from entering covered facilities is only part of the statutory inquiry under Section 527. The rider does not function by simply prohibiting DHS from "prevent[ing]" congresspersons' entry: It acts by prohibiting DHS from "us[ing]" "funds" appropriated by the annual appropriations acts and continuing resolutions to do so. § 527(a), 138 Stat. at 619. The question of what it means to have "used" funds to promulgate and enforce the seven-day notice requirement is not a question that the Court has previously addressed. In the case of the June 2025 notice policy previously stayed by the Court, it was undisputed as a factual matter that Section 527-restricted funds had indeed been "used" to promulgate the policy and were continuing to be "used" to implement it. Thus, the only question facing the Court was whether those uses of funds were preventing Members' entry under the statute. *Neguse*, 2025 WL 3653597 at *26, *31. That is not the case here. The Parties dispute several issues relating to the use of funds in connection with the notice policy, such as the types of expenses that are properly considered as having been "used" to promulgate and enforce the policy and whether Section 527-restricted funds supported those expenses. The Court addresses each of those issues in turn.

i.    **The Types of Expenditures Necessary to Promulgate and Enforce the January 8 Policy**

Unsurprisingly, the Parties have widely divergent views on what funds are necessary to promulgate and implement the January 8 policy. Plaintiffs argue that the "number and variety" of DHS resources that must be used to promulgate and implement the January 8 oversight visit policy "are almost too vast to contemplate." ECF 49-1 at 38. In their view, the process of promulgating and enforcing the policy "begins with the [S]ecretary, continues down through ICE leadership and middle management, and affects all ICE detention facilities." *Id.* Plaintiffs also claim that "use[s]" of funds prohibited by Section 527 include more incidental costs incurred by DHS, such as "paper, pens, information technology systems and contracts, security contracts, facility utilities, and physical infrastructure." *Id.* at 39. Finally, Plaintiffs argue that there is "no de minimis exception to appropriation limitations," and that to the extent that any Section 527-restricted funds are implicated in putting the notice requirement into effect, no matter the amount, the requirement is contrary to Section 527. *Id.* at 41 (citing Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1362 (1988)). Defendants dispute that Section 527 extends to "various and sundry overhead costs [DHS] would incur regardless" of the notice requirement, and instead argues that it "applies only to activities that directly prevent the entry to covered facilities." ECF 55 at 14.

The Court finds Plaintiffs' view more persuasive. As for why, look first to the principle which animates limitation riders and gives them their force as a mechanism for Congress's control of substantive government policy: "[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation." *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995) (citing 31 U.S.C. §§ 1341–42); *see also* Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1077 (2021) ("Without appropriations, the executive branch cannot act, and thus choices about agency funding have a fundamental impact on how the

government operates."). Consistent with this understanding that appropriated funds are used when an agency "act[s]," *Babbitt*, 73 F.3d at 872, courts interpreting similar riders to Section 527 have interpreted them to prohibit a wide range of agency activities related to facilitating the prohibited purpose. To do otherwise would be to deprive the riders of their effect in restraining government action. For example, in *Environmental Defense Center v. Babbitt*, the Ninth Circuit evaluated whether a rider which stated that no appropriated funds "may be made available for making a final determination that a species is threatened or endangered," prohibited the Secretary of the Interior from making a final decision that the California red-legged frog was endangered. 73 F.3d at 870–71. The Ninth Circuit found that although "the only action that . . . remain[ed] to be taken [was] in-house review and decisionmaking," the action was prohibited by the rider. *Id.* at 871. This was because any further action on the listing would "necessarily require the use of appropriated funds," given that "the use of any government resources—whether salaries, employees, paper, or buildings—to accomplish a final listing would entail government expenditures." *Id.* at 871–72. The Ninth Circuit emphasized that action on the listing would violate the rider, and the Secretary could not act, even though "completion of the process may require only a slight expenditure of funds." *Id.* at 871. Further, the Ninth Circuit found this to be the case even though the Secretary's action in question was a "nondiscretionary duty" under federal law. *Id.* at 872.

The Ninth Circuit's approach—which implicated the use of incidental resources that facilitated the government's actions—was cited favorably by the D.C. Circuit in *Kimberlin v. U.S. Department of Justice*, where the Circuit found that a rider prohibiting the "use[]" of appropriated funds "for the use or possession" of electric instruments in federal prisons was "reasonably . . . construed to prohibit paying for costs incidental to such use or possession," including "those incurred for storage, supervision, and electricity." 318 F.3d 228, 230, 232

(D.C. Cir. 2003). One of the judges of that panel described the holding—accurately in this Court's view—as "recogniz[ing] the proposition that an appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." *Id.* at 237 (Tatel, J., concurring in part and dissenting in part). The Court therefore agrees with Plaintiffs that *Kimberlin* and *Babbitt* support the proposition that for the purposes of analyzing a limitation rider such as this one, the types of resources considered necessary to accomplish a given government action are of a wide-ranging scope.

Before addressing whether any of those many types of resources were "used" in promulgating or enforcing the policy, however, the Court notes one argument Plaintiffs have made about *Kimberlin* that it rejects. Seizing on Judge Tatel's discussion of "substantive ban[s]", Plaintiffs ask the Court to find that the prohibition in Section 527 should be read as a freestanding prohibition that impliedly extends to act as a legal restriction on the funds appropriated by the OBBBA. ECF 49-1 at 27 (arguing that Section 527 serves as an "existing[,] substantive ban on ICE preventing members of Congress from conducting oversight at detention facilities"). The Court declines the invitation to apply *Kimberlin* in this way. First, Plaintiffs ignore that Section 527 applies only to the funds in "this Act"—as in, the annual appropriations bill and subsequent continuing resolutions—rather than applying, as some other limitation riders do, to "funds appropriated or otherwise made available in this *or any other Act*." *Compare* § 527(a), 138 Stat. at 619, *with* § 537, 138 Stat. at 622 (emphasis added). Second, it ignores that *Kimberlin* and *Babbitt*, while instructive, did not deal with the exact scenario faced here. In those cases, there was no dispute about whether an alternative source of funds existed or was being used to effectuate the challenged actions. There, the denial of funding for a specific activity amounted to a substantive

ban on that activity because the government lacked any non-restricted funds which it could (arguably) use to perform that activity.

The Court therefore understands Section 527's rider to bar the use of every expenditure under the appropriations act necessary to "prevent" Members of Congress from entering DHS facilities, but not to expenditures of OBBBA funds. But while Section 527's limitation is cabined to funds appropriated under its "Act," the limitation is no doubt far-reaching: It extends to the more incidental but nevertheless necessary expenditures that make creation and enforcement of the notice policy possible. Such an understanding is consistent with the statutory text. The relevant term, "used," is the past participle form of the verb "use," which in this context means "[t]o employ for the accomplishment of a purpose; to avail oneself of." *Use*, Black's Law Dictionary (12th ed. 2024). That the inquiry focuses on funds expended to facilitate the prohibited activity, even incidental expenditures, is consistent with that definition. *See United States v. Jackson*, 388 F. Supp. 3d 505, 514 (E.D. Pa. 2019) (finding that rider which provided that none of the Department of Justice's appropriated funds "may be used to prevent" various states from implementing their own medical marijuana laws had the impact of prohibiting Department employees from participating in a supervised release hearing, because "the fact that these employees would be devoting time to this case over another case . . . constitute[d] use of funds," "however minor the expense").[6]

---

[6] Defendants cite several cases for the proposition that appropriations riders are meant to be read narrowly. But Defendants' cases are inapposite to the specific question at hand. Several concern how courts are to construe appropriations riders in cases where it is alleged that the rider is in conflict with other substantive laws, *see Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000), has repealed prior substantive law by implication, *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 317 (2020), or where it was alleged that the rider was itself imposing substantive law, *Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir. 1992). These cases do not speak to the issue here, which is what Congress means when it prohibits funds from being "used" to achieve a specific purpose.

As for identifying the types of expenditures under review in this case, the Court first considers the expenditures likely involved in the promulgation of the policy. Defendants provide next to no detail as to what agency activities took place or what funds were involved in the process of formulating the policy, despite being those in the best position to know, and being fully aware of the Court's view that promulgation of the policy likely falls within the scope of Section 527. *See* ECF 52 at 5. However, the Ninth Circuit in *Babbitt* was faced with determining the kinds of funds involved in similar management-level "review and decisionmaking," and suggested that the funds involved would include "salaries, employees, paper, or buildings." *Babbitt*, 73 F.3d at 871–72. All of those categories of expenditures were likely implicated here. The memorandum itself reflects that various DHS officials, including the Secretary and DHS budgeting and legal officials such as the DHS General Counsel and the Chief Financial Officer, were involved in the promulgation of the policy. ECF 39-1 at 1–2. As Plaintiffs persuasively argue, the employees involved likely included not only the decisionmakers themselves, but other staff in the Secretary's office and other legal and budgeting offices that supported them. ECF 49-1 at 38–39. Plaintiffs, citing to the declaration of a former high-level ICE and DHS budgeting and legal official, identify a variety of other offices whose involvement was substantially likely to be involved in promulgating the notice policy. *See* ECF 49-2 ¶ 20 (citing personnel from the "ICE Office of Congressional Relations, DHS Office of Legislative Affairs, ICE Office of Regulatory Affairs and Policy, DHS Office of Policy, ICE [Enforcement and Removal Operations], the DHS Office of General Counsel and ICE [Office of the Principal Legal Advisor]"). While Defendants dispute that as a legal matter, Section 527 would serve to restrict actions taken in the promulgation of this policy, they do not offer any factual evidence to dispute Plaintiffs' claims about who was actually involved in promulgating the policy. The fact that officials and employees spent time on the

promulgation of the policy constitutes a use of funds, one which is prohibited by the rider if Section 527 funds supported the time spent, "however minor the expense." *See Jackson*, 388 F. Supp. 3d at 514. As for the other associated costs for promulgating the policy, the Court agrees that to the extent that DHS officials' actions were facilitated by other resources, such as the "paper[] or buildings" in *Babbitt*, those costs are properly considered within the scope of "use[]" as contemplated by Section 527. *Babbitt*, 73 F.3d at 872. Plaintiffs identify a wide variety of these kinds of expenditures, such as "information technology systems and contracts, office supplies, utilities, and building infrastructure." ECF 49-2 ¶ 20. And again, while Defendants contest that as a legal matter, "use[]" of funds in Section 527 extends to these types of uses of government resources—an argument the Court has rejected—they do not present any evidence to dispute as a factual matter Plaintiffs' claims that such resources were likely employed by Defendants in promulgating the January 8 notice policy. *See* ECF 50 at 22–23; ECF 55 at 13–14.

Looking beyond the promulgation of the policy to the types of expenditures used in enforcing it, Defendants do acknowledge certain costs that can be attributable to the policy, including "time spent by ICE employees responding to requests by Members of Congress to visit ICE facilities, including time spent planning such visits," although Defendants do not provide any more details as to who those employees might be, what offices or units of DHS they may be part of, or what resources they might be using to facilitate enforcement of the policy. ECF 42-1 ¶ 8. While Defendants have claimed that "it is possible to track the costs incurred to issue and enforce the January 8 policy," Defendants have not presented any evidence that they have in fact done so. *Id.* ¶ 6. Plaintiffs again seek to fill in the gap. One obvious example in the record that they point to is ICE's Office of Congressional Relations (OCR), which is the ICE office that posted the notice policies, and by the terms of the January 8 policy, is in charge of approving and coordinating visits

24

to facilities. *See, e.g.*, ECF 39-1 at 2; ECF 57-2 at 8–10 (example of ICE OCR email to Plaintiff Escobar in response to oversight visit request); ECF 49-10 ¶ 23 (OCR denying a request to visit a facility on January 12, based on the policy as stated in the January 8 memorandum). The employees' time, their salaries, and the various resources they employ to review and deny visit requests are thus implicated by the notice policy. The January 8 memorandum also contemplates that at minimum the DHS Secretary's office is implicated in enforcing the policy, given that any exceptions to the notice requirement "must be approved by [the Secretary]." ECF 39-1 at 2. For that reason, the Court finds persuasive Plaintiffs' declaration which states that various "different management functions would also necessarily be involved in scheduling visits under the oversight visit policy and enforcing the policy against unannounced visits at facilities." ECF 49-2 ¶ 21.

### ii.    What Appropriations Provided for these Expenditures?

Having determined the scope of the relevant expenditures prohibited by Section 527, the Court must now address the question at the crux of this case: Were any of these agency expenditures funded by Section 527-restricted annual appropriation funds? The Court finds that it is highly likely that Section 527-restricted annual appropriations funds were used in promulgating and enforcing the January 8 notice policy, and that Defendants' legal theories for curing these violations are unpersuasive, given that the Purpose Statute would prohibit Defendants from using OBBBA appropriations to fund at least some of the expenditures in question.

### (a) The Record Demonstrates that Section 527-restricted Funds were Likely Used to Promulgate and Enforce the January 8 Notice Policy.

As discussed, the record demonstrates that a wide variety of agency activities at DHS and ICE were necessary to promulgate this policy and are necessary to enforce it. The present record also reflects that Section 527-restricted annual appropriated funds were likely employed to support those activities.

Take for instance certain expenditures required to promulgate the January 8 policy. The Court has determined that officials and offices at DHS, such as the Secretary's office, DHS legal counsel, and various others, were substantially likely to have been involved in the promulgation of the January 8 policy. *See* ECF 39-1 at 1–2 (indicating the involvement of the Secretary in the issuance of the policy); ECF 49-2 ¶ 20 (stating that the "DHS Office of Legislative Affairs," the "DHS Office of Policy," and "DHS Office of General Counsel" were also likely involved in the promulgation of the policy). Further, those officials and employees undoubtedly used resources, such as "buildings," "paper," *Babbitt*, 73 F.3d at 872, and similar materials to accomplish this. At DHS, many of the relevant offices are housed under the Office of the Secretary. *See Office of the Secretary*, DHS, https://perma.cc/H9UX-XNUG. The record and other materials of which the Court takes judicial notice indicate that at the time the policy was issued, those offices were funded through DHS's annual appropriated funds. DHS's annual appropriations contain a specific appropriation for "necessary expenses of the Office of the Secretary and for executive management for operations and support," *see* FY2024 Appropriations Act, 138 Stat at 593, and DHS's own congressional budget justifications regarding this appropriation notes that it "funds the Office of the Secretary and Executive Management's (OSEM) operating salaries and expenses." DHS, *Office of the Secretary and Executive Management, Budget Overview, Fiscal Year 2026 Congressional Justification* 12 (2025), https://perma.cc/J5W5-KHCN [hereinafter OSEM Congressional Budget Justification]. The budget justification indicates offices that were likely part of promulgating the January 8 notice policy, such as the Office of the Secretary, the Office of the General Counsel, the Office of Legislative Affairs, and the Office of Strategy, Policy, and Plans, are all funded by this appropriation. *Id.* The OSEM appropriation also provides a specific appropriation for "necessary expenses of the Office of the Secretary and for executive management

for procurement, construction, and improvements." FY2024 Appropriations Act, 138 Stat. at 593. This is all consistent with the testimony of Plaintiffs' declarant that various relevant DHS offices' "salaries are funded from the 'operations and support' annual appropriation," and their "information technology systems and contracts, office supplies, utilities, and building infrastructure . . . are funded by the 'procurement, construction, and improvements' annual appropriation." ECF 49-2 ¶ 20.

The January 8 policy was also directed to and contemplated the assistance of the Chief Financial Officer of DHS. ECF 39-1 at 1–2. The Office of the Chief Financial Officer is part of DHS's Management Directorate, which is "responsible for Department-wide mission support services and oversight functions, including information technology, budget and financial management, procurement and acquisition, . . . security, [and] logistics and facilities." DHS, Management Directorate Budget Overview Fiscal Year 2026 Congressional Justification 6 (2025), https://perma.cc/44S5-4AHH [hereinafter MD Congressional Budget Justification].[7] DHS's Management Directorate is also funded through a specific appropriation in the annual appropriations process, which provides for "necessary expenses of the Management Directorate for operations and support." FY2024 Appropriations Act, 138 Stat at 594; *see also* ECF 49-2 ¶ 13

---

[7] The Court takes judicial notice of DHS's fiscal year 2026 budget justifications. "Executive agencies submit written justifications of their budget requests to the appropriations committees and subcommittees of jurisdiction in each chamber. An agency's budget justification generally consists of a detailed description of each program activity and its purpose." Cong. Rsch. Serv., R47090, *Executive Agency Justification of the President's Budget: In Brief* 3 (2025). While these congressional budget justifications date to shortly before the OBBBA was passed in July 2025, the Court views these documents as strong evidence regarding the state of funding at DHS at the present time. *See* DHS, *Congressional Budget Justification Fiscal Year (FY) 2026*, https://perma.cc/48LT-LGEJ (noting that these documents date to June 2025). First, they are entirely consistent with the testimony of Plaintiffs' declarant, the relevant appropriations acts, and DHS's other documentation regarding the organization of these offices. Further, the budget justifications appear to have been prepared with anticipation of the funding that was to come from the reconciliation process. The budget justification for ICE, for example, states that the annually appropriated funding "complements the Administration funding requested in the reconciliation bill currently under consideration in the Congress," DHS, *U.S. Immigration and Customs Enforcement Budget Overview Fiscal Year 2026 Congressional Justification* 7 (2025), https://perma.cc/432S-UAEZ, whereas the justification documents for OSEM and the Management Directorate make no mention of the reconciliation bill. *See generally* OSEM Congressional Budget Justification; MD Congressional Budget Justification.

(noting that the Office of the Chief Financial Officer is funded as part of DHS's Management Directorate, and that this funding is also provided through annually appropriated funds).

The record thus reflects that various offices and employees involved in promulgating the notice policy are funded through DHS's annual appropriations, to which Section 527 attaches. There is also evidence that funds used to enforce the policy were paid for by annual appropriations rather than any other funds. For example, the Court finds it likely that DHS officials in the Office of the Secretary and its subdivisions are also involved in enforcing the policy, given that the January 8 notice requirement assigns to the Secretary the sole authority to approve exceptions from the notice requirement. ECF 39-1 at 2. While the Court views the uses of Section 527-restricted appropriated funds by DHS sufficient to render the policy problematic, the Court notes that these issues appear to extend to ICE's use of funds as well. Take the ICE Office of Congressional Relations, which is heavily involved in enforcing the policy, including by approving, scheduling, and denying visit requests. *Id.* Plaintiffs have presented evidence that shows that OCR was operating with annually appropriated funds as late as February 2, 2026, about a month after the January 8 policy was implemented. On February 2, while appropriated funds were lapsed, Plaintiff Representative Torres' staff sent an email to OCR following up on a request to visit an ICE facility. ECF 57-1 at 5–10. ICE's response stated that OCR was "unable to return emails or telephone calls" "[d]ue to the current federal funding hiatus," and would "return to duty once appropriations are restored." *Id.* at 10. When questioned about this issue at the February 12 hearing on Plaintiffs' stay request, Defendants did not contest Plaintiffs' factual contention that OCR was, even to that date, operating with annually appropriated funds. The annual appropriation for ICE contains an appropriation for "necessary expenses of [ICE] for operations and support." FY2024 Appropriations Act, 138 Stat. at 598. While it is not clear from ICE's FY 2026 congressional

budget justification whether this funding was going to be used for ICE OCR, Plaintiffs' declarant claims that ICE OCR is "funded through annual appropriations," ECF 49-2 ¶ 21, a conclusion which is supported by the fact that OCR was claiming it had ceased functioning during the lapse of appropriated funds.

Finally, the language of the January 8 memorandum supports Plaintiffs' contention that at the time the new policy was issued and first implemented, DHS and ICE had not attempted to ensure that only OBBBA-funded resources were employed. Indeed, the language of the January 8 memorandum anticipates that the steps taken to ensure DHS and ICE's compliance with Section 527 are largely prospective. The memorandum states that DHS and ICE officials "shall ensure"— not *have* ensured—"appropriate funding for the promulgation" and "implement[ation] and "enforce[ment]" of the policy." ECF 39-1 at 2. The Court finds on this record that it is substantially likely that Section 527-restricted annual appropriated funds were used for promulgating and enforcing the January 8 notice policy.

### (b) The Purpose Statute Undermines Defendants' Proposed Methods to Cure Their Uses of Section 527 Funds.

Perhaps acknowledging these factual difficulties, Defendants have not seriously attempted to argue that DHS and ICE ensured that only OBBBA-funded resources were employed when promulgating and first implementing the January 8 policy. Instead, they proffer legal arguments for why even if the facts were as Plaintiffs claim, Defendants' actions would not represent a violation of Section 527. In Defendants' view, any such violations could be fixed through back-end accounting, through which DHS tracks the relevant expenditures and cures the use of Section 527 funds, either by reassigning incurred (but as of yet unpaid) financial obligations to the OBBBA appropriations, or, assuming that the annual appropriation account had been charged, otherwise adjusting accounts by the end of the fiscal year. ECF 50 at 22–27. Plaintiffs dispute Defendants'

ability to take such steps under principles of appropriations law. *See* ECF 49-1 at 33–38. They also contest that Defendants could feasibly accomplish this task as a practical matter, given the wide range of expenditures involved in promulgating and enforcing the policy. *Id.* at 38–41.

The Parties' arguments on this point raise complex questions regarding the technical details of DHS budgeting and the application of appropriations law that the Court finds difficult to resolve on this preliminary factual record. Luckily, the Court does not need to fully address those disputes to resolve the present motion, because Defendants' proposed solution suffers from a fatal flaw: It assumes that OBBBA funds are available for all of the costs necessary to promulgate and enforce the policy. But the Purpose Statute, 31 U.S.C. § 1301(a), does not allow Defendants to use OBBBA funds for at least some of the relevant expenditures here.

The Purpose Statute commands that all "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). As a result, "all uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient." *U.S. Dep't of Navy*, 665 F.3d at 1348. Thus, for OBBBA funds to permissibly be used in service of promulgating and enforcing the notice requirement, the types of expenditures discussed previously in this opinion, *see supra* Section III.A.2.b.i, need to have been affirmatively authorized in the OBBBA. *See id.* Authorization may be express or implied. *Id.* at 1349. Implied authorization for a given expenditure may exist when the "general statutory text leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *Id.* In such cases, a reviewing Court applies the Comptroller General's "necessary expense" doctrine.[8] *Id.* To apply that doctrine

---

[8] The Comptroller General is a legislative official who heads the Government Accountability Office. *See* 31 U.S.C. § 702(b). Among other publications and opinions issued by the Office regarding appropriations-related questions and disputes, GAO publishes "its 'Red Book,' an influential guide to appropriations law and rulings cited numerous times

in this case, the Court must review the appropriations made in the OBBBA and ask whether the proposed expenditures—in this case, the various expenditures necessary to promulgate and implement the January 8 notice policy—are "necessarily incident to accomplishing" the object of the OBBBA appropriations. *Id.* However, even if the expenditure is "necessarily incident" to accomplishing the object of the OBBBA appropriation, the expenditure may still be unauthorized under the Purpose statute if it is "prohibited by law" or "otherwise provided for," *id.*, meaning that the expenditure "must not be an item that falls within the scope of some other appropriation or statutory funding scheme," GAO, *Principles of Federal Appropriations Law* (Red Book), GAO-17-797SP, at 3-17 (4th ed. 2017).[9]

To catalogue the relevant appropriations that Defendants have suggested authorize the disputed expenditures, ECF 50 at 19–20, the OBBBA appropriates hefty sums directly to ICE for the following purposes:

- "Hiring and training additional [ICE] personnel, including officers, agents, investigators, and support staff, to carry out immigration enforcement activities and prioritizing and streamlining the hiring of retired [ICE] personnel." *Id.* § 100052(1).

- "[T]ransportation costs and related costs associated with alien departure or removal operations." *Id.* § 100052(4).

- "[F]acility upgrades to support enforcement and removal operations." *Id.* § 100052(6).

The bill also appropriates funds to DHS, separately from ICE, for the following purposes:

---

by the federal courts, including . . . by the Supreme Court." Jesse M. Cross & Abbe R. Gluck, *The Congressional Bureaucracy*, 168 U. Pa. L. Rev. 1541, 1593 (2020); *Me. Cmty. Health Options*, 590 U.S. at 308–316 (extensively citing and discussing the Red Book).

[9] The GAO has framed the test's requirements as follows: (1) "[t]he expenditure must bear a logical relationship to the appropriation sought to be charged," (2) "[t]he expenditure must not be prohibited by law," and (3) "[t]he expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other appropriation or statutory funding scheme." GAO, Red Book, GAO-17-797SP, at 3-16–17. In conducting the Purpose Statute analyses in this opinion, the Court focuses on the first and third prongs of the test. The second test is not relevant here, given that the Court has found that Section 527 does not represent a freestanding substantive ban on "prevent[ing]" congressional access to ICE facilities that would prohibit OBBBA funds from being used for those purposes if they otherwise satisfied the requirements of the Purpose Act.

- "Hiring and training of additional U.S. Customs and Border Protection agents, and the necessary support staff, to carry out immigration enforcement activities." *Id.* § 100051(1).

- "[T]ransportation costs and related costs associated with the departure or removal of" noncitizens. *Id.* § 100051(2).

- "[A]ssignment of [DHS] employees and State officers to carry out immigration enforcement activities pursuant to sections 103(a) and 287(g) of the Immigration and Nationality Act." *Id.* § 100051(3).

The Court finds that at minimum, expenses undertaken by DHS's Office of the Secretary and Management Directorate in promulgating and enforcing the notice requirement, *see supra* III.A.2.b.ii.(a), are not authorized by the OBBBA appropriations. The Court has determined that various officials in the Secretary's office, DHS legal counsel, and various others, were substantially likely to have been involved in the promulgation of the January 8 policy and used various resources for those offices assigned to and paid out of annually appropriated funds. While the OBBBA makes appropriations specifically to the Secretary of Homeland Security in Section 100051, none of those appropriations can be construed to include the activities undertaken by these DHS officials. Section 100051(1) focuses on the hiring of CBP agents and their support staffs, and does not extend to the salaries, costs, and expenses of the relevant DHS offices. The same goes for Section 100051(2), which focuses on a specific purpose—transportation costs for the removal of noncitizens. Nor does the Court find that the expenditures that DHS undertook to promulgate and enforce the policy are categorized as "necessary expenses" for those appropriations under the GAO's test.

As for Section 100051(3), this is a closer issue. To begin, the Court does not view the relevant expenditures as expressly included in the appropriation providing for the assignment of DHS employees to carry out "immigration enforcement activities pursuant to sections 103(a) and

287(g)" of the Immigration and Nationality Act (INA). Given that Section 103(a), codified at 8 U.S.C. § 1103(a), provides the source of authority to the Secretary of DHS to "administ[er] and enforce[]" the immigration laws, the reference to "section[] 103(a)" in a vacuum could be construed to extend to the authorization of funding of some of the management-level actions taken by the Office of the Secretary and the Management Directorate in this case. However, the simultaneous reference in the same appropriation to section 287(g) of the INA, codified at 8 U.S.C. § 1357(g), which allows for DHS to enter into agreements that allow state or local employees to serve as "immigration officer[s]," demonstrates that the purpose of the appropriation is to provide funding for DHS employees engaging in the kinds of on-the-ground enforcement of the immigration laws contemplated by section 287(g), meaning "the investigation, apprehension, or detention of aliens in the United States," 8 U.S.C. § 1357(g), rather than the kind of management-level policymaking in question here.

Nor can the relevant expenditures qualify as "necessary expense[s]" to the 100051(3) appropriation because even if they were implicitly authorized under the appropriation, they were at the time of the issuance of the January 8 policy "otherwise provided for in another" more specific appropriation. GAO, Red Book, GAO-17-797SP, at 3-407 (noting this inquiry as the "final step of [the] . . . purpose analysis," and that this step applies even when an expense is found to be "plainly . . . available"). That "other appropriation" is DHS's annually appropriated funds. Again, DHS's annual appropriations bill provides funding for the "necessary expenses of the Office of the Secretary and for executive management for operations and support," along with a separate specific appropriation for "procurement, construction, and improvements." FY2024 Appropriations Act, 138 Stat. at 593. This appropriation plainly covers many of the offices previously discussed in this opinion. DHS's Management Directorate, similarly implicated by the

notice policy, is also funded by a specific appropriation. *Id.* at 594. "It is a well-settled rule that even where an expenditure may be reasonably related to a general appropriation, it may not be paid out of that appropriation where the expenditure falls specifically within the scope of another appropriation." GAO, Red Book, GAO-17-797SP, at 3-407.

Finally, the Court also does not find that the appropriations to ICE in the OBBBA Section 100052 can support the various expenditures associated with the above-discussed DHS officials' involvement with the promulgation and enforcement of the notice requirement. Given that Section 100052 of the OBBBA appropriates funds to ICE alone, the appropriation cannot be construed as expressly or implicitly appropriating funds to the DHS offices and officials discussed above. And again, attempts to fund the DHS offices and officials in question would fail under appropriations principles given that they are provided for in their more specific appropriation.[10]

As a result, the Court agrees with Plaintiffs that, even assuming that Defendants had the logistical ability to transfer the costs of promulgating and enforcing the notice requirement between annually appropriated funds and the OBBBA appropriations, the Purpose Statute would prohibit Defendants from doing so because not all of those costs are authorized for payment under the OBBBA appropriations.

---

[10] The OBBBA also appropriates funds to DHS for "reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States." § 90007, 139 Stat. at 361. Defendants do not argue that this provision is a source of funding for the various expenditures involved with the notice requirement, *see* ECF 50 at 19–20 (citing various other provisions, but not § 90007), and the Court also does not view this section as authorizing funding for the expenditures in dispute here. According to Plaintiffs' declarant, the term "'reimbursement of costs' in this context refers to funds that may 'reimburse' existing DHS annual appropriations, which are available for other specified purposes." ECF 49-2 ¶ 16(b). The Court thus agrees with Plaintiffs' interpretation of Section 90007 that the reimbursement of costs contemplated by the provision extends only to reimbursement of costs that could be permissibly incurred under DHS's annual appropriations. DHS's annual appropriations were, of course, restricted by Section 527 which prohibited funding for the activities in question.

### c. The January 8 Notice Policy is Contrary to Law and the February 2 Memorandum Does not Change that Conclusion.

To sum up the Court's determinations regarding the January 8 notice policy: The Court has found that expenditures necessary to promulgate and enforce the notice policy—including actions taken by and resources used by DHS leadership and management staff—were highly likely to have been funded by Section 527-restricted appropriations. Further, it is substantially likely under the Purpose Statute that the OBBBA does not provide funding for these categories of expenditures, meaning that DHS could not use OBBBA funds to either remedy the use of Section 527-restricted funds after the fact, or, although it appears Defendants did not do so, use OBBBA funds to take the steps it did in the first instance. Because the record reflects that at least some Section 527-restricted funds were used in promulgating and enforcing the policy, and that Defendants' only other available source of funds may not be used to remedy that violation, the January 8 notice policy is contrary to law.

Secretary Noem's February 2 memorandum does not affect that conclusion. Recall that this memorandum was issued while DHS appropriated funds had lapsed between January 31 and February 3. The memorandum stated that Secretary Noem was "issu[ing] [a] new policy that is identical in substance to the January 8 access policy," and noted the Secretary's view that "Section 527 is not currently in effect." ECF 55-1 at 2. At the February 12 hearing on Plaintiffs' stay motion, Defendants' counsel represented that the February 2 memorandum was not a "new" policy, but merely a "ratification" of the January 8 policy. Hr'g Tr. 40:17–20, 41:7–19. Because the funds to which the Section 527 rider were lapsed at that time, Defendants appear to view the issuance of the February 2 memo as curing any concerns the Court has about whether the promulgation of the January 8 policy was contrary to law. ECF 55 at 10; Hr'g Tr. 38:11–15. This seems to be both because of their view that the Section 527 rider did not restrict the DHS Secretary's actions during

the lapse and because, while the annual appropriation was lapsed, OBBBA funds were necessarily used for the issuance of the memorandum.

First, the Court has doubts regarding the legal effect, if any, of the February 2 memorandum given the obvious tension between Defendants' claims that the memorandum is both a fresh repromulgation of the notice requirement and simultaneously not a new policy that must be addressed through an amended or supplemental pleading. Second, assuming that the February 2 memorandum counts as a repromulgation of the policy, the Court does not view the repromulgation to change the outcome here. As a result of the Purpose Statute analysis, the Court has found that the kind of activities that the Secretary purported to engage in on February 2 related to the notice requirement are not the kinds of activities that may be funded by the OBBBA.[11] And, as a factual matter, the record indicates that the Office of the Secretary is presently funded through annual appropriations. Defendants argue that nevertheless, because appropriated funds had lapsed, the "legally logical[] necessary conclusion" is that OBBBA funds were being used for DHS activities during the lapse because DHS "only had access to one" set of funds. Hr'g Tr. 39:5–8. But it is not accurate to say that, because appropriated funds had lapsed, Reconciliation Act funds must have

---

[11] The Court also finds that its Purpose Act holding that OBBBA funds could not pay for the DHS activities in question is also not altered by the existence of a lapse in appropriations on February 2. In the Court's view, the only way that a lapse could conceivably affect the analysis is by altering the third step of the "necessary expense" analysis of whether the putative expenditures "fall within the scope of another appropriation or funding source." *Bd. of Directors*, B-330693, 2019 WL 4942499 at *3 (Comp. Gen. Oct. 8, 2019). The GAO has rejected this proposition, on the principle that "where general and specific appropriations are both available for a given expenditure, the agency must use the specific appropriation for that expenditure to the exclusion of the more general appropriation." *Id.* at *4. GAO has previously applied this specifically in the case of a lapse of funds at the Federal Deposit Insurance Corporation (FDIC). *See generally id.* In that case, a government shutdown had led to the lapse of funds at the FDIC's Office of Inspector General (OIG), which was funded through a specific appropriation, while other components of the FDIC were funded through the deposit insurance fund (DIF). *Id.* at *4. Even though providing money to the OIG through the DIF satisfied the first two steps of the "necessary expense[]" test, GAO found that doing so nevertheless was impermissible because Congress had long funded OIG through its own, more specific appropriation. *Id.* GAO found that this was the case even though OIG's specific appropriation had lapsed and no funds were at the time available for OIG to operate. *Id.* at *5 ("[D]uring a lapse in appropriations, FDIC's general authority to incur obligations against the DIF remains unavailable to FDIC OIG, just as such authority has been unavailable to FDIC OIG in every fiscal year since FY 1998.").

36

been used during that period. As DHS's own guidance recognizes, during a government shutdown, functions and activities may continue if they are either "exempt" or "excepted." DHS, *Procedures Relating to a Lapse in Appropriations* 4 (2025), https://perma.cc/66L7-65HM. "Exempt" functions and activities are funded by appropriations that "have neither lapsed nor been exhausted"—for example, the OBBBA. *Id.* In contrast, "excepted" functions and activities are funded by "lapsed . . . appropriations" (e.g. annual appropriations) "which may nonetheless continue because the function or activity by law[] may continue to be performed during a lapse in appropriations." *Id.*

Given the restrictions on OBBBA funding and the fact that the Office of the Secretary is funded through the annual appropriations process, the Court finds on this record that the logical conclusion is not that the Office of the Secretary was using OBBBA funds, but that it was acting in an excepted status while the February 2 memorandum was issued and working pursuant to the lapsed appropriation.[12] But as Defendants previously acknowledged in this litigation, an agency that continues work on excepted functions during a lapse in appropriations is not simply working with a blank check, legally or financially: The agency is funding its activity by "incur[ring] obligations in advance of [future] appropriations." ECF 32-1 ¶ 6. Those obligations must eventually be retroactively funded and approved by Congress, which is what happened here: On February 3, 2026, Congress passed a continuing resolution that "ratified and approved" "[a]ll obligations incurred and in anticipation of the appropriations made and authority granted by" the continuing resolution. Consolidated Appropriations Act, 2026, div. H, § 104, 140 Stat. at 629.

---

[12] Further supporting the notion that the Office of the Secretary and related offices continued to be funded through the annual appropriations process, even after the passage of the OBBBA, is DHS's own guidance issued in September 2025 regarding procedures to be followed in the case of a lapse of appropriations. That guidance indicates that the Office of the Secretary and Executive Management had approximately 1,060 employees prior to a lapse in appropriations and estimated that only 158 employees would be working during a lapse of appropriations. DHS, *Procedures Relating to a Lapse in Appropriations* 35.

However, the continuing resolution only approved expenditures "if otherwise in accord with the provisions of" the continuing resolution, which contains the Section 527 rider. *Id.* Because the Secretary's actions in allegedly repromulgating the policy were eventually funded by appropriations which ultimately included the Section 527 restriction (through incorporation by reference to the prior appropriations bill), the Court does not view the memorandum as curing the Court's concerns regarding the policy's promulgation.

Defendants also raise the fact that DHS's annual appropriated funds again lapsed on February 14, 2026. The Court does not view this as an obstacle to Plaintiffs' likely success on the merits of their challenge to the January 8 notice policy, which is not only premised on how it has and will be enforced, but also includes a backwards-looking challenge addressing how it was promulgated—i.e., challenging actions that took place while Section 527 was fully in force (both on January 8 and again on February 2 in light of the continuing resolution passed on February 3). Plaintiffs' challenge asks whether the agency, at the time it made its decision, acted impermissibly under governing law. The fact that appropriated funds have now lapsed does not mean that Section 527 has been repealed or wiped off the books, or otherwise did not impose a limitation on the agency in January and early February 2026. The present record shows that it is likely that Section 527-restricted funds were used to promulgate the policy, a finding which, if confirmed at the end of merits litigation, would provide a sufficient basis to vacate and set aside the agency's actions. *See* 5 U.S.C. § 706(2)(C) (requiring a reviewing court to "hold unlawful and set aside agency action" found to be "in excess of statutory . . . authority[] or limitations"). That same finding would justify granting preliminary relief in the form of a Section 705 stay, as the Court does here.

*        *        *

Throughout this litigation, Defendants have emphasized the vast amount of money appropriated to DHS and ICE under the OBBBA. The Court agrees that these funds are indeed staggering. But the power of the purse rests with Congress, and even a deep-pocketed agency must comply with Congress's restrictions on the permissible uses of appropriated funds. *See Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion."); *U.S. Dep't of Navy*, 665 F.3d at 1348. When Section 527 says that "[n]one" of DHS's annually appropriated funds may be used for a prohibited purpose, it means none. § 527, 138 Stat. at 619; *see* Stith, *supra*, at 1362 ("[T]here is no de minimis exception to appropriation limitations, just as there is no de minimis exception to the constitutional appropriations requirement."). Defendants' likely inability to promulgate and enforce a notice policy in the manner they currently desire is not a question of, as Defendants portray it, having "Section 527 . . . negate and override Congress's later decision to make millions of dollars available to DHS." ECF 50 at 23. And Defendants continue to act as if the OBBBA appropriations expressly authorized them to impose notice requirements on Members of Congress, when the statute is in fact altogether silent on this question. The legal infirmities with the notice policy are a function of how DHS is structured and how Congress has decided to provide for its operations, including by funding significant decisionmaking portions of the agency through annual appropriations. *See Babbitt*, 73 F.3d at 872 (finding that an appropriations rider prevented the Secretary of the Interior himself from taking action otherwise required by law). Defendants may disagree with those choices, but they are obliged to respect those decisions.

The Court thus finds that Plaintiffs are likely to succeed on the merits of their claim that the January 8 version of the notice policy is contrary to law and in excess of DHS's statutory authority.[13]

### B. Plaintiffs Have Demonstrated Irreparable Harm.

Success on the merits of Plaintiffs' claim will not alone justify preliminary relief. Plaintiffs must also establish that they face irreparable injury absent relief. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

The Court previously found that the policy imposes irreparable harm upon the Plaintiffs in denying them the ability to carry out timely oversight of covered facilities. *Neguse*, 2025 WL 3653597, at *30. As the Court found in the first opinion, Plaintiffs continue to demonstrate a significant need for real-time, on-the-ground information about conditions in facilities, the status of detainees, and Defendants' practices. *Id.* The record continues to reflect that the information to be gained from such visits is inherently time-sensitive, and that it is not speculative that the relevant conditions in the facilities could change over the course of the seven-day notice period. *Id.* The Court sees no reason to revise its prior conclusion, which also extends to Representative Morrison, who was not a Plaintiff at the time of the original opinion, but whose declarations reflect that the harm she suffers is also irreparable like those of her co-Plaintiffs. *See* ECF 49-13 ¶¶ 35–46. If anything, the strength of the Court's irreparable harm finding has become even greater over the

---

[13] Having found that the January 8 policy is likely contrary to law under the APA, and (as discussed below) found that this likely violation justifies a stay of the policy, the Court finds it unnecessary to address Plaintiffs' separate claim that the January 8 policy violates the APA as arbitrary and capricious agency action.

intervening months, given that ICE's enforcement and detention practices have become the focus of intense national and congressional interest. Accordingly, Plaintiffs have shown that they suffer irreparable harm due to the January 8 notice policy and this factor weighs in their favor.

### C. The Equitable Factors Support Preliminary Relief.

As before, the public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs limited preliminary relief. The Court's prior reasoning on this issue fully applies here and addresses the majority of Defendants' objections on this point. *See Neguse*, 2025 WL 3653597, at *30–31. To address Defendants' new contentions, the Court acknowledges that the federal government has an interest in providing for adequate safety measures on federal property. *See* ECF 55 at 16 (citing *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *11 (D.C. Cir. Dec. 17, 2025)). However, Defendants have presented no record evidence, aside from Secretary Noem's suggestion in her memorandum that congressional visits create a "chaotic environment with heightened emotions," ECF 39-1 at 2, demonstrating that congressional visits without the notice policy are causing Defendants harm, let alone harm sufficient to outweigh the public interests in ending the perpetuation of unlawful agency action and ensuring that the statutes enacted by Congress are "not imperiled by executive fiat," *see Neguse*, 2025 WL 3653597, at *30 (citing *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019)). As for Defendants' argument that the Court should decline to rule given the pendency of ongoing negotiations in Congress regarding the status of DHS appropriations funding, ECF 50 at 33, the Court disagrees. This case—which regards statutes previously passed by Congress and how they apply to DHS and ICE—is not the type of dispute that must be "resolved through the process of negotiation and accommodation between the political branches rather than through the judicial system." *Neguse*, 2025 WL 3653597, at *31.

**D. The Court Stays the January 8 Notice Policy Under Section 705 of the APA.**

All the factors support a grant of preliminary relief. Plaintiffs ask the Court not only to exercise its power under 5 U.S.C. § 705 to "postpone the effective date" of the January 8 policy, but to issue additional relief necessary to "preserve status or rights pending conclusion of the review proceedings," including that the Court order that "Defendants may not enforce, implement, extend, or give effect to any policy, under any name, that alters the status quo that existed prior to June 2025 by requiring [M]embers of Congress to provide advance notice before conducting oversight visits." ECF 57 at 12–13. Plaintiffs also ask that the Court order that Defendants be required to provide any new or modified policy to the Court before doing so. *Id.* at 13.

The Court will stay the January 8 policy under Section 705, which necessarily includes a stay of the February 2 purported "ratification" of the January 8 memo, ECF 55-1, but will decline at this time to order the additional relief that Plaintiffs request. The Court acknowledges that Section 705's language regarding the Court's ability to "issue all necessary and appropriate process . . . to preserve status or rights" could be interpreted to allow the Court to fashion a stay beyond simply "postpon[ing] the effective date" of the January 8 memorandum. 5 U.S.C. § 705. But the Court finds that staying the policy alone provides Plaintiffs relief sufficient to return the Parties to the status quo which existed before the notice requirement was instituted. Plaintiffs' lawsuit challenges a specific agency decision: the January 8 memorandum. Issuance of a Section 705 stay will function as a "temporary form of vacatur," in that it "suspends the legal source of authority to act," *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.), and thus deprives the memorandum "of enforceability," *Nken*, 556 U.S. at 428. Plaintiffs will be back in the same place they were before the notice policy was enacted, and Defendants will be prohibited from enforcing that policy.

Plaintiffs are undoubtedly frustrated with Defendants' repeated attempts to impose a notice requirement. But in taking further action, Defendants are required to abide by the terms of the Court's order and act consistently with the legal principles announced in this opinion. The Court has found that OBBBA funds cannot be used to fund various DHS activities that were undertaken to implement this policy. The Court has also found that, on this record, in any lapse of appropriations, the DHS executive management offices discussed in this opinion are likely to be operating by incurring obligations in advance of Congress's next appropriations bill. Their expenditures of funds must necessarily be consistent with that bill and any limitation riders contained within it, lest they violate those riders, the Purpose Statute, and the Anti-Deficiency Act.

Finally, the Court denies Defendants' request that the Court issue a stay of its order pending appeal. ECF 55 at 17. None of the factors weigh in favor of a stay. *See Nken*, 556 U.S. at 426 (listing the relevant factors). As for a likelihood of success on the merits, while the Court acknowledges that this iteration of the litigation raises complex legal and factual issues regarding appropriations law—issues that will likely benefit from a more developed record in the case— Defendants' failure to prevail on their arguments regarding the merits at this stage indicates that they will also be unlikely to prevail on the merits of their appeal. Defendants have also not shown that they are irreparably harmed by the failure to grant a stay. Defendants point to the need to protect federal facilities and property, but during the pendency of this litigation, Defendants have not cited any concrete examples of safety issues posed by congressional visits without advanced notice, let alone the significant harm necessary to justify a stay of the Court's order. The Court's order is targeted to one specific measure that Defendants have taken with regard to these facilities—the notice policy. It does not affect any other measures that Defendants have provided for the safety and security of visitors, ICE employees, or detainees. ECF 57-2 at 8–10 (listing

various other visitor requirements). If DHS is concerned about "circus-like publicity stunts," ECF 39-1 at 2, a notice requirement does not prevent those—a publicity stunt can still happen after a seven-day delay. Defendants' claim of irreparable harm from the Court's decision in this case is also undermined by Defendants' decision not to appeal the Court's prior opinion, which resulted in a similar outcome with respect to allowing Members' visits to DHS facilities. As to the equitable factors, the Court has already held that they clearly favor the *Plaintiffs'* stay of the challenged agency action, rather than Defendants' stay of the Court's order. Each factor weighs against granting Defendants a stay pending appeal.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 49, is **GRANTED**. The challenged January 8 notice policy, including the purported ratification on February 2, is **STAYED** pending conclusion of these review proceedings, and the temporary restraining order entered by the Court on February 2, 2026, ECF 52, is hereby dissolved.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: March 2, 2026